## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KASIM KURD, STEPHEN ARTHUR, )
HEEWA ARYA, personally and on behalf of )
his minor child C.A., C.A., a minor by her )
guardian HEEWA ARYA, ABBAS AZIZI, )
CEREN BORAZAN, JANE DOE I, JANE )
DOE II, JANE DOE III, ELIF GENC, RUKEN )
ISIK, JALAL KHEIRABADI, MEHMET )
ÖZGEN, MEHMET TANKAN, and MURAT )
YASA. )
)
Addresses redacted pursuant to Court Order. )
Plaintiffs can be reached at: )
c/o Cohen Milstein Sellers & Toll PLLC )    **FIRST AMENDED COMPLAINT**
1100 New York Avenue, NW )
Washington, DC 20005 )
)
Plaintiffs, )
)    Civil Action No.: 1:18-cv-1117-CKK
v. )
)
THE REPUBLIC OF TURKEY )
c/o Turkish Ministry of Foreign Affairs )
Dr. Sadik Ahmet Cad. )
No:8 Balgat /Ankara, Turkey 06100 )
)
c/o Ministry of Justice )
General Directorate of International Law and )
Foreign Relations )
Adalet Bakanlığı Ek Binası )
Namık Kemal Mah. Milli Müdafaa Caddesi )
No:22 Çankaya /Ankara, Turkey )
)
AHMET CENGIZHAN DERECI )
Address unknown )
)
ALPKENAN DERECI )
81 Winston Park Blvd )
North York, ON M3K 1C2 )
Canada )
)
MAHMUT SAMI ELLIALTI )
Address unknown. )
)
)

SINAN NARIN                              )
1513 Lincoln Way Unit 304A              )
McLean, VA 22102-5808                   )
                                        )
EYUP YILDIRIM                           )
3 Overlook CT                           )
Manchester, NJ 08759-5680              )
                                        )
MOE DEFENDANTS 1-20.                    )
                                        )
                    Defendants.         )
                                        )

## I.    <u>INTRODUCTION – NATURE OF THE ACTION</u>

1.      On May 16, 2017, peaceful demonstrators – including parents with young children and local business owners – stood in Sheridan Circle, on Embassy Row in Washington, D.C., across the street from the Turkish Chief of Mission's residence.  The demonstrators were peacefully expressing opposition to human rights abuses by Defendant Republic of Turkey against the Kurds, an ethnic minority facing persecution in that country.  Suddenly, Turkish security officials pushed past U.S. law enforcement officers to attack and silence the demonstrators, repeatedly punching and kicking defenseless people.  One woman was beaten so severely she lost consciousness and had a seizure.  Plaintiffs seek to hold Turkey accountable for this outrageous violation of United States, District of Columbia, and international law.

## II.    <u>JURISDICTION AND VENUE</u>

2.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1330 and 28 U.S.C. § 1605(a) as money damages are sought from a foreign state for personal injury occurring in the United States and caused by the tortious act or omission of that foreign state and of officials or employees of that foreign state acting within the scope of their office or employment; 28 U.S.C. § 1350, the Alien Tort Statute, as certain Plaintiffs are aliens who bring claims for torts in violation of the law of nations; and 28 U.S.C. § 1367, supplemental jurisdiction, as the remaining claims form part of the same case or controversy.

3.      This Court has personal jurisdiction over Defendants under 28 U.S.C. § 1330(b) and D.C. Code § 13-423(a), as a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's causing tortious injury in the District of Columbia by an act or omission in the District of Columbia.

4.      Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(2), (f)(1) and (f)(4) as a substantial part of the events or omissions giving rise to this claim occurred within the District of Colombia.

## III.    PARTIES

### Plaintiffs

5.      Kasim Kurd is a citizen of the United States and a resident of New York.  He is a small business owner.  He is married and has two young children. Mr. Kurd is of Kurdish heritage. On May 16, 2017, he traveled to Washington, D.C. with friends to participate in a peaceful demonstration against the human rights abuses of the regime of Turkish president Recep Tayyip Erdogan.

6.      Stephen Arthur is a citizen of the United States and a resident of Baltimore, Maryland.  He works for a U.S. government contractor. On May 16, 2017, he attended the demonstration in Washington, D.C. to express his opposition to the Erdogan regime's treatment of its own people, particularly the Kurds, and to protest Turkey's policies in Syria and Iraq.

7.      Heewa Arya is a citizen of the United States and a resident of Fairfax, Virginia. He is married and works at a local university.  On May 16, 2017, Mr. Arya attended the demonstration with his then-seven-year-old daughter, whom he carried on his shoulders.  Mr. Arya, who is of Kurdish heritage, was there to express his opposition to Turkey's mistreatment of the Kurds.

8.      C.A. is a citizen of the United States and a resident of Fairfax, Virginia. This action is brought on her behalf by her father, Plaintiff Heewa Arya.  C.A. is now eight and was seven when she attended the demonstration with her father.

9.      Abbas Azizi is a citizen of the United States and a resident of Springfield, Virginia. Mr. Azizi is 62-years old. He is of Kurdish heritage. He worked for many years as a U.S.

government contractor.  On May 16, 2017, he attended the demonstration in Washington, D.C. to express his opposition to Turkey's treatment of Kurdish people and to Turkey's foreign policy.

10.     Ceren Borazan is a lawful permanent resident of the United States and a resident of Alexandria, Virginia.  Ms. Borazan is of Kurdish heritage. On May 16, 2017, Ms. Borazan was a student at a community college in New Jersey.  She went with friends to participate in the demonstration in Washington, D.C. against the persecution of Kurdish people in Turkey.

11.     Jane Doe I is a citizen of Turkey.  She is a graduate student. On May 16, 2017 she traveled to Washington, D.C. to participate in a peaceful demonstration against the Erdogan regime's policies and practices against the Kurds.

12.     Jane Doe II is a citizen of the United States and a resident of New York City. She works for the City of New York. Jane Doe II is a Kurdish woman. On May 16, 2017, she attended the demonstration in Washington, D.C. with friends to express her opposition to the policies and practices of President Erdogan.

13.     Jane Doe III is a citizen of Turkey. She is of Kurdish heritage. On May 16, 2017 she was in Washington, D.C. and attended the demonstration to express her opposition to the mass arrests of mayors, members of parliament, and journalists by the Erdogan regime and to protest the Erdogan regime's destruction of Kurdish towns.

14.     Elif Genc is a Canadian citizen. She is a graduate student in New York City, pursuing her doctorate.  Ms. Genc is of Kurdish heritage. She traveled to Washington, D.C. on May 16, 2017 to protest human rights abuses committed against the Kurds.

15.     Ruken Isik is a legal permanent resident of the United States and a resident of Rockville, Maryland.  Ruken Isik is of Kurdish heritage. She is married, with two children.  She is a graduate student, pursuing her doctorate and working as a graduate assistant. On May 16,

2017, she attended the demonstration in Washington, D.C., to express her opposition to human rights abuses by the Erdogan regime, including the imprisonment of Kurdish political leaders, journalists, and students.  She brought her then four-year-old son in a stroller.

16.     Jalal Kheirabadi is a citizen of the United States and a resident of Fairfax, Virginia. Mr. Kheirabadi has a seven-year-old son and runs his own business as an electrician. He is of Kurdish heritage. On May 16, 2017, Mr. Kheirabadi attended the demonstration in Washington, D.C. to express his opposition to Turkey's military operations, which have resulted in the deaths of Kurdish people.

17.     Mehmet Özgen is a lawful permanent resident of the United States and a resident of River Edge, New Jersey.  He works as an editor. Mr. Özgen attended the demonstration in Washington, D.C. on May 16, 2017 to express his opposition to the persecution of Kurdish people, the arrests of academics and journalists, and the fact that Turkey has become increasingly undemocratic.

18.     Mehmet Tankan is a lawful permanent resident of the United States and a resident of Arlington, Virginia.  Mr. Tankan owns a small pizza restaurant. Mr. Tankan is of Kurdish heritage. On May 16, 2017, Mr. Tankan attended the demonstration to protest the Erdogan regime's treatment of Kurds and destruction of Kurdish communities.

19.     Murat Yasa is a citizen of the United States and a resident of Great Falls, Virginia. He is 61-years old and an ethnic Kurd. He owns and operates a flooring, counter and carpentry business.  On May 16, 2017, Mr. Yasa attended the demonstration in Washington, D.C. to express his opposition to President Erdogan, the regime's oppression of Kurdish people and the imprisonment of Kurdish civil society leaders.

**Defendants**

20.    Defendant Republic of Turkey is a foreign state. At all times relevant herein, and currently, Turkey's president is Recep Tayyip Erdogan.  At all times relevant herein, Turkey acted through and is responsible for the tortious acts or omissions of its officials or employees acting within the scope of their office or employment.  In this case, Turkey's officials and employees include, but are not limited to, President Erdogan; Serdar Kilic, the Turkish Ambassador to the United States; Turkey's Foreign Minister, Mevlut Cavusoglu; Turkey's officials and staff including security personnel who accompanied the President and the Foreign Minister on their trip to Washington, D.C.; members and staff of Turkey's diplomatic mission in the U.S.; and other officials and employees who oversaw, directed, or participated in attacking Plaintiffs on May 16, 2017.

21.    Ahmet Cengizhan Dereci is a Canadian citizen.  On May 16, 2017, Mr. Dereci was in Washington, D.C. and participated in attacking Plaintiffs and other peaceful protesters in front of the Turkish Chief of Mission's residence (the "Residence").  Mr. Dereci was wearing a purple shirt and khaki-colored pants during the attack.  Mr. Dereci was indicted for various bias-related (hate) crimes in connection with the attacks.[1]

22.    Alpkenan Dereci is a Canadian citizen.  On May 16, 2017, he was in Washington, D.C. and participated in attacking Plaintiffs and other peaceful protesters in front of the Residence. Mr. Dereci was wearing a yellow shirt during the attack.

