IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KASIM KURD, *et al.*,      ) | |
|      ) | |
| Plaintiffs,      ) | |
|      ) | |
| v.      ) | Case No. 1:18-CV-01117-CKK |
|      ) | |
| THE REPUBLIC OF TURKEY, *et al.*,      ) | |
|      ) | |
| Defendants.      ) | |
|      ) | |

## **DEFENDANT REPUBLIC OF TURKEY'S MOTION TO DISMISS**

Defendant Republic of Turkey ("Turkey"), by counsel and pursuant to Federal Rule of Civil Procedure 12(b)(1), hereby moves the Court to dismiss the Amended Complaint for lack of subject matter jurisdiction.[1]  In support of its Motion, Turkey refers the Court to the Memorandum and its supporting exhibits, filed herewith.

---

[1] Pursuant to Fed. R. Civ. P. 12(h), Turkey expressly preserves and does not waive its right to assert additional defenses under Fed. R. Civ. P. 12(b)(6) and 12(c).

Date:   June 4, 2019                         Respectfully submitted

*/s/ Cathy A. Hinger*
Cathy A. Hinger (DC Bar No. 473697)
Victoria A. Bruno (DC Bar No. 484197)
Mark E. Schamel (DC Bar No. 463965)
WOMBLE BOND DICKINSON (US) LLP
1200 Nineteenth Street, NW
Suite 500
Washington, DC  20036
Tel:  202-857-4489
Fax:  202-261-0029
cathy.hinger@wbd-us.com
victoria.bruno@wbd-us.com
mark.schamel@wbd-us.com

*Counsel for Defendant Republic of Turkey*

*/s/ David S. Saltzman*
David S. Saltzman (DC Bar No. 436201)
Saltzman & Evinch, PLLC
1050 K Street, NW
Suite 1150
Washington, DC  20001
Tel:  202-372-0092
Fax:  202-318-0892
dsaltzman@saltzmanevinch.com

*Counsel for Defendant Republic of Turkey*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KASIM KURD, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )      Case No. 1:18-CV-01117-CKK |
| | ) |
| THE REPUBLIC OF TURKEY, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF**
**<u>DEFENDANT REPUBLIC OF TURKEY'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I.   INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................... 1

II.  STATEMENT OF FACTS ........................................................................................... 5

     A.   FACTS AS ALLEGED BY THE PLEADINGS ........................................... 5

          1.   The Incident At Sheridan Circle As Alleged By Plaintiffs .................................. 6

          2.   Summary Of Legal Claims Alleged By The Amended Complaint ...................... 7

     B.   COUNTERSTATEMENT OF FACTS IN SUPPORT OF
          TURKEY'S JURISDICTIONAL DEFENSES ........................................... 8

          1.   Turkey Is Entitled To Present A Counterstatement Of Facts And
               Evidence Outside Of The Pleadings In Support Of Its Jurisdictional
               Defenses ........................................................................................... 8

          2.   The Challenge Of Securing Turkish Leaders ....................................... 9

          3.   The U.S. Invited President Erdogan To Washington, D.C. ............... 11

          4.   President Erdogan Arrived On May 15, 2017 Under Tight Security ................. 12

          5.   The Lafayette Park Demonstrations: U.S. Security Officers Intervened
               To Separate Rival Groups ....................................................... 13

               a.   The Anti-Turkey Group Displayed Support For A
                    Foreign Terrorist Organization ................................... 14

               b.   There Were Likely Military-Trained Men In The Anti-Turkey
                    Group Who Had Fought With PKK Units ................................. 16

               c.   U.S. Officers Acted Decisively To Defuse A Potentially Violent
                    Situation In Lafayette Park ......................................... 18

          6.   MPD "Escorted" The Anti-Turkey Group To Sheridan Circle .......................... 19

          7.   U.S. Security Officers Placed The Rival Groups Within 35 Feet Of
               Each Other At Sheridan Circle, Leaving Them Separated By Only
               Two Lanes Of Traffic ............................................................. 19

          8.   The First Altercation Broke Out On Massachusetts Avenue ............................. 21

i

9.  After The First Altercation, Turkish Security Officers And
The Turkish Ambassador Implored U.S. Security Officers To Move The
Anti-Turkey Group Back ................................................................. 23

10. President Erdogan Arrived And Was Held In His Vehicle By
U.S. Secret Service And Turkish Security Pending The Restoration
Of Order ........................................................................................ 24

11. Turkish Security Officers, Perceiving A Threat To Their Protectees,
Took Action To Push Back The Anti-Turkey Group ....................... 25

12. The Aftermath ............................................................................... 25

13. Expert Analysis Of Former U.S. Secret Service Special Agent In
Charge of Presidential Protective Division, Michael White, Shows That
There Was A Security Void At Sheridan Circle That Presidential
Protective Services Are Trained To Address, And Were,
Using Common Security Tactics .................................................... 26

14. Plaintiffs' Contention That The Turkish Government Has A
Policy Of Discriminating Against Kurds Is Grossly Overbroad And
Misinformed ................................................................................... 29

III.  LEGAL STANDARD FOR RULE 12(b)(1) MOTION TO DISMISS ............................ 30

IV.  ARGUMENT ....................................................................................... 30

A.  U.S. LAW MANDATES THE PROTECTION OF FOREIGN
DIGNITARIES INVITED TO THE U.S. .................................................... 30

1.  By Treaty, The U.S. Is Required To Criminalize Threats Of Attacks
On, And Prevent Attacks On, Internationally Protected Persons ("IPPs") .......... 30

2.  18 U.S.C. §§ 112 And 878 Guide Law Enforcement Officers To
Provide Foreign Officials, Official Guests, And IPPs With A 100-Foot
Zone Of Protection From Threats Or Harassment, Which Was Eminently
Achievable At Sheridan Circle ....................................................... 31

3.  U.S. Law Enforcement At Sheridan Circle Ignored The Law
Applicable To Dignitaries ............................................................... 33

B.  THE FOREIGN SOVEREIGN IMMUNITES ACT DEPRIVES THIS
COURT OF JURISDICTION OVER PLAINTIFFS' CLAIMS .................................. 35

1.  Overview Of The FSIA And The Exceptions Claimed By Plaintiffs ............... 35

2. The Tortious Acts Exception To Sovereign Immunity,
   28 U.S.C. § 1605(a)(5), Does Not Apply Because Turkey And
   Its Agents Were Performing A Discretionary Function ........................................ 36

   a. The Discretionary Function Rule, 28 U.S.C. § 1605(a)(5)(A),
      Is An Exception To The Tortious Acts Exception That Protects
      Governments From Suits Arising Out Of Actions Based On
      Considerations Of Public Policy ................................................................. 36

   b. Turkey's Conduct During The Sheridan Circle Incident
      Satisfies The D.C. Circuit's Two-Prong Test For The Discretionary
      Function ......................................................................................................... 38

      i. Turkey Satisfies The First Prong Because Its Employees
         Had Discretion To Act ......................................................................... 38

      ii. Turkey Satisfies The Second Prong Because Its Employees'
          Acts Were Grounded In Public Policy ................................................ 42

   c. No Prior Cases Have Evaluated Whether Foreign Security Agents
      Taking Protective Measures To Remove Perceived Imminent Threats
      To A Head Of State By Apparent Associates Of An FTO Is A
      Discretionary Function .................................................................................. 46

C. THE POLITICAL QUESTION DOCTRINE FORBIDS THE COURT FROM
   MAKING FINDINGS ABOUT TURKEY'S NATIONAL POLICIES
   AND INTERNATIONAL GOALS .............................................................................. 50

   1. Factors 1 And 6: Constitutional Commitment To A
      Coordinate Political Department, And Potentiality Of
      Embarrassment From Multifarious Pronouncements ............................................ 52

   2. Factor 2: Lack Of Judicially Discoverable And Manageable Standards ............. 54

   3. Factors 3 and 4: The Prudential Factors ............................................................. 58

   4. The D.C. Circuit's Functional Approach To The Political Question Doctrine ... 58

D. THE DOCTRINE OF INTERNATIONAL COMITY FAVORS
   DISMISSAL OF PLAINTIFFS' CLAIMS .................................................................. 60

   1. Assassination Attempts Are A Constant Reality For A Traveling President ...... 62

2.   U.S. Secret Service Demands Heavy Security Cooperation From
     Its Host State .......................................................................................... 62

3.   Turkish Security Officers Have Died Protecting U.S. Missions ......................... 64

4.   Security For Turkey's Head Of State At Sheridan Circle ................................... 65

E.   28 U.S.C. § 1350 DOES NOT CONFER SUBJECT MATTER JURISDICTION ...... 67

V.   CONCLUSION ............................................................................................... 70

# TABLE OF CASES AND AUTHORITIES

**Cases**

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976)..................................................................................................... 35

*Allen v. United States*, 816 F.2d 1417 (10th Cir. 1987).................................... 43, 44

\* *Alperin v. Vatican Bank*, 410 F.3d 532 (9th Cir. 2005)................................... 51, 55

*Al-Tamimi v. Adelson*, 916 F.3d 1 (D.C. Cir. 2019) ............................... 53, 55, 58

*American Federation of State, Country, Mun. Employees Local 2401 v. District of Columbia*, 796 F. Supp. 2d 136 (D.D.C. 2011) ..................................................................................................... 60

*American Ins. Ass'n v. Garamendi*, 539 U.S. 396 (2003)...................................... 52, 53

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989)..................................................................................................... 67, 68

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 60

*Azima v. RAK Investment Authority*, 305 F. Supp. 3d 149 (D.D.C. 2018) ..................................................................................................... 30

\* *Baker v. Carr*, 369 U.S. 186 (1962).............................................................. 52, 58, 59

*Belhas v. Ya'Alon*, 466 F. Supp. 2d 127 (D.D.C. 2006) ................................... 9

*Berkovitz v. United States,* 486 U.S. 531 (1988) ................................................. 38, 39

\* *bin Ali Jaber v. United States*, 861 F.3d 241 (D.C. Cir. 2017)............... 52, 54, 58, 59

*Boos v. Barry*, 485 U.S. 312 (1988)...................................................................... 33

*Briggs v. Goodwin*, 569 F.2d 10 (D.C. Cir. 1977) ......................................... 49

*CISPES (Comm. in Solidarity with People of El Salvador) v. F.B.I.*, 770 F.2d 468 (5th Cir. 1985) ............................................................... 32, 33, 34

*Dalehite v. United States*, 346 U.S. 15 (1953)....................................................... 37, 49

*Deuser v. Vecera*, 139 F.3d 1190 (8th Cir. 1998)........................................... 39

*Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005)........................... 56

*Doe v. Federal Democratic Republic of Ethiopia*, 189 F. Supp. 3d
6 (D.D.C. 2016) ................................................................................... 48

*El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C.
Cir. 2010) ................................................................................. 55, 58, 69

*Ex parte Republic of Peru*, 318 U.S. 578 (1943) ..................................... 36

*Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347 (D.C. Cir. 2018) ............................................. 30

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................. 33

*Haygan v. United States*, 627 F. Supp. 749 (D.D.C. 1986) ..................... 40

*Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175
(D.C. Cir. 2013) ................................................................................... 30

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ..................... 57

*Hwang Geum Joo v. Japan*, 332 F.3d 679 (D.C. Cir. 2003) ..................... 68

*Japan Whaling Assoc. v. Am. Cetacean Society*, 478 U.S. 221
(1986) .............................................................................................. 55, 58

*Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108 (2013) ......................... 67

*Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980) ............... 46

*Long v. United States*, 119 F.2d 717 (4th Cir. 1952) ............................. 32

* *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d
918 (1987) ................................................................... 35, 37, 46, 47, 50

* *Macharia v. United States*, 238 F. Supp. 2d 13 (D.D.C. 2002) .......... 39, 42, 43, 45, 46

* *Macharia v. United States*, 334 F.3d 61 (D.C. Cir. 2003) .................... 38, 39, 40, 42

*Martin v. D.C. Metro. Police Dep't*, 812 F.2d 1425 (D.C. Cir.
1987) ..................................................................................................... 49

*McMahon v. United States*, 342 U.S. 25 (1951) ..................................... 35

*Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117
(D.D.C. 2018) ................................................................................. 48, 49

*Mich. Cmty. Servs., Inc. v. NLRB*, 309 F.3d 348 (6th Cir. 2002) ............ 60

*MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486 (S.D.N.Y. 2017) ..................................................................................................... 8

*Mohammadi v. Islamic Republic of Iran,* 947 F. Supp. 2d 48 (D.D.C. 2013) ........................................................................................................... 48

*Monarch Ins. Co. of Ohio v. District of Columbia*, 353 F. Supp. 1249 (D.D.C. 1973) ................................................................................................ 44

*Nixon v. United States*, 506 U.S. 224 (1993) ......................................................... 55

*Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918) ........................................ 60, 61

*Olaniyi v. District of Columbia*, 763 F. Supp. 2d 70 (D.D.C. 2011) ..................... 39, 44

*Olsen by Sheldon v. Gov't of Mexico*, 729 F.2d 641 (9th Cir. 1984) ..................... 37, 50

*People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17 (D.C. Cir. 1999) ........................................................................... 51

*Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83 (D.C. Cir. 2005) ........................................................................................................... 35

*Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000) ........................................................................................................ 8, 30

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) ............................................................................................... 9

*Robinson v. Gov't of Malaysia*, 269 F.3d 133 (2d Cir. 2001) .................................. 8

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) .................................. 35

*Risk v. Halvorsen*, 936 F.2d 393 (9th Cir. 1991) .................................................... 47

*Rostker v. Goldberg*, 453 U.S. 57 (1981) ............................................................... 57

*Roy v. United States*, 416 F.2d 874 (9th Cir. 1969) ................................................ 45

*S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99 (D.D.C. 2012) ......................... 69

*SACE S.p.A. v. Republic of Paraguay*, 243 F. Supp. 3d 21 (D.D.C. 2017) ........................................................................................................ 8

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ........................................................ 35

*Shuler v. United States*, 531 F.3d 930 (D.C. Cir. 2008) .......................................... 44

vii

*Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016) .................................................. 9

*Singh v. South Asian Society of the George Washington University*,
   572 F. Supp. 2d 11 (D.D.C. 2008) ............................................................................. 40

*Sledge v. United States*, 883 F. Supp. 2d 71 (D.D.C. 2012) ..................................................... 40

*The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116
   (1812) ............................................................................................................................. 43

*Underhill v. Hernandez*, 168 U.S. 250 (1897) ............................................................................ 35

*United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304 (1936) ............................................ 53

*United States v. Gan*, 636 F.2d 28 (2d Cir. 1980) ...................................................................... 31

* *United States v. Gaubert*, 499 U.S. 315 (1991) ................................................. 38, 43, 45

*United States v. Kashamu*, 656 F.3d 679 (7th Cir. 2011) ............................................................ 60

*United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d
   1 (D.D.C. 2013) ............................................................................................................. 60

*Von Dardel v. Union of Soviet Socialist Republics*, 736 F. Supp. 1
   (D.D.C. 1990) ................................................................................................................. 68

*Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010) .................................... 58, 59

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ................................................. 53

*Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012) ...................................................... 51

**Statutes**

18 U.S.C. § 111 ................................................................................................................................ 32

* 18 U.S.C. § 112(a) ....................................................................................................................... 31

* 18 U.S.C. § 112(b) ............................................................................................................. 32, 33, 66

18 U.S.C. § 878 .................................................................................................................... 32, 34, 50

18 U.S.C. § 2339D .......................................................................................................................... 17

18 U.S.C. § 3056(a)(1) ................................................................................................................... 45

* 28 U.S.C. §§ 1330 & 1602, *et seq.* .......................................................................................... 2, 35

28 U.S.C. § 1350 ............................................................................................................................. 67

28 U.S.C. § 1604 ................................................................................................... 35, 69

* 28 U.S.C. § 1605(a)(5) ............................................................................................. passim

28 U.S.C. § 1605B ........................................................................................................ 36

28 U.S.C. § 2680 ........................................................................................................... 37

**Rules**

Fed. R. Civ. P. 12(b)(1) ......................................................................................... 5, 8, 30

**Other Authorities**

U.S. Const. art. II, § 1, cl.1 ......................................................................................... 52

U.S. Const. art. II, § 3 ................................................................................................... 53

H.R. Rep. 79-1287 ....................................................................................................... 37

H.R. Rep. 94-1487 ................................................................................................... 38, 68

Convention on the Prevention and Punishment of Crimes Against
Internationally Protected Persons, Including Diplomatic Agents,
Feb. 20, 1977, 28 U.S.T. 1975 ..................................................................................... 30

United Nations Convention on the Prevention and Punishment of the
Crime of Genocide art. 2, Dec. 9, 1948, 78 U.N.T.S. 277 .......................................... 55

Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77 .................................. 47

## I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT.

On May 16, 2017, two altercations occurred outside the Turkish Ambassador's Residence ("Residence") in Washington, D.C. (the "Incident").   The second of the two garnered wide publicity, the first, none.   The altercations occurred during Turkish President Recep Tayyip Erdogan's official state visit to the United States with a delegation of his senior ministers.   Just prior to the altercations, President Erdogan and President Trump met at the White House where they discussed matters of vital importance to both Turkey and the United States, including both nations' interlocking roles as partners in the Global Coalition to Defeat ISIS, as well as a host of issues raised by the civil war raging in Syria.

President Erdogan traveled by car from the White House to the Residence.   Moments before he arrived, a group of protesters (the "Anti-Turkey Group") had physically confronted Turkish security officers and injured several Turkey supporters who had gathered to welcome President Erdogan.   Upon his arrival, President Erdogan's security detail engaged physically with some of the Plaintiffs and other protesters at Sheridan Circle who were in close proximity to the President's car, senior Turkish ministers, and the Residence, and who were perceived as a threat to their protectees' safety.

The two altercations resulted in highly publicized injuries to some Plaintiffs, but scantly publicized injuries to police, civilian supporters of Turkey, and Turkish security officers, all of whom were assaulted by members of the Anti-Turkey Group.   Plaintiffs' theories that President Erdogan intended the altercation to further what they characterize as "policies and procedures to restrict fundamental freedoms" and to "deteriorat[e] . . . human rights," (Am. Compl. ¶¶ 38-39), or that Turkey's presidential security detail acted out of ethnic animus towards persons of Kurdish ethnicity, (Am. Compl. ¶¶ 45-50), are preposterous.

