**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Kurd, *et al.,* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | )   Civil Action No.: 1:18-cv-1117-CKK |
| The Republic of Turkey, *et al.,* | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' RESPONSE TO DEFENDANT REPUBLIC OF**
**TURKEY'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT ........................................................... 1
    A.    The Evidence Disproves Turkey's Narrative .................................................. 2
    B.    Turkey Is Not Immune for Its Serious Criminal Conduct in the United States ................................................................................................................ 5

II. RESPONSE TO COUNTERSTATEMENT OF FACTS ....................................................... 6
    A.    Turkey's Narrative is Contradicted by the Evidence .................................... 6
        1.    Contemporaneous reports by United States law enforcement contradict Turkey's narrative ....................................................... 6
        2.    The video evidence contradicts Turkey's narrative ................................... 9

III. UNDISPUTED ALLEGATIONS ..................................................................................... 40

IV. LEGAL STANDARD ..................................................................................................... 42

V. ARGUMENT ................................................................................................................. 44
    A.    Defendant is Not Entitled to Immunity Under the FSIA .............................. 44
        1.    The Sheridan Circle attack was a tortious act committed in the United States, satisfying FSIA exemption 1605(a)(5) ............................ 44
        2.    The attack was not a discretionary act ...................................................... 45
               a. The FSIA does not extend immunity to the commission to crimes in the United States…………………………………………45
              b. The FTCA, like the FSIA, does not immunize illegal conduct…………………………………………………………..50
    B.    Plaintiffs' Claims for Damages Arising Out of Torts Committed in the United States are Justiciable ...................................................................... 62
        1.    The doctrine of comity does not apply to torts committed on U.S. soil ............................................................................................................. 62
        2.    No Political Question is posed by Plaintiffs' tort claims .......................... 64
    C.    Plaintiffs Do Not Allege the ATS is an Exception to Sovereign Immunity ......... 70

VI. CONCLUSION ............................................................................................................. 71

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agudas Chasidei Chabad v. Russian Fed'n*,
    528 F.3d 934 (D.C. Cir. 2008) ...................................................................................... 43, 56

*Al-Tamimi v. Adelson*,
    916 F.3d 1 (D.C. Cir. 2019) .......................................................................... 64, 65, 67, 68, 70

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ........................................................................................................ 71

*Baker v. Carr*,
    369 U.S. 186 (1962) .................................................................................... 64, 65, 67, 69, 70

*Bell v. Hood*,
    327 U.S. 678 (1946) ................................................................................................ 43, 45, 56

*Berkovitz v. U.S.*,
    486 U.S. 531 (1988) ........................................................................................................ 51

*Biton v. Palestinian Interim Self-Gov't Auth.*,
    310 F. Supp. 2d 172 (D.D.C. 2004) .............................................................................. 68

*Bodner v. Banque Paribas*,
    114 F. Supp. 2d 117 (E.D.N.Y. 2000) .......................................................................... 63

*Boos v. Barry*,
    485 U.S. 312 (1988) .................................................................................................. 53, 54

*Cty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ........................................................................................................ 54

*Doe v. Bin Laden*,
    663 F.3d 64 (2d Cir. 2011) .............................................................................................. 49

*Doe v. Exxon Mobil Corp.*,
    654 F.3d 11 (D.C. Cir. 2011) .......................................................................................... 63

*Doe v. Fed. Democratic Republic of Ethiopia*,
    189 F. Supp. 3d 6 (D.D.C. 2016) .............................................................................. 46, 66

*Feldman v. FDIC*,
    879 F.3d 347 (D.C. Cir. 2018) .................................................................................. 30, 43

*Gates v. Syrian Arab Republic*,
    646 F.3d 1 (D.C. Cir. 2011) ................................................................................................65

*Gilligan v. Morgan*,
    413 U.S. 1 (1973) ................................................................................................................69

*Hardin v. Warden, Lebanon Corr. Inst.*,
    No. 3:09-CV-0019, 2009 WL 529838 (S.D. Ohio Feb. 27, 2009) .........................................49

*Hartman v. Moore*,
    547 U.S. 250 (2006) ............................................................................................................53

*Haygan v. United States*,
    627 F. Supp. 749 (D.D.C 1986) ..........................................................................................55

*Hilton v. Guyot*,
    159 U.S. 113 (1895) ............................................................................................................63

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................................................................69

*Hourani v. Mirtchev*,
    796 F.3d 1 (D.C. Cir. 2015) ................................................................................................65

*Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) ............................................................................................................47

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
    478 U.S. 221 (1986) ............................................................................................................65

*Johnson v. District of Columbia*,
    528 F.3d 969 (D.C. Cir. 2008) ......................................................................................54, 69

*Jones v. Parmley*,
    465 F.3d 46 (2d Cir. 2006) ..................................................................................................53

*Joseph v. Off. of Consulate Gen. of Nigeria*,
    830 F.2d 1018 (9th Cir. 1987) .............................................................................................49

*Kadic v. Karadzic*,
    70 F.3d 232 (2d Cir. 1995) ..................................................................................................68

*Kaplan v. Cent. Bank of the Islamic Rep. of Iran*,
    896 F.3d 501 (D.C. Cir. 2018) ............................................................................................47

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C.Cir.2004) ............................................................................................43

*Letelier v. Rep. of Chile,
    488 F.Supp. 665 (D.D.C. 1980)............................................................45, 46, 47, 48, 49, 50, 66

*Liu v. Republic of China,
    892 F.2d 1419 (9th Cir. 1989) ................................................................46, 49, 50

*Loumiet v. United States,
    828 F.3d 935 (D.C. Cir. 2016)................................................................50, 51, 52, 53

MacArthur Area Citizens Ass'n v. Rep. of Peru,
    809 F.2d 918 (D.C. Cir. 1987)................................................................47, 48

MacArthur Area Citizens Ass'n v. Republic of Peru,
    809 F.2d 918,922 (1987).......................................................................47, 48, 49

Macharia v. U.S.,
    334 F.3d 61 (D.C.Cir. 2003).................................................................51, 53

*Miango v. Democratic Rep of Congo,
    288 F.Supp.3d 117 (D.D.C. 2018)...........................................................46, 47, 66, 69

Mick v. Brewer,
    76 F.3d 1127 (10th Cir. 1996) ...............................................................69

Mohammadi v. Islamic Republic of Iran,
    947 F. Supp. 2d 48 (D.D.C. 2013).............................................................47, 48

Monarch Ins. Co of Ohio v. D.C.,
    353 F.Supp. 1249 (D.D.C. 1973)..............................................................55

Moore v. District of Columbia,
    79 F. Supp. 3d 121 (D.D.C. 2015).............................................................54

Neal v. Roche,
    349 F.3d 1246 (10th Cir. 2003) ..............................................................47

Nnaka v. Fed. Republic of Nigeria,
    238 F. Supp. 3d 17 (D.D.C. 2017)............................................................66

Olaniyi v. District of Columbia,
    763 F.Supp.2d 70 (D.D.C. 2011)..............................................................55

Phoenix Consulting, Inc. v. Republic of Angola,
    216 F.3d 36 (D.C. Cir. 2000)................................................................30, 42, 43, 44, 56

Powell v. McCormack,
    395 U.S. 486 (1969)..........................................................................64, 69

iv

*Prakash v. Am. U.*,
  727 F.2d 1174 (D.C. Cir. 1984) ................................................................. 43, 44, 56

*\*Red Lake Band of Chippewa Indians v. U.S.*,
  800 F.2d 1187 (D.C. Cir. 1986) ................................................................. 52, 55

*Rendall-Speranza v. Nassim*,
  942 F. Supp. 621 (D.D.C. 1996), *rev'd on other grounds*, 107 F.3d 913 (D.C.
  Cir. 1997) ................................................................................................. 46

*\*Republic of Austria v. Altmann*,
  541 U.S. 677 (2004) ................................................................................. 42, 62, 66

*Risk v. Halvorsen*,
  936 F.2d 393 (9th Cir. 1991) ................................................................... 47, 48

*Rudder v. Williams*,
  666 F.3d 790 (D.C. Cir. 2012) ................................................................. 69

*S.K. Innovation, Inc. v. Finpol*,
  854 F. Supp. 2d 99 (D.D.C. 2012) ........................................................... 71

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ................................................................................. 30

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974) ................................................................................. 69

*Shuler v. U.S.*,
  531 F3d 930 (D.C. Cir. 2008) ................................................................. 55

*Simon v. Republic of Hungary*,
  812 F.3d 127 (D.C. Cir. 2016) ................................................................. 65, 68

*Simpson v. Socialist People's Libyan Arab Jamahiriya*,
  362 F. Supp. 2d 168 (D.D.C. 2005) ......................................................... 71

*Singh v. South Asian Soc'y of the Geo. Wash. Univ.*,
  572 F. Supp. 2d 11 (D.D.C. 2008) ........................................................... 55

*Sledge v. U.S.*,
  883 F.Supp.2d 71 (D.D.C. 2012) ............................................................. 52, 55, 56

*Tel-Oren v. Libyan Arab Republic*,
  726 F.2d 774 (1984) (Edwards, J. concurring) ......................................... 64, 69

*Transamerican S.S. Corp. v. Somali Dem. Rep.*,
  767 F.2d 998 (D.C. Cir. 1985) ................................................................. 42

*Ungar v. Palestine Liberation Org.*,
402 F.3d 274 (1st Cir. 2005)..................................................................................66

*United States v. Gaubert*,
499 U.S. 315 (1991)................................................................................47, 51, 52

*United States v. Mendenhall*,
446 U.S. 544 (1980)................................................................................................54

*United States v. Munoz-Flores*,
495 U.S. 385 (1990)................................................................................................69

*United States v. Narin, et al.*
(D.C. Sup. Ct. July 17, 2017)..............................................................................11

*United States v. One Gulfstream G-V Jet Aircraft*,
941 F. Supp. 2d 1 (D.D.C. 2013)........................................................................64

*United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*
467 U.S. 797 (1984)........................................................................................51, 54

*United States v. Schatzle*,
901 F.2d 252,253 (2d Cir. 1990)....................................................................68, 69

*USAA Cas. Ins. Co. v. Permanent Mission of Rep. of Namib.*,
681 F.3d 103 (2d Cir. 2012)..................................................................................48

*Verlinden B.V. v. Cent. Bank of Nigeria*,
461 U.S. 480 (1983)................................................................................................62

*Vieth v. Jubelirer*,
541 U.S. 267 (2004)................................................................................................65

*Williams v. District of Columbia*,
268 F. Supp. 3d 178 (D.D.C. 2017).....................................................................54

*Wultz v. Islamic Rep. of Iran*,
755 F.Supp.2d 1 (D.D.C. 2010)....................................................................67, 69

*Xuncax v. Gramajo*,
886 F. Supp. 162 (D. Mass. 1995).......................................................................46

*Zadvydas v. Davis*,
533 U.S. 678 (2001)................................................................................................52

*\*Zivotofsky ex rel. Zivotofsky v. Clinton*,
555 U.S. 189 (2012)..............................................................................64, 65, 66, 70

STATUTES

18 U.S.C. § 112 ...................................................................................................................53

28 U.S.C. § 1350 ...................................................................................................................6

28 U.S.C. § 1602 .................................................................................................................66

28 U.S.C. § 1605 ........................................................................................................44, 45, 46

D.C Code § 22-3704 .....................................................................................................51, 52, 53

D.C. Code § 5331.02 ............................................................................................................17

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

This case is about whether agents of a foreign nation can come to our nation's capital and with impunity beat, kick, punch and bludgeon United States citizens and local residents to prevent them from exercising their First Amendment right of political protest. Turkey asks this Court to adopt a rule of law inconsistent with longstanding authority in this jurisdiction that holds that a foreign sovereign is not entitled to immunity in a United States court if its officials and employees commit serious crimes in the United States.

Turkey's motion is premised on the fiction that its security agents were forced to attack a small group of protesters in Sheridan Circle, including parents with young children, older men and women, because the protesters threatened President Erdogan.[1] Two branches of the U.S. government already have rejected this story. Congress, in a unanimous resolution, stated that the "demonstrators did not instigate violence," but that "[v]iolence erupted when pro-Erdogan supporters and individuals from the Turkish embassy grounds pushed past District of Columbia police officers to brutally attack the demonstrators." Congress also stated, "[a]t no point was President Erdogan in danger." The U.S. State Department announced: "Violence is never an appropriate response to free speech, and we support the rights of people everywhere to free expression and peaceful protest. We are communicating our concern to the Turkish government in the strongest possible terms."

In addition to this condemnation, the Metropolitan Police Department ("MPD") conducted a criminal investigation. This investigation culminated in the U.S. Attorney's Office securing the return of an Indictment that charged 15 Turkish agents with crimes for attacking

---

[1] *Compare* Dkt. No. 90 (Memorandum in Support of Defendant Republic of Turkey's Motion to Dismiss) ("MTD") at 16 (speculating that protestors "likely" included "military-trained *men*") (emphasis added).

protesters.  The conclusions of these arms of government and the Grand Jury were based on, among other things, indisputable video evidence that utterly contradicts Turkey's story.

## A.     The Evidence Disproves Turkey's Narrative

While the truth of what happened in Sheridan Circle on May 16, 2017 is made clear by even a cursory review of that video evidence, nonetheless, in the Response to Counterstatement of Facts, *infra,* we offer a highly detailed analysis with pinpoint citations on the following issues:

1)     An attack by Turkey's security agents and a group of allied civilians[2] that occurred at approximately 4:05 p.m., just after the protesters had arrived in Sheridan Circle near the Turkish Chief of Mission's Residence ("CMR").  Turkey inaccurately describes this episode as having been initiated by the protesters.  In fact, it began with a punch thrown by a pro-Erdogan civilian, who later boasted that he had started the fight and pled guilty to assault.  The attack ended when MPD officers pulled the pro-Erdogan group back from the protesters.

2)     There was a period of nearly eight minutes after the first attack ended and before a second, much larger attack by the pro-Erdogan group began.  During this period, the protesters were on the sidewalk bordering Sheridan Circle, on the opposite side of the street from the CMR, while the pro-Erdogan group was on the sidewalk bordering the CMR or in the street itself.  Law enforcement officers stood between the two groups, facing the pro-Erdogan group.  The officers repeatedly had to restrain the pro-Erdogan group from advancing on the protesters.  The pro-Erdogan group made vulgar gestures at the protesters, urged them to fight, and yelled taunts like, "I am going to fuck your mother."  There is no evidence that any protester attempted to approach the pro-Erdogan group.

---

[2] This group is referred to at times as the "pro-Erdogan group."

3)      There is no basis for Turkey's current argument that, while its agents were making obscene gestures and threatening to sexually assault the protesters' mothers, those agents also were gravely concerned that the protesters might try to kill President Erdogan, who was to arrive shortly at the CMR.

4)      Turkey's specific contentions about its agents fearing the protesters could use a handgun, improvised explosive device or biochemical weapon are debunked by the video evidence and by Plaintiff's expert, Dr. Ronald M. Layton. Dr. Layton spent more than 26 years in the United States Secret Service. Pls. Ex. 2 ¶ 5. He held positions in the Office of Protective Operations and the Office Strategic Intelligence and Information, among others. *Id.* ¶¶ 5-6, 10-18. Dr. Layton also served as Deputy Assistant Director of the Office of Protective Operations, which is responsible for protecting visiting heads of state. *Id.* ¶ 6. He analyzed the footage from Sheridan Circle and concluded there were no "pre-attack indicators," and that "the observable conduct of [Turkey's agents] does not indicate in any manner that those agents believed that a handgun, IED or chemical-agent threat existed." *Id.* at ¶¶ 41-62. Dr. Layton's conclusions are discussed throughout this brief as relevant.

5)      There is no basis for Turkey's argument that the protesters evidenced support for a terrorist group before the second attack. This argument is premised on the idea that, at a different protest near the White House that day, one Plaintiff held the flag of a militia the United States supports directly in the fight against ISIS, but that Turkey has labeled a terrorist group. *See* Dkt. No. 63 (First Amended Complaint) ("AC") ¶ 44 (describing Turkey's use of terrorism charges to silence criticism).

6)      The actions of Turkey's agents after President Erdogan arrived at the CMR, just before the second attack, were entirely inconsistent with the idea that a threat existed. As Dr.

3

Layton explains, that Turkey's agents brought President Erdogan to the CMR belies any notion they believed there was a threat. Also, the video evidence shows that agents left the area around the vehicle to run more than 130 feet into Sheridan Circle to attack the protesters. This conduct was entirely antithetical to the idea that a threat existed because, when faced with a threat, agents do not leave a protectee, but rather "shrink" around him, as Dr. Layton describes.

7)    Turkish agents and allied civilians began a second attack by breaking through the line of police in front of them to kick, punch, stomp on and choke people including older men, diminutive women, and parents with children. Turkey's agents engaged in prolonged assaults on people like Plaintiffs Murat Yasa, Elif Genc, Heewa Arya, and Jane Doe II, even after those individuals were lying injured on the ground. Turkey's agents beat people like the then 62-year-old Abbas Azizi and Stephen Arthur, who were simply trying to get out of the way. Most tellingly, Turkey's agents chased people like Plaintiffs Mehmet Tankan, Ceren Borazan, Jane Doe II, Heewa Arya, and Ruken Isik (who was carrying her child), even after those people had fled from the area Turkey now claims was too close to the CMR for a safe protest. Notably, Turkey does not dispute a single allegation made by Plaintiffs regarding any specific action the agents took during the second attack.

8)    The actions of Turkey's agents after the second attack underscored that the attack was for the purpose of silencing the protest. For example, Turkey's agents tore the protesters' signs and yelled at a few remaining protesters who were on the side of Sheridan Circle, saying things such as "I'm going to take that flag [which a protester held] to put in your mom's pussy. I'm going to fuck your mom's pussy." And, even though (i) the protesters had left the area that Turkey tells the Court was too close to the CMR and (ii) President Erdogan was ensconced in the

4

CMR, the Turkish Ambassador commanded a police officer to "just tell them to move away. And they keep on *insulting*."

**B.    Turkey Is Not Immune for Its Serious Criminal Conduct in the United States**

Turkey's primary legal argument is that its agents' actions are shielded from tort liability by the discretionary-function exception in the Foreign Sovereign Immunities Act, because the agents perceived a threat before the second attack. As addressed in detail in the Response to Counterstatement of Facts, *infra,* the facts undermine Turkey's contention.

