IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Kurd, *et al.*, | ) |
| Plaintiffs, | ) |
| v. | ) |
| The Republic of Turkey, *et al.*, | ) Civil Action No.: 1:18-cv-1117-CKK |
| Defendants. | ) |

## DECLARATION OF DR. RONALD M. LAYTON

I, Dr. Ronald M. Layton, declare as follows:

1.      I am over the age of eighteen (18) and am fully competent to make this Declaration. I have personal knowledge of the facts attested to below that derive from my professional experiences and training, and my knowledge of the attack on those protesting President Erdogan and his regime at Sheridan Circle and Massachusetts Avenue on May 16, 2017.

2.      My knowledge of this attack stems from the videos filed by Defendant Turkey and those provided by Plaintiffs' counsel, as well as my review of the Plaintiffs' First Amended Complaint, the Defendant Turkey's Motion to Dismiss and its supporting exhibits, police reports prepared by the District of Columbia Metropolitan Police Department (MPD), documents produced by the United States Department of State, English translations of statements made by members of the Turkish Security Detail (TSD) present at Sheridan Circle, maps of the area surrounding Sheridan Circle, and a site visit to Sheridan Circle.

3.      I am currently the CEO and founder of LCR Enterprises, LLC, a private

1

company that specializes in consultations regarding security matters. Prior to forming LCR, I was employed by the United States Secret Service (USSS or Secret Service) for more than 26 years. My relevant work experience is encapsulated within this document and a copy of my résumé is attached hereto as Exhibit A.

4.      I was retained by Plaintiffs' counsel to provide expert analysis and opinions in the matter of *Kurd, et al. v. The Republic of Turkey, et al.* regarding, among other things, non-confidential security protocols and procedures for hosting a foreign dignitary in the United States and an assessment of the security situation including the responsibilities and actions of the USSS, local law enforcement, and the TSD, in relation to the attacks on protesters that took place at Sheridan Circle, and near the Embassy of Turkey, on May 16, 2017.[1]

5.      In reaching the conclusions contained herein, I applied my professional experience as the former Deputy Assistant Director of the USSS (Office of Protective Operations and Office of Strategic Intelligence and Information) and the former USSS Key Intelligence Official. I also relied on my other professional experience, training, and knowledge gained during 26 years with the USSS, including assignments in the elite Presidential Protective Division for Presidents Clinton and Bush (41) and the Counter Assault Team, where I was Team Leader and Squadron Commander. I held this position during the Clinton, Bush (43), and Obama administrations.

6.      I further relied on my experience as the Deputy Assistant Director and Acting Assistant Director of the USSS Strategic Information and Intelligence Division,

---

[1] I also provided a declaration on behalf of Plaintiffs in the related matter, *Usoyan, et al. v. The Republic of Turkey.*

which is responsible for producing threat intelligence products for all U.S. Presidents and all visiting foreign heads of state, and the Deputy Assistant Director of the Office of Protective Operations, responsible for the supervision of the Dignitary Protective Division. The Dignitary Protective Division is responsible for the protection of all visiting heads of state, as well as all National Special Security Events.

7.      LCR Enterprises, LLC is being compensated at a flat rate for my time spent in undertaking the analyses contained herein and conveying my opinions and conclusions to Plaintiffs' counsel. My compensation is not contingent upon the nature or substance of my opinions and conclusions, nor is it contingent on the outcome of this matter.

## I.      GENERAL QUALIFICATIONS AND PROFESSIONAL BACKGROUND

8.      I am an experienced professional in law enforcement, executive protection, special event security, cyber security, and protective technologies. Prior to joining the USSS, I worked as a Police Academy Instructor in western Pennsylvania, teaching defensive measures, escalation of force, mechanics of arrest, and control tactics. I held instructional licenses issued by the Pennsylvania State Police under the Pennsylvania Municipal Police Officers' Education and Training Act and the Pennsylvania Lethal Weapons Training Act. I also held instructional licenses to teach defensive tactics with the Police Survival and Defense Institute, the American Society of Law Enforcement Trainers, and the Justice System Training Association.

9.      As a licensed police academy instructor, I taught hundreds of police academy recruits, as well as hundreds of police officers during "in-service" training, in the use and escalation of force and control/arrest tactics. Overall, in my 30-year law enforcement career, I have instructed more than 1,000 personnel in defensive

3

measures/tactics, escalation of force, control tactics, and the use of lethal weapons. As an accomplished instructor of such tactics, I have taught at numerous national law enforcement symposiums to a wide range of officers.

10.   My 26-year USSS career included ten supervisory assignments and the supervision of hundreds of personnel. I retired as a Senior Executive, supervising seven USSS Divisions and seven subordinate Special Agents in Charge. As referenced above, I was a member of the elite Presidential Protective Division (PPD) and was responsible for protecting the lives of President Clinton and President Bush (43). In this capacity, I conducted advance preparations, domestically and overseas. I worked in the immediate proximity of the President to perform protective duties; often within one to three feet. During this same time, I also worked on the elite Presidential Counter Assault Team (CAT), which serves as the principal and immediate tactical response to a terrorist attack.

11.   As a CAT member and supervisor, I worked hundreds of protective movements, protecting Presidents Clinton, Bush (43), and Obama; Vice Presidents Cheney and Biden, domestically and overseas (including in two war zones, Iraq and Afghanistan); and numerous visiting foreign heads of state.

12.   Working as a member of the elite CAT, I received highly specialized training, including in the following tactical domains: motorcade tactics, close quarter battle, explosive breaching, use of specialized munitions, improvised explosive recognition, terrorist tactics and weapons systems, building defense, and tactical egress tactics. While on the CAT, I trained and worked with members of U.S. Special Forces, including the U.S. Navy Seal Development Group (also known as Seal Team Six) and U.S. Army Delta Force, as well as the Federal Bureau of Investigation's Hostage Rescue

4

4851-6098-7558\1

Team. The training involved with these elite units centered on recognition and highly advanced response tactics to potential and actual terrorist attacks.

13.    During the Obama administration, I was a supervisor in the Special Operations Division and was the tactical architect and planner for several National Special Security Events (NSSE). An NSSE is a large-scale event of international significance and a potential target of terrorist activity. The full force of the United States Government is utilized to protect these events under the direction of the USSS.

14.    In 2007 and 2008, I was the tactical architect for the protection of the heads of state who visited the United Nations General Assembly. In this capacity, I was responsible for designing security plans to recognize and respond to terror attacks on all high-level foreign dignitaries visiting the United Nations.

15.    In 2008, I was the primary tactical architect designing security plans for the purpose of recognizing, responding to, and ultimately neutralizing terrorist attacks for the following NSSEs: the Republican National Convention, the Democratic National Convention, a visit of the Pope to the United States, and the G-20 Summit. I also functioned as the on-site incident commander for each of these events, responsible for the deployment of resources to address any threat.

16.    In 2015, I became the Special Agent in Charge of the White House Technology section and the first presidentially appointed (via Presidential Memorandum) "Technical Liaison." In that capacity, I was responsible for the daily operations and long-term strategy for presidential information systems. I was also responsible for protecting the White House complex against all technological threats to include, but not limited to: drone attacks, magnetometer operations, and cyber intrusions. I conducted research and

provided countermeasures regarding significant foreign technological based threats (to the White House and First Family), as well as countering attempts by foreign threat actors to ascertain sensitive information from the White House complex.

17.     In 2017, I became the Deputy Assistant Director as well as the Acting Assistant Director of the Strategic Intelligence and Information Division (SII), which is responsible for providing threat intelligence for all USSS protectees as well as all visiting foreign heads of state. In this capacity, I supervised the Counter Surveillance Division (CSD) as well as all authorized counter surveillance activity around the White House complex and in connection with other USSS protectees. The principal purpose of the CSD is to detect terrorist pre-attack indicators and, if necessary, prevent terrorists from attacking USSS protectees or protected facilities. During my tenure as the Acting Assistant Director, I was also the Secret Service Key Intelligence Officer and the top Intelligence Official at the agency.

18.     My next appointment (2018) was as the Deputy Assistant Director for the Office of Protective Operations. In this capacity, I supervised the Dignitary Protective Division and all former presidential protective divisions. I also supervised the daily operations for all visiting foreign heads of state.

19.     During my professional career, I have responded to and supervised responses to acts of aggression and attacks on USSS protectees. I have been intimately involved with the removal and relocation of protectees based on emergency circumstances as well as commanding immediate additional protective resources from other USSS personnel and the U.S. military. It is extremely rare for USSS personnel to respond to actual acts of aggression and attacks, primarily due to extensive advance

4851-6098-7558\1

preparations and the adherence to security plans. The emergency actions that I took were guided by my training and experience in Secret Service, Assault on Protectee Protocols.

