**PUBLIC REDACTED VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Kurd, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| ) | Civil Action No.:  1:18-cv-1117-CKK |
| v. ) | |
| ) | |
| The Republic of Turkey, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
DEFAULT JUDGEMENT**

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ............................................................................................. 1

II. INTRODUCTION ............................................................................................................... 1

III. BACKGROUND ............................................................................................................... 3

      A.     Procedural History ................................................................................................... 3

               1.     U.S. Government Briefs ................................................................................ 5

      B.     Facts ........................................................................................................................ 5

               1.     The attack at Sheridan Circle ....................................................................... 5

               2.     The social, political, and historical background ......................................... 12

IV. LEGAL STANDARD ....................................................................................................... 16

V. ARGUMENT ..................................................................................................................... 18

      A.     Entry of Default on Liability is Appropriate Under Rule 55(b)(2) ...................... 18

      B.     The evidence demonstrates Plaintiffs' right to relief ........................................... 20

               1.     Turkey's agents assaulted each Plaintiff (Count I) ................................... 20

               2.     Turkey's agents battered Plaintiffs Arthur, Arya, Azizi, Borazan, Jane Doe I, Jane Doe II, Jane Doe III, Genc, Kheirabadi, Özgen, Tankan, and Yasa (Count II) ..................................................................... 24

               3.     Turkey's agents falsely imprisoned Plaintiff Borazan (Count III) .......... 27

               4.     Turkey's agents intentionally inflicted emotional distress upon Plaintiffs Kurd, Arya, Azizi, Borazan, C.A., Jane Doe II, Jane Doe III, Genc, Kheirabadi, Tankan, and Yasa (Count IV) .............................. 28

               5.     Turkey's agents committed bias-related crimes against each Plaintiff (Count V) ..................................................................................... 32

               6.     Plaintiffs attackers were Turkey's officials or employees acting within the scope of their employment ........................................................ 40

VI. CONCLUSION .................................................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aboye v. United States*,
121 A.3d 1245 (D.C. 2015) ..............................................................32, 33, 34

*Alexander v. Newman*,
345 F. Supp. 2d 876 (W.D. Tenn. 2004)..............................................................30

*Belkin v. Islamic Republic of Iran*,
667 F. Supp. 2d 8 (D.D.C. 2009) ..............................................................39

*Blair v. District of Columbia*,
190 A.3d 212 (D.C. 2018) ..............................................................41

*Blais v. Islamic Republic of Iran*,
459 F. Supp. 2d 40 (D.D.C. 2006) ..............................................................39

*Brown v. Bettinger*,
2019 WL 8892623 (S.D. Fla. 2019) ..............................................................30, 42

*Campuzano v. Islamic Republic of Iran*,
281 F. Supp. 2d 258 (D.D.C. 2003)..............................................................17

*Clarke v. District of Columbia*,
311 A.2d 508 (D.C. 1973) ..............................................................27

*Collier v. District of Columbia*,
46 F. Supp. 3d 6 (D.D.C. 2014) ..............................................................24

*Council on Am. Islamic Relations v. Ballenger*,
444 F.3d 659 (D.D.C. 2006) ..............................................................42

*Dammarell v. Islamic Republic of Iran*,
370 F. Supp. 2d 218 (D.D.C. 2005) ..............................................................39

*Daniels v. District of Columbia*,
894 F. Supp. 2d 61 (D.D.C. 2012) ..............................................................24

*Dingle v. District of Columbia*,
571 F. Supp. 2d 87 (D.D.C. 2008) ..............................................................21

iii

Athorities upon which we chiefly rely are marked with asterisks

*District of Columbia v. Bamidele*,
    103 A.3d 516 (D.C. 2014) ..................................................................................41

*Djourabchi v. Self*,
    240 F.R.D. 5 (D.D.C. 2006)...............................................................................38

*Doe v. Exxon Mobil Corp.*,
    573 F. Supp.2d 16 (D.D.C. 2008) ...............................................................41, 42

*Est. of Heiser v. Islamic Republic of Iran*,
    659 F. Supp. 2d 20 (D.D.C. 2009) ....................................................................30

*Fain v. Islamic Republic of Iran*,
    856 F. Supp. 2d 109 (D.D.C. 2012) ..................................................................24

*Faniel v. Chesapeake and Potomac Telephone Co. of Maryland*,
    404 A.2d 147 (D.C. 1979) .................................................................................27

*Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*,
    915 F. Supp. 2d 124 (D.D.C. 2013) ..................................................................16

*Gatling v. Jubilee Hous., Inc.*,
    2022 WL 227070 (D.D.C. 2022) .......................................................................38

*GSS Grp. Ltd v. Nat'l Port Auth.*,
    680 F.3d 805 (D.C. Cir. 2012)...........................................................................18

*H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*,
    432 F.2d 689 (D.C. Cir. 1970)...........................................................................19

*Han Kim v. Democratic People's Republic of Korea*,
    774 F.3d 1044 (D.C. Cir. 2014).........................................................................17

*Harbury v. Hayden*,
    522 F.3d 413 (D.C. Cir. 2008).....................................................................41, 42

*Hicks v. Office of the Sergeant at Arms for the U.S. Senate*,
    873 F. Supp. 2d 258 (D.D.C. 2012) .............................................................41, 42

*Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal &
    Glass, LLC*,
    635 F. Supp. 2d 21 (D.D.C. 2009) ...............................................................16, 19

*Jenkins v. District of Columbia.*,
    223 A.3d 884 (D.C. 2020) .................................................................................21

iv

Athorities upon which we chiefly rely are marked with asterisks

*Jiggetts v. Cipullo*,
    285 F. Supp. 3d 156 (D.D.C. 2018) ................................................................38

*Johnson v. BAE Sys., Inc.*,
    106 F. Supp. 3d 179 (D.D.C. 2015) ................................................................28

*Johnson v. Bollinger*,
    356 S.E.2d 378 (N.C. Ct. App. 1987) .............................................................21

*Johnson v. City of Shelby*,
    574 U.S. 10 (2014) ..........................................................................................37

*Johnson v. Weinberg*,
    434 A.2d 404 (D.C. 1981) ..............................................................................42

*Konah v. District of Columbia*,
    815 F. Supp. 2d 61 (D.D.C. 2011) .............................................................30, 31

*Kotsch v. D.C.*,
    924 A.2d 1040 (D.C. 2007) ........................................................................30, 31

*Kurd v. Republic of Turkey ("Kurd I")*,
    374 F. Supp. 3d 37 (D.D.C. 2019) ......................................................... *passim*

*Kurd v. Republic of Turkey ("Kurd II")*,
    438 F. Supp. 3d 69 (D.D.C. 2020) ......................................................... *passim*

*Lucas v. United States*,
    240 A.3d 328 (D.C. 2020) ..........................................................................33, 36

*Lyon v. Carey*,
    533 F.2d 649 (D.C. Cir. 1976) ...................................................................41, 42

*Maalouf v. Islamic Republic of Iran*,
    514 F. Supp. 3d 280 (D.D.C. 2021) ...............................................................39

*Marshall v. District of Columbia*,
    391 A.2d 1374 (D.C. 1978) ........................................................................27, 28

*McKnight v. D.C.*,
    412 F. Supp. 2d 127 (D.D.C. 2006) ...............................................................29

*Mendonca v. City of Providence*,
    170 F. Supp. 3d 290 (D.R.I. 2016) ............................................................21, 23

Athorities upon which we chiefly rely are marked with asterisks

*Miango v. Democratic Republic of Congo*,
288 F. Supp. 3d 117 (D.D.C. 2018) ........................................................................16, 42

*NAACP Legal Def. & Educ. Fund, Inc. v. Wilkinson*,
2021 WL 723993 (D.D.C. 2021) .................................................................................39

*Newmyer v. Sidwell Friends Sch.*,
128 A.3d 1023 (D.C. 2015) .........................................................................................30

*Owens v. Republic of Sudan*,
864 F.3d 751 (D.C. Cir. 2017) ...............................................................................16, 17

*Prevatt v. Islamic Republic of Iran*,
421 F. Supp. 2d 152 (D.D.C. 2006) ............................................................................39

*Raess v. Doescher*,
883 N.E.2d 790 (Ind. 2008) ....................................................................................21, 23

*Richardson v. United States*,
193 F.3d 545 (D.C. Cir. 1999) ....................................................................................37

*Rogers v. Loews L'Enfant Plaza Hotel*,
526 F. Supp. 523 (D.D.C. 1981) .................................................................................24

*Shepherd v. United States*,
905 A.2d 260 (D.C. 2006) ......................................................................................33, 36

*Sherrod v. McHugh*,
249 F. Supp. 3d 85 (D.D.C. 2017) ..............................................................................38

*Shoham v. Islamic Republic of Iran*,
922 F. Supp. 2d 44 (D.D.C. 2013) ..............................................................................39

*Smith v. District of Columbia*,
399 A.2d 213 (D.C. 1979) ...........................................................................................27

*Steele v. Meyer*,
964 F. Supp. 2d 9 (D.D.C. 2013) ................................................................................41

*Strange v. Islamic Republic of Iran*,
2016 WL 10770678 (D.D.C. 2016) .........................................................................39, 40

*Tocker v. Great Atlantic & Pacific Tea Co.*,
190 A.2d 822 (D.C. 1963) ......................................................................................26, 27

Athorities upon which we chiefly rely are marked with asterisks

*United States v. Grider*,
   2022 WL 17829149 (D.D.C. 2022) .................................................................22

*\*Usoyan v. Republic of Turkey*,
   6 F.4th 31 (D.C. Cir. 2021) ................................................... *passim*

*Waldon v. Covington*,
   415 A.2d 1070 (D.C. 1980) .................................................................31

**Statutes**

28 U.S.C. § 1330 .................................................................................18

28 U.S.C. § 1605 ...................................................................................3

28 U.S.C. § 1606 ...................................................................................2

28 U.S.C. § 1608 ..........................................................................*passim*

D.C.Code § 22–3701 ...........................................................................32

D.C. Code § 22-3704 ...........................................................................32

**Other Authorities**

Fed. R. Civ. P. 5 ..................................................................................18

Fed. R. Civ. P. 12 .............................................................................4, 18

Fed. R. Civ. P. 15 ...........................................................................37, 38

Fed. R. Civ. P 26 ..................................................................................4

Fed. R. Civ. P. 55 ..............................................................1, 16, 18, 20

U.S. Dep't of State, *Report on Human Rights Practices: Turkey 2016* (2017)............................12

U.S. Dep't of State, *Report on Human Rights Practices: Turkey 2017* (2018)............................12

Restatement (Second) of Torts § 433B (3) (Am. Law Inst. 1965) ...............................23

Athorities upon which we chiefly rely are marked with asterisks

## I.  PRELIMINARY STATEMENT

The D.C. Circuit, affirming this Court, held that the Republic of Turkey's claim to sovereign immunity for its agents' attack on peaceful protestors at Sheridan Circle on May 16, 2017, "fails" and that Turkey is not entitled to immunity for the attack. *Usoyan v. Republic of Turkey*, 6 F.4th 31, 28-47 (D.C. Cir. 2021). After the Supreme Court denied Turkey's petition for certiorari, Turkey abandoned its defense of this lawsuit. *See* Dkt. 170, Affidavit for Default; Dkt.173, Clerk's Entry of Default. Accordingly, pursuant to Rule 55(b)(2) and 28 U.S.C. § 1608(e), Plaintiffs now move for default judgment on liability against the Republic of Turkey.[1]

## II.  INTRODUCTION

This case arises out of the May 16, 2017, attack by President Erdogan's security detail on a small handful of protestors exercising their First Amendment right to criticize President Erdogan's history of human rights abuses, call for the release of political prisoners being held by Turkey, and advocate for the rights of the Kurds, an ethnic minority in that country. The Turkish security detail beat, kicked, punched, and bludgeoned United States citizens, local residents, and visitors to Washington, D.C., to prevent them from expressing their political beliefs.