---

[1] As discussed further below, on August 29, 2017, an indictment was returned in the Superior Court of the District of Columbia against fifteen Turkish security officials and four civilians (all four civilians are defendants in this action), for their participation in the attack. (Crim. Nos. 2017 CF3 10331, et seq.) (the "Indictment").

23.     Mahmut Sami Ellialti is a Canadian citizen.  Mr. Ellialti was in Washington, D.C. on May 16, 2017 and participated in attacking Plaintiffs and other peaceful protesters in front of the Residence.  Mr. Ellialti was indicted for various bias-related (hate) crimes in connection with the assault.

24.     Sinan Narin is a United States citizen.  On May 16, 2017, Mr. Narin participated in attacking Plaintiffs and other peaceful protesters in front of the Residence. Mr. Narin was wearing a suit during the attack.  Mr. Narin was charged with a number of bias-related (hate) crimes.  He pled guilty to an assault charge and served time in prison.

25.     Eyup Yildirim is a citizen of the United States.  On May 16, 2017, Mr. Yildirim participated in attacking Plaintiffs and other peaceful protesters in front of the Residence.  Mr. Yildirim also was charged with bias-related (hate) crimes.  He pled guilty to assaulting Plaintiff Murat Yasa and served time in prison.

26.     Plaintiffs are ignorant of the true names and capacities of the Defendants who are sued herein as Moe Defendants 1-20. Plaintiffs will amend this Complaint to allege the Moes' true names and capacities once they can be ascertained. Plaintiffs are informed and believe, and on that basis allege, that each fictitiously named Moe 1-20 Defendant was proximately responsible for the events and happenings alleged in this complaint and for Plaintiffs' injuries and damages.

## Other Relevant Actors

27.     Turkish security officials participated in the attack against Plaintiffs and other peaceful protesters in front of the Residence.  Some of the Turkish security officials wore dark suits, with the men wearing ties.  Others wore military-style khaki pants and olive-green jackets. At least some security officials wore earpieces, were armed with handguns, and wore Turkish breast pins and lanyards with identification cards.

28.     On May 16, 2017, the Turkish security officials were officials or employees of Defendant Turkey.  Their tortious acts at the protest were committed within the scope of their office or employment.

29.     Fifteen Turkish security officials were indicted for conspiring and/or participating in the attack.  According to the Indictment, the following Turkish security officials wearing a suit and tie were indicted: Turgut Akar, Yusuf Ayar, Ismail Dalkiran, Servet Erkan, Tugay Erkan, Ahmet Karabay, Muhsin Kose, Lutfu Kutluca, Mustafa Murat Sumercan, and Gokhan Yildirim. Feride Kayasan, a female Turkish security official who was wearing a suit, was also indicted.  The following Turkish security officials wearing military-style khaki pants and olive green jackets were indicted: Harrettin Eren, Ismail Ergunduz, Mehmet Sarman, and Hamza Yurteri.

## IV.     STATEMENT OF FACTS

### A.     Background

#### 1.     Peaceful Protest Is Protected by the United States Constitution

30.     In 1988, the United States Supreme Court upheld the right to picket and criticize a foreign government on the sidewalk in front of a foreign embassy, holding that "We have recognized that the First Amendment reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open'" and reaffirming "the central importance of protecting speech on public issues." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (citing *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

31.     That case involved two groups of individuals, one group who wished to carry signs and protest the treatment of dissidents by the former Soviet Union and another group who wished to display a sign reading "stop the killing" at the Nicaraguan Embassy in order to protest the policies of that government.

32.     Since that time, and even before, Embassy Row in Washington, D.C., has been the site of robust protests, pickets, and demonstrations on a variety of issues.

33.     For example, during one summer, demonstrators gathered at the Embassy of Myanmar and called on that government to stop the violence and oppression of the Rohingya community.  Two weeks later, roughly 100 protestors gathered outside the Russian Embassy to protest the jailing, in Russia, of the members of the punk rock band Pussy Riot. A solitary man outside the Vatican Embassy continued his longstanding protest against the Catholic Church, where he has for years held a sign decrying child sex abuse.  Indian-Americans gathered outside the Pakistani Embassy to protest the treatment of a jailed Indian national.  Demonstrators outside the Qatari Embassy protested against the persecution of Christians.

34.     Washington, D.C. has also, of course, hosted mass demonstrations in support of civil rights, voting rights, women's rights, and against the Vietnam War, as well as by high school students calling for an end to gun violence in schools.

35.     In many instances, as in the protest in this case, the demonstrators come from all walks of life.  They are young and old, students as well as business people, and often include parents who bring their children to participate in exercising rights guaranteed by the United States Constitution.

36.     The Plaintiffs' right to peaceful protest was well-established.

### 2.     <u>The Deterioration of Human Rights Under the Erdogan Regime</u>

37.     Plaintiffs came to Washington, D.C. to protest the human rights abuses of the Erdogan regime, an activity protected by the First Amendment.

38.     The United States, human rights groups, and international organizations have long criticized the government of President Erdogan for the failure to respect human rights, including the freedom of speech, association, and assembly.

39.    This repression has only worsened in recent years following an attempted coup on July 15, 2016.  The Erdogan regime responded to the coup by declaring a state of emergency and putting in place policies and procedures to restrict fundamental freedoms. Tens of thousands of individuals, including journalists and academics, have been detained, and thousands of civil servants and judges have been fired, which, according to the United States Acting Secretary of State, has "undermined the rule of law."[2] According to Human Rights Watch, there has been an "alarming deterioration of rights."[3] This deterioration has been condemned worldwide, including by human rights organizations, and regional and international organizations.

40.    The Erdogan regime has used its state of emergency powers to crack down on criticism of the state. For example, the most recent United States Department of State Country Report on Human Rights Practices[4] reports that Turkey prosecuted almost 4,000 persons on charges related to insulting the president in 2016. The Erdogan regime also closed roughly 200 media outlets.  Among the incidents catalogued by the State Department Report is the detention of members of a group calling itself Women for Peace on the grounds that their press statement insulted the Turkish state.

41.    According to the State Department, the Erdogan regime has banned protests, viewed many demonstrations as "security threats," and deployed riot police and security forces "that regularly responded with excessive force," resulting in "dozens of injuries, detentions,

---

[2] John J. Sullivan, Acting Sec'y of State, Remarks on the Release of the 2017 Country Reports on Human Rights Practices (Apr. 20, 2018).

[3] *Turkey: Alarming Deterioration of Rights*, Human Rights Watch (Jan. 12, 2017).

[4] For over 40 years, the United States Department of State has produced annual Human Rights Reports. The United States Congress mandated these reports to provide policymakers with an accurate accounting of human rights conditions in nearly 200 countries and territories worldwide, including all member states of the United Nations and any country receiving U.S. foreign assistance.

arrests, and even deaths."[5]  The State Department further found that "[a]t times, the government used its authority to detain persons before protests,"[6] and "banned many demonstrations outright if they touched sensitive issues."[7]

42.    And, most relevant to the Sheridan Circle attacks, the State Department found that "[p]ro-Kurdish demonstrations of many kinds faced violent police responses throughout the year."[8]

43.    The European Parliament passed a resolution criticizing Turkey for using the coup attempt to "stifle legitimate and peaceful opposition," preventing the "exercise of freedom of expression through disproportionate and illegal actions and measures."[9]

44.    The U.S. State Department, the European Parliament, the U.N., and human rights organizations have also expressed concern about the Erdogan Regime's misuse of terrorism charges to silence criticism. The 2017 U.S. State Department Report notes that, as of July 2017, over 55,000 people have been arrested on terror-related grounds following the coup. The European Parliament expressed concern over the Erdogan regime's abusive use of "broadly defined Turkish anti-terrorism legislation," finding it was being used "to punish citizens and media for exercising their right of freedom of expression."[10] Similarly, the United Nations High Commissioner for

---

[5] U.S. Dep't of State, Country Report on Human Rights Practices -- Turkey 2016 at 39 (2017); U.S. Dep't of State, Country Report on Human Rights Practices -- Turkey 2017 at 35, 36 (2018).

[6] State Dep't Human Rights Report Turkey 2016 at 39; State Dep't Human Rights Report Turkey 2017 at 35.

[7] State Dep't Human Rights Report Turkey 2016 at 39; State Dep't Human Rights Report Turkey 2017 at 35

[8] State Dep't Human Rights Report Turkey 2016 at 39; State Dep't Human Rights Report Turkey 2017 at 36.

[9] European Parliament Resolution of 8 February 2018 on the Current Human Rights Situation in Turkey at ¶ 1, P8_TA-PROV(2018)0040 (Feb. 8, 2018).

[10] European Parliament Resolution at ¶ 5.

Human Rights has found "respect for fundamental human rights continues to deteriorate" citing "credible reports" of "arbitrary detention of people arrested on broad allegations of links to terrorist organizations."[11] Recently, three Turkish journalists were convicted on what Human Rights Watch calls "bogus charges" and sentenced to life in prison.[12]

### 3.    The Defendants' Attack at Sheridan Circle is Endemic of Bias Against the Kurds

45.    Kurds are the largest ethnic and linguistic minority in Turkey.  The Turkish state has a long history of discrimination against and oppression of the Kurdish people.  For decades the U.S. State Department and human rights organizations, such as Human Rights Watch, have reported on the oppression faced by Turkey's Kurds and have most recently expressed concern that the Erdogan regime has used the state of emergency to further target, and persecute, the Kurdish population.

46.    Human Rights Watch reported that, as of March 2017, the Erdogan Regime had arrested thousands of members of pro-Kurdish political parties and jailed members of the pro-Kurdish democratic opposition in parliament.  Human Rights Watch examined 11 indictments issued against the pro-Kurdish Peoples' Democracy Party ("HDP") members of parliament and found that "the indictments consist mainly of political speeches rather than any conduct that could reasonably support charges of membership of an armed organization or separatism."[13]

47.    The regime also has used its state of emergency powers to remove elected officials on spurious grounds.  As of December 2016, Turkey had removed 106 elected mayors from office,

---

[11] UN High Commissioner for Human Rights, High Commissioner's Global Update of Human Rights Concerns (Mar. 7, 2018).