These unfortunate altercations should never have happened, and should never occur again due to the lessons learned that day.  Fortunately, extensive video and other evidence related to this Incident is available and depicts a sequence of events not mentioned by Plaintiffs' Amended Complaint, but which demonstrates U.S. courts lack jurisdiction to hear Plaintiffs' claims against Turkey.  The evidence shows that the actions of the Turkish presidential security agents occurred at a moment when they were faced with an angry and aggressive group of apparent supporters or affiliates of a U.S.-designated Foreign Terrorist Organization ("FTO"), who had not been subjected to security screenings at the site, who had just assaulted supporters of Turkey (the "Pro-Turkey Group") with impunity, who had previously advanced towards the Residence despite police commands to stay back, and who remained within hand-gun or improvised explosive device ("IED") proximity of President Erdogan.  The Turkish security officers' and Ambassador's requests for the Metropolitan Police Department ("MPD") to move this dangerous group away from their head of state had been ignored or denied.  It was in this volatile environment that President Erdogan's personal security detail came to his aid to ensure he could safely emerge from his car and enter the Residence without risk of an assassination attempt, the avoidance of which is the primary objective of presidential security officers.  These were discretionary acts of security, which are absolutely excluded from the subject matter jurisdiction of the courts of the United States.  *See* The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 & 1602, *et seq.*

As set forth in Turkey's counterstatement of facts (*infra* § II.B), the video and other evidence submitted herewith objectively establish the following indisputable facts that undermine Plaintiffs' absurd theory that the Turkish security detail acted out of any motivation

other than to secure its protectees who had entered a dangerous and volatile environment just

moments after leaving the White House:

- o On May 16, 2017, while President Erdogan was meeting with President Trump at the White House, Pro- and Anti-Turkey Groups demonstrated in Lafayette Park.  The Anti-Turkey Group displayed flags and signs supporting the Kurdistan Workers' Party ("PKK"), a dangerous terrorist organization responsible for tens of thousands of deaths that has been designated by the U.S. as a Foreign Terrorist Organization, and the YPG, the PKK's Syrian arm.

- o U.S. law enforcement properly separated the Pro- and Anti-Turkey Groups at Lafayette Park, precluding physical conflict.

- o Later, MPD inexplicably "escorted" the Anti-Turkey Group to Sheridan Circle and positioned them just two traffic lanes from the Residence.  The Anti-Turkey Group advanced into traffic and ignored MPD commands.

- o A first altercation erupted when Plaintiff Jalal Kheirabadi ("Kheirabadi") spit on a Turkish security guard, during which Plaintiff Kasim Kurd ("Kurd") smashed a bullhorn on the head of a civilian supporter of Turkey, requiring his hospitalization.  Kurd hurled it a second time at an MPD officer.  Kurd or another member of the Anti-Turkey Group threw a full or frozen water bottle at another civilian in the Pro-Turkey Group, hitting him in the face and drawing blood.  Plaintiff Mehmet Tankan ("Tankan") kicked a Turkish official during this altercation.  MPD arrested no one.

- o After the first altercation subsided, members of President Erdogan's security detail and Turkey's Ambassador asked local law enforcement to move the Anti-Turkey Group farther away from the Residence because President Erdogan was arriving.  These requests were either ignored or denied.

- o When President Erdogan arrived at the Residence, the angry Anti-Turkey Group, of which several members had already acted violently, continued to tout symbols of PKK/YPG support while yelling aspersions about President Erdogan within an unsafe distance of the Turkish president and the Residence he was attempting to enter.

- o Local law enforcement did nothing to enforce U.S. federal law making it a crime for two or more persons to harass or attempt to harass a foreign dignitary within 100 feet.  *See* 18 U.S.C. § 112.  MPD either ignored or was unaware that under U.S. law, and international treaty obligations, dignitaries are different, and that the United States promises a higher level of security to "internationally protected persons" than ordinary persons, as part of the fabric of diplomacy and international comity.

Layer into these circumstances that Turkey, President Erdogan, his senior ministers, and other dignitaries in his delegation, who were being protected by Turkish security officers, face monumental, daily security threats unparalleled by most NATO allies.  And at the time of this Incident, Turkey's counter-ISIS missions in Syria were at their height.

Turkey borders some of the toughest patches of geography in the world, including Syria, which in 2017 was the center of the so-called ISIS caliphate[1] with armed conflict taking place just over the Turkish border.  Importantly here, Turkey is also under constant terrorist threats from the PKK, and its Syrian arm, the YPG, which have been responsible for the brutal murders of tens of thousands of people.  The PKK is responsible for scores of bombings throughout Turkey, numerous assassination attempts on Turkish politicians from multiple political parties, and is known to target diplomatic missions.  Therefore, while MPD may have perceived this as just another group of protesters, the Anti-Turkey Group's indicia of support for, or affiliation with, a known terrorist organization presented unique grounds for concern about the intentions of this group when they achieved a position of close proximity to President Erdogan and members of his delegation.  The Turkish security officers filled this security vacuum and exercised their discretion to remove the perceived threat.

The Kurd Plaintiffs have placed extraordinary emphasis in their Amended Complaint on their political beliefs that it is the current Turkish government's policy to illegally suppress political discourse and discriminate against the entire population of Kurds.  Plaintiff Murat Yasa ("Yasa") has made it very clear that this lawsuit was brought to leverage political pressure on Turkey to negotiate with an imprisoned foreign terrorist leader – a perverse use of the U.S. court

---

[1] In Turkey and the surrounding region, ISIS is more commonly referred to by its Arabic acronym "DAESH."

system. Yasa boldly stated in an interview with *Al-Monitor* that, if President Erdogan were to conduct peace talks with Abdullah Ocalan, the founder and leader of the PKK, he would withdraw this lawsuit "without a second thought."[2] Yasa's comments highlight that adjudication of Plaintiffs' theories would require this Court not only to judge whether President Erdogan employs discriminatory or illegal tactics, an accusation made of the U.S. President on a daily basis, but to engage in extreme entanglements with a foreign sovereign's domestic policies, which long-settled international legal principles, among them sovereign immunity, the sovereign equality of all states, non-interference in domestic affairs of states, the Political Question Doctrine, and comity, sternly prohibit. Moreover, Yasa's comments reflect his support for, if not activism on behalf of, the PKK, whose apparent presence among the Anti-Turkey Group in Sheridan Circle in part prompted the protective measures now under scrutiny in this lawsuit.

In the context of these extraordinary circumstances and in light of Turkey's sovereign immunity, Turkey respectfully asks this Court to dismiss Plaintiffs' claims, with prejudice and without leave to amend, for lack of jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

## II. STATEMENT OF FACTS.

### A. FACTS AS ALLEGED BY THE PLEADINGS.

Since this is a Rule 12(b)(1) motion, Turkey summarizes only those allegations of fact that are jurisdictionally relevant.

---

[2] Amberin Zaman, "Lawsuit over Washington violence looms over US-Turkey relations", *Al-Monitor* (Jan. 3, 2019), https://www.al-monitor.com/pulse/originals/2019/01/lawsuit-washington-violence-us-turkey-relations.html (last visited June 3, 2019).

### 1.    The Incident At Sheridan Circle As Alleged By Plaintiffs.

Plaintiffs allege that on May 16, 2017, they assembled in Lafayette Square in front of the White House to protest against President Erdogan.  (Am. Compl.  ¶¶ 54-55.)  They then traveled with other protesters to the Residence at Sheridan Circle, "where they believed President Erdogan was going," and found a group already gathered on the sidewalk directly in front of the Residence when they arrived.  (*See id.* ¶¶ 57-59.)  Plaintiffs allege this group included individuals invited by the Turkish Ambassador to show support for President Erdogan, as well as staff of the Turkish delegation traveling with him. (*See id.* ¶ 59.)  Plaintiffs allege no one in the Anti-Turkey Group advocated violence and they contend they were all peaceful.  (*See id*. ¶ 64.)

The Amended Complaint alleges that despite the presence of MPD and U.S. Secret Service, members of the Pro-Turkey Group pushed past the police and, along with Turkish security officials, physically attacked the Anti-Turkey Group in a "relatively short" first altercation.  (*See id.* ¶¶ 66-69.)  Plaintiffs allege that after the first altercation, MPD created a "cordon" attempting to keep the Pro-Turkey Group on the sidewalk in front of the Residence. (*See id*. at ¶ 70.)

Plaintiffs allege that after the first altercation, one of the Turkish security officials told an MPD officer, "'[Y]ou need to take them' referring to the protest[ers], and 'if you don't, I will.'" (*Id*. ¶ 74.)  Plaintiffs allege another Turkish agent told a U.S. Secret Service officer, "'We are waiting [for] you to take them out, because President [Erdogan] is coming.  If you don't take . . . I will take.'"  (*Id*. (alteration in original).)  Plaintiffs also allege that the Turkish Ambassador himself urged MPD to move the Anti-Turkey Group away, saying, "'I am the ambassador.  You cannot let this . . . you cannot touch us.'"  (*Id*. ¶ 75.)  Plaintiffs also allege that civilian Defendant Eyup Yildirim "'yelled' at an officer warning him 'of potential violence if the protesters

continued their protest.'"   (*Id*. ¶ 76.)   Individual Sinan Narin made a similar plea to MPD,

"saying not to touch the Turkish security officers as they 'protect' the 'President,'" and Plaintiffs

allege he explained that he did not cooperate with MPD commands because, as he said, "'My

President is coming, I don't want them to be over there.'"   (*See id*. ¶ 77.)   Thus, Plaintiffs

acknowledge that Turkish agents were expecting MPD and U.S. Secret Service to take action to

protect their head of state.   The only MPD response Plaintiffs allege is that an officer said the

protesters, "'have a right to talk.'"   (*Id*. ¶ 73.)

President Erdogan then arrived at the Residence.   (*See id*. ¶ 79.)   He was allegedly seen

speaking to his head of security and, following that interaction, Plaintiffs, none of whom could

have possibly heard or known what was said, make the wild accusation that President Erdogan

ordered an attack on the protesters.   (*See id*. ¶¶ 79-80.)   Plaintiffs contend that following

communications among Turkish government employees, Turkish government employees then

crossed the street, passed the MPD officers, and commenced a second assault on the anti-Turkey

protesters.   (*See id*. ¶ 80.)   Plaintiffs allege that during the assault, the attackers yelled "ethnic

slurs."   (*See id*. ¶ 82.)   Plaintiffs allege the Turkish agents' actions were motivated by prejudices

against Kurds.   (*See id*. ¶¶ 254-255.)

Plaintiffs also contend President Erdogan's security team has resorted to violence and

removed protesters during other state visits and international travel with President Erdogan, but

do not allege the security circumstances or threats to President Erdogan that related to these

incidents.   (*See id*. ¶¶ 218-221.)

### 2.     Summary Of Legal Claims Alleged By The Amended Complaint.

Plaintiffs, in various combinations, assert the following claims against Turkey: Assault

(Count I); Battery (Count II); False Imprisonment (Count III); Intentional Infliction of Emotional

Distress (Count IV); violation of D.C. Code § 22-3704 (Count V); and Violation of Enforcement

Jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350 (Count VI).

**B.     COUNTERSTATEMENT OF FACTS IN SUPPORT OF TURKEY'S JURISDICTIONAL DEFENSES.**

**1.     Turkey Is Entitled To Present A Counterstatement Of Facts And Evidence Outside Of The Pleadings In Support Of Its Jurisdictional Defenses.**

In the context of a Rule 12(b)(1) challenge to jurisdiction under the FSIA, "the court must

go beyond the pleadings and resolve any disputed issues of fact the resolution of which is

necessary to a ruling upon the motion to dismiss." *Phoenix Consulting Inc. v. Republic of*

*Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (reversing the lower court's denial of an FSIA motion

to dismiss because it failed to consider Angola's evidence and assumed the truth of the

complaint's factual allegations). Courts may consider evidence beyond the pleadings and "must

do so if resolution of a proffered factual issue may result in the dismissal of the complaint for

want of jurisdiction." *MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 499

(S.D.N.Y. 2017) (quoting *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 n.6 (2d Cir. 2001)).

"This evidence may include affidavits, exhibits and declarations." *Id.* In the FSIA case *Republic*

*of Peru*, for example, the court granted a motion to dismiss based on "reports and articles from

the late 1800s detailing Peruvian debt instruments and the guano trade," "excerpts from

newspaper articles," "trade reports and a congressional hearing transcript," none of which was in

the pleadings. *Id.* at 503-04. The Court "has a duty to make its own independent factual

determinations in order to ascertain its authority under the FSIA." *SACE S.p.A. v. Republic of*

*Paraguay*, 243 F. Supp. 3d 21, 43 (D.D.C. 2017) (granting Paraguay's FSIA motion to dismiss in

reliance on declarations it proffered). Thus, when a foreign state disputes the factual basis of

subject matter jurisdiction under the FSIA, "the trial court is required to go beyond the pleadings

. . . ."  *Belhas v. Ya'Alon*, 466 F. Supp. 2d 127, 129 (D.D.C. 2006) (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002)) (granting FSIA motion to dismiss in reliance on an ambassador's letter in response to litigation); *see also*, *e.g.*, *Simon v. Republic of Hungary*, 812 F.3d 127, 144 (D.C. Cir. 2016) ("If the defendants were to challenge the factual basis of those allegations on remand, the district court would need to go beyond the pleadings and resolve the factual dispute.").

Accordingly, on this Rule 12(b)(1) motion, it is proper for Turkey to present evidence outside the pleadings concerning the Incident that is relevant to its sovereign immunity defense. Evidence of the circumstances that show Turkey's entitlement to sovereign immunity follows.

### 2.     The Challenge Of Securing Turkish Leaders.

Turkey, a NATO, G-20, and Council of Europe member, is a consequential regional power with a population of over 80 million, located in a strategic and sometimes dangerous region.[3]   (Ex. 1, Yavuz Decl. ¶¶ 7, 9.)  Its leaders' policies are, therefore, scrutinized carefully both within and beyond the country's borders.  Turkey's current head of state, President Recep Tayyip Erdogan, has been a public figure since the mid-1990s, having first served as Mayor of Istanbul, then as a member of the Turkish parliament, then as Prime Minister and, since July 2014, as President.  (*Id.* ¶ 33.)

President Erdogan, perhaps no less so than the U.S. president, stokes heated discussion. His style of campaigning and governance, the policies he supports, the tenor of his public addresses, and even his mustache, engender passionate debate.  Any person with a newspaper subscription or access to the Internet can attest to the many column inches of newsprint,

---

[3] U.S. Dep't of State, U.S. Relations With Turkey, Bureau of European and Eurasian Affairs Fact Sheet (Mar. 27, 2019), https://www.state.gov/r/pa/ei/bgn/3432.htm (last visited June 3, 2019).

megabytes of online journalism, and millions of social media posts that report on and analyze his actions.

And perhaps no less so than the U.S. president, President Erdogan has extraordinary security needs.  (*See* Ex. 2, White Decl. ¶¶ 18-21, 26-27, 31-32; *see also* Ex. 1, ¶¶ 8, 34, 52.)  In service of his country, he travels abroad frequently, having made twenty foreign visits between July 2018 and April 2019 alone.[4]  Moreover, on July 16, 2016, ten months before his visit to the U.S., an assassination attempt on President Erdogan killed one of his security guards and a policeman.[5]  And although security risks are not usually publicized, President Erdogan was the target of more than 300 assassination attempts between 2002 and 2013 when he was serving as Prime Minister.[6]  (*See* Ex. 1, ¶ 8.)  As Turkey is a member of the anti-ISIS coalition and faces several U.S.-designated FTOs[7] both on its home soil and in its near abroad, securing Turkey's leaders presents a host of acute and complex challenges.  (*See id.* ¶¶ 8, 10-11, 51-52, 55

---

[4]   Website of the Turkish Presidency, *Yurt Dışı Ziyaretler* (Foreign Visits), https://www.tccb.gov.tr/receptayyipErdogan/yurtdisiziyaretler/?&page=1 (last visited June 3, 2019).

[5]  Times of Israel, *Erdogan said to have been target of assassination attempt during failed coup*, (July 18, 2016), https://www.timesofisrael.com/Erdogan-said-to-be-target-of-assassination-attempt-during-failed-coup/1 (last visited June 3, 2019).  Additionally, in December 2017, just months after the Sheridan Circle Incident, Greek authorities foiled a plan to assassinate President Erdogan during his visit to Athens by attacking his car with rockets, grenades, and Molotov cocktails.  *See Arrested DHKP-C militants plotted to assassinate Erdogan in Athens: Greek media*, HURRIYET DAILY NEWS (Dec. 18, 2017), http://www.hurriyetdailynews.com/arrested-dhkp-c-militants-plotted-to-assassinate-Erdogan-in-athens-greek-media-124323 (last visited June 3, 2019).

[6]  Yahya Bostan, Alper Sancar, Gündem Haberleri, *Erdoğan'a 10 yılda 100 suikast girişimi*, Sabah, (Jan. 25, 2013), https://www.sabah.com.tr/Gundem/2013/01/25/Erdogana-10-yilda-100-suikast-girisimi (last visited June 3, 2019).

[7] *See* U.S. Dep't of State, U.S. Relations With Turkey, Bureau of European and Eurasian Affairs Fact Sheet (Mar. 27, 2019), https://www.state.gov/r/pa/ei/bgn/3432.htm (last visited June 3, 2019) (referencing Turkey's security cooperation in defeating terrorist organizations including the PKK, DHKP/C, and ISIS); *see also* U.S. Dep't of State, Foreign Terrorist Organizations, Bureau of Counterterrorism, https://www.state.gov/j/ct/rls/other/des/123085.htm (last visited June 3, 2019).

(describing ISIS attacks on Turkish targets since 2013, among them, bombings in Turkey that claimed 259 lives and maimed hundreds more).)

### 3.    The U.S. Invited President Erdogan To Washington, D.C.

At the invitation of the White House, President Erdogan, and a delegation including his Minister of Foreign Affairs, Minister of Defense, Minister of Justice, Minister of Energy and Natural Resources, several senior diplomats, and other aides visited Washington, D.C. on May 15 and 16, 2017.  The composition of the delegation reflected the breadth and significance of the U.S.–Turkey relationship and the planned meetings.   The two nations are NATO members, partners in the anti-ISIS coalition in Iraq and Syria, and share a robust trading relationship of more than $20 billion annually, with the balance of trade favoring the U.S.[8]  The centerpiece of the visit was the planned bilateral meeting at the White House chaired by the two presidents to take place on May 16.  Topping the agenda were joint efforts to fight terrorism both globally and within countries adjoining Turkey[9] and the controversial decision of the U.S. to arm the Syrian branch of a U.S.-designated FTO.[10]  (*Id.* ¶¶ 41-46 (describing the alter ego status of the PKK and YPG); *id.* ¶¶ 11, 47-48, 54-55 (describing the policy problem inherent in the U.S.' treatment of

---

[8] U.S. Dep't of State, U.S. Relations With Turkey, Bureau of European and Eurasian Affairs Fact Sheet (Mar. 27, 2019), https://www.state.gov/r/pa/ei/bgn/3432.htm (last visited June 3, 2019).