However, even if all independent evidence were ignored and Turkey's argument about a threat were credited, Turkey's legal arguments would still fail. Turkey does not address the specific actions any of its agents took during the second attack and offers no factual declaration from any participant. And, it, obviously, has not attempted to explain how any of those specific actions served a legitimate threat-neutralizing purpose. Thus, Turkey's position essentially is that, once its agents perceived a threat, the agents had discretion to take any action against the protesters, including stomping, punching and choking people, including (i) people Turkey does not claim did anything to create the supposed threat and (ii) people who were outside the area of Sheridan Circle that Turkey claims was unsafe for a protest. As such, Turkey asks the Court to find that foreign agents on U.S. soil have unfettered authority to batter U.S. citizens and residents, even as the United States Secret Service and the MPD seek to put a stop to the violence, as long as an after-the-fact justification can be found. That is not the law.

The Foreign Sovereign Immunities Act does not grant immunity to the perpetrators of serious crimes, such as those committed here. Indeed, there is a seminal case on this point that was issued in this district and has been followed repeatedly by courts in this district. There also is parallel authority under the Federal Tort Claims Act.

Finally, the doctrine of comity does not apply to torts committed on U.S. soil and no political question is posed by Plaintiffs' tort claims. Plaintiffs do not assert that 28 U.S.C. § 1350 provides an exception to sovereign immunity and agree that Turkey has reserved its arguments with respect to that claim.

Turkey's motion should be denied.

## II.  RESPONSE TO COUNTERSTATEMENT OF FACTS

### A.    Turkey's Narrative is Contradicted by the Evidence

1.    Contemporaneous reports by United States law enforcement contradict Turkey's narrative

Turkey portrays the Plaintiffs as instigators of two violent skirmishes, and considerable risks to Erdogan. MTD at 21-25. Since the Plaintiffs filed their complaint, additional evidence has been obtained though FOIA. These reports by law enforcement witnesses -- including from Diplomatic Security agents at the Department of State and Metropolitan Police officers -- contradict Turkey's narrative and substantiate Plaintiffs' allegations.

For example, a same day summary of the events prepared by the Threat Investigations and Analysis Directorate (DS/TIA) of the Department of State depicts Turkey's security officers not as reasonable and controlled professionals reacting to a credible threat, but as the aggressors throughout the conflict. Pls.' Ex. 1 (Memorandum to DS Bill Miller (May 17, 2017). Specifically the memo states "**Turkish security agents assaulted protestors/demonstrators, and U.S. law enforcement personnel**. Multiple injuries were reported and sustained, to include two Diplomatic Secirty (DS) Special Agents (SA), six U.S. Secret Service (USSS) officers and agents and one Metropolitan Police Department (MPD officer." Pls.' Ex. 1 at 1 (emphasis added).

6

The memo goes on to state "at least three separate disturbances occurred where multiple Turkish security personnel used undue force against protestors/demonstrators and U.S. law enforcement personnel … In the second instance, Turkish security personnel physically assaulted protestors and U.S. law enforcement officers at the Turkish Ambassador's residence." Pls.' Ex. 1 at 1; *See also id*. ("In the third instance, Turkish security personnel were detained after assaulting law enforcement personnel directly across the street from the Turkish Embassy. While this was occurring, Turkish security personnel continued to confront and assault protestors.")

Contemporaneous e-mails produced by the State Department DS Command Center confirm this account.   For example, a DS Command Center email from the Office of Protection, Dignitary Protection Division, by the Agent-in-Charge states "after arrival, I learned from USSS agents and police on site that the melee **had been provoked by Turkish security officers** who upon seeing the protestors had run directly into the crowd to physically engage them, and that one Turkish security officer had punched a MPD officer directly in the nose causing massive blood flow and other MPD officers were also assaulted." Pls.' Ex. 2, DS SSA Sit-Rep from FD-17-182 Turkish FM Incident (Email of May 17, 2017, 5:50AM); *see also* Pls.' Ex. 3, DS SA Sit-Rep from FD-17-182 Turkish FM Incident (Email of May 17, 2017, 5:50AM) (relaying report from a Special Agent: "The Turkish security agent in his car opened the door and jumped out, while the car was moving to join the fighting.  SA [redacted] tried to tell the Turkish security agent to stay in the car and shut the door.  The Turkish security agent did not listen." Likewise the Affidavits in Support of An Arrest Warrant describe the Sheridan Circle protestors as "a group conducting a peaceful first Amendment assembly." Pls.' Ex. 4, Affidavit in Support of An Arrest Warrant (Mehmet Sarman); Pls.' Ex. 5, Affidavit in Support of An Arrest Warrant (Yasin

Simsek).  The Affidavits further state that the Turkish Security personnel were in a group that

"attack[ed] the Complainant and additional protestors …  the Defendant is seen pushing pass the

MPD to assault the Complainant."  Pls.' Ex. 4 (also identifying the Defendant as a member of the

Turkish delegation); *see also* Pls.' Ex. 5 (same).

The law enforcement memoranda also confirm that multiple agents from Department of

State Diplomatic Security, the Secret Service, and Metropolitan police were detailed to protect

President Erdogan and he was not in danger.  Pls.' Ex. 1 at 1.  Turkey complains vociferously

about the competence of the Metropolitan Police Department, repeatedly asserting that the MPD

was unaware of its obligations, refused to take "common sense" security tactics, and generally

failed to protect President Erdogan.  MTD at 3, 24.  But the FOIA exhibits reveal that the U.S.

law enforcement agencies took a well-practiced, professional and responsible approach to

protecting the foreign dignitaries.  Indeed, between 2014 and 2016, the District of Columbia was

the site of approximately 2,436 marches and demonstrations, not including events over which the

Capitol Police and National Park Service have jurisdiction.  Office of the District of Columbia

Auditor, *Metropolitan Police Monitor Nearly 2,500 Demonstrations in 2014-2016 and Report*

*No First Amendment Inquiries* (2017), http://dcauditor.org/report/metropolitan-police-monitor-

nearly-2500-demonstrations-in-2014-2016-and-report-no-first-amendment-inquiries/ at 9.  The

report notes that roughly 10% of the demonstrations involve over 1,000 people.  *Id.*  An audit of

the MPD concluded that "Leaders of MPD are justifiably proud of their handling of the

thousands of special events that take place in the nation's capital and the protection they provide

to demonstrators and residents" and cites "the prior development of rules and practices

governing police handling of First Amendment assemblies." *Metropolitan Police Monitor Nearly*

*2,500 Demonstrations* at 15.   The MPD has a 108-page standard operating procedure document

for "Handling First Amendment Assemblies and Mass Demonstrations," which includes

procedures for handling planned and unplanned events, "violent civil disturbances," command

assignments and responsibilities, among other topics. Metropolitan Police Department, *Handling*

*First Amendment Assemblies and Mass Demonstrations* (2016),

https://go.mpdconline.com/GO/SOP_16_01.pdf.  Turkey's complaints about the MPD also

ignore that multiple law enforcement agencies were on site and provided protective services.

The United States Secret Service was one of the other agencies present, and in 2017 reported

providing protection during 2,003 travel stops for foreign dignitaries and coordinating protective

measures for 1,444 visits by foreign heads of state with a 100% success rate in safe arrivals and

departures.  United States Secret Service, *2017 Annual Report*,

https://www.secretservice.gov/data/press/reports/CMR-2017_Annual_Report_online.pdf at 4.

    2.      The video evidence contradicts Turkey's narrative

Turkey relies on cherry picked video footage to spin a counterfactual narrative.  But from

the first minute of the relevant video, it is clear that Turkey's narrative is contradicted by its own

evidence.

        a.      Turkey's Description of the First Attack Is Contradicted by the Evidence

Turkey's assertion that the violence began when Plaintiff Jalal Kheirabadi approached a

man in a khaki uniform is belied by the video.  *See* MTD at 21.  The video actually shows that

Defendant Sinan Narin, who pled guilty to assault for his role in the second attack, threw a right-

handed punch at Kheirabadi before any other violent action. *See* SC01[3] at .48[4]; Am. Compl.¶ 24 (Narin pled guilty); Pls.' Ex. 6 (Declaration of Dr. Ronald Layton) ¶ 62. And, Narin later boasted that he had started the fight.[5]

Narin's punch was only the beginning of the violence directed at Kheirabadi. In fact, Narin grabbed Kheirabadi and repeatedly punched Kheirabadi. SC01 at .53-.55. Then, Defendant Alpkenan Dereci (Subject A),[6] who was wearing a yellow t-shirt, ran into the scene from the right (SC01 at .57-1:00), and repeatedly hit Kheirabadi in the head. SC02 at .21-.27.[7] An MPD officer pulled Alpkenan away (SC02 at. 30 (on left)), but then multiple Turkish security agents hit Kheirabadi as well. SC02 at .30-.48. The same MPD officer who had restrained Alpkenan ultimately put his arms around one of the agents attacking Kheirabadi to restrain him as well. SC02 at .48.

---

[3] Unless otherwise specified, citations to videos are to the videos submitted by Turkey as Exhibit 6, which are referred to using the same delineations used by Turkey (*e.g.*, "SC01"). In addition, Turkey's Exhibit 10 contains screen shots from a portion of SC02 (a video compilation created by the U.S. government) in which the government identified particular individuals by name (when known) and "subject" letter. All references to "subjects" herein are to the subjects as delineated in Exhibit 10 to Turkey's motion to dismiss, except that references are made to SC02 for individuals identified as subjects in SC02 whom Turkey did not include in Exhibit 10.

[4] Run frame-by-frame Narin's punch can be seen at the .48 mark.

[5] *See amerikada pkklilari deviren adam Sinan Narin Mahmut Alan la roportaj yapti*, YouTube (May 19, 2017), https://www.youtube.com/watch?v=pjC3KxX7MJA (English translation at Pls.' Ex. 8).

[6] Referred to as "Alpkenan" to avoid confusion with his cousin Ahmet Dereci, also a defendant.

[7] Turkey fails to mention that Plaintiff Kasim Kurd hit Alpkenan not in a random act of violence, but in an attempt to stop Alpkenan's assault on Kheirabadi. *See* MTD at 21; SC01 at .21-.27. Turkey asserts the video does not show Kurd being hit in the head as he alleges, while omitting that the view of Kurd is obscured a number of times, including when a large khaki-clad security agent confronts him. *See* SC02 at .21-.28. Thus, Turkey has not meaningfully contested Kurd's allegations about being assaulted. *See* Am. Compl.¶¶ 92-93.

Just after Narin attacked Kheirabadi, Turkish agents and pro-Turkey civilians began assaulting Jane Doe II as well.  First, a security official identified in the Indictment[8] as Mehmet Sarman (Subject G) pushed Jane Doe II to the ground.  *See* SC02 at .17.  As that occurred, Alpkenan ran at Jane Doe II and stood over her menacingly while she lay on the ground, before he moved away to punch Kheirabadi in the head.  SC02 at .16-.20.  An unidentified civilian (Subject B per SC02 at 10:30) hit Jane Doe II in the head with a Turkish flag while she was on her knees trying to get to her feet.  SC02 at .21.  Defendant Mahmut Ellialti (Subject C) then stood threateningly over Jane Doe II and shoved her when she put her hands up in defense.  SC02 at .23-.27.  Plaintiff Mehmet Tankan awkwardly kicked at the muscular Ellialti in an effort to move Ellialti away from Jane Doe II.  SC02 at .27.  It is presumably this act or Tankan's attempt to defend himself against the kicks of a burly approaching security agent, Ismail Ergunduz (Subject F), that Turkey claims constituted wrongful participation by Tankan in the first incident.  SC02 at .43-.45; *see* MTD at 21-22.[9]

Turkey also makes an unsubstantiated assertion that Plaintiffs Abbas Azizi, Heewa Arya, Stephen Arthur, and Mehmet Özgen participated in some improper way in the first attack.  MTD at 21.  Turkey offers no specifics regarding what these individuals supposedly did, instead simply citing to some 40 seconds of video.  *Id.* (citing SC02 at .24-1:02).  That portion of video, however, shows certain of these individuals doing little more than facing a group of large, armed security agents, looking frightened and raising their hands in a meek attempt at self-defense, while not hitting anyone.  *E.g.,* SC02 at .44 (Azizi, then 62-years-old (Subject Y); Arthur at right

---

[8] "Indictment" refers to the criminal indictment returned against fifteen Turkish agents and four civilians.  Pls.' Ex. 9, *United States v. Narin, et al.*, (D.C. Sup. Ct. July 17, 2017).

[9] Contrary to Turkey's contention, Defendant Ahmet Dereci (Subject J) is seen kicking at Tankan.  SC02 at .46-.48; *see* MTD at 22.

of screen with beard and glasses in red t-shirt; and Plaintiff Ceren Borazan (Subject T). The cited video scarcely shows Özgen and Arya at all, let alone doing anything even vaguely aggressive.

Finally, Turkey claims Borazan sprayed liquid from a plastic bottle "in the direction of the police and Pro-Turkey group." MTD at 23. As shown on the video, Borazan flicked a small amount of water from a nearly empty plastic bottle into the middle of the street, which was clear of people, except for Defendant Eyup Yildirim (who pled guilty to assault in connection with the second attack), who does not appear to have been targeted. SC02 at 1:17-1:18.

> b.      Turkey's Description of the Eight-Minute Period Between the First and Second Attacks Is Contradicted by the Evidence

Turkey's account of the period between attacks is false in a number of respects.

> (1)      Turkey's Argument that the Groups Were Not Properly Separated Is Contradicted by the Evidence

Turkey complains that, while police moved the protesters and the pro-Erdogan group onto separate sides of the street, there was no physical barrier between the sides. MTD at 23. It is not clear what type of barrier Turkey believes should have been in place, given that it commends police for their handling of the protests in Lafayette Square, where the only barriers were "tape" and police officers. *Id.* at 18.[10]

However, it is undisputed that there were police officers between the two groups in Sheridan Circle from the time the first altercation ended until Turkey's agents began the second attack some eight minutes later. Notably those officers were facing the CMR because they perceived the risk of a confrontation as emanating from the Turkish agents and their civilian

---

[10] In praising the security measures employed at Lafayette Circle, Turkey ignores that, even in the absence of security concerns there, its agents "confronted and argued with protesters at the White House," as reflected in State Department records. Pls.' Ex. 1 at 1.

12

supporters, as opposed to the protesters. *See generally* Pls.' Ex. 7 (Declaration of Kasim Kurd), Ex. A (protesters lined up on sidewalk bordering Sheridan Circle); SC03 (protesters in a small group, entirely on the sidewalk bordering Sheridan Circle, while police officers face the group on the CMR-side of the street; two police cruisers on the on left); SC05 at .04-1:00 (police officers and a suited U.S. agent); *see generally* SC06 (the street between the two groups is clear, vehicles are passing, and police are facing the crowd on the CMR-side of the street); Pls.' Ex. 6 ¶ 66.

In fact, during the eight-minute period between attacks, additional police arrived, including numerous police on motorcycles. Those police lined up their motorcycles as a barrier behind the line of police already facing the pro-Turkey group, underscoring that the MPD believed that any violence would be initiated by that group. Pls.' Ex. 7, Exs. A and B (at 1:32 additional motorcycle officers arrive and position their motorcycles); *see also* SC08 at .52-1:00 (showing line of motorcycles that Turkish agents had just broken through as police officer drags Narin back to the CMR during second attack); SC09 at 7:41 (showing motorcycles as officer looks back across street right after second attack).

There is no evidence that the protesters left the sidewalk bordering Sheridan Circle and no evidence that U.S. law enforcement ever had to ask the protesters to remain there.[11] *See, e.g.,* SC03; Pls.' Ex. 7, Ex. A; Pls. Ex. 6 ¶ 64. Rather, the evidence shows clearly that police officers repeatedly had to order Turkish security agents and their civilian supporters out of the street and back onto the sidewalk in front of the CMR and also had to physically restrain those individuals

---

[11] Turkey does not contend otherwise as to this period, although it does claim the protesters defied "repeated police commands to remain on Sheridan Circle," prior to the first attack. MTD at 20. However, the video Turkey cites does not support this proposition. *See* SC01 at .01-.50.

from advancing on the protesters.  *See generally* SC05 at .01-1:00; SC08 at .01-.24; SC09 at .01-7:14; SC12 at .01-7:10; Pls.' Ex. 6 ¶¶ 65-66.  More specifically and just by way of example:

- Officers had to hold their arms up or out to the side to indicate that agents should stay in place.  *See generally* SC06;

- Two female officers were forced to link arms to restrain agents Mustafa Sumercan (Subject AM) and Turgut Akar (Subject AL).  SC06 at .02-.20;

- Officer struggling to hold back pro-Erdogan group, yelled "stay back, stay back, you're not helping us, you need to contain yourselves!"  SC09 at .47-.56

- Officer pleaded for Turkish group to move back, saying "please."  SC09 at 1:24-1:26;

- One officer said to another, "watch those guys.  See these three guys right here?  Don't let them cross the street."  SC12 at 4:20;

- Officer said, "Sir, don't cross this line.  Just stay here."  SC09 at .25-.28;

- Officer said, "you need to contain yourselves!"  SC09 at .54-.57; 1:00-1:03; 1:10-1:13;

- Referring to the protesters, officer said: "Let them talk!"  SC09 at 1:26-1:28. "They have a right to talk!"  SC09 at 1:33-1:37;

- Officer yelled, "stay back!"  SC09 at .49-.51; 1:43-1:45; 2:42-2:49;

- Officer said, "don't cross the white line!"  SC09 at 2:51-2:53;

- Officer yelled, "we need order right now."  SC09 at 3:39-3:42;

- Officer directed, "I need you to back up!"  SC09 at 3:47-3:50; and

- Officer said, "you are the head of security.  You need to keep your guys back."  SC09 at 6:55-7:00.

As Dr. Layton observes, the behavior of Turkey's agents escalated – rather than calmed – tensions in Sheridan Circle, while the MPD and other U.S. agents acted to de-escalate the situation.  Pls.' Ex. 6 ¶ 68, 71.  Thus, it is particularly ironic for Turkey to complain about a lack of separation, considering it was *Turkish* agents who broke through the line of police and motorcycles to attack the protesters.  *See* SC02 at 2:35 *et seq.*; SC08 at .25 *et seq.*

          (2)    Turkey's Argument that its Agents Wanted the Protesters to Move Away for Security Reasons Is Contradicted by the Evidence

Turkey claims that its security personnel (and civilians who were allowed to stand on the sidewalk with those personnel) asked police officers to move the protesters further away to allow

14

President Erdogan "to enter the residence safely."  MTD at 23-24.  This assertion is

unsustainable for many reasons.  As an initial matter, Turkey presents no evidence that anyone

asked law enforcement to move the protesters for *security* reasons.  *Cf.* MTD at 24 (quoting

agent as telling police officer with no reference to security, "do you understand my president is

coming?  If you don't take, I will take.").