20.     Based on the above experience, I am well versed in the training, protocols, and execution of foreign head of state visits to the United States.

## II.     RELEVANT SPECIALIZED EXPERIENCE AND ACHIEVEMENTS

21.     During my career, I have performed all aspects of foreign dignitary protection. I have been an advance agent responsible for site planning and a shift agent, *i.e.,* a non-supervisory agent on a protection team who reports to a detail leader. I have also been a detail leader, responsible for supervising multiple USSS personnel. As detail leader, I have had many conversations and briefings with foreign heads of state and their security representatives about security protocols and planning.

22.     I have also been assigned as CAT Leader, protecting high risk foreign dignitaries from terrorist actions. During my career, I have conducted terrorism investigations and am well versed in the legal and authorized investigative techniques that prevent acts of terrorism.

23.     In my role as Deputy Assistant Director (and Acting Assistant Director) of SII, I was responsible for providing threat intelligence to protective details to include the division responsible for the protection of foreign dignitaries. In this capacity, I was also responsible for directing investigative assets to determine the level of danger that a subject posed to USSS protectees.

24.     In my role as Deputy Assistant Director of the Office of Protective Operations, I supervised the Dignitary Protective Division. In that capacity, I was responsible for supervising the protection of numerous foreign dignitary and head of state visits, and I was frequently briefed by the subordinate Special Agent in Charge regarding

the security plans. I could approve or deny additional protective assets based on my expertise and the availability of resources.

25.     Over my course of service, I held supervisory assignments in the field, and at USSS headquarters, Department of Homeland Security headquarters, and the White House. Because of my well-rounded knowledge of USSS matters, I represented the agency at numerous law enforcement conferences, university events, in congressional testimony preparations, and in briefings to the White House. During my career, I routinely mentored USSS personnel with respect to leadership, technical competencies, and advancement criteria.

26.     My ten supervisory assignments, culminating in two Senior Executive Assignments, provided an extraordinary and holistic understanding of how the USSS functions and the significant complexities leveraged to keep protectees safe. In addition, my decades of experience instructing law enforcement officers in defensive measures, control tactics, and force escalation provides a high level of expertise when analyzing the appropriateness of the actions taken by the TSD as well as determining if the use of force was directed at accomplishing a legitimate protective objective.

27.     In 1998, I was the case agent investigating a subject who was planning to assassinate a U.S. Congressman and detonate a bomb at the White House. At the culmination of this investigation, I secured a sworn confession from the subject indicating his intent to construct and detonate a bomb at the White House. In October of 1998, the subject pled guilty to one count of solicitation of another to use an explosive device to damage or destroy a building owned by the United States, in violation of 18 U.S.C. § 373. This case (*United States v. Byron Bazarte*) was chronicled by the U.S.

4851-6098-7558\1

Department of Justice as one of 12 prevention of terrorism cases in the United States during 1998.[2]

28.    It is rare for a USSS agent to be credited with an acknowledgement from the U.S. Department of Justice for the prevention of a terrorist attack. It is incomparably rare for a USSS agent to be credited with preventing an act of terrorism where the subject of the investigation planned to construct and detonate a bomb at the White House. I received such acknowledgements for my role in the *Bazarte* matter.

29.    In March of 2019, I was recognized by the Police Survival and Defense Institute (PSDI) as a "Pioneer of Police Self Defense Instruction" and inducted into the PSDI Hall of Fame for a lifetime of dedicated instruction to law enforcement in the field of defensive measures and control tactics. The PSDI specializes in the instruction of defensive and control tactics and is one of the oldest organizations of its kind in the United States. The PSDI enjoys a high level of prestige, having instructed thousands of law enforcement officers over the organization's more than 40 years of existence.

## III.    GENERAL PROTOCOL FOR HEAD OF STATE SECURITY PROTECTION

### A.    Methodology for Protection

30.    The USSS depends on concentric circles of protection as a model and methodology to keep its protectees safe, whether the protectee is the U.S. President or a foreign head of state. The outer perimeter is considered the first line of defense and is often in proximity to protesters. The middle perimeter serves as a redundant form of protection. This position is staffed almost exclusively with USSS personnel and often

---

[2] "Terrorism in the United States 1999," Counterterrorism Threat Assessment and Warning Unit, Counterterrorism Division, U.S. Department of Justice, Federal Bureau of Investigation, https://www.fbi.gov/stats-services/publications/terror_99.pdf.

occupied by agents who have additional weapons systems and protective equipment to repel an attack. The inner perimeter provides immediate 360 degree proximity protection to protectees. Often, the circumference of this inner perimeter is only 1 to 5 feet, but it will expand and contract based on protectee movement. The inner perimeter is by far the most critical circle of protection, given its proximity to the protectee.

31.    The overarching "golden rule" as taught to all Secret Service agents is that "the least amount of agents" addresses a threat outside the inner perimeter, while "the greatest amount of agents" stays with the protectee. Consistent with this standard methodology, personnel assigned to the inner perimeter would not leave that perimeter to address an issue in the middle or outer perimeter because the most sacred area of protection would be weakened due to the absence of personnel, increasing the protectee's vulnerability to a successful attack. Furthermore, an individual agent's absence from the inner perimeter could result in significant deterioration of the 360 degrees of protective coverage to a protectee.

32.    Disturbances at the outer perimeter, whether manifested in the form of civil protest, civil disturbance, or a terrorist attack, are handled by outer perimeter forces. A Presidential Protective Division Special Agent would never leave the inner perimeter of the President to address an outer perimeter threat. This would be antithetical to Secret Service doctrine.

33.    These principles are so fundamental to executive protection that they would be employed by any well-trained security detail.

**B.    The Role of Intelligence Before and During the Visit**

34.    Prior to the visit of a high-level foreign head of state, such as President Erdogan, USSS-SII would prepare a threat assessment document that would be

disseminated to the detail agents assigned to the Turkish President. This document would contain historical data regarding previous visits and on-going threats to the protectee. SII would also monitor threats received by members of the U.S. Intelligence Community (USIC) and immediately notify detail agents and USSS Protective Intelligence (PI) agents of an emergent threat or attack plan that would occur at a site or during a protest. The ability to notify PI agents or detail agents would be maintained on a 24 hour basis and during the entirety of the visit to the United States.

35.     PI agents also are vigilant in the "real time" monitoring of crowds, because protests can be volatile with various levels of excitation. PI agents communicate the existence of a threat perception to other USSS personnel, including to detail agents and their counterparts in foreign security details. PI agents would also have intelligence provided by SII relative to ongoing threats to the protectee. It is common for agents who are assigned "fixed" positions on the outer perimeter to call PI agents for the purpose of investigating suspicious people or groups, or packages that could be Improvised Explosive Devices (IED).

36.     SII has an exceedingly strong partnership with the USIC as well as other Intelligence Organizations around the world.  The USSS relationship with the USIC is one of the principal mechanisms used to protect the life of the U.S. President and other individuals under USSS protection, such as a foreign head of state.

37.     SII was and is aware that many countries whose officials visit the United States, such as Turkey, are home to various hostile and radical non-state political actors, some of which are recognized as foreign terrorist organizations. As a result, SII would have relayed any advance information regarding an assassination threat on President

Erdogan. In such an instance, SII also would have disseminated information regarding tactics and techniques that a terror organization might deploy against President Erdogan. This information would have been shared with the foreign counterparts as well as with USSS and MPD.

### C.    First Amendment Considerations

38.    Secret Service agents are trained to distinguish between civil protests or acts of civil disturbance, and an actual attack on protectees. The Secret Service is well versed in the principle that civil protest by individuals who exercise their First Amendment rights to assembly and freedom of speech must be respected.

39.    It is a standard occurrence for protesters to assemble in relatively close proximity to a USSS protective event site or a USSS protectee. While the USSS frequently constructs protective perimeters, a lawful respect for individuals engaging in First Amendment activity is adhered to and never disregarded.

40.    In my experience, security personnel and officials visiting the United States from countries that do not respect free speech and assembly will often ask the Secret Service to prohibit any assembly in proximity to their protectee. This request is always denied pursuant to 18 U.S.C. § 112(d), a criminal statute that relates to the protection of foreign officials, but explicitly provides that it is not to be construed or applied in a manner that violates the First Amendment. Moreover, it is standard procedure for Secret Service agents to brief visiting head of state security details about civil protest and the impropriety of U.S. law enforcement arresting people for simple assembly, protest, and speech maligning a head of state.

### IV.    ANALYSIS OF THREATS AT SHERIDAN CIRCLE

41.    As a threshold matter, verbal altercations, acts of civil disturbance, or even

a series of fist-fights or the throwing of water bottles, do not constitute an imminent threat to a protectee and are not pre-attack indicators. Rather, pre-attack indicators that could be identified through intelligence reporting or surveillance include, but are not necessarily limited to:

- Subjects carrying cases capable of concealing long weapons (*i.e.* rifles);
- Bulges around the waist of subjects indicative of a concealed weapon;
- Excessive cell phone use prior to arrivals and departures;
- Coordinated movements of subjects in proximity to protected site; and
- Seizure of high ground terrain in proximity to protected site.