U.S. officials called for the perpetrators to be held responsible, describing the attack as an assault on American values and on American sovereignty. The House of Representatives unanimously passed a resolution condemning the attack. The State Department formally communicated concerns that "[v]iolence is never an appropriate response to free speech" to Turkey "in the strongest possible terms." Ex. 81, U.S. Dept. of State, Press Statement (May 17, 2017).

---

[1] Consistent with Plaintiffs' proposal and the Court's order setting the deadline for this motion, the present motion addresses only Turkey's liability. *See* Minute Order of April 12, 2023; Dkt. 183, Status Report. Plaintiffs will present their damages evidence separately.

**PUBLIC REDACTED VERSION**

In order to evaluate Turkey's assertion of immunity, this Court reviewed an "abundance of video evidence" "from multiple camera angles," as well as other evidence, and found that the Turkish security detail "launched an attack" on the Plaintiffs, who were standing on the Sheridan Circle sidewalk, a public park, where U.S. law enforcement directed them to stand. *Kurd v. Republic of Turkey ("Kurd II")*, 438 F. Supp. 3d 69, 77 (D.D.C. 2020). The Plaintiffs included a seven-year-old girl with her father, a mother pushing her four-year-old in a stroller, local small-business owners, employees of government contractors and senior citizens. This Court found that the Turkish security detail "rushed forward and broke through the United States law enforcement line which had been separating the two groups." *Id.* The Court further found that none of the protesters rushed forward. Rather, some fell to the ground and others attempted to run away. *Id*. The Turkish security agents punched and kicked the protesters who were lying prone on the ground and chased those who fled, violently attacking them. *Id*. at 78. The agents continued striking those protesters who lost consciousness, and, in the case of one Plaintiff, who suffered seizures. The agents also grabbed and ripped up the Plaintiffs' signs, which had called for, among other things, "Peace in Kurdistan." The Plaintiffs were left bloodied and disoriented, suffering from concussions, lost teeth, and other serious injuries.

Because Turkey is not entitled to immunity, under 28 U.S.C. § 1606, Turkey is "liable in the same manner and to the same extent as a private individual under like circumstances." Because Plaintiffs have ample evidence in support of their claims of assault, battery, hate crimes, intentional infliction of emotional distress and false imprisonment, and Turkey has abandoned its defense of this lawsuit, default judgment in favor of Plaintiffs is appropriate.

### III.  <u>BACKGROUND</u>

**A.    Procedural History**

Plaintiffs filed this action on May 10, 2018. Dkt. 1, Complaint. Turkey filed a motion to

dismiss on sovereign immunity grounds, Dkt. 90, which the Court denied on February 6, 2020.

In a "fact-specific decision," the Court concluded, among other things, that Turkey's agents did

not use force to protect President Erdogan, but as part of an objectively unjustifiable attack. *Kurd*

*II*, 438 F. Supp. 3d at 87-89.

Turkey filed an interlocutory appeal. In connection with that appeal, the D.C. Circuit

asked the United States to file a brief *amicus curiae* addressing the views of the government on

immunity-related issues. Per Curiam Order, *Kurd v. Republic of Turkey*, (D.C. Cir. 2021) (No.

20-7019), Dkt. 1881740. On March 9, 2021, the government filed its brief. In the government's

view, while foreign security agents have authority to use force as necessary for protective

purposes, any use of force for other purposes subjects a foreign sovereign to suit under the

Foreign Sovereign Immunities Act's noncommercial tort exception, 28 U.S.C. § 1605(a)(5). Br.

for the United States as Amicus Curiae in Support of Affirmance at 1, *Kurd v. Republic of*

*Turkey*, 6 F.4th 31 (D.C. Cir. 2021) (No. 20-7019). The government also agreed with this Court's

evaluation of the evidence and the Court's conclusion "that Turkey is not immune from these

suits." *Id.* at 2.

On July 27, 2021, the D.C. Circuit unanimously affirmed the Court's denial of Turkey's

motion to dismiss, finding that, "[i]n a 'fact-specific decision,' the district court concluded that

Turkey's actions were not covered by the [discretionary function] exception…We agree."

*Usoyan*, 6 F.4th at 45-46.

On September 27, 2021, Turkey filed a petition for *en banc* review. Petition, *Kurd v.*

*Republic of Turkey*, 6 F.4th 31(D.C. Cir. 2021) (No. 20-7019), Dkt. 1915800. With no judge

even requesting a vote, the D.C. Circuit denied Turkey's petition on October 15, 2021. Per

Curiam Order, *Kurd v. Republic of Turkey*, 6 F.4th 31 (D.C. Cir. 2021) (No. 20-7019), Dkt.

1918390. The D.C. Circuit issued its mandate on October 25, 2021. Dkt. 138.

Turkey petitioned for a writ of certiorari. *See* Petition, *Republic of Turkey v. Usoyan*, 143

S.Ct. 395 (2021) (No. 21-1013). On date April 18, 2022, the Supreme Court invited the Solicitor

General to express the views of the United States. The United States filed a brief as amicus

curiea, recommending that certiorari be denied, explaining that "the court of appeals correctly

held that petitioner is not immune from these suits."  Br. for the United States as Amicus Curiae

Supporting Respondents at 8-7, *Republic of Turkey v. Usoyan*, 143 S. Ct. 395 (2022) (No. 21-

1013). On October 31, 2022, the Supreme Court denied Turkey's petition *See Republic of Turkey*

*v. Usoyan*, 143 S. Ct. 395 (2022).

Pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), Turkey was required to file an

answer within 14 days of the issuance of the Mandate, *i.e.,* by November 8, 2021. Turkey did not

file an answer. Rather, more than two months later, it applied for a stay. Dkt. 139, Mot. to Stay.

The Court denied this motion on September 21, 2022, ordering the parties to meet and confer

under Rule 26(f) by October 21, 2022. Dkt. 157-158, Mem. Op. Counsel for Turkey declined to

meet and confer and declined to participate in discovery. *See* Dkt. 170 at ¶ 6.

On October 21, 2022, counsel for Turkey sought to withdraw, based on Turkey's reported

refusal to participate in discovery. Dkt. 164, Mot. to Withdraw as Attorney. Several days later,

Turkey submitted a letter to the Court, stating that in fact it would not participate in discovery.

Dkt. 165, Notice. As a result, on November 9, 2022, Plaintiffs filed an Affidavit in Support of

Default. Dkt. 170. On November 22, 2022, the Clerk of the Court entered a default. Dkt. 173.

1.    U.S. Government Briefs

As noted above, the United States filed two briefs, one in the Court of Appeals and one at the Supreme Court, both agreeing with this Court that Turkey was not entitled to immunity. *Supra* pp. 3-4.  The United States informed the Supreme Court that the facts of this case "establish that Turkish security personnel used force in a manner outside any reasonable conception of their protective function" and that "[b]ecause the Turkish agents' use of force was not protective in character, the agents were not exercising legally protected discretion."  Br. for the United States as Amicus Curiae Supporting Respondents at 15-16, *Republic of Turkey v. Usoyan*, 143 S. Ct. 395 (2022) (No. 21-1013). The United States concluded that while it had an interest in protecting diplomats and foreign leaders from physical attack, "the United States does not have the same reciprocal interests in maintaining a foreign state's immunity for the use of force by security officials in the United States targeting those who do not pose a physical threat to the protected foreign officials."  *Id.* at 20.  The United States recommended this Court's decision be affirmed and that Turkey's petition for certiorari be denied.  *Supra* pp. 3-4.

**B.    Facts**

1.    The attack at Sheridan Circle

This Court set out the facts in detail in its opinion of February 20, 2020. *See Kurd II*, 438 F. Supp. 3d at 76-77. The Court noted that it was "aided by the abundance of video evidence filed as exhibits by both parties" and that as a result "the Court was able to view the events at issue from multiple camera angles." *Id.* at 75. Most significantly, this Court found:

> while President Erdogan remained sitting in his car at the entrance to the Ambassador's Residence, the pro-Erdogan group, including Turkish security forces, launched an attack on the protesters. As the video evidence shows, at the time the pro-Erdogan group attacked the protesters, all of the protesters were standing on the Sheridan Circle sidewalk. *Usoyan*, Def. Mot., Ex. 6, SC02, 2:36-2:40; SC08, 0:08-0:12; SC07, 2:27-3:45. In order to launch the attack, the pro-Erdogan group, including Turkish security forces, rushed forward and broke

through the United States law enforcement line which had been separating the two groups. *Usoyan*, Def. Mot., Ex. 6, SC02, 2:36-2:50; SC09, 7:15-7:25. The video evidence shows that none of the protesters rushed forward to meet the attackers. *Id*. Some of the protesters immediately fell to the ground. Once on the ground, Erdogan civilian supporters and Turkish security forces continued to strike and kick the protesters who were lying prone on the ground. *Usoyan*, Def. Mot., Ex. 6, SC02, 2:45-5:03; SC08, 0:25-2:26; SC09, 7:29-7:40; SC10, 0:30-0:57. Other protesters attempted to run away from the attackers and away from the Turkish Ambassador's Residence. *Id*. Erdogan civilian supporters and Turkish security forces chased the protesters and violently physically attacked many of them. *Id*. It is uncontroverted that each of the Plaintiffs in both suits, except Plaintiff Lacy MacAuley in *Usoyan*, No. 18-cv-1141-CKK, alleged injuries flowing from this altercation.

*Id.* at 77.

This Court further found that "[a]fter the attack, Turkish security forces and other Erdogan supporters ripped up the protestors' signs. It is uncontroverted that the Turkish security forces did not detain, question, search, or otherwise investigate any of the protestors before, during, or immediately after the attack. *Id.* at 78 (citing Ex. 36, [Video SC08] at 1:41-1:45). This Court also noted that "Defendant Turkey argues that President Erdogan was within range of a possible handgun, improvised explosive device, or chemical weapons attack," and concluded that "[e]ven if the Court assumes this to be true, at the time of the second attack, the protesters were merely standing on the Sheridan Circle sidewalk. Defendant Turkey points to no indication that an attack by the protesters was imminent." *Id.* at 88. The Court of Appeals, in its opinion affirming this Court, held that "having reviewed video of the altercation ourselves, we find no clear error with this statement of facts." *Usoyan*, 6 F.4th at 38. This Court also found the following facts, also relevant here.

Plaintiffs attended a peaceful protest at Lafayette Square, across from the White House. *Kurd II*, 438 F. Supp. 3d at 76; *see also* Statement of Material Facts ("SMF") ¶ 4. Plaintiffs then proceeded to Sheridan Circle to continue their protest, as they believed President Erdogan was headed to the Residence of the Turkish Chief of Mission, which is located there. *Kurd II*, 438 F.

Supp. 3d at 76; *see also* SMF ¶ 7. Approximately 10 to 20 protestors, including the Plaintiffs gathered in Sheridan Circle, across the street from the Residence. *Kurd II*, 438 F. Supp. 3d at 76; *see also* SMF ¶ 8. A much larger group of Turkish officials and employees, including Embassy staff and Turkish security agents were on the sidewalk outside the Residence. *Kurd II*, 438 F.Supp.3d at 76; *see also* SMF ¶ 14.