[12] *Turkey: Convicted for Critical Ideas*, Human Rights Watch (Feb. 16, 2018).

[13] *Turkey: Crackdown on Kurdish Opposition,* Human Rights Watch (Mar. 20, 2017).

93 of whom were from pro-Kurdish parties. As of March 2017, the Erdogan regime had taken control of all those municipalities in which the mayor removed was from a pro-Kurdish party, but allowed elected representatives to take over in municipalities in which the mayor was from another party.

48.    The U.S. State Department reports that the government has closed hundreds of Kurdish civil society organizations and that nearly all private Kurdish language newspapers, television channels, and radio stations were closed on national security grounds. The 2018 European Commission report on Turkey reported that "demonstrations relating to the Kurdish issue were prohibited on security grounds," as were "some Kurdish festivals."[14]

49.    The Office of the United Nations High Commissioner for Human Rights ("OHCHR") has "documented numerous cases of excessive use of force; killings; enforced disappearances; torture; destruction of housing and cultural heritage; incitement to hatred; prevention of access to emergency medical care, food, water and livelihoods; violence against women; and severe curtailment of the right to freedom of opinion and expression as well as political participation" in South-East Turkey, which is majority Kurdish.[15]  Focusing on the South-East, the OHCHR expressed concern that the measures taken under the state of emergency which target dissent in general and opposition political parties have been "disproportionately affecting citizens of Kurdish origin."[16]

---

[14] *Turkey 2018 Report,* European Commission: Commission Staff Working Document, 37 (Apr. 17, 2018).

[15] *Report on the Human Rights Situation in South-East Turkey* at 2, UN High Commissioner for Human Rights (Feb. 2017).

[16] *Id.* at 4.

50.     Amnesty International's report on Turkey for 2016/2017 found that "people expressing dissent, especially in relation to the Kurdish issue, were subjected to threats of violence and criminal prosecution."[17] Similarly, the 2017 State Department Report notes that 38 of 56 editors from a newspaper that reported on Kurdish issues and mainly was read by Kurdish people faced prosecution for alleged "terror propaganda." In what Human Rights Watch calls "a new low," the government has even detained and prosecuted over 600 people on terrorism charges for social media posts advocating for peace, including an end to the Turkish-Kurdish conflict.[18]

**B.    Defendants' Attack on Plaintiffs at Sheridan Circle**

**1.    President Erdogan's Visit to the United States**

51.     On May 15 and 16, 2017, President Erdogan and Turkish Foreign Minister Mevlut Cavusoglu were visiting Washington, D.C.  The trip included a visit at the White House. The Turkish President and Foreign Minister were accompanied on their visit by Turkish security officials.

52.     In anticipation of President Erdogan's visit, Salih Celik, the Washington Education Counselor at the Turkish Embassy in Washington, D.C., sent an email to a listserve inviting recipients to come to Washington, D.C. to support President Erdogan.  The email advised that free accommodations would be provided "for the friends who come from out of Washington DC."

53.     When leaders of the local Kurdish community learned President Erdogan would be visiting the White House, they planned a peaceful protest and applied for a permit. On May 4, 2017, the U.S. National Park Service issued a permit for the protest.

---

[17] *Turkey 2016/2017 Annual Report*, Amnesty International (2017).

[18] *Turkey: Crackdown on Social Media Posts*, Human Rights Watch (MAR. 27, 2018).

### 2.    Protest in Front of the White House

54.    On May 16, 2017, President Erdogan visited the White House.

55.    During President Erdogan's visit, individuals, including the Plaintiffs, gathered in Lafayette Square in front of the White House to express their opposition to the repression and abuses of the Erdogan regime.  The demonstrators were peacefully expressing their opposition to Turkey's oppressive treatment of the Kurdish peoples in Turkey, Syria, and Iraq, and protesting the increasing repression and loss of civil liberties in Turkey, including the Erdogan regime's imprisonment of elected officials, academics, journalists, and other civil society leaders.  The demonstrators included U.S. citizens, permanent residents, and foreign nationals of all ages. Parents brought young children.  The group included Iranians, Kurds, Armenians, Ezidis, and Americans.

56.    Also at the White House was a group that supported President Erdogan.  This group was in an area close to, but separated from, the protestors.

### 3.    Protest at Sheridan Circle

57.    After his visit at the White House, President Erdogan went to the Residence located at Sheridan Circle.  The Residence sits amid embassies from Ireland, Latvia, and Romania on a stretch of Massachusetts Avenue, NW, known as Embassy Row.

58.    From the White House protest a number of individuals walked to the Residence, where they believed President Erdogan was going, as they hoped he would hear their voices.  They ranged from children as young as four, who attended with their parents, to individuals in their sixties to local business people and graduate students.

59.    By the time some of the Protesters arrived in Sheridan Circle, a group of individuals were already gathered on the sidewalk directly in front of the Residence. This group included pro-Erdogan private civilians, Turkish security officials, and according to affidavits in support of an

14

arrest warrant filed by the U.S. Attorney's Office (hereinafter "criminal affidavits")[19] "people who appear[ed] to be additional staff members from the Turkish delegation."  Upon information and belief, this group included persons who accepted the Turkish Ambassador's invitation to come to Washington, D.C. to show support for President Erdogan.  Among the pro-Erdogan group were Defendants Sinan Narin, Eyup Yildirim, Mahmut Sami Ellialti, Ahmet Cengizhan Dereci and Alpkenan Dereci, private civilian supporters of President Erdogan.  Hereinafter this group will be referred to in its entirety as the "pro-Erdogan group" or "Erdogan-supporters."

60.     Members of the pro-Erdogan group were carrying Turkish flags.

61.     Eventually there was a total of approximately 20 protesters in Sheridan Circle. They were greatly outnumbered by the pro-Erdogan group.

62.     The Protesters began to gather on the sidewalk across the street from the Residence, which bordered Sheridan Circle.

63.     The Protesters had signs calling for "Peace in Kurdistan" and "Free Demirtas now," referring to Selahattin Demirtas, the imprisoned Kurdish co-chair of Turkey's third largest political party.  Others held a sign that said, "Kurds fight ISIS, Turkey fights Kurds."  This sign was directed at the fact that (i) Kurdish militia in Syria and Iraq, often with U.S. support, have been among the most effective fighters against the Islamic State in Syria and Iraq ("ISIS") and (ii) Turkish military

---

[19] As set out further below, following the attack, the U.S. Attorney's Office filed charges against some of the perpetrators.  The U.S. Attorney's Office filed a document entitled "affidavit in support of an arrest warrant" for Defendants Eyup Yildirim and Sinan Narin.  The affiant for both affidavits was Detective Victor J. DePeralta, a member of the Metropolitan Police Department.  The affidavits state that to identify the individuals who attacked and assaulted the protesters "the Diplomatic Security Visa and Passport Analysis Unit assisted the DSS Office of Protective Intelligence Investigations, the Diplomatic Security Command Center, and the Washington Metropolitan Police Department in identifying Turkish security personnel, pro-Erdogan civilians, and anti-Erdogan protesters by comparing screen captures from video footage to visa and passport images using facial recognition methodologies."

forces have attacked those militia. Others held red, yellow, and green flags and scarves. This combination of colors represents Kurdish culture and is banned in Turkey.

64.     None of the protestors advocated violence. Some of the protesters had bullhorns. Some chanted "long live America, long live Kurdistan." The protesters also criticized President Erdogan, chanting anti-Erdogan slogans such as "dictator, Erdogan."

65.     Members of the pro-Erdogan group yelled threats and anti-Kurdish slurs at the protesters like: "Fuck you, Kurds," "Kurdish bitches," and "traitors." They also threatened to kill the protesters. Others challenged the anti-Erdogan protesters to a fight.

66.     Both Metropolitan Police Department ("MPD") officers and U.S. secret service officers were present at Sheridan Circle (collectively, "U.S. law enforcement officers"). Some U.S. law enforcement officers stood between the two groups, facing the pro-Erdogan group, sometimes with arms extended to direct the pro-Erdogan group not to move toward the protesters, as members of the pro-Erdogan group pushed forward and made movements indicating a desire to physically confront the protesters.

### 4.        The Pro-Erdogan Group Attacks the Peaceful Protesters

67.     Despite the presence of U.S. law enforcement personnel, members of the pro-Erdogan group pushed past the police and physically attacked the Protesters. Turkish security officials and civilians repeatedly hit, punched, and kicked protesters, including Plaintiffs as described below.

68.     Also as described below, all five individual Defendants in this action participated in the first attack.

69.     This altercation was relatively short. The U.S. law enforcement personnel were able to push the pro-Erdogan group back toward the Residence, away from the protesters.

16

70.     After the first attack, U.S. law enforcement personnel tried to calm the pro-Erdogan group. In addition, they created a cordon in an attempt to keep the pro-Erdogan group on the sidewalk in front of the Residence.

71.     The pro-Erdogan supporters were relentless and continued to bypass the officers, despite the officers' repeated directives to remain on the sidewalk.  Defendants Eyup Yildirim and Sinan Narin have admitted that they bypassed the police cordon despite police efforts to contain them.

72.     The pro-Erdogan group, including the Turkish security officials, yelled ethnic slurs and threatened the protesters.  For example, according to the Indictment, Turkish security official Mustafa Murat Sumercan "made a throat-slashing motion by moving his hand horizontally across his throat with his palm facing down."

73.     Members of the pro-Erdogan group continued to confront the MPD officers.  For example, according to the Indictment, Turkish security officials Gokhan Yildirim, Turgut Akar, Mustafa Murat Sumercan, as well as other pro-Erdogan supporters "bumped up" against the MPD officers at the cordon line.  One of the officers reprimanded the pro-Erdogan group, telling them that the protestors "have a right to talk."  They disagreed.

74.     According to the Indictment, Turkish security official Gokhan Yildirim told an MPD officer, "you need to take them," referring to the protestors, and "if you don't, I will."  Later, he told a Secret Service officer, "we are waiting [for] you to take them out, because President [Erdogan] is coming. If you don't take … I will take."