[9] *Remarks by President Trump and President Erdogan of Turkey in Joint Statement* (May 16, 2017), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-president-Erdogan-turkey-joint-statement/ (last visited June 3, 2019); Yasmeen Serhan, *'A New Era' in U.S.-Turkish Relations,* THE ATLANTIC (May 16, 2017),
 https://www.theatlantic.com/news/archive/2017/05/trump-Erdogan/526851/ (last visited June 3, 2019).

[10]    Angela Dewan, *Erdogan meets Trump: 3 key issues topping the agenda*, https://www.cnn.com/2017/05/16/politics/Erdogan-trump-turkey-us-meeting/index.html    (last visited June 3, 2019); Julie Hirschfeld Davis, Mark Landler, *Trump Praises Erdogan as Ally in Terrorism Fight, Brushing Aside Tensions*, N.Y. TIMES (May 17, 2017), https://www.nytimes.com/2017/05/16/world/middleeast/erdogan-turkey-trump.html (last visited June 3, 2019).

the PKK/YPG in Syria); *id.* ¶¶ 49-50, 53 (detailing Turkish security threats emanating from Syria and the humanitarian burden Turkey has absorbed from the influx of Syrian refugees).)

4.      **President Erdogan Arrived On May 15, 2017 Under Tight Security.**

The U.S. provided President Erdogan lodging at the President's Guest House, commonly known as Blair House, on Pennsylvania Avenue.  When a Turkish head of state arrives in a foreign country, Turkish citizens and those with Turkish heritage customarily greet him or her. The May 2017 visit was no different.  Prior to President Erdogan's arrival on May 15, 2017, a group of Turkish Americans, some having traveled from long distances, gathered near the closest barricades outside of Blair House to welcome him to the U.S.  They assembled on Pennsylvania Avenue near the northeast corner of 17th Street.  The group had obtained a valid assembly permit from MPD.  (Ex. 3, 5/15/17 MPD Assembly Plan.)

No protesters, whether anti-Turkey or anti-President Erdogan, were present. Nevertheless, out of an apparent abundance of caution, U.S. Secret Service officers ordered the group of friendly Turkish Americans to move to the northwest corner of 17th Street and Pennsylvania Avenue, a distance of approximately 280 feet from Blair House.  (Ex. 4, A-E, May 16, 2017 Photos of 17th & Pennsylvania.)  The group willingly complied and understood this to be a valid safety measure befitting the solemnity of President Erdogan's visit.

President Erdogan arrived by motorcade in the late afternoon.  The Turkish Americans displayed a welcome banner, waved Turkish flags, sang the Turkish national anthem, and shortly afterward dispersed.  (*See id.*).

12

5. **The Lafayette Park Demonstrations: U.S. Security Officers Intervened To Separate Rival Groups.**

On May 16, 2017, as Presidents Trump and Erdogan were meeting, the Pro-Turkey Group[11] and the Anti-Turkey Group staged demonstrations on Pennsylvania Avenue across from the White House and in Lafayette Park. Each group possessed a valid assembly permit from MPD. The Pro-Turkey Group, mainly Turkish Americans voicing support for the U.S.–Turkey relationship, obtained a permit in the name of the Turkish American National Steering Committee from MPD for Pennsylvania Avenue in front of the White House. (Ex. 5, 5/16/17 MPD Assembly Plan.) However, the area directly in front of the White House was closed due to security for the bilateral talks, so U.S. security officers moved the Pro-Turkey Group eastward on Pennsylvania Avenue. (Ex. 6, Video Thumbdrive at File Nos. LS01, LS02, LS03, LS04, LS05) (showing Pro-Turkey Group in front of the White House fence surrounded by heavy security).[12] Meanwhile the Anti-Turkey Group[13] had gathered on the southeast quadrant of Lafayette Park, directly facing the Pro-Turkey Group, apparently having obtained a permit from MPD for the use of Lafayette Park. (*Id.* at File No. LS06) (showing Anti-Turkey and Pro-Turkey Groups separated on opposite sides of Pennsylvania Avenue).

[11] Turkey uses the term Pro-Turkey Group with respect to the group in Lafayette Park, but not all of the people among the Pro-Turkey Group in Lafayette Park were present for the Incident because many of them went to the Turkish Embassy, rather than the Residence.

[12] Exhibit 6 was filed under seal.

[13] As will be illustrated, this group included PKK and YPG supporters, as well as persons espousing anti-President Erdogan and anti-Turkey rhetoric.

a.     **The Anti-Turkey Group Displayed Support For A Foreign Terrorist Organization.**

Members of the Anti-Turkey Group held signs and yellow flags that openly supported the PKK, a U.S.-designated Foreign Terrorist Organization,[14] the PKK's founder and leader, Abdullah Ocalan, and the PKK's Syrian alter ego, the YPG.[15]   (*Id.* at File Nos. LS07, LS08, LS09; Ex. 1, ¶¶ 19-24 (describing Ocalan, "His main goal was to destroy not just the Turkish state, but also the traditional Kurdish societal structure," and the founding and operation of the PKK).)  Plaintiff Kheirabadi[16] displayed a YPG flag.  (Ex. 7, Photo of Kheirabadi with YPG flag; Ex. 8, Photos showing PKK and YPG signs among Anti-Turkey Group in Lafayette Park.)[17]  One of the flags displaying PKK leader Ocalan in Lafayette Park was a smaller version of the tremendous one displayed by the YPG in Raqaa, Syria.  (*Compare* Ex. 1, ¶ 47 (citing internet photo of same flag in Raqaa) *with* Ex. 6, at File Nos. LS17, LS02, LS04 at 0:00-03, LS06 at 0:04-08, LS07 at 0:04-12, LS08, LS09, LS10.)

---

[14] U.S. Dep't of State, *State Department Maintains Foreign Terrorist Organization (FTO) Designation of the Kurdistan Workers' Party (PKK)*, (Mar. 1, 2019), https://www.state.gov/state-department-maintains-foreign-terrorist-organization-fto-designation-of-the-kurdistan-workers-party-pkk/ (last visited June 3, 2019).

[15] Indeed, the so-called *Official YPG Page for International Fighters*, extols Ocalan as the "founder of the the Kurdistan Workers' Party (PKK), the armed wing of the Kurdish struggle for autonomy … . From 1984, the PKK fought for an independent Kurdish state in southeast Turkey, … in which thousands of PKK guerrillas have fought the Turkish army, the second largest in NATO."   Official   YPG   Page   for   International   Fighters, https://ypginternational.blackblogs.org/books/ (last visited June 3, 2019).

[16] Kheirabadi, who is wearing a bright blue shirt, can be seen in one of these photos holding up a yellow YPG flag.  Later, he appears in the Sheridan Circle videos, easily identifiable by his bright blue shirt, leading the Anti-Turkey Group's advancement on the Residence in the first altercation, failing to obey commands of Turkish security officers, kicking and punching Turkish security officers, assaulting an MPD officer, and being arrested for "APO," – assaulting a police officer.  (*See infra* § II.B.8.)

[17] Exhibits 7 and 8 were filed under seal.

The PKK is a terrorist organization that aims to carve an ethnically pure, Marxist-Leninist state from the territory of Turkey.  (Ex. 1, ¶ 19.)  Turkish military operations to eliminate PKK terrorism have been ongoing since the mid-1980's.  (*Id*. ¶ 25.)  Fighting continues up to the present.  Casualties from this period alone have been steep:  since July 2015, over 1,200 Turkish soldiers and security officers have been killed by the PKK, with another 5,000 wounded.  (*Id*. ¶ 50.)  According to the U.S. Office of the Director of National Intelligence, the PKK's "campaign of armed violence, including terrorism, [has] resulted in over 45,000 deaths."[18]

PKK attacks have been numerous and gruesome.  (Ex. 1, ¶ 26 (13 killed to protest Ocalan's arrest); *id*. at ¶ 24 (describing car and truck bombings that killed 57 people, including a mother and her baby); *id*. at ¶ 34 (describing five high-casualty PKK attacks, two of them by suicide bombers, and two PKK attacks against Turkish politicians, all near the date of President Erdogan's visit to the U.S.).)  Of particular significance to the present case, the PKK routinely targets diplomatic missions, having attacked Turkish missions in multiple countries, the U.S. Embassy in Athens, the Israeli consulate in Berlin, as well as Greek and Kenyan embassies.  (*Id*. ¶¶ 27-31.)

In short, PKK terrorism targeting Turkey constitutes a clear and present danger to the lives of Turkish officials, security forces, and innocent civilians.  Understandably, all threats of PKK violence and all expressions of support for the PKK are taken with extreme seriousness and urgency by the government of Turkey.  (*Id*. ¶ 51.)

---

[18]  Office of the Director of National Intelligence, Turkish Domestic Terrorism, https://www.dni.gov/nctc/groups/turkey_domestic_terrorism.html (last visited June 3, 2019).

**b.     There Were Likely Military-Trained Men In The Anti-Turkey Group Who Had Fought With PKK Units.**

The likelihood is great that among the crowd of Turkish Americans gathered in Lafayette Park and later at the Residence were individuals who had experienced PKK terror that claimed the lives of, or that injured, loved ones or close friends.  The same would be true for the Turkish security officers accompanying President Erdogan and his delegation.

Added to this is the fact that foreign fighters from various countries have gone to Syria and returned, making the security challenges faced by those guarding Turkish officials worldwide more complex.[19]  (Ex. 2, ¶ 32.)  Some of those foreign fighters include Americans who have joined the PKK/YPG.[20]  Publicly available sources illustrate at least two of the Plaintiffs – Kurd and Kheirabadi – have associations with such foreign fighters.  (*See* Ex. 1, ¶ 25 (noting that, unlike these misguided American adventurists, the majority of Turkey's Kurds have not rallied to the PKK's cause).)

On September 21, 2017, three YPG supporters, including one woman holding the flag of the Women's Protection Units ("YPJ"), the female counterpart to the YPG, interrupted a speaking engagement by President Erdogan at a hotel in New York City by shouting obscenities

---

[19] Megan Specia, *Foreign Fighters Back Kurdish Militia in Syria in Fight Against Turkey*, N.Y. TIMES  (Jan. 27, 2018), https://www.nytimes.com/2018/01/27/world/middleeast/foreign-fighters-kurdish-militia-syria.html (last visited June 3, 2019).

[20] Shirin Jaafari, *For some Americans, the conflict in Syria is 'the Spanish Civil War of our time'*, PRI'S THE WORLD, (Sept. 13, 2017), https://www.pri.org/stories/2017-09-13/some-americans-conflict-syria-spanish-civil-war-our-time (last visited June 3, 2019).  The YPG recruits using English language websites, among them, The Official YPG Page for International Fighters, https://ypginternational.blackblogs.org (last visited June 3, 2019), and the Lions of Rojava Facebook Page, https://www.facebook.com/TheLionsofRojavaOfficial/ (last visited June 3, 2019).

at President Erdogan.[21]   U.S. security officials in President Erdogan's detail forcibly ejected them, and they were then detained by venue security.   (*Id.*)   Among those detained was Kurd. Also detained were at least three individuals known to have taken up arms in Syria, quite likely in violation of 18 U.S.C. § 2339D, which prohibits "receiving military-type training from a foreign terrorist organization."  *See* 18 U.S.C. § 2339D.

One of them, Lucas Chapman, is from the Washington, D.C. area.  In an interview with The New Yorker, he explained that he meets other potential YPG military recruits at pro-Kurdish protests in Washington, D.C.[22]   Another who was stalking President Erdogan that day was Robert Amos, who in one of his published war diaries explicitly declares that the organizations that perpetuate the ideals of PKK founder Abdullah Ocalan are, "the PKK in Turkey, PJAK in Iran, and PYD in Rojava (northern Syria).  All of these organizations are members of an umbrella . . . ."[23]   Kheirabadi who, as shown above, was holding a YPG flag in Lafayette Park on May 16, 2017, is an associate of Amos.[24]

---

[21] Maggie Astor, Nicholas Fandos, *Fighting Breaks Out at Turkish President's Speech in New York*, N.Y. TIMES, (Sept. 21, 2017), https://www.nytimes.com/2017/09/21/us/erdogan-new-york.html (last visited June 3, 2019).

[22] Nicholas Schmidle, *College Grads Fight ISIS With The Kurds*, THE NEW YORKER, (July 31, 2017), https://www.newyorker.com/magazine/2017/08/07/college-grads-fight-isis-with-the-kurds (last visited June 3, 2019) (stating that Chapman's job prior to taking up arms in Syria was in Washington, D.C., also stating that he meets YPG military recruits in D.C.); Liz Sly, *How two U.S. Marxists wound up on the front lines against ISIS*, THE WASHINGTON POST, (Apr. 1, 2017), https://www.washingtonpost.com/world/middle_east/how-two-us-marxists-wound-up-on-the-front-lines-against-isis/2017/03/30/3c722344-c79e-11e6-acda-59924caa2450_story.html?utm_term=.df85b4a78bfa (last visited June 3, 2019).

[23] Robert Amos, *I Fought ISIS with the Kurds In Syria. This Is What It Was Like*, THE TOWER MAGAZINE, (Jan. 2017), http://www.thetower.org/article/i-fought-isis-with-kurds-in-syria-this-is-what-it-was-like/ (last visited June 3, 2019).

[24] Wes Enzinna, *This American Fought ISIS.  Now He's Trying to Get Washington to Untangle Its Syria Policy,* PULITZER CENTER, (Dec. 27, 2016), https://pulitzercenter.org/reporting/american-fought-isis-now-hes-trying-get-washington-untangle-its-syria-policy (last visited June 3, 2019) (describing a 2016 incident in Washington,

Thus, a proper intelligence and security briefing concerning the composition of the opposing groups should have alerted U.S. Secret Service and MPD that it was likely that there were individuals in the Anti-Turkey Group that had received training on the use of weapons and explosives from PKK/YPG terrorists and were part of PKK/YPG units.  (*See* Ex. 2, ¶¶ 29-32.)

        c.        **U.S. Officers Acted Decisively To Defuse A Potentially Violent Situation In Lafayette Park.**

While the presidents were meeting, some members of each group in Lafayette Park began shouting slogans and unflattering epithets and gesticulating toward each other.  As tempers flared, U.S. federal security officers decisively intervened to create additional space between the groups.  First, federal security officers pushed the Pro-Turkey Group south across Pennsylvania Avenue.  Then, the same officers moved the Anti-Turkey Group to the northeast quadrant of Lafayette Park, and shortly afterward moved the Pro-Turkey Group also into Lafayette Park.  The two groups were separated by approximately 50-75 feet, with each side behind barricade tape, a phalanx of federal security officers between them, and police cars bordering the square.  (*See generally* Ex. 6, at File Nos. LS07, LS11, LS12.)  There were also SWAT officers present.  (*Id*. at File No. LS13.)  The Anti-Turkey Group chanted anti-President Erdogan rhetoric while the Pro-Turkey Group voiced support for Turkey and played patriotic Turkish music.  (*See id*. at File Nos. LS14, LS15, LS16.)

---

D.C. where Amos chased Joe Biden by car following a Hillary Clinton campaign speech where Amos shouted at Biden from the crowd regarding U.S. policy concerning the YPG, and referring to Amos' driver in the chase as, "Jay Kheirabadi, an Iranian Kurd who lives in Maryland," who then also helped Amos stage a protest outside the gates of the U.S. Naval Observatory).

In short, U.S. security officers perceived the need for physical separation, and moved the two groups apart accordingly, meanwhile allowing each group's members to express themselves within well-defined spaces at a safe distance.

Put another way, a combustible situation had arisen:  fuel was present in the form of dozens of rival protesters; pressure had built from the groups being in close proximity; oxygen was present in the form of the ability of each group to hurl insults at each other.  All that was needed for an explosion was a spark, whether a thrown fist or hurled object.  But the officers, recognizing the risk of a conflagration, exercised their discretion and reacted by separating the groups and filling the gap with a sufficient number of officers to enforce the division.  Therefore, other than some feelings being hurt, the Lafayette Park demonstrations concluded without incident.

### 6.   MPD "Escorted" The Anti-Turkey Group To Sheridan Circle.

Following the demonstrations in Lafayette Park, while the majority of the Pro-Turkey Group made their way to the Turkish Embassy Chancery at 2525 Massachusetts Avenue, N.W., according to an affidavit recorded by one of the U.S. security officers, MPD officers were detailed to "escort" the Anti-Turkey Group to the Residence, which is located on 23rd Street, N.W., adjacent to Sheridan Circle.  (*See* Ex. 9, MPD Off. Alberti Statement ¶ 2.)  There were no protocols for screening the Anti-Turkey Group upon their arrival at Sheridan Circle.  (*See* Ex. 2, ¶¶ 34-35.)

### 7.   U.S. Security Officers Placed The Rival Groups Within 35 Feet Of Each Other At Sheridan Circle, Leaving Them Separated By Only Two Lanes Of Traffic.

Prior to the arrival of the Anti-Turkey Group, supporters of Turkey and President Erdogan had gathered on the sidewalk adjoining the Residence to await the arrival of President

Erdogan and his delegation, intending to show their support for Turkey.  (Ex. 6, at File No. SC01 at 0:01-0:40.)  Having escorted the Anti-Turkey Group to the vicinity of the Residence, U.S. security officers arrayed the Anti-Turkey Group directly opposite the Pro-Turkey Group, separated only by two active lanes of traffic on Massachusetts Avenue on the southwest portion of Sheridan Circle.  (*Id.*)  This placed the Anti-Turkey Group within approximately fifty feet of the Residence.  (*Id.*)  "That [was] well within the range of a hand gun, an IED, or a biochemical projectile."  (Ex. 2, ¶ 35.)  Some members of the Anti-Turkey Group, including Kurd, Kheirabadi, Heewa Arya ("Arya"), C.A. (carried by her father Arya), Abbas Azizi ("Azizi"), and Ceren Borazan ("Borazan"), moved into Massachusetts Avenue while Kurd and others yelled rhetoric like "Erdogan Terrorist!" and "Baby Killer Erdogan" over a megaphone as they advanced through two lanes of traffic towards the Residence and members of the Turkish delegation.  (Ex. 6, at File No. SC01 at 0:01-0:40.)  There were no physical barriers to maintain separation between the rival groups.  Eventually, the Anti-Turkey Group, in defiance of repeated police commands to remain on Sheridan Circle, blocked traffic on Massachusetts Avenue.  (*Id.* at 0:01-0:50.)  There were no visual barriers blocking the direct line of sight between Sheridan Circle and the Residence where President Erdogan was to arrive.  (*Id.*)  Relative to the security applied for other events related to the Turkish state visit at, for example, Blair House and Lafayette Park, the insufficiency of the resources devoted to Sheridan Circle was aberrant.