Beyond the fact that Turkish security agents did not make any reference to security in

asking the police to move protesters away, Turkish security agents actually urged the protesters

to come *to them* on the CMR-side of the street, *i.e.,* to come *closer* to the CMR.  Specifically:

- Agent Ismail Ergunduz (Subject F) extended his arm and moved his hand in a downward gesture that is well-known in Turkey and elsewhere as indicating "come here."  SC06 at .02 (khaki-clad agent on right); Pls.' Ex. 7 ¶ 11 (describing meaning of gesture);

- Agent Mustafa Sumercan (Subject AM) made the same gesture at protesters numerous times, including over the interlocked arms of police officers who were trying to restrain him.  SC06 at .06-.12 (in middle-right of screen); *see also* Pls.' Ex. 9 ¶¶ 7-8 (Sumercan made throat-slashing gesture and angrily motioned for protesters to come to him); and

- Agent Sumercan yelled at the protesters: "You come here!  Come here, I said!  Come here!  Come!"  SC09 at 2:47-2:53 (English translation at Pls.' Ex. 10); SC09 at .59 (Sumercan's face is visible).

Given their furious expressions and gestures, and the hateful words they uttered, as described

more fully below, these agents clearly were urging the protesters to come *closer* to fight; that the

protesters did not oblige prompted the agents to run across the street to beat them moments later.

*See* Pls.' Ex. 6 ¶¶ 69-70 (Dr. Layton concludes that the words and actions of the agents directly

contradicts the proposition that the agents wanted the protesters to move for security reasons).

Underscoring the entirely personal animus of the security agents and their civilian

supporters toward the protesters:

- Agent Turgut Akar (Subject AL) wagged his finger at protesters in a gesture that means, essentially, "I will get you."  SC06 at .04; Pls.' Ex. 7 ¶ 12 (meaning of gesture);

- Another agent made a gesture to the protesters, meaning "fuck you."  SC06 at .16 (agent on right); Pls.' Ex. 7 ¶ 13 (meaning of gesture);

15

- Narin gave protesters the finger directly in front of a police officer, while standing shoulder-to-shoulder with security agents. SC06 at .15;

- Yildirim, also directly in front of a police officer and directly next to the security agents, yelled, "dirty bastards" and "shut the fuck up, bitch" at the protesters. SC12 at 2:28-2:29, 5:20; *see also* Am. Compl.¶ 76 (Yildirim admitted making these statements in his criminal case);

- Agent Akar yelled: "I am going to stick [inaudible] in your ass. You fucking son of a bitch. I am going to fuck your mother." SC09 at 2:42-2:52 (English translation at Pls.' Ex. 10); SC09 at 2:40 (Akar's face is visible as he begins to yell); and

- Agent Sumercan yelled: "Make those fuckers shut up! Shut them up!" SC09 at 6:55-6:58 (English Translation at Pls.' Ex. 10); SC09 at 6:38 (Sumercan can be seen walking up to officer, which is position from which he yells at 6:55).[12]

In the words of Dr. Layton, this conduct represented a "complete breakdown of professionalism" and was "contrary to the goal of maintaining a secure environment." *See* Pls.' Ex. 6 ¶ 70. Quite notably, as addressed, no protester responded to these provocations by moving toward the agents.

Turkey also complains that its Ambassador had to speak to police about moving the protesters. MTD at 24. However, Turkey does not claim the Ambassador framed his request in terms of security. *See id.* Rather, the Ambassador complained that the protest was supposedly simply "without permission." SC12 at 2:03. In fact, the words of the Ambassador after the second attack establish that he wanted the protesters to move because of what the protesters were saying, not because of security concerns. Specifically, the Ambassador complained to a police officer that the protesters were "*provocating* [sic]," and said, "just tell them to move away. And they keep on *insulting*." SC08 at 5:35 (emphasis added).

Further, Turkey cites statements by pro-Turkey civilians to contend that requests were made to move the protesters for security reasons. *See* MTD at 23-24 (citing comments by

---

[12] Consistent with the absence of visible security concerns on the part of agents is the fact that agents Hamza Yurteri (Subject E), Ismail Ergunduz (Subject F), and Mehmet Sarman (Subject G) were laughing with each other as they looked at their knuckles, which appear to have been bruised from punches thrown during the first attack. SC09 at 2:11-2:30.

"individuals" and then stating that "the security detail…*also* spoke with U.S. law enforcement." (Emphasis added).  Turkey does not explain how civilians had relevant insight regarding security needs.  Moreover, Turkey does not cite any statement by a civilian to the effect that the protesters had to be moved for security reasons.[13]  Indeed, to the contrary, the civilians on the CMR side of the street made clear that they wanted the protesters moved to silence the protest, just as Turkey's agents did.  For example, one civilian said to police just moments before the second attack, "we are going to make a curtain for him, we don't want him to see them."  SC09 at 5:23; *see also* SC12 at 5:20; Am. Compl. ¶ 76 (Yildirim yelled, "shut the fuck up, bitch.")

Turkey's argument that the protesters were too close to the CMR is fatally undercut also by the fact that many civilians were allowed to stand on the sidewalk right next to the CMR between the first and second attacks, *i.e,* far closer to the CMR than the protesters ever were.[14] *E.g.,* SC09 at .01-7:15; SC12 at .01-7:10.  As Dr. Layton observes, there were "significant and highly unusual (if not unprecedented) deviations in security standard protocols" in that Turkey's agents allowed these unscreened individuals to intermingle with the outer perimeter security force.  Pls.' Ex. 6 ¶ 94.  Obviously, Turkey would retort that these civilians supported President Erdogan.  However, the fact that these individuals waved Turkish flags or chanted slogans in

---

[13] *See* MTD at 23 (citing civilian who complained protesters did not have permit, an issue that does not bear on security).  On this point, the protesters did not need a permit because Sheridan Circle is a National Park, and permits are not required for protests on federal land if they involve fewer than 25 people.  C.F.R. § 7.96(g)(2)(i).  For protesters on the sidewalk in front of Sheridan Circle, they stood on D.C. property, where individuals are allowed to protest with or without a permit.  *See* D.C. Code § 5331.02, *et seq.*

[14] The fact that unscreened civilians were allowed onto the CMR-side of the sidewalk renders irrelevant Turkey's claim – made without substantiation by anyone with personal knowledge – that at an event on May 15, 2017, Turkish supporters greeting President Erdogan at Blair House were properly moved away from the location "and understood this to be a valid safety measure befitting the solemnity of President Erdogan's visit."  *See* MTD at 12.

support of President Erdogan can hardly be said – as a matter of security protocol – to mean that such individuals posed no threat, particularly because we know for certain that, at least certain of these individuals, did not know any of the Turkish security personnel. *See* Pls.' Ex. 11 (proffers of Narin and Yildirim in criminal case averring they did not know security agents).

Indeed, there were violent civilians among the pro-Erdogan group whose views should have been quite alarming to Turkey. For example, Narin has shared social media posts that equate the United States with ISIS and display his collection of firearms. Pls.' Ex. 12 (Declaration of Joshua Colangelo-Bryan), Ex. A (post says, "ISIS Murders Children – 'Terrorism,' The United States Murders Children – 'Mistake'"), Ex. B (weapons); *compare* MTD at 1 *et seq.* (repeatedly emphasizing Turkey's fight against ISIS). Alpkenan has voiced support of Hamas and inquired why the leader of ISIS was not commenting on Israel's misdeeds. *Id.* Exs. C and D; *compare* MTD at 11 (describing Turkey's global fight against terrorism, including groups designated by the United States as Foreign Terrorist Organizations). In sum, the fact that Turkish agents took no security measures with respect to civilians it did not know and who were closest to the CMR underscores that Turkey cannot legitimately complain that the protesters – who were significantly farther away – created a risk simply based on their position.

In addition, Turkey's agents permitted these civilians to play loud nationalist music during the times when Turkey now claims its agents were gravely concerned about an attack. *See* SC09 at 6:16; SC12 at 5:34; Am. Compl.¶ 76 (uncontested allegation that "Mehter March," a Turkish nationalist song was played). The playing of loud music, obviously, is antithetical to the proposition that Turkey's agents believed there to be a threat against President Erdogan because, in such circumstances, security personnel would want to communicate effectively without the interference of (avoidable) loud music, as Dr. Layton confirms. *See* Pls.' Ex. 6 ¶ 94. Indeed,

18

one can only conclude that the agents allowed the music to be played in the hope of drowning out the protesters, further vitiating the argument that the agents believed there was a threat.

### c. Turkey's Arguments Regarding the Threat of a Handgun, IED and Biochemical Weapon Are Contradicted by the Evidence

#### (1) The Supposed Handgun Threat

Turkey claims its agents were concerned that a protester could have had a handgun "approximately fifty feet away from the [CMR], with a direct line of sight to the arrival point, without any screening or other visual barriers, placing President Erdogan within 'handgun distance.'" MTD at 28 (citing Ex. 2 thereto ¶ 35). Turkey does not refer to any evidence purportedly showing a protester had a handgun, instead basing the proposition about this threat solely on the distance between President Erdogan's arrival point and the protesters.

However, Turkey's expert states that he "understands" the distance between the protesters and the "sidewalk on the Residence side of Massachusetts Avenue" to be 50 feet (MTD, Ex. 2 thereto ¶ 35), demonstrating he did not make the measurement upon which this point is premised. Dr. Layton visited the site and physically determined that the distance from the sidewalk bordering Sheridan Circle (where the protesters stood) to the arrival point of President Erdogan's vehicle was approximately 130 feet. And, it is this distance – not the distance across Massachusetts Avenue – that matters. Pls.' Ex. 6 ¶ 45, n.3; Pls.' Ex. 13. Moreover, the arrival point was higher in altitude than the protesters' location and essentially obscured by foliage and shrubs. Pls.' Ex. 6 ¶ 45; SC12 at .01-1:50; Pls.' Ex. 7, Exs. A and B. Critically, 130 feet is well beyond the distance for even Secret Service agents to qualify with handguns – and that is on a sterile pistol range. Dr. Layton, a Secret Service firearms instructor designated as an "Expert" in marksmanship, has concluded that the combination of the distance

19

involved as well as the obscured line of sight would have made an "aimed" shot nearly impossible to execute.  Pls.' Ex. 6 ¶ 46.

Incorrect measurements aside, Dr. Layton saw no evidence at all that objectively would have raised concerns to a security professional that any protester had a handgun, and, again, Turkey does not claim there was such evidence.  Dr. Layton also saw no evidence that any security agent took action in a manner suggesting the agent believe there was a handgun threat.  In particular, no Turkish agents stopped, detained, frisked, patted down or questioned any protesters.  Thus, in Dr. Layton's expert opinion, there is simply no basis to conclude that any security agent believed there was a handgun threat.  Pls.' Ex. 6 ¶ 48.

(2)     The Supposed IED Threat

Turkey contends there was an IED threat for no reason other than that Plaintiff Kheirabadi had a backpack.  MTD at 28 (citing Ex. 2 thereto ¶¶ 35, 41).  This contention is questionable even to the ear of a layperson.  As Dr. Layton explains, observing an individual with a backpack is far from an adequate basis to determine there is an IED threat.  Considering how many people use backpacks, there is simply no basis to contend that carrying a backpack, including while protesting, constitutes pre-attack behavior, involving an IED or otherwise; and the Secret Service does not consider a protester with a backpack as evidencing pre-attack behavior.  Pls.' Ex. 6 ¶ 50.

Beyond this, it would have been impossible to throw a backpack from the area of the protest more than 130 feet (through natural and man-made barriers) to President Erdogan's arrival point; it also would have been impossible or nearly impossible to throw it to the CMR.  In this context, Dr. Layton saw no indication that anyone even attempted to move toward the arrival point, which would have required by-passing Turkish and U.S. security personnel, such that an

20

IED could have been brought near the arrival point.  Pls.' Ex. 6 ¶ 52; *compare* MTD, Ex. 2 ¶ 41 (claiming a protester could have detonated an IED "within feet of the arrival point.").

Moreover, as mentioned, many civilians were in closer proximity to the CMR than the protesters and a number of those civilians carried backpacks and other bags, without drawing any scrutiny from Turkey's agents.  Pls.' Ex. 6 ¶ 51 (citing SC01 at 2:10-2:20; SC05 at .55-.59); *see also* SC12 at 10:40-10:55 (starting at left side of video); *compare* MTD, Ex. 2 thereto ¶ 35 (noting protesters had not undergone screening, but omitting that civilians on CMR-side of the street had not been screened).  And, individuals were carrying purses or bags within a few feet of President Erdogan's vehicle without Turkish agents detaining, searching or even seeming to notice them.  SC10 at 1:00-1:10 (includes people who appear to be journalists on far left).

The issue of backpacks aside, Dr. Layton did not see any evidence that otherwise would have indicated an IED threat.  Further, no protester was stopped, detained or frisked by any security personnel.  Also, during and after the second attack on the protesters, there is no evidence that Turkey's agents made any attempt to locate or search the backpack that supposedly posed a "significant concern."  Rather, the agents simply beat Kheirabadi – who had worn the backpack.  Pls.' Ex. 6 ¶ 54; SC02 at 2:36-2:42, 5:45-5:51 (Kheirabadi wearing a blue t-shirt); *compare* MTD at 28 (asserting it was a serious failure of MPD not to "search and confiscate the backpack that Kheirabadi carried").  For all of these reasons, Dr. Layton concludes that there is no reason to believe that any security agent at Sheridan Circle actually had concerns about an IED threat.  Pls.' Ex. 6 ¶ 55.

(3)    The Supposed Biochemical Weapon Threat

Turkey asserts its agents were faced with a threat of biochemical weapons.  MTD at 28. This assertion is based on the fact that a protester sprayed a small amount of liquid from a plastic water bottle and the statement of Turkey's expert that "the dispersal of *any* liquid" is "a potential

biochemical hazard." *Id.* (citing Ex. 2 thereto ¶ 46 (emphasis added)). Again, even a layperson would have to question the proposition that a government security detail regards the spilling of any liquid under any circumstances as a legitimate biochemical hazard.

And, again, as Dr. Layton explains, this is not at all the case. Indeed, in Dr. Layton's 26-year career with the Secret Service, he has never seen the simple dispersal of a liquid from a water bottle treated as a potential biochemical attack. Moreover, the Secret Service does not consider a protester dispersing liquid from a water bottle to be a pre-attack indicator, let alone an indicator of a biochemical attack, and agents do not stop or frisk a protester just because a protester disperses liquid from a water bottle. Pls.' Ex. 6 ¶ 58.

General protocols aside, there was no other evidence suggesting that the small amount of liquid sprayed raised security concerns. The liquid was sprayed in the middle of the street and not at anyone in particular. SC02 at 1:16-1:18. The woman who sprayed the liquid wore no protective clothing and made no attempt to protect herself from the liquid. *Id.* In addition, she walked directly into the area where the liquid had been sprayed immediately thereafter. SC02 at 1:18-1:28; Pls.' Ex. 6 ¶ 57. Also, Dr. Layton did not observe anyone, including Turkey's agents and U.S. personnel, react to the spraying of water as a potential threat. Pls.' Ex. 6 ¶ 58.

In relation to these three supposed threats, Turkey's expert also opines that Kheirabadi acted like a person surveilling President Erdogan's arrival point, "tried to hit and kick his way through," and "managed to get around the Turkish Security Detail." MTD, Ex. 2 ¶ 41. However, as borne out by the video evidence, Dr. Layton saw no behavior by Kheirabadi that indicated an attempt to surveil anything. The portion of the video cited by Turkey's expert does not even show Kheirabadi looking at the CMR, let alone trying to approach it. *See* SC01 at .23-.41. Dr. Layton also saw no evidence that Kheirabadi got past Turkish security. Pls.' Ex. 6 ¶ 62.

Rather, the portion of the video Turkey's expert cites shows Kheirabadi being punched by Turkish agents and Alpkenan.  *See* SC01 at 0:26-0:57.

Ultimately, if Turkey's agents or other security personnel had actually believed that there were threats from a handgun, an IED or a chemical agent, it would have been inexcusable for those agents not to respond immediately to the threats.  Yet, no agent did so.  Indeed, if an agent had believed there were threats, there would have been no security rationale at all for the agent to wait nearly ten minutes after the threat had manifested and then run across a street to beat protesters, including many people who had nothing to do with the supposed threats.  For all of these reasons, the objective conduct of Turkey's agents is contrary to the proposition that those agents believed there was a handgun, IED or chemical-agent threat.  Pls.' Ex. 6 ¶ 60.

        d.      The Protesters Did Not Display Support for a Foreign Terrorist Organization

Defendant Turkey asserts that "members" of the "Anti-Turkey group" "openly supported" the PKK, a U.S.-designated Foreign Terrorist Organization.  MTD at 14.  But Turkey fails to identify a single Plaintiff – or any other person at Sheridan Circle – who did so or who advocated violence.[15]  In fact, the protestors at Sheridan Circle – as the video evidence confirms – held pro-democracy signs.  For example, the Protesters had signs calling for "Peace in Kurdistan" and "Kurds fight ISIS, Turkey fights Kurds," referring to the fact that the Kurds are a United States ally in the fight against ISIS. Am. Compl. ¶ 63. [16]

---

[15] A "Delist the PKK," sign was held at Lafayette Square (*see* MTD, Ex. 8 at 6), but advocating a change in U.S. policy is not the same as advocating terrorism.  Moreover, the non-Plaintiff who held this sign was well within their First Amendment rights to do so.