In my review of the video attached to Turkey's Motion to Dismiss, I did not witness any of the aforementioned pre-attack indicators at Sheridan Circle.

## A.   The Prospect of a Handgun Threat

42.    Herein I will address the concept raised by Michael White, whose declaration was submitted by Turkey, that there was a hand gun threat present at Sheridan Circle that posed a risk for President Erdogan. Def.'s Ex. 2, Declaration of Michael White ("White Decl.") at ¶ 35.

43.    The TSD and USSS would have been cognizant of the potential of a handgun threat at Sheridan Circle. Significant considerations when determining handgun effectiveness are line of sight to the target as well as the natural and man-made barriers that would obscure the view of the intended target.

44.    I visited the site under review and physically determined the various lines of sight that would have been necessary for the use of a handgun at Sheridan Circle in relation to President Erdogan's arrival point. As a result of my site review, it is my

assessment that no trained security agent would have had an objectively reasonable basis to believe that a handgun would have been an effective weapon at Sheridan Circle in relation to President Erdogan.

45.     I determined that the distance from the sidewalk bordering Sheridan Circle (on which protesters stood prior to President Erdogan's arrival) to the arrival point of his vehicle was approximately 130 feet.[3] *See* Pls.' Ex. 9. Moreover, the arrival point was higher in altitude than the location of the protesters and was significantly obscured by foliage and shrubs. *See* Pls.' Ex. 2, Exs. A and B; Def.'s Ex. 6, at File No. SC12 at 0:00-1:50.

46.     For purposes of comparison, 130 feet is well beyond the distance that a Secret Service agent qualifies (on a sterile pistol range) with his or her issued handgun. The combination of the distance involved as well as the obscured line of sight to the target is such that an "aimed" shot would have been nearly impossible to execute, which severely minimizes the threat of a handgun at the site under review.

47.     This opinion rests on my experience as a USSS firearms instructor for more than 20 years designated by the USSS as an "Expert" in marksmanship, my experience as a highly seasoned high threat security architect for numerous large scale events, and my significant experience on the elite CAT.

48.     Moreover, I saw no evidence on any video depicting the events at Sheridan Circle that objectively would have raised concerns to a trained security

---

[3] Conversely, Michael White states that he "understands" the distance between the protesters and the "sidewalk on the Residence side of Massachusetts Avenue" to be 50 feet. White Decl. at ¶ 35. It is unclear what it means for Mr. White to "understand" what a particular distance is. but in any event. the critical measurement is between the protesters' location and the arrival point. not the sidewalk.

professional that any individual (other than TSD and U.S. government personnel) had a handgun. I also saw no evidence that any security agent took the actions that would properly be taken in response to a handgun threat. Specifically, I did not observe protesters being stopped, detained, frisked, patted down, or questioned by the TSD, MPD or Secret Service (other than for one protester whom MPD handcuffed as a result of the melee). Given the absence of such actions, there is no reason to believe that any security agent on the scene believed there was a handgun threat from the protesters.

## B. The Prospect of an IED Threat

49.     Herein I will address the proposition raised by Michael White, that there was an IED threat present at Sheridan Circle that posed a threat to President Erdogan. White Decl. at ¶ 35. White's proposition is based on the fact that one protester carried a backpack and that the TSD "had to assume" the "backpack might contain an IED." *Id.* at ¶ 41.

50.     The fact that an individual is carrying a backpack is far from an adequate basis to determine that there is a legitimate IED threat, let alone a reason that agents would "ha[ve] to assume" the backpack contains an IED. Indeed, given the ubiquitous nature of backpacks in Washington, D.C. (and around the world), the notion that carrying a backpack or other bag while protesting constitutes any manner of pre-attack behavior, involving an IED or otherwise, which would necessitate some follow on from law enforcement, is simply meritless. Otherwise, every protester with a backpack would be stopped, detained, and frisked by law enforcement based simply on carrying a backpack, which obviously does not occur. For all of these reasons, the Secret Service does not consider a protester carrying a backpack as a pre-attack indicator.

51.     Consistent with this, on the video provided by counsel, I witnessed

15

4851-6098-7558:1

numerous civilians in closer proximity to the Turkish Chief of Mission Residence (CMR) than the protesters were. Certain of the civilians in closer proximity were carrying backpacks and other bags, but they did not draw any attention from the TSD. Def.'s Ex. 6, at File No. SC01 at 2:10-2:20; SC05 at 0:55-0:59; SC12 at 10:40-10:55. In fact, I observed several individuals not identified as protesters who were carrying purses or backpacks on the sidewalk closest to the CMR, within just a few feet of President Erdogan's arrival point. *Id.* The TSD did not detain, search, or even seem to notice these individuals. Notably, I saw no indication on the videos that any of the civilians on the sidewalk closest to the CMR, whether wearing bags or not, were screened by the TSD, even though they were in very close proximity to the Residence and President Erdogan's arrival point. *See* White Decl. at ¶ 35 (noting the lack of evidence that protesters had undergone screening, but omitting the lack of evidence that any civilians on the CMR side of the street had been screened).

52.     Further, it would have been impossible for someone standing where the protesters were located on the border of Sheridan Circle to throw a backpack more than 130 feet (through natural and man-made barriers) into the area where President Erdogan's vehicle was positioned upon arrival; it also would have been impossible or nearly impossible to throw it to the CMR. My assertions are based on my physical visit to the incident site, my observation of the distances involved, and my training and experience constructing security architecture for high threat sites. I saw no indication on the videos that any protester even attempted to move toward the arrival point, which would have required by-passing the TSD and U.S. security personnel, such that an IED could have been brought near the arrival point. *See* White Decl. at ¶ 41 (raising notion

that a protester could have detonated an IED "within feet of the arrival point."). The only backpacks that could have been thrown into the arrival point were those carried by the civilians on the CMR side of the street.

53.     Putting aside backpacks, I did not observe anything on the videos from Sheridan Circle that would have otherwise indicated an IED threat.

54.     I also observed from the videos that no protester was stopped, detained and frisked, or questioned by the TSD, MPD, or Secret Service about the contents of his or her backpack. Moreover, during and after the TSD's second attack on the protesters, TSD agents paid no attention to the backpack that supposedly posed a "significant concern." There is no evidence that the TSD searched or secured the backpack. Rather, the TSD simply attacked and beat the protester who had been carrying the backpack, despite the fact that the protester was no longer carrying the backpack when he was attacked. Def.'s Ex. 6, at File No. SC02 at 2:35-2:45 (protester is wearing a blue t-shirt in middle of screen).

55.     Given that no security personnel took any steps consistent with the belief that an IED threat was present, there is no reason to believe that any member of the TSD, MPD, or Secret Service actually had concerns about an IED threat.

## C.    Threat of Biochemical Weapons

56.     Herein I will address the proposition raised by Michael White, that the protesters could have had biochemical weapons that posed a threat to President Erdogan. White Decl. at ¶ 35. This proposition appears to be based on the fact that one protester sprayed water from a plastic water bottle on the street between Sheridan Circle and the CMR. *Id.* at ¶ 46.

57.     I saw no evidence to suggest that the small amount of liquid sprayed

17

raised legitimate concerns about biochemical weapons. First, the liquid was sprayed in the middle of the street, where it landed, and not at anyone in particular. Def.'s Ex. 6, at File No. SC02 at 1:16-1:18. Second, the individual who sprayed the liquid wore no protective clothing that would have shielded her from the effect of chemical agents and made no attempt to protect herself from the liquid. *Id.* Moreover, the protester walked directly into the area where the liquid had been sprayed immediately thereafter. *Id.* at 1:18-1:28.

58.     Consistent with this, I saw no indication that the TSD or other security agents treated any water bottles as a "suspicious package" or something that "might contain biochemical weapons," as asserted by Mr. White. *See* White Decl. at ¶ 46. I did not observe anyone, including the TSD, local law enforcement, or the Secret Service, react to the spraying of water as a potential threat.