Plaintiffs wished to express their opposition to policies and practices of President Erdogan toward the Kurdish people; express support for Kurdish political parties, especially the HDP, and call for the release of HDP political prisoners; and express opposition to President Erdogan's human rights abuses. SMF ¶ 5; *see also, e.g.,* Ex. 9, Arthur Decl. at ¶ 3 (Arthur wished to protest the Turkish regime's treatment of its own people, particularly the Kurds, and to protest Turkey's policies in Syria and Iraq); Ex. 10, Arya Decl. at ¶ 3 (Arya went to protest to express opposition to Turkey's mistreatment of the Kurdish people); Ex. 16, Genc Decl. at ¶ 3 (Genc wanted to protest the systemic oppression of Kurdish people by Turkey, specifically the ongoing crackdown on pro-Kurdish politicians); ); Ex. 15, Jane Doe III Decl. at ¶ 34 (Doe III wanted to express her opposition to Turkey's mass arrests of elected mayors and parliamentarians from the HDP political party); Ex. 17, Kheirabadi Decl. at ¶ 3 (Kheirabadi demonstrated to express opposition to Turkey's military operations that have caused the deaths of Kurdish people).

Plaintiffs and other protestors held signs calling for peace and justice and wore Kurdish colors, which are banned in Turkey. SMF ¶ 10 (Plaintiffs held signs calling for "Peace in Kurdistan"; Jane Doe II waved a red, yellow, and green shawl; Stephen Arthur and Heewa Arya held flags with Kurdish colors).

PUBLIC REDACTED VERSION

Other Plaintiffs held signs in support of the HDP, a Kurdish political party. SMF ¶ 11. Elif Genc held a large sign reading "Free Demirtas now," calling for the release of Selahattin Demirtas, a leader of the HDP who has been imprisoned in Turkey since 2016 on political charges. *Id*. Mehmet Tankan also held a sign calling for Demirtas's release. *Id*. Other protestors held signs calling for the release of imprisoned HDP party parliamentarians and mayors. *Id.* Some Plaintiffs held pro-Kurdish signs and signs criticizing President Erdogan. SMF ¶12 (Jane Doe I and Mehmet Özgen held a white banner that read, "Kurds fight ISIS, Turkey fights Kurds."). Jalal Kheirabadi held a sign that said, "Destroyed Kurdish Cities. Erdogan is a War Criminal." The sign included photographs of cities that had been attacked by Turkey. *Id*. The protesters also used a bullhorn to criticize President Erdogan, chanting anti-Erdogan slogans such as "dictator, Erdogan" and "terrorist, Erdogan." SMF ¶ 134.

After an initial altercation, lasting less than a minute, *Kurd II*, 438 F. Supp. 3d at 77, and involving just a handful of individuals, all of the Plaintiffs and other protestors remained on the sidewalk where they were instructed to stand by U.S. law enforcement and engaged in a peaceful, if loud, First Amendment protest. SMF ¶¶ 25-27; Ex. 5, Affidavit in Support of Arrest Warrant of Mehmet Sarman (describing protestors as "a group conducting a peaceful First Amendment assembly"); *see also Kurd II*, 438 F. Supp. 3d at 77 (at the time of the attack, "all of the protesters were standing on the Sheridan Circle sidewalk").

Plaintiffs were separated from the Turkish officials and employees by a row of police officers and a row of motorcycles that the police had placed between the groups as an additional physical barrier. SMF ¶¶ 28-29; *See also* SMF ¶¶ 30 (U.S. law enforcement tries to hold back the Turkish security detail), 34.

PUBLIC REDACTED VERSION

The Turkish officials and employees, along with a handful of civilian supporters, taunted and cursed at the protestors. SMF ¶¶ 19-22; *see also Kurd II*, 438 F. Supp. 3d at 76. The Turkish security detail shouted violent threats – including death threats and threats of sexual assault – and challenged the protestors to fight. SMF ¶¶ 19-22. The Turkish security detail also lobbed ethnic and misogynist curses at the Plaintiffs, including "die, fucking Kurds," "Kurdish sons of bitches" and wide range of vile and obscene threats of sexual violence, including threats of rape. *Id*. The security agents also threatened to kill Plaintiffs, yelling "we will kill you" and "I will kill you bitch." SMF ¶ 21. The agents urged Plaintiffs to come closer and fight. SMF ¶ 24. The outnumbered Plaintiffs remained on the sidewalk, holding their protest signs and Kurdish flags, and shouting political slogans. SMF ¶¶ 25-26. President Erdogan arrived at the Residence, saw the protestors and heard the chants. SMF ¶ 47.

After President Erdogan arrived at the Residence, the Turkish security agents, including agents who had traveled with the President, forced their way through the police line to charge at the Plaintiffs. SMF ¶¶ 15-16, 48-49; *see also* Ex. 3, DS Command Center Situational Report on Turkish FM Incident, May 16-17, 2017 at 2:50 EDT at 2 (agent-in-charge states "melee had been provoked by Turkish security officers who upon seeing the protesters had run directly into the crowd to physically engage them, and that one Turkish security officer had punched a MPD officer directly in the nose causing massive blood flow, and other MPD officers were also assaulted"). The Turkish security detail pushed past the law enforcement officers, injuring several, to chase and attack the Plaintiffs. SMF ¶¶ 36, 42-43, 162. The Plaintiffs saw the Turkish security detail running at them, heard the shouted threats and curses, and feared imminent physical harm. SMF ¶ 37; *see also* Ex. 58, at 0:01-0:15 (Video showing Turkish agents rushing past police and chasing protesters); Ex. 18, Kurd Decl., Ex. C (Video taken by Kurd while

running away); Ex. 89, [Pls.' Video F] at 0:03-0:12 (Video of Plaintiff Borazan fleeing from Turkish agents chasing her). As the Plaintiffs fled the onslaught of attackers, several were knocked to ground. SMF ¶ 38; *see also* Ex. 58, [Pls.' Video B] at 0:01-0:20 (Video showing Turkish agents chasing, grabbing, and tackling protesters to the ground); Ex. 38, NYT Video 3 (Video identifying Turkish security agents kicking several protesters on the ground).

Turkish security agents surrounded the fallen protestors, kicking and striking them repeatedly. SMF ¶¶ 39-40, 56-161. For example, Turkish security agents kicked 59-year old Murat Yasa in the head and face after he was knocked to the ground, shouting, "we are going to show you the power of the Turks" and "[w]e will find and punish you [Kurds], no matter where you are." SMF ¶¶ 19, 158; Ex. 21, Yasa Decl. at ¶ 15.



Ex. 94, (still extracted from Ex. 58 [Pls.' Video B] at 0:17 showing an agent kicking Plaintiff Yasa in the head).

Other Plaintiffs fled, only to be chased and attacked by the Turkish security agents. SMF ¶ 40. An agent chased Ceren Borazan as she ran away and tried to get into a car to escape. The

agent wrapped one arm tightly around her neck, placing her in a chokehold and told her "you're dead, bitch" and "you're going to get more." The agent pulled her hair and threw her to the ground. SMF ¶¶ 82-85. A group of agents beat and kicked Plaintiff Jane Doe II in the head so brutally that she began to have a seizure. SMF ¶¶ 100-106.



Ex. 95 (still extracted from Ex. 10, Arya Decl. Ex. A at 0:08, showing agents attack Plaintiffs Arya and Jane Doe II).

Agents repeatedly kicked and punched Mehmet Tankan, including in the head, face, neck, and back, even as police officers tried to protect him. SMF ¶¶ 147-149. Agents flashed their guns at Plaintiffs. SMF ¶ 23. Ample evidence demonstrates that one or more Turkish security agent battered at least 12 of the Plaintiffs. SMF ¶¶ 52-161; *see also, e.g.*, Ex. 9, Arthur Decl. at ¶ 14 (while he was running away, several Turkish agents grabbed Arthur, punched him in the head and body, and kicked him); *see generally infra* Part V.B.2. The Turkish security agents kept up their attack, even after U.S. law enforcement officers intervened to protect the

Plaintiffs and stop the battery. SMF ¶¶ 41-42. Several Plaintiffs believe the U.S. law enforcement officers saved their lives. SMF ¶¶ 41-42. Even after U.S. law enforcement directed the Turkish security agents back to sidewalk, the agents had to be physically restrained from continuing to confront the injured victims. SMF ¶ 43. At the conclusion of the attack, the Turkish agents took the protest signs and tore them up.  SMF ¶ 45. No Plaintiff was searched or questioned by the Turkish security agents. SMF ¶ 44. Each Plaintiff was injured, many suffering severe and lasting injury. SMF ¶¶ 52-161.

       2.       The social, political, and historical background

The United States, human rights groups and international organizations have long criticized the government of President Erdogan for failure to respect human rights, including the freedom of speech, association, and assembly. *E.g.*, John J. Sullivan, Acting Sec'y of State, Remarks on the Release of the 2017 Country Reports on Human Rights Practices (Apr. 20, 2018); U.S. Dep't of State, *Country Report on Human Rights Practices: Turkey 2017* (2018) at 35, 36; U.S. Dep't of State, *Country Report on Human Rights Practices: Turkey 2016* (2017) at 39[2]*; Turkey: Alarming Deterioration of Rights*, Human Rights Watch (Jan. 12, 2017); Amnesty International Turkiye 2022 Report ("Baseless investigations, prosecutions and convictions of human rights defenders, journalists, opposition politicians and others persisted. Parliament introduced draconian amendments to existing laws that further restricted freedom of expression").

---

[2] For over 40 years, the United States Department of State has produced annual Human Rights Reports. The United States Congress mandated these reports to provide policymakers with an accurate accounting of human rights conditions in nearly 200 countries and territories worldwide, including all member states of the United Nations and any country receiving U.S. foreign assistance.

In particular, President Erdogan's regime targeted the Kurds and Turkey's third largest political party, the HDP. And as described below, attacks have been targeted at Kurdish women.

The Kurds are the largest ethnic and linguistic minority in Turkey. Since the establishment of the Turkish Republic, minorities have been perceived as a threat to the integrity of the Turkish state. Ex. 90, Decl. of Dr. Alan O. Makovsky at 1-2; Ex. 91, Decl. of ███████ ████ ¶ 2; Ex. 96, Decl. of ████████████████ at ¶ 7. As a result, "Turkish state oppression of Kurds and particulary of ethnically-conscious Kurds is longstanding." Ex. 90, Makovsky Decl. at 1. The history has been marked by a series of rebellions followed by massacres, as well as by efforts to marginalize Kurdish culture and political power. Ex. 90, Makovsky Decl. at 1-2; Ex. 91, ████ Decl. at ¶¶ 3-8; Ex. 96, ████ Decl. at ¶ 7. For example, Turkey banned teaching in the Kurdish language and certain Kurdish letters are banned, limiting the ability of parents to give Kurdish names to their children. Ex. 91, ████ Decl. at ¶ 5; Ex. 90, Makovsky Decl. at 3; Ex. 96, ████ Decl. at ¶ 9. Kurds have been subjected to racist attacks for speaking in Kurdish, wearing traditional Kurdish clothes, or listening to Kurdish music. Ex. 91, ████ Decl. at ¶¶ 4, 21. In most cases, no effective investigation is conducted and the perpetrators are not effectively punished. Ex. 91, ████ Decl. at ¶ 21; Ex. 92, Decl. of Professor ████████ at ¶ 3. Conversely, advocacy for recognition of Kurdish rights has resulted in prosecutions and criminal charges. Ex. 91, ████ Decl. at ¶ 8; Ex. 92, ████ Decl. at ¶¶ 8-10; Ex. 97, Decl. of Expert Doe I at 2; Ex. 96, ████ Decl. at ¶ 20; *see also* Turkey 2016/2017 Annual Report, Amnesty International (2017). People have been detained for wearing shawls in Kurdish colors. Ex. 91, ████ Decl. at ¶ 7. Bans on peaceful assemblies in Kurdish regions have been enacted. Ex. 91, ████ Decl. at ¶¶ 18-20; *see also* Ex. 96, ████ Decl. ¶ 16 (noting bans on Kurdish festivals, as well as on demonstrations). President Erdogan has actively partnered with

"hard-core" Turkish nationalists to consolidate power. Ex. 90, Makovsky Decl. at 5 -7 (Erdogan appears to have concluded "that Turkish nationalism and anti-Kurdishness are electoral winners").