75.     In addition, the Turkish Ambassador to the U.S. walked up to a MPD officer, pointing his finger at the officer and said, amongst other things, "I am the ambassador. You cannot

let this…you cannot touch us." On information and belief, the Ambassador was asking the police to remove the protesters.

76.     According to the Indictment, Defendant Eyup Yildirim "yelled" at an officer warning him "of potential violence if the protesters continued their protest." Defendant Yildirim has admitted that he called the protesters "dirty bastards," and yelled "shut the fuck up, bitch!" to a protester.

77.     Defendant Sinan Narin has admitted that, in response to efforts by MPD officers to restrain him, he yelled at the officers, saying not to touch the Turkish security officers, as they "protect" the "President." Defendant Narin also admitted that he called on the pro-Erdogan group to line up in the street, ignoring the command of a U.S. police officer to stay on the sidewalk. He explained that he was not cooperating because "My President is coming, I don't want them to be over there." Finally, an MPD officer had to physically push Defendant Narin back.

78.     Shortly after the first attack, the pro-Erdogan supporters played the "mehter march," a Turkish nationalist song, on a loudspeaker.

79.     At some point during or shortly after the first attack, President Erdogan's car arrived at the Residence. President Erdogan sat in the black Mercedes-Benz sedan in the driveway at the Residence. A Turkish security official who, on information and belief, is Muhsin Kose, President Erdogan's head of security, leaned into the car and conferred with President Erdogan.

80.     On information and belief, President Erdogan ordered a second attack. After conferring with Erdogan, Mr. Kose communicated with other Turkish security officials, who then hurried toward the protestors. A few seconds later, Turkish security officials and private civilian supporters of President Erdogan violently broke through the police cordon in what Defendants Sinan Narin and Eyup Yildirim admitted was a "coordinated" fashion and began a second attack

on the protesters. According to the criminal affidavits, "members of the Turkish security detail were seen speaking with each other and touching communication devices seconds before the rush to the anti-Erdogan group happened."

81.     The second attack was longer and more violent than the first.  Turkish security officials and the civilian Defendants bypassed the police cordon and chased, kicked, punched, and grabbed protesters.  Multiple Turkish security officials and civilian Defendants beat and attacked the protesters, who were outnumbered by the attackers.   The violence was unrelenting: the attackers surrounded and kicked the protesters, including older men and young women, who had fallen and were defenseless on the ground.

82.     And, throughout, the attackers yelled ethnic slurs at the protesters and threatened to kill them.  As the protesters were trying to flee, the attackers yelled, "catch him…where are you going?, Mother fucker...! ,  fuck you...! catch them...!"

83.     President Erdogan could view the attack from his car. While the attack was happening, Mr. Kose, who was also watching, conferred with President Erdogan.  When President Erdogan exited his car, he looked toward Sheridan Circle while the attack was still ongoing before entering the Residence.  At no point did he intervene to stop the attack.

84.     The Turkish Ambassador also watched the attack without intervening to stop it.

85.     Numerous unidentified individuals in suits, who upon information and belief, were officials and/or employees of Turkey, watched the attack from the driveway or from the sidewalk in front of the Residence.

86.     Throughout the second attack, U.S. law enforcement officers tried to stop the assaults, physically restraining the attackers and ordering them to return to the sidewalk in front of the Residence. The attackers, including Turkish security officials and civilian Defendants,

ignored these commands and physically resisted the U.S. law enforcement officers.  At one point, an MPD officer had to use his baton against a Turkish security official to stop him from kicking a woman who was lying defenseless on the ground.

87.    According to the Indictment several Turkish security officials "ignored MPD and United States Secret Service officers' commands to stop the assault against anti-Erdogan protesters and return to the sidewalk in front of the CMR [Ambassador's Residence]."  These officials included Turgut Akar, Ismail Dalkiran, Servet Erkan, Tugay Erkan, Ahmet Karabay, Feride Kayasan, Lutfu Kutluca, Mustafa Murat Sumercan, Gokhan Yildirim, Ismail Ergunduz, Mehmet Sarman, Hamza Yurteri and Harrettin Eren.

88.    Eventually the U.S. law enforcement officers were able to stop the attackers and push them back to the sidewalk in front of the Residence.

89.    After the attack, pro-Erdogan supporters, including Turkish security officials, destroyed the protesters' signs.  According to the criminal affidavits, Ismail Ergunduz tore a sign with a pro-Kurdish message on it.  According to the Indictment, Turkish security officials Ismail Ergunduz, Hamza Yurteri, Mehmet Sarman, and others "took the anti-Erdogan protesters signs, tore them up, and either threw them on the ground or carried them across the street."  Defendant Eyup Yildirim stomped on one of the protester's flags.

90.    After the attack, U.S. law enforcement officers repeatedly had to direct the pro-Erdogan group to remain on the sidewalk in front of the Residence and had to physically restrain members of the group from crossing the street and confronting the victims.

### 5.    The Attacks on Individual Plaintiffs, and Plaintiffs' Injuries

Kasim Kurd

91.    Mr. Kurd was physically attacked and threatened while he was participating in the peaceful protest at Sheridan Circle by Defendants, including through their officials or employees.

92.     Upon his arrival at Sheridan Circle, pro-Erdogan supporters cursed at and threatened Mr. Kurd. Turkish security officials opened their coats to show him their guns.  Mr. Kurd heard some of the men state that he should come to Turkey, where they could beat him.  One Turkish security official told him, in Turkish, "we are already fucking your mothers."

93.     During the first attack, Turkish security officials, including at least one with a gun, attempted to grab, pushed, and then repeatedly punched Mr. Kurd in the head.

94.     After the first attack, Mr. Kurd called 911 twice.

95.     During the second attack, several pro-Erdogan supporters, including Turkish security officials, chased and attempted to grab Mr. Kurd, but he was able to escape.

96.     Mr. Kurd witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, threaten and violently attack his friends and fellow protesters.

97.     Mr. Kurd suffered injuries to his head and hand because of Defendants' conduct. Since the attack, he has experienced emotional distress, which has manifested itself in symptoms, including, but not limited to, headaches, difficulty sleeping, and difficulty concentrating.

Stephen Arthur

98.     Mr. Arthur was beaten by Turkish security officials while participating in the peaceful protest at Sheridan Circle.  At the start of the second attack, Mr. Arthur saw the pro-Erdogan group, including Turkish security officials, charge at him and his fellow protesters. Mr. Arthur ran from the attackers, but he was chased and then beaten by multiple pro-Erdogan supporters.  He was hit and punched about the head and body by several Turkish security officials.

99.     Mr. Arthur saw Turkish security officials carrying guns.

100.     Mr. Arthur witnessed the pro-Erdogan supporters, including the Turkish security officials and civilians, threaten and violently attack his friends and fellow protesters.

101.   Because of Defendants' conduct, Mr. Arthur suffered injuries, including to his head, leg, and arm, causing pain and suffering.

Heewa Arya

102.   Mr. Arya, who was at the demonstration with his seven-year-old daughter on his shoulders, was threatened and physically attacked by Turkish security officials and pro-Erdogan civilians while peacefully protesting at Sheridan Circle.

103.   When he arrived at Sheridan Circle, Mr. Arya and his daughter were greeted with curses from the pro-Erdogan group.  Members of the pro-Erdogan group yelled "fuck you Kurds," and "Armenian bastards."

104.   Mr. Arya and his daughter witnessed the first attack. This was particularly frightening for his daughter who was panicking and shaking.  After the first attack, Mr. Arya yelled at the pro-Erdogan group, "this is America, not Turkey."

105.   After the first attack, Mr. Arya took his daughter away from the sidewalk and the crowd, near some trees.

106.   When Defendants overran the police during the second attack, Mr. Arya was violently attacked by Turkish security officials and pro-Erdogan civilians.  At least one Turkish security official hit him in in the face and another Turkish security official kicked him in the chest, knocking him to the ground.  After he fell, multiple Turkish security officials and civilians, including upon information and belief, Defendant Mahmut Sami Ellialti, continued to kick and punch Mr. Arya all over.

107.   The criminal affidavits identify one of the assailants who punched Mr. Arya in the face as Turkish security official Mustafa Murat Sumercan.  According to the criminal affidavits and the Indictment, Mr. Sumercan and other Turkish security officials kicked Mr. Arya on the ground.

108.    Mr. Arya heard the attackers shout "fuck you," and "die fucking Kurds."

109.    Mr. Arya thought he was going to die as the Turkish security officials beat him.

110.    Mr. Arya saw that many of the Turkish security officials carried guns.

111.    Mr. Arya witnessed the pro-Erdogan supporters, including the Turkish security officials and civilians, violently attack his friends and fellow protesters.

112.    As set out further below, Mr. Arya's young daughter also witnessed the pro-Erdogan supporters, including the Turkish security officials and civilians, threaten and attack the protesters.  Mr. Arya saw his daughter cry, shake and panic as a result of witnessing the attack.

113.    Because of Defendants' conduct, Mr. Arya suffered injuries to his face, head, chest, shoulders, leg, and neck.

114.    Since the attack, Mr. Arya has suffered emotional distress, which has manifested itself in symptoms, including, but not limited to, difficulty sleeping, difficulty concentrating, irritability, and disinterest in social activities.  Because of the effects of the attack, Mr. Arya had to take time off from work.

### C.A. by and through her guardian, Heewa Arya

115.    C.A. attended the protest at Sheridan Circle with her father, Plaintiff Heewa Arya.

116.    Mr. Arya carried C.A. on his shoulders at Sheridan Circle and she was on his shoulders when the pro-Erdogan supporters, including Turkish security officials and civilians, attacked protesters.  C.A. was close to and witnessed the violence.  C.A. started shaking and was panicked after seeing this attack.

117.    After the first attack, C.A. was sitting to the side of Sheridan Circle with Jane Doe III and others when the pro-Erdogan group bypassed the police and ran to attack the protesters.  C.A. saw the pro-Erdogan group, including the Turkish security officials and civilians, attack the protesters.

118.    From witnessing this violence, C.A. was panicked, crying, and shaking.  She told her father this was the worst day of her life.