The encroachment of the Anti-Turkey Group, predictably, caused members of each group to once again engage in shouting, chanting, insulting, and gesticulating toward each other.  (*Id.*)  The same combustible situation that had existed at Lafayette Park was thus recreated.  But this time there was a spark.

### 8.     The First Altercation Broke Out On Massachusetts Avenue.

At approximately 4:05 p.m., the shouting Anti-Turkey Group in Massachusetts Avenue was completely blocking both lanes of vehicular traffic, possibly to obscure the movements of others in their group.  (*Id.* at File No. SC01 at 0:01-0:30; *see also* Ex. 2, ¶ 40.)  Kheirabadi (in the bright blue shirt and wearing a backpack) can be seen almost at the edge of the sidewalk of the Residence, and Kurd (man with the bullhorn) is within a few feet of the sidewalk.  (Ex. 6, at File No. SC01 at 0:01-0:30.)  No U.S. officer intervened even to stop the Anti-Turkey Group from impeding traffic.  (*Id.*)   The groups continued to taunt each other.  (*Id.*)

The first altercation broke out when Kheirabadi is seen in the video shouting, spitting at, and advancing towards a man in khaki uniform (which Plaintiffs allege signifies members of President Erdogan's security team (*see* Am. Compl. ¶ 27), breaking into a fist fight among them. (Ex. 6, at File No. SC01 at 0:24-1:02.)  Kheirabadi's backpack is an extremely serious security threat.  (Ex. 2, ¶ 41.)  Plaintiffs Kurd, Tankan, Azizi, Arya, Borazan, Stephen Arthur, Mehmet Ozgen, and others also participated in this first altercation.[25]  (Ex. 6, at File No. SC01 at 0:24-1:02.)

Kurd smashed Canadian citizen Alpkenan Dereci in the head with a bullhorn, severely injuring him.[26] (*Id.* at 0:53-57; *see also id.* at File No. SC02 at 0:04-28.)  Mr. Dereci was later hospitalized and required sixteen stitches to repair his split scalp and bruised skull.  (*See id.* at File No. SC02 at 2:00-2:08; SC01 at 3:10-3:24.)

---

[25] Exhibit 10 (filed under seal) is a set of screen shots taken from the end of File No. SC02 identifying the various persons from the still segments of that video, which identifies a number of the *Kurd* Plaintiffs involved in the first altercation.

[26] *See also id.* at File No. SC02 at 12:48 "Subject AK: Mollaouglu, Kasim a.k.a Kurd, Kasim" (showing Kurd about to throw his bullhorn at Alpkenan Dereci).

Notwithstanding that Kurd was one of the most visible aggressors during the first altercation, Kurd alleges in the Complaint that, "during the first attack, Turkish security officials . . . attempted to grab, pushed, and then repeatedly punched [him] in the head." (Am. Comp. ¶ 93.)  The video, however, shows Kurd was not punched in his head at all during the first altercation. (*See* File No. SC02 at 0:22-59).  Kurd also alleges that during the second altercation he "was able to escape" (Am. Compl. ¶ 95), and the video corroborates that no Turkish agents made any physical contact with him and he was not physically injured. (*See* File No. SC02 at 0:29-58.)  Yet, inexplicably, Kurd alleges that he suffered injuries to his head and hand. (Am. Compl. ¶ 97.)

Kheirabadi is seen during the first altercation kicking and fighting with Turkish security officers, while Kurd used his bullhorn as a weapon a second time, hurling it towards an MPD officer and Turkish security officers. (*Id*. at 0:29-51.)  Approximately 25-30 seconds into the altercation, Kheirabadi still had not retreated, but continued to advance toward Turkish security officers, and confronted an MPD officer. (*Id.* at 0:29-58.)  It took two uniformed MPD officers to escort Kheirabadi back to Sheridan Circle. (*Id.* at File No. SC01 at 1:18-28.)

Kurd also hurled what appears to be a full or frozen bottle at the Pro-Turkey Group, which hit U.S. citizen Sinan Narin in the face, injuring him and drawing blood. (*Id*. at File No. SC02 at 0:57-1:04, 2:08-2:14 (showing blood above Narin's lip).)  Tankan, the man wearing a white shirt, red vest, and sunglasses, alleges that he was kicked by Defendant Ahmet Cengizhan Dereci during the first altercation, but the video shows otherwise. (*See* Am. Compl. ¶ 177.)  The video shows that Tankan kicked a Turkish official during the first altercation. (*See* File No. SC02 at 00:40-47.)

At this point most of the Pro-Turkey Group voluntarily withdrew to the sidewalk adjoining the Residence.  But, the Anti-Turkey Group continued to hurl objects and shout provocations.  Plaintiff Borazan, the woman with long brown hair wearing a scarf and white shirt, accused the Turkey supporters of being terrorists and sprayed the contents of another plastic bottle in the direction of the police and Pro-Turkey Group, while standing in the middle of the traffic lanes on Massachusetts Avenue.  (*Id*. at File No. SC02 at 1:04-1:30.)  Head of state security officers are typically "trained to treat the dispersal of any liquid as a potential biochemical hazard."  (*See* Ex. 2, ¶ 46.)

U.S. law enforcement at this point managed to separate the rival groups to the sidewalks on opposite sides of Massachusetts Avenue and re-open traffic flow.  (Ex. 6, at File No. SC01 at 1:15-3:55; *see also id*. at File No. SC02 at 1:29-2:31.)  But, a physical barrier remained lacking, MPD offered no medical assistance to either Alpkenan Dereci or Sinan Narin, and MPD did not arrest Kheirabadi, Kurd, Tankan, or anyone else in the Anti-Turkey Group whom they had just witnessed committing assaults on the Pro-Turkey Group, a Turkish security agent, and one of their own officers.  (*Id*.; *see also* Ex. 2, ¶¶ 35, 47-50, 54.)

> **9.    After The First Altercation, Turkish Security Officers And The Turkish Ambassador Implored U.S. Security Officers To Move The Anti-Turkey Group Back.**

Having heard or witnessed the altercation on Massachusetts Avenue, Turkish security officers and others awaiting the Turkish President's arrival exited the Residence to assess the situation.  Between 4:05 p.m. and 4:13 p.m., numerous individuals pleaded with U.S. law enforcement officers to move the Anti-Turkey Group, who had already proven their capacity for violence, a reasonable distance away.  (Ex. 6, at File No. SC03 ("they don't have a permit," and "why are you not taking them back"); *see also id.* at File Nos. SC04, SC05, SC06.)  Members of

the security detail of President Erdogan also spoke with U.S. law enforcement emphasizing the need to move the protesters farther away to ensure that President Erdogan would be able to enter the Residence safely.  (*Id*.)  It is consistent with standard operating procedure for presidential protective detail to seek the assistance of local law enforcement to protect the secure zone.  (Ex. 2, ¶ 47.)  Even Turkey's Ambassador was forced to leave the safety of the Residence to plead for this common sense security tactic, without success.  (Ex. 6, at File No. SC07 at 2:08-20; *see also id.* at File No. SC08 at 0:01-25.)  One of the Turkish security officers at least twice told local law enforcement: "Do you understand my president is coming?  If you don't take, I will take."  (*Id.* at File No. SC09 at 0:45-57, 4:35-53.)  The MPD officer did not respond at all.  A U.S. Secret Service agent responded: "Yes, sir."  (*Id.* at 4:35-4:53.)  These responses suggested local law enforcement was unwilling or unable to secure a perimeter or that Turkish security officers had tacit approval to take action necessary to protect their head of state.  (*See* Ex. 2, ¶ 48.)  U.S. law enforcement took no action to move the Anti-Turkey Group farther away from the Residence where President Erdogan and senior Turkish ministers were about to arrive, (Ex. 6, at File No. SC07; *see also id.* at File No. SC08 at 0:01-25), even though it was their function to neutralize threats outside the secure zone.  (Ex. 2, ¶¶ 25, 48.)

> **10.    President Erdogan Arrived And Was Held In His Vehicle By U.S. Secret Service And Turkish Security Pending The Restoration Of Order.**

At approximately 4:12 p.m., President Erdogan's motorcade arrived at the Residence. (Ex. 6, at File No. SC05 at 1:01-2:28.)  President Erdogan's vehicle was held in the Residence driveway and he remained in this vulnerable position where he could see and hear the PKK supporters in Sheridan Circle in close proximity.  He and his security detail no doubt were aware

of the violence that had just occurred minutes prior.  (*Id.*; *see also id*. at File No. SC02 at 5:10-5:25; Ex. 2, ¶¶ 51-57.)

11.    **Turkish Security Officers, Perceiving A Threat To Their Protectees, Took Action To Push Back The Anti-Turkey Group.**

At approximately 4:13 p.m., Turkish security officers, facing a compromised security environment and perceiving a risk to their protectees, exercised their discretion and moved to reduce the risk to the Turkish President and the ministers, advisors, and diplomats accompanying him.  (Ex. 6, at File No. SC02 at 2:35-3:50; Ex. 2, ¶¶ 25, 51-57.)  In so doing, they physically confronted the protesters, sparking an altercation in which U.S. security officers and civilians took part.  It lasted approximately one minute.  (Ex. 6, at File No. SC02 at 2:35-3:50.)  The altercation resulted in the Anti-Turkey Group being dispersed and pushed back from the edge of Sheridan Circle.  When that occurred, the Turkish President entered the Residence.  (*See generally id*. at File No. SC10 (showing President Erdogan in his vehicle during the second altercation, and emerging among U.S. Secret Service and Turkish security protection after Kheirabadi and others were removed from close proximity); *see also id*. at File No. SC02 at 5:10-7:04 (same); Ex. 2, ¶ 57.)  The Turkish security officers, though armed, did not draw their weapons.  (*See generally* Ex. 6, at File No. SC02 at 2:35-3:50.)

12.    **The Aftermath.**

Following the events, arrest warrants were issued against four civilians from the Pro-Turkey Group and 15 Turkish security officers.  Two of the civilians, Eyup Yildirim and Sinan Narin, have pleaded guilty to one count of assault each while two others have not yet been arrested or arraigned.  Charges against all but four of the Turkish security officers have been dropped.  Plaintiff Kurd, who grievously injured Alpkenan Dereci with a bullhorn and hurled the full or frozen water bottle that injured Sinan Narin, was neither arrested nor charged.  (*See id.* at

25

File No. SC11 (showing Eyup Yildirim pleading with MPD to arrest the assailant that assaulted Alpkenan Dereci with the bullhorn).  Kheirabadi was charged with assaulting a police officer, but, inexplicably, the District of Columbia soon abandoned those charges.  In arresting Turkish American Necmi Ayten, who was eventually cleared because he arrived at Sheridan Circle after the brawl had ended, an MPD officer offered a sworn statement labeling the Pro-Turkey Group as "radicalized," (Ex. 9), while casting the Anti-Turkey Group as "peaceful." (*Id.*; *see also* Ex. 11, Ayten Police Aff.)  The videos showing Kheirabadi's assault on a police officer and Kurd's hurling of his bullhorn at the opposing group and law enforcement, belie this characterization. The officer further described those presumed to be Turkish security officers as "Middle Eastern men," a meaningless, if not biased characterization.  (Ex. 9; *see also* Ex. 11.)  Turkish Americans consider this narrative and failure of the U.S. to criminally prosecute any of the Anti-Turkey Group the result of bias.

In subsequent anti-Turkey protests outside the Residence, MPD has consistently deployed bike rack barricades and kept anti-Turkey protesters generally to the north side of the equestrian statue in Sheridan Circle, approximately 150 feet from the Residence.  There have been no repeat occurrences of events of the type that occurred on May 16, 2017.  (*See* Ex. 12, Photos of anti-Turkey protest on Sheridan Circle, Apr. 24, 2018.)

13. **Expert Analysis Of Former U.S. Secret Service Special Agent In Charge of Presidential Protective Division, Michael White, Shows That There Was A Security Void At Sheridan Circle That Presidential Protective Services Are Trained To Address, And Were, Using Common Security Tactics.**

Michael White is a twenty-six year veteran of the U.S. Secret Service and former Special Agent in Charge of its elite Presidential Protection Detail.  He is one of the world's most experienced experts in protective services, including the training and protocols used by

professional head of state security details throughout the developed world.  (*See* Ex. 2, ¶¶ 2, 7-25.)

Mr. White has analyzed the video footage of the Incident at Sheridan Circle.  (*Id.* ¶¶ 1, 3-5.)  Mr. White concluded that the security conditions at Sheridan Circle, the violent behaviors of members of the Anti-Turkey Group, and their display of affiliations with a known terrorist organization violently hostile to the Turkish government, posed a significant, immediate threat to President Erdogan's personal safety that local law enforcement was unwilling or unable to control.  (*Id.* ¶¶ 31, 34, 49-50.)  Mr. White observed that when President Erdogan arrived at the Residence, the Turkish security officers took action to neutralize the threat of one or more members of the Anti-Turkey Group breaching the secure perimeter expected for head of state security, but that local law enforcement failed to create or safeguard, despite being asked repeatedly to do so.  (*Id.* ¶¶ 47-48, 54.)  Mr. White also concluded that the Turkish security officers' actions were consistent with standard operating protocols that call for discretionary use of whatever force is necessary to carry out the primary mission of protecting a head of state from a legitimately perceived, imminent harm when defensive techniques to stop the advance fail.  (*Id.* ¶¶ 24-25, 58-62.)  Mr. White expects the Turkish security officers assigned to presidential protection would have been trained to assume the potential for an assassination attempt given the circumstances.  (*Id.* ¶¶ 26-28, 55.)

Mr. White found significant that when President Erdogan arrived, the Turkish security officers had already witnessed the Anti-Turkey Group engage in numerous "pre-attack" behaviors that would have put them on high alert of the potential for a violent, possibly deadly, confrontation in the presence of their protectee.  (*Id.* ¶¶ 36-46, 53.)  In Mr. White's training and experience, the Anti-Turkey Group repeatedly ignoring police commands to remain on Sheridan

Circle could be indicators of attempts to either surveil the arrival point for weaknesses or breach the secure perimeter outside the Residence, or plans to initiate another violent altercation, like the first altercation which injured two Pro-Turkey Group civilians in the head and face.  (*Id.* ¶¶ 37, 40, 45, 52-55.)  Mr. White also found the failure of local law enforcement to move the Anti-Turkey Group a safe distance away from the head of state's arrival point, failure to detain or arrest the Anti-Turkey Group members who were hurling projectiles (*i.e.*, full or frozen plastic bottles), spraying unknown substances in the direction of police (a potential biochemical hazard), and committing assaults, failure to confiscate the weapon (*i.e.*, bullhorn) used in the prior assaults, and failure to search and confiscate the backpack that Kheirabadi carried, to be matters of great security concern.  (*Id.* ¶¶ 43-46.)  The latter was a serious security failure by local law enforcement because of the well-known risk that backpacks can be used to carry or conceal IEDs, that if detonated so close to the arrival point, could have been lethal to the protectee, the Ambassador, the senior ministers in the delegation, and countless civilians.  (*Id.* ¶ 41.)  Another serious concern was the fact that local law enforcement positioned the Anti-Turkey Group approximately fifty feet away from the Residence, with a direct line of sight to the arrival point, without any screening or other visual barriers, placing President Erdogan within "handgun distance."  (*Id.* ¶ 35.)

Based on Mr. White's experience and training, it is his conclusion that President Erdogan was in an extremely vulnerable safety position when he arrived and was forced to temporarily remain in his vehicle.  (*Id.* ¶¶ 51-52.)  Mr. White opines that President Erdogan's security detail made a reasonable decision, given the circumstances, the available intelligence, and lack of assistance from local law enforcement, not to permit him to exit the vehicle until the Anti-Turkey Group was under control and the threat neutralized.  (*Id.* ¶¶ 56-57.)

14.     **Plaintiffs' Contention That The Turkish Government Has A Policy Of Discriminating Against Kurds Is Grossly Overbroad And Misinformed.**

Plaintiffs' allegations that "the Turkish state has a long history of discrimination against and oppression of the Kurdish people" and that it "persecute[s] the Kurdish population" (Am. Compl. ¶ 45), are as misinformed as they are inaccurate and fail to take into account the vast majority of Turkish citizens' rejection of the PKK and its affiliates, who have terrorized the Turkish state and its people for decades.

As amply described by Professor Hakan Yavuz, the majority of Turkish citizens of Kurdish origin in Turkey are fully integrated into Turkey's social, cultural, and political life. (Ex. 1, ¶ 14.)  In Turkey, citizenship is a constitutional right and every citizen is equal before the law. The PKK, by contrast, is a radical faction, operating under the leadership of Abdullah Ocalan, who was born in 1948. (*Id.* ¶ 19.)  His goal has been to destroy the Turkish state as well as traditional Kurdish societal structure, which he has sought to replace with a socialist Pan-Kurdish state. (*Id.*)  Thus, while Ocalan is a Kurd himself, as are tens of thousands of his followers, the terrorist group cultivated under his ideology has terrorized the Turkish state as well as all other Kurds who do not ascribe to his and the PKK's terrorist ideology. (*See generally id*. ¶¶ 19-31.)  And indeed, it is likely that among the Pro-Turkey Group at Lafayette Park and Sheridan Circle were Turkish citizens of Kurdish origin.  Therefore, Plaintiffs' sweeping allegations that President Erdogan's policies "persecute[ ] the Kurdish population" (Am. Compl. ¶ 45), fail to acknowledge that the Turkish state's efforts are against the PKK and they are grounded in national security interests and fighting against terrorism.

29

### III.    LEGAL STANDARD FOR RULE 12(b)(1) MOTION TO DISMISS.

Under Rule 12(b)(1), when a defending sovereign disputes the factual basis of the court's

subject matter jurisdiction the "plaintiff bears the initial burden" to overcome the presumption of

sovereign immunity "by producing evidence that an [FSIA] exception applies." *Azima v. RAK*

*Investment Authority*, 305 F. Supp. 3d 149, 159 (D.D.C. 2018) (quoting *Helicopter Textron, Inc.*

*v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013)).   Upon the plaintiff's

production of evidence, the defending sovereign then bears the "burden of persuasion" to show

the alleged exception does not apply.  *Id.* (quoting *Helicopter Textron*, 734 F.3d at 1183).  When

resolving a fact-based challenge to subject matter jurisdiction, "the court may not deny the

motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed

by the defendant.   Instead, the court must go beyond the pleadings and resolve any disputed

issues of fact . . . ."  *Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347, 351 (D.C. Cir. 2018)

(citation omitted) (quoting *Phoenix Consulting*, 216 F.3d at 40).