[16] As such, Turkey's long discussion about the wrongful acts of the PKK is irrelevant, in addition to being based on a poorly sourced declaration.  *See* MTD at 14-15, Ex. 1 thereto ¶ 22 n.4 (citing TRT World, a Turkish government propaganda tool (*see* Janko Roettgers, *How Turkey's TRT World Wants to Win Over U.S. Online Video Viewers (Exclusive),* VARIETY (Nov. 22, 2017, 1:53 PM), https://variety.com/2017/digital/news/trt-world-u-s-viewers-1202621932/)),

Turkey points out that Plaintiff Jalal Khereibadi held a *YPG* flag when he was at Lafayette Square.  MTD, Ex. 7 (photograph of Khereibadi with flag standing next to protestor holding sign saying "Christianity is not a crime").[17]  Apparently, Turkey seeks to create confusion to conflate the YPG with the PKK.  But, as Turkey concedes, the U.S. government has armed the YPG.  MTD at 11.  The United States also has trained the YPG and provided it direct battle-field support in a collective fight against ISIS in Syria.[18]  Indeed, U.S. service members regularly work with YPG fighters who wear, as an insignia, the YPG flag Turkey now claims evinced a terrorist threat.  *See Rebuffing Trump, Syrian Kurds Say IS Not Yet Defeated,* THE TIMES OF ISRAEL, December 20, 2018, *available at* https://www.timesofisrael.com/rebuffing-trump-syrian-kurds-say-is-not-yet-defeated/; *see also* Pls.' Ex. 17, Yarsoslav Trofimov, *U.S. is caught between Ally Turkey and Kurdish partner in Syria*, Wall St. J., May 4, 2017 (photographs of YPG militia with tanks flying American flag); Pls.' Ex. 16, *Turkey's Erdogan says 'seriously saddened' by US flags with Syrian YPG*, Agence France Presse, Apr. 30, 2017 (YPG seen by Washington as most effective fighting force in the battle against jihadists but Erdogan asserts Turkey "could again bomb the YPG positions at any time it wanted."); Pls.' Ex 15, Declaration

---

¶ 34 n.14 (referencing an April 2017 terrorist attack that is not mentioned in the cited source), ¶ 40 n.20 (citing to Daily Sabah, which is propaganda arm of Turkish government (*see* Hasan Esen, *European Parliament Bans Turkey's Daily Sabah,* ANADOLU AGENCY (March 23, 2017), https://www.aa.com.tr/en/europe/european-parliament-bans-turkeys-daily-sabah-/778435)).

[17] The YPG is an acronym for the People's Protection Units, an anti-ISIS group in Syria.

[18] *See* Jim Garamone, *Chairman's Senior Enlisted Advisor Visits U.S. Troops, Syrian Democratic Forces,* CENTCOM, April 5, 2017, *available at* https://www.centcom.mil/MEDIA/NEWS-ARTICLES/News-Article-View/Article/1143769/chairmans-senior-enlisted-advisor-visits-us-troops-syrian-democratic-forces/ (military reports on collaboration with Syrian Democratic Forces of which YPG is a component); Matt Bradley & Joe Parkinson, *America's Marxist Allies Against ISIS*, THE WALL ST. J., July 24, 2015, *available at* https://www.wsj.com/articles/americas-marxist-allies-against-isis-1437747949 (U.S. defense official states YPG has ability to strike ISIS)

of Agnieszka Fryszman, Exs. A and B thereto (photographs of American and YPG soldiers together wearing their respective flag patches).  In sum, for a person to hold a YPG flag on U.S. soil is to hold the flag of our ally.  Turkey is in effect asserting that the U.S. military has been fighting shoulder-to-shoulder with terrorists.[19]

Turkey also attempts to raise the more ominous specter that its agents in Sheridan Circle "likely" faced "military-trained men…who had fought with PKK units."  MTD at 16, *see also id.* 18.  Turkey's inflammatory accusations should be summarily dismissed because they are not supported by any purported evidence.  *See* MTD at 16-18.  Presumably recognizing this, Turkey resorts to claiming that Plaintiffs Kurd and Kheirabadi "have associations with such foreign fighters."  *Id.*  These specific assertions are as implausible – and improper – as the general accusation that the protesters, or at least the male protesters, had military training.

As to Kurd, Turkey appears to allege that, in September 2017, YPG supporters were ejected from a New York event at which President Erdogan spoke, and Kurd was detained there. MTD at 16-17.  Turkey asserts three other detained individuals had fought with the YPG, but cites nothing to support this assertion or to suggest Kurd had an "association" with them.[20]  *Id.*

---

[19] Beyond telling the Court that the U.S. military is fighting alongside terrorists, Turkey also disparages the legally irrelevant, but hardly objectionable hope of Plaintiff Murat Yasa for "peace talks" in Turkey.  MTD at 4-5, n.2. In the *Al Monitor* article quoted by Defendant, Mr. Yasa simply reaffirmed his commitment to the peaceful ideals of the May 2017 protest, stating, "Peace is what we were demonstrating for in Sheridan Circle."  Turkey's suggestion that this hope indicates the instant litigation was brought to pressure Turkey into engaging in negotiations is ludicrous.

[20] The New York Times article Turkey cites to establish that this event occurred does not support these assertions, but it does states that Turkish security forces "have a history of violent run-ins in the United States."  *See* Maggie Astor, Nicholas Fandos, *Fighting Breaks Out at Turkish President's Speech in New York*, N.Y. TIMES, (Sept. 21, 2017), *available at* https://www.nytimes.com/2017/09/21/us/erdogan-newyork.html.  If Turkey refers to this September 2017 incident for a purpose other than attempting to smear Kurd, it has failed to explain the relevance of events that took place four months *after* the Sheridan Circle attacks.

As to Kheirabadi, Turkey claims he is an "associate" of Robert Amos, someone Turkey does not assert was anywhere near Sheridan Circle.  MTD at 17.  Turkey cites an internet article for the proposition that a person named "Jay Kheirabadi" drove a car from which Amos yelled to Vice President Biden.  *Id.* at n.24.  Beyond the fact that this does not constitute evidence and would be irrelevant even if it did, Turkey mischaracterizes the article, which actually says "Jay Kheirabadi" was driving the reporter and Amos during the interview, not while anyone yelled at Joe Biden.[21]  Finally, Turkey offers no evidence that its agents had any specific information about Kurd or Kheirabadi on May 16, 2017.  After-the-fact Google searches for Plaintiffs are irrelevant as to any threat supposedly perceived by agents on May 16, 2017.

> e.   Turkey's Assertions as to President Erdogan's Arrival Are Contradicted by the Evidence, and Its Agents' Actions Establish There Was no Perceived Threat

Turkey asserts that, when President Erdogan arrived, he was in a "vulnerable position" where he could "hear the PKK supporters."  MTD at 24.  The very fact that Turkish agents brought President Erdogan to the CMR utterly belies the notion that an articulable threat existed.  As explained by Dr. Layton, it would have been entirely improper on the part of Turkish agents (and Secret Service personnel) to bring President Erdogan to the CMR if a legitimate threat exited there.  Indeed, there would be no reason at all for a security detail to voluntarily bring a protectee *to* a location where it was actually feared that a terrorist would attempt to assassinate the protectee with a handgun, an ordnance or chemical agents.  Pls.' Ex. 6 ¶ 78.  And Turkey

---

[21] *See* Wes Enzinna, *This American Fought ISIS. Now He's Trying to Get Washington to Untangle Its Syria Policy*, PULITZER CENTER, (Dec. 27, 2016), *available at* https://pulitzercenter.org/reporting/american-fought-isis-now-hes-trying-get-washington-untangle-its-syria-policy.  Turkey's reference to Lucas Chapman, a person it does not claim was at the protest or otherwise related to the relevant events, requires no response.  *See* MTD at 17.

confirms that its agents and its President were aware of everything that had transpired in Sheridan Circle prior to President Erdogan's arrival.  *See* MTD at 24-25 (President Erdogan "and his security detail no doubt were aware" of events in Sheridan Circle).

Moreover, as Dr. Layton describes, it is standard protocol for Secret-Service controlled motorcades to use a secondary arrival point if using the primary arrival point would endanger the protectee.  Dr. Layton has identified the likely secondary arrival point at the CMR, which had no line of sight to Sheridan Circle.  Pls.' Ex. 6 ¶ 79; Pls.' Ex. 14.  Nonetheless, President Erdogan was brought to the primary arrival point.  Thus, beyond that President Erdogan was brought to the CMR, the fact that a secondary arrival point was not used underscores that no threat was perceived.  Pls.' Ex. 6 ¶ 79.

The actions taken by security agents and President Erdogan following his arrival similarly cannot be reconciled with Turkey's theory that there was an imminent threat to President Erdogan's life.  In fact, immediately upon arrival, a Turkish agent and an individual who is likely a U.S. security agent (Pls.' Ex. 6 ¶ 96), opened the rear doors to President Erdogan's vehicle, with the Turkish agent instructing the U.S. agent to open the door through a nod of the head.  *See* SC05 at 1:30-1:34. The doors then remained open for over a minute before President Erdogan exited the car through the right rear door.  SC10 at 0:01-1:15. As Dr. Layton explains, an armored vehicle's doors offer some protection from many forms of attack.  If security agents had believed an attack was imminent, they most certainly would not have held the vehicle's doors open for any length of time, let alone nearly a minute, especially the door where President Erdogan sat.  Pls.' Ex. 6 ¶ 96.

Turkish agents also left the area near the vehicle and ran more than 130 feet into Sheridan Circle to attack protesters.  *See* SC02 at 5:13-5:56; Pls.' Ex. 6 ¶ 45 (establishing distance).  More

27

specifically, agent Muhsin Kose (Subject M), President Erdogan's head of security, leaned into the vehicle to speak with President Erdogan.  SC02 at 5:13; *see* Am. Compl.¶ 79 (undisputed allegation regarding role of Kose and his speaking with President Erdogan).  Then, Kose appears to have spoken into his ear piece.  Agent Yusuf Ayar (Subject N) turned around, looked at Kose, and nodded.  SC02 at 5:15-5:25. Ayar then left the vehicle and moved toward the protest as did another agent who appears to be Servet Erkan (Subject O).  SC02 at 5:25-5:27.[22]  Servet Erkan assaulted protesters in Sheridan Circle.  SC02 at 5:46 *et seq.* (Subject O).  Moments later, Servet Erkan and Ayar returned to the vehicle.  SC02 at 6:29.

These actions are completely irreconcilable with the proposition that Turkish agents believed President Erdogan was under threat.  As outlined by Dr. Layton, security details create concentric circles of protection to keep protectees safe, including an outer perimeter, a middle perimeter, and an inner perimeter.  The inner perimeter provides immediate 360-degree protection and it is the most critical.  As a fundamental principle of close protection, the fewest agents as possible address threats that are beyond the inner perimeter, while the greatest number of agents stay with the protectee in the inner perimeter.  Indeed, personnel assigned to the inner perimeter would not leave that perimeter to address a threat in the middle or outer perimeter because that would weaken the most critical area of protection and increase the direct risk to the protectee.  The fact that, here, agents left President Erdogan's immediate vicinity to attack protesters beyond even the outer perimeter is entirely contrary to Turkey's position that a threat existed.  Pls.' Ex. 6 ¶¶ 30-33, 73-74.

---

[22]  A burly individual of Servet Erkan's build is briefly visible to the right of the screen, walking toward Sheridan Circle.  In addition, Servet Erkan is clearly visible assaulting protestors in Sheridan Circle (Subject O on SC02 at 5:46 *et seq.*), and returning to the vehicle.  SC02 at 6:32.

Furthermore, after the inner perimeter agents ran into Sheridan Circle and after President Erdogan left the vehicle, he stopped to watch the melee in Sheridan Circle that had been initiated by his agents.  First he stopped next to his vehicle and then he stopped behind the vehicle before proceeding to the CMR.  At all times, he walked slowly.  *See* SC10 at 1:15-1:50.  By stopping twice to watch the attack and walking at a leisurely pace, President Erdogan took over 30 seconds to traverse the short distance from the vehicle to the CMR.  It is entirely inconsistent with the idea that President Erdogan's life was in danger for his agents not to have taken some action to move President Erdogan more quickly to the CMR.  *See* Pls.' Ex. 6 ¶ 97.  In addition, people who were not agents, including individuals carrying bags and holding cameras, walked by and were otherwise in close proximity to President Erdogan's vehicle, yet they received no attention from any security agents despite the supposedly grave threat to the President.  SC10 at 0:60-1:10.

In this context, Turkey repeatedly makes the false assertion that, only after the second attack had finished and the protesters were dispersed, did President Erdogan exit the car.  MTD at 25, 28; *see also* MTD (citing Ex. 1 thereto ¶ 56 (Turkey's security expert claims President Erdogan was kept in the vehicle until the "threat" had been "neutralized")).  In fact, President Erdogan exited the vehicle while the disturbance was ongoing.  SC10 at 1:28-1:30 (people are running in Sheridan Circle in the background of the video after President Erdogan has left the car).  Thus, rather than waiting in the car for the incident to end, it is more accurate to say that President Erdogan waited until his agents had violently silenced the chants of "baby killer, Erdogan" that were audible when he arrived.  SC10 at .03-.12.[23]

---

[23]  Turkey contends President Erdogan could "hear the PKK supporters" upon arrival arrived.  MTD at 24.  But, no protester evinced support for the PKK, and saying, "baby, killer,

29

In sum, security agents who perceived a threat to a protectee such as a head of state would have absolutely no reason to (i) bring the protectee to the site of the supposed threat; (ii) use the primary rather than secondary arrival point; (iii) open the doors to the protectee's vehicle while the protectee sits in the vehicle for a protracted time; (iv) leave the protectee's vicinity to beat up protesters some 130 feet away; (v) allow the protectee to walk slowly from the vehicle to a protected building; and (vi) allow the protectee to stop and view the fighting during the walk. As such, Turkish agents did not act in a manner that even remotely shows they believed a threat was present.  Pls.' Ex. 6 ¶ 99.

   f.  The Actions of Turkey's Agents During the Second Attack Contradict Any Notion that the Agents Were Responding to a Threat

In a devastating concession, Turkey does not address, let alone dispute, Plaintiffs' allegations regarding the specific actions by its agents during the second attack.  Thus, Plaintiffs' allegations regarding these actions stand.  *See Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000) (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 351, 361 (1993)); *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (citations omitted) (a court must fully credit Plaintiffs' unchallenged factual allegations and evidentiary material).

Indeed, instead of attempting to justify any specific action any of its agents took during the second attack, Turkey does everything it can to avoid a particularized discussion of the attack, using the most anodyne euphemisms to describe its agents' brutal actions.  MTD at 25 (agents "physically confronted the protesters"), *id.* at 1 ("President Erdogan's security detail engaged physically with some of the Plaintiffs"), *id.* at 45 (agents acted "to push back and disperse"), *id.* at 46 (agents took "protective measures").

---

Erdogan," which is what President Erdogan actually could "hear," does not indicate support for the PKK.

If Turkey had addressed its agents' actions during the second attack, it only would have underscored that the agents did nothing to address a security threat, let alone simply to move the protesters, which would have been the most logical course if the agents had actually believed there was a risk because the protesters were too close to the CMR. In fact, when Turkey's agents broke through the line of U.S. law enforcement officers and motorcycles, they did not ask any protester to move. They did not hold any protesters in place to search for an IED, a handgun, or other weapon. Rather, the agents indiscriminately punched, stomped, kicked and choked the protesters as described in the uncontested allegations of Plaintiffs' pleading and confirmed in gruesome detail by the very video evidence Turkey submitted. As Dr. Layton describes – and as any lay person could observe – these actions served no remotely security-related purpose and contradicted Turkey's contention that the protesters posed a threat. Pls.' Ex. 6 ¶¶ 75-76, 84-86, 88.[24] As to the specific actions:

Murat Yasa

Just after the second attack began, pro-Erdogan civilian Ahmet Dereci threw Yasa, who was then 61-years-old, to the ground. *See* Am. Compl.¶ 187; Pls.' Ex. 9 ¶ 24. Turkish agents and pro-Erdogan civilians then repeatedly delivered brutal kicks to Yasa, including to his head, as he lay helplessly on the ground. Am. Compl.¶¶ 187-191; Pls.' Ex. 9 ¶ 25 (agents Tugay Erkan, Ismail Ergunduz, and Gokhan Yildirim along with civilians kicked Yasa); *see also* SC02 at 2:56 (Ahmet Dereci hits Yasa, causing him to fall), at 2:58-3:10 (agents Tugay Erkan (Subject

---

[24] Turkey's expert claims that Turkish agents used defensive techniques, specifically: (i) raising their "hands with a motion to stop"; (ii) assuming defense postures "with hands positioned in front"; (iii) touching a person to determine if the person has weapons; (iv) reaching for a person's wrist; and (v) using "flat hands, not closed fists." MTD, Ex. 2 thereto ¶¶ 58-62. Dr. Layton did not observe any Turkish agent "even remotely employ these tactics." Pls.' Ex. 6 ¶ 83.

AI), Ergunduz (Subject F), and Gokhan Yildirim (Subject D), as well as Ahmet Dereci and another a civilian kick Yasa on the ground, with Gokhan Yildirim landing a brutal kick to Yasa's undefended face as Yasa lay in a fetal position); SC09 at 7:28 (Yasa falls to ground at center with Ahmet Dereci pushing him), at 7:29 (agent Tugay Erkan (Subject AI) and Ahmet Dereci kick Yasa), at 7:30 (agents Ergunduz (Subject F) and Gokhan Yildirim (Subject D) kick Yasa), at 7:33 (a security agent kicks at Yasa), at 7:35 (civilian kicks Yasa as he futilely holds up his hands to protect his head).  At the end of this attack, Yasa was left disoriented and bleeding profusely.  Am. Compl.¶ 94; SC02 at 4:20.

Elif Genc

As the second attack began, Turkey's agents and allied civilians viciously beat Elif Genc as she lay helplessly on the ground.  Indeed, the attackers repeatedly and brutally, in a manner that could only be animated by hatred, kicked her defenseless body and head.  Am. Compl.¶¶ 160; Pls.' Ex. 9  ¶ 23 (agents Mehmet Sarman and Hamza Yurteri along with civilians Eyup Yildirim, Narin, and Ellialti attacked Genc); *see* SC02 at 2:46-.56 (agents Yurteri (subject E) and Sarman (Subject G), and civilians attacking Genc (Subject AB)); SC08 at .30 (security agent on right in khaki pushes police officer out of the way to kick at Genc).

Mehmet Tankan

Numerous Turkish agents punched and kicked Tankan.  Am. Compl.¶ 179-182; Pls.' Ex. 9  ¶ 31 (agents Ismail Ergunduz, Turgut Akar, Ahmet Karabay, Murat Sumercan, and Harrettin Eren, along with others attacked Tankan); *see* SC02 at 3:26-3:37 (Turgut Akar (Subject AL), an unidentified khaki-clad agent (Subject S) and agent Karabay (Subject AE) among a number of other agents attacking Tankan).