59.     Finally, I note Mr. White's statement that the "Turkish Security Detail would have been trained to treat the dispersal of any liquid as a potential biochemical hazard." White Decl. at ¶ 46. In my experience, I have never seen the mere dispersal of liquid from a water bottle under these circumstances treated as a potential biochemical attack. In fact, just as security details do not treat every backpack as an IED threat, it certainly is not the case that a HAZMAT team is called whenever a protester disperses liquid from a water bottle or that such a protester is stopped, detained, and frisked by law enforcement based simply on spilling or splashing water. For all of these reasons, the Secret Service does not consider a protester dispersing liquid from a water bottle to be a pre-attack indicator, let alone an indicator of a biochemical attack (in obvious contrast to the scenario of an individual throwing a water bottle over the White House fence. in

18

which case, as Mr. White correctly notes, a HAZMAT team would respond). *See id.*

60.    In sum, if the TSD or other security personnel actually believed there to be threats from a handgun, an IED, or a chemical agent, it would have been utterly inexcusable for those agents not to act. Yet, no agent acted in a manner remotely consistent with the belief that such threats existed. In this context, I make the perhaps obvious point that, if an agent believed there were a threat from a gun, IED or chemical agent, there would be no security rationale at all for the agent to wait approximately ten minutes after the threat had supposedly manifested itself and then to run across a street to beat a large group of protesters, including many people who had nothing to do with the supposed threat. As such, the observable conduct of the TSD does not indicate in any manner that those agents believed that a handgun, IED, or chemical-agent threat existed.

## D.    Other Purported Threats

61.    In this section, I will address a number of other assertions made by Michael White regarding the conduct of protesters in Sheridan Circle that he opines reflected "pre-attack behaviors." White Decl. at ¶ 40. Specifically, White claims that protester Jalal Kheirabadi wore a backpack, acted consistently with a person surveilling President Erdogan's arrival point, who "tried to hit and kick his way through," "managed to get around the Turkish Security Detail," and was responsible for "starting the fight." *Id.* at ¶ 41, 43.

62.    I have already addressed that Kheirabadi's wearing a backpack was not a pre-attack behavior. Supra at ¶¶ 49-55. Beyond that, I did not observe any behavior by Kheirabadi on the video that indicates an attempt to surveil anything. Indeed, the portion of the video cited by Michael White does not even show Kheirabadi looking at the CMR, let alone trying to approach it. Def.'s Ex. 6, at File No. SC01 at 0:23-0:41. I saw no

evidence on the video that Kheirabadi kicked or hit his way past any members of the TSD. Rather, the video shows Kheirabadi being punched in the head repeatedly by pro-Turkey civilian Alpkenan Dereci[4] and then attacked by multiple TSD agents until an MPD officer faced the attackers and separated them from Kheirabadi. Def.'s Ex. 6, at File No. SC02 at 0:26-0:57.[5] Finally, the video evidence shows that Sinan Narin, a pro-Erdogan civilian, attempted to throw a right-handed punch at Kheirabadi before any other violence had been committed, thus "starting the fight." Def.'s Ex. 6, at File No. SC01 at 0:48-0:50. (Not that it would be of any significance as a general security matter if Kheirabadi or Narin threw the first punch).

## V.    ANALYSIS OF ACTIONS TAKEN AT SHERIDAN CIRCLE

### A.    MPD Efforts to Maintain Order at the Outer Perimeter

63.    After this initial attack on the protesters, the protesters were again moved to the sidewalk bordering Sheridan Circle by MPD officers, while the TSD and pro-Erdogan civilians were on the sidewalk in front of the CMR and in the street abutting that sidewalk. Def.'s Ex. 6, at File No. SC03. Based on my experience working in Washington, D.C. (in Protective Operations and Strategic Intelligence), it was standard practice for MPD to move the protesters across the street from the CMR to Sheridan Circle. This decision served two simultaneous functions: protect the protesters from the

---

[4] I have identified individuals other than Plaintiffs by reference to a government-created video attached to Turkey's Motion to Dismiss as Defendant's Exhibit 6, at File No. SC02. This video contains images and names of TSD agents and pro-Turkey civilians who engaged in violence.

[5] I note that Michael White asserts that Plaintiff Kasim Kurd hit pro-Turkey civilian Alpkenan Dereci with a bullhorn (White Decl. at ¶ 44), but omits to mention that this was in direct response to Dereci's delivering blows to Kheirabadi. Def.'s Ex. 6, at File No. SC02 at 0:21-0:27.

free movement of the general public, and protect the general public from the free movement of the protesters. MPD's decision to locate the protesters in the park at Sheridan Circle, across two lanes of traffic from the outer perimeter created by the TSD and local law enforcement, was sufficient to protect President Erdogan's arrival point. Staffing and enforcement of the outer perimeter is a standard function that the USSS asks MPD to perform during visits of protectees. In my experience, MPD is well trained to do so.

64.    From that point forward, the protesters remained on the sidewalk and in Sheridan Circle, and made no attempts to advance towards to the TSD or the arrival point.

65.    Contrarily, I observed multiple U.S. law enforcement officers attempting to keep the TSD and others in the pro-Erdogan crowd from advancing towards the protesters. Again and again, I heard MPD officers order the TSD and other Erdogan supporters back to their side of the street, saying:

- "Sir, don't cross this line. Just stay here." Def.'s Ex. 6, at File No. SC09 at 0:25-0:28.

- "You need to contain yourselves!" *Id.* at 0:54-0:57; 1:00-1:03; 1:10-1:13.

- "Stay back!" *Id.* at 0:49-0:51; 1:43-1:45; 2:42-2:49.

- "Don't cross the white line!" *Id.* at 2:51-2:53.

- "We need order right now." *Id.* at 3:39-3:42.

- "I need you to back up!" *Id.* at 3:47-3:50.

- "You are the head of security. You need to keep your guys back." *Id.* at 6:55-7:00.

66.    I observed U.S. officers attempting to physically restrain the TSD and

21

their agents from crossing the street toward the protesters, contrary to Michael White's assertion that no TSD agents confronted U.S. law enforcement. *See* White Decl. at ¶ 62. It is also telling that the majority of the MPD officers at Sheridan Circle were facing toward the TSD with their backs to the protesters, which is antithetical to the notion that the protesters were the aggressors. Def.'s Ex. 6, at File No. SC06 at 0:00-0:30. It is my expert opinion that the threat to "general order" was the TSD officials rather than those engaging in civil protest.

67.    It is my conclusion that significant police resources were needed to repel Turkish forces rather than protesters; thereby diluting the overall strength of available personnel required to maintain a secure environment and separation between the two groups. My conclusion is supported by experience in constructing numerous high threat site security events as well as my review of body cam footage wherein multiple MPD officers were attempting to stop Turkish agents from rushing across the street for the demonstrated purpose of assaulting and silencing protesters.

68.    It is also my conclusion that Turkish officials and agents, who asked MPD to remove the protesters, simultaneously acted as the primary causal factor for the melee and erosion of order. Moreover, it is my conclusion that the aggressive actions taken by the TSD escalated tensions at the event site with no effort to de-escalate the situation.

69.    In addition to the activity addressed above, the following observed statements[6] and actions of the TSD directly contradict that idea that the TSD's intent was to move the protesters further away from President Erdogan's arrival point for *security*

---

[6] Some of the statements were made in Turkish, for which I have been provided certified English translations, attached to the Opposition as Plaintiffs' Exhibit 6.

reasons:

    a. Members of the TSD urged protesters via statements and gestures to come *closer* to President Erdogan's arrival point, encouraging them to fight. Def.'s Ex. 6, at File No. SC06 0:05-0:12 (English Translation at Pls.' Ex. 6); Pls.' Ex. 2 ¶¶ 11-13 (interpreting gestures).

    b. Members of the TSD made vulgar and inflammatory statements, including:

- "I am going to stick [INDISCERNIBLE] in your ass. You fucking son of a bitch. I am going to fuck your mother." Def.'s Ex. 6, at File No. SC09 2:42-2:52 (English Translation at Pls.' Ex. 6).

- "Make those fuckers shut up! Shut them up!" Def.'s Ex. 6, at File No. SC09 6:55-6:58 (English Translation at Pls.' Ex. 6).

- "Tell him, I am going to fuck his mother. Do not come here. I am going to fuck your mom." Def.'s Ex. 6, at File No. SC09 0:39-0:49 (English Translation at Pls.' Ex. 6).

    c. The Turkish Ambassador responded to a U.S. law enforcement officer who told him, "they can protest," by stating, "here, they cannot." Def.'s Ex. 6, at File No. SC08 at 3:28.

    d. At another point, the Ambassador complained to a U.S. law enforcement officer that the protesters were "provocating [sic]," and said to the officer, "just tell them to move away, and they keep on insulting." Def.'s Ex. 6, at File No. SC08 at 5:35-5:50.

70.    It was a complete breakdown of professionalism and contrary to the goal of maintaining a secure environment for the TSD to hurl insults at and provoke the protesters. Indeed, it was absolutely antithetical to proper practices and completely inconsistent with the notion that the TSD believed the protesters were too *close* when

23

TSD agents encourage protesters to come *closer*, inviting them to cross the street toward the CMR to fight. This is further evidence of a blatant disregard for standard security measures and stands in contrast to any known professional law enforcement standard.