The HDP is a pro-Kurdish political party that emphasizes human rights and egalitarianism, including on gender, in its platform. Ex. 91, ▮ Decl. at ¶ 10; Ex. 90, Makovsky Decl. at 5; Ex. 96, ▮ Decl at ¶ 10. In 2015, the HDP decided to enter candidates in Turkey's parliamentary election. Ex. 90, Makovsky Decl. at 5. The HDP won enough votes to prevent President Erdogan's party from winning a single party majority (after three consecutive victories), thereby threatening Erdogan's consolidation of executive power. Ex. 92, ▮ Decl. at ¶ 6; Ex. 90, Makovsky Decl. at 5-7. As a result, Erdogan took steps to retaliate against and dismantle the HDP, including by publicly (and falsely) accusing the HDP of supporting terrorism. Ex. 90, Makovsky Decl. at 7 (Erdogan has consistently accused the HDP, a legitimate political party whose members helped Erdogan pursue peace negotiations of terrorism); Ex. 92, ▮ Decl. at ¶ 6. Since 2016, over 10,000 HDP parliamentarians, elected officials and party members have been imprisoned and subjected to political persecution. Ex. 92, ▮ Decl. at ¶ 7; Ex. 91, ▮ Decl. at ¶¶ 11, 15-17.  In total, 88% of elected HDP officials have been removed from office by administrative fiat. Ex. 90, Makovsky Decl. at 7; Ex. 96, ▮ Decl. at ¶¶ 18, 23. The best known jailed HDP member is Selahattin Demirtas, a former co-leader of the party. A state prosecutor "almost certainly acting at Erdogan's behest" charged the HDP's leader, Demirtas, with terrorism, separatism, and insulting the president. Ex. 90, Makovsky Decl. at 7; Ex. 91, ▮ Decl. at ¶ 12. The European Court of Human Rights found that Turkey had improperly detained Demirtas for the purpose of limiting political debate and ordered his release. Turkey has refused to comply with the ECHR ruling and refused to release Demirtas and other

political prisoners. *See Selahattin Demirtas v. Turkey (No.2)*, App. No. 14305/17, (Nov. 20, 2018); *Selahattin Demirtas v. Turkey (No.2)*, App. No. 14305/17, (Dec. 20, 2020); *see also* Ex. 92, ███ Decl. at ¶ 7; Ex. 90, Makovsky Decl. at 7.

The HDP is an outlier in the conservative, patriarchal Turkish political landscape, particularly when contrasted to President Erdogan's ruling party. Ex. 92, ███ Decl. at ¶ 3; Ex. 96, ███ Decl. ¶ 15; Ex. 97, Expert Doe I at 2. President Erdogan has engaged in the systematic erosion of women's rights, even withdrawing from international conventions on violence against women, and Turkey has seen an increase in gender-based violence. Ex. 92, ███ Decl. at ¶ 13-14; Ex. 96, ███ Decl. at ¶ 15. In contrast, the HDP has had high levels of women's representation – 36% of HDP parliamentarians elected were women, even though women make up just 17% of the Turkish parliament overall. 65% of female elected mayors were from the HDP. Ex. 92, ███ Decl. at ¶ 13-14; Ex. 96, ███ Decl. at ¶ 13. Perhaps as a result, Kurdish women have been particularly targeted for persecution and arrest. Ex. 92, ███ Decl. at ¶¶ 3, 8; *see also id.* at ¶ 9 ("Many Kurdish female co-mayors, lawyers, journalists, academics and activists have been at the receiving end of state persecution, violence and harassment."). Indeed, Turkish security forces regularly use sexual and gender-based harassment and assault as an intimidation tactic in Kurdish regions. Ex. 92, ███ Decl. at ¶¶ 8, 13, 16.

Finally, it is widely recognized that "it is common for Turkish authorities to prosecute and convict people on terrorism related charges for their non-violent civil society engagement and political commentary," particularly politically active Kurds. Ex. 92, ███ Decl. at ¶ 5; *see also* Ex. 90, Makovsky Decl. at 7 (Erdogan terror accusations for political gain); Ex. 96, ███ Decl. at ¶ 16; Turkey: Crackdown on Social Media Posts, Human Rights Watch (Mar. 27, 2018)

("a new low": Turkey detained and prosecuted over 600 people on terrorism charges for social media posts advocating for peace, including an end to the Turkish-Kurdish conflict).

## IV.  LEGAL STANDARD

"A court has the power to enter default judgment when a defendant fails to defend its case appropriately or otherwise engages in dilatory tactics." *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal & Glass, LLC*, 635 F. Supp. 2d 21, 23 (D.D.C. 2009). "Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint." *Id.* Where, as here, the complaint seeks damages for an uncertain sum, default is requested via an application to the court under Federal Rule of Civil Procedure 55(b)(2).

A plaintiff litigating under the FSIA must "establish[] his claim or right to relief by evidence satisfactory to the court" before a default judgment can be entered against a foreign sovereign defendant. 28 U.S.C. § 1608(e). The FSIA's "evidence satisfactory to the court" requirement is a "lenient standard" that can be satisfied with a lesser "quantum and quality of evidence . . . than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal citations and quotations omitted), *rev'd sub. nom. on other grounds*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). The standard is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Id.* (quoting *Alameda v. Sec'y of Health, Ed. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980)).

"In evaluating whether a plaintiff has sufficiently established its claim [under the FSIA], courts may accept the plaintiff's 'uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence.'" *Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124, 126 (D.D.C. 2013) (omission in original) (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 49 (D.D.C. 2012)); *see also, e.g.*, *Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117, 125 (D.D.C. 2018) (default judgment

entered per § 1608(e) based on "detailed affidavits," establishing an assault by Congolese agents against protesting individuals in Washington, D.C. during a visit by the Congolese President), *vacated in part on other grounds*, 2019 WL 2191806 (D.D.C. 2019) and 2020 WL 3498586 (D.D.C. 2020); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) ("In evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence.'" (quoting *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000))).

The court also has discretion in the evidence it chooses to consider. As the D.C. Circuit has said, "[s]ection 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion." *Owens*, 864 F.3d at 785-86. Indeed, in an FSIA default proceeding, the court may "allow[] plaintiffs to prove their claims using evidence that might not be admissible in a trial." *Id.* at 785; *see also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (court has "the obligation[] to 'adjust [evidentiary requirements] to . . . differing situations.'" (second alteration and omission in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981))). This broad discretion extends to the admission of expert testimony. *Owens*, 864 F.3d at 785.[3]

The "district court's satisfaction with the evidence presented" is reviewed for abuse of discretion, while its legal conclusions are reviewed de novo. *Id.*

---

[3] In the event the Court concludes that the evidence on any of Plaintiffs' claims is insufficient to meet Plaintiffs' burden under 28 § U.S.C. § 1608(e), Plaintiffs request an opportunity to supplement their submission and, if it would aid the Court's analysis, an evidentiary hearing.

# V. **ARGUMENT**

Plaintiffs are entitled to a default judgment on Turkey's liability. The Court has subject-matter and personal jurisdiction over Turkey, which has been properly served and is in willful default. Plaintiffs' claims against Turkey are accordingly ripe for entry of default judgment on liability pursuant to Rule 55(b)(2). Moreover, Plaintiffs submit evidence demonstrating Turkey's liability for each of their claims, which the Court should find satisfactory under § 1608(e) to establish Plaintiffs' entitlement to a default judgment on Turkey's liability.

## A. **Entry of Default on Liability is Appropriate Under Rule 55(b)(2)**

As an initial matter, default judgment on liability is ripe and appropriate under Federal Rule 55(b)(2). Turkey has been served and is in willful default, and the Court has subject-matter and personal jurisdiction over it.

Plaintiffs served Turkey on February 11, 2019, via diplomatic channels pursuant to the procedures set forth in 28 U.S.C. § 1608(a)(4). *See* Dkt. 49, Return of Service. Counsel for Turkey entered an appearance on Turkey's behalf on April 5, 2019. Dkts. 57, 58, 59. The First Amended Complaint was served upon Turkey's counsel via CM/ECF in compliance with Rule 5(b)(2)(E). On June 4, 2019, Turkey filed a motion to dismiss pursuant to Rule 12(b)(1), in which it did not contest the validity of service, thus waiving any challenge to service. *See* Fed. R. Civ. P. 12(h)(1)(B)(i). Accordingly, Turkey has been properly served, which establishes this Court's personal jurisdiction over Turkey. *See* 28 U.S.C. § 1330(b); *see also GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012) ("[F]oreign sovereigns . . . are not "persons" under the Fifth Amendment's Due Process Clause—and thus have no right to assert a personal jurisdiction defense.").

This Court also has subject-matter jurisdiction over Turkey, as this Court and the D.C. Circuit have previously found. 28 U.S.C. § 1330(a) gives the federal district courts subject-

matter jurisdiction over civil any civil damages suit against a foreign sovereign for which the

sovereign is not immune. This Court ruled that Turkey does not enjoy immunity, 438 F. Supp 3d

at 89, and the D.C. Circuit affirmed in *Usoyan*, 6 F.4th at 47. The Court's ruling was based on

the evidence – and in particular the "the ample video evidence submitted by the parties." *Kurd II,*

438 F. Supp. 3d at 75. Because the parties' arguments regarding immunity largely turned on

factual disputes, the Court stated it "must go beyond the pleadings and resolve any disputed

issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.*

(quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). The D.C.

Circuit likewise affirmed based on the evidence. The court stated that it also "reviewed video of

the altercation" and found "no clear error" with this Court's finding of the critical facts. *Usoyan*,

6 F.4th at 37. Accordingly, pursuant to the law of the case and the mandate rule, Plaintiffs have

already established subject-matter jurisdiction "by evidence satisfactory to the court." § 1608(e).

Plaintiffs' claims against Turkey are otherwise ripe for default judgment as to liability.

Default is appropriate "when the adversary process has been halted because of an essentially

unresponsive party." *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d

689, 691 (D.C. Cir. 1970). Here, worse than "essentially unresponsive," Turkey is willfully in

default. Turkey itself, via its Ambassador to the United States, told the Court that Turkey "has

chosen not to participate in the discovery process as recently ordered." Dkt. 165. Turkey also has

not filed an answer, though one was due, at the latest, on November 8, 2021 – almost two years

ago. *See* Dkt. 170 ¶ 4. Entry of default judgment on liability is warranted under these

circumstances. *See, e.g.*, *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural

Metal & Glass, LLC*, 635 F. Supp. 2d 21, 25 (D.D.C. 2009) (entering default where defendant's

answer was a year overdue and defendant "ha[d] not responded to either the plaintiffs' request to the Clerk for entry of default or the instant motion for default judgment").

Finally, Turkey received notice the entry of default entered against it and will receive notice of the present motion. The entry of default was entered against Turkey while it was still represented by counsel. *See* Minute Order of Oct. 25, 2022. And in granting counsel's motion to reconsider their request to withdraw, the Court stated that it would "provide copies of pertinent pleadings to Defendant Republic of Türkiye moving forward." Dkt. 180, Order Grant. Mot. to Recons. Req. to Withdraw as Counsel at 2.

Accordingly, default judgment is appropriate under Rule 55(b)(2).