119.    Since the attack, C.A. has been worried that she and her family are not safe.  She always makes sure that the doors in her house are locked because she is worried that the attackers will come find her and her family.

<u>Abbas Azizi</u>

120.    Mr. Azizi, a 62-year-old man, was physically attacked by Turkish security officials and Defendant Mahmut Sami Ellialti while he was participating in the peaceful protest.

121.    During the first attack, a Turkish security official hit Mr. Azizi.

122.    Mr. Azizi suffered from an increasingly brutal beating during the second attack. Several Turkish security officials and pro-Erdogan civilians, including Defendant Mahmut Sami Ellialti, kicked him all over his body, including his head, neck, and chest.  As Mr. Azizi tried to help Plaintiff Jalal Kheirabadi, who was being attacked, a private civilian pushed him away.  A Turkish security official then jump-kicked him, knocking him to the ground.  As Mr. Azizi lay defenseless on the ground, Turkish security officials and Defendant Mahmut Sami Ellialti kicked him.  The criminal affidavits and Indictment identify two of the assailants who kicked Mr. Azizi as Servet Erkan, a Turkish security official, and Defendant Ellialti.  After Mr. Azizi managed to stand up, he was punched by a Turkish security official.

123.    Mr. Azizi feared for his life during the attack.  When Mr. Azizi stood up after the beating, his face and shirt were covered in blood.

124.    Mr. Azizi also witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, threaten and attack his friends and fellow protesters.

125.    Mr. Azizi suffered physical injuries from the attack including head injuries, cuts and bruises, contusions, and general pain.  He was diagnosed with a concussion, post-concussion

syndrome, and a chest wall contusion. Since the attack, Mr. Azizi has also suffered emotional distress, which has manifested itself in symptoms, including but not limited to, difficulty sleeping, difficulty concentrating, depression, and anxiety. The effects of the attack have also impacted Mr. Azizi's ability to work.

Ceren Borazan

126. Ms. Borazan was threatened and physically attacked while she was participating in the peaceful protest at Sheridan Circle by Defendants, including through their officials or employees.

127. Ms. Borazan saw the Turkish security officials and pro-Erdogan civilians bypass the police and assault protesters. She tried to flee from the attackers. As she ran, she heard a voice behind her yelling, "bitch, come here," and asking "where are you running?"

128. Ms. Borazan ran to the cars that were stopped in the street and began begging drivers to let her in. As she was getting into a car, she was grabbed from behind by a Turkish security official. The criminal affidavits and Indictment identify that official as Ismail Dalkiran. Mr. Dalkiran placed Ms. Borazan in a chokehold, grabbing her with one arm tightly around the neck and using the other to twist her arm behind her back.

129. While Mr. Dalkiran held Ms. Borazan in a chokehold, he threatened her in Turkish saying, "you're dead, bitch," and "you're going to get more." He also pulled her hair, hit her on the back of her head, threw her to the ground, and kicked her as she lay on the ground.

130. Ms. Borazan was able to get away and get into another car. As she was getting into the car, a Turkish security official yelled at her, "bitch, get out of the car, you haven't had enough yet."

131. Ms. Borazan remained in the car for a short while and then joined her fellow protesters in Sheridan Circle.

132.    Ms. Borazan witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, threaten and attack her friends and fellow protesters.

133.    Ms. Borazan received medical treatment after the attack.  Because of Defendants' conduct, Ms. Borazan suffered from neck pain, a popped blood vessel, and bruises.  Since the attack, she has experienced emotional distress, which has manifested itself in symptoms including, but not limited to, difficulty concentrating, nightmares, anger, disinterest in social activities, depression, and feelings of hopelessness.

Jane Doe I

134.    Jane Doe I was threatened and physically attacked while participating in the peaceful protest at Sheridan Circle by Defendants, including through their officials or employees.

135.    Jane Doe I stood on the sidewalk in front of the circle holding a banner that read "Kurds fight ISIS, Turkey fights Kurds."  In response, pro-Erdogan supporters threatened and cursed at Jane Doe I and the other protesters.  A Turkish security official yelled "I'll kill you bitch," at her.

136.    Jane Doe I saw individuals from the pro-Erdogan group, many of them Turkish security officials, running at her and the other protesters.  She tried to duck behind a tree, but was attacked.  Pro-Erdogan supporters, including Turkish security officials, punched and kicked Jane Doe I in the neck, head, and leg.

137.    After she managed to escape, Jane Doe I went over to her friend, Jane Doe II, who was lying on the ground. She sat with her friend, while Jane Doe II slipped in and out of consciousness and appeared to suffer seizures.

138.    While she watched over Jane Doe II, Turkish security officials and a pro-Erdogan civilian approached the women, but U.S. law enforcement officers pushed them away.

139.     Jane Doe I also witnessed individuals from the pro-Erdogan group, including Turkish security officials and civilians, threaten and attack her friends and fellow protesters.

140.     Because of Defendants' conduct, Jane Doe I suffered injuries from the attack, including bruising, swelling, and neck pain

<u>Jane Doe II</u>

141.     Jane Doe II was brutally attacked while she was participating in the peaceful protest at Sheridan Circle by Defendants, including through their officials or employees.  She was beaten so severely that she lost consciousness and had seizures on the grass in Sheridan Circle.

142.     When Jane Doe II arrived at Sheridan Circle, she heard pro-Erdogan supporters yelling ethnic slurs at her and fellow protesters, including "Kurdish bitches" and "traitors."

143.     Pro-Erdogan supporters physically attacked Jane Doe II.  She was pushed to the ground by a Turkish security official, identified in the Indictment as Mehmet Sarman.

144.     As Jane Doe II was attempting to get up, a pro-Erdogan civilian hit her in the head with a flagpole that held a Turkish flag.  Defendant Mahmut Sami Ellialti then shoved her.

145.     Soon after, during the second attack, Jane Doe II was attacked again.  Turkish security officials surrounded Jane Doe II.  They pushed her, grabbed her hair, dragged her along the ground, and punched her.  The Indictment identifies one of her assailants as security official Feride Kayasan.

146.     Jane Doe II fainted and fell to the ground because of the attack.  While she was lying on the ground, she slipped in and out of consciousness, suffering from seizures.

147.     Jane Doe I came to the aid of Jane Doe II.  Turkish security officials and a pro-Erdogan civilian approached them, but U.S. law enforcement officers repulsed them.

148.     Jane Doe II also witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, threaten and attack her friends and fellow protesters.

27

149.    Jane Doe II was taken by ambulance from Sheridan Circle to George Washington University Hospital, where she suffered another seizure.

150.    She received medical attention after the attack and continues to receive medical attention. Because of Defendants' conduct, Jane Doe II suffered from injuries including four herniated discs, bone bruises, and injuries to her head, back, neck, arm, and shoulder.

151.    Since the attack, Jane Doe II has experienced emotional distress, which has manifested itself in symptoms including, but not limited to, headaches, difficulty sleeping, irritability, loss of interest in social activities, stress, and difficulty concentrating.

152.    Jane Doe II has also lost time at work due to her injuries.

Jane Doe III

153.    Pro-Erdogan supporters, including Turkish security officials, threatened and physically attacked Jane Doe III while she was participating in the peaceful protest at Sheridan Circle.

154.    At Sheridan Circle, she heard the pro-Erdogan group yell curses at the protesters, including "Armenian bitch," and threaten the protestors, saying "we will kill you."  When the second attack started, Jane Doe III was with Mr. Arya's daughter.  She saw Turkish security officials running towards them and tried to run with the little girl.  As she ran, she felt what she was believed was a kick in her back from one of the Turkish security officials.  She fell down as a result and was overrun by attackers.

155.    Jane Doe III witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, threaten and attack her friends and fellow protesters.

156.    Jane Doe III suffered physical injuries including back pain because of Defendants' attack.  Since the attack, Jane Doe III has experienced emotional distress, which has manifested

itself in symptoms including headaches, difficulty sleeping, nightmares, depression, and disinterest in seeing friends and activities.

Elif Genc

157.   Defendants' threatened and physically attacked Ms. Genc while she was participating in the peaceful protest at Sheridan Circle.

158.   When Ms. Genc arrived at Sheridan Circle, she remained behind the police line. She stood on the grass in the Circle, holding a sign calling for the release of a political prisoner. She saw several men, including Turkish security officials, across the street pointing at her, yelling out insults to Kurds, and making threatening gestures.

159.   As the pro-Erdogan supporters rushed across the street and pushed past the police cordon, she ran.

160.   Ms. Genc was grabbed by the arm and pushed to the ground by a Turkish security official.  She was kicked over and over by several men, including Turkish security officials and pro-Erdogan civilians.  One man threatened, "I will kill you, bitch."  The criminal affidavits and Indictment identify five of Ms. Genc's assailants as Turkish security officials Mehmet Sarman and Hamza Yurteri, and Defendants Eyup Yildirim, Sinan Narin, and Mahmut Sami Ellialti.

161.   Ms. Genc witnessed individuals from the pro-Erdogan group, including Turkish security officials and civilians, threaten and violently attack her friends and fellow protesters.

162.   Because of Defendants' conduct Ms. Genc suffered physical injuries including bruises and scrapes.  She also had trouble walking after the attack.  The attacks also caused emotional distress, which has manifested itself in symptoms, including nightmares, fearfulness, and difficulty concentrating.  The attack also negatively impacted her course work in school.

Ruken Isik

163.    Ms. Isik and her then four-year-old son arrived at Sheridan Circle after the first attack.  She was standing with her son, Jane Doe III, and C.A. when the second attack broke out. Ms. Isik saw Turkish security officials charge at her and the other protesters.  She grabbed her son and ran.  As she ran, at least one Turkish security officer chased them yelling threats like, "I'm going to fuck you!" and "you whores!"

164.    Ms. Isik witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, attack her friends and other protesters. For instance, she saw a Turkish security official attack Ms. Borazan.  She saw other protesters covered in blood.

165.    Since the attack, Ms. Isik has experienced emotional distress, which has manifested itself in symptoms including, but not limited to, difficulty sleeping, outbursts of anger, and difficulty concentrating.