### IV.    ARGUMENT.

#### A.    U.S. LAW MANDATES THE PROTECTION OF FOREIGN DIGNITARIES INVITED TO THE U.S.

##### 1.    By Treaty, The U.S. Is Required To Criminalize Threats Of Attacks On, And Prevent Attacks On, Internationally Protected Persons ("IPPs").

The United States and Turkey are parties to the Convention on the Prevention and

Punishment of Crimes Against Internationally Protected Persons (the "IPP Convention"), a

multi-national treaty borne out of the member states' recognition that, "crimes against diplomatic

agents and other internationally protected persons create a serious threat to the maintenance of

normal international relations . . . ."  Convention on the Prevention and Punishment of Crimes

Against Internationally Protected Persons, Including Diplomatic Agents, Feb. 20, 1977, 28

U.S.T. 1975.  Article 2 of the IPP Convention requires states to make it a crime for persons to intentionally attack an IPP, their official premises, accommodation, or means of transport, or to make a "threat to commit any such attack," or attempt to commit any such attack."  *Id*. at art. 2. Article 4 of the IPP Convention requires a receiving state to cooperate in the prevention of such crimes and take measures to ensure that the Article 2 crimes do not occur in the receiving state:

> States Parties shall cooperate in the **prevention** of the crimes set forth in article 2, particularly by:
>
> (a)    taking all practicable measures to **prevent preparations** in their respective territories for the commission of those crimes within or outside their territories;

*Id.* at art. 4 (emphasis added).  In sum, Articles 2 and 4 of the IPP Convention establish a plain and unequivocal obligation for the U.S. to protect foreign dignitaries visiting the U.S.[27]

### 2.    18 U.S.C. §§ 112 And 878 Guide Law Enforcement Officers To Provide Foreign Officials, Official Guests, And IPPs With A 100-Foot Zone Of Protection From Threats Or Harassment, Which Was Eminently Achievable At Sheridan Circle.

Congress enacted 18 U.S.C. §§ 112 and 878 to implement the U.S.' international obligation to protect foreign dignitaries visiting the U.S. from acts that threaten the maintenance of normal international relations.

Section 112(a) broadly prohibits assaults against foreign officials, official guests, and IPPs, and attacks upon the official premises, private accommodations, and means of transport of such persons.  18 U.S.C. § 112(a).  The provision also criminalizes attempts to commit such offenses.  *Id*.  Notably, neither intent to injure an IPP nor proof of injury is required to be found guilty of a crime under Section 112(a).  *See United States v. Gan*, 636 F.2d 28, 29-30 (2d Cir. 1980), *cert. denied*, 451 U.S. 1020 (1981).

---

[27] The IPP Convention also applies to diplomats.

Section 112(b) prohibits, among other things, (1) harassment or (2) attempts to harass a foreign official and (3) the congregation of two or more persons within 100 feet of a foreign official with the intent to harass.  18 U.S.C. § 112(b).[28]  The term "harass" has been interpreted to apply to "such activities as may seriously alarm or persecute foreign officials."  *CISPES (Comm. in Solidarity with People of El Salvador) v. F.B.I.*, 770 F.2d 468, 476 (5th Cir. 1985). The legislative history of the statute (in its pre-amended form) includes the following example of individual misconduct criminalized by Section 112(b)(1) and (2):

> Engaging in a course of conduct, including the use of abusive language, or repeatedly committing acts which alarm, intimidate or persecute him which serve no legitimate purpose;

Senate Report No. 1105, 92d Cong., 2d Sess. 18 (1972), *reprinted at* 1972 U.S. Code. Cong. and Adm. News 4316, 4327.[29]  *See also* 18 U.S.C. § 878 (making it a crime to knowingly and willingly threaten to violate Section 112).

Of paramount relevance to the Sheridan Circle Incident is Section 112(b)(3)'s prohibition on the gathering of more than two people within 100 feet of a foreign official with the intent to intimidate or harass that official, which unequivocally occurred in Sheridan Circle and on Massachusetts Avenue on May 16, 2017.  *See* 18 U.S.C. § 112(b)(3).  This provision prohibits persons from gathering, even in the name of "protesting," within a 100-foot zone of an IPP with

---

[28] This section also prohibits coercion and intimidation of a foreign official and attempts to do the same.  The behavior of the Anti-Turkey Group at Sheridan Circle could as easily fit the definitions of coercion and intimidation as it does harassment.

[29] In contrast, 18 U.S.C. § 111, which prohibits assaults upon **U.S. government** employees, requires that the interference with the official be "forcibl[e]."  (Emphasis added.)  18 U.S.C. § 112 lacks a "forcible" requirement and, thus, establishes a lower threshold for violation.  In this respect, then, visiting foreign dignitaries are accorded a higher level of protection.  Consequently, one can be guilty of violating Section 112 merely by harassing or interfering with the performance of a foreign official's duties, even without resorting to force.  *Cf. Long v. United States*, 119 F.2d 717, 719 (4th Cir. 1952).

the intent to harass. *Id.* at § 112(b)(3). These protections are so important to the smooth functioning of international relations that the IPP Convention imposes a mandatory obligation on a "State Party in whose territory the alleged offender is present" to either extradite the offender or prosecute him. *See* IPP Convention, at art. 7.

Thus, demonstrations encroaching within 100 feet of an IPP, his or her official premises, or means of transport must remain peaceful. When demonstrations turn harassing, violent, or threaten violence in such close proximity to a foreign dignitary, official premises, or means of transport, "they lose their protected quality as expressions under the First Amendment" and become criminal acts. *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972). In responding to a constitutional challenge to a similar but more restrictive provision of the D.C. Code prohibiting the display of banners and placards near foreign embassies, the Supreme Court spoke approvingly of Section 112 and cited it as an example of careful legislative draftsmanship designed to withstand First Amendment scrutiny. *See Boos v. Barry*, 485 U.S. 312, 326 (1988). *See also CISPES*, 770 F.2d at 477 (affirming denial of protesters' motion for TRO seeking prohibition on enforcement of Section 112 based on First Amendment challenge).[30]

### 3.   U.S. Law Enforcement At Sheridan Circle Ignored The Law Applicable To Dignitaries.

Based on the events that transpired at Sheridan Circle, it appears MPD was either not aware of, or not trained to give effect to, or ignored these U.S. international obligations. MPD took no action to enforce the U.S.' obligations to afford President Erdogan and his delegation a 100-foot zone free from harassment or attempts to harass. To the contrary, police records show

---

[30] U.S. Dep't of Justice, *Justice Manual*, Criminal Resource Manual at 1625 (2018), https://www.justice.gov/jm/criminal-resource-manual-1625-first-amendment-18-usc-112 (last visited June 3, 2019), (citing *CISPES*, 770 F.2d at 477).

MPD "escorted" the Anti-Turkey Group to a position well within the 100-foot zone that the U.S. has committed to secure for IPPs. Moreover, despite witnessing Plaintiffs Kheirabadi, Kurd, and other Anti-Turkey Group members engage in many direct violations of Sections 112 and 878 in the presence of IPPs that were inside or had emerged from the Residence, no one in the Anti-Turkey Group was arrested or removed from the 100-foot zone after the first altercation.[31]   Even after the Incident, the United States Attorney's Office failed to prosecute any of the numerous persons associated with the Anti-Turkey Group who the videos show openly violating Sections 112 and 878 for prolonged periods of time. The Turkish head of state, his senior ministers, and his diplomatic agents, as beneficiaries of and protectees under the IPP Convention, had every reason to expect U.S. law enforcement would uphold the U.S.' promise to "prevent preparations" of the types of acts criminalized by Sections 112 and 878. Their failure to do so left a security void in contravention of a decades long international commitment the U.S. had made to afford visiting IPPs, and in particular, heads of state, protection from harassment and threats in close proximity during official visits. Likely, the Incident at Sheridan Circle would have unfolded differently if the Anti-Turkey Group had been kept at a distance greater than 100 feet. Indeed, at subsequent anti-Turkey protests at Sheridan Circle, the United States has kept protesters at a distance greater than 100 feet from the Residence and there have been zero confrontations.[32]

---

[31] Compare with *CISPES*, 770 F.2d at 470-71, where FBI agents who received tip that protesters might try to seize the Honduran Consulate told protesters picketing outside that they were violating Section 112 by their prior conduct of entering the Consul, asking questions challenging governmental policies, and taking pictures as if to surveil the premises, causing the protesters to disperse.

[32] *See supra* Ex. 12, Photos of Anti-Turkey Protest on Sheridan Circle, April 24, 2018.

B.   **THE FOREIGN SOVEREIGN IMMUNITES ACT DEPRIVES THIS COURT OF JURISDICTION OVER PLAINTIFFS' CLAIMS.**

1.   **Overview Of The FSIA And The Exceptions Claimed By Plaintiffs.**

The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 & 1602, *et. seq.*, provides "the 'sole basis' for obtaining jurisdiction over a foreign sovereign." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992); *Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 86 (D.C. Cir. 2005) ("[T]here is only one way for a court to obtain jurisdiction over a foreign state and it is not a particularly generous one—the FSIA.").  It creates a blanket presumption of immunity, mandating that a "foreign state shall be immune from the jurisdiction of the courts of the United States."  28 U.S.C. § 1604.  Thus, unless a specific exception listed in Sections 1605 to 1607 applies, "a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).  "[I]mmunity remains the rule rather than the exception." *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 919 (1987) (citation omitted); *compare id. with McMahon v. United States*, 342 U.S. 25, 27 (1951) (stating statutes waiving immunity of the United States "are to be construed strictly in favor of the sovereign").

The policy underlying foreign sovereign immunity is two-fold.  On the one hand, it recognizes that "[e]very sovereign state is bound to respect the independence of every other sovereign state." *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *see also Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 703-04 (1976) (noting the "risk of affronting" sovereignty of a foreign state by "attempt[ing] to pass on the legality of their governmental acts").  On the other hand, it recognizes that U.S. interests "will be better served in such cases if the wrongs to suitors, involving our relations with a friendly foreign power, are righted through

diplomatic negotiations rather than by the compulsions of judicial proceedings." *Ex parte Republic of Peru*, 318 U.S. 578, 589 (1943).

Plaintiffs allege that the FSIA's tortious acts exception, 28 U.S.C. § 1605(a)(5), confers jurisdiction.[33]  For the reasons discussed below, it does not.

> **2.      The Tortious Acts Exception To Sovereign Immunity, 28 U.S.C. § 1605(a)(5), Does Not Apply Because Turkey And Its Agents Were Performing A Discretionary Function.**
>
> > **a.      The Discretionary Function Rule, 28 U.S.C. § 1605(a)(5)(A), Is An Exception To The Tortious Acts Exception That Protects Governments From Suits Arising Out Of Actions Based On Considerations Of Public Policy.**

The tortious acts exception to the FSIA provides a potential path for U.S. courts to exercise jurisdiction over a sovereign's alleged torts occurring in the United States.  *See* 28 U.S.C. § 1605(a)(5) (hereinafter "Tortious Acts Exception").  Congress, however, explicitly carved out an exception for claims based on the foreign sovereign's exercise of a discretionary function.  *See* 28 U.S.C. § 1605(a)(5)(A) (hereinafter the "Discretionary Function Rule").  The Tortious Acts Exception and Discretionary Function Rule, read together, state in pertinent part, that jurisdiction lies in any case:

> in which money damages are sought . . . for personal injury . . . occurring in the United States and caused by the tortious act . . . of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment . . . **except this paragraph shall not apply to**—(A) **any** claim based upon the exercise or performance or the failure to exercise or perform a **discretionary function regardless of whether the discretion be abused.**

---

[33] In the related case *Usoyan, et al. v. Turkey*, United States District Court for the District of Columbia, Civ. No. 1:18-CV-1141-CKK ("*Usoyan*"), the plaintiffs pled two additional FSIA exceptions to sovereign immunity: waiver, 28 U.S.C. § 1605(a)(1); and international terrorism, 28 U.S.C. § 1605B.  In this case, Plaintiffs have not specifically pled any FSIA exception other than "tortious acts," so Turkey presumes Plaintiffs contend the "tortious acts" exception is the only one they will argue is applicable.  Turkey nonetheless reserves its right to contest any other FSIA exception Plaintiffs may later assert based on the same or similar reasons Turkey argued other FSIA exceptions are not applicable in the Motion to Dismiss it filed in *Usoyan*.

28 U.S.C. § 1605(a)(5) (emphasis added).

The Discretionary Function Rule protects "the discretion of the executive or the administrator to act according to one's judgment of the best course." *Dalehite v. United States*, 346 U.S. 15, 34 (1953) (affirming lower court's dismissal of damages claims against the United States arising out of an explosion of fertilizer that had been produced and distributed under the direction of the U.S. Coast Guard).[34]  It is a "**highly important exception**, **intended to preclude** any possibility that [the FSIA] might be construed to authorize **suit for damages against the Government growing out of an authorized activity**." *Id.* at 30 (emphasis added) (citing legislative history of FTCA, H.R. Rep. No. 79-1287, at 5-6 (1945)).  Congress thus "exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions." *Id.* at 32.

Congress expressed its intent for the FSIA to afford foreign sovereigns the same Discretionary Function Rule protections as the U.S.  The FSIA's "legislative history counsels that the [Tortious Acts Exception] should be narrowly construed . . . .  Accordingly, 'acts or omissions of a fundamentally governmental nature' are discretionary functions for purposes of [section 1605(a)(5)(A)]." *MacArthur*, 809 F.2d at 921 (citations omitted) (quoting *Olsen by Sheldon v. Gov't of Mexico*, 729 F.2d 641, 645 (9th Cir. 1984), *cert. denied,* 469 U.S. 917

---

[34] "[G]uidance on what acts should be deemed discretionary for FSIA purposes can be drawn from decisions construing the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680 (1982) a statute with analogous language.  *MacArthur*, 809 F.2d at 921-22 (comparing 28 U.S.C. § 2680(a) with § 1605(a)(5)(A)).

(1984)).[35]   Thus, the protective shield of sovereign immunity is, by its terms, far-reaching and unassailable for any claim in tort involving a discretionary function.

> **b.    Turkey's Conduct During The Sheridan Circle Incident Satisfies The D.C. Circuit's Two-Prong Test For The Discretionary Function Rule.**

The D.C. Circuit follows a two-prong test for determining whether the Discretionary Function Rule applies. *Macharia v. United States*, 334 F.3d 61, 65 (D.C. Cir. 2003) (citing *United States v. Gaubert*, 499 U.S. 315, 323 (1991) and *Berkovitz v. United States,* 486 U.S. 531, 536 (1988)).   Under this test, immunity is preserved over any claim where (1) a government employee or agent had discretion to act, rather than there being a statute, regulation or policy specifically proscribing a course of conduct, and (2) the exercise of that discretion was grounded in considerations of public policy. *Macharia*, 334 F.3d at 65.

> **i.    Turkey Satisfies The First Prong Because Its Employees Had Discretion To Act.**

Under the first prong of the discretionary acts test, courts must look to whether the government employee's acts were discretionary in nature and involved an element of judgment or choice. *Macharia*, 334 F.3d at 65 (quoting *Gaubert*, 499 U.S. at 322); *see also Berkovitz*, 486 U.S. at 538 (advising to look at whether the act was within a "permissible range of choices" accorded to that employee).   For example, "[l]aw enforcement decisions of the kind involved in making or terminating an arrest must be within the discretion and judgment of enforcing

---

[35]  The House Judiciary Committee explained that "[t]he purpose of section 1605(a)(5) is to permit the victim of a traffic accident or other noncommercial tort to maintain an action against the foreign state to the extent otherwise provided by law." H.R. Rep. 94-1487, at 21 (1976). "Section 1605(a)(5) is directed primarily at the problem of traffic accidents but is cast in general terms as applying to all tort actions for money damages." *Id.* at 20-21.  The Committee hoped to give "American citizens[, who] are increasingly coming into contact with foreign states," a means of recovery for nondiscretionary torts like "when a citizen crossing the street may be struck by an automobile owned by a foreign embassy." *Id.* at 6-7.

officers." *Olaniyi v. District of Columbia*, 763 F. Supp. 2d 70, 89 (D.D.C. 2011) (quoting *Deuser v. Vecera*, 139 F.3d 1190, 1195 (8th Cir. 1998)) (finding Capitol Police's arrest and detention of plaintiff, who appeared as a threat based on a costume he was wearing, as well as police acts of physically cutting the costume from his body, were discretionary). However, if a government policy or statute leaves "no room for an official to exercise policy judgment in performing a given act, or if the act simply does not involve the exercise of such judgment, the [Discretionary Function Rule] does not bar a claim that the act was negligent or wrongful." *Berkovitz*, 486 U.S. at 546-47.

In *Macharia v. United States,* this Court found "determinations about what security precautions to adopt at American embassies" involved elements of choice and judgment and were therefore discretionary. 238 F. Supp. 2d 13, 23 (D.D.C. 2002); *aff'd Macharia*, 334 F.3d at 69. This Court granted a Rule 12(b)(1) motion by the United States invoking sovereign immunity in response to negligent security and failure to warn claims filed against it by survivors of the 1998 Al-Qaeda terrorist bombing of the U.S. Embassy in Nairobi. 238 F. Supp. 2d at 18. This Court held that "determinations about what security precautions to adopt at American embassies . . . do not involve the mechanical application of set rules, but rather the **constant exercise of judgment and discretion**." *Id.* at 23 (emphasis added). In support of this finding, this Court reasoned that the U.S. Department of State Foreign Affairs Manual, Diplomatic Security ("FAM") specifically instructs that "when full implementation of outlined standards is 'impossible or inappropriate,' foreign service officers should engage in a process of 'risk management.'" *Id.* (citing 12 FAM 6 H 511.4) (brackets omitted). The Court further explained:

> This **risk management** 'process begins with an assessment of the value of the assets, the degree of a specific type of threat, and the extent of the vulnerabilities . . . . **A decision is then made as to what level of risk can be accepted and**

**which countermeasures should be applied**. Such a decision involves a cost-benefit analysis, giving decision makers the ability to weigh varying security risk levels against the cost of specific countermeasures.'