32

This episode was notable for two reasons beyond the sheer violence of it. First, as the video evidence shows, at least five Turkish agents attacked Tankan even though there were several U.S. police officers right by Tankan (who ultimately protected him).[25] Second, Turkey's agents chased Tankan to and beat him in a part of Sheridan Circle where Turkey asserts protesters could have demonstrated without risk to Turkey. *See* MTD at 24 (asserting second attack caused the protesters to "be[] dispersed and pushed back from the edge of Sheridan Circle," making the scene safe for President Erdogan); SC12 at 8:24 (after second attack, protesters' signs can be seen at right by tree near when Tankan was attacked). Given these two facts – in addition to the fact that Turkey's agents did not search or question Tankan – it is truly preposterous for Turkey to argue that its agents were acting for any legitimate security-related purpose, including to move Tankan away from an objectionable spot on the sidewalk across the street from the CMR.

Ceren Borazan

As the second attack began, Borazan was standing on the sidewalk and, it appears, looking down at her phone. SC02 at 2:36 (woman in white shirt in front of banner in center of the screen). When Borazan saw the squad of agents running at the protesters, she fled across Sheridan Circle away from the CMR. SC08 at 0:28-.29 (woman in white shirt at far left of screen, beginning to run). At the street on the far side of Sheridan Circle, she begged drivers to let her in their cars. Borazan was about to get into the car of a Good Samaritan when agent Ismail Dalkiran grabbed her and placed her in a chokehold while cursing her. Am. Compl.¶¶ 127-129; *see also* SC02 at 3:41 (showing photograph of chokehold and stating that agent

---

[25] The police put their bodies between Tankan and the agents in order to move Tankan to safety, and also pulled agents away from Tankan and brought them back to the CMR side of the street, despite the agents' resistance. *See* SC12 at 7:30-8:10

Dalkiran (Subject AF) "uses choke hold on [Borazan] behind statue…Verified by additional video").

Beyond the utterly terrifying nature of this attack, its location underscores that the attack had no security-related purpose.  Indeed, Turkey contends specifically that protesters should have been kept by police next to the statue in Sheridan Circle for security purposes.  MTD at 26.[26]  Thus, there is no possibly legitimate explanation as to why agent Dalkiran chased Borazan *past* that point, let alone why he put her in a chokehold there.

Ruken Isik

At least one Turkish agent chased Isik, who was carrying her young son, into the street on the opposite side of Sheridan Circle.  Am. Compl.¶ 163; Pls.' Ex. 9  ¶ 41; *see also* Pls. Ex. 7, Ex. D (screen shot of agent pursuing Isik and child into street).  Again, the fact that an agent ran after Isik and her child past the point at which Turkey now says a protest would have been safe, establishes beyond any doubt that the agent was not acting in furtherance of a legitimate purpose, including supposedly ensuring that protesters were at a safe distance from the CMR.

Jane Doe II

Agents beat Jane Doe II to the point that she had seizures while lying helplessly on the ground and then continued assaulting her even thereafter.  Am. Compl.¶¶ 45-146.  Moreover, the agents attacked Jane Doe II despite the fact that she was far to the side of the main protest area at Sheridan Circle.  *See* SC09 at 7:51 (burly agent kicks Jane Doe II who legs are visible as she lies

---

[26] Turkey asserts that at a subsequent demonstration protesters were kept in that area, based on photographs.  MTD at 26 (citing Ex. 12 thereto).  The photographs are entirely unauthenticated, and therefore Turkey's claim about the location of other protests cannot be credited.

34

on the ground).[27]  In fact, even after Jane Doe II had been incapacitated by the beatings, agents including Ismail Dalkiran (Subject AF) and Harrettin Eren (Subject L) approached her menacingly and had to be rebuffed by U.S. law enforcement.  *See* SC02 at 4:26-4:50. Obviously, there was no threat-neutralizing purpose served in beating Jane Doe II outside the area of supposed risk, let alone after she was reduced to lying on the ground with seizures.

Heewa Arya

As the second attack began, Arya moved from the sidewalk where the protest had been and toward the statue in the middle of Sheridan Circle.  There, agents attacked him.  Am. Compl.¶ 106; *see also* SC02 at 2:52 (Arya at left 1/3 of screen with blue shirt and long hair, standing next to another protester), at 2.52-2:56 (Arya moves away from main attack until he is assaulted at upper right of screen by agent in a suit); Pls.' Ex. 9 ¶ 35 (agent Mustafa Sumercan attacked Arya).[28]  Arya continued to move away from the main area of the attack.  However, at the far side of Sheridan Circle, an agent kicked Arya, who was in a defensive posture beneath a helmeted police officer, just a few feet from where agents were attacking Jane Doe II.  SC09 at 7:51.[29]

Jalal Kheirabadi

Turkish agents repeatedly attacked Kheirabadi during the second attack.  Am. Compl.¶ 169.  Indeed, a Turkish agent assaulted Kheirabadi to initiate the second attack, grabbing

---

[27] The video must be paused several times at the 7:51 mark to ensure the kick is seen. For ease of reference, we note that the kick is delivered by an agent facing away from the camera who is to the left of the screen.

[28] Arya's child, also a Plaintiff, attended the protest and – it goes without saying – was traumatized by the attack.  Am. Compl.¶¶ 115-119.

[29] Again, the video may have to be paused at the time mark to observe the kick.  For ease of reference, we note the kick is delivered by an agent to the left of Arya as viewed on the video.

Kheirabadi and throwing punches until Kheirabadi fell to the ground, despite the efforts of a police officer to thwart the attack.[30]  SC02 at 2:36-2:42 (the first agent to attack assaults Kheirabadi who stands with sign, wearing blue t-shirt).  Later, agent Servet Erkan, who had left the vicinity of President Erdogan to participate in the beatings, repeatedly punched Kheirabadi in the head.  SC02 at 5:45-5:51 (Erkan is identified as Subject O); Pls.' Ex. 9  ¶ 21 (agents Servet Erkan and Feride Kayasan, among others, kicked and punched Kheirabadi).

Stephen Arthur

Arthur attempted to run from security agents as the second attack began.  However, he was chased down and beaten both by Turkish agents and their civilian supporters.  Am. Compl.¶ 98; *see also* SC02 at 2:37-2:53 (at right, Arthur with long hair, red t-shirt and flag retreats as an agent identified as Subject Q throws a punch in his direction and then kicks him; Arthur continues to retreat as another agent assaults him while a police officer attempts to intervene); SC08 at .28-.33 (shows Arthur being attacked during start of second attack from another angle); SC10 at .34-.39 (view from President Erdogan's vehicle, showing several agents throwing brutal overhead punches at and kicking Arthur in middle of the screen).

Kasim Kurd

When the second attack began, Kurd fled from the primary area of the attack, running to the opposite side of Sheridan Circle.  Even though he was well outside the area Turkey now claims created a risk, a security agent chased him nonetheless, before veering off to chase Ruken Isik.  Pls.' Ex. 7, Ex. C (video Kurd shot behind him as he fled).

---

[30] As a result of the confusion in this part of the attack, Kheirabadi was arrested. However, as Turkey notes, he was never charged.  MTD at 26.  Indeed, there is no evidence that Kheirabadi had any intent to assault a police officer, rather than just trying to protect himself against the onslaught.  *Compare id.* at 25-26 (suggesting some manner of bias drove charging decisions).

36

Abbas Azizi

During the second attack, numerous Turkish agents (and civilians) attacked Azizi, who was 62-years-old at the time. Am. Compl.¶ 122. First, as Azizi bent down to help Kheirabadi, an agent in a black suit took a flying kick at him, knocking him down. SC02 at 2:45-2:46 (Azizi is bald gentlemen in white button down shirt and white pants in middle of screen, bending down to help individual in blue t-shirt). Then, agent Servet Erkan (Subject O), who was one of the agents who left President Erdogan's vehicle, repeatedly kicked Azizi as Azizi lay on the ground. SC02 at 2:50-2:54; Pls.' Ex. 9 ¶ 30 (Erkan kicked Azizi). Seconds later, two additional suit-clad men kicked Azizi as he struggled to get up from the ground. SC02 at 3:05-3:06 (at right of screen); SC09 at 7:27-7:31 (Azizi is at center-left of screen wearing all white under large security agents). Then, agent Servet Erkan again punched the diminutive Azizi before being pushed away by a police officer. SC02 at 3:15-3:16 (toward right of screen); SC02 at 5:56-5:57 (same punch from a different angle). Azizi was bloodied and disoriented after the attack. SC02 at 4:00-4:08 (referred to a Subject Y); SC09 at 7:47-7:50.

Plaintiffs Jane Doe I, Jane Doe III, and Mehmet Özgen

The assaults on these Plaintiffs during the second attack were not captured on video that is available to date. However, Turkey does not dispute the allegations regarding these Plaintiffs in the context of that attack. *See* Am. Compl.¶¶ 136-37 (Jane Doe I); Am. Compl.¶ 154 (Jane Doe III); Am. Compl.¶ 175 (Mehmet Özgen).

g.  The Actions of Turkey's Agents After the Second Attack Contradict Any Notion that the Agents Had Attacked the Protesters for Security-Related Reasons

According to Turkey, the second attack resulted in the protesters "being dispersed and pushed back from the edge of Sheridan Circle," allowing President Erdogan to enter the CMR. MTD at 25; SC12 at 11:41-11:42 (protesters to far left of screen after second attack), at 48:24

37

(after second attack, protesters' signs can be seen at right). Thus, even accepting Turkey's theory that a threat had existed based on the protesters' presence in Sheridan Circle opposite the CMR, that threat no longer existed. However, even after the protesters had been "dispersed and pushed back," the Pro-Erdogan group kept insisting that they be removed entirely. Indeed, even after the second attack, U.S. law enforcement had to push the pro-Erdogan group back toward the sidewalk on the CMR-side of the street. *See* SC08 at 3:00-7:30; SC12 at 11:40-14:10. Moreover:

- The Turkish Ambassador complained to a police officer about the remaining protesters on the side of Sheridan Circle and, when the police officer said, "they can protest," the Ambassador responded, "here, they cannot." SC08 at 3:28;

- An individual on the CMR-side of the street yelled, "they're still there." SC08 at 4:45;

- Agent Sumercan yelled at the few remaining protestors: "I'm going to take that flag to put in your mom's pussy. I'm going to fuck your mom's pussy." SC08 at 5:00 (English translation at Pls.' Ex. 10);

- Another individual on the CMR side said to police, "take this motherfucker, look at this." SC08 at 5:16; and

- The Ambassador complained to police that the protesters were "*provocating* [sic]," and said to an officer, "just tell them to move away. And they keep on *insulting*." SC08 at 5:35 (emphasis added).

Thus, even after (i) the protesters had fled from the area Turkey now tells the Court created a security risk and had in a small number regrouped to the side of Sheridan Circle and (ii) President Erdogan was in the CMR, Turkey still wanted the protesters removed. Nothing could make clearer that, from the very beginning, Turkey's motivation was to silence the protesters, as the Ambassador in fact explicitly stated in complaining about the protesters' "insulting" words.

Turkish agents also repeatedly tore the signs that protesters had left on the street when fleeing the second attack. *See, e.g.,* SC02 at 5:00; SC08 at 1:22-1:26 (lower left), 1:40-1:44 (khaki-wearing agent Hamza Yurteri tearing signs), 1:53-1:55 (tearing signs and throwing in air),

at 1:55-1:56 (carrying sign out of Sheridan Circle), at 1:58 (tearing); *see also* Pls.' Ex. 9 ¶ 43 (agents Ismail Ergunduz, Hamza Yurteri and Mehmet Sarman destroyed and took signs). Obviously, there is no security rationale in tearing signs. Indeed, if a security agent legitimately believed that his protectee's life had been in imminent danger only moments earlier, it would have been antithetical to proper practice to waste time tearing signs. Thus, this activity also underscores that Turkey's motivation was to silence the protest. Pls.' Ex. 6 ¶ 91 (Dr. Layton concludes, "had those agents believed there was a real threat, they would have been staying vigilant to additional indicia of risk, rather than bothering to tear pieces of paper").

In addition, even well after the second attack and blocks from Sheridan Circle, Turkish agents acted to silence dissent. On Massachusetts Avenue, a sole woman stood chanting, among other things, "no Erdogan…democracy," not creating a risk for anyone. Nonetheless, numerous Turkish agents approached her, telling her to "stop," tearing a sign she was carrying, and – in perhaps the most emblematic gesture of the day – literally placing hands over her mouth. The agents only ceased this brazenly suppressive conduct when the MPD intervened. *See* SC02 at 7:12-8:19. This episode can only be seen as confirmation of the Turkish agents' determination to silence the protesters.

Nor did Turkey's agents reserve their non-security related violence to protestors. In fact, on May 16, 2017, Turkish agents repeatedly attacked and injured U.S. law enforcement personnel, including two U.S. Diplomatic Security Special Agents, six Secret Service officers, and one MPD officer. Pls.' Ex. 1 at 1.

      h.     Turkey's Agents Have Repeatedly Engaged in Violent Confrontations with Security Personnel and Civilians in the United States and Elsewhere

In their pleading, Plaintiffs addressed four other violent altercations between Turkish agents on one hand and security services and protestors on the other in the United States,

39

Belgium, and Ecuador.  Turkey did not address these allegations, which therefore must be

accepted as true.  *See* Am. Compl. ¶ 218 – 220.  This was far from a comprehensive list.  Indeed,

additional violent encounters have been reported in South Africa and Bosnia.  *See,* AHVAL*,*

*Turkey's South Africa embassy's personnel attacks protestors* (Jul. 26, 2018),

https://ahvalnews.com/turkey-south-africa/turkeys-south-africa-embassys-personnel-attacks-

protestors; AP, *Erdogan's security guards scuffle with Bosnian border police* (Jul. 8, 2019),

https://www.apnews.com/553c8c38995d4b6b845a4efb3c410f28.    As such, the behavior of

Turkey's agents in Sheridan Circle was far from an aberration.

### III.  UNDISPUTED ALLEGATIONS

The Complaint alleges a brutal attack on peaceful protestors by Turkish security

officials and private citizens.  Am. Compl., Dkt 63 ¶1.  Plaintiffs, who range from a then-seven-

year-old girl to a 62 year-old former U.S. government contractor, and include employees of local

universities and small business owners, were participants in a demonstration at Sheridan Circle,

in front of the CMR.  *Id.*  The demonstrators were primarily Kurdish-Americans who were

protesting President Erdogan's ongoing human rights abuses against the Kurdish community in

Turkey.  *Id.*  ¶¶ 5, 7-9, 13-16, 18-19.  The protestors had signs that, for example, stated "Peace in

Kurdistan" and called for the release of political prisoners.  *Id*. ¶ 63.

A group of pro-Erdogan supporters, including Turkish security personnel and civilians,

were also gathered in front of the CMR.  Am. Compl. ¶ 59.  The pro-Erdogan group

outnumbered the approximately 20 protesters assembled at Sheridan Circle.  *Id.* ¶¶ 61.  The

Turkish security personnel yelled threats and ethnic slurs at the group of Plaintiffs, challenged

Plaintiffs to fight, and threatened to kill them.  Am. Compl. ¶¶ 65, 230; *see also Id.* ¶¶ 72; 108

("die fucking Kurds"), 129 ("you're dead bitch"), 135 ("I'll kill you"); 163 ("I'm going to fuck

you"); 168 ("we did your mom and sister in Turkey").

40

The Metropolitan Police Department ("MPD") and U.S. Secret Service deployed officers at Sheridan Circle.  Am. Compl. ¶¶ 66, 67, 69.  Despite the presence of these officers, members of the pro-Erdogan group physically attacked Plaintiffs.  *Id.* ¶¶ 67, 230

After this first attack, police officers created a cordon in an attempt to keep the pro-Erdogan group on the sidewalk in front of the Residence.  Nonetheless, the pro-Erdogan supporters continued to try to bypass the officers.  Am. Compl. ¶¶ 70-71.

Turkish officials exhorted officers to remove the protestors, who were lawfully present in Sheridan Circle.  Am. Compl. ¶¶ 74, 75.  President Erdogan's car subsequently arrived at the CMR.  *Id.* ¶ 79.  After he arrived, the pro-Erdogan group pushed past the police officers and ran towards the protestors, yelling at and threatening them, before physically attacking them.  *Id.* ¶¶ 81, 82.  The violence was unrelenting: the attackers, including Turkish security personnel surrounded the protestors, including older men and young women, who had been knocked down and were defenseless on the ground.  *Id.*  The attackers, yelled ethnic slurs at the protestors and threatened to kill them.  *Id.* 81, 82 (as Plaintiffs fled, the attackers yelled "catch him"), 160, 171, 190.   Many of the Plaintiffs fled.  *E.g., Id.*  ¶¶ 98 (Plaintiff Arthur saw attackers coming and ran); 127-128 (Ms. Borazan ran, heard voices yelling "where are you running," and begged cars stopped in the street to let her in); 136 (Jane Doe I saw attackers coming and hid behind a tree); 137 (Jane Doe II unconscious on the ground); 154 (Jane Doe III heard attackers shout "we will kill you" and ran); 159 (Plaintiff Genc saw attackers pushing past police cordon and ran); 163 (Ms. Isik grabbed her four year old son and ran).

Police officers tried to stop the assaults, physically restraining the attackers and ordering them to return to the sidewalk in front of the Ambassador's residence.  The Turkish Security

41

personnel ignored these commands and physically resisted the police.  *Id.* ¶ 86.  Eventually, however, the police were able to end the assault.  *Id.* ¶ 192.

Plaintiffs were physically injured in the attack, many suffering severe and lasting injuries, including concussions, seizures, and lost teeth.  Am. Compl. ¶¶ 97, 101, 112-114, 119, 125, 128-29, 136, 143-46, 150-51, 154, 156, 160-62, 165, 166, 167-72, 175, 178-85, 188-194, 239.

The attack received extensive news coverage and horrified the American public.  Am. Compl. ¶ 195.  U.S. officials condemned the attack and called for the perpetrators to be held responsible.  *Id.*  Members of Congress wrote to the State Department expressing their outrage, the House of Representatives unanimously passed a resolution condemning the attack, and the State Department communicated concerns to Turkey "in the strongest possible terms."  *Id.* ¶¶ 196, 201, 202, 203; *see also id.* ¶¶ 199, 200, 205-07.