71.    In my expert opinion, MPD and USSS acted with discipline and restraint in their efforts to maintain order as well as continually providing necessary and appropriate protection to President Erdogan by establishing distance between the protesters and the arrival point; with the evidence being that no protester attempted to or actually breached the outer perimeter. Based on my review of the videos and my experience, significant efforts to de-escalate the situation at Sheridan Circle were demonstrated by MPD and the Secret Service.

**B.    Turkish Detail Decision Points**

72.    Michael White asserts that the protesters constituted a security threat because they were too close to President Erdogan's arrival point and thus had to be moved further away. White Decl. at ¶¶ 47-50. He states that when U.S. law enforcement officers were unwilling to secure the perimeter in this fashion, "[t]hat was the decision point for the Turkish Security Detail. They had no choice but to react." *Id.* at ¶ 50. This assertion is contradicted by the evidence cited above.

73.    Beyond that and with respect to decision points, the lead agent for the Turkish President bears ultimate responsibility to make appropriate decisions to ensure the safety of his protectee. It is my conclusion that if TSD leadership had deemed that there was an imminent threat to President Erdogan due to MPD's failure to move protesters further way, standard and effective security protocols (shared by all well-trained security details) would have been to move TSD personnel from the street abutting Sheridan Circle *toward* the CMR. In fact, well-established protocols would have been to

re-establish a "tighter" and "hardened" perimeter and decrease the distance between Turkish agents to form an elongated series of human shields to prevent any and all forms of penetration from protesters. Put differently, if the TSD had believed an attack was imminent against President Erdogan because of the proximity of protesters, standard protocols would have mandated that the bulk of their security officers "shrink" backwards *toward* the protectee and act to shield him while relocating him or holding him in his vehicle with the doors closed.

74.     However, the TSD did not act in that fashion. Rather, as described in detail below, TSD agents ran *away* both from the inner perimeter around President Erdogan and from the outer perimeter to attack protesters (who were outside the outer perimeter). I cannot overstate the extent to which the TSD's decision to pursue protesters located in Sheridan Circle, across the street from the CMR and away from the arrival point, contradicts standard security procedures for perimeter control and the premise that the TSD perceived a security threat from the protesters. Indeed, if there had been a legitimate security threat, the TSD's actions would have resulted in making the outer perimeter and inner perimeter more permeable and would have opened "holes" in the perimeters, rather than closing them, greatly increasing the protectee's vulnerability. Leaving the protectee to assault the protesters was a breach of care.

75.     In addition, when TSD agents breached the police line and ran at the protesters in Sheridan Circle, they did not attempt to engage in any law enforcement action, let alone action that would be consistent with a belief that protesters were too close to the CMR. The agents did not seek simply to move protesters further away from the CMR, which would be the most obvious action if they believed protesters were too

25

close. The TSD did not temporarily detain any individuals as would be appropriate if an individual refused a legitimate request to move. The TSD did not search anyone for weapons, such as through a "pat down." Rather, the TSD indiscriminately punched and kicked the protesters.

76.     For all of these reasons, it is my conclusion that the TSD did not act in a manner suggesting that the protesters posed a security threat. I also conclude that the TSD was not engaged in a legitimate, protocol driven, or acceptable law enforcement action.

### C.     Security Considerations Upon Protectee Arrival

77.     Before the TSD and Secret Service left the White House to bring President Erdogan to the CMR, agents would have been provided a situation report to indicate the level of threat at the arrival location. The practice of obtaining a real time situation report is standard practice prior to all USSS motorcade movements; primarily to ensure that USSS protectees are transiting and arriving in environments that are safe. The situation report would have been passed via USSS radio in real time. The situation report is generally provided several minutes prior to departure. It is highly likely that if the volatility level of the protest at Sheridan Circle was believed to represent an ongoing threat to the protectee, a "site agent" at Sheridan Circle would have contacted the "lead agent" (who would have been with President Erdogan) and advised him or her to hold the protectee on site until the arrival area was safe.

78.     There would have been no reason at all to bring President Erdogan to the CMR if TSD or USSS personnel thought there was any manner of legitimate threat there. Indeed, it would be an unforgivable dereliction of duty for any USSS or TSD security detail to voluntarily bring a protectee *to* the site of a threat. That President Erdogan was

26

brought to the CMR at the time when he arrived is therefore utterly inconsistent with the notion that the TSD or USSS believed there was any appreciable security risk based on the protest in Sheridan Circle.

79.     Moreover, it is standard protocol for USSS controlled motorcades to maintain an alternate route of travel to and from USSS controlled sites. It is also standard practice for USSS controlled motorcades to use secondary arrival points in the event of an emergency or some event of significance that would endanger the protectee if the primary arrival were used. I personally identified a potential secondary arrival point at the CMR, which was beyond any line of sight from Sheridan Circle. *See* Pls.' Ex. 10.

80.     Beyond the fact that President Erdogan was brought to the CMR in the first place, the fact that the USSS controlled motorcade, with all available real time threat data, did not deviate from the primary arrival point further evidences that neither the TSD nor any other security agents believed that there was an imminent threat to President Erdogan based on the Sheridan Circle protest.

81.     Also relevant here is the fact that the motorcade did not pass Sheridan Circle at all, instead travelling on 23rd Street NW, which was closed to traffic. This route significantly minimized any exposure and vulnerability associated with the protectee. The potential secondary arrival point could have also been accessed without requiring the motorcade to transit past Sheridan Circle.

### D.     Violent Actions of the Turkish Security Detail at Sheridan Circle

82.     In Michael White's declaration, he stated that he observed the TSD using defensive techniques and minimal use of force, consistent with standard operating procedure. White Decl. at ¶¶ 58-62. Specifically, he writes that he observed TSD agents taking the following sequence of actions: (i) raising their "hands with a motion to stop, as

27

when a police officer raises hands to signal a car to stop"; (ii) assuming defense postures "with hands positioned in front"; (iii) patting or touching a person's waist to determine if the person has weapons; (iv) reaching for a person's wrist to control the person; (v) using "flat hands, not closed fists" to "deflect any physical contact with the minimal use of force." *Id.* at ¶¶ 59-61.

83.     Suffice it to say that I did not observe any member of the TSD even remotely employ these tactics. Rather, I observed conduct that bears no relation to these techniques. Specifically, I observed the following actions by the TSD, among others:

- Hamza Yurteri, Mehmet Sarman, and an unknown TSD agent (Subject I),[7] all of whom left the perimeter, kicking Lusik Usoyan and Elif Genc, two young women who lay prone and defenseless on the edge of Sheridan Circle, with no attempt to control, detain or search them. Def.'s Ex. 6, at File No. SC02 at 2:46-2:56; SC02 at 3:18-3:20.

- Tugay Erkan, Ismail Ergunduz, Gokhan Yildirim and Subject I, all of whom left the perimeter, kicking Murat Yasa, an older man, in the body and head as he lay on the ground, with no attempt to control, detain or search him. Def.'s Ex. 6, at File No. SC02 at 2:58-3:10; SC02 at 3:18-3:20.

- Servet Erkan, who left the area immediately around President Erdogan's car at the command of a security agent who had just spoken to President Erdogan, attacking Abbas Azizi, an older man, with no attempt to control, detain or search him. Def.'s Ex. 6, at File No. SC02 at 5:20-5:26 (leaving area of car); Def.'s Ex. 6, at File No. SC02 at 6:20-6:34 (returning to area of car); Def.'s Ex. 6, at File No. SC02 at 2:50-2:55 (attacking Azizi after leaving area of car). Erkan also beat Jalal Kheirabadi after leaving the vehicle, with no attempt to control, detain or search him. Def.'s Ex. 6, at File No. SC02 at 5:51-5:56.

- Turgut Akar, an unknown TSD agent (Subject S), Ahmet Karabay, Ismail Ergunduz, Murat Sumercan, and Harrettin Eren, all of whom left the perimeter, attacked Mehmet Tankan even though he had moved farther from the CMR than the main group of protesters and was being watched by two MPD officers, with no attempt to control, detail or search him. Def.'s Ex. 6, at

---

[7] This individual has not been identified by name, but was designated as Subject I in the government-created video attached to Turkey's Motion to Dismiss as Defendant's Exhibit 6 at File No. SC02.

File No. SC02 at 3:25-3:50 (episode begins on right side of screen); Def.'s Ex. 6, at File No. SC12 at 7:35-7:45.

- Unknown member of TSD (Subject Q), who left the perimeter, punched one standing protester and kicked another standing protester, with no attempt to control, detain or search them. Def.'s Ex. 6, at File No. SC02 at 2:37.