**B.    The evidence demonstrates Plaintiffs' right to relief**

Because the requirements of Rule 55(b)(2) are met, default judgment on liability is warranted if the Court likewise concludes that the Plaintiffs have "establishe[d] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). For the reasons set forth below, the Court should so conclude.

1.    Turkey's agents assaulted each Plaintiff (Count I)

Each Plaintiff presents evidence of assault by Turkey's security detail sufficient to satisfy the requirements of 28 U.S.C. § 1608(e).  As this Court previously explained,

> An assault is "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim."  *Hall v. District of Columbia*, 867 F.3d 138, 158 (D.C. Cir. 2017) (quoting *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)).  In order to state a claim for assault, a plaintiff must show that he suffered apprehension of harmful or offensive contact and that a reasonable person in his position would have experienced such apprehension. *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014).

*Kurd v. Republic of Turkey ("Kurd I")*, 374 F. Supp. 3d 37, 46 (D.D.C. 2019).  Although it may be probative of a plaintiff's apprehension, "[p]hysical contact is not an element of a prima facie

claim of assault." *Konah v. District of Columbia*, 815 F. Supp. 2d 61, 80 (D.D.C. 2011) (citing *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)).

Video and testimonial evidence establishes that Turkey's agents assaulted all fourteen Plaintiffs by intentionally threatening and putting each plaintiff in fear of a violent attack, and, in fact, violently attacking almost all of them. *Supra* Part III.B.1. The agents cursed, made threatening gestures, displayed firearms, threatened physical violence, and ultimately pushed their way through the police line, charging towards the Plaintiffs while shouting additional threats. These actions constitute assault. *See, e.g.*, *Dingle v. District of Columbia*, 571 F. Supp. 2d 87, 98-99 (D.D.C. 2008); *Mendonca v. City of Providence*, 170 F. Supp. 3d 290, 299 (D.R.I. 2016) (defendant "lunged at" and "chased" plaintiff); *Jenkins v. Dsitrict of Columbia.*, 223 A.3d 884, 897 (D.C. 2020) ("Simply holding a weapon before another person in a threatening manner can constitute intent-to-frighten assault."); *Raess v. Doescher*, 883 N.E.2d 790, 794 (Ind. 2008) (defendant liable for assault who, "angry at the plaintiff . . . , aggressively and rapidly advanced on the plaintiff with clenched fists, piercing eyes, beet-red face, popping veins, and screaming and swearing at him"); *Johnson v. Bollinger*, 356 S.E.2d 378, 381 (N.C. Ct. App. 1987) (defendant liable for assault who "approached plaintiff in an angry and threatening manner while wearing a pistol[,] . . . shook his hand in plaintiff's face[,] and said in a loud voice, 'I will get you.'").

The Turkish security agents repeatedly threatened to kill the Plaintiffs. SMF ¶ 21 (telling Mehmet Tankan "we will kill you" and "you will be done"; telling Jane Doe I "we will kill you bitch"); *see also* Ex. 12, Borazan Decl. ¶ 16; Ex. 13, Doe I Decl. ¶ 11; Ex. 14, Doe II Decl. ¶ 14. Adding gravity to these threats, agents opened their suit jackets to flash their handguns. SMF ¶ 23. Turkish security agents threatened the female Plaintiffs with sexual assault. SMF ¶ 20

(yelling "I am going to fuck you" while chasing the protestors and, while beating another, "you're going to get more"). Turkish security agents repeatedly pushed at the police line, attempting to advance, causing U.S. law enforcement to repeatedly restrain the Turkish agents and attempt to direct them back to the sidewalk. SMF ¶ 30. The Agents combined this threatening behavior with threats to fight the protestors. For example, Officers Ismail Ergunduz, Mustafa Sumercan, and Turgut Akar made gestures with their arms understood to mean "come here," and "I will get you." SMF ¶ 21, 24. Agent Akar yelled: "I am going to stick [inaudible] in your ass." *Id.*

The Turkish security officers soon followed through on their threats: they "shoved the police out of the way" and "charged across the street directly" at protestors. Ex. 18, Kurd Decl. ¶ 16; Ex. 12, Borazan Decl. ¶ 13; Ex. 48 [Video SC02] (2:36-2:54); Ex. 36 [Video SC08] (0:23-0:32); Ex. 45 [Video SC09] (7:16-7:30); Ex. 56 [Video SC12] (7:10-7:20). As they attacked the protestors, Turkish officers levied additional threats, including: "die fucking Kurds", "I will kill you, bitch" and "we are going to show you the power of the Turks." SMF ¶¶ 19, 21.

It is black letter law that a person is presumed to intend the natural consequences of his acts. *E.g.*, *United States v. Grider*, 2022 WL 17829149, at *3 (D.D.C. 2022) (Kollar-Kotelly, J.). The natural consequence of the agents' violent threats and charge through the police line was to make the protestors fear imminent physical harm. The Plaintiffs' apprehension of physical harm was both genuine and reasonable. Indeed, the video evidence of the attack, which shows the black-clad Turkish security agents charging past police officers and sprinting at the protestors, while screaming, is harrowing. *See* Ex. 48, [Video SC02] at 2:36-2:54; Ex. 36, [Video SC08] at 0:23-0:32; Ex. 45, [Video SC09] at 7:16-7:30; Ex. 56, [Video SC12] at 7:10-7:20. The video evidence on its face shows how frightening the attack was to a reasonable person in Plaintiffs'

shoes. And each Plaintiff submits a declaration testifying about the fear of imminent physical harm that they felt. *See* SMF ¶ 37. These threats "terrified" the Plaintiffs; they feared the agents would imminently attack. *Id.* These reasonable fears were bolstered by Plaintiffs' awareness of the physical violence often meted out by Turkish authorities against Kurdish demonstrators in Turkey. *Supra* Part III.B.2; SMF ¶ 176. Moreover, the Plaintiffs' actions, as demonstrated by both the video evidence and their testimony, demonstrates their fear. As this Court previously found from the video evidence, while "[s]ome of the protesters immediately fell to the ground," and "[o]ther protesters attempted to run away from the attackers." *Kurd II*, 438 F. Supp. 3d at 9. These are the actions of persons who reasonably fear for their safety.

The reasonableness of Plaintiff's fear of physical harm is further demonstrated by the fact that Turkey's agents indeed inflicted physical harm on many of the Plaintiffs. Although a plaintiff need not prove actual physical contact to establish assault, *Konah*, 815 F. Supp. 2d at 79, as demonstrated in Part V.B.2, *infra*, the evidence shows that Turkish agents violently battered twelve of the Plaintiffs during the attack. Indeed, Turkish officers beat the protestors so viciously that they feared death. SMF ¶ 41. This easily satisfies the standard for assault. *See Kurd I*, 374 F. Supp. 3d 37, 48 (D.D.C. 2019) (Plaintiffs stated assault claims against Individual Defendants by alleging they "twice pushed past the police to beat and attack Plaintiffs," that their "actions were intentional, and that Plaintiffs were placed in reasonable apprehension of harmful or offensive contact due to Defendants' actions."); *see also, e.g.*, *Mendonca*, 170 F. Supp. 3d at 299; *Raess v. Doescher*, 883 N.E.2d at 794**.** Accordingly, the evidence is more than sufficient to demonstrate that Turkey is liable for assaulting each Plaintiff.

2.     Turkey's agents battered Plaintiffs Arthur, Arya, Azizi, Borazan, Jane Doe I, Jane Doe II, Jane Doe III, Genc, Kheirabadi, Özgen, Tankan, and Yasa (Count II)

Under D.C. law, battery is "'an intentional act that causes harmful or offensive bodily contact.'" *Kurd I*, 374 F. Supp. 3d at 48 (citing *Magliore v. Brooks*, 844 F. Supp. 2d 38, 44 (D.D.C. 2012)) (internal quotations omitted). Bodily contact is "harmful" if it "results in 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 123 (D.D.C. 2012) (quoting Restatement (Second) of Torts § 13)). Even somewhat minimal intentional contact, when offensive, constitutes battery. *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 17 (D.D.C. 2014) (plaintiff's allegations of being struck, including in jaw, stated claim for battery); *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 67 (D.D.C. 2012) (getting "pushed, shoved, and jerked" constituted battery); *Rogers v. Loews L'Enfant Plaza Hotel*, 526 F. Supp. 523, 529 (D.D.C. 1981) (touching that included pulling hair was proper basis of battery claim).

Again, the video and testimonial evidence demonstrates that one or more Turkish agents battered 12 of the 14 Plaintiffs: [4]

- Turkey's agents punched Stephen Arthur in the head and body and kicked him as he sought to run from the attack – and despite the efforts of police to protect him. SMF ¶¶ 54-56.  He suffered injuries, including to his head, leg, and arm. SMF ¶ 58.

- An agent hit Heewa Arya in the face. Arya was able to escape his initial attackers but a civilian knocked him down and Agents proceeded kicked him repeatedly while he was on the ground. SMF ¶¶ 63-64. Arya had a concussion and injuries to his face, chest, shoulders, leg, and neck. SMF ¶ 68.

- One of Turkey's agents leapt in the air and kicked Abbas Azizi in the chest, knocking him down. Agents then kicked Azizi repeatedly in his body, neck, head, and face. SMF ¶ 76. After Azizi was able to get up and move away from his attackers, another agent continued to punch him. *Id.* Azizi suffered a chest wall contusion, a concussion, cuts that required stitches, bruises, back pain, ear pain, memory loss, elevated blood pressure, and knee pain that made it difficult to walk. SMF ¶¶ 78-79.

---

[4] Plaintiffs CA and Kasim Kurd do not bring a battery claims in this motion.

- One of Turkey's agents grabbed Ceren Borazan by the neck and put her in a chokehold, while also twisting her arm behind her back. The agent pulled Borazan's hair, hit her in the head, threw her to the ground, and kicked her. SMF ¶ 84. Borazan suffered neck pain, a burst blood vessel in her eye, and bruises. SMF ¶ 87.

- One of Turkey's agents grabbed Jane Doe I. She was then punched in the neck and ear and kicked in the leg. SMF ¶ 92. Doe I suffered injuries, including neck and shoulder pain, swelling to her ear, and bruising. SMF ¶ 97.

- Turkey's agents hit Jane Doe II near the sidewalk where protestors had stood prior to the second attack began.  Ex. 36, [Video SC08] at 0:26-0:30. Jane Doe II managed to escape into the interior of Sheridan Circle, but a large agent bashed Doe II in the back of the head as she looked away, knocking her to the ground. The agent then grabbed her by the hair, pulled her along the ground, and kicked to her head. Another agent kicked Doe II while she barely clung to consciousness, causing her to suffer a seizure. SMF ¶¶ 101 – 105. Doe II suffered another seizure in the hospital after the attack. SMF ¶¶ 106-107. Doe II suffered herniated discs, bruised bones, and other injuries to her head, back, neck, arm, and shoulder. SMF ¶ 106. Jane Doe II suffered a frozen shoulder and was unable to move her arm more than 30 degrees. She could barely get out of bed for months and could not work for a year after the attack before she returned to work part time, despite being in pain and struggling with everyday activities. During this time, she struggled to bathe herself, needed her son's help to get dressed, and couldn't take her son to school. *Id.*

- Turkey's agents chased Jane Doe III as she was trying to flee from the attack with C.A., who was seven-years old at the time. Doe III felt a kick in her back from someone she believed was an agent, given that most of the people chasing her were agents. Doe III fell down and was kicked several times in the back and head, she believes, by agents. SMF ¶ 113. After the attack, Doe III had trouble keeping her balance and was lightheaded. She experienced back pain and headaches causing vision problems. SMF ¶ 115.