Jalal Kheirabadi

166.    Mr. Kheirabadi was threatened and physically beaten by pro-Erdogan civilians, including Defendants Alpkenan Dereci and Eyup Yildirim, and Turkish security officials, while he was participating in the peaceful protest at Sheridan Circle.

167.    Prior to the first attack, Mr. Kheirabadi stood with fellow protesters on the sidewalk bordering Sheridan Circle.  During the first attack, Defendant Alpkenan Dereci repeatedly punched Mr. Kheirabadi.

168.    Mr. Kheirabadi was then punched and kicked by several men including Turkish security officials.  According to the Indictment, the Turkish security officials included Ismail Ergunduz, Gokhan Yildirim, Hamza Yurteri and Mehmet Sarman.  The men yelled at Mr. Kheirabadi, "Motherfucker, we did your mom and your sister in Turkey."

169.   Mr. Kheirabadi was beaten again during the second attack when multiple persons kicked and punched him, often at the same time.  The Indictment identifies two of Mr. Kheirabadi's assailants as Turkish security officials Servet Erkan and Feride Kayasan.

170.   Mr. Kheirabadi also witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, threaten and attack his friends and fellow protesters.

171.   After the attack ended, Defendant Eyup Yildirim screamed in a threatening manner at Mr. Kheirabadi in Turkish, saying, "go die, you traitors, go to hell."  While yelling at Mr. Kheirabadi, Defendant Yildirim ignored the commands of a police officer to back up.

172.   Because of Defendants' conduct, Mr. Kheirabadi suffered injuries, including a lost tooth, full-body pain, and scrapes on his arms and legs.  Since the attack, Mr. Kheirabadi has also experienced emotional distress, which has manifested itself in symptoms including, but not limited to, nightmares, difficulty sleeping, fearfulness, severe anxiety (including around unknown people), and headaches.  The symptoms are negatively impacting his work and his daily life.

Mehmet Özgen

173.   Defendants physically assaulted Mr. Özgen while he was participating in the peaceful protest at Sheridan Circle.

174.   Together with Plaintiff Jane Doe I, Mr. Özgen held up a banner at Sheridan Circle saying "Kurds fight ISIS, Turkey fights Kurds."

175.   As the second attack began, Mr. Özgen saw a group of Turkish security officials run in his general direction.  A Turkish security official then kicked Mr. Özgen's leg, causing him to stumble backwards. The kick left a gash on his Mr. Özgen's leg.

176.   Mr. Özgen also witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, threaten and attack his friends and fellow protesters.

31

<u>Mehmet Tankan</u>

177.    Mr. Tankan was threatened and physically attacked by pro-Erdogan supporters, including Turkish security officials and Defendant Ahmet Cengizhan Dereci, while he was participating in the peaceful protest at Sheridan Circle.

178.    In the first attack, pro-Erdogan supporters kicked Mr. Tankan.  According to the Indictment, Turkish security official Ismail Ergunduz and Defendant Ahmet Cengizhan Dereci, a civilian, kicked Mr. Tankan.

179.    When the second attack began, Mr. Tankan was standing behind the rest of the protesters.  He saw a number of attackers running towards him.  Several men then surrounded Mr. Tankan and repeatedly kicked and punched him all over his body.  According to the Indictment the assailants included Turkish security officials Ismail Ergunduz, Turgut Akar, Ahmet Karabay, Mustafa Murat Sumercan, and Harrettin Eren, as well as civilian Defendant Ahmet Cengizhan Dereci.

180.    Mr. Tankan saw that his assailants had guns.

181.    While attacking Mr. Tankan, the assailants cursed and threatened Mr. Tankan in Turkish.  They called him a son of a bitch, called his mother a bitch, and threatened to kill him.

182.    The attack was so violent, it required four police officers ultimately to separate Mr. Tankan from his assailants.  For some time, the attackers had ignored the police and continued to assault Mr. Tankan.

183.    Mr. Tankan also witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, threaten and attack his friends and fellow protesters.

184.    Mr. Tankan was transported by ambulance to George Washington University Hospital.

185.    Because of Defendants' conduct, Mr. Tankan suffered physical injuries including contusions, a concussion, bruises all over his body, general pain and dizziness.  Since the attack, Mr. Tankan also suffered emotional distress that impacted his business, including sleeplessness, nightmares, irritability, disinterest in social activities and friends, fearfulness, and depression.

Murat Yasa

186.    Mr. Yasa, a 61-year-old man, was threatened and violently attacked by pro-Erdogan supporters, including Turkish security officials and Defendants Ahmet Cengizhan Dereci and Eyup Yildirim, while he was peacefully protesting at Sheridan Circle.

187.    When the second attack began, Defendant Ahmet Cengizhan Dereci threw Mr. Yasa to the ground.

188.    Defendant Ahmet Cengizhan Dereci and several other men, including Turkish security officials, repeatedly kicked Mr. Yasa as he lay on the  sidewalk, trying to cover his face. Defendant Ahmet Cengizhan Dereci and at least three other Turkish security officials kicked Mr. Yasa's head and body. Another Turkish security official then kicked Mr. Yasa's head before Defendant Eyup Yildirim kicked his body.  Mr. Yasa feared he was going to die.

189.    According to the Indictment, the assailants who kicked Mr. Yasa included Turkish security officials Tugay Erkan, Ismail Ergunduz, and Gokhan Yildirim, as well as civilian Defendants Ahmet Cengizhan Dereci and Eyup Yildirim.

190.    The assailants cursed at Mr. Yasa.  They yelled "We are going to show you the power of the Turks" and "we don't care if you are in America."  They told him that they would find him no matter where he went.

191.     According to the Indictment, Defendant Eyup Yildirim threatened Mr. Yasa telling him that he was going to make life miserable for the Kurds.

192.     Once police officers managed to stop the assault, some of them helped Mr. Yasa sit up.  His face and shirt were covered in blood.  He was treated at the scene by emergency medical personnel, before being taken to the hospital in an ambulance.

193.     Mr. Yasa also witnessed the pro-Erdogan supporters, including Turkish security officials and civilians, attack his friends and fellow protesters.

194.     Because of Defendants' conduct, Mr. Yasa suffered physical injuries including head injuries, a broken tooth and loose teeth, facial cuts and contusions, hand injury, back pain, and leg pain. Since the attack, Mr. Yasa also suffered emotional distress that impacted his business including memory loss and confusion.  He has been diagnosed with post-traumatic stress disorder.

**C.     Aftermath of the Attack**

195.     The attack horrified the American public.  U.S. officials condemned the attack and called for the perpetrators to be held responsible.  The United States Attorney's Office filed criminal charges and a grand jury indicted 19 individuals for bias-related (hate) crimes committed as part of a conspiracy.

**1.     The U.S. Government Condemned the Attack**

196.     On May 17, 2017, the U.S. Department of State issued a statement, saying: "We are concerned by the violent incidents involving protestors and Turkish security personnel Tuesday evening.  Violence is never an appropriate response to free speech, and we support the rights of people everywhere to free expression and peaceful protest.  We are communicating our concern to the Turkish government in the strongest possible terms."

197.     On May 25, 2017, the U.S. House of Representatives Subcommittee on Europe, Eurasia and Emerging Threats, Committee on Foreign Affairs held an emergency hearing about the attack.   The Committee passed a Resolution "condemning the violence against peaceful

protesters outside the Turkish Ambassador's residence on May 16, 2017, and calling for the perpetrators to be brought to justice."

198.    Victims, including Plaintiff Murat Yasa, testified before the Committee.

199.    Chairman of the Subcommittee, Representative Dana Rohrabacher, opened the hearing by stating: "The attempt by members of the Turkish security service is an affront to the democratic values that we hold dear in the United States and was an act of supreme disrespect for the American people and our institutions."  He also shared his view that President Erdogan must have ordered the attack and placed the attack in the context of "Turkey's ongoing crackdown against fundamental freedoms, including freedom of the press and peaceful assembly."

200.    Echoing Mr. Rohrabacher's sentiments, Representative Brad Sherman stated that "this was not just an attack on American values, on international values of human rights, this was an attack on American sovereignty.  Quasi-military forces of a foreign nation beat and attacked Americans on American soil."

201.    On May 25, 2017, 40 members of Congress sent a letter to Attorney General Jeff Sessions and then-Secretary of State Rex W. Tillerson expressing their "outrage over the remorseless acts of violence inflicted upon individuals exercising their Constitutionally-protected First Amendment right to free speech" and reiterating that the attack was "a clear disrespect for our laws and those who enforce them."  The Members called for "the individuals involved in Tuesday's attacks on Americas on U.S. soil [to be] identified and brought to justice."

202.    On May 26, 2017, 20 U.S. Senators sent a letter to then-Secretary of State Rex W. Tillerson expressing their outrage over the attack.  The Senators called for accountability, urging the State Department to work with the MPD to identify the perpetrators of the assault, and urged that "those responsible should be held accountable under applicable U.S. law."

203.    On June 6, 2017, the House of Representatives unanimously passed House Resolution 354, condemning the attack on the protesters gathered outside the Residence.

204.    The Resolution stated that the "demonstrators did not instigate violence," but that "[v]iolence erupted when pro-Erdogan supporters and individuals from the Turkish embassy grounds pushed past District of Columbia police officers to brutally attack the demonstrators." It also stated, "[a]t no point was President Erdogan in danger." The Resolution called for "any Turkish security officials who directed, oversaw, or participated in efforts by Turkish security forces to illegally suppress peaceful protests on May 16, 2017, [to] be charged and prosecuted under United States law."

205.    Representatives spoke in support of the Resolution and condemned the violence against peaceful protesters. For instance, Representative Royce expressed his outrage over the attack and remarked that "at no time was President Erdogan in danger. This was not an act of protection. It was an act of suppression on our American soil." He explained that "the violent attacks…by officers assigned to Turkish President Erdogan's security detail against peaceful protesters back on May 16 were designed to…silence those protesters' criticism of the Turkish government."