*Id.* at 23-24 (citing 12 FAM 6 H 511.4) (emphasis added). The D.C. Circuit agreed, finding embassy security is vested in the discretion of the State Department and affirming dismissal of the claims. *Macharia*, 334 F.3d at 66.

As in *Macharia*, this Court, in cases brought under the Federal Tort Claims Act ("FTCA"), has repeatedly found governmental decisions concerning the level of security needed to protect certain persons or facilities are discretionary.  *See also*, *e.g.*, *Sledge v. United States*, 883 F. Supp. 2d 71, 87 (D.D.C. 2012) (finding the manner in which federal Bureau of Prisons security officer handled a transfer of an inmate that resulted in a deadly attack on the inmate was "the type of decision fraught with policy considerations," and therefore discretionary); *see Singh v. South Asian Society of the George Washington University*, 572 F. Supp. 2d 11, 13-14 (D.D.C. 2008) (finding decisions concerning the posting of security guards at the Old Post Office Pavilion was a discretionary function); *Haygan v. United States*, 627 F. Supp. 749, 751 (D.D.C. 1986) (finding decision as to the number of security officers to patrol a government parking lot was discretionary).

Since the Turkish security officers' acts involved elements of choice and judgment, they satisfy the first prong.  As illuminated by the expert observations of Michael White, the Turkish security officers were thrust into a position where they had to make decisions based on risk-management that fell squarely within their professional training and discretion.  Carrying out the primary mission of protecting a head of state requires constant monitoring and evaluation of potential and evolving threats to the head of state's physical safety, how imminent and credible identified or perceived threats might be, and the tactics deemed necessary to neutralize those

threats, given the circumstances and the available intelligence.  (*See generally* Ex. 2, ¶¶ 25-28, 33, 37, 51-57.)

Following the first altercation, the Turkish security officers were keenly aware of the potential for another violent confrontation by the Anti-Turkey Group, who repeatedly defied commands by local enforcement not to approach the secure zone outside the Residence.  (*See supra* §§ II.B.7, 9.)  Plaintiffs Kheirabadi and Kurd, along with others in the Anti-Turkey Group, had already assaulted, or threatened to assault, the Pro-Turkey Group, as well as local law enforcement, without MPD making any arrests or taking any measures to push back the Anti-Turkey Group to a safer distance and physically separate them, as had been done in Lafayette Park.  (*See supra* §§ II.B.5.c, 8.)   Nothing had been done to search the Anti-Turkey Group, including Kheirabadi's backpack, or to confiscate Kurd's bullhorn that he used to severely injure a civilian in the Pro-Turkey Group.  (*See* Ex. 2, ¶ 55.)  Local law enforcement ignored multiple requests by Turkish security officers, and even the Turkish Ambassador, to move the Anti-Turkey Group farther away from the Residence and President Erdogan's arrival point.  (*See id.* ¶ 48.)  At the time of President Erdogan's arrival, the Anti-Turkey Group was approximately fifty feet away, which is well-within the range of hand guns and explosive devices.  (*See id.* ¶ 35.)

Under these circumstances, and with no assistance from local law enforcement, the Turkish security officers had to undertake the necessary risk assessment calculations to carry out their mission to protect their head of state.  (*See id.* ¶ 50.)  They were left to weigh the security risks posed to the President, his senior ministers traveling with him, and his diplomats by aggressive individuals in close range who had already demonstrated a capacity for violence, and who had already thrown projectiles and sprayed unknown liquids, and one of whom – Kheirabadi

– carried a backpack that head of state security detail may perceive as a threat of containing explosives. (*See id.* ¶¶ 41, 44, 45, 55.)

The security concerns present at Sheridan Circle were not merely hypothetical given the hundreds of assassination attempts on President Erdogan's life, the Anti-Turkey Group's touting of flags bearing the image of the PKK's leader, and the PKK's terroristic slaughter of tens of thousands of people. (Ex. 1, ¶¶ 21-31.)  In *Macharia*, victims of an embassy bombing attempted to sue the United States for providing inadequate security and failing to protect them from perceived imminent threats.  Similarly, here, the Turkish security officers took actions to protect certain individuals and all others in the public vicinity of a diplomatic edifice, from the risk of the type of tragedy that befell the victims at the U.S. Embassy in Nairobi.   As in *Macharia*, the conduct challenged by Plaintiffs is the product of risk management decisions made by Turkish security officers about how best to protect not only their official diplomatic residence, but also their President and his senior ministers traveling with him.  These are real-time decisions that do not involve the mechanical application of rules and are decidedly discretionary.  *See Macharia*, 238 F. Supp. 2d at 23.

### ii.   Turkey Satisfies The Second Prong Because Its Employees' Acts Were Grounded In Public Policy.

Under the second prong of the Discretionary Function Rule test, the Court must decide:

'[W]hether th[e] judgment is of the kind that the discretionary function exception was designed to shield,' [ ] "Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,' the Supreme Court explained, 'when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy.

*Macharia*, 334 F.3d at 66.   For example, if a state official, while carrying out the ordinary, routine duties of his office, negligently collides with another car, his tortious conduct is not

grounded in public policy decision-making. *See Gaubert*, 499 U.S. at 325 n.7. The discretion used to drive a car is separate from, and incidental to, the official mission, and "can hardly be said to be grounded in regulatory policy." *Id.*[36]

In *Macharia*, this Court found that the security decisions the Department of State made concerning the U.S. Embassy in Nairobi were grounded in policy, reasoning in part:

> The conduct at issue in this case and the **decisions regarding what action to take related to security clearly are 'susceptible to policy analysis' and thus the discretionary function is applicable** . . . . [E]ach of Defendant's decisions regarding security involved balancing potential inconvenience to State Department employees against the perceived security gains that would result from a safety measure . . . . As risk classification makes a statement about conditions in the country where the embassy is located, it could also influence United States relations with that country, and therefore be influenced by the footing on which the United States seeks to maintain those relations.

*Macharia*, 238 F. Supp. 2d at 25 (emphasis added).

In a similar vein, the Tenth Circuit held in an FTCA case against the U.S. government that its nuclear weapon testing activities undertaken in the name of national security were grounded in policy decisions, and therefore, immune from tort claims, even though the decisions resulted in mass casualties of U.S. citizens. *See Allen v. United States*, 816 F.2d 1417, 1424 (10th Cir. 1987). The Discretionary Function Rule precluded government liability for the 500 death and injury claims that resulted from radioactive fallout from open-air atomic bomb tests conducted in Nevada in the 1950s and 1960s. *See id*. at 1418. The Tenth Circuit recognized that the bomb-testing decisions by the President, the Atomic Energy Commission, and those with

---

[36] Protecting foreign states from U.S. courts' jurisdiction to the same degree afforded the United States preserves the concept of sovereign equality of states "which, as Article 2, paragraph 1, of the Charter of the United Nations makes clear, is one of the fundamental principles of the international legal order." *Jurisdictional Immunities of the State (Germany v. Italy: Greece intervening)*, Judgment, I.C.J. Reports 2012, 99 ¶ 57; *see The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812) (emphasizing the notion of sovereign equality among nations).

delegated authority were among the most "controversial choices made during" the relevant era. *Id*. at 1424.  However, the FTCA's Discretionary Function Rule was held to apply because the U.S. government's "decisions expressly balanced public safety against what was felt to be a national necessity, in light of **national and international security**." *Id*. (emphasis added). "However erroneous or misguided [the government's] deliberations may seem today," the court concluded that "it is not the place of the judicial branch to now question them." *Id*.  *Allen* illustrates the inviolate sovereign immunity afforded to nations' highest leaders engaged in discretionary public policy decisions deemed to be of national security importance.

Decisions whether to pursue, detain, or arrest individuals during a riot or who are near dignitaries are "susceptible to policy analysis" no less so than the weighty decisions found discretionary in *Allen*.  In *Monarch Ins. Co. of Ohio v. District of Columbia*, for example, the court explained that "[p]olicy considerations . . . pervade every phase of planning and executing a riot control program."  353 F. Supp. 1249, 1258 (D.D.C. 1973) (dismissing claims against the United States as barred by the Discretionary Function Rule), *aff'd*, 497 F.2d 684, *cert. denied*, 419 U.S. 1021 (1974).  In *Olaniyi*, for example, the court held that "the decision to detain and then arrest the plaintiff in the Capitol Building falls well within the scope of the discretionary function."  763 F. Supp. 2d at 89 (dismissing detention and false arrest claims for lack of subject matter jurisdiction under the Discretionary Function Rule).  And, decisions regarding arrests are the kind of government decisions, rife with considerations of public policy, that the judiciary is not to second-guess. *See Shuler v. United States*, 531 F.3d 930, 934 (D.C. Cir. 2008).

Protecting a head of state is no less grounded in policy than decisions concerning embassy security, the level of protection afforded to ordinary persons at government facilities, and whether to arrest or detain persons due to security concerns.  In the United States, through an

enabling statute, Congress has given the Secret Service wide latitude to protect the President. *See* 18 U.S.C. § 3056(a)(1) (U.S. Secret Service "is authorized to protect" the President). A threat against a president "is qualitatively different from a threat against a private citizen or other public official," as is a presidential security officer's corresponding duty and discretion to guard against such a threat. *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969). "A President's death in office has worldwide repercussions and affects the security and future of the entire nation." *Id.* "A President not only has a personal interest in his own security, as does everyone, **he also has a public duty** not to allow himself to be unnecessarily exposed to danger." *Id.* (emphasis added). Further, as a president's authority to make discretionary decisions waxes in areas of national security, those decisions' "susceptib[ility] to policy analysis" likewise increases. *Gaubert*, 499 U.S. at 325.

The Turkish security officers' conduct satisfies the second policy prong because their discretionary acts to physically push back and disperse the encroaching crowd were based on national security policy considerations, principally, a perceived, imminent threat to the head of state's and other IPPs' physical safety. Taking actions to protect a head of state from individuals reasonably believed to be supporters or affiliates of a terrorist organization are quintessential government policy functions, and are among the responsibilities designated to the head of state's security detail, as is their choice of the means for addressing such a threat. (*See* Ex. 2, ¶¶ 24-25.) Security decisions concerning a terrorist threat against a head of state are precisely the kind that are "susceptible to policy analysis" as they fall squarely within the ambit of national security and foreign policy under both Turkish and United States law and practice. *Gaubert*, 499 U.S. at 325. These decisions involve a real-time balancing of national security, foreign policy, and intelligence decisions. And, as in *Macharia*, the security decisions made by the Turkish security

officers could have, and most certainly did, influence the footing of Turkey's policy relations with the United States.  *See Macharia*, 238 F. Supp. 2d at 25.

> **c.**     **No Prior Cases Have Evaluated Whether Foreign Security Agents Taking Protective Measures To Remove Perceived Imminent Threats To A Head Of State By Apparent Associates Of An FTO Is A Discretionary Function.**

No FSIA cases to date have dealt with a similar, imminent threat posed by supporters or affiliates of a foreign terrorist organization within close proximity to a head of state, who moments earlier were engaged in acts of violence in the presence of MPD, without being arrested, and who were taunting further threats of harassment or violence against IPPs in blatant violation of 18 U.S.C. § 112.  Therefore, the Court should rely exclusively on its application of the two-prong discretionary acts test in this case of first impression.

For example, *Letelier v. Republic of Chile*, 488 F. Supp. 665, 673 (D.D.C. 1980), which holds that a foreign state does not have discretion to commit an illegal act, is no longer good law.[37]  Further, in *MacArthur*, the only D.C. Circuit case that appears to have interpreted the Discretionary Function Rule with respect to "wrongful acts," confirmed that the proper jurisdictional inquiry is whether the governmental acts complained of were discretionary, not whether they were illegal.  *See MacArthur*, 809 F.2d at 922 n.4.  In doing so, the D.C. Circuit rejected *Letelier's* seeming blanket rule that a foreign government lacks the discretion to commit illegal acts.  *See id*.  In *MacArthur*, the plaintiff relied on *Letelier* to argue that the Republic of Peru's conversion of a residential building into a diplomatic chancery in violation of D.C. zoning

---

[37] Moreover the facts of *Letelier*, are nothing like this case, because in *Letelier,* the Republic of Chile was alleged to have spent months orchestrating the overseas assassination of an IPP with no connections to known terrorist groups and who, unlike here, did not pose a security threat, let alone an imminent one, to a head of state within fifty feet of his presence.  *Id.* at 665-66.

laws was illegal, and thus not exempt under the Discretionary Function Rule. *See id*. The Court disagreed. It held that it was "beyond serious question that establishing a chancery in the District of Columbia to conduct foreign relations is a discretionary public policy decision," and Peru was entitled to sovereign immunity, despite its alleged violation of D.C. zoning laws. *Id*. at 922. The Court explained that the choice of where to locate the chancery "embodies a political decision regarding the image that the Peruvian Government seeks to project through the offices it occupies" and, importantly here, "reflects **security considerations** that one might presume to be of interest in the present day." *Id*. at 923 (emphasis added). The factual question of whether Peru's actions were criminal was not determinative of the threshold jurisdictional question of Peru's immunity from suit. The Circuit Court stressed that it "is hardly clear that, even if a criminal act were shown, it would automatically prevent designation of Peru's acts as discretionary." *Id.* at 922 n.4.

*Risk v. Halvorsen*, 936 F.2d 393 (9th Cir. 1991), further illustrates that illegal acts may nevertheless be discretionary within the meaning of the Discretionary Function Rule. In *Risk*, the Ninth Circuit considered claims against Norway stemming from the issuance of travel documents and travel funds to a Norwegian citizen and her children by a Norwegian diplomat to help them to leave the United States in violation of a temporary custody order, which constituted a felony under California law. *See id*. at 394, 396 n.3 (referencing Cal. Penal Code § 278.5). Citing the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, the Court held that the acts complained of fell expressly within the function of consular officials. *See id*. at 395-96. The Ninth Circuit acknowledged that, although the intentional violation of a custody order is a crime under California law, every conceivably illegal act is not outside protection of the Discretionary Function Rule. *See id*. at 397 (referencing *MacArthur*, 809 F.2d at 922 n.4).

More recently, in *Mohammadi v. Islamic Republic of Iran,* 947 F. Supp. 2d 48 (D.D.C. 2013), this Court dismissed various tort claims against Iran. *Id*. at 54.  Though the Tortious Acts Exception to foreign sovereign immunity was abandoned by the plaintiffs, the Court considered it in a footnote, recognizing that "whether or not the [exception] applies in the instant case would depend upon whether the defendants had exceeded the permissible limits of their sovereign political discretion in harassing the plaintiffs via electronic communications while they were living in the United States." *Id*. at 81 n.4 (emphasis added).  This Court in *Mohammadi* thus recognized the evolution from *Letelier*'s conclusion that foreign sovereigns lack the discretion to commit illegal acts, 488 F. Supp. at 673, to *Risk's* acknowledgement that illegal acts may fall within the Discretionary Function Rule, and ultimately followed *Risk*.  *See id*. at 81 n.4; *see also Doe v. Federal Democratic Republic of Ethiopia*, 189 F. Supp. 3d 6, 27 (D.D.C. 2016) (concluding, in *dicta*, that "Congress did not mean to shield 'discretionary' acts by foreign states when those acts involve **serious violations of U.S. criminal law**," while dismissing claims on other grounds) (emphasis added).

Finally, *Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117 (D.D.C. 2018), appears to be the most recent case to apply the Discretionary Function Rule to intentional tort claims.  In that case, protesters had gathered outside the hotel from which the President of the Democratic Republic of Congo ("DRC") was exiting.  Members of the President's entourage allegedly proceeded to beat the protesters and steal items from the car of one of the plaintiffs.  Plaintiffs filed suit against the DRC for various intentional torts, including assault, battery, and

conversion.  *Id*. at 124.[38]  Unlike Turkey here, the DRC did not make an appearance to assert its immunity, and the District Court entered a default judgment.  *Id*. at 128.  The Court can hardly be said to have addressed the Discretionary Function Rule, only referring to it once in a single phrase of a single sentence buried in a footnote.  In its only mention of the Rule, the Court cursorily cited, without examination, *Letelier's* conclusion that a foreign state does not have discretion to commit an illegal act, and did not undertake the analysis required by the discretionary acts test.  *Id*. at 126 n.3.

Thus, despite the limited case law, it is clear that those which have analyzed the FSIA's Discretionary Function Rule have followed FTCA precedent and established that it is the scope of sovereign discretionary authority that matters, not the nature or unlawfulness of the underlying acts.  Any argument that allegedly unlawful acts automatically strip a sovereign of its immunity must be rejected.  (*See*, *e.g.*, Am. Compl. ¶ 1 ("Plaintiffs seek to hold Turkey accountable for this outrageous violation of United States, District of Columbia, and international law.").)  And this makes sense, because "if the scope of an official's authority or line of duty were viewed as coextensive with the official's lawful conduct, then immunity would be available only where it is not needed; in effect, the immunity doctrine would be 'completely abrogate[d].'"  *Martin v. D.C. Metro. Police Dep't*, 812 F.2d 1425, 1429 (D.C. Cir. 1987) (alteration in original) (quoting *Briggs v. Goodwin*, 569 F.2d 10, 15 (D.C. Cir. 1977)); *Dalehite*, 346 U.S. at 33 (the "abuse of discretion" clause to the Discretionary Function Rule "connotes both negligence and wrongful acts in the exercise of the discretion.").  Accordingly, a "foreign state remains largely immunized

---

[38] Plaintiffs also sued the MPD and U.S. Secret Service for their alleged negligence in failing to protect them.  *Miango*, 243 F. Supp. 3d 113 (D.D.C. 2017) (dismissed for failure to exhaust remedies under the FTCA, public duty doctrine, and failure to state a claim).

from torts committed in its governmental capacity." *MacArthur*, 809 F.2d at 921 (quoting *Olsen*, 729 F.2d at 645).

In sum, prior cases have bantered about the concept of whether illegal or wrongful acts may nevertheless be discretionary, without any clear rule or guidance emerging, other than there is no blanket rule, and sometimes illegal acts have been found to be discretionary. Importantly though, none of those cases arose in the context of protective measures employed by a head of state security detail, faced with protesters who were apparent supporters or affiliates of an FTO that had carried out a recent string of deadly attacks, who were harassing or threatening to harass an IPP in close proximity in violation of 18 U.S.C. §§ 112 & 878, and where MPD was unwilling to remove such persons from the IPP secure zone, despite some of the protesters injuring and assaulting multiple people in a prior altercation. No such prior case exists. Therefore, the Court need only rely on the two-prong discretionary acts test, without regard to whether the Turkish security officers' acts were arguably criminal, because a core concept of sovereign immunity is to immunize foreign sovereigns from liability for wrongful conduct.