## IV.  LEGAL STANDARD

The Foreign Sovereign Immunities Act is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004).  Where a plaintiff has alleged that one or more of the exceptions to immunity enumerated in the FSIA apply, the foreign state bears the burden of proving that the plaintiff's allegations cannot bring its case within that exception.  *Phoenix Consulting Inc. v. Rep. of Angl.*, 216 F.3d 36, 40 (D.C. Cir. 2000) (citing *Transamerican S.S. Corp. v. Somali Dem. Rep.*, 767 F.2d 998, 1002 (D.C. Cir. 1985).  A defendant may challenge either the legal sufficiency or the factual underpinning of an exception, and how the district court proceeds depends upon whether the motion presents a factual or a legal challenge. *Id.*

Where a foreign state challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court should accept the plaintiff's factual allegations as true and determine whether such facts bring the case within one of the FSIA exceptions.  *Phoenix Consulting*, 216

42

F.3d at 40; *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1127

(D.C.Cir.2004). In such a case, the traditional *Bell v. Hood*, 327 U.S. 678, 682-83 (1946),

standard applies: there is jurisdiction unless the allegations are immaterial and frivolous. *Agudas*

*Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008).

Where the foreign state has challenged the factual allegations, the Court "must go beyond

the pleadings and resolve any disputed issues of fact" necessary to resolving the motion.

*Phoenix Consulting*, 216 F.3d at 40. In such a case, a plaintiff must "present adequate

supporting evidence," but this is only a "burden of production," "the burden of persuasion rests

with the foreign sovereign claiming immunity, which must establish the absence of the factual

basis by a preponderance of the evidence." *Agudas Chasidei Chabad*, 528 F.3d at 940. The court

may rely on either written or oral evidence, including affidavits, oral testimony or deposition.

*Prakash v. Am. U.*, 727 F.2d 1174, 1179-80 (D.C. Cir. 1984) (citing Fed. R. Civ. P. 43(e)).

In any circumstance, if a foreign sovereign does not challenge a jurisdictional fact, the district

court should take that allegation as true. *Phoenix Consulting*, 216 F.3d at 40; *Feldman v. FDIC*,

879 F.3d 347, 351 (D.C. Cir. 2018) (citations omitted) (a court must fully credit Plaintiffs'

unchallenged factual allegations and evidentiary material).

At this threshold stage, prior to discovery, a court must accord plaintiff "the benefit of all

reasonable inferences." *Feldman v. Fed. Deposit Ins. Corp.*, 879 F.3d 347, 351 (D.C. Cir. 2018).

Should a court find the plaintiff's pleading and evidence insufficient to establish subject-matter

jurisdiction, it must allow jurisdictional discovery. *Prakash*, 727 F.2d at 1179-80. "The district

court retains 'considerable latitude in devising the procedures it will follow to ferret out the facts

pertinent to jurisdiction,' but it must give the plaintiff 'ample opportunity to secure and present

43

evidence relevant to the existence of jurisdiction.'" *Phoenix. Consulting*, 216 F.3d at 40 (quoting

*Prakash*, 727 F.2d at 1179-80).[31]

## V.  **ARGUMENT**

### A.    **Defendant is Not Entitled to Immunity Under the FSIA**

1.      The Sheridan Circle attack was a tortious act committed in the United States, satisfying FSIA exemption 1605(a)(5)

The FSIA provides that a foreign state shall not be immune from suit in any case in

which money damages are sought against a foreign state for personal injury occurring in the

United States and caused by the tortious act or omission of that foreign state or of any official or

employee of that foreign state while acting within the scope of his office or employment, except

when the claim is based on the performance of a discretionary function.  28 U.S.C. § 1605(a)(5)

& (a)(5)(A).  Defendant Turkey does not dispute that Plaintiffs have satisfied all of the

requirements of the tort exception, except Defendant contends that the discretionary function

exception-to-the-exception applies. MTD at 24.  It does not.  The discretionary function

exception does not shield serious violations of U.S. criminal law.

This case arises out of a brutal attack on peaceful protestors by Turkish security

officials and private citizens.  Am Compl., Dkt 63 ¶1.  Plaintiffs, who included a then-seven-

year-old elementary school girl, employees of local universities, and small business owners,

were participants in a demonstration at Sheridan Circle, in front of the Turkish Ambassador's

residence.  *Id.*

Defendant Turkey does not present any evidence that meaningfully contests the

allegations related to many of the Plaintiffs (including Plaintiffs Stephen Arthur, Jane Doe I, Jane

---

[31] Plaintiffs will file a motion for jurisdictional discovery if necessary.

Doe III, C.A., Elif Genc, Ruken Isik, Mehmet Özgen, and Murat Yasa).  For example, Turkey does not assert that these Plaintiffs engaged in threatening behavior.  Indeed, Turkey does not even mention Plaintiffs Jane Doe I, Jane Doe III, Elif Genc, Ruken Isik, or (apart from complaining about a press statement) Murat Yasa.  As to then-seven-year old Plaintiff C.A., Turkey argues only that, before Erdogan's arrival, she was carried across Massachusetts Avenue by her father.  MTD at 20.  There are no further mentions of the child in Turkey's motion.  As to Plaintiffs Arthur and Özgen, Turkey offers no specifics regarding what these individuals supposedly did, instead simply citing to some 40 seconds of video.  *Id.* at 21 (citing SC02 at 0:24-1:02). That portion of video, however, shows these individuals doing little more than facing a group of large, armed security agents.  *Supra* p. 11.  Thus, the *Bell v. Hood* standard applies to these Plaintiffs' claims.

Turkey has challenged the facts underlying subject matter jurisdiction for a subset of Plaintiffs (Plaintiffs Kurd, Kheirabadi, Arya, Azizi, Borazan, Jane Doe II, and Tankan) who were victims of the first attack.  Even as to these Plaintiffs, however, Turkey has not presented cognizable evidence that establishes that the "discretionary function" exception applies, as discussed in more detail below and in Plaintiffs' response to the counterstatement.

2.      The attack was not a discretionary act

   a.      The FSIA does not extend immunity to the commission of crimes in the United States

It is well-settled that the FISA discretionary function exception, § 1605(a)(5)(A), does not protect serious criminal conduct because there is no discretion to commit or to have one's officers or employees commit a criminal act, as enunciated by a seminal and often-cited opinion from this district. *Letelier v. Rep. of Chile*, 488 F.Supp. 665, 673 (D.D.C. 1980) (foreign state cannot be accorded sovereign immunity for tort claims resulting from illegal conduct); *see also*,

45

e.g., *Liu v. Republic of China*, 892 F.2d 1419, 1431 (9th Cir. 1989) (citing *Letelier*) (discretionary function is inapplicable because Wong had no discretion to commit murder); *Miango v. Democratic Rep of Congo,* 288 F.Supp.3d 117, 126, n.3 (D.D.C. 2018), *vacated as to claims against President Joseph Kabila Kabange by* No. CV 15-1265 (ABJ), 2019 WL 2191806 (D.D.C. Jan. 19, 2019) (citing *Letelier*); *Doe v. Fed. Democratic Republic of Ethiopia*, 189 F. Supp. 3d 6, 28 (D.D.C. 2016), *aff'd*, 851 F.3d 7 (D.C. Cir. 2017) (citing *Letelier*) ("when a plaintiff alleges underlying conduct that constitutes a serious violation of a U.S. criminal statute, the FSIA's discretionary function exception does not apply"); *Rendall-Speranza v. Nassim*, 942 F. Supp. 621, 627 (D.D.C. 1996), *rev'd on other grounds*, 107 F.3d 913 (D.C. Cir. 1997) ("the alleged actions of Mr. Nassim—that he grabbed the plaintiff's wrists, twisted her arm behind her back, and kicked her shin—cannot fairly be said to be a "discretionary function" within the meaning of the FSIA"); *Xuncax v. Gramajo*, 886 F. Supp. 162, 176 (D. Mass. 1995); Scott A. Gilmore, *Suing the Surveillance States: The (Cyber) Tort Exception to the Foreign Sovereign Immunities Act*, 46 Colum. Human Rights L. Rev. 227, 271 (2015) ("There is thus an unbroken chain of FTCA and FSIA case law that denies discretionary function immunity for clearly illegal acts.").

A court in this jurisdiction recently considered very similar facts – a beating by Democratic Republic of Congo ("DRC") security forces of persons participating in a protest across the street from the hotel where the DRC President was staying -- and found that the discretionary function did not apply, citing *Letelier*.  *Miango*, 288 F. Supp. 3d at 125 n.3 (citing *Letelier*, 488 F. Supp. at 673); *see also id*. ("the alleged assault took place immediately after plaintiffs were observed by the DRC President, and [] it was carried out by individuals in his entourage against people who were obviously involved in a protest").  Turkey attempts to

46

distinguish this case as a "cursory" default judgment, MTD at 49, but that argument is unavailing. It is black letter law that a court "must always assure itself of its subject-matter jurisdiction regardless of whether a party has raised a challenge." *Kaplan v. Cent. Bank of the Islamic Rep. of Iran*, 896 F.3d 501, 511 (D.C. Cir. 2018) (citing *Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). Thus, the fact that the *Miango* decision was the result of a default judgement is of no moment. In a well-reasoned opinion, the court assured itself of subject matter jurisdiction, held that the discretionary function did not extend to an illegal beating of protestors, and confirmed that, contrary to Turkey's argument, *Letelier* is good law.[32]

Turkey's claim that the D.C. Circuit has rejected *Letelier*, MTD at 46, is similarly mistaken. *MacArthur Area Citizens Ass'n v. Rep. of Peru*, 809 F.2d 918, 919 (D.C. Cir. 1987) involved complaints by the MacArthur Area citizens association that Peru, after obtaining permission from the State Department, had purchased a building for its chancery and, among other things installed fluorescent lighting, a burglar alarm, and bars on the windows, as well as caused an increase in cars taking up close-in parking. In that case, the Court of Appeals confirmed, contrary to Turkey's argument, that the "case law buttresses the proposition that a criminal act cannot be discretionary," citing *Letelier*, and further found that Peru had not committed a criminal act: "it has by no means been established that Peru has violated any criminal law." *MacArthur Area Citizens Ass'n*, 809 F.2d at 922 n.4. The Court also noted, in

---

[32] Turkey also argues this Court should ignore *Miango* because it addressed *Letelier* in a footnote, MTD at 49, but Turkey itself cites to discussions found in footnotes in numerous cases. *See* MTD at 43 (citing *United States v. Gaubert*, 499 U.S. 315, 325 n.7 (1991)), 46-47 (citing *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918,922 n.4 (1987)), 47 (citing *Risk v. Halvorsen*, 936 F.2d 393, 396 n.3 (9th Cir. 1991)), 48 (citing *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 81 n.4 (D.D.C. 2013)). Footnotes can contain binding holdings. *E.g*. *Neal v. Roche*, 349 F.3d 1246, 1250 (10th Cir. 2003).

dicta, that even if a zoning violation could be a criminal act, the cases cited by the appellant

"involve criminal acts of a rather different character and order," and cited *Letelier*, 488 F.Supp.

at 673, approvingly. *MacArthur Area Citizens Ass'n*, 809 F.2d at 922 n.4 (noting that *Letelier*

involved an assassination – an action clearly contrary to law – but observing that Peru's

violations, if any, of a zoning ordinance do not rise to the level of actions "*malum in se*.").[33]

After *MacArthur*, two Circuits have found that tortious conduct, even in the chancery

construction context, falls outside the discretionary function, confirming that *MacArthur* does

not stand for the proposition that immunity extends to illegal conduct. *See, e.g.*, *USAA Cas. Ins.*

*Co. v. Permanent Mission of Rep. of Namib.*, 681 F.3d 103, 113 (2d Cir. 2012) (discretionary

function does not shield Namibia: once Namibia decided to renovate chancery, it could not

---

[33] Thus, the D.C. Circuit has drawn a clear distinction between serious crimes, which are considered *malum in se*, and acts that are merely *malum prohibitum*, like a potential zoning violation. This distinction rebuts Turkey's argument that, absent immunity for all criminal acts of its agents, "the scope of an official's authority [would be] viewed as co-extensive with the official's lawful conduct, [and] then immunity would be available only where it is not needed." MTD at 49 (citations and internal quotations omitted).

Similarly, *Risk v. Halvorsen*, 936 F.2d 393, 396-97 (9th Cir. 1991), another case cited by Turkey (MTD at 47), observed that "the most that can be said is that Norwegian officials issued travel documents to a Norwegian citizen and her children, also citizens of Norway; that they provided funds for her travel; and that they protected her from contact by her former husband." The court found the routine consular tasks were "expressly within the function of consular officials" pursuant to the Vienna Convention on Consular Relations and therefore covered by the discretionary function exception. *Id.* at 395. The Court also noted that while the acts complained of "may" be a crime, because the intentional violation of a custody order is a crime in California, as in *Macarthur*, that the clearly routine consular acts did not rise to the level of the serious crimes in *Letelier*. *Id*. at 397.

Turkey also cites *Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48 (D.D.C. 2013) (MTD at 48), but the plaintiffs there abandoned the non-commercial tort exception, so the court made no determination regarding the discretionary function. *Mohammadi*, 947 F. Supp. 2d at 81 n.4 Moreover, it was undisputed that the torture and extrajudicial killings occurred in Iran, not the United States, and that the court lacked personal jurisdiction over the defendants, thus the court declined to address whether harassment through electronic communications for political purposes was a criminal act. *Id*.

48

disregard the New York City Building Code); *Joseph v. Off. of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1027 (9th Cir. 1987) (discretionary function does not shield Nigeria from property damage claims: "*MacArthur* does not indicate that the purely destructive acts which give rise to Joseph's tort claims were discretionary. Destruction of property can hardly be considered as part of a policy decision to establish a consular residence.").  Plaintiffs have not located, despite a diligent search, any case where a court has held that a physical attack, including assault, battery and a hate crime, is entitled to immunity under the FSIA as a discretionary function.

Defendant Turkey does not dispute that assault, battery and hate crimes constitute serious criminal conduct.  *See also, e.g., Hardin v. Warden, Lebanon Corr. Inst.*, No. 3:09-CV-0019, 2009 WL 529838, at *3 (S.D. Ohio Feb. 27, 2009) ("felonious assault is a *malum in se* offense which has been criminal since at least the thirteenth century").  Indeed, Turkey concedes that felony charges against four Turkish security officers remain pending.  MTD at 25.  Two civilian defendants who committed acts indistinguishable from those of the agents pled guilty, while charges remain also pending against two other civilians.  *Id.*  Plaintiffs have not located, despite a diligent search, any case where a court has held that a physical attack, including assault, battery and a hate crime, is entitled to immunity under the FSIA as a discretionary function.

Frankly, it cannot seriously be disputed that the rule first enunciated in *Letelier* is good law.  Congress has repeatedly referenced *Letelier* during consideration of amendments to the FSIA and never sought to overturn the decision.  *E.g., Doe v. Bin Laden*, 663 F.3d 64, 69 (2d Cir. 2011) (in the debate surrounding recent amendments to FSIA, *Letelier* and *Liu* were explicitly discussed, "so Congress was actually, and not just presumptively, aware of their existence, yet no one even suggested—let alone argued—either that they were incorrectly decided"); *Foreign Sovereign Immunities Act: Hearing on S.825 Before the Subcomm. on Courts and Admin.*

49

*Practice of the S. Comm. on the Judiciary*, 103d Cong. 84 (1994) (Statement of Abraham D. Sofaer, former Legal Advisor, Department of State) ("the argument that the activities of government law enforcement agencies are necessarily 'sovereign' ignores the decisions in *Letelier* and *Liu* … The [State] Department has never taken the position that the decisions in *Letelier* and *Liu* are incorrect or that the principles that they espouse are inconsistent with U.S. obligations under international law.").[34]

Turkey's conduct is not entitled to immunity.  The Sheridan Circle attack was a tortious and criminal act committed in the United States, satisfying FSIA exemption 1605(a)(5).

b.    The FTCA, like the FSIA, does not immunize illegal conduct

Turkey asks the court to focus on the discretionary function doctrine as applied pursuant to the Federal Tort Claims Act (FTCA).  But the FTCA offers no help to Defendant Turkey.  The FTCA, like the FSIA, does not extend immunity to conduct that violates the law, even if the acts are quintessentially discretionary.  In *Loumiet*, the plaintiff alleged that a retaliatory prosecution had been brought against him.  *Loumiet v. United States*, 828 F.3d 935, 939 (D.C. Cir. 2016).  The D.C. Circuit found that the question of "whether to prosecute is typically a quintessentially discretionary function…thus meriting protection under the discretionary-function exception." *Id.* at 942 (internal quotations omitted).  Nonetheless, the D.C. Circuit, joining seven other circuits, found that "the FTCA's discretionary-function exception does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional prescription."

---

[34] Many states, in fact, provide no discretionary function exemption and simply do not extend immunity to torts committed on their soil at all.  *See, e.g.*, Eur. Convention on State Immunity art. 11, E.T.S. No. 74 (June 11, 1976) (no discretionary function exception at all for tortious conduct); State Immunity Act 1978, c. 33, § 5 (U.K.); State Immunity Act, 8 R.S.C. 1985, c. S-18 (Can.); *State Immunity Act 1985*, s 13 ch 196 (Austl.)  Section 13 of Australia's State Immunity Act of 1985, ch. 196; Foreign State Immunity Act of 1981 § 6 (S. Afr.); and State Immunity Act of 1979, § 7 (Sing.).

*Id.* at 943.  Because Plaintiffs here have alleged both conduct in violation of District of Columbia law, including D.C Code § 22-3704, and acts that flout Constitutional prescriptions, the FTCA, like the FSIA, indicates Turkey is not entitled to immunity.

There is a two-part test for determining whether the FTCA discretionary function applies in a particular case.  *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991); *Macharia v. U.S.*, 334 F.3d 61, 65 (D.C.Cir. 2003).

Under part one, it is clear that the FTCA authorizes tort claims for conduct that violates a statute, rule or policy. *Gaubert*, 499 U.S. at 322-23 (there is no discretion to violate a statute, regulation, or policy); *Loumiet*, 828 F.3d at 944; *Macharia v. U.S.*, 334 F.3d 61, 65 (D.C.Cir. 2003) (citing *Berkovitz v. U.S.*, 486 U.S. 531, 536 (1988).

Second, even when the challenged conduct is lawful and involves an element of judgment, the "court must decide 'whether the judgment is of the kind that the discretionary function exception was designed to shield.'"  *Loumiet v. U.S.*, 828 F.3d 935, 942 (D.C. Cir. 2016) (citing *Gaubert*, 499 U.S. at 322-23); *Macharia*, 334 F.3d at 65.  Thus part-two of the test requires an assessment of whether a relevant act is "of the nature and quality that Congress intended to shield from tort liability."  *United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)* ("*Varig*") 467 U.S. 797, 813 (1984).  The Court of Appeals has explained that "even a discretionary act within the scope of a federal official's employment is not within the exception if it 'cannot be said to be based on the purposes that the regulatory regime seeks to accomplish'." *Loumiet*, 828 F.3d at 942 (citing *Gaubert*, 499 U.S. at 325 n.7); *see also Macharia*, 334 F.3d at 65 ("when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy" (citing *Gaubert*, 499 U.S. at 323)).