- I also observed civilians Ahmet Dereci, Sinan Narin, Mahmut Ellialti, and Eyup Yildirim join TSD agents in kicking and punching protesters who had no means to defend themselves. Def.'s Ex. 6, at File No. SC02 at 2:59-3:10 (Dereci, Yildirim and others kick Murat Yasa); Def.'s Ex. 6, at File No. SC02 at 2:46-2:56 (Narin kicks Lucy Usoyan); Def.'s Ex. 6, at File No. SC02 at 2:50-2:55 (Ellialti kicks Elif Genc and Lucy Usoyan).

84.    For all of the reasons I have discussed, there was no security rationale for the TSD to cross the street and attack protesters in Sheridan Circle. To the contrary, if the TSD had believed that a threat to President Erdogan was imminent, they would not have crossed the street and assaulted protesters, but instead would have shrunken the zone of protection. Beyond that, even assuming that there had been some rationale to cross the street based on an actual perception of a threat, the TSD would have attempted to move or search the protesters to neutralize that threat, not beat them.

85.    In no instance did I observe any member of the TSD attempt to further any law enforcement objective (i.e. detention, control). I did not observe any control tactics or techniques being used by the TSD.

86.    Instead, I observed several TSD agents apply kicking techniques to the head and midsection of people who had been knocked down and were on the ground in positions of extreme vulnerability and who were offering no threat or level of resistance. Most of the protesters kicked were already on the ground in positions of vulnerability, and posed no threat to law enforcement and offered no resistance to the TSD. Thus, the TSD actions were inconsistent with any attempt to address a perceived threat, wherein the

4851-6098-7558\1

appropriate response would be to increase distance between themselves (coupled with the protectee), and those that posed the threat.

87.    In the United States, an officer may not legally apply a striking technique (kicking or punching) to a protester that is completely dissociated with any official law enforcement or protective function (e.g. lawful detention); especially when there is no resistance to the officer's actions and no threat of harm to the officer.

88.    Put differently, the use of force deployed by the TSD served no legitimate security purpose, given the totality of circumstances on the ground at the time, especially since there was no attempt to legitimately neutralize any supposed threat.

89.    My conclusions here are not controversial. Law enforcement officers are taught that it is impermissible and unlawful to strike another person without cause, reason, or without the justification of furthering a law enforcement action. In more succinct language, an officer may not indiscriminately punch or kick someone for no reason. In my 30-year career, I have instructed these principles to more than 1,000 individuals. In my experience, these principles are common practice across the law enforcement and security spectrum.

90.    Underscoring my conclusions, on numerous occasions, MPD officers physically restrained members of the TSD and pushed them back to the outer perimeter on the side of the street opposite Sheridan Circle. I also heard MPD officers refer to the TSD as "a bunch of fucking savages" that "are taught in their country that anyone that opposes their president, you're supposed to rip their fucking head off." Def.'s Ex. 6, at File No. SC12 at 3:21:35-3:21:55. Two additional MPD officers agreed that the TSD "head of security was the one that ran over" and started the second assault. Def.'s Ex. 6,

at File No. SC09 at 1:07:52-1:08:06. Another MPD officer echoed this, telling a Turkish agent, "If we press official charges, half of your security team would be going to jail." Def.'s Ex. 6, at File No. SC08 at 4:00-4:09. These comments and my other observations lead me to conclude that MPD deemed the Turkish officials as the aggressors during this event.

91.     Also underscoring the fact that TSD agents were not acting for legitimate security purposes, were the scenes of TSD agents ripping up placards and signs of the protesters after the primary attack concluded. Def.'s Ex. 6, at File No. SC08 at 1:23-1:58. Obviously, had those agents believed there was a real threat, they would have been staying vigilant to additional indicia of risk, rather than bothering to tear pieces of papers containing statements they found objectionable.

92.     If USSS agents acted as the TSD did that day, they would rightly be charged with using excessive force and subject to prosecution. As an example, in 1989, a New York based USSS agent was convicted of excessive use of force during an arrest after punching and kicking a man while transporting a USSS protectee on a motorcade route. *U.S. v. Schatzle*, 901 F.2d 252 (2d Cir. 1990).

93.     Thus, the members of the TSD who struck the protesters without provocation and without furthering any legal law enforcement action (i.e. detention, investigative stop, identification check) committed assault.

94.     Finally, in viewing the video, I found significant and highly unusual (if not unprecedented) deviations in security standard protocols wherein the TSD permitted pro-Erdogan supporters to intermingle with the outer perimeter security force. *E.g.,* Def.'s Ex. 6, at File No. SC09 at 0:01-7:15; SC12 at 0:01-7:10. Not only did the TSD perform no

31

evident screening of these individuals – who were far closer to the CMR than the protesters – it also allowed them to scream at the protesters (Def.'s Ex. 6, at File No. SC12 at 2:28-2:29, 5:20), escalating tensions at the site. The TSD also permitted the pro-Erdogan group to play music loudly, which is antithetical to the proposition that the TSD believed there to be a threat against President Erdogan; in such circumstances, security personnel would want to communicate with each other via earpiece and without having to contend with avoidable loud music. Def.'s Ex. 6, at File No. SC12 at 5:28-6:35. Finally, and most egregiously, the TSD was joined by the pro-Erdogan group in attacking the protesters. I can recall no instance in which the Secret Service or any other reputable security detail engaged in a supposed security operation in collaboration with untrained and unknown civilians, including civilians who later pled guilty to crimes in connection with the attacks. Put simply, the TSD would not have collaborated with unknown private citizens in this way had it believed there was a genuine threat.

**E.    Presidential Motorcade (Arrival and Departure Concerns)**

95.    Michael White contends, that President Erdogan "was in an extremely vulnerable position when he arrived at the Residence…." White Decl. at ¶ 51. And, it is true as a general matter that arrivals and departures of protectees represent an increased vulnerability because the protectees' vehicle is stationary; representing a fixed target.

96.    However, there is no basis to conclude that President Erdogan was under any specific threat in this instance or that the TSD or Secret Service believed he was. I observed several videos of the protectee arriving at the CMR. In the videos, I observed that, immediately upon arrival, the doors to President Erdogan's vehicle were opened, including the right rear door, by a TSD agent and an individual I believe was with the Secret Service. Def.'s Ex. 6, at File No. SC05 at 1:30-1:34. The doors remained open for

over a minute before President Erdogan exited the car through the right rear door. Def.'s Ex. 6, at File No. SC10 at 0:01-1:15. The doors of an armored vehicle offer a level of protection from numerous forms of attack. If the TSD had believed that an attack was imminent, they would not have held the vehicle's doors open, especially the right rear door where President Erdogan sat facing Sheridan Circle.

97.   Moreover, after slowly exiting the vehicle, President Erdogan stopped to watch the continuing melee in Sheridan Circle, first next to the vehicle and then from behind the vehicle. Def.'s Ex. 6, at File No. SC02 6:24-7:03. By walking slowly and stopping to watch the attack, President Erdogan took over 30 seconds to walk the very short distance from the vehicle to the CMR, even though the disturbance was ongoing. *Id.*; Def.'s Ex. 6, at File No. SC10 at 1:28-1:30 (people can be seen running in Sheridan Circle in the background of the video after President Erdogan has left the car).[8] If the TSD had believed an attack was imminent they would have taken some action to move President Erdogan more quickly to the CMR, but they did not.

98.   I note here Michael White's statement that President Erdogan was kept in the vehicle until the "threat" had been "neutralized." White Decl. at ¶ 56. Even assuming for the sake of argument there was a "threat," I do not believe this statement can be reconciled with the fact that President Erdogan left the vehicle while the assault continued and stopped to watch it. Rather, it appears clear that President Erdogan was kept in the vehicle when he arrived at the CMR and protesters could be heard chanting

---

[8] The Turkish Ambassador to the United States, Serdar Kilic, can also be seen walking around the outside of President Erdogan's vehicle. Def.'s Ex. 6, at File No. SC05 at 1:45-2:09. This further undercuts Turkey's argument that the TSD perceived a legitimate threat.

"baby killer, Erdogan" Def.'s Ex. 6, at File No. SC10 at 0:03-0:12, and exited the vehicle only after the TSD assault silenced the protesters.

99.     In sum, based on my training and experience, it is entirely inconsistent with the belief that an attack is imminent for security agents to (i) bring a protectee to the site of the supposed threat; (ii) use the primary rather than secondary arrival point; (iii) open the doors to the protectee's vehicle while the protectee sits in the vehicle for a protracted time; (iv) allow a protectee to walk slowly from the vehicle to a protected building; and (v) allow the protectee to stop and view a fight during the walk. Thus, it is my conclusion that the TSD did not believe that any legitimate threat was present and deemed the event as civil disturbance, unworthy of any immediate relocation or evacuation. In my opinion, the TSD's actions and treatment of the protesters in Sheridan Circle constituted an assault and was inconsistent with any law enforcement best practices that I am aware of in my 30-year career.