- One of Turkey's agents knocked Elif Genc to the sidewalk and then additional agents kicked and hit her as she lay vulnerable on the ground. SMF ¶¶ 120-22. Genc suffered bruises, cuts, dizziness, light-headedness, and severe knee pain that made it difficult to walk. SMF ¶ 124.

- One of Turkey's agents hit Jalal Kheirabadi then grabbed him and threw punches until he fell. SMF ¶ 129. Kheirabadi was able to get off the ground, but an agent hit him again. Kheirabadi escaped his initial assailants, but then another agent repeatedly punched him in the head and kicked him. SMF ¶ 130. The agents' violent contacts with Kheirabadi caused him full-body pain, and bruises on his face and body. Within days, he lost a tooth, and he has since had to have additional teeth removed and replaced with dentures because of lasting damage sustained during the attack. SMF ¶¶ 131-132.

- An agent kicked Mehmet Özgen's in the leg, causing him to stumble. SMF ¶ 141. Özgen suffered a painful gash to his leg. SMF ¶ 142.

- Turkey's agents repeatedly kicked and punched Mehmet Tankan, including in the head, face, neck, and back, even as police officers used their bodies to try to protect Tankan from his assailants. SMF ¶¶ 147-149. Tankan suffered a concussion, contusions, dizziness, and pain to throughout his body – particularly in his back, head, and face – that lasted for weeks and made it difficult for him to move or even sit. SMF ¶ 151-152.

- Several of Turkey's agents viciously beat Murat Yasa. SMF ¶¶ 157-159. An agent hit Yasa from behind, knocking him to the ground. As Yasa attempted to stand, another agent hit him repeatedly, causing him to fall again, this time landing on the sidewalk. Then, as Yasa lay on the sidewalk, a parade of agents took turns kicking him as he lay vulnerable on the ground. *Id.* Yasa received a concussion, a broken tooth, loose teeth, facial cuts and contusions that required stitches, a hand injury, back pain, and leg pain. He continues to have leg and back pain and Yasa also suffers memory loss as a lasting effect of his concussion. SMF ¶¶ 160-161.



Ex. 70, (still extracted from Ex. 48 at 2:45 of agent kicking Plaintiff Azizi in the chest).

Each of these contacts constitutes a battery. They each caused pain and physical injury – some quite serious. SMF ¶¶ 52-161. As discussed in Part V, the agents' intent can be inferred from their actions. Moreover, the agents threatened to commit violent acts before doing so, adding to the compelling inference that they committed these acts intentionally.

Accordingly, Turkey is liable for battering Plaintiffs Arthur, Arya, Azizi, Borazan, Jane Doe I, Jane Doe II, Jane Doe III, Genc, Kheirabadi, Özgen, Tankan, and Yasa.

3.    Turkey's agents falsely imprisoned Plaintiff Borazan (Count III)

False imprisonment is "the unlawful detention of a person without a warrant or for any length of time whereby he is deprived of his personal liberty or freedom of locomotion." *Tocker v. Great Atlantic & Pacific Tea Co.*, 190 A.2d 822, 824 (D.C. 1963). False imprisonment may be proven by evidence of "a restraint against plaintiff's will, as where she yields to force, to the threat of force or to the assertion of authority." *Faniel v. Chesapeake and Potomac Telephone Co. of Maryland,* 404 A.2d 147, 151-52 (D.C. 1979). One is liable for false imprisonment when, "by acts or words, one directs, requests, invites or encourages the unlawful detention of another." *Smith v. District of Columbia*, 399 A.2d 213, 218 (D.C. 1979). "Confinement, no matter how brief, suffices to establish a prima facie case of false arrest [or imprisonment]." *Marshall v. District of Columbia*, 391 A.2d 1374, 1381 (D.C. 1978).

The plaintiff's only burden is to show a nonconsensual detainment. *See Marshall*, 391 A.2d at 1380 (The "lack of legal authority or justification is not part of plaintiff's affirmative case; rather, these are defenses to be raised and proved by the defendant."). Thereafter, the "presumption of unlawful restraint…shifts to defendant the burden of justifying the restraint as lawful." *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C. 1973). If a defendant fails to rebut a prima facie case of false imprisonment by presenting a lawful basis therefor, the plaintiff is entitled to judgment. *Id.*

The evidence establishes incontrovertibly that one of Turkey's agents unlawfully detained Plaintiff Ceren Borazan, "depriv[ing her] of [her] personal liberty or freedom of locomotion." *Tocker*, 190 A.2d at 824. The agent grabbed Borazan from behind and placed her in a chokehold, squeezing one of his arms tightly around her neck and using his other to twist her arm behind her back, constraining her freedom of movement. SMF ¶¶ 83-85. While restraining her, the agent threatened Ms. Borazan in Turkish, taunting, "you're dead, bitch," and "you're

going to get more." SMF ¶ 83. The agent threw Borazan to the ground, pulled her hair, hit her in the back of her head, and kicked her as she struggled on the ground. Borazan did not consent to this restraint. SMF ¶¶ 83-85.

Because the evidence demonstrates that Turkey's agent subjected Plaintiff Borazan to a nonconsensual detainment, the burden of proof shifts to Turkey to assert defenses that justify the restraint as lawful. *Marshall*, 391 A.2d at 1374. And because Turkey has not asserted any justification or defense to its Plaintiff Borazan's nonconsensual detainment, Turkey is liable for falsely imprisoning Plaintiff Borazan.

4.     Turkey's agents intentionally inflicted emotional distress upon Plaintiffs Kurd, Arya, Azizi, Borazan, C.A., Jane Doe II, Jane Doe III, Genc, Kheirabadi, Tankan, and Yasa (Count IV)

A defendant is liable for intentional infliction of emotional distress if it commits extreme and outrageous conduct that intentionally or recklessly causes the plaintiff severe emotional distress. *Johnson v. BAE Sys., Inc.*, 106 F. Supp. 3d 179, 187 (D.D.C. 2015) (citing *Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007)). This Court has already held as a matter of law that the conduct Plaintiffs alleged amounts to extreme and outrageous behavior:

> these actions occurred during an attack which included "Turkish government agents, in America's capital, to stifle the First Amendment rights of people protesting the treatment of a minority group in Turkey." Highlighting the **extreme and outrageous nature** of Defendants' alleged actions, following the attack, 40 members of the United States Congress sent a letter to then-Attorney General Jeff Sessions and then-Secretary of State Rex Tillerson expressing their "outrage over the remorseless acts of violence inflicted upon individuals exercising their Constitutionally-protected First Amendment right to free speech In addition, 20 members of the United States Senate sent a similar letter to then-Secretary of State Tillerson. Id. at ¶ 202.
> . . . . .
>
> Plaintiffs allege that they were engaging in a peaceful protest over Turkey's treatment of its Kurdish minority and President Erdogan's other repressive policies. Plaintiffs claim that, during this protest, Defendants yelled threats and ethnic slurs at them. Plaintiffs further allege that Defendants twice pushed past law enforcement in order to repeatedly physically attack the protesters.

*Kurd I*, 374 F. Supp. 3d at 53-54 (citations omitted) (emphasis added).

Plaintiffs' evidence corroborates these allegations. The testimonial and video evidence shows that Plaintiffs were in Washington, D.C., peacefully protesting Turkey's treatment of its Kurdish minority population and President Erdogan's other repressive policies. *Supra* Part III.B.1; SMF ¶ 5. The testimonial and video evidence likewise shows that Turkey's agents yelled threats and ethnic slurs at them and then pushed past law enforcement to physically attack them. *Supra* Part III.B.1; SMF ¶¶ 19-22, 30, 36-37. The statement from the State Department and letters from members of the Congress publicly condemning the attack confirm the extreme and outrageous nature of the conduct. *See supra* p. 27; *see also* SMF ¶¶ 169-172; Ex. 87, Letter from 40 Members of Congress to Attorney General Jeff Sessions & Secretary of State Rex. W. Tillerson ("We write today to express our outrage over the remorseless acts of violence inflicted upon individuals exercising their Constitutionally-protected First Amendment right to free speech outside the Washington, D.C. residence of the Turkish Ambassador on Tuesday, May 16, 2017."); Ex. 88, Letter from 20 U.S. Senators to Secretary of State Rex W. Tillerson ("[T]his is the second time in little more than a year that members of Turkish diplomatic security have intervened violently against protestors and members of the media in the United States. This is not acceptable."); Ex. 81, U.S. Dept. of State, Press Statement (May 17, 2017) ("Violence is never an appropriate response to free speech, and we support the rights of people everywhere to free expression and peaceful protest.").

Under the law of the case, this evidence suffices to show extreme or outrageous behavior. Additionally, other courts routinely find that the unprovoked beating of an unarmed individual rises to the level of "outrageous" conduct, especially when the perpetrator is an armed state officer. *See McKnight v. D.C.*, 412 F. Supp. 2d 127, 137 (D.D.C. 2006) ("[A] reasonable jury

could find that kicking an unarmed young man, who was laying on the ground after having been shot without justification" by a police officer, was outrageous conduct); *see also, e.g.*, *Brown v. Bettinger*, 2019 WL 8892623, *4 (S.D. Fla. 2019) (applying and citing multiple cases for this proposition); *Alexander v. Newman*, 345 F. Supp. 2d 876, 888 (W.D. Tenn. 2004) ("Unprovoked beatings by officials who are hired to protect and serve the community could certainly be deemed [outrageous]."). Indeed, Turkey's brutal and coordinated attack on unarmed protestors satisfies this prong "easily" because it was "intended to cause the highest degree of emotional distress… in [the] targeted audience." *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).

The agents' intent or recklessness with respect to Plaintiffs' emotional wellbeing can be inferred "from the very outrageousness of [their] conduct." *Kotsch v. D.C.*, 924 A.2d 1040, 1046 (D.C. 2007) (citing *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980)). Turkish agents called protestors "whore," Ex. 16, Genc Decl. at ¶ 11, threatened to "fuck" their female family members, Ex. Yasa Decl. at ¶ 15, and hurled racial slurs calculated to cause emotional harm. *See supra* Part III.B.1; *see also, e.g.*, SMF ¶¶ 19-22 (agents yelled, "I am going to take that flag to put in your mom's pussy" and "die fucking Kurds," among numerous other anti-Kurdish and misogynistic threats and taunts); *id.* (agents yelled "We will find and punish you [Kurds], no matter where you are."); *cf. Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1042 (D.C. 2015) (publicizing civil complaint containing sexually explicit language in part to trigger professional licensure investigations "may reasonably be regarded as so extreme and outrageous" (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1316 (D.C. 1994))). Small children like Plaintiff C.A. were present at the attack. Ex. 10, Arya Decl. at ¶ 9, 18; Ex. 15, Jane Doe III Decl. at ¶ 10. Moreover,

D.C. police officers stationed at Sheridan Circle tried to prevent and then stop the attack, putting Turkey's agents on-notice to the fact that their actions were unacceptable. Put simply, "any reasonable person would have known that emotional distress . . . would result" from Turkey's brutal and coordinated attack on peaceful protestors. *Waldon*, 415 A.2d at 1077 (cleaned up).

The evidence further shows that the agents' actions inflicted severe emotional distress "of so acute a nature that harmful physical consequences might be not unlikely to result." *Kostch v. D.C.*, 924 A.2d 1040, 1046 (D.C. 2007) (internal quotation marks and citation omitted). The evidence demonstrates that each IIED plaintiff has suffered some physical effects:

- Plaintiff Kurd has experienced headaches, difficulty sleeping, difficulty concentrating, and difficulty working. Ex. 19, Kurd Decl. at ¶ 23.

- Plaintiff Arya has experienced irritability, disinterest in social activities, difficulty sleeping, difficulty concentrating. Ex. 10, Arya Decl. at ¶ 20.