206.    Representative Norton explained that "this was an assault, after all, not only on the protesters, but on one of our most important American values: the right to assemble and use the First Amendment to protest."

207.    Representative Sarbanes shared a similar sentiment. He condemned the "shocking assault" by "trained paramilitary agents of the Turkish Presidential security force against a peaceful assembly of protesters." He also expressed the view that "President Erdogan sanctioned

the attack," and that "the assault on innocent protesters in the streets of Washington, D.C. is entirely consistent with the impulses of an autocratic Turkey."

### 2.    Pro-Erdogan Supporters Were Criminally Charged for the Attack

208.    On June 15, 2017, the U.S. Attorney's Office filed charges against Defendant Sinan Narin for aggravated assault and assault, both committed based on the actual or perceived race or ethnicity of the complainants.  On June 28, 2017, the U.S. Attorney's Office filed charges against Defendant Eyup Yildirim for aggravated assault and assault with significant bodily injury, committed based on the actual or perceived race or ethnicity of the complainants.

209.    On August 29, 2017, a District of Columbia grand jury indicted nineteen individuals for their role in the May 16, 2017, attack. The individuals indicted include fifteen Turkish security officials and four civilians.  The four civilians are Defendants in this action. Collectively they were charged with bias-related (hate) crimes, including: conspiracy, aggravated assault, assault with a dangerous weapon, assault with a dangerous weapon against a senior citizen, assault with significant bodily injury, and simple assault.

210.    The Indictment found that the Turkish security officials, staff members from the Turkish diplomatic delegation, and pro-Erdogan civilians, including the individual Defendants in this action, were members and associates of the conspiracy. The Indictment found that the members of the conspiracy "did knowingly and willfully combine, conspire, confederate and agree together to assault with a dangerous weapon with a shod-foot and to assault."  Further, the Indictment found that "the members and associates of the conspiracy attacked the anti-Erdogan protesters because of their opposition to Mr. Erdogan, their support of the HDP, their support ethnic Kurds, and their belief that the protesters were ethnically Kurdish."

211.    The Turkish security officials and foreign civilian perpetrators left the U.S. after the attack.  Ultimately, the U.S. Attorney's Office dropped the charges against some of the Turkish

security officials who were indicted.  Outstanding charges remain against Turkish security officials Ismail Dalkiran, Mehmet Sarman, Ahmet Karabay, and Servet Erkan, as well as civilians Ahmet Cengizhan Dereci and Mahmut Sami Ellialti.

212.    On December 21, 2017, Defendants Eyup Yildirim and Sinan Narin pled guilty to assault with significant bodily injury.  Defendant Eyup Yildirim pled guilty to assaulting Plaintiff Murat Yasa.  In their factual proffers, both Defendants, admitted that the "government would have shown that all [their] actions were willful and intentional."

### 3.    Turkey Has Defended and Even Celebrated the Attack

213.    On or about May 18, 2017, the U.S. State Department summoned the Turkish Ambassador in Washington to protest the action of Turkey's personnel.

214.    On May 18, 2017, the Turkish Embassy in the U.S. attempted to justify the actions of the Turkish security personnel as "self-defense."  Rather than accept responsibility for the criminal actions of its personnel, Turkey protested what it called "aggressive and unprofessional actions" of U.S. law enforcement officers.

215.    President Erdogan acknowledged that his security officials participated in the attack, asking, "[w]hy would I take my guards to the United States if not to protect myself?"

216.    Beyond refusing to accept any responsibility for the attacks, the Turkish government has celebrated the perpetrators.  In September 2017, the Turkish Foreign Minister visited Defendants Eyup Yildirim and Sinan Narin in prison. The Foreign Minister tweeted, "While visiting our brothers Sinan Narin and Eyüp Yildirim who continue to be tried in Washington, we transferred to them our nation's love and greetings."  Defendants Yildirim and Narin willingly participated in this visit.  Defendant Yildirim's Facebook page displayed a photograph of this visit.

217.    Through these actions, among others, Turkey ratified the tortious actions of its officials and employees who threatened, cursed, and attacked the protesters on May 16, 2017, and the tortious actions of the officials and employees who conspired and aided and abetted in the attack.

### 4.    The Attack at Sheridan Circle Is Not an Isolated Incident

218.    In 2011, President Erdogan's security team resorted to violence at the United Nations General Assembly in New York when they were told they could not enter a section of the building. At least one U.N. security guard was hospitalized following the incident.

219.    In October 2015, President Erdogan's security detail had a violent altercation with Belgium police while visiting Belgium on an official visit.

220.    In February 2016, President Erdogan's security agents attacked protesters in Quito, Ecuador.  The agents violently removed three individuals who were protesting during a speech by President Erdogan.  One of the agents placed a woman in a headlock.

221.    In February 2016, President Erdogan's security detail attacked protesters, tried to remove a journalist, and cursed at individuals at the Brookings Institution in Washington, D.C., where President Erdogan was giving a speech. His security detail tried to remove a Turkish journalist from the event, telling him he was a traitor, and physically confronted protesters outside the event.  President Erdogan's security officials threatened Kurdish activists and ripped protesters signs.

## V.    CAUSES OF ACTION

### GENERAL ALLEGATIONS

222.    At all times relevant herein, the Turkish security officials were "officials or employees" of Turkey as delineated in 28 U.S.C. § 1605(a).  Their actions at the protest, including

threatening and physically attacking peaceful protesters, including Plaintiffs, and ripping up protesters' signs, were committed within the scope of their office and employment.

223.   At all times relevant herein, the Turkish security officials acted pursuant to the direction and/or control of Turkey and its officials and employees including President Erdogan and the Turkish Ambassador to the U.S. Serdar Kilic.

224.   At all times relevant herein, President Erdogan, Ambassador Kilic, and the Turkish Foreign Minister, Mevlut Cavusoglu, were acting within the scope of their office and employment, including when they ratified the conduct of the Turkish officials.

225.   At all times relevant herein, any other employee or official of Defendant Turkey who was present at the attack in Washington, D.C., and participated, aided and abetted, and/or conspired did so within the scope of their office and employment.

226.   Each Defendant is liable as a joint venturer.  Each Defendant aided and performed a wrongful act that caused an injury to at least one of the Plaintiffs.  Each Defendant was generally aware of its/his/her role as part of an unlawful and tortious activity (assaulting peaceful protestors) at the time it/he/she provided assistance to the other Defendants.  Finally, each Defendant knowingly and substantially assisted in the attacks on the Plaintiffs, whether by directing the attacks, carrying them out, or encouraging other pro-Erdogan supporters to attack the Plaintiffs.

227.   Defendants acted in concert by aiding and abetting each other by encouraging attacks on the Plaintiffs, and substantially assisted one another during the attacks on the Plaintiffs.

## COUNT I

### ASSAULT
### (Each Plaintiff against each Defendant)

228.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

229.    At all times relevant herein, Defendant Turkey acted through its officials or employees, who were acting within the scope of their office or employment.

230.    Defendants intentionally and knowingly committed, attempted, and/or threatened to commit wrongful acts, including pushing past the police cordon, cursing and threatening the protestors, and threatening to commit bodily harm and/or in fact beating protestors, causing Plaintiffs to imminently fear and/or apprehend harmful, offensive, and/or unlawful contact.

231.    Defendants caused Plaintiffs to imminently fear and/or apprehend such harmful, offensive and/or unlawful contact.

232.    Defendants acted with the intent to threaten and harm, and did actually threaten and harm Plaintiffs.

233.    Plaintiffs did not consent to such conduct, which caused injury, damage, loss, and harm to Plaintiffs.

234.    Defendants acted in concert and aided and abetted each other by encouraging attacks on the Plaintiffs, and substantially assisted one another during the attacks on the Plaintiffs.

## COUNT II

### BATTERY
**(Plaintiffs Kasim Kurd, Stephen Arthur, Heewa Arya, Abbas Azizi, Ceren Borazan, Jane Doe I, Jane Doe II, Jane Doe III, Elif Genc, Jalal Kheirabadi, Mehmet Özgen, Mehmet Tankan, and Murat Yasa as set out below)**

235.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

236.    At all times relevant herein, Defendant Turkey acted through its officials or employees, who were acting within the scope of their office or employment.

237.    Defendants intentionally and knowingly committed wrongful acts which resulted in harmful or offensive contact with the bodies of Plaintiffs.

238.    Plaintiffs did not consent to the contact.

239.    Defendants acted with the intent to cause injury and actually did cause injury, damage, loss and harm to Plaintiffs, including as a result of the following:

(a)    Plaintiff Kasim Kurd was pushed and punched by Turkey's officials or employees.

(b)    Plaintiff Stephen Arthur was hit and punched by Turkey's officials or employees.

(c)    Plaintiff Heewa Arya was hit, punched and kicked by Turkey's officials or employees, and, on information and belief, kicked by Defendant Mahmut Sami Ellialti.

(d)    Plaintiff Abbas Azizi was hit, punched and kicked by Turkey's officials or employees, and kicked by Defendant Mahmut Sami Ellialti.

(e)    Plaintiff Ceren Borazan was placed in a chokehold, hit, had her hair pulled, was thrown to the ground, and kicked by an official or employee of Turkey.

(f)    Plaintiff Jane Doe I was hit, punched and kicked by Turkey's officials or employees.

(g)    Plaintiff Jane Doe II was pushed, hit, shoved, punched, dragged, and had her hair grabbed by Turkey's officials or employees, and shoved by Defendant Mahmut Sami Ellialti.

(h)    Plaintiff Jane Doe III was kicked by Turkey's officials or employees.

(i)    Plaintiff Elif Genc was grabbed by the arm, pushed to the ground, and repeatedly kicked by Turkey's officials or employees, and kicked by Defendants Eyup Yildirim, Mahmut Sami Ellialti, and Sinan Narin.

(j)    Plaintiff Jalal Kheirabadi was punched and kicked by Turkey's officials or employees, and punched by Defendant Alpkenan Dereci.

(k)    Plaintiff Mehmet Özgen was kicked by an official or employee of Turkey.