## C.   THE POLITICAL QUESTION DOCTRINE FORBIDS THE COURT FROM MAKING FINDINGS ABOUT TURKEY'S NATIONAL POLICIES AND INTERNATIONAL GOALS.

The Amended Complaint does not discuss the Discretionary Function Rule, or allege any facts indicating why Plaintiffs believe Turkey's security officers were not performing a discretionary function entitled to sovereign immunity. Rather, it is riddled with sweeping and disparaging allegations that Turkey "has a long history of discrimination against and oppression of the Kurdish people." (Am. Compl. ¶ 45.) It is largely a political opposition statement against a sovereign state's methods of governance in a country situated in one of the most geographically dangerous locations in the world. (*See id.* ¶¶ 37-66.) For example, the Amended Complaint

takes issue with anti-terrorism laws duly passed by the Turkish Legislature, (*see id.* ¶ 44); indictments issued by the Turkish Executive, (*see id.* ¶ 46); the democratic removal of elected officials from office, (*see id.* ¶ 47); and Turkey's banning of terrorist symbols, (*see id.* ¶ 63).[39]  It is not clear how these allegations are relevant to Plaintiffs' claims other than to use the publicity of two U.S. lawsuits receiving international media attention as a vehicle to publicize their negative political opinions of the Turkish government.  To the extent Plaintiffs contend that their political grievances with Turkey are legally significant, the Political Question Doctrine forbids the Court from engaging in such an inquiry.

"It is not [the judiciary's] place to speak for the U.S. Government by declaring that a foreign government is at fault for [human rights violations].  Any such policy condemning the [] regime must first emanate from the political branches."  *Alperin v. Vatican Bank*, 410 F.3d 532, 561 (9th Cir. 2005).  To request from the judiciary a declaration regarding a foreign country's "political status . . . certainly raises" a nonjusticiable political question.  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 197 (2012).

Absent an otherwise impermissible judicial finding on Turkey's national policies concerning civil discourse, the Amended Complaint is reduced to allegations of this spontaneous, unplanned, and isolated incident.  *Cf. People's Mojahedin Org. of Iran v. United States Dep't of*

---

[39] Banning symbols associated with terrorist organizations is not uncommon in other countries facing serious threats of domestic terrorism.  Germany also bans red, yellow, and green flags that symbolize the PKK.  *See* Wladimir van Wilgenburg, *German court increases fine for activist who waved Kurdish group's flag*, KURDISTAN 24 (Nov. 13, 2018), http://www.kurdistan24.net/en/news/5857967b-4c6e-4240-b79b-430ea0a050c0 (last visited June 3, 2019).  Even in the U.S., the U.S. House of Representatives passed an amendment banning confederate flags from being displayed on flag poles in Arlington National Cemetery.  *See House Votes to Ban Confederate Flags on VA Cemetery Flagpoles*, NBC (May 19, 2016), https://www.nbcnews.com/storyline/confederate-flag-furor/house-would-ban-confederate-flags-va-cemetery-flagpoles-n576906 (last visited June 3, 2019).

*State*, 182 F.3d 17, 23-24 (D.C. Cir. 1999) (ignoring the portion of the complaint presenting a political question).  Plaintiffs invite the Court to wander into a nonjusticiable political thicket and announce, as a finding of fact, that Turkey violently and systemically oppresses particular ethnic groups and those that oppose President Erdogan.  (*See* Am. Compl. ¶¶ 45-50.)  The Court must decline the request pursuant to the political question doctrine.

The Court confronts a nonjusticiable political question where any **one** of the following six factors is present:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*bin Ali Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017) (alterations in original) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).  Factors 1, 2, 3, 4, and 6 are present here.

    **1.**    **Factors 1 And 6: Constitutional Commitment To A Coordinate Political Department, And Potentiality Of Embarrassment From Multifarious Pronouncements.**

Speaking on behalf of the federal government regarding a foreign state's perceived national policies and goals is a function constitutionally committed to the Executive Branch.  The Constitution distributes the powers of the federal government over external affairs between the Executive and the Legislative Branches, but "in foreign affairs the President has a degree of independent authority to act."  *American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003).  Article II of the Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America."  U.S. Const. art. II, § 1, cl.1.  "[T]he historical gloss on the

executive Power vested in Article II of the Constitution has recognized the President's vast share

of responsibility for the conduct of our foreign relations." *Garamendi*, 539 U.S. at 414 (internal

quotation marks omitted) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610-

11 (1952)).   The President has "plenary and exclusive power . . . as the sole organ of the federal

government in the field of international relations." *United States v. Curtiss-Wright Exp. Corp.*,

299 U.S. 304, 320 (1936).   In addition, the Constitution grants to the President alone the

authority to "receive Ambassadors and other public Ministers." U.S. Const. art. II, § 3.

With respect to Turkey, the U.S. President is actively and publicly engaged in performing

his unique constitutional duty to conduct foreign relations.   Recently, the U.S. Department of

State affirmed that Turkey is:

- "a key NATO Ally and critical regional partner,"
- "NATO's vital eastern anchor,"
- "engaged in intensive efforts to defeat terrorist organizations both inside and outside its borders, including the Kurdistan Workers' Party (PKK),"
- "a vital member of the Defeat ISIS Coalition,"
- "critical in the effort to degrade and ultimately destroy ISIS in Syria and Iraq,"
- "contribut[ing] to international security alongside U.S. Forces in Afghanistan, the seas bordering Somalia, and in the Mediterranean [and] borders Greece, Bulgaria, Georgia, Armenia, Azerbaijan, Iran, Iraq, and Syria," and
- "a key partner for U.S. policy in the [Middle East] region."[40]

By answering the political questions Plaintiffs implicitly raise, "the court would directly

contradict the Executive, which has formally decided to take [a] position on the question" of U.S.

foreign policy toward Turkey and Turkish foreign policy toward the U.S.  *Al-Tamimi v. Adelson*,

916 F.3d 1, 13 (D.C. Cir. 2019) (finding a nonjusticiable political question where the Executive

---

[40] U.S. Dep't of State, Bureau of European and Eurasian Affairs, *U.S. Relations With Turkey* (Mar. 27, 2019), https://www.state.gov/r/pa/ei/bgn/3432.htm (last visited June 3, 2019).

formally took "no position" on the issue, let alone a position that is at odds with the conclusion Plaintiffs' ask the court to reach).   Judicially-issued policy decisions about the state of U.S.–Turkey relations and Turkey's global and domestic policies and goals are "determination[s] of a kind clearly for nonjudicial discretion." *bin Ali Jaber*, 861 F.3d at 245.   This Court cannot make those determinations without expressing a lack of respect for a coordinate branch of the federal government, thus implicating the first *Baker* factor.   The Amended Complaint essentially asks the Court to invade the Executive Branch's deliberate foreign relations decisions and diplomatic initiatives by proclaiming that Turkey employs repugnant national policies and possesses an institutional bias against Kurdish people.   (*See* Am. Compl. ¶¶ 45-50.)   The first *Baker* factor prohibits the Court from entertaining those issues.

Moreover, this case implicates the sixth *Baker* factor in that Plaintiffs seek a pronouncement from the Court which, if inconsistent with the Executive Branch's substantial pre-existing body of public statements about U.S.–Turkey relations, could cause embarrassment to the Executive and/or the Judicial Branches.   It is hard to image how the Court could answer questions about Turkish policy without risking interference with, and thereby dilution of, the Executive's position on U.S.–Turkey relations.

### 2.   Factor 2: Lack Of Judicially Discoverable And Manageable Standards.

There are no judicially discoverable and manageable standards for resolving Plaintiffs' allegations that Turkey "has a long history of discrimination against and oppression of the Kurdish people," (Am. Compl. ¶ 45), the Incident "at Sheridan Circle is Endemic of Bias Against the Kurds," (*id.* ¶¶ 45-50), and that Turkey's "policies and procedures [] restrict fundamental freedoms," (*id.* ¶ 39).   If this Court adopts Plaintiffs' novel and federally unrecognized

description of Turkey's national "policies and practices against Kurds," (*id.* ¶¶ 45-50), it would be formulating national policy, a task that is "not legal in nature," and for which the courts are "fundamentally underequipped" to perform. *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010) (quoting *Japan Whaling Assoc. v. Am. Cetacean Society*, 478 U.S. 221, 230 (1986)). There are no "manageable standards to channel any judicial inquiry" into "strategic choices directing the nation's foreign affairs." *Id.* at 843 (citing *Nixon v. United States*, 506 U.S. 224, 229-29 (1993)).

The recent decision *Al-Tamimi* provides good guidance on the manageable standards inquiry. In *Al-Tamimi*, when faced with adjudicating the question "whether Israeli settlers are committing genocide," the court concluded that there **were** judicially manageable standards for deciding the issue because the Alien Tort Statute, the basis for the plaintiffs' claims, defined "genocide." 916 F.3d at 11 (citing the United Nations Convention on the Prevention and Punishment of the Crime of Genocide art. 2, Dec. 9, 1948, 78 U.N.T.S. 277, 280). "Thus, the ATS—by incorporating the law of nations and the definitions included therein—provides a judicially manageable standard to determine whether Israeli settlers are committing genocide." *Id.* at 11-12. *But cf.*, *e.g.*, *Alperin*, 410 F.3d at 561 (holding that issues involving condemnation of a foreign regime's wartime conduct are nonjusticiable).

Plaintiffs' contentions about Turkey's national policies, on the other hand, cannot be resolved by applying a statutory definition to knowable facts. For example, the Amended Complaint alleges that Turkey disproportionately uses excessive force "in South-East Turkey, which is majority Kurdish." (Am. Compl. ¶ 49.) There are no judicially manageable standards for resolving a dispute about whether Turkey uses "excessive" force along its southeastern border, which is its longest border which abuts Syria where the YPG, the PKK's alter ego in

Syria, operates.  (Ex. 1, ¶¶ 40-48.)  Syria has been in a state of civil war since March 2011, and

the vast majority of that fighting has occurred on or near Turkey's southeastern border.  (*Id.* ¶

49.)   The long-time seat of the so-called ISIS caliphate, Raqqah, is just fifty miles from the

Turkish border (*id.*), and ISIS terrorist attacks in Turkey have killed more than 300 people since

2013 (*id.* ¶ 52).  Turkey has also accepted more than 3.6 million Syrian refuges entering through

the southeastern border.  (*Id.* ¶ 53.)  In light of these facts, this Court is certainly not in any

position to judge, critique, or criticize the Turkish government's security recourse along its

southeast border.  More importantly, these facts preview how ill-equipped a U.S. judicial trier of

fact is to weigh in on the reasonableness of Turkey's border security measures and related

national policies.

Nor are there any workable standards for adjudicating the Amended Complaint's parade

of similarly inflammatory, misleading, and factually unsupported allegations.  This Court would

have to hold hundreds of evidentiary hearings and review scores of evidence involving decades

of Turkey's socio-political history and role in the Middle East, often with no ability to obtain

testimony or discovery from foreign witnesses, to resolve issues like the credibility of

assassination attempts[41] and whether Turkey is responding appropriately to that constant threat.

Such an unwieldy exercise is precisely the type of meddling in U.S. international relations the

political question doctrine is designed to prevent.  Accordingly, the Court must decline to decide

these questions under the second *Baker* factor.  *See*, *e.g.*, *Doe I v. State of Israel*, 400 F. Supp. 2d

86, 112 (D.D.C. 2005) (declining to decide whether "Israel's self-defense policies are tantamount

to terrorism" because the issue is "peculiarly volatile, undeniably political, and ultimately

nonjusticiable").

---

[41] *See supra* § II.B.2 (discussing assassination attempts).

Furthermore, the U.S. judiciary is not equipped to judge a presidential security team in the discharge of sensitive executive functions.  Questions such as whether a particular group or person poses a threat to a head of state's life or physical safety that is likely or imminent are decisions informed by that foreign state's intelligence, foreign policy, and security considerations.  For example, in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), individuals were charged under 18 U.S.C. § 2339B for providing material support to the PKK and another designated terrorist group.[42]  The Supreme Court accepted the Executive Branch's determination that the defendants' facially lawful, nonviolent support of the terrorist organization nonetheless contributed to violent terrorist activity.  *Id.* at 33-34.  The Court explained that "when it comes to collecting evidence and drawing factual inferences in [the national security and foreign relations] area, 'the lack of competence on the part of the courts is marked.'"  *Id.* at 34 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)).  "One reason for that respect [for the Executive] is that national security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess."  *Id.*

Finally, the Court rejected the need for "specific evidence" and hard proof that the defendants' alleged activities would support PKK terrorist attacks, considering such a requirement to be "dangerous."  *Id.*  Rather, "[i]n this context, conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government."  *Id*. at 34-35.

---

[42]  The Supreme Court acknowledged that the PKK is a "deadly group[]" that by 2010 had claimed 22,000 lives.  *Id.* at 29-30.

### 3.      Factors 3 and 4: The Prudential Factors.

The third and fourth *Baker* factors "are closely related in that they are animated by the same principle: as a prudential matter, the Judiciary should be hesitant to conflict with the other two branches."  *Al-Tamimi*, 916 F.3d at 12 (citing *Baker,* 369 U.S. at 217).  The Court cannot decide issues of Turkey's national policies without running afoul of this prudential principle.

### 4.      The D.C. Circuit's Functional Approach To The Political Question Doctrine.

Since *Baker*, the D.C. Circuit has adopted a "functional approach" to the political question doctrine.  *bin Ali Jaber*, 861 F.3d at 246.  Under that approach, nonjusticiable claims are "those controversies which revolve around policy choices and value determinations," *id.* at 245 (quoting *Japan Whaling,* 478 U.S. at 230), while justiciable claims present "purely legal issues," *id.* at 246 (quoting *El-Shifa*, 607 F.3d. at 842).  For example, a court may properly decide whether the government had legal authority to order a drone strike.  The court cannot, however, decide whether the strike was factually justified.  *See id.*  In this case, Plaintiffs impermissibly ask the Court to declare that Turkey "has a long history of discrimination against and oppression of the Kurdish people" (Am. Compl. ¶ 45), and violently and systemically oppresses those that oppose President Erdogan and particular ethnic groups.  (*See id.* ¶¶ 45-50.)

The court declined to decide a similar question in *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010).  In *Wultz*, a Palestinian suicide bomber attacked a restaurant in Israel killing an American citizen.  *Id.* at 18.  After the bombing, the decedent's estate sued the Bank of China ("BOC") on the grounds that BOC knowingly facilitated international wire transfers to the Palestinian Islamic Jihad for the purpose of planning, preparing for, and executing terrorist attacks.  *Id.*  BOC moved to dismiss arguing, in part, that the entire case was nonjusticiable because it raised inextricable political questions about the "political policies and

goals of the Chinese government with respect to other foreign powers, . . . its relationship to Chinese citizens and corporations in connection with its policies, . . . and the Chinese government's alleged disregard of Israeli government concerns about terrorism . . . ." *Id.* at 26 (quoting BOC's Mot. to Dismiss at 9-10).

The court reasoned it could hear the case, but only because the plaintiffs "do not ask the Court to say anything at all with respect to the actual policies or goals of China," or "ask this court to 'pass judgment' on whether those policies are 'valid or invalid, good or evil.'" *Id.* (quoting Pl.'s Opp'n at 41). Rather, the plaintiffs "merely ask[ed] the Court to determine whether, as a matter of fact, China received certain information from Israel." *Id.* The court concluded that the factual issues were extricable from questions of China's political policies and goals, the resolution of which would invoke the political question doctrine. *Id.*

Plaintiffs in this case, unlike those in *Wultz*, seek far more than mere adjudication of discoverable or knowable facts. Plaintiffs invite the Court to independently categorize and classify Turkey's domestic and foreign "policies and procedures." (Am. Compl. ¶ 39.) Not only is there a "lack of judicially discoverable and manageable standards" for independent judicial classification of a foreign sovereign's national policy, *bin Ali Jaber*, 861 F.3d at 245 (quoting *Baker*, 369 U.S. at 217), doing so will require the Court to intrude on the Executive Branch's foreign policy prerogatives and interfere with U.S. foreign relations by contravening the Executive Branch's constitutionally exclusive authority to manage the United States' relationship with its critical NATO ally. Either of those obstacles alone is sufficient to bar this Court's resolution of the issue. *See id.*

The Amended Complaint alleges that as President Erdogan approached Sheridan Circle, a Turkish security officer told an MPD officer: "you need to take [the crowd]" and "if you don't, I

will."  (Am. Compl. ¶ 74.)  Another Turkish security officer told the U.S. Secret Service: "We are waiting [for] you to take them out, because President [Erdogan] is coming."  (*Id.* (alteration in original).)  Even the Turkish Ambassador pleaded with MPD officers to push the crowd back to a safe distance.  (*See id.* ¶ 75.)  Turkey's actions were thus objectively focused solely on clearing a safe zone for its head of state and senior ministers and resolving a reasonably perceived imminent security threat that was local and did not transcend national boundaries.  "As between that 'obvious alternative explanation for' [Turkey's] conduct, and the purposeful, invidious discrimination the [Plaintiffs] ask [the Court] to infer, discrimination is not a plausible conclusion."  *American Federation of State, Country, Mun. Employees Local 2401 v. District of Columbia*, 796 F. Supp. 2d 136, 141 (D.D.C. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009)).

### D.    THE DOCTRINE OF INTERNATIONAL COMITY FAVORS DISMISSAL OF PLAINTIFFS' CLAIMS.

Plaintiffs' claims should be rejected under the doctrine of international comity.  Comity "is a doctrine of deference based on respect for the decisions of foreign sovereigns."  *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 8 (D.D.C. 2013) (citing *United States v. Kashamu*, 656 F.3d 679, 683 (7th Cir. 2011)).  "To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations."  *Oetjen v. Central Leather Co*., 246 U.S. 297, 304 (1918).  The doctrine, thus, is "a 'golden rule among nations—that each must give the respect to the laws, policies and interests of others that it would have others give to its own in the same or similar circumstances.'"  *Gulfstream*, 941 F. Supp. 2d at 8 (quoting *Mich. Cmty. Servs., Inc. v. NLRB*, 309 F.3d 348, 356 (6th Cir. 2002)).

Chief among these concerns for respecting a coequal sovereign state is the protection of its head of state when traveling abroad.  This concern is particularly acute for the U.S. Government, which demands unparalleled cooperation from its host countries.  As former President Obama cautioned in his veto statement for the Justice Against Sponsors of Terrorism Act:

> [R]eciprocity plays a substantial role in foreign relations, and numerous other countries already have laws that allow for the adjustment of a foreign state's immunities based on the treatment their governments receive in the courts of the other state.