51

In addition, under this prong, the Court of Appeals has held that a decision cannot be shielded from liability if the decisionmaker is acting without actual authority.  *See Loumiet*, 828 F.3d at 942 (employee acting beyond his authority is not exercising the sort of discretion the discretionary function was enacted to protect); *Red Lake Band of Chippewa Indians v. U.S.*, 800 F.2d 1187, 1196-1197 (D.C. Cir. 1986) (FBI agent who departed from FBI policy against engaging in policing activity on reservations was not shielded from liability for his actions in taking charge and ordering withdrawal of law enforcement personnel).  And the discretionary function exemption "does not protect all governmental activities involving an element of choice."  *Gaubert,* 499 U.S. at 335 (Scalia, J., concurring); *see also Sledge v. U.S.*, 883 F.Supp.2d 71, 90 (D.D.C. 2012) (laziness or carelessness are not grounded in policy considerations and are not protected by discretionary function immunity).

This framework is fatal to Turkey's argument that the FTCA discretionary function exemption would protect its conduct.

It is undisputed that Turkey's officials and employees must obey United States law while in the United States.  Vienna Convention on Diplomatic Relations art. 41, Apr. 18, 1961, 500 U.N.T.S 95.  ("Without prejudice to their privileges and immunities, it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State.");  *Cf. Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  Turkey itself argues it should be protected "from U.S. court's jurisdiction to the same degree afforded the United States," relying on the Charter of the United Nations.  MTD at 43, n.36.

Plaintiffs have alleged that Turkey's security personnel committed crimes in violation of District of Colombia law, including, specifically, a violation of D.C. Code § 22-3704 as well as assault, battery, and false imprisonment.  Am. Compl. Dkt. 63, ¶¶ 228-257.  This Court, in ruling

52

on the individual defendants' motion to dismiss, found that Plaintiffs stated a claim under that statute for which relief may be granted. Mem. Op., Dkt. 52 at 2. Because the FTCA does not extend immunity to conduct that violates the law, e.g., *Macharia*, 334 F.3d at 65, Turkey cannot claim immunity for its violation of D.C. Code § 22-3704 or the prohibitions against assault, battery and false imprisonment.

Turkey's conduct also "flouts a constitutional prescription," *Loumiet*, 828 F.3d at 943, including the rights guaranteed under the First, Fourth and Fifth Amendments.[35] Specifically, Turkey acted to suppress Plaintiffs' speech. *Supra* p. 23. Turkey complained about the protestors and insisted they did not have the right to protest. *Supra* pp. 16, 38 (Ambassador complains that the protestors are "provocating" and "they keep on insulting"; after police officers states "they can protest", Ambassador responds "here they cannot"). Turkey physically attacked the protestors, beating them and repeatedly tearing apart the signs the protestors were holding. *Supra* pp. 38-39; *see also* Am. Compl., Dkt. 63 ¶¶ 1, 63, 73 74, 89, 205-207 (members of Congress condemn attack on First Amendment). This conduct flouts the First Amendment. *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (retaliation for voicing opinions violates First Amendment); *Boos v. Barry*, 485 U.S. 312, 318 (1988) (political protest "operates at the core of the First Amendment"); *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (Sotomayor, J.) (police officers who violently dispersed protestors in violation of First Amendment not entitled to qualified immunity). This same conduct also violated 18 U.S.C. § 112, which provides statutory protection for First Amendment rights.[36]

---

[35] *Loumiet* also explained that the underlying state law necessarily remains the source of the substantive standard for a plaintiff's claim, but a plaintiff can identify constitutional defects in order to challenge the availability of the discretionary function defense. *Id.* at 945-46.

[36] Turkey is mistaken when it argues that Plaintiffs violated § 112. The statute specifically provides that "Nothing contained in this section shall be construed or applied so as to

In addition, Turkey's agents carried firearms and threatened, punched, kicked, choked and otherwise beat Plaintiffs, including Plaintiffs who were lying defenseless on the ground. *Supra* pp. 32, 41; *see also, e.g.* Am. Compl., Dkt. 63 ¶¶ 1, 67-90.   This conduct flouts the Fourth Amendment.  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Johnson v. District of Columbia*, 528 F.3d 969, 977 (D.C. Cir. 2008), the D.C. Circuit "had no trouble finding" that unreasonable force was used where an officer repeatedly kicked a surrendering suspect in the groin.  578 F.3d at 977; *see also Williams v. District of Columbia*, 268 F. Supp. 3d 178, 190 (D.D.C. 2017) (police pinned plaintiff to ground in prone position, and repeatedly hit his head and smashed it into the ground).   The same conduct also violates the Fifth Amendment because it was so egregious, it may fairly be said to shock the conscience. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *Moore v. District of Columbia*, 79 F. Supp. 3d 121, 130-132 & n.11 (D.D.C. 2015); *see also* Am. Compl. Dkt. 63 ¶¶ 195-207 (U.S. officials, including State Department and U.S. Congress condemn the attack and express outrage).   Indeed, this Court has already found that Plaintiffs have adequately alleged extreme and outrageous conduct. Mem. Op., Dkt. 52 at 22-27.

Violent, criminal conduct that flouts protections guaranteed by the Constitution is clearly not conduct "of the nature and quality that Congress intended to shield from tort liability," *Varig*, 467 U.S. at 813, and Turkey cannot claim immunity based on the FTCA for that reason.

Turkey argues that its decision "whether to pursue, detain or arrest individuals" is protected.  MTD at 44.  But this argument fails for two reasons.  First, Turkey did not pursue, detain, and arrest individuals, rather it pursued and punched, kicked and beat them.  Second,

---

abridge the exercise of rights guaranteed under the first amendment to the Constitution of the United States."  It therefore does not prohibit political protest directed at a foreign government. *E.g. Boos*, 485 U.S. at 325-26.

Turkey is not authorized to enforce U.S. law in the United States.  As in *Red Lake Band of Chippewa Indians*, 800 F.2d at 1196-1197, Turkey is not shielded from liability for unauthorized policing activity.  Thus, Turkey's reliance on cases regarding the decision to arrest, MTD at 44, is inapposite.[37]  Turkey also relies upon a number of cases that allege the government was negligent in protecting a prison inmate or in providing adequate security at, for example, a parking lot.  MTD at 40.  But Plaintiffs are not challenging the adequacy of the security at Sheridan Circle.[38]  Indeed *Sledge v. U.S.*, 883 F. Supp. 2d 71 (D.D.C. 2012), supports Plaintiffs'

---

[37] For example, *Shuler v. U.S.*, 531 F3d 930, 934 (D.C. Cir. 2008), held that law enforcement decisions regarding the best time to arrest dangerous criminal suspects did not violate a duty to protect a confidential informant whose cover was blown as a result.  *Olaniyi v. District of Columbia*, 763 F.Supp.2d 70 (D.D.C. 2011), reviewed each act separately and found that while the decision to detain and arrest the plaintiff in the Capitol building fell well within the scope of the discretionary function, *id*. at 89, a later arrest not supported by probable cause was an unlawful violation of the Fourth Amendment, *id*. at 93, and permitted that claim to go forward. *Shuler* is simply inapposite and *Olaniyi* provides no support to Turkey, whose conduct also flouted the Fourth Amendment.

*Monarch Ins. Co of Ohio v. D.C.*, 353 F.Supp. 1249, 1256 (D.D.C. 1973) does not concern discretion to arrest, but rejected claims that the District of Colombia's planning for containing civil disturbances after the assassination of Dr. Martin Luther King in 1968 effected a Fifth Amendment taking because it "intentionally sacrificed private property in order to further the public purpose of disturbance control." The court concluded that decisions about where to station troops "are best left to officials directly responsible to the electorate." *Id*.

[38] Turkey relies on cases brought by crime victims who alleged the government provided inadequate security at, respectively, a parking lot and at the Old Post Office Pavilion. *See Haygan v. United States,* 627 F. Supp. 749 (D.D.C 1986); *Singh v. South Asian Soc'y of the Geo. Wash. Univ.*, 572 F. Supp. 2d 11 (D.D.C. 2008).  Courts uniformly find that unless the choices regarding adequate lighting and the number of roving guards violated a mandatory policy, they are classic examples of discretionary acts that weigh budgetary limitations. *E.g. Haygan*, 627 F. Supp at 750.  Plaintiffs here are not challenging any decisions regarding the number of police officers assigned to Sheridan Circle.  In *Sledge v. U.S.*, 883 F. Supp. 2d 71 (D.D.C. 2012), as in *Olaniyi*, *supra* note 6, the court evaluated each claim separately.  *Sledge* found that as to the prisoner protection claim "Plaintiffs fail to identify any statute, regulations or policy that specifically prescribes a course of action with respect to the protection of inmates that [defendant] Sweithelm violated" when he smoked, but did not leave his post, during a prisoner move. *Sledge*, 883 F. Supp. 2d at 85.  Here, Plaintiffs have identified such a statute.

argument. *Sledge* found that the Bureau of Prisons failure to timely process an attorney's request for a visit was not grounded in public policy, but rooted in "laziness" and "carelessness." *Id.* at 90. As a result, the court found the discretionary function exception did not bar the court from considering the plaintiff's intentional and negligent infliction of emotion distress claims. *Id. Sledge* supports, not undercuts, Plaintiffs' intentional infliction of emotional distress claims here, which allege that Turkey's agents threatened Plaintiffs with physical harm and encouraged the physical attacks. Am. Compl., Dkt. 63 ¶¶ 247, 248; see also *id.* at 92 (Turkish security officer yells "we are already fucking your mothers"); 127-130 (Turkish security officer yells "bitch, come here", "why are you running?" "you're dead, bitch", "bitch get out of the car, you haven't had enough yet."); 163 (Turkish security officer yells to mother running away with her four-year-old son, "I'm going to fuck you" and "you whores!"). As in *Sledge*, this conduct is not grounded in public policy or the type of conduct Congress intended to protect. Turkey did not challenge these allegations – or the allegations with respect to the hate crime claim – in its motion. Therefore, Plaintiffs' non-frivolous allegations must be taken as true and support jurisdiction here. *Phoenix Consulting*, 216 F.3d at 40; *Bell* 327 U.S. at 682-83.

Finally, as described below, the facts do not support Turkey's narrative with respect to the remaining claims.

> c. Turkey has not met its factual burden

Turkey has failed to meet its burden to come forward with written or oral evidence, including affidavits or testimony. *Agudas Chasidei Chabad*, 528 F.3d at 940; *Prakash*, 727 F.2d at 1179.

Turkey's fundamental premise is that its agents perceived a risk and had to act. Despite this, Turkey presents no direct evidence of the state of mind of any agents. It does not offer declarations from agents regarding what they observed in Sheridan Circle; for example, there is

no declaration that any agent saw or was concerned by the backpack Turkey now claims created an IED risk or that any agent assessed the "line of sight" between the protesters' location and the obscured arrival point of President Erdogan.  Nor does Turkey offer testimony from agents about how or why any specific behavior witnessed led to a conclusion that a threat was afoot.  And, Turkey offers no statements from any agents as to how the specific actions those agents took were designed to address the particular threats Turkey now claims existed.

Rather, Turkey's counsel speculates that "the Turkish security officers accompanying President Erdogan" had likely "experienced PKK terror that claimed the lives of, or that injured, loved ones or close friends."  MTD at 16.  Turkey's experts offer similarly pure speculation that the agents "undoubtedly" had heightened security concerns (MTD, Ex. 1 thereto ¶ 34), and "had to assume" that a protester's backpack contained an explosive.  MTD, Ex. 2 thereto ¶ 41.  these inflammatory statements are not based on personal knowledge and, simply put, are not evidence.

The objective evidence on the other hand makes perfectly clear that Turkey's agents attacked the protesters, not because they believed President Erdogan was at risk, but because the protesters' words and very presence were simply unacceptable.  Specifically, as addressed in detail, the first episode of violence was initiated by Narin and saw a number of Plaintiffs set upon by pro-Erdogan civilians and Turkish agents.  *Supra* pp. 9-11.

Despite that, the protesters then lined up in an orderly manner on the sidewalk bordering Sheridan Circle.  There is absolutely no evidence that any protester attempted to leave the sidewalk and approach the CMR during the 8 minutes that passed between the first and second attacks.  *Supra* p. 13.  By contrast, the video is clear that U.S. officers repeatedly were forced to command Turkey's agents and their civilian contingent to move back to the sidewalk in front of the CMR and had to physically push them back toward the CMR.  *Supra* pp. 12-14.  Further,

there can be no dispute that the officers – who faced the CMR side of the street, illustrating their perception that any threat would emanate therefrom – were soon reinforced by a group of motorcycle officers who placed their motorcycles between the groups. *Supra* p. 13.

Moreover, Turkey presents no evidence that its agents wanted the protesters moved for security purposes, contrary to Turkey's current position. To the contrary, the video shows that Turkey's agents actually urged the protesters to come *closer* to the CMR so that the agents could fight them, using gestures and words. *Supra* p. 15. In addition, the video shows that agents and their civilian supporters made vulgar gestures to the protesters and yelled things like, "I am going to fuck your mother" and "make those fuckers shut up!" *Supra* pp. 15-16.

Underscoring that the Turkish agents were not concerned about security based on the position of the protesters, the video shows that agents permitted civilians they did not know to stand with them right in front of the CMR, *i.e.,* far *closer* to the CMR than the protesters were. *Supra* pp. 16-18; Pls.' Ex. 6 ¶ 94; Pls.' Ex. 7 (Narin and Yildirim aver they did not know security agents). The agents did this because those civilians were voicing support for Turkey, which evidently trumped any concern for who those civilians might actually be or whether they posed a threat; and we now know that at least some of those civilians are sympathetic to terrorists like ISIS and Hamas. *Supra* p. 18.

Turkey also claims that, during the period between attacks, its agents worried that a protester might shoot President Erdogan on his arrival. But, as Dr. Layton explains, no evidence suggested any protester had a weapon and the shot Turkey claims to have worried about would have been essentially impossible to make. *Supra* pp. 19-20; Pls.' Ex. 6 ¶¶ 45- 48. Moreover, no Turkish agent took any action even suggesting a concern about weapons, such as patting down protesters. *Id.*

58

Turkey asks the Court to believe its agents perceived an IED threat because one protester wore a backpack.  MTD at 21.  That facially flawed proposition is debunked by Dr. Layton, who points out that: (i) carrying a backpack is not a pre-attack behavior necessitating action by security personnel (otherwise such personnel would do little but search the countless number of bags people carry today), (ii) Turkey's agents paid no attention to individuals wearing bags who were even closer or right next to the CMR; (iii) it would have been impossible to throw an IED 130 feet to President Erdogan's arrival point, (iv) no evidence otherwise suggesting an IED threat was visible, and (v) Turkey's agents took no action indicating a concern that the backpack in question had an IED – in fact, rather than search the backpack upon the start of the second attack, the agents simply beat the bag's carrier. *Supra* pp. 20-21; Pls.' Ex. 6 ¶¶ 49 -55.

Turkey suggests that a small amount of water flicked from a plastic bottle by a protester created a "biochemical" risk, because "the dispersal of *any* liquid" presents such a risk. (Emphasis added).  MTD at 23.  Once more, Dr. Layton definitively refutes this notion, given that: (i) in his 26 years with the Secret Service, the simple dispersal of a liquid has never been treated as a potential biochemical attack, (ii) there was no evidence suggesting the liquid here was a biochemical, including because the individual who sprayed it was not wearing protective clothing, did not spray it at anyone and walked into the area where it had been sprayed immediately thereafter, and (iii) no Turkish agent had any discernible reaction to the spraying. *Supra* pp. 21-23; Pls.' Ex. 6 ¶¶ 56-60.  Most fundamentally as to all these supposed threats, as Dr. Layton explains, if any Turkish agent actually believed the threats existed, there would have been no security rationale to wait for approximately eight minutes, taking no action, and then run across the street to beat people.  *Id.*

59

Turning to President Erdogan's arrival at the CMR, which immediately preceeded the second attack, the actions of Turkey's agents make plain no threat was perceived. As Dr. Layton explains, if Turkey's agents had believed a legitimate threat existed, they would not have: (i) brought President Erdogan to the scene of the threat at the CMR; (ii) used the primary rather than secondary arrival point if they had brought him to the CMR for some inexplicable reason; (iii) kept the doors to President Erdogan's vehicle open while he sat in it; (iv) allowed President Erdogan to walk slowly from the vehicle to a protected building; and (v) allowed President Erdogan to stop and view the ongoing assault during the walk. *Supra* pp. 26-30; Pls.' Ex. 6. Beyond that, it is utterly antithetical to close-protection protocol for agents in the inner perimeter of a protectee to leave that inner perimeter when there is a threat. Yet, here, agents left President Erdogan's vehicle to run 130 feet away to attack protesters, including people who had already been seriously beaten. *Supra* pp. 27-28.

In this vein, the nature of the second attack itself vitiates Turkey's contention that its agents were acting for security-related purposes. As Dr. Layton notes, Turkey's agents did not ask the protestors to move away, even though it was the protesters' proximity to the CMR that supposedly was a grave concern. *Supra* p. 31; Pls.' Ex. 6 ¶ 75. Turkey's agents did not attempt to hold any protesters in place so they could be searched or perhaps questioned. No, instead, Turkey's agents gratuitously and cruelly kicked, punched, stomped on and choked people including older men, diminutive women, and parents with children, often levelling personal insults in the process. Indeed, Turkey's agents engaged in prolonged assaults on people who were lying defenselessly and seriously injured on the ground, kicking such people in the face over and over. *Supra* pp. 31-37. Beyond that, Turkey's agents chased protesters well past the

60

point in Sheridan Circle where Turkey now tells the Court that a safe protest could be held, and beat protesters at those far-flung positions. *Id.*

Given all of this, it is not surprising that neither Turkey nor its security expert makes any attempt to address let alone justify a single specific action any agents took during the second attack. Instead, Turkey simply employs euphemisms to gloss over the inhumane attack. *E.g.,* MTD at 1 (the "security detail engaged physically with some of the Plaintiffs"); *id.* at 45 (agents acted "to push back and disperse"). As the contemporaneous law enforcement memoranda confirm, "Turkish security agents assaulted protestors/demonstrators and U.S. law enforcement personnel" and United States Secret Service Agents and police on site confirmed "that the melee had been provoked by Turkish security officers who upon seeing the protestors had run directly into the crowd to physically engage them." Pls.' Ex. 1 at 1 & Pls.' Ex. 2 at 2.