100.    Indeed, the belief that a terrorist action is imminent demands an immediate response by all personnel in the inner perimeter. Here, during the time President Erdogan was in the driveway of the CMR, his inner perimeter was shared by Secret Service agents and the TSD. Def.'s Ex. 6, at File No. SC05 at 1:30-1:50. The only notable action taken by anyone in the inner perimeter was by the TSD agents who ran *away* from President Erdogan to attack the protesters. Def.'s Ex. 6, at File No. SC02 at 5:13-5:28. This also is entirely contrary to the idea that the TSD believed a threat existed.

## VI.    ANALYSIS OF ACTIONS TAKEN OUTSIDE SHERIDAN CIRCLE

### A.    The TSD's Assault on Lacy MacAuley

101.    I observed a video provided by counsel that depicts a protester, identified as Lacy MacAuley, exercising her First Amendment rights on Massachusetts Avenue

34

hours after the initial attack at Sheridan Circle. After a video review of the incident, I offer the following opinions based on my experience and training.

102.     Three members of the TSD engaged Ms. MacAuley at approximately 18:17 hours, while she was standing on the sidewalk of Massachusetts Avenue. Def.'s Ex. 6, at File No. SC02 at 7:22-7:55. Ms. MacAuley was not in immediate proximity to the Turkish Embassy or CMR. The fact that Ms. MacAuley was engaged by the TSD two hours after the Sheridan Circle attack substantially minimizes any rational claim that she would have been an imminent or ongoing threat to President Erdogan at the time she was accosted by Turkish officers.

103.     The only legitimate reason to approach or stop Ms. MacAuley would be based on some articulable circumstance or behavior that characterized a threat to Erdogan. I saw no threat to Erdogan based on Ms. MacAuley's behavior. Ms. MacAuley was legally present and holding a protest sign, standing in the immediate proximity of local police officers. Def.'s Ex. 6, at File No. SC02 at 7:12-7:24. Ms. MacAuley had a backpack strapped to her person but the TSD demonstrated no discernable safety concern about the backpack or its concealed contents. Even if the TSD saw something not apparent from the video that they deemed suspicious, they could have approached her and asked for identification, or engaged in some dialogue to better understand the nature of her grievance, or performed a visual inspection (of outer garments) to see if any weapons were visible, all of which are common tactics of the USSS.

104.     It would have been well within Ms. MacAuley's right not answer any questions, as the TSD had no ability or authority to compel an answer and no articulable reason to detain, even for the purpose of turning over to United States officials. since

there was not a visible articulable threat.

105.    I heard Ms. MacAuley chant "No Erdogan, Democracy," which clearly upset the TSD. I observed a member of the TSD seize Ms. MacAuley's wrists, confiscate and destroy her sign, while another officer grabbed her face and smothered her mouth and then walked away, taking no law enforcement action. Def.'s Ex. 6, at File No. SC02 at 7:52-8:15. I heard Ms. MacAuley state "Give me my property!" after her sign was confiscated and destroyed.

106.    The actions taken by the TSD did not serve any investigative or authorized protective function. These tactics and actions were inconsistent with standard security protocols for protection and/or protocols for the investigation of threats because Ms. MacAuley was legally present and did not attempt to strike or in any way threaten the TSD, who had no justifiable reason to use force to seize or detain her.

107.    The TSD's decision to seize Ms. MacAuley's wrists, grab her face, smother her mouth and destroy her property was impermissible and served no function to protect President Erdogan.

108.    The TSD's use of force was unjustified and inconsistent with any security protocol recognized and practiced by the USSS. In my opinion, the TSD's actions and treatment of Ms. MacAuley constituted an assault and was inconsistent with any law enforcement best practices that I am aware of in my 30-year career.

**B.    The TSD's Confrontations with U.S. Law Enforcement**

109.    Beyond the physical confrontations between TSD agents and U.S. law enforcement personnel at Sheridan Circle discussed above, TSD agents directed aggressive conduct toward U.S. agents, including violence, according to documentation from the U.S. Department of State in and around the time of the Sheridan Circle incident.

4851-6098-7558\1

*See generally* Pls.' Ex. 3.

110.    According to this documentation, after the incident in Sheridan Circle, TSD agents initiated a number of violent altercations with U.S. personnel. *See* Pls.' Ex. 3 at F014 at 1-3, F013 at 3-4. Ultimately, U.S. law enforcement was forced to keep the gate to the Turkish embassy closed to prevent additional Turkish security personnel from exiting to fight. Def.'s Ex. 6, at File No. SC12 at 3:14:00-3:14:21 (U.S. personnel standing outside gate while Turkish personnel yell at them).[9]

111.    The documentation also addresses other incidents that have occurred in the United States in which Turkish agents have engaged in violence. For example, it describes an incident at the United Nations in which members of the security detail for the Turkish Foreign Minister assaulted U.S. law enforcement officers. Pls.' Ex. 3 at F010 at 2. It describes further an incident at the Brookings Institution in Washington, D.C. where U.S. police had to physically restrain Turkish agents from attacking protesters. *Id.*

112.    These are further examples of the TSD taking actions that not only serve no security-related purpose, but actually endanger the protectee by diverting the attention of agents from potential threats to deal with violence by other agents, and by creating an unnecessarily charged atmosphere.

## VII.    SUMMATION

113.    The Secret Service uses long-standing security protocols to keep protectees safe. These protocols permit the Secret Service to engage in thousands of "protective movements" on a global basis and without incident. Adherence to the protocols, even in the midst of terrorist threats and actions, keeps protectees safe.

---

[9] These incidents underscore the inaccuracy of Michael White's statement that no TSD agents confronted U.S. personnel. White Decl. at ¶ 62.

114.    The TSD suffered a deterioration of discipline and a failure to execute standard and effective security protocols. The TSD also significantly deviated from the generalized procedures of Secret Service hosted foreign head of state protective operations.    A degradation of professional composure and failure to abide by United States laws protecting free speech and legal protest appeared to fuel aggressive and unwarranted actions by the TSD.

115.    It is my conclusion that the pivotal points of escalation, which ignited tensions at Sheridan Circle were the impermissibly aggressive actions demonstrated by the TSD. It is clear that the primary causal factor contributing to the chaos at Sheridan Circle was when the TSD broke standard security protocols, crossing the street at Sheridan Circle for the sole purpose of attacking protesters.

116.    It is also clear that the TSD confiscated and destroyed the signs carried by the protesters, which served no possible law enforcement purpose.

117.    The statements of the TSD agents towards protesters were inflammatory, vulgar, threatening, intimidating, and only served to escalate the situation, in significant contrast to how a professional law enforcement organization would conduct enforcement or protective actions. If not for the professionalism, experience, and defensive actions of MPD and the Secret Service, civil disorder might have promulgated beyond Sheridan Circle.

118.    In my professional opinion and based on the totality of my experience, there was no terrorist threat and no credible indicators of an imminent attack. Moreover, there was no justification for the aggressive actions of the TSD toward individuals engaging in lawful First Amendment activity. Lastly, the actions of the TSD in and

around Sheridan Circle were disassociated and incongruent with the professional standards of an organization that bears responsibility for safeguarding the life of a foreign head of state.

Pursuant to 28 U.S.C. § 1746, I Dr. Ronald M. Layton, swear under the penalty of perjury under the laws of the United States of America that the foregoing factual statements are true and correct, and the opinions stated are provided to the best of my professional abilities, experience and beliefs.

Executed September 20, 2019.

_____
Dr. Ronald M. Layton

# EXHIBIT A

**Dr. Ronald M. Layton**

**Vice President- Sallie Mae, Inc.  Converged Security Operations**

**Contact: Ron.Layton@gmail.com   202 487-8568**

---

**Specialized understanding of executive and facilities protection as well as Cyber-Security/Information Technology and Investigative matters.  Extensive experience in four Presidential Administrations regarding matters of protection, technology, cyber and associated policies (Classified and Unclassified).**

**Present: Vice President – Sallie Mae, Inc. Converged Security Operations**

- Responsible for physical security and asset protection

- Responsible for all corporate investigations

- Responsible for the merger of physical and cyber systems

- Responsible for the construction of the corporate Intelligence Fusion Center

- Responsible for cyber incident management

### <u>United States Secret Service</u>

**2018: Deputy Assistant Director, Office of Protective Operations**

- Direct oversight for the protection all visiting Foreign Heads of State

- Direct oversight of all former Presidential Protective Divisions

- Direct oversight for the protection of all Major Events in the United States determined to be a National Special Security Events (i.e. Republican National Convention, Democratic National Convention, United Nations General Assembly, The State of the Union Address, The G20)

**2017 to 2018: Deputy Assistant Director, Office of Strategic Intelligence and Information**

- Direct oversight of all agency protective intelligence matters regarding the President