- Plaintiff C.A., who was 7-years old at the time of the attack, has demonstrated hypervigilance and anxiety. Ex. 10, Arya Decl. at ¶ 21.

- Plaintiff Azizi has experienced depression, anxiety, and difficulty sleeping and concentrating. Ex. 11, Azizi Decl. at ¶ 17.

- Plaintiff Borazan has experienced difficulty concentrating, nightmares, fear, depression, and hopelessness. Ex. 12, Borazan Decl. at ¶ 21.

- Plaintiff Doe II has experienced headaches, difficulty sleeping, irritability, loss of interest in social activities, anxiety, stress, and difficulty concentrating. Ex. 15, Jane Doe II Decl. at ¶ 19.

- Plaintiff Doe III has experienced difficulty sleeping, nightmares, depression, disinterest in seeing friends and other normal life activities. Doe III Decl. ¶ 16.

- Plaintiff Genc has experienced nightmares, fearfulness, and difficulty concentrating. Ex. 16, Genc Decl. at ¶ 15.

- Plaintiff Kheirabadi has experienced reduced appetite, nightmares, difficulty sleeping, fearfulness, severe anxiety, and headaches. Ex. 17, Kheirabadi Decl. at ¶ 13.

- Plaintiff Tankan has experienced sleeplessness, nightmares, disinterest in social activities, memory loss, and fearfulness. Ex. 20, Tankan Decl. at ¶ 17.

- Plaintiff Yasa has experienced post-traumatic stress disorder, manifesting in symptoms like mental confusion, difficulty sleeping, and memory loss. Ex. 21, Yasa Decl. at ¶ 18.

In addition, Plaintiffs submit a declaration from Dr. James S. Gordon on the lasting psychological trauma that resulted from the attack. SMF ¶ 173 & Ex. 29, Decl. of Dr. James S. Gordon (finding, for example, the "full spectrum of symptoms of post-traumatic stress" even six years after attack).

Accordingly, Turkey is liable for intentionally inflicting emotional distress upon Plaintiffs Kurd, Arya, Azizi, Borazan, C.A., Jane Doe II, Jane Doe III, Genc, Kheirabadi, Tankan, and Yasa.

5.     Turkey's agents committed bias-related crimes against each Plaintiff (Count V)

D.C. Code § 22-3704 permits a civil action by "any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, homelessness, disability, matriculation, or political affiliation of a victim of the subject designated act." D.C. Code § 22-3704; *see also Kurd I*, 374 F. Supp. 3d at 42-46 (citing D.C. Code § 22-3704).

Both assault and battery qualify as predicate offenses under the statute. *Kurd I*, 374 F. Supp. 3d at 42-46; *Aboye v. United States*, 121 A.3d 1245, 1249-50 (D.C. 2015) ("the term 'designated act' in D.C.Code § 22–3701(2) means any criminal act recognized under D.C. law, including the offense of threats to do bodily harm"); see also D.C. Code § 22-3701(2) (liability extends to "attempting, aiding, abetting, advising, inciting, conniving, ...."). Liability is not dependent on the existence of a criminal prosecution for the designated act. *Kurd I*, 374 F. Supp. 3d at 56-57 (citing D.C. Code § 22-3704(a)).

Courts in the District of Columbia find that the required demonstration of "an accused's prejudice" is satisfied by evidence that the accused shouted, for example, ethnic or homophobic slurs before or during an alleged assault. *E.g., Lucas v. United States*, 240 A.3d 328, 348 (D.C. 2020) (sufficient evidence included "volume and duration of homophobic taunts, the temporal proximity between the comments and the assault, and the gravity of the physical encounter") (citing *Kurd I*, 374 F. Supp. 3d at 59); *Aboye*, 121 A.3d at 1248 (evidence that appellant used the word "faggot" and made statements such as "Look at those faggots," in a conversation with a third party prior to threatening his neighbors was sufficient to uphold conviction); *Shepherd v. United States*, 905 A.2d 260, 263 (D.C. 2006) (trial court's finding "was amply supported by evidence" that perpetrator "accompanied his assaults on the two women with a verbal stream of homophobic insults"). For example, in *Shepherd*, the perpetrator "used his left forearm and shoulder to hit one of the woman in the chest, as he said, "you fucking dikes, get off the sidewalk." *Shepherd v. United States*, 905 A.2d 260, 261–62 (D.C. 2006). Bias need not be the only motivation for the attack – "additional motives like anger or revenge" can also be present. *Lucas v. United States*, 240 A.3d 328, 349 (D.C. 2020).

   a.    Plaintiffs have shown qualifying predicate acts

Here, each Plaintiff has ample evidence that they were the victim of assault or battery by agents of the Republic of Turkey. *Supra* Part V.B.1; *see also* SMF ¶¶ 52-161. Plaintiffs also present ample evidence that the assault and batteries were motivated by prejudice based on ethnicity/national origin, political affiliation and gender.

   b.    Plaintiffs have demonstrated the accused's prejudice based on national origin, political affiliation, and gender

At the motion to dismiss stage, the Court found that the allegations in the Complaint demonstrated "'prejudice based on' the protester's Kurdish identity and anti-Erdogan political

affiliation." *Kurd I*, 374 F. Supp. 3d at 59. Similarly, the United States charged individual Turkish security agents with bias-related hate crimes "based on the actual or perceived ethnicity and political affiliation" of the Plaintiffs. Ex. 26, Indictment at 12. Specifically, the Indictment charges that the Turkish security personnel committed these crimes "because of [the Plaintiffs'] opposition to Mr. Erdogan, their support of the HDP, their support of ethnic Kurds, and [the agents'] belief that the protesters were ethnically Kurdish." SMF ¶ 167.

The Plaintiffs were holding Kurdish flags and scarves in Kurdish colors; signs announcing their affiliation with the HDP, a pro-Kurdish political party that is an electoral rival of President Erdogan, including signs calling for the release of HDP leaders jailed in Turkey; signs criticizing the oppression of Kurds by President Erdogan; and signs indicating political opposition to President Erdogan. SMF ¶¶ 11-12. For example, Plaintiffs Genc and Tankan had signs calling for the release of Selahattin Demirtas, a leader of the HDP party who has been wrongfully imprisoned in Turkey since 2016.[5] SMF ¶ 11. Other protestors held signs calling for the release of imprisoned HDP party parliamentarians and mayors. SMF ¶ 11. Plaintiff Kheirabadi held a sign that said "Destroyed Kurdish Cities. Erdogan is a War Criminal." SMF ¶ 12, 127. Plaintiff Jane Doe II held a shawl that was yellow, red and green – colors that are culturally associated with Kurds. Plaintiffs Arthur and Arya also held flags with those colors. SMF ¶ 10. Plaintiff Yasa and others chanted slogans like "Erdogan, stop killing Kurdish Children." SMF ¶¶ 13, 155; *see also* Ex. 55, [Video SC05] at 0:01-1:01; Ex. 49, [Video SC06]; Ex. 36, [Video SC08] at 0:01-0:22; Ex. 45, [Video SC09] at 0:01-7:15; Ex. 56, [Video SC12] at 0:01-7:09.

---

[5] The European Court of Human Rights has ordered Turkey to release Demirtas, but Turkey has refused to comply. *Supra* Part III.B.2.

Plaintiffs have submitted expert reports demonstrating that discrimination against Kurds, the largest minority in Turkey, is "longstanding." *Supra* Part III.B.2. Plaintiffs' experts explained that Kurds are subjected to racist attacks and even detention for speaking Kurdish, wearing Kurdish colors or listening to Kurdish music; that the Kurdish language and other expressions of Kurdish identity were banned for years, and that bans continue on assemblies, demonstrations and festivals in Kurdish regions. *Id.* Advocacy for Kurdish rights has resulted in prosecutions and criminal charges. *Id.* President Erdogan has actively partnered with Turkish nationalists to target the Kurds, making anti-Kurdishness part of his political platform. *Id.*

Plaintiffs' experts also explained that the HDP is a pro-Kurdish political party that siphoned votes away from President Erdogan's ruling party and threatened his one-party control *Id.* As result, President Erdogan has retaliated against and sought to dismantle the HDP. *Id.* He has (falsely) accused its members of terrorism. *Id*. He has removed elected HDP mayors and parliamentarian from office, imprisoning over 10,000 HDP officials, including the leader of the HDP, Selahattin Demirtas. *Id*.

The actions of the Turkish agents on May 16, 2017, were consistent with this historical background and context. Before and during the attack, the Turkish security agents shouted ethnic slurs and threats targeted at Plaintiffs' Kurdish identity, including "die, fucking Kurds," "fuck you, Kurds," "Kurdish sons of bitches" "we are going to show you the power of the Turks," and "we will find and punish you [Kurds], no matter where you are." SMF ¶ 19. The Turkish agents called the Plaintiffs "traitors" and "dogs." SMF ¶ 19. The Turkish agents repeatedly and loudly threatened the Plaintiffs, directly disparaging their Kurdish identity and Kurdish political affiliation both immediately prior and during their attack. SMF ¶¶ 19-21, 22. The content, volume and duration of these taunts, the temporal proximity between the comments and the

attack (the threats and slurs continued during the assault) and the gravity of the attack (plaintiffs were repeatedly kicked, punched and battered, resulting in severe injuries), more than satisfy the governing case law. *See, e.g., Lucas*, 240 A.3d at 348; *Aboye*, 121 A.3d at 1248; *Shepherd*, 905 A.2d at 263. In addition, as further evidence of their motivation, after the attack the Turkish security agents ripped up the protestor's signs – in particular signs that advocated for the release of HDP political prisoners and for Kurdish causes – and threw them on the ground. *Kurd II*, 438 F. Supp. 3d at 78 (citing Ex. 36, [Video SC08] at 1:41-1:45 and 1:50-2:00); *see also* Ex. 48, [Video SC02] at 5:00; Ex. 55, [Video SC08] at 1:22-1:58. This evidence demonstrates that the agents were motivated, at least in part, by Plaintiffs' actual or perceived Kurdish ethnicity, anti-Erdogan political beliefs, and political affiliation with the HDP.

In addition, as Plaintiffs experts further explain Kurdish women have been particularly targeted for persecution and arrest. *Supra* Part III.B.2. In part, this is due to the prominent role of women in the HDP, which contrasts sharply with President Erdogan's political party which withdrawn from international treaties meant to tackle violence against women and presided over an increase in police violence against women. *Id.* Accordingly, gender-based violence is inherently intertwined with political violence against actual or perceived HDP members. In addition to the anti-Kurdish slurs discussed above, the agents before and during the attack interspersed their threats with vile, sexist terms and phrases otherwise indicative of gender-based violence. SMF ¶ 20. For example, Turkish agents threatened to sexually assault (and kill) the female Plaintiffs and called them whores. SMF ¶ 20. The agents yelled "motherfucker, we did your mom and sister in Turkey," "I'm going to take that [Kurdish] flag to put in your mom's pussy," "your mother is a whore," "I will fuck your wife," "I will fuck your sister," and "I will fuck your mother" while attacking Plaintiffs. SMF ¶ 20. The Turkish security agent who placed

Ceren Borazan in a chokehold told her "you are dead, bitch," "you are gong to get more" and "you haven't had enough yet."  The Turkish security agent who chased former Plaintiff Ruken Isik (who was carrying her four year old son) yelled "I am going to fuck you!" and "you whores!" SMF ¶ 20.  This evidence demonstrates that the Turkish agents were motivated, at least in part, by animus based on gender, as well as by animus based on political affiliation.

        c.      To the extent necessary, the Court should permit Plaintiffs to amend by interlineation to clarify that their bias-related crimes claims includes sex- and gender-based bias

The First Amended Complaint does not specifically allege that the attack on Plaintiffs was motived in part by sex-based animus, although the statute that forms the basis of Plaintiffs' claims encompasses it. Plaintiffs maintain that their complaint encompasses this legal theory. The Amended Complaint alleges that the agents shouted sexist slurs and threatened gender-based violence. *See* Dkt. 63, Am. Compl., at ¶¶ 65, 76, 92, 127, 129-30, 135, 142, 154, 160, 163, 168, 181. And it generally alleges that Turkey is liable for bias-related crimes its agents committed against each Plaintiff. *Id.* ¶¶ 251-57. Plaintiffs are not required to spell out more specific legal theories in their complaint. *See Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) ("Having informed the city of the factual basis for their complaint, they were required to do no more to stave off threshold dismissal for want of an adequate statement of their claim.").