(l)    Plaintiff Mehmet Tankan was kicked and punched by Turkey's officials or employees, and kicked by Defendant Ahmet Cengizhan Dereci.

(m)    Plaintiff Murat Yasa was repeatedly kicked by Turkey's officials or employees, kicked by Defendant Eyup Yildirim, and grabbed, thrown the ground, and kicked by Defendant Ahmet Cengizhan Dereci.

240.    Defendants acted in concert and aided and abetted each other by encouraging attacks on the Plaintiffs, and substantially assisted one another during the attacks on the Plaintiffs.

## COUNT III

### FALSE IMPRISONMENT
**(Plaintiff Ceren Borazan, against Defendant Turkey)**

241.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

242.    At all times relevant herein, Defendant Turkey acted through its officials or employees, who were acting within the scope of their office or employment.

243.    Turkey arbitrarily detained, restrained and/or falsely imprisoned Plaintiff Ceren Borazan within boundaries fixed by the Defendant's employee, or official.  Such detention, restraint and/or false imprisonment was illegal and unjust, and carried out without any lawful authority or justification.

244.    Plaintiff Ceren Borazan was placed in fear for her safety, deprived of her liberty, and reasonably believed she was detained against her will by an employee or official of Turkey when placed in a chokehold.  Plaintiff Ceren Borazan did not consent to such conduct, which caused her injury, damage, loss, and harm.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(Plaintiffs Kasim Kurd, Heewa Arya, C.A., Abbas Azizi, Ceren Borazan, Jane Doe II, Jane Doe III, Ruken Isik, Elif Genc, Jalal Kheirabadi, Mehmet Tankan, and Murat Yasa against each Defendant)**

245.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs as if set forth herein.

246.    At all times relevant herein, Defendant Turkey acted through its officials or employees, who were acting within the scope of their office or employment.

247.    Defendants intentionally caused severe emotional distress to Plaintiffs by their willful, wanton, extreme, and outrageous conduct, including but not limited to physically attacking

Plaintiffs, encouraging the physical attack of Plaintiffs, and threatening Plaintiffs with physical harm at the scene of the attack.

248.    Defendants recklessly caused severe emotional distress to Plaintiffs by their willful, wanton, extreme and outrageous conduct, including but not limited to physically attacking Plaintiffs, encouraging the physical attack of Plaintiffs, and threatening Plaintiffs with physical harm at the scene of the attack.

249.    Defendants' conduct was so outrageous in character and so extreme in degree that a reasonable member of the community would regard such conduct as atrocious, going beyond all possible bounds of decency and as being utterly intolerable in a civilized community.

250.    As a direct and proximate result of the Defendants' intentional and/or extremely reckless and indifferent conduct, Plaintiffs suffered pain, severe emotional distress, and mental anguish.

## **COUNT V**

### **HATE CRIME PURSUANT TO D.C. CODE § 22-3704**
### **(Each Plaintiff against each Defendant)**

251.    Plaintiffs reallege incorporate by reference all the preceding paragraphs as if set forth herein.

252.    At all times relevant herein, Defendant Turkey acted through its officials or employees, who were acting within the scope of their office or employment.

253.    D.C. Code § 22-3704 provides a private right of action for victims of hate crimes against their offenders. This encompasses crimes against persons based upon the victims' actual or perceived race, color, national origin, or political affiliation.

254.    As alleged herein, Plaintiffs incurred injuries as a result of Defendants' intentional acts committed as a result Defendants' prejudice towards Plaintiffs' actual or perceived race, color, national origin or political affiliation.

255.    Defendants yelled anti-Kurdish statements, made pejorative references to Kurdish heritage, ripped up posters supporting Kurdish rights or politicians, and desecrated a Kurdish flag.

256.    Defendants' persecutory conduct is the proximate cause of Plaintiffs' injuries and damages alleged herein.

257.    As a result of Defendants' conduct, Plaintiffs are entitled to damages for economic or non-economic loss, including damages for emotional distress, punitive damages in an amount to be determined by a jury or a court sitting without a jury, and reasonable attorneys' fees and costs.

## COUNT VI

### VIOLATION OF ENFORCEMENT JURISDICTION UNDER THE ALIEN TORT STATUTE, 28 U.S.C. § 1350
**(Plaintiffs Ceren Borazan, Jane Doe I, Jane Doe III, Elif Genc, Ruken Isik, Mehmet Özgen, and Mehmet Tankan against Defendant Turkey)**

258.    Plaintiffs reallege and incorporate by reference the allegations set forth above as if set forth full herein.

259.    At all times relevant herein, Defendant Turkey acted through its officials or employees who were acting within the scope of their office or employment.

260.    Plaintiffs Ceren Borazan, Jane Doe I, Jane Doe III, Elif Genc, Ruken Isik, Mehmet Özgen, and Mehmet Tankan are "aliens" for purpose of the Alien Tort Statute.

261.    The Alien Tort Statute was enacted in 1789 in response, in part, to an assault and battery upon a French Ambassador in violation of international law, including principles now found in the Vienna Convention on Diplomatic Relations and other authorities.

262.    Assault and battery are torts.  The torts in this action were committed by Defendant Turkey in violation of international law.  Specifically, the torts were committed in violation of the prohibition in international law against foreign states exercising their enforcement jurisdiction in the territory of another State and interfering in the internal affairs of another State.  Defendant Turkey improperly exerted its powers and enforcement jurisdiction in the United States in violation of customary international law and international treaties.

263.    The prohibition against one state exercising its enforcement jurisdiction in and interfering in the internal affairs of another state is a norm of international character accepted by the civilized world and defined with specificity.  Thus, violations of this norm are cognizable under 28 U.S.C § 1350.

264.    "Now the first and foremost restriction imposed by international law upon a State is that failing the existence of a permission rule to the contrary it may not exercise its power in any form in the territory of another State.  In this sense jurisdiction is certainly territorial; it cannot be exercised by a State outside its territory except by virtue of a permissive rule derived from international custom or from a convention."  *S.S. "Lotus" (Fr. V. Turk.*) 1927 P.C.I.J. (ser. A) No. 10, (Sept. 7).

265.    The principle of non-intervention in the internal affairs of another state is found in numerous United Nations General Assembly Resolutions including, but not limited to, The Essentials of Peace, UNGA Res 290 (V), A/RES/4/290, 1 Dec. 1949; Declaration on the Inadmissibility of Intervention in the Domestic Affairs of States and the Protection of their Independence and Sovereignty, UGA Res 2131(XX), A/RES/20/2131, 21 Dec. 1965; the Friendly Relations Declaration, UNGA Res 2625 (XXV), A/RES/25/2625, 24 Oct. 1970.

266.    The principle of non-intervention is also found in the Vienna Convention on Diplomatic Relations. Article 41 provides that "without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving state.  They also have a duty not to interfere in the internal affairs of that State."  U.N.T.S. vol. 500, p.95, 18 April 1961, entered into force 24 April 1964.  A diplomatic mission functions to protect the interests of the sending state in the receiving state "within the limits permitted by international law." *Id.* at Art. 3(b).  Article 22 provides "that receiving state is under a special duty to take all appropriate steps to protect the premises of the mission against any intrusion or damage and to prevent a disturbance of the peace of the mission or impairment of its dignity."  *Id.* at Art. 22.

267.    Defendant Turkey interfered in the U.S.'s internal affairs and enforced its jurisdiction in the U.S. when its officials or employees bypassed U.S. police officers and attacked peaceful protesters on U.S. soil.  In doing so, Defendant Turkey was using its powers and enforcement jurisdiction to curtail the protest.

268.    Although the United States guarantees the right to peaceful protest, Turkish law includes the following: Article 299 of Turkey's Penal Code, which criminalizes "insulting the President of the Republic"; Article 301 of Turkey's Penal Code, which criminalizes publicly "degrading Turkish Nation, State of Turkish Republic, the Organs and Institutions of the State"; and Law No. 2911 Law on Meetings and Demonstrations, which classifies a demonstration as illegal when organizers do not provide advanced notification and allows for the use of force to disperse illegal demonstrations, following a warning to disperse.

269.    Defendant Turkey is liable for the violations of international law alleged herein. Defendant Turkey is responsible for the actions of its officials or employees who: gave the order

47

to attack the protestors, actually attacked the protesters, conspired with those who attacked the protesters, and did nothing to stop or condemn the attack.  These torts interfered in the internal affairs of the U.S. and enforced Defendant Turkey's jurisdiction in the U.S.  Defendant Turkey is liable for its acts and omissions that led to the injuries described herein in violation of the law of nations.  Defendant Turkey's acts and omissions were deliberate and intentional.

270.    Plaintiffs Ceren Borazan, Jane Doe I, Jane Doe III, Elif Genc, Ruken Isik, Mehmet Özgen, and Mehmet Tankan suffered injuries and damages as a result of these actions by Defendant Turkey's officials or employees.

271.    Plaintiffs' claims touch and concern the U.S. because this violation, *i.e.,* the attack, took place in the U.S.

WHEREFORE, Plaintiffs hereby demand:

a)    compensation for all injuries;

b)    punitive damages;

c)    attorneys' fees and reimbursement of litigation expenses, recoverable under applicable law; and

d)    such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims triable by a jury.

Dated: April 19, 2019                    Respectfully submitted,

/s/ Agnieszka M. Fryszman
Agnieszka M. Fryszman, DC Bar No. 459208
Douglas J. McNamara, DC Bar No. 494567
**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
1100 New York Ave., NW
East Tower, Suite 500

Washington, DC 20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699
afryszman@cohenmilstein.com
dmcnamara@cohenmilstein.com

Mark S. Sullivan (*pro hac vice*)
Joshua Colangelo-Bryan (*pro hac vice*)
**DORSEY & WHITNEY LLP**
51 West 52nd Street
New York, NY 10019
Tel:  (212) 415-9200
sullivan.mark@dorsey.com
colangelo.joshua@dorsey.com

Michael E. Tigar, DC Bar No. 103762
P.O. Box 528
Oriental, NC 28571
Tel:  (202) 549-4229
metigar@gmail.com

***Attorneys for Plaintiffs***