Veto Message from the President, S.2040 (Sept. 23, 2016).  This Court should abstain from allowing the "validity of the acts of [Turkey] to be reexamined and perhaps condemned," for doing so "would very certainly imperil the amicable relations between governments and vex the peace of nations."  *Oetjen*, 246 U.S. at 304.  The risk of assassination for Turkey's and the United States' heads of state is acute and ever present; the U.S. demands far-reaching security protections for its head of state and government officials within Turkey; in the past decade alone, Turkish security guards have died protecting the U.S. embassy and consulates in Turkey from terrorist attacks.  (*See* Ex. 1, ¶¶ 8, 27-30, 34.)  The inaction of MPD at Sheridan Circle constituted a failure to reciprocate the same protections afforded to U.S. officials in Turkey. The apparent failures by MPD upended the delicate reciprocity between the U.S. and Turkey and, therefore, for reasons of international comity, this Court should defer to the political branches of government to resolve the consequences.

61

1.    **Assassination Attempts Are A Constant Reality For A Traveling President.**

Assessing whether a target is a threat to the president is different than assessing other forms of violence, and persons who pose an actual threat to a president often do not make threats, especially direct threats.[43]

For example, in April 2009, ahead of President Obama's visit to Turkey where he held bilateral talks and attended the Alliance of Civilizations Summit, Turkish security forces foiled an assassination plot by a Syrian permanent resident of Turkey planning to pose as an *Al Jazeera* reporter.[44]   And in May 2005, just as President Bush began delivering a speech in Tbilisi, Georgia, Vladimir Arutyunian threw a live grenade at the podium, landing 61 feet from the President and First Lady.[45]   It is the duty and expertise of presidential security details to anticipate and neutralize threats, whether they are expressly pronounced in advance or identified in the moment through the experience and expertise of the presidential security detail.  (*See also* Ex. 2, ¶¶ 22-25, 33.)

2.    **U.S. Secret Service Demands Heavy Security Cooperation From Its Host State.**

The United States is keenly aware of the increased vulnerability of a U.S. President traveling abroad.  This in turn leads U.S. security officials to demand extensive cooperation, security measures, and manpower from its host country.  President Trump's 2018 and 2019 visits

---

[43] *See* Robert A. Fein and Bryan Vossekuil, *A Guide for State and Local Law Enforcement Officials*, U.S. Dep't of Justice, Protective Intelligence & Threat Assessment Investigations (July 1998), https://cryptome.org/assassins.htm (last visited June 3, 2019).

[44] Ed Henry, *Plot to assassinate Obama foiled in Turkey*, CNN (Apr. 6, 2009), http://www.cnn.com/2009/POLITICS/04/06/turkey.assassination.plot/index.html (last visited June 3, 2019).

[45] Federal Bureau of Investigation, *The Case of the Failed Hand Grenade Attack: Man Who Tried to Assassinate President Convicted Overseas* (Jan. 11, 2006), https://archives.fbi.gov/archives/news/stories/2006/january/grenade_attack011106 (last visited June 3, 2019).

to London have involved all-encompassing security precautions to ensure that protesters and supporters alike are kept at distances far beyond 100 feet of the President at all times.  For both visits a multi-million dollar "ring of steel" was erected around the part of Regent's Park on which the U.S. Ambassador's residence sits,[46] roads were closed to the public, and thousands of U.K. police officers tasked.[47]  In particular, access to the area around the U.S. Ambassador's residence for the 2019 visit has been controlled via full-height turnstiles.[48] This was in addition to the many U.S. special agents, rooftop snipers, and counter-terrorism police brought in from the United States to secure the President.[49]

President Obama's 2009 visit, as well as his visit to Turkey in 2015 for the G-20 summit meeting, also demanded heavy security not only around the U.S. Embassy Residence in Ankara but any place near to where the President would be.  On these visits, air traffic was suspended over areas where the President would be, U.S. security officers set up extensive inspection stations to screen all reporters and other persons who would be in the same vicinity as the

---

[46] Alexander Robertson, *Trump ruined my picnic!: The moment two Osprey helicopters fly over Regent's Park in London as $40m 'ring of steel' takes shape ahead of US President's three-day visit*, DAILY MAIL (July 9, 2018), https://www.dailymail.co.uk/news/article-5934249/Osprey-helicopters-fly-Regents-Park-London-ahead-Trump-three-day-visit.html (last visited June 3, 2019).

[47] Justin Davenport, *Donald Trump protests: Massive security operation begins with '250,000' protesters set to descend on London*, Evening Standard (June 3, 2019), https://www.standard.co.uk/news/uk/donald-trump-protests-massive-security-operation-begins-with-250000-protesters-set-to-descend-on-a4157766.html (last visited June 3, 2019).

[48] Darren Boyle, *Trump gets his wall! US Ambassador's residence is surrounded by a ring of steel as security fences are erected ahead of President's state visit to Britain*, DAILY MAIL (June 1, 2019), https://www.dailymail.co.uk/news/article-7093803/Ring-steel-Ambassadors-residence-ahead-Trump-visit.html (last visited June 3, 2019).

[49] Holly Ellyatt, *The UK is spending millions on security for Trump's controversial visit*, CNBC (July 12, 2018), https://www.cnbc.com/2018/07/12/uk-spending-millions-on-security-for-trumps-controversial-visit.html (last visited June 3, 2019).

President, roads were blocked and traffic stopped in areas around his location at all times.[50]   Over

8,800 Turkish policemen were deployed to ensure Obama's security during his 2009 visit.[51]   At

the request of the United States, all persons, supporters and protesters alike, were all kept at a

great distance from the U.S. President at all times.[52]   (*See also* Ex. 2, ¶¶ 19, 20-21.)

Such methodical or organized security apparently was lacking as President Erdogan

departed the White House and arrived at the Residence where he faced an angry and encroaching

crowd, sympathetic to a U.S.-designated FTO and which had engaged in violence moments

before.   Turkey takes every measure so that U.S. Presidents' security details are not faced with

tough discretionary decisions of the type the Turkish agents faced in Sheridan Circle.

### 3.   Turkish Security Officers Have Died Protecting U.S. Missions.

Turkish security officers have died protecting U.S. missions in Turkey.   In 2008, at the

U.S. Consulate in Istanbul, three Turkish security officers died in a shootout defending the

Consulate after a group of men with concealed weapons approached the entrance and began

shooting.[53]   In 2013, a man walked up to the entrance of the U.S. Embassy in Ankara and

detonated an explosives-laden vest.   Just before doing so, however, a Turkish security officer

threw himself on the suicide bomber to blunt the impact of the explosion and protect the

---

[50] *See Tight Security measures applied for Obama's one-night stay at G-20 Summit in Turkey*, HURRIYET DAILY NEWS (Nov. 17, 2015), http://www.hurriyetdailynews.com/tight-security-measures-applied-for-obamas-one-night-stay-at-g-20-summit-in-turkey-91272 (last visited June 3, 2019).

[51] *Obama due to arrive in Ankara for symbolic two-day Turkey visit*, HURRIYET (Apr. 5, 2009), http://www.hurriyet.com.tr/gundem/obama-due-to-arrive-in-ankara-for-symbolic-two-day-turkey-visit-11368320 (last visited June 3, 2019).

[52] *Antalya air traffic stopped for Obama's departure from the G20 Summit*, DAILY SABAH (Nov. 16, 2015), https://www.dailysabah.com/turkey/2015/11/16/antalya-air-traffic-stopped-for-obamas-departure-from-the-g20-summit (last visited June 3, 2019).

[53] *6 die in attack on U.S. Consulate in Istanbul*, N.Y. TIMES (July 9, 2008), https://www.nytimes.com/2008/07/09/world/europe/09iht-turkey.4.14369483.html (last visited June 3, 2019).

Embassy.[54]   In 2015, Turkish security officers defended the U.S. Consulate in Istanbul from an attack by two female members of the Revolutionary People's Liberation Party-Front (Turkish acronym, "DHKP-C"), a U.S.-designated terrorist group that was also responsible for the 2013 attack on the U.S. Embassy in Ankara.[55]   (*See* Ex. 1, ¶ 8.)

### 4.    Security For Turkey's Head Of State At Sheridan Circle.

According to former U.S. Assistant Secretary of State for European Affairs, Wess Mitchell, Turkey has "suffered more casualties from terrorism in the past several years than any other [U.S.] Ally . . . ."[56]   Turkey's national security interest in heightened security for its traveling officials cannot be understated.  Physical injury to the Turkish head of state at the hands of a PKK member, sympathizer, or associate in the U.S. would surely serve the PKK's nefarious purposes by destabilizing Turkey–U.S. relations.

These threats to President Erdogan, which may have been beyond the comprehension of MPD in May of 2017, are very real.  Just months after the Sheridan Circle Incident, in December 2017, Greek counter-terrorism police foiled an attempt by members of the DHKP-C (the terrorist group that carried out a suicide attack at the U.S. Embassy in Ankara) to assassinate President Erdogan during his visit to Athens by throwing hand grenades, Molotov cocktails, and rockets at

---

[54] Tim Arango and Sebnem Arsu, *Suicide Blast Kills U.S. Embassy Guard in Turkey*, N.Y. TIMES (Feb. 1, 2013), https://www.nytimes.com/2013/02/02/world/europe/2-dead-in-suicide-bombing-at-us-embassy-in-turkey.html (last visited June 3, 2019).

[55] Yesim Dikmen and Seyhmus Cakan, *U.S. consulate in Turkey targeted as wave of attacks kills 9*, REUTERS (Aug. 10, 2015), https://www.reuters.com/article/us-turkey-usa-attack/u-s-consulate-in-turkey-targeted-as-wave-of-attacks-kills-9-idUSKCN0QF0DT20150810 (last visited June 3, 2019).

[56] Testimony for Assistant Secretary Wess Mitchell, House Foreign Affairs Committee Hearing on "U.S. Policy Toward a Turbulent Middle East" (Apr. 18, 2018), https://docs.house.gov/meetings/FA/FA00/20180418/108182/HHRG-115-FA00-Wstate-MitchellA-2018041 8.pdf (last visited June 3, 2019).

his official car.[57]  The un-permitted Sheridan Circle protesters were in close enough proximity to President Erdogan to have done the same.  (*See* Ex. 2, ¶¶ 51, 56.)  Understanding the persistence of this threat sheds light on the Incident at Sheridan Circle on May 16, 2017.

Prior to President Erdogan's arrival at the Residence, D.C. local police escorted a crowd within fifty feet of the Residence without warning to Turkish security.  The crowd did not have an assembly permit; violated federal law prohibiting the harassment of IPPs within 100 feet of diplomatic or consular premises, *see* 18 U.S.C. § 112(b), and included apparent supporters or affiliates of a terrorist organization that has been targeting the Turkish state for decades and had carried out numerous deadly attacks in Turkey just months earlier.  *See supra* § II.B.5.a.  The local police were deaf not only to the criminal threats, harassment and attempts to intimidate Turkish officials by protesters spoken in the Turkish language, but apparently dismissed the Turkish security officers' and Ambassador's legitimate pleas to push back the throng of agitators who had hurled the bullhorn and two plastic bottles of liquid, and were blatantly violating federal criminal law that is designated to protect foreign dignitaries from precisely this type of security risk.  18 U.S.C. § 112. (*See* Am. Compl. ¶ 75; *see also Usoyan* Compl. ¶¶ 33-40 (acknowledging efforts by Turkish authorities to request that the protesters be moved).)

For reasons of international comity, therefore, this Court should defer to the political branches of government to resolve this dispute.

---

[57]  *Arrested DHKP-C militants plotted to assassinate Erdoğan in Athens: Greek media*, HURRIYET DAILY NEWS (Dec. 18, 2017), http://www.hurriyetdailynews.com/arrested-dhkp-c-militants-plotted-to-assassinate-erdogan-in-athens-greek-media-124323 (last visited June 3, 2019).

**E.    28   U.S.C.   §   1350   DOES   NOT   CONFER   SUBJECT   MATTER JURISDICTION.**

The alien Plaintiffs in this suit allege jurisdiction over Turkey pursuant to the Alien Tort Statute, 28 U.S.C. § 1350 (the "ATS").  (Am. Compl. ¶ 2, Count VI.)  The ATS states in its brief entirety, "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  Plaintiffs allege that assaults and batteries "were committed in violation of the prohibition in international law against foreign states exercising their enforcement jurisdiction in the territory of another State and interfering in the internal affairs of another State."  (*Id.* ¶ 262.) Plaintiffs' attempt to bring separate violation of international law claims under the ATS, however, must be rejected under controlling Supreme Court precedent interpreting the ATS as subordinate to the FSIA.

While "the ATS is a jurisdictional statute," *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 108 (2013), the Supreme Court has ruled that, to the extent it ever was, the ATS is not a basis for jurisdiction over a foreign sovereign following enactment of the FSIA, *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (holding in an ATS case that the FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts.").

In *Amerada Hess*, two Liberian corporations sued Argentina for damages stemming from the alleged bombing of their non-combatant oil tanker outside of a designated war-zone, and sought jurisdiction under both the FSIA's tortious acts exception, § 1605(a)(5) and the ATS, § 1350.  488 U.S. at 431-32.  In holding that the FSIA was the exclusive and comprehensive scheme governing foreign sovereign immunity, the Supreme Court rejected any notion that the

ATS confers jurisdiction over violations of international law not specifically recognized in the FSIA, or that the ATS even "supplements" the FSIA. *Id.* at 435-36, 438. The Court explained that "Congress had violations of international law by foreign states in mind when it enacted the FSIA," as evidenced by the FSIA's "expropriation exception" at § 1605(a)(3), and the fact that Congress "rested the FSIA in part on its power under Art. I, § 8, cl. 10, of the Constitution '[t]o define and punish …Offenses against the Law of Nations.'" *Id.* at 435-36 (citing H.R. Rep. No. 94-1487, p. 12 (1976) ("H.R. Rep.")). The "plain implication" is thus that foreign sovereigns are immune "in those cases involving alleged violations of international law that do not come within one of the FSIA's exceptions." *Id.* at 436; *see also id.* at 438 (citing H.R. Rep. at 12 (the FSIA "intended to preempt any other State and Federal law (excluding applicable international agreements) for according immunity to foreign sovereigns")); *see Hwang Geum Joo v. Japan*, 332 F.3d 679, 687 (D.C. Cir. 2003) (holding that "whatever else the [ATS] might do, it does not provide the courts with jurisdiction over a foreign sovereign. Only the FSIA can provide such jurisdiction"), *vacated on other grounds*, 124 S. Ct. 2835 (2004)); *Von Dardel v. Union of Soviet Socialist Republics*, 736 F. Supp. 1, 3 (D.D.C. 1990) (following the publication of *Amerada Hess*, reversing a D.C. Circuit's assertion of ATS jurisdiction over the USSR for its alleged role in the detention and murder of a Swedish diplomat in Hungary).

Thus, "Congress' decision to deal comprehensively with the subject of foreign sovereign immunity in the FSIA, and the express provision in § 1604 that 'a foreign state shall be immune from the jurisdiction' of United States courts except as provided in §§ 1605-1607, preclude a construction of the ATS that permits" an alternative means to jurisdiction over a sovereign. *Amerada Hess,* 488 U.S. at 438. Accordingly, the ATS does not provide this Court with a basis for subject matter jurisdiction over Turkey.

Claims that Turkey committed assault and battery in "violation of enforcement jurisdiction" and interfered in the internal affairs of the United States (Count VI) cannot be sustained, for to do so would cripple foreign security details in their efforts to guard their protectees, and likewise risk subjecting U.S. protective services to similar limitations abroad.  If Plaintiffs had their way, foreign security forces would be free to huddle around their protectee, but otherwise hopelessly shackled and muzzled from acting lest they risk "interfer[ing] with the internal affairs of the United States."

This policy problem notwithstanding, Plaintiffs' ATS allegations must be analyzed under the FSIA's limited immunity exceptions.  *S.K. Innovation, Inc. v. Finpol*, 854 F. Supp. 2d 99, 109 (D.D.C. 2012) ("The Court thus finds that Defendants are entitled to a presumption of immunity under the FSIA and moves next to consider whether an FSIA exception confers jurisdiction over Plaintiffs' ATS claim on this Court.").  For the reasons discussed above, none of those exceptions, including the tortious acts exception, 28 U.S.C. § 1605(a)(5), supplies this Court with jurisdiction to adjudicate claims for "enforcement jurisdiction"—which is a separate tort from the assault and battery claims raised in Counts I and II.  Moreover, for the Court to determine the validity of Plaintiffs' allegation that the alleged torts "were committed in violation of the prohibition in international law against foreign states exercising their enforcement jurisdiction in the territory of another State and interfering in the internal affairs of another State," (Am. Compl. ¶ 262), the Court would have to decide the merits of those tort allegations, which it cannot do without infringing on Turkey's sovereign immunity.  *See*, *e.g.*, *El-Shifa*, 607 F.3d at 843-44; *see also* 28 U.S.C. § 1604.

Turkey expressly reserves all defenses to the claims made in Count VI to the Amended Complaint, including whether the ATS creates a cause of action for the violations of customary

international law alleged, whether the alien Plaintiffs have standing to bring such a claim, and whether it would be justiciable.

## V.     CONCLUSION

For the foregoing reasons, the Republic of Turkey requests that the Court grant its Motion to Dismiss in its entirety and order that the Amended Complaint be dismissed with prejudice and without leave to amend.

Date:   June 4, 2019                                                   Respectfully submitted


*/s/ Cathy A. Hinger*                                              */s/ David S. Saltzman*
Cathy A. Hinger (DC Bar No. 473697)          David S. Saltzman (DC Bar No. 436201)
Victoria A. Bruno (DC Bar No. 484197)          Saltzman & Evinch, PLLC
Mark E. Schamel (DC Bar No. 463965)          1050 K Street, NW
WOMBLE BOND DICKINSON (US) LLP          Suite 1150
1200 Nineteenth Street, NW                            Washington, DC  20001
Suite 500                                                            Tel:  202-372-0092
Washington, DC  20036                                    Fax:  202-318-0892
Tel:  202-857-4489                                          dsaltzman@saltzmanevinch.com
Fax:  202-261-0029
cathy.hinger@wbd-us.com                               *Counsel for Defendant Republic of Turkey*
victoria.bruno@wbd-us.com
mark.schamel@wbd-us.com

*Counsel for Defendant Republic of Turkey*