As if to punctuate the obvious purpose of the second attack, Turkey's agents grabbed the protesters' signs and – often with dramatic effect – tore them and flung them in the air, even while some Plaintiffs were still on the ground, reeling from their injuries. *Supra* pp. 38-39. Tearing paper signs which are flapping harmlessly in the breeze has nothing to do with security and everything to do with silencing dissent.

The video evidence provides express, explicit confirmation regarding the purpose of Turkey's actions. Right after the second attack and seconds after Agent Sumercan had yelled at a few remaining protestors, "I'm going to take that flag to put in your mom's pussy. I'm going to fuck your mom's pussy" (SC08 at 5:00 (English translation at Pls.' Ex. 10)), the Ambassador approached a police officer. Even though the remaining protesters were on the side of Sheridan Circle, far from the area Turkey claims caused a security concern, the Ambassador complained to the officer that the protesters were "*provocating* [sic]," and said, "just tell them to move away.

61

And they keep on *insulting*." SC08 at 5:35 (emphasis added). In sum, the protesters had fled the area at issue and President Erdogan was ensconced in the CMR, but Turkey still demanded that the protesters be moved because of their "insulting" behavior.

**B.      Plaintiffs' Claims for Damages Arising Out of Torts Committed in the United States are Justiciable**

Turkey raises two additional threshold doctrines. Neither is applicable here.

1.      The doctrine of comity does not apply to torts committed on U.S. soil

The doctrine of international comity does not apply to this case. To the extent Defendant Turkey suggests that this Court may decline to apply the FSIA and instead "defer to the political branches" to resolve Plaintiffs' claims, MTD at 61, the Supreme Court has, of course, foreclosed that argument. The Supreme Court has unequivocally held that the FSIA is the sole framework for resolving any claim of sovereign immunity and has further explained that the statute was passed with the principal purpose of eliminating political participation in immunity determinations. *E.g. Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004) (The principal purpose of the FSIA is to "clarify[] the rules that judges should apply in resolving sovereign immunity claims and eliminat[e] political participation in the resolution of such claims."); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983) ("In 1976, Congress passed the Foreign Sovereign Immunities Act in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to 'assur[e] litigants that ... decisions are made on purely legal grounds and under procedures that insure due process'"). This Supreme Court precedent is fatal to Defendant Turkey's argument this Court should "defer to the political branches" rather than apply the FSIA.

To the extent Defendant Turkey argues that the comity doctrine provides a secondary basis for dismissal of Plaintiffs' claims, its argument is similarly unavailing. Defendant

misapprehends the doctrine of international comity.  Comity reflects the "extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation." *Hilton v. Guyot*, 159 U.S. 113, 163 (1895).  Plaintiffs in this case are seeking to apply United States law to conduct in the United States.  As a result, the comity doctrine is simply not implicated.  Plaintiffs are aware of *no* case where the doctrine of comity was invoked to abstain from jurisdiction over a case brought under U.S. law seeking redress in a U.S. court for a tort that occurred in the United States where citizens and residents of the United States were injured.  Indeed, invoking comity seems particularly untenable where, as here, the United States government has condemned Defendants' conduct (*see* Am. Compl., Dkt. 63, ¶¶ 196-197, 199-207) and several of the perpetrators were successfully prosecuted in the United States for their role in the attacks.

Even if the doctrine was theoretically available (it is not), Defendant wholly fails to establish any of the predicates for invoking comity.  Under the comity doctrine, a U.S. court may give full faith and credit to a foreign judgment that has been rendered with impartiality and due process.  *E.g.*, *Hilton*, 159 U.S. at 163, 202–03.  Turkey points to no such judgment.  A U.S. court may also defer to ongoing proceedings.  *E.g.*, *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 65 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013) ("In order to invoke this doctrine, Exxon must either point to a legal proceeding in Indonesia involving these particular plaintiffs to which the court must defer or at least the availability of effective and non-futile local remedies.") ; *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 130 (E.D.N.Y. 2000) (choosing not to abstain on comity grounds in part because "[t]here is no pending litigation in France, nor is the Court aware of any current law or policy of the French government which

63

could either supplant or fully redress plaintiffs' claims"). Turkey points to no legal proceedings in Turkey that promise to provide compensation to these Plaintiffs. Indeed, Defendant Turkey's own authority declines to invoke comity for this reason: "the claimants have not identified any foreign proceeding to which this court should lend its deference … invoking the doctrine of international comity would be inappropriate under these circumstances, as there is no foreign adjudication of rights to which this court might defer." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 9–10 (D.D.C. 2013). There is no basis for invoking the doctrine of comity here.

> 2.      No Political Question is posed by Plaintiffs' tort claims

Defendant Turkey argues that Plaintiffs "implicitly raise" a political question but its motion fails to clearly specify whether Defendant is arguing that the immunity determination is itself a political question or whether the cited background paragraphs create a political question. Despite the lack of clarity in Defendant Turkey's argument, it is clear that both arguments are unavailing. Ample Supreme Court and Circuit precedent demonstrate that no political question is posed here.

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 555 U.S. 189, 194 (2012). The political question doctrine is a narrow exception to that rule, rooted in respect for separation of powers. *See Zivotofsky*, 555 U.S. at 195; *Powell v. McCormack*, 395 U.S. 486, 512 (1969); *Baker v. Carr,* 369 U.S. 186, 217 (1962); *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019) (the political question doctrine is a limited and narrow exception to federal court jurisdiction); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 798 (1984) (Edwards, J. concurring) (political question doctrine is "a very limited basis for nonjusticiability").

In *Baker v. Carr*, the Supreme Court established a six-part test for determining whether an issue constitutes a political question that is inappropriate for judicial resolution:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially-discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker*, 369 U.S. at 217.  The Supreme Court has since indicated that the first and second factors are the most important.  *See Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004) (factors are listed in "descending order of both importance and certainty"); *Al-Tamimi*, 916 F.3d  at 12.

"Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability."  *Baker*, 369 U.S. at 217.  In addition, the Supreme Court has repeatedly cautioned that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."  *Id*. at 211; *see also Zivotofsky*, 555 U.S. at 195-96; *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 229-30 (1986).

To the extent Defendant Turkey argues that determining whether it is entitled to immunity under the FSIA presents a political question, that argument is, again, squarely foreclosed by Supreme Court and Circuit precedent.  The determination of whether a foreign state is entitled to immunity has been committed to the judiciary by the FSIA and does not pose a political question.  *E.g.*, *Simon v. Republic of Hungary*, 812 F.3d 127, 132 (D.C. Cir. 2016) (holding claims "do not constitute non-justiciable political questions falling outside of the Judiciary's cognizance"); *Hourani v. Mirtchev*, 796 F.3d 1, 9 (D.C. Cir. 2015); *Gates v. Syrian Arab Republic*, 646 F.3d 1, 3–4 (D.C. Cir. 2011) (argument that case poses non-justiciable

65

political question is "specious and clearly resolved by this court's prior cases"); *see also, e.g., Ungar v. Palestine Liberation Org*., 402 F.3d 274, 280 (1st Cir. 2005); *Nnaka v. Fed. Republic of Nigeria*, 238 F. Supp. 3d 17, 31 (D.D.C. 2017).   When it enacted the FSIA, Congress expressly provided that "Claims of foreign states to immunity ***should henceforth be decided by courts*** of the United States and of the States in conformity with the principles set forth in this chapter." 28 U.S.C. § 1602 (emphasis added); *see also Republic of Austria* 541 U.S. at 699 (purpose of FSIA is to eliminate political participation).   Indeed, courts in this jurisdiction have repeatedly considered and applied the FSIA discretionary function exemption, including under very similar facts, illustrating that the immunity determination can be resolved in accordance with traditional, judicially manageable standards.  *E.g. Miango v. Dem. Rep. Congo,* 288 F.Supp.3d 117 (D.D.C. 2018); *Doe v. Fed. Dem. Rep. of Ethiopia*, 189 F. Supp. 3d 6, 28 (D.D.C. 2016), *aff'd*, 851 F.3d 7 (D.C. Cir. 2017)*, Letelier v. Republic of Chile*, 488 F. Supp. 665, 667 (D.D.C. 1980).  As the Supreme Court explained in *Zivotofsky*, no political question is posed by this "familiar judicial exercise."  *Zivotofsky*, 566 U.S.  at 196.

Defendant complains about – and misquotes – a number of background allegations from the Amended Complaint, apparently raising the novel argument that factual background paragraphs in a Complaint can create a political question.[39]  None of the cited background paragraphs (*see, e.g*., MTD at 54-55) are necessary to the immunity determination or to the resolution of Plaintiffs' underlying claims.  Thus, even assuming that the background paragraphs

---

[39] Rather than asserting a cognizable political question defense, Defendant Turkey seems to be suggesting these paragraphs should be struck.  Turkey has not, however, filed a Rule 12(f) motion to strike the allegations.   Such a motion would be frivolous.  The cited paragraphs provide background information regarding Turkey's treatment of its Kurdish minority, citing to United States Department of State, Human Rights Watch and Amnesty International reports as support.

somehow pose a political question (they do not), Defendants have failed to demonstrate that the

political question is "inextricable from the case at bar."  *Baker*, 396 U.S. at 217; *Al-Tamimi*,916

F.3d at 13.

> For example, Turkey cites paragraph 45, which states:
>
>> The Turkish state has a long history of discrimination against and oppression of
>> the Kurdish people.  For decades the U.S. State Department and human rights
>> organizations, such as Human Rights Watch, have reported on the oppression
>> faced by Turkey's Kurds and have most recently expressed concern that the
>> Erdogan regime has used the state of emergency to further target, and persecute,
>> the Kurdish population.

Am. Compl., Dkt. 63 ¶ 45

This reference to reports by the State Department and a well-regarded human rights

organization does not request a judicial endorsement of the cited reports nor does it pose a

political question.  Similarly, paragraph 49 simply states that the Office of the United Nations

High Commissioner for Human Rights has "documented numerous cases of excessive use of

force," against the Kurds.  Like paragraph 45, paragraph 49 does not require a judicial finding

regarding the use of force in South-east Turkey or a judicial endorsement of OHCR reporting.

Defendant Turkey concedes that "it is not clear how these allegations are relevant to Plaintiffs'

claims," in effect conceding that these background paragraphs do not require judicial resolution

and are not inextricable from the case at bar.  In *Al-Tamimi*, the Court of Appeals held that the

question of who had sovereignty over disputed territory in the West Bank (a political question)

was extricable from the case: "from what we can tell, the court could rule in the plaintiffs' favor

on all counts without addressing who has sovereignty over the disputed territory."  *Al-Tamimi*,

916 F.3d at 13. The Court concluded that therefore the plaintiffs' torture, genocide and war

crimes claims could not be dismissed on political question grounds.  *Id*. at 14; *see also Wultz v.*

*Islamic Rep. of Iran,* 755 F.Supp.2d 1, 26 (D.D.C. 2010) (to extent allegations implicate *Baker*

factors, they are extricable); *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 184 (D.D.C. 2004) (rejecting defendants' argument that the allegations amounted to an all-out political attack upon the PLO of such wide scope as to be nonjusticiable: "[a]lthough the backdrop for this case—i.e., the Israeli–Palestinian conflict—is extremely politicized, this circumstance alone is insufficient to make the plaintiffs' claims non-justiciable."). Even more clearly than the allegations in *Al-Tamimi*, the complained of background paragraphs here are, as Defendant itself recognizes, extricable from the Counts. These paragraphs provide no basis for invoking the political question doctrine.

The Court in this case is not being asked to rule on the treatment of the Kurdish minority in Turkey, but on the assault, battery, and hate crimes committed against American citizens and residents here in Washington, D.C. It is worth noting, however, that even if a United States court was faced with a case that required a ruling on human rights abuses in Turkey, such claims are clearly justiciable and are routinely considered by the courts. E.g. *Al-Tamimi*, 916 F.3d at 11 (the question of whether Israeli settlers are committing genocide is not a political question); *Simon*, 812 F.3d at 132 (Nazi-era genocide and expropriation claims do not constitute non-justiciable political questions falling outside of the Judiciary's cognizance); *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) (political question doctrine does not bar adjudication of claims against a Bosnian–Serb leader for committing atrocities).

Finally, Defendant Turkey argues that the U.S. judiciary "is not equipped to judge a presidential security team." But it cannot seriously be disputed that United States courts routinely hear claims against the Secret Service, including claims of excessive force and other abuses involving presidential security details. *E.g.*, *United States v. Schatzle*, 901 F.2d 252,253 (2d Cir. 1990) (affirming excessive force conviction of secret service officer who punched,

68

kicked, and kneed bystander who crossed into presidential candidate motorcade); *Mick v. Brewer*, 76 F.3d 1127, 1129 (10th Cir. 1996) (considering excessive force claims against officers who were part of Russian President Boris Yeltsin's security detail); *see also Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (reversing dismissal of excessive force claims by parade goers against police officers who hit them with a baton).

Plaintiffs' tort claims do not raise a political question. *Compare Scheuer v. Rhodes*, 416 U.S. 232 (1974) (justiciable tort suit), *with Gilligan v. Morgan*, 413 U.S. 1 (1973) (non-justiciability of suit arising out of same episode seeking judicial supervision and training of Ohio National Guard).[40]  The first *Baker* factor is not present here.  Determining whether Defendant's officials and employees committed certain torts is committed to the judiciary and "falls within the traditional role of courts to interpret the law."  *Powell*, 395 U.S. at 548; *Tel-Oren*, 726 F.2d at 798 (Edwards, J. concurring) (tort suit arising out of terrorist acts presents no clash between branches of government).  The second Baker factor is also absent: manageable standards exist for resolving Plaintiff's tort claims.  *E.g., United States v. Munoz-Flores*, 495 U.S. 385, 395-96 (1990) (second factor not applicable where general nature of inquiry is familiar to courts); *Johnson v. D.C.,* 528 F.3d 969, 975–76 (D.C. Cir. 2008) (evaluating excessive force claim); *Schatzle*, 901 F.2d at 253; *Miango,* 288 F.Supp.3d 117, Mem. Op., Dkt. 52 at 14-17 (evaluating the tort claims in this case).  Similarly, none of the last four prudential factors apply here.  *Baker*, 369 U.S. at 217.  No initial policy determination need be made to resolve whether Defendants

---

[40] Defendant Turkey recites that it is a NATO ally and contributor to international security.  Plaintiffs' tort claims arising out of an assault and battery at Sheridan Circle obviously do not seek or require a court ruling on United States' foreign policy towards Turkey or NATO. Turkey cites *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) but that case did not involve the political question doctrine and was, moreover, plainly justiciable.  Turkey's other authority supports Plaintiffs.  *E.g. Wultz* 755 F. Supp. 2d at16-17 (declining to dismiss on political question grounds).

committed assault, battery, or other torts.  Nor will this determination express a lack of respect to a coordinate branch or present the potential of embarrassment from various departments on one question.  To the contrary, the political branches have uniformly condemned this attack and urged that those responsible be held accountable under U.S. law.  Am. Compl., Dkt. 63 ¶¶ 201 (40 members of Congress express outrage over the violent attack, reiterate that attack was "a clear disrespect for our laws and those who enforce them,"  and call for "the individuals involved in Tuesday's attacks on Americans on U.S. soil [to be] identified and brought to justice"); 202 (20 U.S. Senators called for accountability, urging that "those responsible should be held accountable under applicable U.S. law.").  Indeed, the House of Representatives unanimously passed a resolution calling for "any Turkish security officials who directed, oversaw, or participated in efforts by Turkish security forces to illegally suppress peaceful protests on May 16, 2017, [to] be charged and prosecuted under United States law." *Id.* ¶ 204.  Even if the political branches took the opposite position, it would not present a political question where, as here, the determination is squarely committed to the judiciary and manageable standards exist. *Zivotofsky*, 566 U.S. at 194–201 (no political question notwithstanding Judiciary's decision that plaintiff's passport can list "Jerusalem, Israel" as his birthplace was inconsistent with Executive's decision on same issue); *Al-Tamimi*, 916 F.3d at 12 ("At the very least, *Zivotofsky I* suggests that, if the first two *Baker* factors are not present, more is required to create a political question than apparent inconsistency between a judicial decision and the position of another branch."). No political question is posed here.

**C.     Plaintiffs Do Not Allege the ATS is an Exception to Sovereign Immunity**

Plaintiffs do not dispute that the FSIA is the sole basis for jurisdiction over the Republic of Turkey.  Plaintiffs do not allege that the ATS is an exception to sovereign immunity. Plaintiffs agree that this Court first must determine whether the FSIA provides jurisdiction over

Turkey before any claims under the ATS can proceed. The "sole basis for obtaining jurisdiction over a foreign state [or its instrumentalities] in our courts" is the FSIA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *see also S.K. Innovation, Inc. v. Finpol,* 854 F. Supp. 2d 99, 107 (D.D.C. 2012) ("Although the ATS is itself a jurisdictional statute, claims brought thereunder against a foreign state are nevertheless subject to the jurisdictional constraints codified in the FSIA"); *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 362 F. Supp. 2d 168, 175 n.4 (D.D.C. 2005), *aff'd and remanded*, 470 F.3d 356 (D.C. Cir. 2006) (plaintiff must first prove jurisdiction under the FSIA before any claims under the ATS can proceed).

Other than immunity, Turkey expressly reserved all remaining defenses to Plaintiffs' ATS claims.  MTD at 69-70.  Plaintiffs will address the reserved arguments after the immunity issues are resolved.

## VI.  **CONCLUSION**

For the above reasons, Defendants' motion should be denied.

Dated:  September 27, 2019.                 Respectfully submitted,


  /s/ *Agnieszka M. Fryszman*
Agnieszka M. Fryszman, DC Bar No. 459208
Douglas McNamara, DC Bar No. 494567
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699
afryszman@cohenmilstein.com
dmcnamara@cohenmilstein.com

Mark S. Sullivan*
Joshua Colangelo-Bryan*
**DORSEY & WHITNEY LLP**

51 West 52nd Street
New York, NY 10019
Tel:  (212) 415-9200
sullivan.mark@dorsey.com
colangelo.joshua@dorsey.com

Michael E. Tigar, DC Bar No. 103762
P.O. Box 528
Oriental, NC 28571
Tel:  (202)549-4229
metigar@gmail.com

*Attorneys for Plaintiffs*

\* Admitted *pro hac vice*

72