- Direct oversight of all agency threat assessments

- Direct oversight of the Secret Service behavioral analysis program

- Direct oversight of the Secret Service counter surveillance activities

- Deputy Key Intelligence Officer (DKIO) for the Secret Service and key liaison to the Intelligence Community

- Author of Ph.D. Dissertation on Law Enforcement behavioral analysis assessment (Published)

- Senior Executive Service (SES) member


**2014 – 2017: Special Agent in Charge,  The White House Technical Liaison Section:**

- Responsible for the day-to-day and long-term strategy for information resources and information systems for the President and the Executive Office of the President.
- Senior representative to the White House Senior Staff- Direct oversight of: information technology, communications, cyber/network architecture and protective/countermeasure technologies that ensure the safety of the President, First Family and White House Complex. *Strong emphasis on building a culture of Customer Service and Responsiveness.*
- Conduct monthly briefings to White House Senior Staff (2 levels below the President) on sensitive matters regarding protective and countermeasure technology pertaining to the safety and security of the President, the White House Complex and worldwide Presidential Travel.
- Represent the Secret Service Director to White House Senior Officials for the review of all technological matters.
- Introduce innovative technology to assist in the safety and security of the White House
- Chief architect-Virtual Reality program

**Executive Agent to the Presidential Information Technology Council (PITC)**:

- Work in partnership with senior mission partners at the White House for the purpose of streamlining all technological service (i.e. email, comms, video, wireless, help-desk, incident response) across the entire White House Complex as well as for Presidential travel.   Partners include the Director's of: White House Information Technology, White House Military Office, White House Communication Agency, Office of Administration, Chief Information Security Officer and select members of the Intelligence Community (IC).
- Strong emphasis on the development of relationships with the Intelligence Community (IC) as well as a keen understanding of IC technological assets.
- Research foreign and domestic technologies and technological capabilities that threaten the President and the safe operating condition of the White House.
- Develop relationships with CEO/CTO's of private sector technology firms.

**2012 to 2014:  Deputy Chief Information Officer** – **U.S. Secret Service**

- Responsible for oversight, governance, strategic planning, and policy for the USSS Information Technology infrastructure across 136 Offices, worldwide encompassing a 7 million dollar budget.
- Responsible for the alignment of technology to mission.
- Provided decision points and counsel to USSS senior leadership on all Information Technology matters, conducted major program and budgetary reviews, collaborated and coordinated with all aspects of the-DHS OCIO components.
- Assisted in the coordination, strategy, and selection of all major Information Technology acquisitions within the USSS.

- Developed strong partnership with the USSS Chief Information Security Officer.

**2010 to 2012: Resident Agent in Charge**, Charleston, West Virginia.
- Responsible for oversight, management and direction for the USSS investigative and protective missions statewide.
- Developed and expanded partnerships with state and local government officials throughout West Virginia to include 20 domestic Secretaries of State on cyber crimes.
- Initiated and fostered collaboration and a community partnership between West Virginia's University System and the USSS on cyber and digital forensics training.
- Promoted strong relationships with the Pittsburgh Electronic Crimes Task Force and the Carnegie Mellon University Computer Emergency Readiness Team (CERT-CC).

**2008 to 2010: Counter Assault Team Supervisor, Special Operations Division**
- Chief tactical planner and security architect for the: Democratic National Convention, Republican National Convention, G20, and The Visit of the Pope to the United States.
- Operational assignments with the President: numerous domestic trips and foreign countries to include war zone trips to Iraq and Afghanistan.  Conducted numerous assignments (training and liaison) with Joint Special Operations Command (JSOC) elements (US Army Delta Force, US Navy Seals, and US Army Rangers) domestically and internationally for multiple major events.

**2007 to 2008: Program Director – Electronic Crimes Task Force (ECTF)**
- Responsible for the management of worldwide transnational cyber crime investigations.
- Responsible for the nationwide management, policy development and interagency liaison for the 17 Electronic Crimes Task Force(s).
- Closely coordinated with the DOJ and the DHS to facilitate and ensure agency cooperation and collaboration on significant criminal enforcement matters as well as cyber/forensic training.
- Worked closely with the Carnegie Mellon University's USSS resident affiliate on significant cyber research projects.

**2007: USSS Beijing, China Delegation Representative**
- Served as the USSS representative in a delegation including DOJ/Computer Crimes and Intellectual Property Section (CCIPS) to Beijing to participate in talks with high-level Chinese Government Officials regarding cyber crime enforcement and U.S. cyber policy matters.

**2007: USSS Seoul, Korea Delegation Representative**
- Served as the USSS representative in a delegation to Seoul to present cyber infrastructure protection methods to high-level members of the Asian Pacific Economic Council (APEC).

**2007**: **USSS's Vice President's Sensitive Circumstance Cyber Briefer**
- USSS briefer to Vice President Cheney and senior staff regarding highly sensitive cyber intelligence matters.  Introduced to VP Cheney as the Secret Service leading authority on cyber matters.

**2005 to 2007: Deputy Director of DHS' National Cyber Security Division**
- Responsible for leading major international cyber investigations across multiple Federal agencies.
- Protected federal networks from foreign threat actors.
- Major emphasis on bridging cultural gaps between Law Enforcement and Intelligence.
- Led team members from the NSA, CIA, FBI, and ICE.
- Authored Concept of Operations for the integration of Law Enforcement and Intelligence
- Successfully integrated members of the U.S. Computer Emergency Readiness Team.

- Managed 2.5 million dollar budget and a division of 168 employees.
- Assisted with the drafting of the National Response Plan's (NRP) Cyber Annex.

**1999 to 2004: Presidential Protective Division (PPD)**
- Responsible for the safety of the President.
- Performed numerous security preparations for Presidential Travel, domestic and foreign trips.
- Worked numerous protection assignments traveling with the President.

**1992 to 1999: Philadelphia Field Office, USSS**
- Worked investigations within the criminal jurisdiction of the Secret Service (Counterfeiting, Money Laundering, Bank Fraud, Presidential Threat cases)
- Major Case Agent in the prevention of a terrorist event (Joint Terrorism Task Force Member).

**1990 to 1992: Landis and Gyr Powers, Inc**
- Electrical Engineer, designed and wrote software for supervisory control and data acquisition systems for large automation and controls applications

**1989 to 1990: University of Pittsburgh, Adjunct Instructor of Physics and Mathematics (Upward Bound program)**

**Awards/Honors:**
- 2019: USA Karate Federation, Hall of Fame Inductee
- 2018: Commencement Speaker-Montana Technological University
- 2018: Montana Technological University Athletic Hall of Fame Inductee
- 2018: Distinguished Alumni Award, Montana Technological University
- 2017 George E. Anderson Memorial Award (Contributions to Martial Arts in the United States)
- 2015: Police Survival and Defense Institute Hall of Fame Inductee.
- 2013: Charleston City Police Service Award.
- US Secret Service Firearms Instructor and Expert Marksman Award Winner
- Presidential Distinguished Service Award – Presented by President George W. Bush for actions on September 11th, 2001.
- Numerous intra-agency recognition awards over 26 years of service to the United States.

**Media:**

- **https://player.fm/series/standing-post/episode-001-welcome-to-standing-post-mr-ronald-layton**

- **http://www.businessofgovernment.org/sites/default/files/audio/ron_layton_abcd.mp3**

- **http://www.fedtechmagazine.com/article/2016/07/secret-service-white-house-tech-liaison-ron-layton-aims-be-team-player**

- **https://federalnewsradio.com/in-depth/2013/11/in-depth-show-blog-november-1-2013/**

- **http://www.eweek.com/security/intelligence-experts-say-cyber-thieves-nation-state-hackers-teaming-up**

- **https://www.sdxcentral.com/articles/news/top-cyber-cops-give-security-tips-preventing-attacks/2017/09/**

- **http://www.itweb.co.za/index.php?option=com_content&view=article&id=165232**

- **FedTech Magazine- Summer 2016**

**Guest Lecture: Leadership and Technology**

- The Naval Post Graduate School (NPS)
- The Johns Hopkins University
- The George Washington University
- The University of Maryland
- West Virginia University
- Marshall University
- West Virginia State University
- Ohio Christian University

**Education:**
- B.S. Systems Control Engineering – 1989 Montana Tech
- M.B.A. – Central Pacific University-2001
- Ph.D. – Electrical Engineering -2003 Central Pacific University
  - Dissertation focus – Supervisory Control and Data Acquisition Systems.
- M.S. – Management- The Johns Hopkins University - 2007
- Ph.D. – Business Administration – Northcentral University 2016
  - Dissertation focus – Social Media Technology and precursors to radicalization.
- United States Senior Executive Service (SES) program graduate and member - 2015

*2005-Present: Authored more than 100 academic and professional papers on cyber crime, infrastructure protection and terrorism. Published in the Center for International Security Policy for expertise in Infrastructure Protection