However, to the extent the Court believes it necessary, Plaintiffs seek to amend by interlineation to insert the words "sex, gender identity," after "national origin" in both paragraphs 253 and 254 of the Amended Complaint. Under Rule 15(a)(2), leave "should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." *Richardson v. United States*, 193 F.3d 545, 548-49 (D.C. Cir. 1999) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**PUBLIC REDACTED VERSION**

The proposed amendment would not be futile because, as demonstrated above, the evidence shows Turkey is liable for bias-related crimes based in part on its agents' sex-based animus. There is no reason to deny the amendment, which is a technical change to fix an oversight, as brought in bad faith, which "generally requires an affirmative showing by the nonmoving party" and "often requires extrinsic evidence." *Sherrod v. McHugh*, 249 F. Supp. 3d 85, 87 (D.D.C. 2017). Nor is there undue delay, given that Turkey has not even filed an answer. *See, e.g.*, *Jiggetts v. Cipullo*, 285 F. Supp. 3d 156, 162 (D.D.C. 2018) (surveying caselaw and concluding courts "only deny[] [Rule 15 motions] on the basis of undue delay when the plaintiffs waited <u>many</u> years before seeking amendments, <u>after</u> discovery had already concluded or summary judgment had already been granted" (emphasis in original)).

Finally, there is no undue prejudice to Turkey. Turkey is no longer defending this case, and there is no reason to believe Turkey would have chose to defend the case or have done anything differently had Plaintiffs' more specifically listed their gender-based bias theory in the complaint, especially since the factual allegations forming these theories were included in the complaint and Plaintiffs otherwise alleged Turkey committed bias-related torts. Moreover, even if Turkey were participating, the requested amendment would "not substantially change [plaintiffs'] theory," which has long been that the agents committed bias-related acts against all Plaintiffs. *Djourabchi v. Self*, 240 F.R.D. 5, 13 (D.D.C. 2006). The amended claim also would be based on the same essential set of facts as the original one. *See Gatling v. Jubilee Hous., Inc.*, 2022 WL 227070, at *2 (D.D.C. 2022) ("[P]rejudice is unlikely to exist when the amended complaint is based on the 'same nucleus of facts' as the original one.").

Amendment is also proper by analogy to Fed. R. Civ. P. 15(b)(1), which allows parties to amend during trial if "doing so will aid in presenting the merits and the objecting party fails to

satisfy the court that the evidence would prejudice that party's action or defense on the merits."

*See also NAACP Legal Def. & Educ. Fund, Inc. v. Wilkinson*, 2021 WL 723993, at *12 & n.8

(D.D.C. 2021) (permitting constructive amendment of pleadings at proceedings other than trial).

The requested amendment would aid in presenting the merits of Plaintiffs' claim, and, as

addressed, there is no undue prejudice to Turkey.

If amendment is permitted, Plaintiffs should not be required to serve an amended

pleading on Turkey. Courts in this district allow plaintiffs to make minor amendments to a

complaint against a defaulted sovereign without re-serving. *See Maalouf v. Islamic Republic of

Iran*, 514 F. Supp. 3d 280, 286 (D.D.C. 2021); *Belkin v. Islamic Republic of Iran*, 667 F. Supp.

2d 8, 20 (D.D.C. 2009); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 46 (D.D.C. 2006);

*Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 155 (D.D.C. 2006); *Dammarell v.

Islamic Republic of Iran*, 370 F. Supp. 2d 218, 224-25 (D.D.C. 2005). Such amendment is proper

here because Plaintiffs seek to clarify that an existing claim has an additional basis – found in the

same statutory text upon which the claim was originally pled.

This is not a situation in which the amendment asserts a claim based on entirely different

statutory sections with "substantially different elements." *See Strange v. Islamic Republic of

Iran*, 2016 WL 10770678, at *3-4 (D.D.C. 2016) (Kollar-Kotelly, J.) (service of amended

pleading required where plaintiffs themselves asserted that new claims were "substantial" to their

case, and pleading included four additional statutory grounds for relief with "substantially

different elements," thereby constituting "a new claim for relief"). Nor is it a situation in which

new and unrelated claims would be brought. *See Shoham v. Islamic Republic of Iran*, 922 F.

Supp. 2d 44, 47 (D.D.C. 2013) (service of amended complaint required where plaintiff filed a "new and unrelated" complaint).[6]

Accordingly, to the extent the Court believes Plaintiffs' sex- and gender-bias theory is not encompassed by the First Amended Complaint, the Court should order the complaint amended by interlineation.

> 6.    Plaintiffs attackers were Turkey's officials or employees acting within the scope of their employment

Plaintiffs identified their attackers as Turkish officials and employees, primarily as members of Turkey's security detail. SMF ¶¶ 54-56, 63-65, 75-77, 82-85, 91-94, 100-105, 111-112, 120, 128-130, 136, 140-42, 146-49, 156-58. The United States government also identified the attackers as members of Turkey's security detail. SMF ¶ 166.[7] In its motion to dismiss, Dkt. 90, the Republic of Turkey did not dispute that these individuals were its officials or employees acting within the scope of their employment. Moreover, in its prior order this Court confirmed that "[t]he events at issue, including the use of force, occurred while the Turkish security forces were engaged in their employment of providing security for President Erdogan." *Kurd II*, 438 F. Supp. 3d at 80, *aff'd Usoyan*, 6 F.4th at 40-41.

---

[6] In the event the Court disagrees and concludes that (a) Plaintiffs are required to amend to pursue their sex- and gender-based bias theory and (b) the amendment would be substantial enough to require Plaintiffs to serve an amended complaint upon Turkey, then Plaintiffs will instead withdraw their sex- and gender-based bias theory. *See Strange*, 2016 WL 10770678, at *4.

[7] The process of identifying the assailants was extensive and included the use of facial recognition methodology. SMF ¶ 166. Furthermore, with the exception of a handful of civilians who joined the attack, the assailants were mostly dressed alike – in either a dark suit and tie or with khaki pants, an olive-green military-style jacket, and combat boots – and each was wearing an earpiece that they appeared to be communicating through. SMF ¶ 15. Similarly dressed persons were present on the grounds of the Chief of Mission Residence when President Erdogan arrived and can be seen on video escorting President Erdogan from his vehicle. SMF ¶¶ 47-49.

**PUBLIC REDACTED VERSION**

To the extent any further analysis is necessary, both the facts and the caselaw confirm that the attack was within the agent's scope of employment for the Republic of Turkey. Courts in D.C. "apply the scope-of-employment test very expansively" – so much so that it "often is akin to asking whether the defendant merely was on duty or on the job when committing the alleged tort." *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008) (Kavanaugh, J.). "Even a servant's unauthorized intended tortious acts are within the scope of employment if they are 'done in connection with the servant's employment' and 'not unexpected in view of the duties of the servant.'" *Doe v. Exxon Mobil Corp.*, 573 F. Supp.2d 16, 27 (D.D.C. 2008). The test is met if a tortious act is committed even only in part to serve the tortfeasor's employer. *See, e.g.*, *Blair v. District of Columbia*, 190 A.3d 212, 226 (D.C. 2018) ("To come within that scope, an employee's actions need not be wholly in furtherance of the employer's business."). Thus, "if the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge." *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014) (quoting *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 (D.C. 2000)); *see also, e.g.*, *Lyon* 533 F.2d at 655.

The use of force is "not unexpected" when the tortfeasor's job duties create the "possibility of confrontation." *Hicks v. Office of the Sergeant at Arms for the U.S. Senate*, 873 F. Supp. 2d 258, 269 (D.D.C. 2012). As this Court has already held, when "security forces" are employed, "the use of some degree of force is not unexpected." *Kurd II*, 438 F. Supp. 3d at 80; *see also, e.g.*, *Steele v. Meyer*, 964 F. Supp. 2d 9, 20 (D.D.C. 2013) (presence of "armed Military Police Officers" during meeting "points to the conclusion that the possible need for the use of force was anticipated").

In light of the breadth of this test, courts in D.C. have often concluded that heinous acts were committed in the scope of employment. *See Harbury*, 22 F.3d at 422 (torture and extrajudicial killing); *Lyon v. Carey*, 533 F.2d 649, 654 (D.C. Cir. 1976) (rape during a furniture delivery); *Doe*, 573 F. Supp. 2d at 27-28 (sexual assault, torture, and extrajudicial killings); *Brown*, 782 A.2d at 758 (sexual abuse of a minor); *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (shooting a laundromat customer). Turkey is similarly liable here for the heinous acts of its agents, committed while on duty during President Erdogan's visit to the United States.

Here, Plaintiffs submit expert testimony showing that the Turkish government has a policy of silencing violently silencing those who speak in favor of Kurdish rights – especially the HDP and its supporters. *Supra* Part III.B.2; SMF ¶¶ 180-182. President Erdogan's security guards have repeatedly engaged in similar attacks on protestors and journalists during foreign visits. SMF ¶ 163. This is sufficient to show that they were acting within the scope of employment. *Miango*, 288 F. Supp. 3d at 125 (allegations that members of Congolese President Joseph Kabila Kabange's presidential security detail had previously committed violence against Congolese dissidents sufficient to show that they were acting within the scope of their employment when they assaulted a group of peaceful protestors). Furthermore, the conduct need only be "incidental" to the employee's duties. *See Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.D.C. 2006). "Conduct is incidental if it is foreseeable." *Hicks v. Office of the Sergeant at Arms for the U.S. Senate*, 873 F. Supp. 2d 258, 265 (D.D.C. 2012). And the foreseeability inquiry "is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf." *Id.* (quoting *Wilson v. Libby*, 498 F. Supp. 2d 74, 97-98 (D.D.C. 2007)). Here, as in *Miango*, the conduct was foreseeable. Moreover, there is good reason to believe Turkey's agents launched the attack to serve the ends

of the Turkish government. As discussed above, it is the policy of the Erdogan regime to silence dissent, especially dissent on matters of Kurdish rights and dissent expressed by HDP supporters. *Supra* Parts III.B.2 & V.B.5; SMF ¶¶ 175-85.

## VI.  CONCLUSION

For the above reasons, Plaintiffs' motion should be granted.

Dated: September 29, 2023                    Respectfully submitted,

/s/ Agnieszka M. Fryszman
Agnieszka M. Fryszman, DC Bar No. 459208
Nicholas J. Jacques, DC Bar No. 1673121
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, DC  20005
Tel: (202) 408-4600
Fax: (202) 408-4699
afryszman@cohenmilstein.com
njacques@cohenmilstein.com

Mark S. Sullivan*
Joshua Colangelo-Bryan*
**DORSEY & WHITNEY LLP**
51 West 52nd Street
New York, NY 10019
Tel: (212) 415-9245
sullivan.mark@dorsey.com
colangelo.joshua@dorsey.com

Michael E. Tigar, DC Bar No. 103762
601 W. Rosemary Street No. 317
Chapel Hill, NC 27516
Tel: (202) 549-4229
metigar@gmail.com

***Attorneys for Plaintiffs***