Exhibit 47

Case 1:18-cv-01117-CKK-ZMF   Document 105-10   Filed 09/27/23 Page 2 of 9
Case 1:18-cv-01117-CKK   Document 04-5   Filed 09/20/83 Page 2 of 153
USCA Case #20-7017   Document #1872595   Filed: 11/20/2020   Page 173 of 268

SC08.
**Dorsey & Whitney LLP**
**July 29, 2019**
**Transcript by TransPerfect**

0:00:32 **MALE 1:** [ENGLISH]

0:00:43: **SINAN NARIN (AMCIT):** [ENGLISH]

0:00:45: **MALE 1:** [ENGLISH]

0:00:48: **SINAN NARIN (AMCIT)** [ENGLISH]

0:00:58: **MALE 3:** [ENGLISH]

[INDISCERNIBLE]

0:01:15: **MALE 1:** [ENGLISH]

0:01:39: **MALE 1:** [ENGLISH]

0:01:44: **YURTERI, HAMZA:** [ENGLISH]

0:01:50: **MALE 1:** [ENGLISH]

0:02:09: **MALE 5:** [ENGLISH]

0:02:11: **MALE 1:** [ENGLISH]

0:02:09: **MALE 5:** [ENGLISH]

0:02:16: **MALE 1:** [ENGLISH]

[INDISCERNIBLE]

0:03:11: **MALE 1:** [ENGLISH]

0:03:14: **EREN, HARETTIN:** [ENGLISH]

0:03:17: **MALE 7:** [INDISCERNIBLE] [ENGLISH]

0:03:20: **MALE 1:** [ENGLISH]

0:03:21: **EREN, HARETTIN:** [ENGLISH]

0:03:23: **MALE 7:** [ENGLISH]

0:03:25: **MALE 8:** [ENGLISH]

0:03:34: **MALE 1:** [ENGLISH]

0:03:40: **MALE 7:** [ENGLISH]

[INDISCERNIBLE]

0:04:31: **MALE 1:** [ENGLISH]

0:04:48: **MALE 9:** [ENGLISH]

Case 1:18-cv-01117-CKK-ZMF   Document 105-10   Filed 09/27/23   Page 3 of 9
Case 1:18-cv-01117-CKK-ZMF   Document 84-15   Filed 09/29/23   Page 3 of 153
USCA Case #20-7017   Document #1872595   Filed: 11/20/2020   Page 174 of 268

**SC08.**
**Dorsey & Whitney LLP**
**July 29, 2019**
**Transcript by TransPerfect**

0:04:54: **MALE 10:** [ENGLISH]

0:05:00 **MUSTAFA MURAT SUMERCAN (MEMBER OF TSD/SUBJECT AM):** I'm going to take that flag to put in your mom's pussy. I'm going to fuck your mom's pussy.

0:05:00: **MALE 11:** [ENGLISH]

0:05:07: **MALE 12:** I will ask you to pay for this!

0:05:08: **MALE 1:** [ENGLISH]

0:05:14: **MALE 13:** 15 police officers my friends! Everyone just keep standing wherever you are!

0:05:16: **MALE 7:** [ENGLISH]

0:05:26: **MALE 14:** [ENGLISH]

0:05:36: **MALE 8:** [ENGLISH]

0:05:39: **MALE 1:** [ENGLISH]

0:05:43: **MALE 8:** [ENGLISH]

0:05:44: **MALE 1:** [ENGLISH]

0:05:47: **MALE 8:** [ENGLISH]

0:05:47: **MALE 1:** [ENGLISH]

0:05:47: **MALE 8:** [ENGLISH]

0:05:55: **MALE 1:** [ENGLISH]

0:05:57: **MALE 8:** [ENGLISH]

0:05:59: **MALE 1:** [ENGLISH]

0:06:01: **MALE 8:** [ENGLISH]

0:06:05: **MALE 1:** [ENGLISH]

0:06:01: **MALE 8:** [ENGLISH]

0:06:11: **MUTLU, HALIL:** [ENGLISH]

0:06:13: **MALE 8:** [ENGLISH]

0:06:15: **MALE 1:** [ENGLISH]

0:06:17: **MUTLU, HALIL:** [ENGLISH]

0:06:18: **MALE 1:** [ENGLISH]

SC08.
Dorsey & Whitney LLP
July 29, 2019
Transcript by TransPerfect

0:06:20: **MALE 7:** [ENGLISH]

0:06:21: **MALE 1:** [ENGLISH]

0:06:42: **MALE 16:** [ENGLISH]

0:06:48 **MALE 13:** 15 of them friends! Go towards the back side! Come backwards!

0:07:22 **MALE 17:** Guys come here! Guys! Guys!

[INDISCERNIBLE]

0:08:35 **MALE 17:** Guys! Come over here guys! Let's calm down! Turkish people over here! Red!

0:08:44 **MULTIPLE MALES AND FEMALES:** White!

0:08:45 **MALE 17:** Red!

0:08:45 **MULTIPLE MALES AND FEMALES:** White!

0:08:46 **MALE 17:** Red!

0:08:47 **MULTIPLE MALES AND FEMALES:** White!

0:08:48 **MALE 17:** The Greatest

0:08:49 **MULTIPLE MALES AND FEMALES:** Turkey!

0:08:50 **MALE 17:** The Greatest

0:08:51 **MULTIPLE MALES AND FEMALES:** Turkey!

0:08:52 **MALE 17:** Recep Tayyip Erdogan!

0:08:53 **MULTIPLE MALES AND FEMALES:** Recep Tayyip Erdogan! Recep Tayyip Erdogan! Recep Tayyip Erdogan! Recep Tayyip Erdogan! Recep Tayyip Erdogan!

0:09:18 **MALE 17:** Red!

0:09:19 **MULTIPLE MALES AND FEMALES:** White!

0:09:19 **MALE 17:** Red!

0:09:20 **MULTIPLE MALES AND FEMALES:** White!

0:09:21 **MALE 17:** Red!

0:09:22 **MULTIPLE MALES AND FEMALES:** White!

0:09:23 **MALE 17:** The Greatest

0:09:24 **MULTIPLE MALES AND FEMALES:** Turkey!

Case 1:18-cv-01117-CKK-ZMF Document 84-5 Filed 09/29/23 Page 5 of 153
Case 1:18-cv-01117-CKK Document 105-10 Filed 09/27/19 Page 5 of 9
USCA Case #20-7017 Document #1872595 Filed: 11/20/2020 Page 176 of 268

SC08.
Dorsey & Whitney LLP
July 29, 2019
Transcript by TransPerfect

0:09:25 **MALE 17:** The Greatest

0:09:26 **MULTIPLE MALES AND FEMALES:** Turkey!

0:09:29 **MALE 17:** This nation can't be divided!

0:09:31 **MULTIPLE MALES AND FEMALES:** This nation can't be divided! This nation can't be divided! This nation can't be divided! This nation can't be divided!

0:09:46 **MALE 1:** [ENGLISH]

[INDISCERNIBLE]

4

# Exhibit 52

Case 1:18-cv-02117-CKK-MF Document 24-5 Filed 09/28/23 Page 7 of 153
Case 1:18-cv-02117-CKK Document 56-9 Filed 06/07/19 Page 206 of 2
USCA Case #20-7017 Document #1872595 Filed: 11/20/2020 Page 204 of 240

# SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CRIMINAL DIVISION
### UNITED STATES
### VS
### NECMI, AYTEN
CCN #: **17082031**

Arrest Number: 021718493

The event occurred on **05/16/2017** at approximately **16:01** at **GENERAL PHILIP SHERIDAN CIRCLE / SHERIDAN CIRCLE, SHERIDAN CIRCLE NW, WASHINGTON, DC 20008**

The event occurred on 5/16/17 at approximately 1615 hours at the southwest corner of Sheridan Circle N.W. Washington, D.C.

MPD Officers were working a detailed assignment in reference to escorting a group of peaceful protesters from Lafayette Square Park which is located at 1600 Pennsylvania Ave.N.W. towards the vicinity of the Turkish Embassy residence at 1606 23rd St. N.W. Within the first hour and upon the arrival at the Turkish Residence, a group of a radicalized protesters began taunting the peaceful protesters. The radicalized group began shouting obscenities and derogatory remarks towards the peaceful protesters. A group of approximately four to five Middle Eastern men dressed in dark clothing came from within the crowd and began attacking several of the peaceful protesters. Approximately eight victims came forward stating they were attacked, thrown onto the ground and stomped on several times.

One victim, Sub-1, stated she observed one of the men within the crowd as the suspect who threw her onto the ground then began kicking and punching her. She identified him as a Middle Eastern male wearing a dark suit and tie. The individual she identified was still in the large crowd of protesters and began pushing and shoving several other peaceful protesters. MPD officers apprehended the Middle Eastern male here forth known as Defendant Ayten Necmi .

Several of the other suspects who assaulted the additional victims fled the scene during the mass victim rescuing and melee. Secret Service, MPD and Park police Detectives all responded to the scene and conducted further interview. SUB-1 sustained injuries to her knees, lower back and head. Sub-1 responded to the hospital for treatment by the DCFEMS Mass casualty Bus along with eight other victims.

Defendant Ayten Necmi was placed under arrest for Aggravated Assault and transported to the Second District for processing.

The event and acts described above occurred primarily in the District of Columbia and were committed as described by defendant(s) listed in the case caption.

Subscribed and sworn before me this **05/16/2017**

| | |
|---|---|
| **ALBERTI, TABITHA / 2447 / 7800 (05/16/2017) E-SIGNATURE** | **FLEMING, WALTER / 2811 (05/17/2017) E-SIGNATURE** |
| Police Officer / Badge# / CAD# | Unit      Witness / Deputy Clerk |
| **ALBERTI, TABITHA / 2447 / 7800** | **FLEMING, WALTER / 2811** |
| Printed Name of Member / Badge# / CAD# | Printed Name of Witness / Deputy Clerk |

The foregoing statement was made under penalty of criminal prosecution and punishment for false statements pursuant to D.C. Code 22-2405

Exhibit 54

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Kurd, *et al.*, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No.: 1:18-cv-1117-CKK |
| The Republic of Turkey, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF DR. RONALD M. LAYTON

I, Dr. Ronald M. Layton, declare as follows:

1.     I am over the age of eighteen (18) and am fully competent to make this Declaration. I have personal knowledge of the facts attested to below that derive from my professional experiences and training, and my knowledge of the attack on those protesting President Erdogan and his regime at Sheridan Circle and Massachusetts Avenue on May 16, 2017.

2.     My knowledge of this attack stems from the videos filed by Defendant Turkey and those provided by Plaintiffs' counsel, as well as my review of the Plaintiffs' First Amended Complaint, the Defendant Turkey's Motion to Dismiss and its supporting exhibits, police reports prepared by the District of Columbia Metropolitan Police Department (MPD), documents produced by the United States Department of State, English translations of statements made by members of the Turkish Security Detail (TSD) present at Sheridan Circle, maps of the area surrounding Sheridan Circle, and a site visit to Sheridan Circle.

3.     I am currently the CEO and founder of LCR Enterprises, LLC, a private

4851-6098-7558\1

company that specializes in consultations regarding security matters. Prior to forming LCR, I was employed by the United States Secret Service (USSS or Secret Service) for more than 26 years. My relevant work experience is encapsulated within this document and a copy of my résumé is attached hereto as Exhibit A.

4.    I was retained by Plaintiffs' counsel to provide expert analysis and opinions in the matter of *Kurd, et al. v. The Republic of Turkey, et al.* regarding, among other things, non-confidential security protocols and procedures for hosting a foreign dignitary in the United States and an assessment of the security situation including the responsibilities and actions of the USSS, local law enforcement, and the TSD, in relation to the attacks on protesters that took place at Sheridan Circle, and near the Embassy of Turkey, on May 16, 2017.[1]

5.    In reaching the conclusions contained herein, I applied my professional experience as the former Deputy Assistant Director of the USSS (Office of Protective Operations and Office of Strategic Intelligence and Information) and the former USSS Key Intelligence Official. I also relied on my other professional experience, training, and knowledge gained during 26 years with the USSS, including assignments in the elite Presidential Protective Division for Presidents Clinton and Bush (41) and the Counter Assault Team, where I was Team Leader and Squadron Commander. I held this position during the Clinton, Bush (43), and Obama administrations.

6.    I further relied on my experience as the Deputy Assistant Director and Acting Assistant Director of the USSS Strategic Information and Intelligence Division,

---

[1] I also provided a declaration on behalf of Plaintiffs in the related matter, *Usoyan, et al. v. The Republic of Turkey.*

4851-6098-7558\1

which is responsible for producing threat intelligence products for all U.S. Presidents and all visiting foreign heads of state, and the Deputy Assistant Director of the Office of Protective Operations, responsible for the supervision of the Dignitary Protective Division. The Dignitary Protective Division is responsible for the protection of all visiting heads of state, as well as all National Special Security Events.

7.      LCR Enterprises, LLC is being compensated at a flat rate for my time spent in undertaking the analyses contained herein and conveying my opinions and conclusions to Plaintiffs' counsel. My compensation is not contingent upon the nature or substance of my opinions and conclusions, nor is it contingent on the outcome of this matter.

## I.      GENERAL QUALIFICATIONS AND PROFESSIONAL BACKGROUND

8.      I am an experienced professional in law enforcement, executive protection, special event security, cyber security, and protective technologies. Prior to joining the USSS, I worked as a Police Academy Instructor in western Pennsylvania, teaching defensive measures, escalation of force, mechanics of arrest, and control tactics. I held instructional licenses issued by the Pennsylvania State Police under the Pennsylvania Municipal Police Officers' Education and Training Act and the Pennsylvania Lethal Weapons Training Act. I also held instructional licenses to teach defensive tactics with the Police Survival and Defense Institute, the American Society of Law Enforcement Trainers, and the Justice System Training Association.

9.      As a licensed police academy instructor, I taught hundreds of police academy recruits, as well as hundreds of police officers during "in-service" training, in the use and escalation of force and control/arrest tactics. Overall, in my 30-year law enforcement career, I have instructed more than 1,000 personnel in defensive

3

measures/tactics, escalation of force, control tactics, and the use of lethal weapons. As an accomplished instructor of such tactics, I have taught at numerous national law enforcement symposiums to a wide range of officers.

10.     My 26-year USSS career included ten supervisory assignments and the supervision of hundreds of personnel. I retired as a Senior Executive, supervising seven USSS Divisions and seven subordinate Special Agents in Charge. As referenced above, I was a member of the elite Presidential Protective Division (PPD) and was responsible for protecting the lives of President Clinton and President Bush (43). In this capacity, I conducted advance preparations, domestically and overseas. I worked in the immediate proximity of the President to perform protective duties; often within one to three feet. During this same time, I also worked on the elite Presidential Counter Assault Team (CAT), which serves as the principal and immediate tactical response to a terrorist attack.

11.     As a CAT member and supervisor, I worked hundreds of protective movements, protecting Presidents Clinton, Bush (43), and Obama; Vice Presidents Cheney and Biden, domestically and overseas (including in two war zones, Iraq and Afghanistan); and numerous visiting foreign heads of state.

12.     Working as a member of the elite CAT, I received highly specialized training, including in the following tactical domains: motorcade tactics, close quarter battle, explosive breaching, use of specialized munitions, improvised explosive recognition, terrorist tactics and weapons systems, building defense, and tactical egress tactics. While on the CAT, I trained and worked with members of U.S. Special Forces, including the U.S. Navy Seal Development Group (also known as Seal Team Six) and U.S. Army Delta Force, as well as the Federal Bureau of Investigation's Hostage Rescue

4

4851-6098-7558\1

Team. The training involved with these elite units centered on recognition and highly advanced response tactics to potential and actual terrorist attacks.

13.    During the Obama administration, I was a supervisor in the Special Operations Division and was the tactical architect and planner for several National Special Security Events (NSSE). An NSSE is a large-scale event of international significance and a potential target of terrorist activity. The full force of the United States Government is utilized to protect these events under the direction of the USSS.

14.    In 2007 and 2008, I was the tactical architect for the protection of the heads of state who visited the United Nations General Assembly. In this capacity, I was responsible for designing security plans to recognize and respond to terror attacks on all high-level foreign dignitaries visiting the United Nations.

15.    In 2008, I was the primary tactical architect designing security plans for the purpose of recognizing, responding to, and ultimately neutralizing terrorist attacks for the following NSSEs: the Republican National Convention, the Democratic National Convention, a visit of the Pope to the United States, and the G-20 Summit. I also functioned as the on-site incident commander for each of these events, responsible for the deployment of resources to address any threat.

16.    In 2015, I became the Special Agent in Charge of the White House Technology section and the first presidentially appointed (via Presidential Memorandum) "Technical Liaison." In that capacity, I was responsible for the daily operations and long-term strategy for presidential information systems. I was also responsible for protecting the White House complex against all technological threats to include, but not limited to: drone attacks, magnetometer operations, and cyber intrusions. I conducted research and

provided countermeasures regarding significant foreign technological based threats (to the White House and First Family), as well as countering attempts by foreign threat actors to ascertain sensitive information from the White House complex.

17.    In 2017, I became the Deputy Assistant Director as well as the Acting Assistant Director of the Strategic Intelligence and Information Division (SII), which is responsible for providing threat intelligence for all USSS protectees as well as all visiting foreign heads of state. In this capacity, I supervised the Counter Surveillance Division (CSD) as well as all authorized counter surveillance activity around the White House complex and in connection with other USSS protectees. The principal purpose of the CSD is to detect terrorist pre-attack indicators and, if necessary, prevent terrorists from attacking USSS protectees or protected facilities. During my tenure as the Acting Assistant Director, I was also the Secret Service Key Intelligence Officer and the top Intelligence Official at the agency.

18.    My next appointment (2018) was as the Deputy Assistant Director for the Office of Protective Operations. In this capacity, I supervised the Dignitary Protective Division and all former presidential protective divisions. I also supervised the daily operations for all visiting foreign heads of state.

19.    During my professional career, I have responded to and supervised responses to acts of aggression and attacks on USSS protectees. I have been intimately involved with the removal and relocation of protectees based on emergency circumstances as well as commanding immediate additional protective resources from other USSS personnel and the U.S. military. It is extremely rare for USSS personnel to respond to actual acts of aggression and attacks, primarily due to extensive advance

4851-6098-7558\1

（

preparations and the adherence to security plans. The emergency actions that I took were guided by my training and experience in Secret Service, Assault on Protectee Protocols.

20. Based on the above experience, I am well versed in the training, protocols, and execution of foreign head of state visits to the United States.

## II. RELEVANT SPECIALIZED EXPERIENCE AND ACHIEVEMENTS

21. During my career, I have performed all aspects of foreign dignitary protection. I have been an advance agent responsible for site planning and a shift agent, *i.e.,* a non-supervisory agent on a protection team who reports to a detail leader. I have also been a detail leader, responsible for supervising multiple USSS personnel. As detail leader, I have had many conversations and briefings with foreign heads of state and their security representatives about security protocols and planning.

22. I have also been assigned as CAT Leader, protecting high risk foreign dignitaries from terrorist actions. During my career, I have conducted terrorism investigations and am well versed in the legal and authorized investigative techniques that prevent acts of terrorism.

23. In my role as Deputy Assistant Director (and Acting Assistant Director) of SII, I was responsible for providing threat intelligence to protective details to include the division responsible for the protection of foreign dignitaries. In this capacity, I was also responsible for directing investigative assets to determine the level of danger that a subject posed to USSS protectees.

24. In my role as Deputy Assistant Director of the Office of Protective Operations, I supervised the Dignitary Protective Division. In that capacity, I was responsible for supervising the protection of numerous foreign dignitary and head of state visits, and I was frequently briefed by the subordinate Special Agent in Charge regarding

7

the security plans. I could approve or deny additional protective assets based on my expertise and the availability of resources.

25.     Over my course of service, I held supervisory assignments in the field, and at USSS headquarters, Department of Homeland Security headquarters, and the White House. Because of my well-rounded knowledge of USSS matters, I represented the agency at numerous law enforcement conferences, university events, in congressional testimony preparations, and in briefings to the White House. During my career, I routinely mentored USSS personnel with respect to leadership, technical competencies, and advancement criteria.

26.     My ten supervisory assignments, culminating in two Senior Executive Assignments, provided an extraordinary and holistic understanding of how the USSS functions and the significant complexities leveraged to keep protectees safe. In addition, my decades of experience instructing law enforcement officers in defensive measures, control tactics, and force escalation provides a high level of expertise when analyzing the appropriateness of the actions taken by the TSD as well as determining if the use of force was directed at accomplishing a legitimate protective objective.

27.     In 1998, I was the case agent investigating a subject who was planning to assassinate a U.S. Congressman and detonate a bomb at the White House. At the culmination of this investigation, I secured a sworn confession from the subject indicating his intent to construct and detonate a bomb at the White House. In October of 1998, the subject pled guilty to one count of solicitation of another to use an explosive device to damage or destroy a building owned by the United States, in violation of 18 U.S.C. § 373. This case (*United States v. Byron Bazarte*) was chronicled by the U.S.

8

Department of Justice as one of 12 prevention of terrorism cases in the United States during 1998.[2]

28.    It is rare for a USSS agent to be credited with an acknowledgement from the U.S. Department of Justice for the prevention of a terrorist attack. It is incomparably rare for a USSS agent to be credited with preventing an act of terrorism where the subject of the investigation planned to construct and detonate a bomb at the White House. I received such acknowledgements for my role in the *Bazarte* matter.

29.    In March of 2019, I was recognized by the Police Survival and Defense Institute (PSDI) as a "Pioneer of Police Self Defense Instruction" and inducted into the PSDI Hall of Fame for a lifetime of dedicated instruction to law enforcement in the field of defensive measures and control tactics. The PSDI specializes in the instruction of defensive and control tactics and is one of the oldest organizations of its kind in the United States. The PSDI enjoys a high level of prestige, having instructed thousands of law enforcement officers over the organization's more than 40 years of existence.

## III.    GENERAL PROTOCOL FOR HEAD OF STATE SECURITY PROTECTION

### A.    Methodology for Protection

30.    The USSS depends on concentric circles of protection as a model and methodology to keep its protectees safe, whether the protectee is the U.S. President or a foreign head of state. The outer perimeter is considered the first line of defense and is often in proximity to protesters. The middle perimeter serves as a redundant form of protection. This position is staffed almost exclusively with USSS personnel and often

---

[2] "Terrorism in the United States 1999," Counterterrorism Threat Assessment and Warning Unit, Counterterrorism Division, U.S. Department of Justice, Federal Bureau of Investigation, https://www.fbi.gov/stats-services/publications/terror_99.pdf.

9

occupied by agents who have additional weapons systems and protective equipment to repel an attack. The inner perimeter provides immediate 360 degree proximity protection to protectees. Often, the circumference of this inner perimeter is only 1 to 5 feet, but it will expand and contract based on protectee movement. The inner perimeter is by far the most critical circle of protection, given its proximity to the protectee.

31.     The overarching "golden rule" as taught to all Secret Service agents is that "the least amount of agents" addresses a threat outside the inner perimeter, while "the greatest amount of agents" stays with the protectee. Consistent with this standard methodology, personnel assigned to the inner perimeter would not leave that perimeter to address an issue in the middle or outer perimeter because the most sacred area of protection would be weakened due to the absence of personnel, increasing the protectee's vulnerability to a successful attack. Furthermore, an individual agent's absence from the inner perimeter could result in significant deterioration of the 360 degrees of protective coverage to a protectee.

32.     Disturbances at the outer perimeter, whether manifested in the form of civil protest, civil disturbance, or a terrorist attack, are handled by outer perimeter forces. A Presidential Protective Division Special Agent would never leave the inner perimeter of the President to address an outer perimeter threat. This would be antithetical to Secret Service doctrine.

33.     These principles are so fundamental to executive protection that they would be employed by any well-trained security detail.

**B.     The Role of Intelligence Before and During the Visit**

34.     Prior to the visit of a high-level foreign head of state, such as President Erdogan, USSS-SII would prepare a threat assessment document that would be

10

disseminated to the detail agents assigned to the Turkish President. This document would contain historical data regarding previous visits and on-going threats to the protectee. SII would also monitor threats received by members of the U.S. Intelligence Community (USIC) and immediately notify detail agents and USSS Protective Intelligence (PI) agents of an emergent threat or attack plan that would occur at a site or during a protest. The ability to notify PI agents or detail agents would be maintained on a 24 hour basis and during the entirety of the visit to the United States.

35.    PI agents also are vigilant in the "real time" monitoring of crowds, because protests can be volatile with various levels of excitation. PI agents communicate the existence of a threat perception to other USSS personnel, including to detail agents and their counterparts in foreign security details. PI agents would also have intelligence provided by SII relative to ongoing threats to the protectee. It is common for agents who are assigned "fixed" positions on the outer perimeter to call PI agents for the purpose of investigating suspicious people or groups, or packages that could be Improvised Explosive Devices (IED).

36.    SII has an exceedingly strong partnership with the USIC as well as other Intelligence Organizations around the world.  The USSS relationship with the USIC is one of the principal mechanisms used to protect the life of the U.S. President and other individuals under USSS protection, such as a foreign head of state.

37.    SII was and is aware that many countries whose officials visit the United States, such as Turkey, are home to various hostile and radical non-state political actors, some of which are recognized as foreign terrorist organizations. As a result, SII would have relayed any advance information regarding an assassination threat on President

11

4851-6098-7558\1

Erdogan. In such an instance, SII also would have disseminated information regarding tactics and techniques that a terror organization might deploy against President Erdogan. This information would have been shared with the foreign counterparts as well as with USSS and MPD.

## C.     First Amendment Considerations

38.     Secret Service agents are trained to distinguish between civil protests or acts of civil disturbance, and an actual attack on protectees. The Secret Service is well versed in the principle that civil protest by individuals who exercise their First Amendment rights to assembly and freedom of speech must be respected.

39.     It is a standard occurrence for protesters to assemble in relatively close proximity to a USSS protective event site or a USSS protectee. While the USSS frequently constructs protective perimeters, a lawful respect for individuals engaging in First Amendment activity is adhered to and never disregarded.

40.     In my experience, security personnel and officials visiting the United States from countries that do not respect free speech and assembly will often ask the Secret Service to prohibit any assembly in proximity to their protectee. This request is always denied pursuant to 18 U.S.C. § 112(d), a criminal statute that relates to the protection of foreign officials, but explicitly provides that it is not to be construed or applied in a manner that violates the First Amendment. Moreover, it is standard procedure for Secret Service agents to brief visiting head of state security details about civil protest and the impropriety of U.S. law enforcement arresting people for simple assembly, protest, and speech maligning a head of state.

## IV.     ANALYSIS OF THREATS AT SHERIDAN CIRCLE

41.     As a threshold matter, verbal altercations, acts of civil disturbance, or even

12

a series of fist-fights or the throwing of water bottles, do not constitute an imminent threat to a protectee and are not pre-attack indicators. Rather, pre-attack indicators that could be identified through intelligence reporting or surveillance include, but are not necessarily limited to:

- Subjects carrying cases capable of concealing long weapons (*i.e.* rifles);
- Bulges around the waist of subjects indicative of a concealed weapon;
- Excessive cell phone use prior to arrivals and departures;
- Coordinated movements of subjects in proximity to protected site; and
- Seizure of high ground terrain in proximity to protected site.

In my review of the video attached to Turkey's Motion to Dismiss, I did not witness any of the aforementioned pre-attack indicators at Sheridan Circle.

### A.   The Prospect of a Handgun Threat

42.   Herein I will address the concept raised by Michael White, whose declaration was submitted by Turkey, that there was a hand gun threat present at Sheridan Circle that posed a risk for President Erdogan. Def.'s Ex. 2, Declaration of Michael White ("White Decl.") at ¶ 35.

43.   The TSD and USSS would have been cognizant of the potential of a handgun threat at Sheridan Circle. Significant considerations when determining handgun effectiveness are line of sight to the target as well as the natural and man-made barriers that would obscure the view of the intended target.

44.   I visited the site under review and physically determined the various lines of sight that would have been necessary for the use of a handgun at Sheridan Circle in relation to President Erdogan's arrival point. As a result of my site review, it is my

13

assessment that no trained security agent would have had an objectively reasonable basis to believe that a handgun would have been an effective weapon at Sheridan Circle in relation to President Erdogan.

45.     I determined that the distance from the sidewalk bordering Sheridan Circle (on which protesters stood prior to President Erdogan's arrival) to the arrival point of his vehicle was approximately 130 feet.[3] *See* Pls.' Ex. 9. Moreover, the arrival point was higher in altitude than the location of the protesters and was significantly obscured by foliage and shrubs. *See* Pls.' Ex. 2, Exs. A and B; Def.'s Ex. 6, at File No. SC12 at 0:00-1:50.

46.     For purposes of comparison, 130 feet is well beyond the distance that a Secret Service agent qualifies (on a sterile pistol range) with his or her issued handgun. The combination of the distance involved as well as the obscured line of sight to the target is such that an "aimed" shot would have been nearly impossible to execute, which severely minimizes the threat of a handgun at the site under review.

47.     This opinion rests on my experience as a USSS firearms instructor for more than 20 years designated by the USSS as an "Expert" in marksmanship, my experience as a highly seasoned high threat security architect for numerous large scale events, and my significant experience on the elite CAT.

48.     Moreover, I saw no evidence on any video depicting the events at Sheridan Circle that objectively would have raised concerns to a trained security

---

[3] Conversely, Michael White states that he "understands" the distance between the protesters and the "sidewalk on the Residence side of Massachusetts Avenue" to be 50 feet. White Decl. at ¶ 35. It is unclear what it means for Mr. White to "understand" what a particular distance is. but in any event, the critical measurement is between the protesters' location and the arrival point. not the sidewalk.

14

professional that any individual (other than TSD and U.S. government personnel) had a handgun. I also saw no evidence that any security agent took the actions that would properly be taken in response to a handgun threat. Specifically, I did not observe protesters being stopped, detained, frisked, patted down, or questioned by the TSD, MPD or Secret Service (other than for one protester whom MPD handcuffed as a result of the melee). Given the absence of such actions, there is no reason to believe that any security agent on the scene believed there was a handgun threat from the protesters.

## B.    The Prospect of an IED Threat

49.    Herein I will address the proposition raised by Michael White, that there was an IED threat present at Sheridan Circle that posed a threat to President Erdogan. White Decl. at ¶ 35. White's proposition is based on the fact that one protester carried a backpack and that the TSD "had to assume" the "backpack might contain an IED." *Id.* at ¶ 41.

50.    The fact that an individual is carrying a backpack is far from an adequate basis to determine that there is a legitimate IED threat, let alone a reason that agents would "ha[ve] to assume" the backpack contains an IED. Indeed, given the ubiquitous nature of backpacks in Washington, D.C. (and around the world), the notion that carrying a backpack or other bag while protesting constitutes any manner of pre-attack behavior, involving an IED or otherwise, which would necessitate some follow on from law enforcement, is simply meritless. Otherwise, every protester with a backpack would be stopped, detained, and frisked by law enforcement based simply on carrying a backpack, which obviously does not occur. For all of these reasons, the Secret Service does not consider a protester carrying a backpack as a pre-attack indicator.

51.    Consistent with this, on the video provided by counsel, I witnessed

15

4851-6098-7558:1

numerous civilians in closer proximity to the Turkish Chief of Mission Residence (CMR) than the protesters were. Certain of the civilians in closer proximity were carrying backpacks and other bags, but they did not draw any attention from the TSD. Def.'s Ex. 6, at File No. SC01 at 2:10-2:20; SC05 at 0:55-0:59; SC12 at 10:40-10:55. In fact, I observed several individuals not identified as protesters who were carrying purses or backpacks on the sidewalk closest to the CMR, within just a few feet of President Erdogan's arrival point. *Id.* The TSD did not detain, search, or even seem to notice these individuals. Notably, I saw no indication on the videos that any of the civilians on the sidewalk closest to the CMR, whether wearing bags or not, were screened by the TSD, even though they were in very close proximity to the Residence and President Erdogan's arrival point. *See* White Decl. at ¶ 35 (noting the lack of evidence that protesters had undergone screening, but omitting the lack of evidence that any civilians on the CMR side of the street had been screened).

52.    Further, it would have been impossible for someone standing where the protesters were located on the border of Sheridan Circle to throw a backpack more than 130 feet (through natural and man-made barriers) into the area where President Erdogan's vehicle was positioned upon arrival; it also would have been impossible or nearly impossible to throw it to the CMR. My assertions are based on my physical visit to the incident site, my observation of the distances involved, and my training and experience constructing security architecture for high threat sites. I saw no indication on the videos that any protester even attempted to move toward the arrival point, which would have required by-passing the TSD and U.S. security personnel, such that an IED could have been brought near the arrival point. *See* White Decl. at ¶ 41 (raising notion

16

4851-6098-7558\1

that a protester could have detonated an IED "within feet of the arrival point."). The only backpacks that could have been thrown into the arrival point were those carried by the civilians on the CMR side of the street.

53.    Putting aside backpacks, I did not observe anything on the videos from Sheridan Circle that would have otherwise indicated an IED threat.

54.    I also observed from the videos that no protester was stopped, detained and frisked, or questioned by the TSD, MPD, or Secret Service about the contents of his or her backpack. Moreover, during and after the TSD's second attack on the protesters, TSD agents paid no attention to the backpack that supposedly posed a "significant concern." There is no evidence that the TSD searched or secured the backpack. Rather, the TSD simply attacked and beat the protester who had been carrying the backpack, despite the fact that the protester was no longer carrying the backpack when he was attacked. Def.'s Ex. 6, at File No. SC02 at 2:35-2:45 (protester is wearing a blue t-shirt in middle of screen).

55.    Given that no security personnel took any steps consistent with the belief that an IED threat was present, there is no reason to believe that any member of the TSD, MPD, or Secret Service actually had concerns about an IED threat.

### C.    Threat of Biochemical Weapons

56.    Herein I will address the proposition raised by Michael White, that the protesters could have had biochemical weapons that posed a threat to President Erdogan. White Decl. at ¶ 35. This proposition appears to be based on the fact that one protester sprayed water from a plastic water bottle on the street between Sheridan Circle and the CMR. *Id.* at ¶ 46.

57.    I saw no evidence to suggest that the small amount of liquid sprayed

17

raised legitimate concerns about biochemical weapons. First, the liquid was sprayed in the middle of the street, where it landed, and not at anyone in particular. Def.'s Ex. 6, at File No. SC02 at 1:16-1:18. Second, the individual who sprayed the liquid wore no protective clothing that would have shielded her from the effect of chemical agents and made no attempt to protect herself from the liquid. *Id.* Moreover, the protester walked directly into the area where the liquid had been sprayed immediately thereafter. *Id.* at 1:18-1:28.

58.     Consistent with this, I saw no indication that the TSD or other security agents treated any water bottles as a "suspicious package" or something that "might contain biochemical weapons," as asserted by Mr. White. *See* White Decl. at ¶ 46. I did not observe anyone, including the TSD, local law enforcement, or the Secret Service, react to the spraying of water as a potential threat.

59.     Finally, I note Mr. White's statement that the "Turkish Security Detail would have been trained to treat the dispersal of any liquid as a potential biochemical hazard." White Decl. at ¶ 46. In my experience, I have never seen the mere dispersal of liquid from a water bottle under these circumstances treated as a potential biochemical attack. In fact, just as security details do not treat every backpack as an IED threat, it certainly is not the case that a HAZMAT team is called whenever a protester disperses liquid from a water bottle or that such a protester is stopped, detained, and frisked by law enforcement based simply on spilling or splashing water. For all of these reasons, the Secret Service does not consider a protester dispersing liquid from a water bottle to be a pre-attack indicator, let alone an indicator of a biochemical attack (in obvious contrast to the scenario of an individual throwing a water bottle over the White House fence, in

4851-6098-7558\1

which case, as Mr. White correctly notes, a HAZMAT team would respond). *See id.*

60.   In sum, if the TSD or other security personnel actually believed there to be threats from a handgun, an IED, or a chemical agent, it would have been utterly inexcusable for those agents not to act. Yet, no agent acted in a manner remotely consistent with the belief that such threats existed. In this context, I make the perhaps obvious point that, if an agent believed there were a threat from a gun, IED or chemical agent, there would be no security rationale at all for the agent to wait approximately ten minutes after the threat had supposedly manifested itself and then to run across a street to beat a large group of protesters, including many people who had nothing to do with the supposed threat. As such, the observable conduct of the TSD does not indicate in any manner that those agents believed that a handgun, IED, or chemical-agent threat existed.

## D.     Other Purported Threats

61.   In this section, I will address a number of other assertions made by Michael White regarding the conduct of protesters in Sheridan Circle that he opines reflected "pre-attack behaviors." White Decl. at ¶ 40. Specifically, White claims that protester Jalal Kheirabadi wore a backpack, acted consistently with a person surveilling President Erdogan's arrival point, who "tried to hit and kick his way through," "managed to get around the Turkish Security Detail," and was responsible for "starting the fight." *Id.* at ¶ 41, 43.

62.   I have already addressed that Kheirabadi's wearing a backpack was not a pre-attack behavior. Supra at ¶¶ 49-55. Beyond that, I did not observe any behavior by Kheirabadi on the video that indicates an attempt to surveil anything. Indeed, the portion of the video cited by Michael White does not even show Kheirabadi looking at the CMR, let alone trying to approach it. Def.'s Ex. 6, at File No. SC01 at 0:23-0:41. I saw no

19

evidence on the video that Kheirabadi kicked or hit his way past any members of the TSD. Rather, the video shows Kheirabadi being punched in the head repeatedly by pro-Turkey civilian Alpkenan Dereci[4] and then attacked by multiple TSD agents until an MPD officer faced the attackers and separated them from Kheirabadi. Def.'s Ex. 6, at File No. SC02 at 0:26-0:57.[5] Finally, the video evidence shows that Sinan Narin, a pro-Erdogan civilian, attempted to throw a right-handed punch at Kheirabadi before any other violence had been committed, thus "starting the fight." Def.'s Ex. 6, at File No. SC01 at 0:48-0:50. (Not that it would be of any significance as a general security matter if Kheirabadi or Narin threw the first punch).

## V.    ANALYSIS OF ACTIONS TAKEN AT SHERIDAN CIRCLE

### A.    MPD Efforts to Maintain Order at the Outer Perimeter

63.    After this initial attack on the protesters, the protesters were again moved to the sidewalk bordering Sheridan Circle by MPD officers, while the TSD and pro-Erdogan civilians were on the sidewalk in front of the CMR and in the street abutting that sidewalk. Def.'s Ex. 6, at File No. SC03. Based on my experience working in Washington, D.C. (in Protective Operations and Strategic Intelligence), it was standard practice for MPD to move the protesters across the street from the CMR to Sheridan Circle. This decision served two simultaneous functions: protect the protesters from the

---

[4] I have identified individuals other than Plaintiffs by reference to a government-created video attached to Turkey's Motion to Dismiss as Defendant's Exhibit 6, at File No. SC02. This video contains images and names of TSD agents and pro-Turkey civilians who engaged in violence.

[5] I note that Michael White asserts that Plaintiff Kasim Kurd hit pro-Turkey civilian Alpkenan Dereci with a bullhorn (White Decl. at ¶ 44), but omits to mention that this was in direct response to Dereci's delivering blows to Kheirabadi. Def.'s Ex. 6, at File No. SC02 at 0:21-0:27.

4851-6098-7558\1

Case 1:18-cv-01117-CKK-ZMF   Document 105-5   Filed 09/27/23   Page 22 of 40
Case 1:19-cv-01117-CKK   Document #1872595   Filed: 11/20/2020   Page 115 of 268
USCA Case #20-7017   Document #1872595   Filed: 11/20/2020   Page 115 of 268

free movement of the general public, and protect the general public from the free movement of the protesters. MPD's decision to locate the protesters in the park at Sheridan Circle, across two lanes of traffic from the outer perimeter created by the TSD and local law enforcement, was sufficient to protect President Erdogan's arrival point. Staffing and enforcement of the outer perimeter is a standard function that the USSS asks MPD to perform during visits of protectees. In my experience, MPD is well trained to do so.

64.   From that point forward, the protesters remained on the sidewalk and in Sheridan Circle, and made no attempts to advance towards to the TSD or the arrival point.

65.   Contrarily, I observed multiple U.S. law enforcement officers attempting to keep the TSD and others in the pro-Erdogan crowd from advancing towards the protesters. Again and again, I heard MPD officers order the TSD and other Erdogan supporters back to their side of the street, saying:

- "Sir, don't cross this line. Just stay here." Def.'s Ex. 6, at File No. SC09 at 0:25-0:28.

- "You need to contain yourselves!" *Id.* at 0:54-0:57; 1:00-1:03; 1:10-1:13.

- "Stay back!" *Id.* at 0:49-0:51; 1:43-1:45; 2:42-2:49.

- "Don't cross the white line!" *Id.* at 2:51-2:53.

- "We need order right now." *Id.* at 3:39-3:42.

- "I need you to back up!" *Id.* at 3:47-3:50.

- "You are the head of security. You need to keep your guys back." *Id.* at 6:55-7:00.

66.   I observed U.S. officers attempting to physically restrain the TSD and

21

their agents from crossing the street toward the protesters, contrary to Michael White's assertion that no TSD agents confronted U.S. law enforcement. *See* White Decl. at ¶ 62. It is also telling that the majority of the MPD officers at Sheridan Circle were facing toward the TSD with their backs to the protesters, which is antithetical to the notion that the protesters were the aggressors. Def.'s Ex. 6, at File No. SC06 at 0:00-0:30. It is my expert opinion that the threat to "general order" was the TSD officials rather than those engaging in civil protest.

67.    It is my conclusion that significant police resources were needed to repel Turkish forces rather than protesters; thereby diluting the overall strength of available personnel required to maintain a secure environment and separation between the two groups. My conclusion is supported by experience in constructing numerous high threat site security events as well as my review of body cam footage wherein multiple MPD officers were attempting to stop Turkish agents from rushing across the street for the demonstrated purpose of assaulting and silencing protesters.

68.    It is also my conclusion that Turkish officials and agents, who asked MPD to remove the protesters, simultaneously acted as the primary causal factor for the melee and erosion of order. Moreover, it is my conclusion that the aggressive actions taken by the TSD escalated tensions at the event site with no effort to de-escalate the situation.

69.    In addition to the activity addressed above, the following observed statements[6] and actions of the TSD directly contradict that idea that the TSD's intent was to move the protesters further away from President Erdogan's arrival point for *security*

---

[6] Some of the statements were made in Turkish, for which I have been provided certified English translations, attached to the Opposition as Plaintiffs' Exhibit 6.

22

4851-6098-7558\1

reasons:

    a. Members of the TSD urged protesters via statements and gestures to come

      *closer* to President Erdogan's arrival point, encouraging them to fight.

      Def.'s Ex. 6, at File No. SC06 0:05-0:12 (English Translation at Pls.'

      Ex. 6); Pls.' Ex. 2 ¶¶ 11-13 (interpreting gestures).

    b. Members of the TSD made vulgar and inflammatory statements,

      including:

- "I am going to stick [INDISCERNIBLE] in your ass. You fucking son of a bitch. I am going to fuck your mother." Def.'s Ex. 6, at File No. SC09 2:42-2:52 (English Translation at Pls.' Ex. 6).

- "Make those fuckers shut up! Shut them up!" Def.'s Ex. 6, at File No. SC09 6:55-6:58 (English Translation at Pls.' Ex. 6).

- "Tell him, I am going to fuck his mother. Do not come here. I am going to fuck your mom." Def.'s Ex. 6, at File No. SC09 0:39-0:49 (English Translation at Pls.' Ex. 6).

    c. The Turkish Ambassador responded to a U.S. law enforcement officer

      who told him, "they can protest," by stating, "here, they cannot." Def.'s

      Ex. 6, at File No. SC08 at 3:28.

    d. At another point, the Ambassador complained to a U.S. law enforcement

      officer that the protesters were "provocating [sic]," and said to the officer,

      "just tell them to move away, and they keep on insulting." Def.'s Ex. 6, at

      File No. SC08 at 5:35-5:50.

70. It was a complete breakdown of professionalism and contrary to the goal of maintaining a secure environment for the TSD to hurl insults at and provoke the protesters. Indeed, it was absolutely antithetical to proper practices and completely inconsistent with the notion that the TSD believed the protesters were too *close* when

4851-6098-7558\1

TSD agents encourage protesters to come *closer*, inviting them to cross the street toward the CMR to fight. This is further evidence of a blatant disregard for standard security measures and stands in contrast to any known professional law enforcement standard.

71.     In my expert opinion, MPD and USSS acted with discipline and restraint in their efforts to maintain order as well as continually providing necessary and appropriate protection to President Erdogan by establishing distance between the protesters and the arrival point; with the evidence being that no protester attempted to or actually breached the outer perimeter. Based on my review of the videos and my experience, significant efforts to de-escalate the situation at Sheridan Circle were demonstrated by MPD and the Secret Service.

## B.     Turkish Detail Decision Points

72.     Michael White asserts that the protesters constituted a security threat because they were too close to President Erdogan's arrival point and thus had to be moved further away. White Decl. at ¶¶ 47-50. He states that when U.S. law enforcement officers were unwilling to secure the perimeter in this fashion, "[t]hat was the decision point for the Turkish Security Detail. They had no choice but to react." *Id.* at ¶ 50. This assertion is contradicted by the evidence cited above.

73.     Beyond that and with respect to decision points, the lead agent for the Turkish President bears ultimate responsibility to make appropriate decisions to ensure the safety of his protectee. It is my conclusion that if TSD leadership had deemed that there was an imminent threat to President Erdogan due to MPD's failure to move protesters further way, standard and effective security protocols (shared by all well-trained security details) would have been to move TSD personnel from the street abutting Sheridan Circle *toward* the CMR. In fact, well-established protocols would have been to

24

re-establish a "tighter" and "hardened" perimeter and decrease the distance between
Turkish agents to form an elongated series of human shields to prevent any and all forms
of penetration from protesters. Put differently, if the TSD had believed an attack was
imminent against President Erdogan because of the proximity of protesters, standard
protocols would have mandated that the bulk of their security officers "shrink"
backwards *toward* the protectee and act to shield him while relocating him or holding
him in his vehicle with the doors closed.

74.    However, the TSD did not act in that fashion. Rather, as described in
detail below, TSD agents ran *away* both from the inner perimeter around President
Erdogan and from the outer perimeter to attack protesters (who were outside the outer
perimeter). I cannot overstate the extent to which the TSD's decision to pursue protesters
located in Sheridan Circle, across the street from the CMR and away from the arrival
point, contradicts standard security procedures for perimeter control and the premise that
the TSD perceived a security threat from the protesters. Indeed, if there had been a
legitimate security threat, the TSD's actions would have resulted in making the outer
perimeter and inner perimeter more permeable and would have opened "holes" in the
perimeters, rather than closing them, greatly increasing the protectee's vulnerability.
Leaving the protectee to assault the protesters was a breach of care.

75.    In addition, when TSD agents breached the police line and ran at the
protesters in Sheridan Circle, they did not attempt to engage in any law enforcement
action, let alone action that would be consistent with a belief that protesters were too
close to the CMR. The agents did not seek simply to move protesters further away from
the CMR, which would be the most obvious action if they believed protesters were too

25

close. The TSD did not temporarily detain any individuals as would be appropriate if an individual refused a legitimate request to move. The TSD did not search anyone for weapons, such as through a "pat down." Rather, the TSD indiscriminately punched and kicked the protesters.

76.    For all of these reasons, it is my conclusion that the TSD did not act in a manner suggesting that the protesters posed a security threat. I also conclude that the TSD was not engaged in a legitimate, protocol driven, or acceptable law enforcement action.

## C.    Security Considerations Upon Protectee Arrival

77.    Before the TSD and Secret Service left the White House to bring President Erdogan to the CMR, agents would have been provided a situation report to indicate the level of threat at the arrival location. The practice of obtaining a real time situation report is standard practice prior to all USSS motorcade movements; primarily to ensure that USSS protectees are transiting and arriving in environments that are safe. The situation report would have been passed via USSS radio in real time. The situation report is generally provided several minutes prior to departure. It is highly likely that if the volatility level of the protest at Sheridan Circle was believed to represent an ongoing threat to the protectee, a "site agent" at Sheridan Circle would have contacted the "lead agent" (who would have been with President Erdogan) and advised him or her to hold the protectee on site until the arrival area was safe.

78.    There would have been no reason at all to bring President Erdogan to the CMR if TSD or USSS personnel thought there was any manner of legitimate threat there. Indeed, it would be an unforgivable dereliction of duty for any USSS or TSD security detail to voluntarily bring a protectee *to* the site of a threat. That President Erdogan was

26

brought to the CMR at the time when he arrived is therefore utterly inconsistent with the notion that the TSD or USSS believed there was any appreciable security risk based on the protest in Sheridan Circle.

79. Moreover, it is standard protocol for USSS controlled motorcades to maintain an alternate route of travel to and from USSS controlled sites. It is also standard practice for USSS controlled motorcades to use secondary arrival points in the event of an emergency or some event of significance that would endanger the protectee if the primary arrival were used. I personally identified a potential secondary arrival point at the CMR, which was beyond any line of sight from Sheridan Circle. *See* Pls.' Ex. 10.

80. Beyond the fact that President Erdogan was brought to the CMR in the first place, the fact that the USSS controlled motorcade, with all available real time threat data, did not deviate from the primary arrival point further evidences that neither the TSD nor any other security agents believed that there was an imminent threat to President Erdogan based on the Sheridan Circle protest.

81. Also relevant here is the fact that the motorcade did not pass Sheridan Circle at all, instead travelling on 23rd Street NW, which was closed to traffic. This route significantly minimized any exposure and vulnerability associated with the protectee. The potential secondary arrival point could have also been accessed without requiring the motorcade to transit past Sheridan Circle.

### D.   Violent Actions of the Turkish Security Detail at Sheridan Circle

82. In Michael White's declaration, he stated that he observed the TSD using defensive techniques and minimal use of force, consistent with standard operating procedure. White Decl. at ¶¶ 58-62. Specifically, he writes that he observed TSD agents taking the following sequence of actions: (i) raising their "hands with a motion to stop, as

27

when a police officer raises hands to signal a car to stop"; (ii) assuming defense postures
"with hands positioned in front"; (iii) patting or touching a person's waist to determine if
the person has weapons; (iv) reaching for a person's wrist to control the person; (v) using
"flat hands, not closed fists" to "deflect any physical contact with the minimal use of
force." *Id.* at ¶¶ 59-61.

83.     Suffice it to say that I did not observe any member of the TSD even
remotely employ these tactics. Rather, I observed conduct that bears no relation to these
techniques. Specifically, I observed the following actions by the TSD, among others:

- Hamza Yurteri, Mehmet Sarman, and an unknown TSD agent (Subject I),[7] all
  of whom left the perimeter, kicking Lusik Usoyan and Elif Genc, two young
  women who lay prone and defenseless on the edge of Sheridan Circle, with no
  attempt to control, detain or search them. Def.'s Ex. 6, at File No. SC02 at
  2:46-2:56; SC02 at 3:18-3:20.

- Tugay Erkan, Ismail Ergunduz, Gokhan Yildirim and Subject I, all of whom
  left the perimeter, kicking Murat Yasa, an older man, in the body and head as
  he lay on the ground, with no attempt to control, detain or search him. Def.'s
  Ex. 6, at File No. SC02 at 2:58-3:10; SC02 at 3:18-3:20.

- Servet Erkan, who left the area immediately around President Erdogan's car at
  the command of a security agent who had just spoken to President Erdogan,
  attacking Abbas Azizi, an older man, with no attempt to control, detain or
  search him. Def.'s Ex. 6, at File No. SC02 at 5:20-5:26 (leaving area of car);
  Def.'s Ex. 6, at File No. SC02 at 6:20-6:34 (returning to area of car); Def.'s
  Ex. 6, at File No. SC02 at 2:50-2:55 (attacking Azizi after leaving area of car).
  Erkan also beat Jalal Kheirabadi after leaving the vehicle, with no attempt to
  control, detain or search him. Def.'s Ex. 6, at File No. SC02 at 5:51-5:56.

- Turgut Akar, an unknown TSD agent (Subject S), Ahmet Karabay, Ismail
  Ergunduz, Murat Sumercan, and Harrettin Eren, all of whom left the
  perimeter, attacked Mehmet Tankan even though he had moved farther from
  the CMR than the main group of protesters and was being watched by two
  MPD officers, with no attempt to control, detail or search him. Def.'s Ex. 6, at

---

[7] This individual has not been identified by name, but was designated as Subject I in the
government-created video attached to Turkey's Motion to Dismiss as Defendant's
Exhibit 6 at File No. SC02.

Case 1:18-cv-01117-CKK-ZMF Document 105-5 Filed 09/29/23 Page 37 of 153
Case 1:19-cv-01117-CKK Document #1872595 Filed: 11/20/2020 Page 123 of 268
USCA Case #20-7017 Document #1872595 Filed: 11/20/2020 Page 123 of 268

File No. SC02 at 3:25-3:50 (episode begins on right side of screen); Def.'s Ex. 6, at File No. SC12 at 7:35-7:45.

- Unknown member of TSD (Subject Q), who left the perimeter, punched one standing protester and kicked another standing protester, with no attempt to control, detain or search them. Def.'s Ex. 6, at File No. SC02 at 2:37.

- I also observed civilians Ahmet Dereci, Sinan Narin, Mahmut Ellialti, and Eyup Yildirim join TSD agents in kicking and punching protesters who had no means to defend themselves. Def.'s Ex. 6, at File No. SC02 at 2:59-3:10 (Dereci, Yildirim and others kick Murat Yasa); Def.'s Ex. 6, at File No. SC02 at 2:46-2:56 (Narin kicks Lucy Usoyan); Def.'s Ex. 6, at File No. SC02 at 2:50-2:55 (Ellialti kicks Elif Genc and Lucy Usoyan).

84.    For all of the reasons I have discussed, there was no security rationale for

the TSD to cross the street and attack protesters in Sheridan Circle. To the contrary, if the

TSD had believed that a threat to President Erdogan was imminent, they would not have

crossed the street and assaulted protesters, but instead would have shrunken the zone of

protection. Beyond that, even assuming that there had been some rationale to cross the

street based on an actual perception of a threat, the TSD would have attempted to move

or search the protesters to neutralize that threat, not beat them.

85.    In no instance did I observe any member of the TSD attempt to further any

law enforcement objective (i.e. detention, control). I did not observe any control tactics or

techniques being used by the TSD.

86.    Instead, I observed several TSD agents apply kicking techniques to the

head and midsection of people who had been knocked down and were on the ground in

positions of extreme vulnerability and who were offering no threat or level of resistance.

Most of the protesters kicked were already on the ground in positions of vulnerability,

and posed no threat to law enforcement and offered no resistance to the TSD. Thus, the

TSD actions were inconsistent with any attempt to address a perceived threat, wherein the

4851-6098-7558\1

appropriate response would be to increase distance between themselves (coupled with the protectee), and those that posed the threat.

87.    In the United States, an officer may not legally apply a striking technique (kicking or punching) to a protester that is completely dissociated with any official law enforcement or protective function (e.g. lawful detention); especially when there is no resistance to the officer's actions and no threat of harm to the officer.

88.    Put differently, the use of force deployed by the TSD served no legitimate security purpose, given the totality of circumstances on the ground at the time, especially since there was no attempt to legitimately neutralize any supposed threat.

89.    My conclusions here are not controversial. Law enforcement officers are taught that it is impermissible and unlawful to strike another person without cause, reason, or without the justification of furthering a law enforcement action. In more succinct language, an officer may not indiscriminately punch or kick someone for no reason. In my 30-year career, I have instructed these principles to more than 1,000 individuals. In my experience, these principles are common practice across the law enforcement and security spectrum.

90.    Underscoring my conclusions, on numerous occasions, MPD officers physically restrained members of the TSD and pushed them back to the outer perimeter on the side of the street opposite Sheridan Circle. I also heard MPD officers refer to the TSD as "a bunch of fucking savages" that "are taught in their country that anyone that opposes their president, you're supposed to rip their fucking head off." Def.'s Ex. 6, at File No. SC12 at 3:21:35-3:21:55. Two additional MPD officers agreed that the TSD "head of security was the one that ran over" and started the second assault. Def.'s Ex. 6,

30

at File No. SC09 at 1:07:52-1:08:06. Another MPD officer echoed this, telling a Turkish agent, "If we press official charges, half of your security team would be going to jail." Def.'s Ex. 6, at File No. SC08 at 4:00-4:09. These comments and my other observations lead me to conclude that MPD deemed the Turkish officials as the aggressors during this event.

91.      Also underscoring the fact that TSD agents were not acting for legitimate security purposes, were the scenes of TSD agents ripping up placards and signs of the protesters after the primary attack concluded. Def.'s Ex. 6, at File No. SC08 at 1:23-1:58. Obviously, had those agents believed there was a real threat, they would have been staying vigilant to additional indicia of risk, rather than bothering to tear pieces of papers containing statements they found objectionable.

92.      If USSS agents acted as the TSD did that day, they would rightly be charged with using excessive force and subject to prosecution. As an example, in 1989, a New York based USSS agent was convicted of excessive use of force during an arrest after punching and kicking a man while transporting a USSS protectee on a motorcade route. *U.S. v. Schatzle*, 901 F.2d 252 (2d Cir. 1990).

93.      Thus, the members of the TSD who struck the protesters without provocation and without furthering any legal law enforcement action (i.e. detention, investigative stop, identification check) committed assault.

94.      Finally, in viewing the video, I found significant and highly unusual (if not unprecedented) deviations in security standard protocols wherein the TSD permitted pro-Erdogan supporters to intermingle with the outer perimeter security force. *E.g.,* Def.'s Ex. 6, at File No. SC09 at 0:01-7:15; SC12 at 0:01-7:10. Not only did the TSD perform no

31

evident screening of these individuals – who were far closer to the CMR than the protesters – it also allowed them to scream at the protesters (Def.'s Ex. 6, at File No. SC12 at 2:28-2:29, 5:20), escalating tensions at the site. The TSD also permitted the pro-Erdogan group to play music loudly, which is antithetical to the proposition that the TSD believed there to be a threat against President Erdogan; in such circumstances, security personnel would want to communicate with each other via earpiece and without having to contend with avoidable loud music. Def.'s Ex. 6, at File No. SC12 at 5:28-6:35. Finally, and most egregiously, the TSD was joined by the pro-Erdogan group in attacking the protesters. I can recall no instance in which the Secret Service or any other reputable security detail engaged in a supposed security operation in collaboration with untrained and unknown civilians, including civilians who later pled guilty to crimes in connection with the attacks. Put simply, the TSD would not have collaborated with unknown private citizens in this way had it believed there was a genuine threat.

### E.    Presidential Motorcade (Arrival and Departure Concerns)

95.    Michael White contends, that President Erdogan "was in an extremely vulnerable position when he arrived at the Residence...." White Decl. at ¶ 51. And, it is true as a general matter that arrivals and departures of protectees represent an increased vulnerability because the protectees' vehicle is stationary; representing a fixed target.

96.    However, there is no basis to conclude that President Erdogan was under any specific threat in this instance or that the TSD or Secret Service believed he was. I observed several videos of the protectee arriving at the CMR. In the videos, I observed that, immediately upon arrival, the doors to President Erdogan's vehicle were opened, including the right rear door, by a TSD agent and an individual I believe was with the Secret Service. Def.'s Ex. 6, at File No. SC05 at 1:30-1:34. The doors remained open for

32

4851-6098-7558\1

over a minute before President Erdogan exited the car through the right rear door. Def.'s
Ex. 6, at File No. SC10 at 0:01-1:15. The doors of an armored vehicle offer a level of
protection from numerous forms of attack. If the TSD had believed that an attack was
imminent, they would not have held the vehicle's doors open, especially the right rear
door where President Erdogan sat facing Sheridan Circle.

97.     Moreover, after slowly exiting the vehicle, President Erdogan stopped to
watch the continuing melee in Sheridan Circle, first next to the vehicle and then from
behind the vehicle. Def.'s Ex. 6, at File No. SC02 6:24-7:03. By walking slowly and
stopping to watch the attack, President Erdogan took over 30 seconds to walk the very
short distance from the vehicle to the CMR, even though the disturbance was ongoing.
*Id.*; Def.'s Ex. 6, at File No. SC10 at 1:28-1:30 (people can be seen running in Sheridan
Circle in the background of the video after President Erdogan has left the car).[8] If the
TSD had believed an attack was imminent they would have taken some action to move
President Erdogan more quickly to the CMR, but they did not.

98.     I note here Michael White's statement that President Erdogan was kept in
the vehicle until the "threat" had been "neutralized." White Decl. at ¶ 56. Even assuming
for the sake of argument there was a "threat," I do not believe this statement can be
reconciled with the fact that President Erdogan left the vehicle while the assault
continued and stopped to watch it. Rather, it appears clear that President Erdogan was
kept in the vehicle when he arrived at the CMR and protesters could be heard chanting

---

[8] The Turkish Ambassador to the United States, Serdar Kilic, can also be seen walking
around the outside of President Erdogan's vehicle. Def.'s Ex. 6, at File No. SC05 at 1:45-
2:09. This further undercuts Turkey's argument that the TSD perceived a legitimate
threat.

33

"baby killer, Erdogan" Def.'s Ex. 6, at File No. SC10 at 0:03-0:12, and exited the vehicle only after the TSD assault silenced the protesters.

99.     In sum, based on my training and experience, it is entirely inconsistent with the belief that an attack is imminent for security agents to (i) bring a protectee to the site of the supposed threat; (ii) use the primary rather than secondary arrival point; (iii) open the doors to the protectee's vehicle while the protectee sits in the vehicle for a protracted time; (iv) allow a protectee to walk slowly from the vehicle to a protected building; and (v) allow the protectee to stop and view a fight during the walk. Thus, it is my conclusion that the TSD did not believe that any legitimate threat was present and deemed the event as civil disturbance, unworthy of any immediate relocation or evacuation. In my opinion, the TSD's actions and treatment of the protesters in Sheridan Circle constituted an assault and was inconsistent with any law enforcement best practices that I am aware of in my 30-year career.

100.     Indeed, the belief that a terrorist action is imminent demands an immediate response by all personnel in the inner perimeter. Here, during the time President Erdogan was in the driveway of the CMR, his inner perimeter was shared by Secret Service agents and the TSD. Def.'s Ex. 6, at File No. SC05 at 1:30-1:50. The only notable action taken by anyone in the inner perimeter was by the TSD agents who ran *away* from President Erdogan to attack the protesters. Def.'s Ex. 6, at File No. SC02 at 5:13-5:28. This also is entirely contrary to the idea that the TSD believed a threat existed.

## VI.    ANALYSIS OF ACTIONS TAKEN OUTSIDE SHERIDAN CIRCLE

### A.    The TSD's Assault on Lacy MacAuley

101.     I observed a video provided by counsel that depicts a protester, identified as Lacy MacAuley, exercising her First Amendment rights on Massachusetts Avenue

34

hours after the initial attack at Sheridan Circle. After a video review of the incident, I offer the following opinions based on my experience and training.

102.   Three members of the TSD engaged Ms. MacAuley at approximately 18:17 hours, while she was standing on the sidewalk of Massachusetts Avenue. Def.'s Ex. 6, at File No. SC02 at 7:22-7:55. Ms. MacAuley was not in immediate proximity to the Turkish Embassy or CMR. The fact that Ms. MacAuley was engaged by the TSD two hours after the Sheridan Circle attack substantially minimizes any rational claim that she would have been an imminent or ongoing threat to President Erdogan at the time she was accosted by Turkish officers.

103.   The only legitimate reason to approach or stop Ms. MacAuley would be based on some articulable circumstance or behavior that characterized a threat to Erdogan. I saw no threat to Erdogan based on Ms. MacAuley's behavior. Ms. MacAuley was legally present and holding a protest sign, standing in the immediate proximity of local police officers. Def.'s Ex. 6, at File No. SC02 at 7:12-7:24. Ms. MacAuley had a backpack strapped to her person but the TSD demonstrated no discernable safety concern about the backpack or its concealed contents. Even if the TSD saw something not apparent from the video that they deemed suspicious, they could have approached her and asked for identification, or engaged in some dialogue to better understand the nature of her grievance, or performed a visual inspection (of outer garments) to see if any weapons were visible, all of which are common tactics of the USSS.

104.   It would have been well within Ms. MacAuley's right not answer any questions, as the TSD had no ability or authority to compel an answer and no articulable reason to detain, even for the purpose of turning over to United States officials, since

35

there was not a visible articulable threat.

105. I heard Ms. MacAuley chant "No Erdogan, Democracy," which clearly upset the TSD. I observed a member of the TSD seize Ms. MacAuley's wrists, confiscate and destroy her sign, while another officer grabbed her face and smothered her mouth and then walked away, taking no law enforcement action. Def.'s Ex. 6, at File No. SC02 at 7:52-8:15. I heard Ms. MacAuley state "Give me my property!" after her sign was confiscated and destroyed.

106. The actions taken by the TSD did not serve any investigative or authorized protective function. These tactics and actions were inconsistent with standard security protocols for protection and/or protocols for the investigation of threats because Ms. MacAuley was legally present and did not attempt to strike or in any way threaten the TSD, who had no justifiable reason to use force to seize or detain her.

107. The TSD's decision to seize Ms. MacAuley's wrists, grab her face, smother her mouth and destroy her property was impermissible and served no function to protect President Erdogan.

108. The TSD's use of force was unjustified and inconsistent with any security protocol recognized and practiced by the USSS. In my opinion, the TSD's actions and treatment of Ms. MacAuley constituted an assault and was inconsistent with any law enforcement best practices that I am aware of in my 30-year career.

## B. The TSD's Confrontations with U.S. Law Enforcement

109. Beyond the physical confrontations between TSD agents and U.S. law enforcement personnel at Sheridan Circle discussed above, TSD agents directed aggressive conduct toward U.S. agents, including violence, according to documentation from the U.S. Department of State in and around the time of the Sheridan Circle incident.

4851-6098-7558\1

*See generally* Pls.' Ex. 3.

110.    According to this documentation, after the incident in Sheridan Circle, TSD agents initiated a number of violent altercations with U.S. personnel. *See* Pls.' Ex. 3 at F014 at 1-3, F013 at 3-4. Ultimately, U.S. law enforcement was forced to keep the gate to the Turkish embassy closed to prevent additional Turkish security personnel from exiting to fight. Def.'s Ex. 6, at File No. SC12 at 3:14:00-3:14:21 (U.S. personnel standing outside gate while Turkish personnel yell at them).[9]

111.    The documentation also addresses other incidents that have occurred in the United States in which Turkish agents have engaged in violence. For example, it describes an incident at the United Nations in which members of the security detail for the Turkish Foreign Minister assaulted U.S. law enforcement officers. Pls.' Ex. 3 at F010 at 2. It describes further an incident at the Brookings Institution in Washington, D.C. where U.S. police had to physically restrain Turkish agents from attacking protesters. *Id.*

112.    These are further examples of the TSD taking actions that not only serve no security-related purpose, but actually endanger the protectee by diverting the attention of agents from potential threats to deal with violence by other agents, and by creating an unnecessarily charged atmosphere.

## VII.   SUMMATION

113.    The Secret Service uses long-standing security protocols to keep protectees safe. These protocols permit the Secret Service to engage in thousands of "protective movements" on a global basis and without incident. Adherence to the protocols, even in the midst of terrorist threats and actions, keeps protectees safe.

---

[9] These incidents underscore the inaccuracy of Michael White's statement that no TSD agents confronted U.S. personnel. White Decl. at ¶ 62.

37

114. The TSD suffered a deterioration of discipline and a failure to execute standard and effective security protocols. The TSD also significantly deviated from the generalized procedures of Secret Service hosted foreign head of state protective operations. A degradation of professional composure and failure to abide by United States laws protecting free speech and legal protest appeared to fuel aggressive and unwarranted actions by the TSD.

115. It is my conclusion that the pivotal points of escalation, which ignited tensions at Sheridan Circle were the impermissibly aggressive actions demonstrated by the TSD. It is clear that the primary causal factor contributing to the chaos at Sheridan Circle was when the TSD broke standard security protocols, crossing the street at Sheridan Circle for the sole purpose of attacking protesters.

116. It is also clear that the TSD confiscated and destroyed the signs carried by the protesters, which served no possible law enforcement purpose.

117. The statements of the TSD agents towards protesters were inflammatory, vulgar, threatening, intimidating, and only served to escalate the situation, in significant contrast to how a professional law enforcement organization would conduct enforcement or protective actions. If not for the professionalism, experience, and defensive actions of MPD and the Secret Service, civil disorder might have promulgated beyond Sheridan Circle.

118. In my professional opinion and based on the totality of my experience, there was no terrorist threat and no credible indicators of an imminent attack. Moreover, there was no justification for the aggressive actions of the TSD toward individuals engaging in lawful First Amendment activity. Lastly, the actions of the TSD in and

4851-6098-7558\1

around Sheridan Circle were disassociated and incongruent with the professional

standards of an organization that bears responsibility for safeguarding the life of a foreign

head of state.

Pursuant to 28 U.S.C. § 1746, I Dr. Ronald M. Layton, swear under the penalty of

perjury under the laws of the United States of America that the foregoing factual

statements are true and correct, and the opinions stated are provided to the best of my

professional abilities, experience and beliefs.

Executed September 20, 2019.

Dr. Ronald M. Layton

Case 1:18-cv-01117-CKK-ZMF   Document 241-5   Filed 09/29/23   Page 48 of 153
Case 1:18-cv-01117-CKK   Document 105-6   Filed 09/27/19   Page 41 of 46
USCA Case #20-7017   Document #1872595   Filed: 11/20/2020   Page 134 of 268

# EXHIBIT A

**Dr. Ronald M. Layton**

**Vice President- Sallie Mae, Inc.  Converged Security Operations**

**Contact: Ron.Layton@gmail.com   202 487-8568**

---

**Specialized understanding of executive and facilities protection as well as Cyber-Security/Information Technology and Investigative matters.  Extensive experience in four Presidential Administrations regarding matters of protection, technology, cyber and associated policies (Classified and Unclassified).**

**Present: Vice President – Sallie Mae, Inc. Converged Security Operations**

- Responsible for physical security and asset protection

- Responsible for all corporate investigations

- Responsible for the merger of physical and cyber systems

- Responsible for the construction of the corporate Intelligence Fusion Center

- Responsible for cyber incident management

## <u>United States Secret Service</u>

**2018: Deputy Assistant Director, Office of Protective Operations**

- Direct oversight for the protection all visiting Foreign Heads of State

- Direct oversight of all former Presidential Protective Divisions

- Direct oversight for the protection of all Major Events in the United States determined to be a National Special Security Events (i.e. Republican National Convention, Democratic National Convention, United Nations General Assembly, The State of the Union Address, The G20)

**2017 to 2018: Deputy Assistant Director, Office of Strategic Intelligence and Information**

- Direct oversight of all agency protective intelligence matters regarding the President

- Direct oversight of all agency threat assessments

- Direct oversight of the Secret Service behavioral analysis program

Case 1:18-cv-01117-CKK-ZMF Document 105-6 Filed 09/29/23 Page 50 of 153
Case 1:18-cv-01117-CKK Document 105-6 Filed 09/27/19 Page 48 of 40
USCA Case #20-7017    Document #1872595    Filed: 11/20/2020    Page 136 of 268

- Direct oversight of the Secret Service counter surveillance activities

- Deputy Key Intelligence Officer (DKIO) for the Secret Service and key liaison to the Intelligence Community

- Author of Ph.D. Dissertation on Law Enforcement behavioral analysis assessment (Published)

- Senior Executive Service (SES) member

**2014 – 2017: Special Agent in Charge,  The White House Technical Liaison Section:**

- Responsible for the day-to-day and long-term strategy for information resources and information systems for the President and the Executive Office of the President.
- Senior representative to the White House Senior Staff- Direct oversight of: information technology, communications, cyber/network architecture and protective/countermeasure technologies that ensure the safety of the President, First Family and White House Complex. *Strong emphasis on building a culture of Customer Service and Responsiveness.*
- Conduct monthly briefings to White House Senior Staff (2 levels below the President) on sensitive matters regarding protective and countermeasure technology pertaining to the safety and security of the President, the White House Complex and worldwide Presidential Travel.
- Represent the Secret Service Director to White House Senior Officials for the review of all technological matters.
- Introduce innovative technology to assist in the safety and security of the White House
- Chief architect-Virtual Reality program

**Executive Agent to the Presidential Information Technology Council (PITC):**

- Work in partnership with senior mission partners at the White House for the purpose of streamlining all technological service (i.e. email, comms, video, wireless, help-desk, incident response) across the entire White House Complex as well as for Presidential travel.   Partners include the Director's of: White House Information Technology, White House Military Office, White House Communication Agency, Office of Administration, Chief Information Security Officer and select members of the Intelligence Community (IC).
- Strong emphasis on the development of relationships with the Intelligence Community (IC) as well as a keen understanding of IC technological assets.
- Research foreign and domestic technologies and technological capabilities that threaten the President and the safe operating condition of the White House.
- Develop relationships with CEO/CTO's of private sector technology firms.

**2012 to 2014:  Deputy Chief Information Officer – U.S. Secret Service**

- Responsible for oversight, governance, strategic planning, and policy for the USSS Information Technology infrastructure across 136 Offices, worldwide encompassing a 7 million dollar budget.
- Responsible for the alignment of technology to mission.
- Provided decision points and counsel to USSS senior leadership on all Information Technology matters, conducted major program and budgetary reviews, collaborated and coordinated with all aspects of the DHS OCIO components.
- Assisted in the coordination, strategy, and selection of all major Information Technology acquisitions within the USSS.

- Developed strong partnership with the USSS Chief Information Security Officer.

**2010 to 2012: Resident Agent in Charge**, Charleston, West Virginia.
- Responsible for oversight, management and direction for the USSS investigative and protective missions statewide.
- Developed and expanded partnerships with state and local government officials throughout West Virginia to include 20 domestic Secretaries of State on cyber crimes.
- Initiated and fostered collaboration and a community partnership between West Virginia's University System and the USSS on cyber and digital forensics training.
- Promoted strong relationships with the Pittsburgh Electronic Crimes Task Force and the Carnegie Mellon University Computer Emergency Readiness Team (CERT-CC).

**2008 to 2010: Counter Assault Team Supervisor, Special Operations Division**
- Chief tactical planner and security architect for the: Democratic National Convention, Republican National Convention, G20, and The Visit of the Pope to the United States.
- Operational assignments with the President: numerous domestic trips and foreign countries to include war zone trips to Iraq and Afghanistan.  Conducted numerous assignments (training and liaison) with Joint Special Operations Command (JSOC) elements (US Army Delta Force, US Navy Seals, and US Army Rangers) domestically and internationally for multiple major events.

**2007 to 2008: Program Director – Electronic Crimes Task Force (ECTF)**
- Responsible for the management of worldwide transnational cyber crime investigations.
- Responsible for the nationwide management, policy development and interagency liaison for the 17 Electronic Crimes Task Force(s).
- Closely coordinated with the DOJ and the DHS to facilitate and ensure agency cooperation and collaboration on significant criminal enforcement matters as well as cyber/forensic training.
- Worked closely with the Carnegie Mellon University's USSS resident affiliate on significant cyber research projects.

**2007: USSS Beijing, China Delegation Representative**
- Served as the USSS representative in a delegation including DOJ/Computer Crimes and Intellectual Property Section (CCIPS) to Beijing to participate in talks with high-level Chinese Government Officials regarding cyber crime enforcement and U.S. cyber policy matters.

**2007: USSS Seoul, Korea Delegation Representative**
- Served as the USSS representative in a delegation to Seoul to present cyber infrastructure protection methods to high-level members of the Asian Pacific Economic Council (APEC).

**2007**: **USSS's Vice President's Sensitive Circumstance Cyber Briefer**
- USSS briefer to Vice President Cheney and senior staff regarding highly sensitive cyber intelligence matters.  Introduced to VP Cheney as the Secret Service leading authority on cyber matters.

**2005 to 2007: Deputy Director of DHS' National Cyber Security Division**
- Responsible for leading major international cyber investigations across multiple Federal agencies.
- Protected federal networks from foreign threat actors.
- Major emphasis on bridging cultural gaps between Law Enforcement and Intelligence.
- Led team members from the NSA, CIA, FBI, and ICE.
- Authored Concept of Operations for the integration of Law Enforcement and Intelligence
- Successfully integrated members of the U.S. Computer Emergency Readiness Team.

Case 1:18-cv-01117-CKK-ZMF   Document 105-6   Filed 09/29/23   Page 52 of 153
Case 1:18-cv-01117-CKK   Document 105-6   Filed 09/27/19   Page 45 of 46
USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 138 of 268

- Managed 2.5 million dollar budget and a division of 168 employees.
- Assisted with the drafting of the National Response Plan's (NRP) Cyber Annex.

**1999 to 2004: Presidential Protective Division (PPD)**
- Responsible for the safety of the President.
- Performed numerous security preparations for Presidential Travel, domestic and foreign trips.
- Worked numerous protection assignments traveling with the President.

**1992 to 1999: Philadelphia Field Office, USSS**
- Worked investigations within the criminal jurisdiction of the Secret Service (Counterfeiting, Money Laundering, Bank Fraud, Presidential Threat cases)
- Major Case Agent in the prevention of a terrorist event (Joint Terrorism Task Force Member).

**1990 to 1992: Landis and Gyr Powers, Inc**
- Electrical Engineer, designed and wrote software for supervisory control and data acquisition systems for large automation and controls applications

**1989 to 1990: University of Pittsburgh, Adjunct Instructor of Physics and Mathematics (Upward Bound program)**

**Awards/Honors:**
- 2019: USA Karate Federation, Hall of Fame Inductee
- 2018: Commencement Speaker-Montana Technological University
- 2018: Montana Technological University Athletic Hall of Fame Inductee
- 2018: Distinguished Alumni Award, Montana Technological University
- 2017 George E. Anderson Memorial Award (Contributions to Martial Arts in the United States)
- 2015: Police Survival and Defense Institute Hall of Fame Inductee.
- 2013: Charleston City Police Service Award.
- US Secret Service Firearms Instructor and Expert Marksman Award Winner
- Presidential Distinguished Service Award – Presented by President George W. Bush for actions on September 11th, 2001.
- Numerous intra-agency recognition awards over 26 years of service to the United States.

**Media:**

- **https://player.fm/series/standing-post/episode-001-welcome-to-standing-post-mr-ronald-layton**

- **http://www.businessofgovernment.org/sites/default/files/audio/ron_layton_abcd.mp3**

- **http://www.fedtechmagazine.com/article/2016/07/secret-service-white-house-tech-liaison-ron-layton-aims-be-team-player**

- **https://federalnewsradio.com/in-depth/2013/11/in-depth-show-blog-november-1-2013/**

Case 1:18-cv-01117-CKK-ZMF   Document 105-6   Filed 09/27/19   Page 46 of 46
USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 139 of 268
Case 1:18-cv-01117-CKK-ZMF   Document 51-5   Filed 09/29/23   Page 53 of 153

- **http://www.eweek.com/security/intelligence-experts-say-cyber-thieves-nation-state-hackers-teaming-up**

- **https://www.sdxcentral.com/articles/news/top-cyber-cops-give-security-tips-preventing-attacks/2017/09/**

- **http://www.itweb.co.za/index.php?option=com_content&view=article&id=165232**

- **FedTech Magazine- Summer 2016**

**Guest Lecture: Leadership and Technology**

- The Naval Post Graduate School (NPS)
- The Johns Hopkins University
- The George Washington University
- The University of Maryland
- West Virginia University
- Marshall University
- West Virginia State University
- Ohio Christian University

**Education:**
- B.S. Systems Control Engineering – 1989 Montana Tech
- M.B.A. – Central Pacific University-2001
- Ph.D. – Electrical Engineering -2003 Central Pacific University
  - Dissertation focus – Supervisory Control and Data Acquisition Systems.
- M.S. – Management- The Johns Hopkins University - 2007
- Ph.D. – Business Administration – Northcentral University 2016
  - Dissertation focus – Social Media Technology and precursors to radicalization.
- United States Senior Executive Service (SES) program graduate and member - 2015


*2005-Present: Authored more than 100 academic and professional papers on cyber crime, infrastructure protection and terrorism. Published in the Center for International Security Policy for expertise in Infrastructure Protection

Exhibits 59-63 SEALED

# Exhibit 69- Exhibit Submitted via Thumb Drive

Exhibit 70



Exhibits 71-72 SEALED

Exhibits 74-76 SEALED

Exhibit 80

Page 212 of 240

Filed: 11/20/2020

Document #1872595

USCA Case #20-7017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LUSIK USOYAN, *et al.*,          )
                                 )
                   Plaintiffs,   )
                                 )
        v.                       )          Case No. 1:18-CV-01141-CKK
                                 )
THE REPUBLIC OF TURKEY,          )
                                 )
                   Defendant.    )
                                 )

## DECLARATION OF DR. STEVEN A. COOK

I, Dr. Steven A. Cook, declare as follows:

1.      I am over the age of eighteen (18) and am fully competent to make this Declaration. I have personal knowledge of the facts attested to below that derive from my professional experiences and training, and my knowledge of the attack at Sheridan Circle that occurred on May 16, 2017.

2.      I was retained by Plaintiffs' counsel to provide an expert opinion concerning why Turkish President Recep Tayyip Erdogan's security team beat the protesters on May 16, 2017. In reaching my conclusion, I reviewed the videos of events on Sheridan Circle, news reports of the incident, my personal recollections of related events, and my expertise in Turkish politics and government gained over 25 years studying, writing, and teaching about Turkey.

3.      I am being compensated at a flat rate for my time spent in undertaking the analyses contained herein and conveying my opinions and conclusions to Plaintiffs' counsel. My compensation is not contingent upon the nature or substance of my opinions and conclusions, nor is it contingent on the outcome of this matter.

1

Page 213 of 240     Filed: 11/20/2020     Document #1872595     USCA Case #20-7017

## GENERAL QUALIFICATIONS AND BACKGROUND

4.      I am the ENI Enrico Mattei Senior Fellow for Middle East and Africa Studies at the Council on Foreign Relations—a leading non-partisan, non-profit research organization dedicated to the analysis of international affairs and U.S. foreign policy. I have spent the last 25 years studying, writing, and teaching (as a visiting lecturer) on the Middle East and Turkey. I earned a Master's degree at the Johns Hopkins School of Advanced International Studies in 1995, another Master's degree in political science at the University of Pennsylvania in 1999, and a Ph.D. in political science from the University of Pennsylvania in 2003. See attached CV.

5.      I lived in Turkey in 2000 and was a frequent visitor to Turkey—at least four times a year for various periods of time—until 2015 when it became too dangerous for many Western analysts to conduct research in the country.  I am the author of three books on the Middle East, two of which examine in part the institutional and political development of contemporary Turkey.  They are *False Dawn: Protest, Democracy and Violence in the New Middle East* (Oxford University Press, 2017) and *Ruling But Not Governing: The Military and Political Development in Egypt, Algeria, and Turkey* (The Johns Hopkins University Press, 2007). Another book, *The Struggle for Egypt: From Nasser to Tahrir Square* (Oxford University Press 2011) won the Washington Institute for Near East Policy's Gold Medal for Best Book on the Middle East in 2011-2012.

6.      In addition, I am a columnist for *Foreign Policy*, where I frequently comment on Turkish politics.  In addition to my column, I have written extensively on Turkey and Turkish politics in other media outlets including the *Washington Post*, *New York Times*, *Wall Street Journal, Foreign Affairs*, *Politico,* the *Atlantic*, and a variety of other opinion magazines, policy

2

JA208

USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 214 of 240

journals, and newspapers. I have appeared on *CNN*, *MSNBC*, the *PBS NewsHour*, *Bloomberg*, and *BBC* to discuss developments in Turkey.

7.      I consult regularly with the U.S. government, especially the intelligence community and members of Congress, on Turkish politics. I have testified before the Senate Foreign Relations Committee, the Subcommittee on the Middle East, North Africa, and International Terrorism of the House Foreign Affairs Committee, and the House's Committee on Homeland Security. I have also provided expert testimony in asylum cases and international commercial arbitration matters.  Finally, I have lectured extensively on Turkey at universities, think tanks, and financial service firms in the United States and Europe.

## EXECUTIVE SUMMARY

8.      As will be discussed in greater detail below, I conclude that the decision to attack the protestors was determined by the dynamics and requirements of Turkish domestic politics—Erdogan's security team reacted as they would in Turkey; any speech insulting or offensive to him, especially from Kurds, will be crushed. This is how he has built and maintained his political power in recent years. President Erdogan's security officers do not just work to shield him from physical harm, but also work assiduously and aggressively to shield the Turkish leader from any and all criticism.  This is partly a function of the cult of personality that President Erdogan has cultivated since he came to power in 2003. There is also an aspect to this aggressive behavior that seeks to protect the honor of the Turkish nation. Although Turkey has political structures and features that resemble a democracy, its political system is authoritarian and as such freedom of expression and freedom of assembly are severely curtailed.  Those who dare speak out are often prosecuted as "terrorists,"—a charge Turkish authorities use against their peaceful political opponents. It is important to note that the attack on protesters came on the

USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 215 of 240

heels of an unsuccessful meeting between the Turkish leader and the newly elected American president, Donald J. Trump. In that meeting President Trump rebuffed Erdogan's demand that the United States end its policy of arming a Syrian Kurdish fighting force called the People Protection Units or YPG. After the violence that the Turkish security team perpetrated against unarmed protesters, Turkish government officials used the incident to change the narrative of President Erdogan's visit to the United States, effectively pushing the Turkish leader's failed efforts to the background.  In the aftermath of the attack, the Turkish ambassador to the United States and the Turkish foreign minister alleged that it was the protesters—not Erdogan's security detail—who were the instigators, charged that a senior U.S. official supports terrorism against Turkey, and claimed that the Metropolitan Police Force, the State Department's Diplomatic Security officers, and U.S. Secret Service were aggressive and unprofessional. Both Turkish government officials undoubtedly knew that these allegations would receive significant attention in the Turkish press.

9.      President Erdogan's visit to the United States in May 2017 was a high stakes affair for the Turkish leader given his publicly stated objective of convincing President Trump to end the American policy of arming the YPG. As a result, the Turkish leader's White House meeting was covered extensively in Turkey's press, the vast majority of which is supportive of the Justice and Development Party. Needless to say, the trip did not go as planned.  Erdogan failed to persuade Trump and immediately thereafter was confronted with a gaggle of protesters demanding Kurdish rights and criticizing the Turkish leader personally. Erdogan, a shrewd politician, likely understood that a confrontation with those demonstrators could accrue to his benefit for three related reasons.  First, showing resolve against Kurdish demands plays well politically in Turkey given that the press invariably characterizes anyone advocating on behalf of

JA210

Page 216 of 240          Filed: 11/20/2020          Document #1872595          USCA Case #20-7017

Kurds as "terrorists." Second, portraying the United States and American law enforcement as weak, incompetent, or indifferent to the safety of the Turkish leader is also good politics given the vast reservoir of anti-Americanism in Turkey. Finally, the violence sent a chilling message to Erdogan's opponents at home. If his security team can beat and injure protesters in the capital of the United States, where rule of law prevails, demonstrators in Turkey can expect as least as much violence from security forces at home.

10. In 2018, Freedom House—an internationally renowned non-governmental organization—determined that Turkey is "Not Free."[1] This finding is based on the fact that the Turkish press is not free, individual liberties like freedom of expression, freedom of thought, and freedom of assembly are routinely violated, and the government employs coercion and force against its opponents. During almost two decades in power, President Recep Tayyip Erdogan and his Justice and Development Party (known by its Turkish acronym, AKP) have hollowed out Turkey's institutions and/or manipulated them to advance their agenda. The Turkish judiciary, which has historically fallen short of international standards, is now packed with supporters of the president and the ruling party, government agencies have been used to intimidate the AKP's opponents—both real and perceived—and a formerly well-respected diplomatic corps has been used to harass Turkey's critics abroad via social media, letters to their employers, direct confrontations, and other means.

11. The Turkish government routinely uses the charge of terrorism or support for a terrorist organization, broadly defined to the point where it encompasses speech and thought, to jail opponents and silence dissent. A cult of personality has also developed around President

---

[1] Freedom House, "Freedom in the World 2019" https://freedomhouse.org/report/freedom-world/freedom-world-2019/map

USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 217 of 240

Erdogan, whose followers and supporters in the press refer to him as the "Great Master" and the "Tall Man."[2]

Although Turkey's political system includes democratic practices, the country was never a democracy despite its membership in the North Atlantic Treaty Organization and its association agreement with the European Union. In the first years of the AKP's rule beginning in 2002, Prime Minister Erdogan and his advisors pursued reform policies that convinced leaders and analysts in the West that Turkey was on the verge of a genuine democratic transition. It was not to be. Beginning in 2007, Erdogan set aside the reformism that characterized the AKP's first four years in power in favor of a divisive and polarizing politics in which he sought to destroy his opponents. This arc—from reform to repression—has placed Erdogan among a group of new global authoritarians that include Hungary's Viktor Orban, Poland's Jaslow Kaczynski, Brazil's Jair Bolsanaro, and Rodrigo Duterte of the Philippines.

12.     The violence of Turkish security officers on Sheridan Circle in May 2017 shocked many in Washington, but it should not have. In Turkey, individuals who try to express dissent are routinely beaten and jailed.   In a May 2019 report, the staff of the European Commission found that, "Severe restrictions on freedom of expression continued and the trend for prosecution of writers, social media users and other members of the public, even children, for insulting the President has dramatically increased. The lack of transparency as to media ownership continues to cast doubt on the independence of editorial comment."[3]

---

[2] "Turkish Writer Pens New Song in Praise of Erdogan," *Yeni Safak* January 2, 2019
https://www.yenisafak.com/en/video-gallery/news/turkish-writer-pens-new-song-in-praise-of-president-erdogan-2198946;  Engin Onder, "The Man from Kasimpasa," *Boston Review*, January 11, 2018,
http://bostonreview.net/politics-global-justice/engin-onder-man-kasimpasa; Steven A. Cook, "Emperor Erdogan," *Politico*, February 3, 2015, https://www.politico.com/magazine/story/2015/02/turkey-emperor-erdogan-114835.
[3] *Commission Staff Working Document: Turkey 2019 Report*, May 25, 2019  https://ec.europa.eu/neighbourhood-enlargement/sites/near/files/20190529-turkey-report.pdf.

JA212

USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 218 of 240

13.     The state-violence that has come to be a fact of Turkish political life has also become an all too common feature of President Erdogan's travel at home and abroad.   Turkish security forces routinely use violence against demonstrators whether on May Day, at LGBT-Q rallies, during the 2013 Gezi Park protests, or other efforts on the part of Turks to gather peacefully and express their views. What happened on Sheridan Circle in May 2017 is all too often a routine occurrence in Turkey.

14.     President Erdogan and the Justice and Development Party often silence their peaceful critics by leveraging overly broad interpretations of "terrorism" and "support for a terrorist organization." Journalists, academics, business leaders, sports star, leaders of non-governmental organizations, and others who have criticized the government find themselves defending themselves against charges of terrorism and attempting to overthrow the state.  In one notorious case, a Turkish philanthropist named Osman Kavala has been held for over 600 days in pre-trial detention because, according to Erdogan, he "financed terrorists during the Gezi incidents."[4] The "Gezi incidents" to which Erdogan was referring, were the Gezi Park protests that began in May 2013 over the proposed redevelopment of a small park in central Istanbul—one of the last green spaces in the city—that turned into large demonstrations against police brutality, corruption, and Erdogan's authoritarian rule. Commenting on the Kavala case in a report to the European Court of Human Rights, the Council of Europe's Commissioner for Human Rights wrote:

> "...The present case is a clear illustration of the increasing pressure on civil society and human rights defenders in Turkey in recent years. This pressure has notably included a series of specific attacks by politicians and a general political discourse targeting civil society activists, in particular by suggesting that reporting on alleged human rights violations perpetrated by the authorities furthers the aims of terrorist organisations and is by extension an attack on the Turkish State."[5]

---

[4] "Turkey: Baseless Charges Over Landmark 2013 Protests," *Human Rights Watch*, March 25, 2019
https://www.hrw.org/news/2019/03/25/turkey-baseless-charges-over-landmark-2013-protests

JA213

## Erdogan's Security Team: A History of Violence

15.     The incident on Sheridan Circle on May 16, 2017 happened because President Erdogan's security detail aggressively shields their leader from even peaceful criticism and, in the process, protects the honor of the Turkish nation. The melee also shifted the narrative of Erdogan's visit with President Trump from his failure to convince the new President to stop arming the YPG to the failure of American law enforcement to protect the visiting Turkish leader.   The violence of the Turkish security team is part of a pattern in which they have employed violence against protesters, journalists, and average citizens at home and abroad.

16.     *UN Headquarters Incident*: On September 23, 2011, after meeting with an official delegation from Iraq, then-Prime Minister Erdogan and his aides sought to gain entry to the UN General Assembly Hall through a door that was closest to where Erdogan met with the Iraqis. Erdogan was eager to attend Palestinian President Mahmoud Abbas' speech, during which Abbas was expected to declare Palestinian statehood—an issue of special importance to Erdogan. When UN security personnel informed the Turkish delegation that there was no access to the Hall through the door Erdogan wanted to use and blocked the prime minister from entering, Erdogan's security detail became physical. A number of UN security officers were injured as a result, including one who was hospitalized with rib injuries.[6]

17. ·     *Brussels Incident*. In October 2015, Erdogan's security detail started two fights with Belgium's VIP protection service while the Turkish leader was on a visit to Brussels.  In the first incident Erdogan's security detail started a shoving match with Belgian officers over responsibility for the President's security at a public event.  Turkish officers began the second

---

[5] "Third Party Intervention by the Council of Europe Commissioner for Human Rights," December 20, 2018, https://rm.coe.int/third-party-intervention-before-the-european-court-of-human-rights-cas/1680906e27
[6] Richard Roth, "Diplomatic Disconnect at UN Leads to Security Face-Off, Sources Say" *CNN.com*, September 28, 2011 https://edition.cnn.com/2011/09/27/world/un-security-scuffle/

JA214

fight, during which they threw punches at their Belgian counterparts, over who would perform security checks for the rooms at chateau Erdogan was to visit.  Belgian authorities attributed the fights to the Turkish security team's "lack of respect."[7]

18.    *Ecuador Incident.* During an official visit to Ecuador in February 2016, President Erdogan gave a speech at the National Higher Studies Institute in the Ecuadoran capital, Quito. When three women heckled Erdogan during the speech in protest over Turkish military operations against the Kurdistan Workers' Party or PKK—a group the U.S. State Department calls a "terrorist organization"—that resulted in civilian deaths, they were, according to press reports, "set upon" by the President's security team. One of the protesters was put in a headlock for a short period of time.  A member of the Ecuadoran National Assembly suffered hand and arm injuries as well as a broken nose during the incident when he tried to protect the three women from Erdogan's security officers. According to one news report, during the incident, Erdogan addressed the protesters directly and declared that they "will get what they deserve." The Ecuadoran Foreign Minister called the security detail's actions "irresponsible," his ministry issued a demarche to the Turkish ambassador, and the Ecuadoran Interior Minister sought to confiscate the passports of the security officers involved, but by the time any action could be taken, the security detail had left the country.[8]

19.    *Brookings Institution Incident.* The March 31, 2016 incident closely resembles the events of May 16, 2017 on Sheridan Circle. Ahead of a speech Erdogan was to give at the Brookings Institution, his security team clashed with pro-Kurdish protesters and other critics of

---

[7] Vince Chadwick, "Battle of the Erdogan Bodyguards," October 7, 2015 https://www.politico.eu/article/battle-of-erdogan-bodyguards-security-belgium-police/
[8] "Ecuador Slams Erdogan Guards for Attack on pro-Kurdish Protest," *TeleSur English*, February 5, 2016 https://www.telesurenglish.net/news/Ecuador-Slams-Erdogan-Guards-for-Attack-on-Pro-Kurdish-Protest-20160205-0034.html; "Ecuador Protests to Turkey Over Erdogan Speech Scuffle," *BBC.comn*, February 6, 2016 https://www.bbc.com/news/world-latin-america-35512926.

Case 1:18-cv-01141-CKK-ZMF   Document 241-5   Filed 09/09/22   Page 79 of 153
Case 1:18-cv-01141-CKK   Document 70-4   Filed 09/09/19   Page 80 of 90

Page 221 of 240          Filed: 11/20/2020          Document #1872595          USCA Case #20-7017

the Turkish leader who were cordoned across the street from Brookings on the south side of Massachusetts Avenue, NW. During the melee, an eyewitness named Yochi Dreazan, who at the time was an editor at *Foreign Policy* magazine, Tweeted:

> "Never seen anything like this: a female protester just tackled. DC cops are in the street trying to keep Turkish guards from hurting folks"

Another journalist at *Foreign Policy* Tweeted:

> "In front of Brookings for Turkish Pres. Erdogan speech, one of his security assaulted Brookings employee. It's crazy"

In addition, President Erdogan's security detail tried to prevent journalists who they deemed critical of the president from attending the event. One journalist, a diminutive woman named Amberin Zaman—an American citizen of Bangladeshi and Turkish descent who has worked for the *Economist*, *Washington Post*, the *Los Angeles Times*, a variety of Turkish newspapers, and as a visiting fellow at the Woodrow Wilson Center for International Scholars in Washington, DC—was surrounded by Erdogan's security team, blocking her from entering Brookings, and called a "PKK whore." Zaman was likely targeted because her journalistic specialty is minority rights and as a consequence has written extensively on Kurdish issues in Turkey.[9]

The incident at Brookings prompted the then President of the National Press Club, Thomas Burr, to release a statement, which read, in part:

> "Turkey's leader and his security team are guests in the United States. They have no right to lay their hands on reporters or protesters or anyone else for that matter, when the people they were apparently roughing up seemed to be merely doing their jobs or

---

[9] Ihssan Tharoor, "Turkey's Erdogan Came to Washington, and Things Got a Bit Crazy," *Washington Post*, March 31, 2016 https://www.washingtonpost.com/news/worldviews/wp/2016/03/31/turkeys-erdogan-came-to-washington-and-things-got-a-bit-crazy/?utm_term=.6d8c4c96f821; David Smith, "Turkish Journalists in Clashes with Bodyguards During Erdogan's US Visit, *The Guardian*, April 1, 2016 https://www.theguardian.com/world/2016/mar/31/turkish-president-erdogan-washington-dc-brookings

JA216

exercising the rights they have in this country. We have increasingly seen disrespect for basic human rights and press freedom in Turkey…Erdogan doesn't get to export such abuse."[10]

Like the incident on Sheridan Circle, the Turkish government blamed the violence on the alleged incompetence of the Metropolitan Police Department and the U.S. State Department's Bureau of Diplomatic Security. As a result of the conduct of Erdogan's security team at Brookings, with a few exceptions President Erdogan has not been welcome to speak at think tank venues in Washington.

20.     *Sarajevo Airport Incident*. In July 2019, Erdogan's security team started an altercation, which included "shoving" and verbal abuse, upon arrival at Sarajevo's airport because the security detail refused to hand over their weapons to Bosnian border police. The chief of the Bosnian border police told the news outlet *Dnevni Avaz*, "They were aggressive and behaved as if they were in their own country. They did not respect our laws and deserved to be arrested."[11]

21.     In two of the incidents outlined above—Ecuador, and Brookings—as well as the attack on demonstrators in Sheridan Circle, President Erdogan's security team sought to suppress political dissent, the work of journalists, and supporters of Turkey's Kurdish minority through threats, abuse, and violence.  Running throughout all of these incidents—including the violence perpetrated against the UN, Belgian, and Bosnian, security officers—is the cult of personality of Erdogan.  Turkey's presidential security team behaves less like a professional security detail and more like armed loyalists who aggressively shield Erdogan from even minor or perceived slights.

---

[10] *National Press Club Alarmed About Reported Abuses in DC by Turkish Security*, March 31, 2016
https://www.press.org/news-multimedia/news/national-press-club-alarmed-about-reported-abuses-dc-turkish-security
[11] Reported in "Turkish President Erdogan's Bodyguards Clash with Bosnian Police," *Die Welle*, July 7, 2019
https://www.dw.com/en/turkish-president-erdogans-bodyguards-clash-with-bosnian-police/a-49517150

USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 222 of 240

JA217

USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 223 of 240

22.     Since the 1990s, advocates for Kurdish and Armenian Americans, among others, have staged protests against Turkish leaders when they visited Washington, DC—including on Sheridan Circle—but unlike the incident in May 2017, they did not descend into violence at the hands of Turkish security.

### Turkey's Kurds

23.     After the end of WWI and the defeat of the Axis Powers, a one-time Ottoman military officer named Mustafa Kemal—known commonly as Ataturk (Father Turk)—forged an ethno-national state out of part of what had been a multi-ethnic and multi-cultural empire. In order for this state-building project to succeed, Ataturk had to re-orient the loyalties of the inhabitants of Anatolia away from the religious and political leadership embodied in the Ottoman sultan/caliph in favor of the modern Republic of Turkey.  The legitimacy of this new state rested on "Turkishness" as an ethnic marker, the linkage between Turks and the land, the Turkish language, and what it meant to be a Turk. From the founding of the Republic in October 1923, the people who lived within its borders were to be Turks devoted to a nation that was coterminous with a state that specifically represented that—Turkish—nation.[12]

24.     Throughout the Republic's history, the demands of "Turkishness" have alienated many Kurds whose own identities are wrapped in different mythologies about language, land, and ethnicity, all of which the official narrative of the Turkish Republic denied.[13] Until relatively recently, the official lexicon of the Turkish state did not even include "Kurds," who were instead referred to as "mountain Turks." There are Kurds who are well integrated into Turkish political, social, economic and cultural life. Still, there remains tension between what it means to be a

---

[12] Serif Mardin, "Religion and Secularism in Turkey," in *The Modern Middle East*, ed. Albert Hourani, Philip Khoury, and Mary C. Wilson (Berkeley: University of California Press, 1993), pp. 363-365.
[13] Henri J. Barkey and Graham E. Fuller, *Turkey's Kurdish Question* (Lanham, MD: Rowman & Littlefield, 1998), p. 10. During the Ottoman era, the use of "Turkey" and "Turks" was a European convention. Inhabitants of Anatolia, which makes up the bulk of the Republic of Turkey, did not refer to themselves as Turks.

JA218

Case 1:18-cv-01117-CKK-ZMF   Document 241-5   Filed 09/09/23   Page 74 of 30
Case 1:18-cv-01141-CKK   Document 704-4   Filed 09/09/19   Page 14 of 30
USCA Case #20-7017   Document #1872595   Filed: 11/20/2020   Page 224 of 240

Turk and what it means to be a Kurd. The very nature of the Republic's founding, based in large part on a specific Turkish identity renders it difficult for Turkish political elites and nationalist Turks to accommodate the idea that another ethnic group with a different identity from Turks may have legitimate claims on and grievances toward the state.

25.    The practical result is an environment in which Kurds enjoy many of the same rights and privileges as Turks, but not all.  For example, for much of the Republic's history, Kurds were proscribed from educating their children in their various dialects of Kurdish, writing or broadcasting in Kurdish, and celebrating their cultural heritage.  Until 2000, the Kurdish holiday celebrating the spring equinox, *Newroz*, was banned in Turkey. The change in 2000 was important and welcome, but it was a limited victory for Kurdish cultural rights.  The authorities in Ankara rebranded the holiday a Turkish celebration of spring and the Kurdish spelling of the holiday remained banned in favor of the Turkish rendering, *Nevruz*.

26.    For reasons related to the issues addressed in the paragraphs above, the Turkish government does not distinguish between ethnic groups when compiling statistics on Turkish society.  Still, it is possible to discern the overall well-being of Kurds in comparison to Turks through analysis of socio-economic indicators at the provincial level. In predominantly Kurdish provinces of the country inhabitants are poorer, less educated, have fewer employment opportunities, greater dependency ratios, and higher infant mortality rates than in other parts of Turkey.[14] There are a variety of complex reasons for disparities between Turks and Kurds in Turkey, but these development lags can in part be traced to institutional factors related to the ethno-national nature of the Turkish Republic.

---

[14] See the Turkish Statistical Institute,
https://biruni.tuik.gov.tr/bolgeselistatistik/tabloYilSutunGetir.do?durum=acKapa&menuNo=408&altMenuGoster=1
and https://biruni.tuik.gov.tr/ilgosterge/?locale=en

JA219

USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 225 of 240

27.     The most extreme manifestation of the difficulties associated with reconciling Turks and Kurds in Turkey is the thirty-year war between the Kurdistan Workers' Party or PKK and the Turkish state. The United States government designates the PKK a terrorist organization.[15]  During the 1980s, the conflict had an unmistakable Cold War gloss given the PKK leadership's reverence for Karl Marx, Friedrich Engels, and Joseph Stalin. The inspiration that communist ideologues and a notorious Soviet leader are important in understanding the origins of the PKK, but too much focus on this issue detracts from a critical component of the conflict. At a fundamental level, however, it is a struggle between Turkish and Kurdish nationalisms and the identities linked to them that have thus far proved to be irreconcilable.[16]

28.     When the Justice and Development Party came to power in late 2002 there was hope that it could resolve the Kurdish issue.  That is because like the Kurds, the AKP's members and leaders faced discrimination at the hands of the state.  Erdogan was jailed in the 1990s for reading a poem that Turkish authorities alleged incited religious violence. It did nothing of the sort and was, in fact, written by an important figure in the development of Turkey's secular nationalism.

29.     The Justice and Development Party is the successor to a series of Islamist political parties dating back to the early 1970s. In Turkey's officially secular political system, the Constitutional Court or the military—through coups d'état—closed the AKP's predecessor parties on the grounds that they were a threat to secularism. The secularism of the Turkish Republic is a different kind of secularism than one would find in the United States, where religion is a matter of conscience and displays of religiosity are tolerated unless they cross the

---

[15] *Foreign Terrorist Organizations*, U.S. Department of State https://www.state.gov/foreign-terrorist-organizations/
[16] Aliza Marcus, *Blood and Belief: The PKK and the Kurdish Fight for Independence* (New York: New York University Press, 2007), p. 38; Marcus once faced criminal charges in Turkey for her work on the Turkey's Kurds and the PKK. https://www.jweekly.com/1995/11/17/turkish-court-drops-charges-against-reporter-amid-outcry/

14

USCA Case #20-7017    Document #1872595    Filed: 11/20/2020    Page 226 of 240

line dividing religion and state. In the Turkish version of secularism, the government sought to control religion in the public sphere. For example, religious garb is proscribed in certain government buildings, like the parliament, and state supported organizations such as universities. For many years, the state policed other areas of public expressions including radio and television broadcasts for even the hint of "reactionary" ideas.[17]

30.     At least initially, the AKP offered a possible way to mitigate or resolve the conflict between Turkish and Kurdish nationalisms. When Erdogan became prime minister, he sought ways to provide religious Turks and Kurds a greater role in the public life of the country. He did this by de-emphasizing Turkishness in favor of "Muslimhood."[18] The idea was simple: Religion rather than ethnicity would be the basis of collective identity for the approximately 98 percent of citizens of Turkey who are Muslims. This would make it easier to incorporate both Kurds and religious Turks in society. Erdogan's moves were not necessarily out of altruism, but also directly related to electoral politics. A quirk in Turkey's electoral law gave the AKP its first parliamentary majority with 34.3 percent of the vote. In his approach to pious Turks and Kurds, he sought to increase the chances of the party's electoral success.

31.     Erdogan's governments invested large sums into the development of the predominantly Kurdish southeastern part of Turkey, sought an "opening" to the Kurds in 2009, and finally agreed to negotiations with the PKK beginning in 2013.

32.     This reformist approach to the Kurdish issue came to an abrupt end in 2014. That was when the AKP ceded voters to the right wing Nationalist Movement Party—which has its origins in radical nationalist vigilantism hostile to Kurds—in municipal elections in April of that

---

[17] Steven A. Cook, *Ruling But Not Governing: The Military and Political Development in Egypt, Algeria, and Turkey* (Baltimore: The Johns Hopkins University Press, 2007).
[18] Jenny White, *Muslim Nationalism and the New Turks* (Princeton, NJ: Princeton University Press, 2012).

JA221

Case 1:18-cv-01117-CKK-ZMF   Document 241-5   Filed 09/09/23   Page 78 of 153
Case 1:18-cv-01141-CKK   Document 704-4   Filed 09/09/19/20   Page 227 of 30 of 153

Page 227 of 240

Filed: 11/20/2020

Document #1872595

USCA Case #20-7017

year. In response, Erdogan quickly repositioned himself and his party to protect his nationalist political flank.

33.     In between the 2014 municipal election and parliamentary election in June 2015, Erdogan took an increasingly tougher line on Kurdish issues and demonstrated considerably less enthusiasm for negotiations with the PKK.  During this period, the self-declared Islamic State laid siege to a Syrian Kurdish town just over the border with Turkey called Kobani.  The Turkish government's refusal to help the Syrian Kurds despite units of the Turkish armed forces in close proximity to the battle angered many Kurds in Turkey.  Demonstrations erupted in Turkey's southeast and other cities, including Istanbul.[19]  It was during this time that U.S. President Barack Obama asked his Turkish counterpart to commit forces to fight the Islamic State. Erdogan and other Turkish officials demurred, however, arguing that defeating the Islamic State required American-led regime change in Syria.[20]

34.     As a result of these policies, Erdogan secured the support of Turkish nationalists, but at the expense of the Justice and Development Party's own Kurdish constituency.  In the June 2015 parliamentary elections, many of those Kurds turned out in favor of a party called the People's Democratic Party (HDP), which boasts a predominantly Kurdish leadership. The party won 13 percent of the vote.  Due to technicalities in the Turkish electoral system, the HDP's result denied the Justice and Development Party the parliamentary majority it had enjoyed since

---

[19] "Kurds Protest Against Turkey as IS Advances on Kobane," *BBC.com*, October 7, 2014
https://www.bbc.com/news/world-middle-east-29518448
[20] At the time of the Islamic State's assault on the Syrian town Kobani, President Erdogan declared, "For Turkey, the PKK and ISIS are the same." Turkish Prime Minister Ahmet Davutoglu then revealed Turkey's ambivalence about the fight against ISIS when he stated, "Turkey will not embark on an adventure at the insistence of some countries unless the international community does what is necessary and introduces an integrated strategy." That "integrated strategy" was first and foremost an American intervention in Syria to bring down the Assad regime. See Piotr Zalewski, "Turkey Decides to Hit Kurdish Rebels Instead of ISIS," Time, October 14, 2014, http://time .com/3507187/turkey-kurdish-rebels-pkk-isis-kobrani.

2002. The AKP's vote total dropped to 40.87 from 49.83 percent of the popular in the previous election.

35.     In accordance with Turkish law, Erdogan tapped the AKP's sitting prime minister—as the leader of the party with the most votes—to begin negotiations to form a coalition government.  Unhappy with the outcome of the election, he also immediately went about undermining those negotiations.  Recalling weak coalition governments and low economic growth of the 1990s, Erdogan's closest advisors and the pro-AKP press (by then the vast majority of media outlets were in the hands of Erdogan supporters) began warning of "instability" that would result if the AKP was forced to cohabitate with another party.[21]  Then, when in July, Kurdish militants murdered two Turkish policemen as they slept; Erdogan took full advantage of the national outrage.  He accused the leaders of the People's Democratic Party of supporting the PKK and called for their parliamentary immunity to be lifted.[22]  The government then mobilized the Turkish armed forces and internal security services, which undertook security operations in Turkey's southeast to root out the PKK.  Video and photographic evidence of the assault strongly suggests that Turkish forces used indiscriminate force, laying waste to entire towns and large sections of cities.[23]

36.     Against the backdrop of a renewed war between the Turkish state and the PKK and Erdogan's anti-coalition agitation, negotiations for a multi-party government failed and new elections were scheduled for November 2015.  The nationalist wave that resulted from the

---

[21] Constanze Letsch and Ian Traynor, "Erdogan Concedes No Party Has Mandate in Shock Turkish Vote," *The Guardian*, June 8, 2015 http://www.theguardian.com/world/2015/jun/08/turkey-may-face-fresh-poll-as-recep-tayyip-erdogan-is-snubbed-by-voters.

[22] Tulay Karadeniz, "Turkey's Erdogan: Peace Process with Kurdish Militants Impossible," *Reuters*, July 28, 2015 https://www.reuters.com/article/us-mideast-crisis-turkey-kurds/turkeys-erdogan-peace-process-with-kurdish-militants-impossible-idUSKCN0Q20UV20150728.

[23] *Report on the Human Rights Situation in Turkey, July 2015 to December 2016*, Office of the United Nations High Commissioner for Human Rights, February 2017 https://www.ohchr.org/Documents/Countries/TR/OHCHR_South-East_TurkeyReport_10March2017.pdf; A link to satellite imagery of the damage to a number of towns can be accessed here: https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=21342.

17

Page 229 of 240

Filed: 11/20/2020

Document #1872595

USCA Case #20-7017

conflict with the PKK and the pro-AKP messaging of the press helped the ruling party regain its parliamentary majority with 49.50 percent of the vote in rerun elections. For its part, the HDP failed to capture 10 percent of national vote required to enter parliament.

37.     In January 2016 as security operations against the PKK continued, 1,128 academics from 89 universities signed a petition demanding an end to the fighting between the government and the PKK.  The petition also accused the government of massacres and mass deportation. Many of those who signed the petition were fired from their university posts and prosecuted for allegedly supporting a terrorist organization.[24]

38.     In an effort to permanently impair the Kurdish-based People's Democratic Party, the Turkish authorities arrested its leader, Selahattin Demirtas, in November 2016. He was charged with spreading propaganda for terrorists. A few months later three additional charges, leading a terrorist organization, incitement, and organization of demonstration were added. Although the European Court of Human Rights found that there was reasonable suspicion that Demirtas engaged in criminal activity, it determined that "stifling pluralism and limiting freedom of political debate" were the "predominant ulterior purpose" of his pretrial detention.[25] The Court ordered Demirtas' release, but the Turkish government refused—a violation of Ankara's commitments to the Council of Europe of which it is a member.

39.     The sequence of events going back to the 2014 municipal elections, the siege of Kobani, the June 2015 general elections, the renewed war between the Turkish state and the PKK, and the rerun election of November 2015 all contributed to the heightening of Turkish domestic tension between Turks and Kurds that has continued ever since.

---

[24] "Turkey: Academics on Trial for Signing Petition," Human Rights Watch, December 5, 2017
https://www.hrw.org/news/2017/12/05/turkey-academics-trial-signing-petition
[25] "Turkey Must Free Selahattin Demirtas, European Rights Court Says," *BBC*, November 20, 2018
https://www.bbc.com/news/world-europe-46274330

JA224

USCA Case #20-7017    Document #1872595    Filed: 11/20/2020    Page 230 of 240

40.     Throughout the long conflict between the Turkish state and the PKK and despite U.S. diplomatic and military support, including intelligence sharing for Turkey in its fight with the PKK, the group has never staged an attack on U.S. soil and has never targeted Americans or American interests abroad.

### The Quality of Turkish Politics and Freedom of Expression

41.     On paper, Turkey looks like a democracy.  The country has a parliament, multiple political parties, and holds regularly scheduled elections.  These features of Turkey's politics obscure the fact that the character of the country's political system is authoritarian. Turkey is a leading example of an "elected autocracy" that has emerged in places like Hungary, Poland, Brazil, and other countries where leaders have used institutions that resemble those found in a democracy to consolidate their hold on power and to justify their authoritarian approach to politics.[26]

42.     In its 2019 Commission Staff Working Document, the European Union reported that Turkey's progress toward EU membership was at a "standstill" in large part because:

> "Despite the welcome lifting of the state of emergency [in 2018], Turkey has introduced many of its more restrictive elements into legislation. The new presidential system has removed many of the checks and balances that existed previously, and has weakened the role of Parliament. It has led to more politicisation of the public administration and the judiciary and given the president the power to nominate the heads of the vast majority of the public regulatory authorities. The continuous deterioration in the situation relating to human rights, rule of law or independence of the judiciary continued during the reporting period."[27]"

---

[26] Turkish officials have sought to undermine democratic institutions through democratic practices is how referendums have been held to advance the AKP's efforts to pack the judiciary with its supporters and to alter the constitution in a way that diminishes parliamentary oversight and other checks and balances on the executive. Referendums are often mistaken to be expressions of direct democracy *par excellence*.  At times they are, but because governments that hold them generally have an advantage over their opponents in terms of messaging, referendums can be used to undermine democratic practices.  See Lawrence LeDuc, "Referendums and Deliberative Democracy," *Electoral Studies* 38 (2015): 139-48.

[27] *Commission Staff Working Document: Turkey 2019 Report*, May 25, 2019  https://ec.europa.eu/neighbourhood-enlargement/sites/near/files/20190529-turkey-report.pdf.

JA225

43.    As the EU Commission makes clear, Erdogan and the AKP have used their control of government to target military officers, politicians, bureaucrats, journalists, academics, civil society activists, lawyers, judges and others who are either actual or perceived threats to the AKP and its project.  Typically, critics of Erdogan and the AKP are branded as supporters of terrorism.  Such was the case when the head of Amnesty International's Istanbul office was arrested with 10 others in the fall of 2017.[28]  It is also the case with 16 people who are alleged to have led the Gezi Park protests in the summer of 2013.[29]  Those demonstrations began around the planned destruction of precious green space in central Istanbul for the purposes of building a mall—construction is a critical source of patronage for the AKP—and turned into a summers-long peaceful protest against crony capitalism, police brutality, corruption, and the arrogance of power. These demonstrations were met with water cannons, tear gas, and arrests.[30]

44.    As of 2013, much of what was once the country's vibrant and free, if not always responsible, press existed in a repressive environment in which the majority of media outlets were in the hands of AKP supporters and used to advance the goals of the ruling party. This was accomplished in a variety of ways including coercion, but also through the manipulation of government rules and regulations.

45.    Two prominent examples stand out in the AKP's successful effort to destroy an independent press: First, in 2007, government regulators took over a daily newspaper called *Sabah* due to the questionable banking practices of one of the paper's owners.  Although this was appropriate, the same agency that took over the paper sold it (and a related TV station) in a sole-

---

[28] "Amnesty International's Director in Turkey Charged with Helping Terror Groups," *CBC.com*, October 8, 2017 https://www.cbc.ca/news/world/amnesty-international-turkey-chief-charged-human-rights-1.4345995.
[29] Laura Pitel, "Trial Begins in Turkey of 16 Activists in 2013 Protests," *Financial Times*, June 24, 2019 https://www.ft.com/content/9fd65286-9698-11e9-8cfb-30c211dcd229.
[30] Steven A. Cook, *False Dawn: Protest, Democracy, and violence in the New Middle East* (New York: Oxford University Press, 2017).

bid deal to a firm whose chief executive officer was Prime Minister Erdogan's son-in-law. Before the sale, *Sabah* was critical of the prime minister and the AKP. After the sale it became a crude mouthpiece for Erdogan and the ruling party.

46.     Second, in 2009, owners of Turkey's largest daily paper and other media properties, were assessed a $2.5 billion tax fine for overstating losses at some of their businesses in order to minimize tax exposure. The real reason for the fine was political, however. The newspaper's owner was a fierce critic of Erdogan and the AKP and his flagship newspaper, *Hurriyet*, closely followed a corruption scandal in Germany that involved AKP supporters. The German authorities alleged that these party operatives raised money for charity among the country's large Turkish émigré population, but instead of directing the money for good works, they funneled these funds to Erdogan-friendly business concerns so that these firms could buy media properties that would support the Turkish leader and the AKP.[31]

47.     The other way in which Erdogan has corralled the press is through arrests. Since 2016, the Committee to Protect Journalists has ranked Turkey the leading jailer of journalists in the world.[32]

48.     In its annual assessment of human rights practices, the U.S. State Department concluded that in Turkey, "Mainstream print media and television stations are largely controlled by progovernment holding companies."[33] The report also cited a study that the well-respected Reporters Sans Frontieres conducted that determined, "The [Turkish] government was able to exert power in

---

[31] Steven A. Cook, *False Dawn: Protest, Democracy, and Violence in the New Middle East* (Oxford University Press, 2017).

[32] Press release, "Turkey, China, and Egypt are Responsible for Jailing More than Half of All Journalists," December 13, 2018 https://cpj.org/2018/12/hundreds-of-jailed-journalists-the-new-norm-cpj-ce.php

[33] United States Department of State, *2018 Country Reports on Human Rights Practices: Turkey* (March 2019) https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/turkey/.

Page 232 of 240    Filed: 11/20/2020    Document #1872595    USCA Case #20-7017

the administration of 90 percent of the most watched television stations and most read national dailies."[34]

49.     The Turkish press reports what the government wants the public to know intertwined with considerable editorializing intended to maximize support for President Erdogan's agenda and policies. Editors leave out the rest.  The most famous example of this forced abdication of responsibility occurred during the Gezi Park protests in the summer of 2013. Instead of broadcasting reports of the demonstrations and subsequent police violence unfolding in Istanbul and other major cities, CNN-Turk (a licensed affiliate of CNN) broadcast a documentary about penguins.  More recently, the same broadcaster repeated accusations the AKP leveled against the opposition's candidate to be mayor of Istanbul, notably that he supported terrorists and thus the division of the country (not true) and that he is of Greek origin. The last charge finds its most malevolent and egregious expressions in Turkish print outlets like *Sabah*, *Yeni Safak,* and *Aydinlik*, all of which are strongly supportive of President Erdogan and are routinely filled with anti-American, anti-Semitic, anti-Western slurs as well as outright fabrications.[35]

As noted above, Freedom House ranks Turkey as "Not Free," placing it in the company of countries such as Venezuela, Iran, Belarus, Iran, Russia, and China.[36]  In addition, in a July 2019 report to the UN's Universal Periodic Review, which examines the human rights records of all UN member state, ten international non-governmental organizations concluded that:

"In the period under review, the human rights situation has deteriorated severely, in particular for freedom of expression. A crackdown on civic space, media freedom, and a purge of

[34] United States Department of State, *2018 Country Reports on Human Rights Practices: Turkey* (March 2019) https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/turkey/.
[35] See, for example: "Why Incitement and Paranoia in the Turkish Press Matters," European Eye on Radicalization, July 29, 2019 https://eeradicalization.com/why-incitement-and-paranoia-in-the-turkish-press-matters/;  Simon Waldman, "The Secret Jewish Plot Against Turkey," *Haaretz,* December 12, 2018 https://www.haaretz.com/middle-east-news/.premium-the-secret-jewish-plot-against-turkey-1.6742265
[36] *Freedom in the World 2019,* Freedom House https://freedomhouse.org/report/freedom-world/2019/turkey

USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 234 of 240

dissenting voices, which escalated in the aftermath of the failed attempted coup in 2016, is ongoing. Changes to the counter-terrorism framework, first introduced under the State of Emergency (SoE) and later made permanent in law, have had far-reaching impacts on the rule of law, and facilitated the arbitrary targeting of journalists, activists, and opposition voices, particularly in the [predominantly Kurdish] Southeast."[37]

50.    The U.S. Department of State's 2018 Report on Human Rights in Turkey sums up

the grim reality of Turkish politics concisely and comprehensively:

> "Human rights issues included reports of arbitrary killing, suspicious deaths of persons in custody; forced disappearances; torture; arbitrary arrest and detention of tens of thousands of persons, including opposition members of parliament, lawyers, journalists, foreign citizens, and three Turkish-national employees of the U.S. Mission to Turkey for purported ties to "terrorist" groups or peaceful legitimate speech; political prisoners, including numerous elected officials and academics; closure of media outlets and criminal prosecution of individuals for criticizing government policies or officials; blocking websites and content; severe restriction of freedoms of assembly and association; restrictions on freedom of movement; and violence against women, and lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons, and members of other minorities."[38]

54.  In their reports, both the European Commission and the U.S. State Department highlight how

charges of terrorism are used with a broad brush to target the opponents—real and perceived—of the

Turkish government and President Erdogan.    Provisions of the post-attempted coup State of

Emergency "amended key pieces of legislation, particularly in relation to property rights, local

authorities and public administration, and audiovisual policy."[39]    This has permitted the

government to seize the property of its opponents and arbitrarily replace the elected leaders of

towns and villages, most often in the Kurdish southeast. Indeed, according to the EU, "A very

broad interpretation of the fight against terrorism…[is] among issues raising concern [for the

European Commission]."[40]    The same EU report provides the following revealing statistic, "Over

[37] Joint submission to the Universal Periodic Review of Turkey by ARTICLE 19, P24, PEN International, English PEN, Reporters Sans Frontiers (RSF), International Press Institute (IPI), Freemuse, European Centre for Press and Media Freedom (ECPMF), IFEX and Norsk PEN, July 2019, https://pen-international.org/app/uploads/JointSubmissionTurkeyUPR.pdf
[38] United States Department of State, *2018 Country Reports on Human Rights Practices: Turkey* (March 2019) https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/turkey/.
[39] *Commission Staff Working Document: Turkey 2019 Report*, May 25, 2019, https://ec.europa.eu/neighbourhood-enlargement/sites/near/files/20190529-turkey-report.pdf.

JA229

Case 1:18-cv-01117-CKK-ZMF   Document 70-4   Filed 09/09/19   Page 25 of 30
Case 1:18-cv-01141-CKK   Document 70-4-5   Filed 09/09/19   Page 25 of 30

Page 235 of 240

Filed: 11/20/2020    Document #1872595

USCA Case #20-7017

20% of the total prison population are in prison for terrorism-related charges. These include journalists, political activists, lawyers and human rights defenders."[41]

## The Failed Coup d'Etat

55.     Since a failed coup d'état in July 2016 that killed 249 people, President Erdogan has overseen an unprecedented crackdown on society. In the two and half years since the attempted putsch about 150,000 people have been dismissed from their jobs and another almost 100,000 have been arrested pending trial. Among these the government has about 4,400 judges and prosecutors as well as 6,000 academics. Also, 319 journalists along with 189 media outlets have been shuttered.[42] The vast majority stand accused of being followers of a cleric named Fethullah Gulen who the Turkish government alleges was a mastermind of the coup. Gulen is a permanent resident of the United States and although Turkey has requested his extradition, Ankara has not produced convincing evidence of his culpability that would require the Justice Department to move forward with Gulen's extradition.[43]

56.     Many of the people rounded up in the ongoing purge languish in jail in pre-trial detention.[44] In some cases, young children have been jailed along with their parents. The accused have had difficulty finding legal representation because lawyers are afraid to take their cases for fear of being accused of supporting Gulen and his group, which the Turkish government now designates a terrorist organization known as "Fethullah Terrorist Organization" or FETO.

---

[40] *Commission Staff Working Document: Turkey 2019 Report*, May 25, 2019  https://ec.europa.eu/neighbourhood-enlargement/sites/near/files/20190529-turkey-report.pdf.

[41] *Commission Staff Working Document: Turkey 2019 Report*, May 25, 2019  https://ec.europa.eu/neighbourhood-enlargement/sites/near/files/20190529-turkey-report.pdf.

[42] The most authoritative tracking of dismissals, jailings, and arrests since the failed 2016 coup can be found at: https://turkeypurge.com/

[43] Oya Artmutcu, "Turkey Sends New Files to US as Evidence for Gulen's Extradition," Hurriyet Daily News, January 30, 2017, http://hurriyetdailynews.com/turkey-sends -new-files-to-us-as-evidence-for-gulens-extradition--109121; Karen DeYoung, "Turkish Evidence for Gulen Extradition Pre-Dates Coup Attempt," Washington Post, August 19, 2016.

[44] Under anti-terror legislation, the ability of detainees to appeal their pretrial detention is limited. United States Department of State, *2018 Country Reports on Human Rights Practices: Turkey* (March 2019) https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/turkey/

57.     In an attack on "freedom of expression," the Turkish government has overseen the removal and destruction of over 300,000 books with alleged links or references to Gulen. In one instance a high school math textbook was removed from classrooms because of a question referencing from "point F to point G," because Turkish officials took "F" and "G" to be veiled references to Fethullah Gulen.[45]  In a statement to *The Guardian* newspaper responding to the actions of the Turkish government, PEN International, a non-governmental organization that "stands for the principle of unhampered transmission of thought within each nation and between all nations," lamented that "In just three years, the publishing landscape in Turkey has been all but decimated, with 29 publishing houses shut down by emergency decree for 'spreading terrorist propaganda'."[46]

58.     Gulen's presence in the United States has contributed to official conspiracies about the attempted coup that continue to this day.  According to Turkish government officials and the government-friendly press, the United States was complicit in the attempted coup. In succession, the CIA, the commander of the U.S. military's Central Command, a professor of international relations at Lehigh University, and American personnel located at an airbase in southeastern Turkey are all implicated in the attempted government overthrow.  There is no evidence to support any of these allegations. These government-fueled conspiracies reached such a fevered pitch that possessing an American dollar bill was grounds for arrest on the bizarre notion that different series of the bill served as an indicator of one's rank within Gulen's organization. For example, Turkish officials insisted that if someone was in possession of an F-series dollar bill it signaled the person was a "high ranking soldier" in Gulen's movement.[47]

---

[45] Alison Flood, " Turkish Government Destroys More than 300,000 Books," *The Guardian*, August 6, 2019
https://www.theguardian.com/books/2019/aug/06/turkish-government-destroys-more-than-300000-books
[46] Alison Flood, " Turkish Government Destroys More than 300,000 Books," *The Guardian*, August 6, 2019
https://www.theguardian.com/books/2019/aug/06/turkish-government-destroys-more-than-300000-books

USCA Case #20-7017      Document #1872595         Filed: 11/20/2020      Page 237 of 240

59.     In its most recent annual review of the state of human rights in Turkey, the U.S.

government described the post-coup d'état environment in the following way:

> "The two-year-long state of emergency–imposed following the 2016 coup attempt–ended
> July 19, but had far-reaching effects on the country's society and institutions, restricting the
> exercise of many fundamental freedoms. New laws and decrees codified some provisions
> from the state of emergency; subsequent antiterror legislation continued its restrictions on
> fundamental freedoms and compromised judicial independence and rule of law. By year's
> end, authorities had dismissed or suspended more than 130,000 civil servants from their jobs,
> arrested or imprisoned more than 80,000 citizens, and closed more than 1,500
> nongovernmental organizations (NGOs) on terrorism-related grounds since the coup attempt,
> primarily for alleged ties to cleric Fethullah Gulen and his movement, accused by the
> government of masterminding the coup attempt, and designated by the Turkish government
> as the "Fethullah Terrorist Organization" ("FETO")."[48]

60.     Gulen's presence in the United States is one among a long list of issues that

divide Turkey and the United States.  The sharp deterioration in relations over the last five years

are related to Ankara's successful effort to help Iran evade UN sanctions; Turkey's purchase of

an advanced air defense system from Russia; its coordination with extremist groups in Syria; and

Ankara's ambivalence toward fighting the Islamic State.  During the conflict with the Islamic

State, the Turkish government forced the United States to negotiate over the use of Incirlik

airbase, where the U.S. military maintains 90 nuclear weapons as a symbol of America's

commitment to Turkish security and which was in close proximity to Raqqa, Abu Bakr al

---

[47] President Erdogan came closest to directly assigning blame for the failed July 2016 coup d'état during a January
2018 speech to the AKP's parliamentary faction, reported in the pro-Erdogan daily Vatan. See "Erdoğan'dan
Bahçeli'nin 'ittifak' açıklamalarına ilk yanıt geldi" ("Erdogan's response to Bahceli's declaration of alliance"),
Vatan, January 9, 2018, http://gazetevatan.com/erdogan-dan-bahceli-nin-ittifak-aciklamalarina-ilk-yanit-geldi -
1133125-siyaset; "U.S. General Denies Involvement in Turkish Coup Attempt," *Reuters*, July 29, 2016
https://www.reuters.com/article/us-turkey-security-usa-votel-idUSKCN10925Y?il=0;  Jackson Diehl, "A Fake
News Campaign Blames an Innocent American for Coup Attempt in Turkey," *Washington Post*, November 12, 2017
https://www.washingtonpost.com/opinions/global-opinions/a-fake-news-campaign-blames-an-innocent-american-
for-a-coup-attempt-in-turkey/2017/11/12/e4e54ad8-c559-11e7-aae0-
cb18a8c29c65_story.html?utm_term=.54486b04c8d4; Daniel Brown, " 'Living in a Fantasy:' A Close Ally is
Investigating Everyone Named John and Trying to Arrest U.S. Military Leaders," *Business Insider*, August 8, 2018
https://www.businessinsider.de/turkey-probing-everyone-named-john-trying-arrest-us-military-leaders-2018-
8?r=US&IR=T; Elena Becatoros, "Turkey: Dollar Bills Seen as Evidence of Coup Plotter Links," *AP.com*, August
5, 2016 https://apnews.com/039b0df1be854a3fbfcfcb30a244d1b5
[48] United States Department of State, *2018 Country Reports on Human Rights Practices: Turkey* (March 2019)
https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/turkey/

USCA Case #20-7017      Document #1872595      Filed: 11/20/2020      Page 238 of 240

Baghdadi's Syrian capital. President Erdogan also sought to complicate the American fight against the Islamic State further by attacking U.S. allies on the ground. These issues underline the fact that while Turkey is a member of NATO and thus a treaty ally, it is not a partner of the United States.[49]

61.     It was the last of these issues—Washington's allies on the ground in Syria—that was the major focus of President Erdogan's first meeting with President Trump in May 2017. Erdogan came to Washington believing he would convince the new American president not to go through with his plan to provide weaponry to a Syrian Kurdish fighting force called the People's Protection Units (YPG) that makes up the bulk of the Syrian Democratic Forces (SDF), which was working with the United States to defeat the Islamic State. President Erdogan's argument rested on a simplistic rationale: The YPG is affiliated with the PKK. Therefore the United States should not work with the YPG.[50]

62.     The YPG has been instrumental in helping the United States significantly undermine the ability of the Islamic State to wage war in the Middle East and beyond. YPG fighters—in coordination with American Special Forces operators—have been the ground forces in the fight obviating the need for a large U.S. deployment of ground forces to Iraq and Syria.

63.     The Turkish government and its supporters are enraged at U.S.-YPG security coordination, but they gloss over the origins of American military coordination with the YPG. This security relationship goes back to Turkey's 2014 refusal to join the fight against the Islamic State directly, offering to provide Turkish-affiliated units of the Free Syrian Army instead. The Pentagon deemed those units poorly trained and many of them too closely connected to al Qaeda.

---

[49] Steven A. Cook, *Neither Friend Nor Foe: The Future of U.S.-Turkey Relations* Council on Foreign Relations Special Report No. 82, November 2018 https://cfrd8-
files.cfr.org/sites/default/files/report_pdf/CSR82_Cook_Turkey.pdf
[50] Sevil Ekus, "Erdogan to Meet Trump Amid Disagreements on YPG," *Hurriyet Daily News*, May 16, 2017
http://www.hurriyetdailynews.com/erdogan-to-meet-trump-amid-disagreements-on-ypg-113125.

27

JA233

Left with no other choice and confronted with Kurds, who, in contrast with the Turkish government, were eager to ally themselves with the United States, the Obama administration made the YPG America's ground forces against the Islamic State.  This is a policy that the United States has continued and expanded since President Trump was inaugurated.

64.    In the short meeting between the presidents on May 16, 2017, President Trump refused President Erdogan's request that the United States stop arming the YPG.

## CONCLUSIONS

65.    The events that occurred in Sheridan Circle on May 16, 2017 are precisely what one would expect to happen to protesters in Turkey. President Erdogan and the AKP brook no criticism or challenge and as a result of the cult of personality around the Turkish leader, his security detail zealously safeguard him from all expressions of dissent.  This is why during Erdogan's visit in May 2017, his guards beat protesters on Sheridan Circle—they were criticizing Erdogan's authoritarian rule, assailing his use of violence against Kurds, and expressing their support for the Kurdish politician Selahattin Demirtas—one of Erdogan's rivals. For Erdogan's security detail, Washington's Sheridan Circle is no different from Istanbul's Taksim Square and protesters were to be treated in the same way regardless of U.S. law and American norms. As the past president of the National Press Club indicated after the attack on protesters, reporters, and Brookings Institution staff in March 2016, President Erdogan and his security team sought to export to their repressive and violent abuses of freedom of expression and assembly to the United States. The attacks at Sheridan Circle would not be out of place in Turkey. The authoritarian impulse to attack any criticism or dissent by Erdogan's security detail, the guards' dogged efforts to attack not only the protestors but their signs, posters, especially the poster of political prisoner Demirtas, all show how the attack at Sheridan Circle mimics similar

JA234

attacks throughout Turkey carried out by government agents and AKP supporters to squelch any freedom of expression that criticizes Erdogan and his government's policies. The attacks at Sheridan Circle bear the marks of a politically motivated act of violence.

Executed September 1, 2019.

Dr. Steven A. Cook

Page 240 of 240

Filed: 11/20/2020

Document #1872595

USCA Case #20-7017

# Exhibit 81

An official website of the United States government   Here's how you know

Press

Business

Employees

Job Seekers

Students

Travelers

2017-2021 ARCHIVED CONTENT

You are viewing ARCHIVED CONTENT released online from January 20, 2017 to January 20, 2021.

Content in this archive site is NOT UPDATED, and links may not function.

For current information, go to www.state.gov.

★ ★ ★

# United States Concerned by Violence Outside Turkish Diplomatic Facilities

PRESS STATEMENT

HEATHER NAUERT, STATE DEPARTMENT SPOKESPERSON

MAY 17, 2017

Share

**Press Statement**
**Heather Nauert**
**Department Spokesperson**
**Washington, DC**
**May 17, 2017**

We are concerned by the violent incidents involving protestors and Turkish security personnel Tuesday evening. Violence is never an appropriate response to free speech, and we support the rights of people everywhere to free expression and peaceful protest.

We are communicating our concern to the Turkish government in the strongest possible terms.

TAGS

Diplomatic Property     Office of the Spokesperson     Turkey

Exhibits 84-85 SEALED

# Exhibit 86

EDWARD R. ROYCE, California
Chairman

ELIOT L. ENGEL, New York
Ranking Democratic Member

AMY PORTER
Chief of Staff

THOMAS SHEEHY
Staff Director

JASON STEINBAUM
Democratic Staff Director



**One Hundred Fifteenth Congress**
**U.S. House of Representatives**
**Committee on Foreign Affairs**
2170 Rayburn House Office Building
Washington, DC 20515
www.foreignaffairs.house.gov

May 17, 2017

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

The Honorable Rex W. Tillerson
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Attorney General Sessions and Secretary Tillerson:

I am writing concerning the brutal attack on individuals outside the Turkish Ambassador's residence in Washington, D.C. yesterday. Video evidence indicates men dressed in suits viciously beat multiple individuals, throwing them to the ground and kicking them in the head. Numerous news reports indicate these individuals were members of President Recep Tayyip Erdogan's security detail who accompanied him on his official state visit this week. Alarmingly, this behavior is indicative of the broad crackdowns on political activists, journalists and religious freedom in Turkey that have greatly harmed Turkish democracy in recent years.

To send a clear message that these acts of violence will not be tolerated, I ask that you immediately look into this matter and bring all appropriate criminal charges before these individuals leave the United States. Agents of foreign governments should never be immune from prosecution for felonious behavior. Above all else, they should never be permitted to violate the protections afforded by the First Amendment of the U.S. Constitution.

Thank you for your prompt attention to this important matter.

Sincerely,

EDWARD R. ROYCE
Chairman

Exhibit 87

# Congress of the United States
## Washington, DC 20515

May 25, 2017

The Honorable Jeff Sessions
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

The Honorable Rex W. Tillerson
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Attorney General Sessions and Secretary Tillerson:

We write today to express our outrage over the remorseless acts of violence inflicted upon individuals exercising their Constitutionally-protected First Amendment right to free speech outside the Washington, D.C. residence of the Turkish Ambassador on Tuesday, May 16, 2017. Widely circulated video evidence shows and subsequent reports confirm that several members of Turkish President Tayyip Erdogan's security detail physically assaulted multiple individuals leaving them bloodied and bruised with some having to be hospitalized due to the severity of their injuries.

This behavior is the second time in two years that Turkish security forces have threatened and assaulted U.S. citizens and legal residents on American soil. This is unacceptable in any situation, but even more so when Turkish leaders come and claim to be faithful allies to the United States. This clear disrespect for our laws and those who enforce them, especially during National Police Week, is intolerable.

The individuals involved in Tuesday's attacks on Americans on U.S. soil must be identified and brought to justice. Turkish personnel based in the U.S. who were involved in the attacks should be declared *persona non grata* and expelled from the U.S. immediately. Turkish personnel not based in the United States who were involved in the attacks should be barred from entry into the U.S. in the future. Foreign nationals who cannot respect the rule of law of this great country should not be allowed to enjoy the rights and privileges it affords.

Allies do not threaten U.S. troops and allies do not attack U.S. citizens on American soil. We ask you to uphold law and order and demand accountability from the Erdogan government.

Thank you for your prompt attention to this important matter and look forward to your response.

Sincerely,

Gus M. Bilirakis
Member of Congress

Ileana Ros-Lehtinen
Member of Congress

Jim Banks
Member of Congress

James P. McGovern
Member of Congress

Ann Wagner
Member of Congress

Jamie Raskin
Member of Congress

Charlie Crist
Member of Congress

Peter T. King
Member of Congress

Frank Pallone, Jr.
Member of Congress

Robert B. Aderholt
Member of Congress

Rodney Davis
Member of Congress

Niki Tsongas
Member of Congress

Norma J. Torres
Member of Congress

Bill Johnson
Member of Congress

Lee Zeldin
Member of Congress

Bonnie Watson Coleman
Member of Congress

Carol Shea-Porter
Member of Congress

Bradley S. Schneider
Member of Congress

Robin Kelly
Member of Congress

Bill Foster
Member of Congress

Joseph Crowley
Member of Congress

Cheri Bustos
Member of Congress

Dina Titus
Member of Congress

Mike Quigley
Member of Congress

Randy Hultgren
Member of Congress

Ted Deutch
Member of Congress

John P. Sarbanes
Member of Congress

Judy Chu
Member of Congress

Adam B. Schiff
Member of Congress

Jan Schakowsky
Member of Congress

Leonard Lance
Member of Congress

Adam Kinzinger
Member of Congress

David N. Cicilline
Member of Congress

Gregory Meeks
Member of Congress

Jeff Duncan
Member of Congress

Bobby L. Rush
Member of Congress

Ted Poe
Member of Congress

Lucille Roybal-Allard
Member of Congress

Albio Sires
Member of Congress

Ted S. Yoho, D.V.M.
Member of Congress

Exhibit 88

# United States Senate
### WASHINGTON, DC 20510

May 26, 2017

The Honorable Rex W. Tillerson
Secretary of State
U.S. Department of State
2201 C Street NW
Washington, DC 20520

Dear Secretary Tillerson:

We write today to express our concern regarding the apparent involvement of members of the Turkish security detail accompanying President Recep Erdogan and Foreign Minister Mevlüt Çavuşoğlu in a violent altercation outside the Turkish Ambassador's residence in Washington, D.C. on May 16. Nine people were hospitalized—one in serious condition—due to the violence. If true, this is the second time in little more than a year that members of Turkish diplomatic security have intervened violently against protestors and members of the media in the United States. This is not acceptable.

Videos and witness accounts of the altercation indicate men dressed in dark suits and wearing earpieces assaulted political protestors gathered outside the Turkish Ambassador's residence. Press reports, including one by Turkey's official news agency, indicate that these men were members of President Erdogan's security detail who had accompanied him to the Ambassador's residence. If accurate, those individuals acted well outside of what is acceptable behavior by a professional security detail, especially that of a 65-year NATO ally.

If these were Turkish diplomatic security guards, their actions demonstrate a pattern of indefensible behavior. In March 2016, members of President Erdogan's detail behaved in a similarly heavy-handed fashion outside the Brookings Institution as Erdogan gave a speech. The Brookings Institution reported that, "Erdogan's security detail behaved unacceptably – they roughed up protesters outside the building and tried to drag away 'undesired' journalists."

We urge you to work expeditiously with the Washington, D.C. Metropolitan Police Department to identify the perpetrators of this assault and to determine whether members of President Erdogan and Foreign Minister Mevlüt Çavuşoğlu's security detail were involved. If their participation is confirmed, those responsible should be held accountable under applicable U.S. law. We look forward to working with you to prevent the recurrence of such incidents in the future.

Sincerely,

Christopher S. Murphy
United States Senator

Ron Johnson
United States Senator

Martin Heinrich
United States Senator

Marco Rubio
United States Senator

Robert Menendez
United States Senator

Kirsten Gillibrand
United States Senator

Sherrod Brown
United States Senator

Richard Blumenthal
United States Senator

Richard J. Durbin
United States Senator

Chris Van Hollen
United States Senator

Patrick Leahy
United States Senator

Tammy Baldwin
United States Senator

Bernard Sanders
United States Senator

Gary C. Peters
United States Senator

Edward J. Markey
United States Senator

Debbie Stabenow
United States Senator

Cory A. Booker
United States Senator

Jack Reed
United States Senator

Patty Murray
United States Senator

Al Franken
United States Senator

# Exhibit 90

## Declaration of Alan O. Makovsky

Alan Makovsky (CV attached) is a senior fellow for National Security and International Policy at the Center for American Progress, a Washington, DC-based think tank. From 2001 to 2013, he served as a senior professional staff member on the Committee on Foreign Affairs in the U.S. House of Representatives, where he covered the Middle East, Turkey, and other related issues.

At The Washington Institute for Near East Policy—another private Washington think tank where he worked from 1994 to 2001—Makovsky wrote widely on Middle Eastern and Turkish topics. He also founded and directed the Washington Institute's Turkey Research Program.

At the State Department, where he worked from 1983 to 1994, Makovsky variously covered southern European affairs and Middle Eastern affairs for the Bureau of Intelligence and Research. He also served as the political advisor to Operation Provide Comfort in 1992 and as the special advisor to the Special Middle East coordinator from 1993 to 1994.

Makovsky has testified before Congress regarding Turkey and U.S.-Turkish relations on four occasions, most recently last year.

I have been asked to assess if and how Turkey's and Erdogan's attitudes toward Kurds may have played a role in the Sheridan Circle attack. Accordingly, I have focused on pre-Sheridan Circle developments, with reference to subsequent events only as necessary to complete a point or observation. Following are my requested thoughts, which I have tried to present in an objective manner, without regard to helping or hurting claimants' case:

**Background and context**

Turkish state oppression of Kurds and particularly of ethnically-conscious Kurds is of longstanding. As successor to the multi-ethnic Ottoman Empire, whose slow disintegration was partly the result of ethnic breakaway movements, the Turkish Republic was founded as a "unitary" state based on the concept that all its citizens – or at least all its Muslim citizens -- should consider themselves "Turks." This concept was expressed most starkly in a 1930 speech by Ismet Inonu, Ataturk's number-two and later successor as president of Turkey: "Only the Turkish nation is entitled to claim ethnic and national rights in this country. No other element has any such right." (Ironically, although a staunch Turkish nationalist, Inonu is widely reported to have been a Kurd.)

This imposed policy seems to have succeeded over time in most cases, as members of most ethnic minorities in Turkey, to a greater or lesser extent, adopted Turkishness as their primary identity. The great exception to this was the Kurds, who were too numerous, too geographically contiguous, and, in large numbers, perhaps too proud to see their language and culture stamped out in favor of Turkishness.

The non-integration of most Kurds into Turkish society was compounded by the fact that the Kurdish-dominated southeast of Turkey has been, since the beginning of the state, the least developed section of Turkey. It remains so today.

As part of its campaign to establish a unitary state, the Turkish Republic outlawed the use of the Kurdish language and even the very term "Kurd" for official purposes. Education and all official transactions were conducted strictly in Turkish. In fact, the Turkish constitution specifies that "(n)o language other than Turkish shall be taught as a mother tongue to Turkish citizens at any institution of education" (Article 42). It also asserts (Article 3) that Turkey's "language is Turkish" – a provision which the constitution says cannot be altered.

Yet, as was obvious to whoever visited southeastern Turkey, people there spoke a language other than Turkish. In fact, Kurdish belongs to the Indo-Iranian branch of Indo-European languages and is akin to Persian, whereas Turkish is linguistically classified as an Altaic language. Official Turkey, however, initially (and for many decades thereafter) insisted that the Kurdish language spoken in eastern Turkey is a dialect of Turkish, its great difference from standard Turkish being explained by the mountain-imposed isolation of its people from other Turks; for many decades, its speakers were officially described as "mountain Turks." On a less formal, popular cultural level, ethnic Turks tended to see Kurds as backward, tribal, and lacking in culture, with a language incapable of expressing sophisticated thought.

In the early years of the Turkish Republic, numerous anti-state rebellions erupted among the Kurdish population, and the state often responded with what amounted to massacres of the civilian population. The best known of the former is the Shaykh Said rebellion of 1925. Whether it was sparked more by ethnic or religious concerns remains a subject of dispute to this day, but it seems that both elements were important factors -- a reaction to the new Turkish Republic's repression of Kurdishness as well its embrace of anti-clerical secularism. Probably the most severe example of state repression against Kurdish civilians in response to a rebellion was the "Dersim massacre" of 1937-38, in which more than 10,000 – some estimates put the figure as high as 40,000 -- civilians were killed and thousands more forcibly removed or displaced.

Because of non-recognition of the Kurds as a separate entity, it has been difficult to determine the precise size of the Kurdish population. Today it is estimated at 15-20% of Turkey's population. Kurdish-majority areas have a higher birth-rate than the rest of the Turkish population, suggesting that the Kurdish portion of Turkey's overall population will grow.

In fairness, it should be noted that talented Kurds who do not prioritize their ethnic identity and especially if they are willing to assume Turkishness as their primary identity – either actively or passively – have a realistic opportunity to succeed in Turkish society. They often cannot be distinguished from Turks based on physical characteristics and, like ethnic Turks, they are predominantly Sunni Muslims. There have been many successful Kurdish businessmen and professionals over the years, although few have risen to the top ranks of political leadership. Ismet Inonu, Ataturk's deputy and presidential successor, and Turgut Ozal are probably the only two of Kurdish origin to achieve the presidency or prime ministry. Inonu never acknowledged

Kurdish roots; nor did his son Erdal, a deputy prime minister in the 1990s. Ozal publicly claimed to have a Kurdish grandmother.

Prior to Ozal, mere acknowledgement of the existence of Kurds in Turkey or public description of oneself as a Kurd could be deemed a crime. In the late 1970s, cabinet minister Serafettin Elci declared, "There are Kurds in Turkey, and I too am a Kurd." For that statement, which seemed stunning at the time, Elci was put on trial by the military government that took power in 1980; he was sentenced to 28 months in jail and banned from practicing law for a decade.

The primary reason for the Turkish state's long-time refusal and current reluctance to recognize a separate Kurdish identity is the fear of a "slippery slope" that would ultimately lead to secession. That remains a primary concern today.

**The Easing of the unitary state…**

Over time, some Turkish leaders came to accept that Kurdish identity could not be wiped out simply by denial and repression – or by a strictly military solution to an insurgency -- and moved toward recognition of a "Kurdish problem" and some limited efforts at change. Turgut Ozal reportedly used some Kurdish when campaigning for re-election as prime minister in 1987. He also claimed Kurdish ancestors in an interview with Western media, which was reported in Turkey. In remarks to the Turkish media following post-Gulf War meetings with Iraqi Kurdish leaders in 1991, Ozal broadly hinted at the existence of Kurds in Turkey. In 1993, then-Prime Minister Suleyman Demirel announced in Diyarbakir that "(w)e recognize the Kurdish reality."

Turkey, however, still has not reached a consensus as to what recognition of "the Kurdish reality" means. For most Turkish reformers, it means simply modification of the unitary state to allow greater linguistic and cultural freedoms. Notions like political autonomy or use of Kurdish as a language of instruction in public schools are red lines, even for most Turks who support reform. Meanwhile, some Turks – such as adherents of the Nationalist Action Party (MHP), Erdogan's coalition partner – resist acceptance of Kurdish identity, "the Kurdish reality," altogether. And the reflex of Turkish officialdom and much of Turkish society remains that any manifestation of Kurdish consciousness is a step toward separatism. Turkish legal codes are an amalgam of twenty-first century limited reforms existing side-by-side with laws and constitutional provisions pulling in the opposite direction, that is, intended to protect the unitary, uni-lingual state; the latter are often written in a vague manner and applied in a subjective and unpredictable fashion. Thus, for example, governors (central-government appointees) might cancel a legal Kurdish concert and arrest the organizers or order the removal of Kurdish books from a bookstore if they deem that they are threatening "social peace" or the "indivisible integrity of the state." These laws are not explicitly aimed at Kurds, but they are implemented primarily against Kurds.

PKK effect. A key turning point bringing the issue of the Kurdish problem into the open was the insurgency staged by the Kurdistan Workers' Party (PKK, by its Kurdish acronym) beginning in 1984. It is the longest and probably bloodiest sustained Kurdish insurgency in Turkish history.

Despite some ceasefires along the way, and Turkey's clearly winning the upper hand militarily over the years, it continues to this day, based primarily from northern Iraq. Particularly in recent years, the PKK has focused its attacks on Turkish security forces, but it has also continued to employ terrorist tactics against civilians.  It is officially designated as a terrorist group by the U.S. and the EU, as well as Turkey.

The PKK initially proclaimed its goal to be an independent Kurdish state uniting all the Kurdish populations of the regions historically home to Kurds in Iran, Iraq, Syria, and Turkey. While focused on Turkey, it later (1993) scaled back its demands to autonomy within each country, albeit as part of a complicated and seemingly unworkable system of multiple ethnic and religious autonomies it calls "democratic confederalism."

European Union effect. A second factor forcing the Kurdish problem into the open in Turkish society was Turkey's quest to join the European Union, whose democratic requirements for membership include minority rights.

Initially, only limited steps were taken. In 1991, an unworkable law banning all public and private use of Kurdish for any purpose, including speaking --- promulgated a decade earlier under a military government – was repealed. In 1995, for the first time, an NGO with the word "Kurd" in its title (full name: Kurdish Culture and Research Foundation) was registered by the state. And in 2002, just before parliamentary elections, the Bulent Ecevit government authorized legalization of private Kurdish radio, television, and schools – to that point, probably the most dramatic legal departure ever from the rules of Turkey's unitary state.

Also in 1991, an unprecedented, avowedly pro-Kurdish political party emerged, the People's Labor Party (HEP, by its Turkish initials) – only to be banned two years later by Turkey's constitutional court because of its explicit advocacy of Kurdish rights. That began a succession of Kurdish political parties founded and then soon dissolved by the state. The most successful and enduring has been the current one, the Peoples' Democracy Party (HDP), founded in 2012, but under judicial threat of closure since 2021 in a still-pending case, as noted below.

More was done to improve the legal situation of the Kurds with the onset of the government of Recep Tayyip Erdogan's Justice and Development Party (AKP, by its Turkish initials), which swept to power in 2002 and remains in power today. In the early AKP years, there were a number of reforms directed toward the Kurds. Controls on the language loosened; state-sponsored Kurdish-language television programming began in 2004, with a separate, all-Kurdish channel added in 2009. Kurds who did not speak Turkish were granted translators in the judicial system. Kurdish-culture NGOs were legalized, albeit closely monitored by the state. Kurdish language courses began to be offered in some universities, and a few universities established departments or programs of Kurdish language and literature. Original Kurdish names were restored to many villages whose names had been Turkicized. Privately-owned Kurdish TV and radio stations emerged, and a handful of private Kurdish schools were established, as foreseen in the 2002 legislation.  Most significantly, the Turkish government opened negotiations with the PKK, at first strictly covertly and later, in 2013, openly through Turkish-Kurdish

representatives from HDP who were allowed to consult with Abdullah Ocalan, the PKK leader who was captured by Turkey in 1999 and has been held under arrest ever since.

Whereas the AKP government was initially seen as liberalizing toward the Kurds, Erdogan did an abrupt volte-face in 2015, presaged by events of 2014. In October of that year, as the Syrian Kurdish town Kobane – just across the Turkish border – was under assault by ISIS, Kurds in Turkey protested their government's refusal to intervene on the Syrian Kurds' behalf or to facilitate refuge for the Syrian Kurds in Turkey. As police tried to break up the demonstrations – which engulfed most cities and towns in Turkey's Kurdish southeast, as well as Istanbul and Ankara, where large Kurdish minorities also reside -- violence ensued. Reportedly joining the attack on the demonstrators were Islamist Kurds and ethnic Turkish nationalists. More than three dozen people were killed and hundreds more were injured, the overwhelming majority of them from among the demonstrators.

Negotiations between the government and PKK continued, but trust had been significantly eroded. Many Turkish Kurds sensed that the Turkish government actually preferred an ISIS victory in Kobane, in order to dilute the Kurdish presence on the Syrian side of the border and undermine an emergent, Kurdish-run autonomous entity (especially as that entity was established by a PKK-established group). A preliminary agreement on a roadmap to a solution to Turkey's Kurdish problem was reached between representatives of the pro-Kurdish Peoples' Democracy Party (HDP) and senior government officials in February 2015 – the so-called "Dolmabahce Agreement" -- but Erdogan did not endorse it, throwing the negotiations into limbo.

**…and its resurgence**

Relations took a nosedive in mid-2015, after Erdogan's AKP party lost its parliamentary majority in elections in June of that year.  A key reason why Erdogan lost his majority is because of the electoral success of HDP, which attracted the votes of most Kurds and many Turkish liberals, both groups of which contained cadre that previously voted for AKP. Although its leadership and base are Kurdish, HDP's platform advocates for a vision of Turkey as a liberal, democratic, multicultural state that promotes gender equality and cultural rights for all minorities, not only Kurds. HDP's leader in 2015 was its charismatic co-chairman Selahattin Demirtas, who in 2014 had run in Turkey's first-ever direct election of the presidency. Erdogan had won that election with 51.8%, but Demirtas won nearly 10% of the vote in a three-candidate field. This "success" seemingly convinced Demirtas that the HDP, founded in 2012, should contest the 2015 parliamentary elections, in the belief that it could meet the necessary 10%-threshold then required to enter parliament. No Kurdish-focused party had ever previously entered parliamentary elections as an independent entity with a meaningful prospect of success. (Starting from 1991, Kurdish parties had successfully run parliamentary candidates only as independents and as parts of other parties' lists.) By winning 13% of the vote, HDP altered parliamentary arithmetic sufficiently to contribute substantially to AKP's failure to win a parliamentary majority – the first time that had happened after three consecutive majority

victories by AKP in parliamentary elections.

Erdogan seems to have seen this as a betrayal. Erdogan's long-time goal was to establish and inhabit an "executive presidency" with nearly unassailable power. (He achieved this via a controversial referendum in 2017.) In 2015, however, he seems to have believed his liberalized approach to the Kurdish issue would stand him in good stead as a tradeoff for Kurdish support for enhancement of his presidential powers. The events of October 2014 had taken their toll on Kurdish attitudes toward Erdogan, however. The HDP not only decided to run in the 2015 elections; its centerpiece campaign slogan was aimed directly at Erdogan: "We won't let you achieve your executive presidency."

Erdogan also likely felt betrayed by the PKK, with which he had entered into a cease-fire agreement in 2013. According to Turkish understanding, the PKK was supposed to have turned over arms in its possession inside Turkey and receive free passage into Iraq. The PKK did not do that. According to a senior PKK official, the PKK had wanted Turkey's parliament to endorse the deal; otherwise, he said, the PKK feared that it would surrender its weapons only to be jailed or murdered thereafter. The PKK also claimed that Turkey was increasing its military preparations in the southeast throughout the cease-fire, as if, the PKK said, the Turkish government were preparing for another round of fighting rather than an extension of the cease-fire. Meanwhile, Turkish Kurdish youth, inspired by the "cantons" established by autonomous Syrian Kurds and believed by Turkey to be backed by the PKK, sought to "liberate" portions of towns in the southeast. Erdogan's effort to end the PKK's armed presence in Turkey had come to naught.

Following the June 2015 election, Erdogan completed his about-face against the Kurds. In July, he unleashed a scorched-earth military approach to recovering urban areas where the state had lost partial control to Kurdish youths. This was accomplished over the next year. The result of the military onslaught and subsequent fighting with the PKK was more than 600 civilians killed and hundreds of thousands displaced, according to the International Crisis Group. Also in July 2015, Erdogan explicitly renounced the Dolmabahce Agreement. Both the dialogue and the cease-fire were over. Erdogan also thus garnered the support of ethnic Turkish ultra-nationalist Devlet Bahceli and his Nationalist Action Party (MHP), who previously had been among Erdogan's harshest critics.

Turning against the Kurds and aligning with ethnic Turkish ultra-nationalists laid the groundwork for achieving the electoral result Erdogan wanted. Following the June election, Erdogan used his presidential authority to prevent his prime minister, Ahmet Davutoglu, from negotiating a coalition government based on the June results. Turkey thus had to hold new elections on November 1, and this time Erdogan's AKP re-captured its parliamentary majority. The Erdogan/AKP alliance with Bahceli and the MHP was born in the run-up to that election, and it continues to this day. In 2016, MHP votes were crucial for parliamentary passage of the constitutional changes Erdogan wanted for his executive presidency and for bringing them to referendum the following year.

Following the failed coup attempt of July 2016, Erdogan availed himself of "emergency rule" authority further to repress Kurdish culture and politics. For one, he closed virtually every private Kurdish TV and radio station and private Kurdish school, squashing the fruit of the 2002 legislation. (To my knowledge, only one private Kurdish TV station remains on the air, its programming aimed only at children and strictly non-political.)

Also in post-coup 2016, a Turkish state prosecutor – almost certainly acting at Erdogan's behest – charged Demirtas with terrorism and separatism, primarily based on a distorted interpretation of his encouragement of the 2014 demonstrations. Although Demirtas did indeed call for demonstrations, he did not advocate violence; in fact, as noted, there is little doubt that it was the pro-Kobane demonstrators who absorbed the brunt of the violence. Demirtas was convicted in 2018 and remains in prison, notwithstanding Turkey's formal obligation to comply with the ruling of the European Court of Human Rights that his imprisonment is strictly political and that he should be immediately released.

It should perhaps be noted that, although rule-of-law has long been problematic in Turkey, there seems to have been a significant deterioration since the 2016 coup attempt and the 2017 passage of the referendum on the executive presidency. Erdogan has tightened his grip on the judiciary, and, particularly under the recently departed interior minister Suleyman Soylu – who served from 2016 until June 2023 – police impunity seems to have been on the rise.

**Conclusion**

The major lesson Erdogan seems to have derived from the twin elections of 2015 is that Turkish nationalism and anti-Kurdishness are electoral winners. The echoes of these lessons have been heard ever since. Over the years since, Erdogan has consistently and baselessly accused the HDP -- a legitimate political party whose members, at Erdogan's request, helped Erdogan pursue negotiations with the PKK -- of terrorism. In 2021, a prosecutor egged on by Bahceli opened a case to close down HDP and bar hundreds of its officials from politics for life, a proceeding that continues to this day. According to the 2022 U.S. Department of State Human Rights report, between 2016 and the end of 2022, 88% of elected HDP officials were removed from office; this was done by administrative fiat, the state over-ruling the expressed will of voters. (Earlier this year, Interior Minister Soylu said that Erdogan personally ordered him to remove elected HDP mayors.) These echoes were heard most sharply during the recent (2023) presidential and parliamentary election campaign, when Erdogan made HDP's open support for his rival Kemal Kilicdaroglu virtually his central campaign theme, repeatedly attacking Kilicdaroglu and his CHP party as "terrorists" on that basis.

In short, Erdogan's resentment of HDP and the PKK, reinforced by electoral considerations and Turkey's historical, fundamental insistence on a unitary state — a commitment to which Erdogan's coalition partner MHP is an unwavering adherent – has brought him to reject virtually all manifestations of Kurdish ethnic consciousness. Such was his outlook as he approached his visit to Washington in May 2017.

# Appendix A

**ALAN O. MAKOVSKY**
730 24th St. N.W. #407
Washington D.C. 20037
(202) 339-0879 (home)
(202) 374-9294 (cell)

**PROFESSIONAL EXPERIENCE**

January 2014-
Present

**SENIOR FELLOW**, Center for American Progress (non-resident, part-time). National Security and International Policy program, with focus on Turkey and related issues.

2016-2018

**CONSULTANT**, Middle East Task Force, Bipartisan Policy Center, 2016-18.

2014-2016

**ADJUNCT PROFESSOR**, Bahcesehir University – International (BAU-I), Washington, DC (September-December 2014 and January-May 2016). Developed and taught undergraduate lecture courses on "History of U.S.-Turkish Relations" (2014) and "American Politics and Campaign Planning" (2016).

May 2001-
June 2013

**SENIOR PROFESSIONAL STAFF MEMBER**, International Relations Committee (HIRC), U.S. House of Representatives. Cover issues related to Arab world, Iran, Israel, Turkey, Cyprus, Armenia, and Azerbaijan for the Minority (Democratic) staff. Initiate, draft, and negotiate legislation; brief and advise Congressmen; write speeches, press releases, and analytic memos for Ranking Member; in cooperation with Majority staff, organize and develop witness list for Committee hearings. Issues of primary focus: Israeli-Palestinian peace process, Iraq, Iran, Libya, Syria/Lebanon, Cyprus, Turkey. Travel extensively in the region; have participated in numerous meetings with heads-of-government and other senior Middle Eastern officials; frequently involved in "track two" meetings.

May 1994 –
May 2001

**SENIOR FELLOW**, The Washington Institute for Near East Policy. Writer/analyst, primarily focused on Turkey, Syria, Iraq, and Middle East peace process. On a regular basis, produced *Policywatches* and *Peacewatches*, a Washington Institute series of two-page analyses of topical issues faxed to hundreds of government officials, diplomats, journalists, and others (available at www.washingtoninstitute.org). Wrote in-depth study of Middle East multilateral peace process, 1995. **Director (and founder), Turkish Research Program,** which focuses on Turkey and regional issues of relevance. In that capacity, authored numerous analyses, commentaries, and policy proposals on Turkey-related issues; organized seminars on Turkish foreign policy featuring scholars from the US, Turkey, Greece, the Middle East, and Europe; convened major speaking events, featuring leading Turkish and US policy-makers and scholars, including Turkey's president, prime minister, defense minister, parliamentary speaker, central bank president, deputy chief of staff, and others, and the US deputy secretary of state; established Turkish military fellows program for senior Turkish officers (lt.col./colonel-level) to enhance their understanding of Washington policy/political realities; founded visiting Turkish scholars program; inaugurated annual Turgut Ozal Memorial Lecture on Turkey and US-Turkish Relations;

2

addressed numerous audiences on Turkey- and Aegean-related issues; frequently interviewed by US, Turkish, Greek, Arab, and Israeli media.

September 1993 – May 1994    **SPECIAL ADVISOR TO THE SPECIAL MIDDLE EAST COORDINATOR**, US Department of State. Produced analyses of peace-process-related issues for Secretary of State and Special Middle East Coordinator Dennis Ross, with close attention to Middle Eastern parties' statements, policy pronouncements, negotiating drafts, and other documents, as well as analytic studies and drawing on resources of analytic community to help form peace process policy. Drafted talking points, initiated policy papers. Represented Special Coordinator on trips, e.g., Secretary of Commerce, Ron Brown's 1994 trip to the Middle East. Worked closely with Special Coordinator and all members of Department's "peace process team."

July 1993 – September 1993    **STAFF CONSULTANT / FOREIGN AFFAIRS ADVISOR**, Office of Senator Patrick Moynihan, US Senate. As LEGIS FELLOW (a selective OPM program designed to acquaint Executive Branch employees with Capitol Hill), generated legislative ideas, assisted in drafting legislation, and briefed Senator Moynihan on Middle East and terrorism-related issues. Represented Senator Moynihan, chairman of the Middle East subcommittee of the Senate Foreign Relations Committee, at meeting of Kurdish Democratic Party in Northern Iraq. Assignment in Senator Moynihan's office was to have lasted through December 1993; it was curtailed, when the State Department asked me to assume assignment in Special Middle East Coordinator's office.

February 1993 – July 1993    **STAFF CONSULTANT**, Subcommittee on Europe and the Middle East, Foreign Affairs Committee (Chairman: Lee Hamilton), US House of Representatives. Prepared background briefings, analyses, and extensive interrogatory material for Chairman Hamilton's meetings and public hearings, particularly on topics related to the Middle East and Southern Europe. Drafted public informational materials for Chairman Hamilton. Drafted and negotiated text of significant portion of "report language" for FY94 authorization bill. Initiated and organized briefings by outside experts for subcommittee staff members.

September 1992 – January 1993    **SPECIAL ASSISTANT FOR MIDDLE EAST PEACE PROCESS**, Office of Analysis for Near Eastern and South Asian Affairs, Bureau of Intelligence and Research, US Department of State. Worked closely with senior peace process policy-makers. Prepared in-depth reports and analyses related to ongoing peace negotiations and developments in key Middle Eastern states. At behest of Middle East peace process team, visited West Bank and researched and wrote study on Palestinian administrative infrastructure under Israeli occupation.

January 1992 – August 1992    **POLITICAL ADVISOR, OPERATION PROVIDE COMFORT (OPC)**, Incirlik Air Force Base, Turkey. OPC was allied operation to deter Iraqi aggression against northern Iraqi, primarily Kurdish, population. As only civilian official on staff of OPC commanding general, provided political advice regarding military decisions. Drafted and edited reports on behalf of OPC commanding general and other staff. Served as OPC's main liaison with US Department of State and the US

3

embassy in Ankara, Turkey. Visited northern Iraq frequently, maintaining close contact with senior Kurdish leaders. Prepared analyses for US civilian and military officials regarding political situation in northern Iraq. Worked closely with British, French, and Turkish military officers. Met regularly with Turkish foreign ministry officials.

November 1988 –
December 1991

**DIVISION CHIEF, SOUTHERN EUROPE** (Turkey, Greece, Cyprus, Italy, Spain, Portugal), office of Analysis for Western European and Canadian Affairs, Bureau of Intelligence and Research, US Department of State). Monitored and analyzed internal, foreign, and security affairs of key southern European countries, including their involvement in the EC (forerunner of the EU), NATO, and CSCE. Prepared briefings, memos, and daily updates for the Secretary of State. Delivered public lectures. Directed drafting of a National Intelligence Estimate. Supervised four country analysts.

November 1985 -
November 1988

**ANALYST FOR PALESTINIAN AND JORDANIAN AFFAIRS,** Office of Analysis for Near Eastern and South Asian Affairs, Bureau of Intelligence and Research, US Department of State. Bureau's main analyst for issues related to Arab-Israeli peace process as well as PLO and Palestinian nationalism. Prepared briefings, memos, and daily updates for the Secretary of State. Worked closely with senior policy-makers in the Bureau of Near Eastern and South Asian Affairs (NEA). Responsible for review of National Intelligence Estimates and other inter-agency products. Delivered public lectures.

January 1986 – July 1986: **ANALYST FOR ISRAELI AFFAIRS**, in addition to responsibilities as Palestinian/Jordanian analyst. Performed all analytic functions, with emphasis on Israeli domestic politics, peace process policies, and security issues.

July 1986 – September 1986: **POLITICAL OFFICER** (temporary duty), US Embassy, Cairo, Egypt.

January 1983 -
November 1985

**ANALYST FOR AEGEAN AFFAIRS** (Turkey, Greece, Cyprus), Office of Analysis for Western European and Canadian Affairs, Bureau of Intelligence and Research, US Department of State. Bureau's main analyst for issues related to Turkey, Greece, and Cyprus. Prepared briefings, memos, and daily updates for the Secretary of State. Worked closely with senior policy-makers in the Bureau of European Affairs (EUR). Responsible for review of National Intelligence Estimates and other inter-agency products. Delivered public lectures.

June 1984 – August 1984: **POLITICAL OFFICER** (temporary duty), US Embassy, Ankara, Turkey.

October 1981 –
January 1983

**EDITOR**, Public Relations Office, Educational Testing Service, Princeton, NJ. Wrote and produced daily radio program on education for Associated Press Radio network. Developed public relations and promotional campaigns; devised strategies for responding to adverse publicity.

March 1979 –

September 1979          **CORRESPONDENT**, Associated Press Radio, Turkey. Reported news and features for Associated Press Radio network (3000 stations).


## EDUCATION

1978 – 1979          **FULBRIGHT FELLOW,** Research scholar conducting research (primarily archival) in Cairo, Damascus, Istanbul, Jerusalem, London, Vienna.

1977          **MA**, Princeton University, Near Eastern History (Major fields: Modern Middle East, North Africa, Turkey, medieval Islamic history).

1975          **MA,** University of Michigan, History (emphasis on modern Middle East and North Africa, Arab – Israeli conflict, Iran, Turkey, medieval Ottoman Empire).

1973          **AB**, Princeton University, *magna cum laude*, University scholar. Thesis: "The Muslim Brotherhood of Egypt: The Dilemma of Urban Millenarianism in the Islamic World".


## AWARDS

Eisenhower Exchange Fellow (in Turkey), May-June 1999.

Legis Fellowship, 1993. (The Legis Fellow Program is a selective, one-year Office of Personnel Management (OPM) Program that places executive branch employees in jobs in the US Congress).

Selected as one of five State Department representatives to participate in Massachusetts Institute of Technology-sponsored "Seminar XXI" on "Foreign Politics and the National Interest," 1991-1992. Included representatives from government, private industry, and academia.

National Intelligence Medal of Achievement, 1991.

Selected to participate in Harvard's University's seminar on intelligence and policy-making for US government foreign-affairs specialists, December 1988.

Meritorious Honor Award for intelligence support to State Department task forces during Freedom of Navigation Exercise (Gulf of Sidra) and Anti-Terrorism Strike on Libya, April 1986.


## BOARD MEMBERSHIPS

Institute of Turkish Studies, 2001

Sephardic Heritage International DC (SHIN-DC), 2018-Present

## PAPERS AND PUBLICATIONS

"Turkey and the Ukraine War: Ankara Charts its Own Course," *The Turkey Analyst*, May 12, 2022, accessible at https://www.turkeyanalyst.org/publications/turkey-analyst-articles/item/687-turkey-and-the-ukraine-war-ankara-charts-its-own-course.html .

"For Sake of Regional Stability, U.S. Should Support Israel in Seeking End to Turkey-Hamas Ties," March 8, 2022, accessible at https://jinsa.org/makovsky-on-israel-turkey-hamas/ .

"U.S.-Turkey Ties: Better Atmosphere, But Harsher Reality Awaits," *The Turkey Analyst*, July 2, 2021, accessible at https://www.turkeyanalyst.org/publications/turkey-analyst-articles/item/669-us-turkey-ties-better-atmosphere-but-harsher-reality-awaits.html .

"Northern Syria Security Dynamics and the Refugee Crisis" (co-authored with Max Hoffman), Center for American Progress, May 26, 2021, accessible at https://www.americanprogress.org/article/northern-syria-security-dynamics-refugee-crisis/ .

"Problematic Prospects for US-Turkish Ties in the Biden Era," *SWP Comment*, Stiftung Wissenschaft und Politik (Berlin), December 7, 2020, accessible at https://www.swp-berlin.org/10.18449/2020C60/ .

"The Turkish Diaspora in Europe: Integration, Migration, and Politics" (co-authored with Max Hoffman and Michael Werz), December 2020, accessible at https://americanprogress.org/wp-content/uploads/2020/12/TurkishDiaspora-report-final.pdf .

"Turkey's Refugee Dilemma," Center for American Progress, March 13, 2019, accessible at https://www.americanprogress.org/issues/security/reports/2019/03/13/467183/turkeys-refugee-dilemma/ .

"What Turkey's Political Changes Mean for U.S.-Turkish Relations" (co-authored with Max Hoffman and Michael Werz), July 31, 2018, accessible at https://www.americanprogress.org/issues/security/reports/2018/07/31/454214/turkeys-political-changes-mean-u-s-turkish-relations/ .

"Erdogan Not Assured of First-Round Victory" (co-authored with John Halpin, Max Hoffman, and Michael Werz), June 14, 2018, accessible at https://www.americanprogress.org/issues/security/news/2018/06/14/452122/erdogan-not-assured-first-round-victory/ .

"U.S. Policy Toward Iran: Strategic Options" (unnamed primary author), Bipartisan Policy Center, May 2018, accessible at https://bipartisanpolicy.org/wp-content/uploads/2019/03/BPC-National-Security-Strategic-Options-on-Iran.pdf .

"Is Turkey Experiencing a New Nationalism?" (co-authored with John Halpin, Max Hoffman, and Michael Werz), February 11, 2018, accessible at https://www.americanprogress.org/issues/security/reports/2018/02/11/445620/turkey-experiencing-new-nationalism/ .

"Turkey's Parliament: An Unlikely but Possible Counterweight to New Presidency," Center for American Progress, December 19, 2017, accessible at https://www.americanprogress.org/issues/security/reports/2017/12/19/444281/turkeys-parliament/ .

"Erdogan's Proposal for an Empowered Presidency," Center for American Progress, March 22, 2017, accessible at https://www.americanprogress.org/issues/security/reports/2017/03/22/428908/erdogans-proposal-empowered-presidency/ .

"Turkey's Path to Prosperity in 2023" (primary author but unnamed), Center for American Progress, July 20, 2016, accessible at https://www.americanprogress.org/issues/security/reports/2016/07/20/141568/turkeys-path-to-prosperity-in-2023/ .

"Re-Educating Turkey: AKP Efforts to Promote Religious Values in Turkish Schools," Center for American Progress, December 14, 2015, accessible at https://cdn.americanprogress.org/wp-content/uploads/2015/12/09115835/Re-EducatingTurkey.pdf .

"Tense, Post-Election Turkey Hosts G-20 Summit," JINSA, November 13, 2015, accessible at http://www.jinsa.org/publications/tense-post-election-turkey-hosts-g-20-summit .

"Turkey's Growing Energy Ties with Moscow," Center for American Progress, May 6, 2015, accessible at https://cdn.americanprogress.org/wp-content/uploads/2015/05/TurkeyEnergy2UPDATED.pdf .

*Turkey's New World: Changing Dynamics in Turkish Foreign Policy* (co-edited with Sabri Sayari), The Washington Institute for Near East Policy, 2000.

"U.S. Policy toward Turkey: Progress and Problems," *Turkey's Transformation and American Policy* (ed. Morton Abramowitz), The Century Foundation Press, New York, 2000, pp. 219-266.

"Turkey's Nationalist Moment," *The Washington Quarterly*, XXII:4 (Autumn 1999), pp. 159-166.

"Turkey," *The Pivotal States: A New Framework for U.S. Policy in the Developing World* (eds. Robert Chase, Emily Hill, and Paul Kennedy), W.W. Norton and Co., New York, 1999, pp. 88-119.

"The New Activism in Turkish Foreign Policy," *SAIS Review*, XIX:1 (Winter-Spring 1999), pp. 88-119.

"Turkish-American Relations: Marching in Step, Mostly," Private View III:7 (Spring 1999), pp. 30-38.

"Defusing the Turkish-Syrian Crisis: Whose Triumph?" *Middle East Insight*, XIV:1 (January-February 1999), pp. 15-16, 45-47.

"Turkey's Faded European Dream," *The parameters of Partnership: Germany, The U.S. and Turkey* (American Institute for Contemporary German Studies, The Johns Hopkins University, 1998), pp. 51-64.

"Turkey's Embattled Westernizers," *Jobs&Capital*, VII:1 (Winter 1998), pp. 70-74.

"Turkey," *State of World Conflict Report*: 1997-98 (The Carter Center, 1998), pp.70-71.

"How To Deal with Erbakan," *Middle East Quarterly*, IV:1 (March 1997), pp. 3-8.

"Assessing the Intentions of Turkey's Refah Party," *Muslim Politics Report* (Council on Foreign Relations, New York) number 10 (November-December 1996), pp. 1-3, 5.

"Responding to Turkey's Eastward Drift," *The New York Times*, August 17, 1996 (op-ed).

"Some 'First Principles' to Avert War Between Turkey and Greece" (co-author), *The Christian Science Monitor*, April 19, 1996 (op-ed).

"Israeli-Turkish Relations: A Turkish 'Periphery Strategy'?" *Reluctant Neighbor: Turkey's Role in the Middle East*, ed. Henri Barkey (United States Institute of Peace, Washington, 1996), pp. 147-170.

"Western Dreams and Eastern Problems: Turkey's Goal of European Integration and its Kurdish Quandary," *Middle East Insight*, XI:4 (May-June 1995), pp. 23-28.

"The Proposal for a 'Conference on Security and Cooperation in the Mediterranean,'" paper delivered at conference on "Mediterranean Security Beyond the Cold War," in Athens, Greece, November 7-8, 1990.

**Note:** Analyses from Washington Institute's *Policywatch* series found at **www.washingtoninstitute.org**.

## LANGUAGES

Working knowledge of Arabic, Hebrew, Turkish, French (reading only).

PUBLIC REDACTED VERSION

# Exhibit 91

**EXPERT DECLARATION OF** ████████████

1. ████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████ █ ████████████████████
████████████████████████████████████

█ ████ ████████████████████████████████████
██████████████████████████
████████████████████████████████████████
██████

████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████
██████████

████████████████████████████████████████

████████████████████████████████████████████
████████████████████████
████████████████████████████████████

██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████
██████████████████████████████

████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████
██████
████████████████████████████████████████

████████████████████████████████████████████
██████████████████████████
████████████████████████████████████████████
██████████████████

████████████████████████████████████████████
██████████████████

PUBLIC REDACTED VERSION

**Background: Turkey's policy on minorities**

2. Turkey was built as a nation state in 1923 on the remnants of the Ottoman Empire that hosted a vast number of ethnic, linguistic and religious groups. The new state defined Turkish identity as the identity of the nation,[2] even though the nation was composed of many diverse groups. Since the establishment of the Turkish Republic, minorities have been perceived as a threat to the 'indivisible integrity of the state with its territory and nation.[3] Non-Muslim groups, but in practise only Armenians, Greeks and Jews, were guaranteed some rights, such as the right to set up and manage their own educational, religious and social institutions, according to the Treaty of Lausanne that was signed between Turkey and the Allied Forces in 1923.[4] Assyrians were also recognised as a minority group thanks to a court judgment of 2013 and they were able to open a kindergarten that would teach in the Assyrian language in 2014.[5] Despite being recognised as minorities, these groups have been facing discrimination in exercising the rights guaranteed to them by the Treaty of Lausanne.[6] It must be noted that the Treaty of Lausanne itself is far from meeting today's standards on the protection of minorities.

3. All other distinct groups, including Kurds, have not been recognised as minorities or as nations and their fundamental rights related to their identities have been violated

---

[2] See Articles 3-4 and 66 of the Turkish Constitution. URL: https://www5.tbmm.gov.tr/yayinlar/2021/TC_Anayasasi_ve_TBMM_Ic_Tuzugu_Ingilizce.pdf

[3] For more information on negative perception of minorities see Oran, B., Türkiye'de Azınlıklar: Kavramlar, Lozan, İç Mevzuat, İçtihat, Uygulama, TESEV, June 2004, pp. 111–18, URL: https://www.tesev.org.tr/wp-content/uploads/rapor_Turkiyede_Azinliklar_Kavramlar_Lozan_Ic_Mevzuat_Ictihat_Uygulamalar.pdf

[4] Article 40 of the Treaty of Lausanne. URL: https://www.mfa.gov.tr/lausanne-peace-treaty-part-i_-political-clauses.en.mfa

[5] See https://haber.sat7turk.com/mor-efrem-suryani-anaokulu-acildi-2/

[6] The recognised minorities faced discrimination in many areas of life, including in exercise of their right to education. For detailed information ▮▮▮▮▮▮

throughout the republican history. Yet today, Turkey accepts only Treaty of Lausanne as a reference document in relation to minority rights and puts reservation on international treaties accordingly.[7] This means that Kurds have not been able to benefit from the protection provided by neither the Treaty of Lausanne nor the international human rights documents. Moreover, advocacy for recognition of their rights have resulted in prosecutions and criminal charges.

**The Current Situation of Kurds in Turkey**

*Recognition of Kurdish Identity and Protection of Cultural Rights*

4. Recognition of Turkey as a candidate state to join the European Union and the accession negotiations that started in 2005 triggered adaption of many reforms to bring the human rights standards in Turkey in line with the European standards. These reforms are far from complete.

5. The Law on the Publications in languages other than Turkish (Law No 2932) was annulled in 1991 however the related provision of the Constitution, which read as "*No publication can be made in languages prohibited by law,*" was annulled only in 2001. In 2002 reforms were adopted to legalise teaching Kurdish in private courses and in 2003-2004, for broadcasting in Kurdish. These reforms were far from meeting international standards[8] and yet today publication and broadcasting in Kurdish continue to face discriminatory restrictions.[9] Kurdish letters x, w, q are still banned in personal names, limiting the ability to give Kurdish names to children in Turkey.[10]

6. Kurdish language became part of the curriculum as a selective course in 2012. Pupils, however, have been facing challenges in opting this course.[11] Moreover, Kurdish still cannot be taught as a mother tongue and cannot be used as the language of instruction public schools.[12] On the other hand, publication and broadcasting in Kurdish continues to face some discriminatory restrictions.[13]

7. Yet today, holding the Kurdish flags or national colours can lead to a racist attack or investigation. In 2019, a tourist group from Kurdistan Region of Iraq, who was visiting the north/Black Sea region of Turkey was attacked by some people because of taking a photograph, holding a scarf Kurdistan written on it. The tourists were detained and finally

---

[7] See for example Turkey's reservation on Article 27 of the International Covenant on Civil and Political Rights: "…The Republic of Turkey reserves the right to interpret and apply the provisions of Article 27 of the International Covenant on Civil and Political Rights in accordance with the related provisions and rules of the Constitution of the Republic of Turkey and the Treaty of Lausanne of 24 July 1923 and its Appendixes." URL: /

[10] See https://www.duvarenglish.com/ban-on-kurdish-alphabet-leads-to-problems-for-people-bearing-kurdish-names-in-turkey-news-60279

[12] See Article 42 of the Turkish Constitution: *"No language other than Turkish shall be taught as a mother tongue to Turkish citizens at any institution of education. Foreign languages to be taught in institutions of education and the rules to be followed by schools conducting education in a foreign language shall be determined by law. The provisions of international treaties are reserved."*

[13] See https://kurdish-studies.org/wp-content/uploads/2021/05/iki-ileri-bir-geri-Kurt-Kulturel-Yayinciligi-Raporu.pdf

deported.[14] A groom and his relatives were detained in 2022 because of wearing shawls in Kurdish colours at the wedding.[15] During the Newroz celebrations or other gatherings people can be detained simply for carrying the Kurdish colours.[16]

8. All these underline that Kurdish identity is still not recognised as a minority or national identity and cultural rights of Kurds are violated according to international standards.

*Infringement with the right to political participation and free expression*

9. Advocating or campaigning for recognition of Kurdish identity can still result in legal restrictions and pressure. The Turkish government took steps to retaliate against advocates for the rights of Kurds in the parliament, including opening legal cases for the closure of the pro-Kurdish parties, by arresting thousands of the party members and then appointing trustees to the municipalities that are governed by the same party.

10. People's Democracy Party (HDP), is the pro-Kurdish political party that strongly advocates for the rights of Kurds -along with other groups' parties- and seeks for peaceful solution to the Kurdish conflict. A case that was opened for closure of the party is currently pending before the Constitutional Court.[17] This case hindered HDP's activities to the level that it did not run for the general elections that took place in May 2023.

11. The pressure is not just on the party but also on the party members. HDP reports that thousands of its members and activists are in jail or on exile for political reasons. According to a report published in 2020, 16.490 party members were detained or arrested since 24 July 2015, the end of the peace negotiations between PKK and Turkey. According to the report, 3,695 of these people were jailed.[18]

12. The best known jailed HDP member is Selahattin Demirtaş, the former co-leader of the party.[19] He has been in jail since November 2016 and has not been released despite the judgment of the European Court of Human Rights (ECtHR), which stated that his jailing was in breach of Article 3 of Protocol No 1 to the European Convention on Human Rights (ECHR),[20] Article 10 of the ECHR that protects the right to free expression and Article 18 of the ECHR that states that restrictions permitted under the ECHR can be applied for only prescribed purposes.

---

[14] See https://m.bianet.org/english/print/210647-kurdish-tourists-assaulted-in-trabzon-to-be-deported-from-turkey
See also https://www.al-monitor.com/originals/2017/03/turkey-iraqi-kurdistan-krg-flag-sparks-turkish-debate.html for reactions to the raise of the Kurdish flag during Massoud Barzani's visit to Turkey in 2017.
[15] See https://bianet.org/english/politics/263380-groom-and-guests-arrested-for-wearing-yellow-red-and-green-colors-at-the-wedding
[16] See https://www.kurdistan24.net/en/story/27696-Turkish-police-ban-Kurdistan-24-correspondent-for-wearing-Kurdish-clothes-in-Newroz-celebrations
https://www.gazeteduvar.com.tr/gundem/2017/03/21/newroz-izmirde-kutlaniyor
https://www.evrensel.net/haber/457657/diyarbakir-newrozunda-kiyafet-renk-ve-sloganlara-engel-ve-gozalti-mantikla-iliskisi-yok
[17] See https://www.amnesty.org/en/wp-content/uploads/2023/04/EUR4466632023ENGLISH.pdf
[18] See https://www.theguardian.com/world/2020/dec/27/as-erdogan-tightens-grip-on-power-last-opposition-politicians-resist-brutal-purge and https://t24.com.tr/haber/hdp-nin-hak-ihlalleri-raporu-son-5-yilda-16-binden-fazla-hdp-li-gozaltina-alindi-4-bine-yakin-hdp-li-tutuklandi,919835
[19] See https://www.hrw.org/news/2020/11/19/turkey-opposition-politicians-detained-four-years
[20] Article 3 of the Protocol No 1 states as: "The High Contracting Parties undertake to hold free elections at reasonable intervals by secret ballot, under conditions which will ensure the free expression of the opinion of the people in the choice of the legislature."

The ECtHR stated that:

> A number of leading figures and elected mayors from the HDP were also placed in pre-trial detention. Although the Court does not have access to the content of the criminal proceedings against these individuals, it observes that, according to various reports and opinions by international observers, the main reason for the measures depriving them of their liberty lay in their political speeches. In those circumstances, the Court attaches considerable weight to the observations of the intervening third parties, and in particular the Commissioner for Human Rights, who stated that national laws were increasingly being used to silence dissenting voices. The Court therefore considers that the decisions on the applicant's initial and continued pre-trial detention are not an isolated example. On the contrary, they seem to follow a certain pattern.[21]

It concluded that:

> Having regard to the foregoing, the Court finds that it has been established beyond reasonable doubt that the applicant's detention, especially during two crucial campaigns relating to the referendum and the presidential election, pursued the ulterior purpose of stifling pluralism and limiting freedom of political debate, which is at the very core of the concept of a democratic society.[22]

13. The European Court finally called for immediate release of Selahattin Demirtaş.[23] Turkey has ignored this ruling and Demirtaş remains in prison today.

14. In another judgment from October 2022, the ECtHR stated that the pre-trial detention of 13 deputies of HDP was in breach of Article 10 of the ECHR, Article 18 of the ECHR in connection with the Article 5 and Article 3 of the Protocol No 1 to the ECHR and asked Turkish state to put an end to the pre-trial detention of the applicants that were still deprived of their liberty.[24]

15. The pressure on the pro-Kurdish politics is not only at the parliamentary level but also in the local level. HDP won 65 municipalities in the local elections that took place in March 2019. However, the Turkish government dismissed the winners of these elections who were mostly Kurds and appointed some public officers as "trustees" [acting mayors]-  to 48 of these municipalities.[25] Moreover, many mayors were facing investigations and legal proceedings on terror charge for their speech and non violent political activities.[26] The mayor of the Diyarbakır Metropolitan Municipality, Selçuk Mızraklı is one of them.[27]

16. In one of its reports on the topic, HRW's Europe and Central Asia Director described the developments in the following way:

---

[21] Paragraph 428, Selahattin Demirtaş v Turkey, Application No: 14305/17, Judgment of 22.12.2020. URL: https://hudoc.echr.coe.int/spa#{%22itemid%22:[%22001-207173%22]}

[22] Paragraph 437.

[23] Paragraph 442.

[24] Yüksekdağ Şenoğlu and Others v. Türkiye (no. 14332/17 and 12 other applications), Judgment of 8 November 2022.

[25] See https://www.bbc.com/turkce/articles/cy9851xl7d5o

[26] See https://www.hrw.org/news/2019/08/20/turkey-3-kurdish-mayors-removed-office

[27] See https://www.reuters.com/article/us-turkey-security-mayor-idUSKBN20W20H
https://m.bianet.org/english/human-rights/257279-hdp-s-dismissed-jailed-diyarbakir-co-mayor-selcuk-mizrakli-sent-to-edirne-prison

PUBLIC REDACTED VERSION

*President Erdogan's government has effectively cancelled the results of the March local elections in the three main cities of the Kurdish southeast and east by removing voters' chosen mayors, all valid candidates, and taking over these municipalities… Smearing the mayors by alleging vague links with terrorism to deprive the Kurdish population of their chosen representatives endangers everyone in Turkey who is committed to democratic elections, human rights, and the rule of law.*[28]

17. As highlighted in this statement, Turkish government's policy on appointing trustees to the municipalities and charging the elected mayors constitute infringement with the Kurdish voters' right to vote. Figures prove that this policy has been applied disproportionately in the east and southeast Turkey where is mostly populated by Kurds and mostly to the municipalities run by pro-Kurdish HDP.[29] Also it must be noted that when mayors from other parties were removed in four other municipalities, the government's policy was different, as in each case the authorities allowed other elected local representatives to take over their duties.[30] The policy of closing down a political party, lifting impunity of deputies, jailing deputies and members of a political party are also applied disproportionately to Kurds.[31]

*Racial motivation in Infringement with the right to peaceful assembly, ill treatment and torture*

18. Particularly since the re-commencement of clashes between PKK and the Turkish forces in 2015, several bans on the right to peaceful assembly have been imposed in the cities mostly populated by Kurds. In November 2022, a weeklong ban was imposed in Diyarbakır.[32] In Van, peaceful assembly was banned for 5 years.[33] Banning peaceful assemblies are taking place disproportionately in the cities mostly populated by Kurds.

19. Assemblies organised by Kurds, the pro-Kurdish party, opposition groups, women and LGBTİ+ activists are banned or attacked systematically in the last years. Saturday Mothers that are gathering at Galatasaray Square in Istanbul every Saturday to ask for whereabouts of their relatives that disappeared in the police custody have been facing police attack and are being detained.[34] Women are facing attacks and harassment by police during 8 March and 25 November demonstrations.[35] LGBTI Pride marches are banned in Turkey and people that try to assemble, face police attack and are taken into custody.[36]

20. During peaceful demonstrations or during detentions following demonstrations, many activists are facing ill treatment or even torture. According to the most recent report of the

---

[28] See See https://www.hrw.org/news/2019/08/20/turkey-3-kurdish-mayors-removed-office

[29] See https://dergipark.org.tr/tr/download/article-file/1186061

[30] See https://www.hrw.org/news/2017/03/20/turkey-crackdown-kurdish-opposition

[31] See https://www.hrw.org/news/2017/03/20/turkey-crackdown-kurdish-opposition for crackdown on the Kurdish opposition.

[32] See https://www.trthaber.com/haber/turkiye/kocaelide-tira-carpan-otomobil-70-metre-suruklendi-3-olu-725109.html

[33] See https://www.evrensel.net/haber/452540/vanda-5-yildan-fazladir-suren-eylem-yasagi-bir-kez-daha-uzatildi

[34] See https://www.mlsaturkey.com/en/police-aggression-against-saturday-mothers-people-continues-in-955-week and https://www.amnesty.org/en/latest/news/2022/06/turkey-police-detain-human-rights-defenders-and-relatives-of-disappeared-people-on-saturday-mothers-people-900th-vigil/

[35] See https://www.amnesty.org/en/latest/news/2023/03/turkiye-international-womens-day-march-must-go-ahead-without-bans-beatings-and-other-police-violence/

[36] See https://www.amnesty.org/en/latest/news/2023/06/turkiye-istanbul-pride-showdown-highlights-threat-to-lgbti-rights/

Human Rights Foundation of Turkey (TIHV) 1201 people applied to TIHV offices in 2022 claiming they were subject to torture or ill treatment. %68.8 of the applicants that was subject to ill treatment and torture were born in east and southeast Turkey, a geography that is mostly populated by Kurds. It must be noted that the population of east and south east Turkey form only around a quarter of the population in Turkey. Another important indicator is that, 71,9 per cent of the applicants to TIHV have reported Kurdish as their mother tongue. These figures prove that Kurds are more likely to face ill treatment and torture during peaceful assemblies, demonstrations and in the police custody in Turkey. TIHV approves this argument with these words:

> Taking into consideration the place of birth and the mother tongue of the applicants, it is seen that people that have Kurdish identity are subject to torture compared to the other ethnic identities and this has not changed in 2022.[37]

It must be noted that police and other officers involved in these acts are generally protected by impunity.[38]

*Racist attacks against Kurds in Turkey and impunity*

21. Kurds are facing racially motivated attacks of civilians in different regions of Turkey. Kurds who are living in regions other than east and southeast Turkey can face such attacks simply because of speaking in Kurdish or listening to Kurdish music. In most of these cases an effective investigation is not conducted or an adequate sentence is not given. Some examples of these racist attacks are:

   • In September 2015, a Kurdish man who dressed traditional clothes and shared photo on social media was subject to a racist attack in Muğla. He was forced to give a kiss to the statute of Atatürk, the founder leader of the Turkish Republic.[39] The perpetrators of this attack exceptionally received a sentence however their sentence was not proportionate to their act. This was endorsed finally by the judgment of the Constitutional Court of Turkey, which decided that the applicant had faced ill treatment and the sentences given to the perpetrators were not adequate.[40]

   • In May 2016, a group of Kurdish workers faced racist attack in Aşkale/Erzurum. The head of one of the workers was broken/injured.[41]

   • In July 2016, Kurdish workers who were listening to Kurdish music in a park faced racist attack in Uskudar/Istanbul. The workers were seriously injured and taken to the hospital. [42]

---

[37] See page 56-57, https://tihv.org.tr/wp-content/uploads/2023/08/tihv-tedavi-raporu-2022.pdf
[38] See https://www.amnesty.org/en/wp-content/uploads/2021/07/eur440082007en.pdf
[39] See https://www.evrensel.net/haber/260435/muglada-zorla-ataturk-bustu-opturulen-ibrahim-cay-jandarma-isin-icinde
[40] Ibrahim Çay application, Constitutional Court of Turkey, Application No: 2019/13373, Judgment of 2 February 2022. See https://www.resmigazete.gov.tr/eskiler/2022/04/20220414-8.pdf
[41] See https://t24.com.tr/haber/erzurumda-kurt-iscilere-saldiri,339447
[42] See https://www.evrensel.net/haber/285944/istanbulda-parkta-kurtce-sarki-dinleyen-iscilere-saldiri

• In June 2017, a group of Kurdish workers were subject to racist attack in Nallıhan/Ankara. One of the workers was thrown from the balcony of the construction.[43]

• In 2018, a Kurdish father and son were subject to racist attack in Sakarya, in which the father lost his life.[44]

• In October 2019, a 74 year old man faced racist attack because of speaking in Kurdish at a hospital in Çanakkale.[45]

• In September 2020, a group of Kurdish workers faced racist attack in Dinar/Afyon. One of the workers lost his life.[46]

• In July 2021, a Kurdish family was attacked by the people that lived in the same neighbourhood.[47]

• In April 2023, Kurdish workers were subject to racist attacks in Bodrum, simply because of speaking in Kurdish with each other. [48]

• In January 2022, four Kurdish Street performers/singers faced police violence, their instruments were taken, they were taken into police custody where they faced physical and psychological violence. [49]

*Assessment of the Incident in Washington*

22. President Erdoğan's security guards and some Erdoğan supporters attacked peacefully demonstrating people in Washington in May 2017. It is clear that the perpetrators assumed the demonstrators were Kurdish. There are two factors endorsing this assumption: First, the demonstrators were carrying posters and flags related to the Kurdish figures. According to international law it is not important whether the victims of a racially motivated crime or discrimination are really holding the assumed identity or not. Attacking someone for the assumed identity is adequate to define the act as racially motivated act.

23. Some of the words used by the perpetrators also endorses the fact that they assumed the demonstrators were Kurdish. One of the perpetrators shouts, "Do act like dogs, die like dog carrions. Do your villainous, will they give you a country betrayers, they gave so many countries in Middle East, which of you got a state? [Kurds are known to be fighting to have a state of their own in the Middle East.] You are still acting like sons of bitches, the dogs."[50]

---

[43] See https://www.evrensel.net/haber/325137/kurt-iscilere-saldiri-raporu-savci-bulamiyoruz-diyor
[44] See https://www.evrensel.net/haber/369170/sakaryada-irkci-saldiri-baba-hayatini-kaybetti-oglu-tedavi-altinda
[45] See https://www.birgun.net/haber/74-yasindaki-ekrem-yasli-kurtce-konustugu-icin-saldiriya-ugradi-272670
[46] See https://m.bianet.org/kurdi/insan-haklari/230798-afyon-da-kurt-iscilere-silahli-saldiri-1-olu-2-yarali
[47] See https://m.bianet.org/bianet/nefret-soylemi/247513-konya-da-kurtlere-ikinci-kez-irkci-saldiri-1-kisi-oldu
[48] See https://www.gazeteduvar.com.tr/bodrumda-kurt-iscilere-irkci-saldiri-saldirganlar-serbest-birakildi-haber-1611749
[49] See http://mezopotamyaajansi35.com/tum-haberler/content/view/160342
[50] See https://www.facebook.com/VOATurkce/videos/erdo%C4%9Fan%C4%B1n-korumalar%C4%B1-kavgaya-kar%C4%B1%C5%9Ft%C4%B1/10158768770105442/?locale=tr_TR

I declare under penalty of perjury under the laws of the United States of America that the foregoing
is true and correct.

Executed on _25.09.2023_

PUBLIC REDACTED VERSION

# Exhibit 92

## DECLARATION OF DR. ████████

1. ██████████████████████████████████████████████████

   ████████████████████████████████████████████████████

   ██████████████████████████████████████████████████

   ██████████████████████████████████████████████████.

2. ███████████████████████████████████████████████

   ███████████████████████████████████████████████

   ████████████████████████.

3. Based on my own research and reports issues by major human rights organizations, Turkey is a country facing both 1) increased gender-based violence as well as femicide and 2) violent harassment, persecution and imprisonment of political opposition and dissidents. The Turkish government is not only turning a blind eye but contributing to an increase in gender-based violence, harassment and killings of women through their rhetoric and policies. It persecutes and imprisons people for expressing their political views non-violently.

4. Turkish and Kurdish academics who have signed the so-called "Peace Petition" in January 2016 have faced criminal charges and have been prosecuted solely as a result of their non-violent expression of ideas.  The Peace Petition, organized by a group known as "Academics for Peace," was initially signed by 1,128 scholars from 89 Turkish universities, as well as more than 300 scholars from outside the country. The petition demanded an end to fighting between Turkish forces and members of the Kurdistan Workers' Party, accused the government of the "deliberate massacre and deportation" of civilians, and

**PUBLIC REDACTED VERSION**

called on the government to allow independent observers into the region, end curfews, and renew peace efforts.

5.  It is common for Turkish authorities to prosecute and convict people on terrorism-related charges for their non-violent civil society engagement and political commentary, especially if they concern solidarity with or advocacy for the Kurdish question. Politically active Kurds are often accused of membership in the outlawed Kurdistan Workers' Party (PKK), an armed group designated as a terrorist organization by Turkey and much of the international community. This is despite the fact that the PKK has denounced violence and the fact that many Kurdish activists, including women, are not active members of the PKK.

6.  The pro-Kurdish People's Democratic Party (HDP), has faced mounting repression ever since it first won seats in parliament in 2015, preventing President Erdoğan's Justice and Development Party (AKP) from maintaining a single-party majority. During this time the HDP was the third largest party in Turkey.

7.  Since 2016, more than 10,000 HDP parliamentarians, elected officials and party members have been imprisoned, subjected to political persecution and thousands are still in prison today, including former party cochairs Selahattin Demirtaş and Figen Yüksekdağ. Demirtaş faces a sentence of up to 142 years in prison. In December 2020, the European Court of Human Rights (ECtHR) ordered Demirtaş's immediate release after finding Turkey guilty of violating his fundamental rights. The Turkish authorities have refused to carry out the ECtHR's order, and Demirtaş remains imprisoned.

8.  While all feminist and queer activists are at risk of persecution and arrest due to their views and political activism, Kurdish women activists have been particularly vulnerable. Many Kurdish women have experienced verbal and physical harassment and assault at the hands of Turkish police and military. Many have been imprisoned for prolonged periods without fair trials and proper justification.

**PUBLIC REDACTED VERSION**

9.  Many Kurdish female co-mayors, lawyers, journalists, academics and activists have been at the receiving end of state persecution, violence and harassment. They do not receive fair trials.

10. Gültan Kışanak, a Kurdish journalist and former MP, was elected co-mayor of Diyarbakır in 2014. I met her in 2016 when she was co-mayor and I was very impressed with her vision and work. Two years later, the Turkish state arrested and imprisoned her, alongside many other female Kurdish co-mayors, lawyers, and activists.

11. While behind bars, she wrote about her own experiences and collected similar accounts from other Kurdish women, all co-chairs, co-mayors and MPs in Turkey; all incarcerated on political grounds, published as *The Purple Color of Kurdish Politics*. The collection of prison writings from more than 20 Kurdish women politicians explore their personal and collective struggles against patriarchy and anti-Kurdish repression in Turkey.

12. Most recently (September 2023) a court in south-eastern Turkey in Diyabarkir has sentenced Narin Gezgör, a founding member of the Rosa Women's Association, a Kurdish women's rights group, to seven years, and six months in prison. Her involvement in the Rosa Women's Association with a focus on the struggle against patriarchal violence has been interpreted by the Turkish judiciary as involvement in terrorism.

13. In addition to the systematic oppression and persecution of Kurdish women in the context of wider repression of political opposition, the media, academia and activism, the Turkish state under President Erdogan has engaged in the systematic erosion of women's rights and has contributed to the increase in different forms of gender-based violence.

14. Turkey withdrew from the so-called Istanbul Convention in 2021 after it had ratified it in 2011. The Istanbul Convention is an international treaty that is meant to be a legal instrument to tackle violence against women. It covers not only domestic violence but other forms of violence against women including psychological and physical abuse,

sexual harassment, rape, crimes committed in the name of so-called "honor", stalking, and forced marriage. The Convention requires states to implement a comprehensive array of practical measures to prevent violence against women, to protect the victims and to prosecute the perpetrators. Importantly, the Convention sends out a powerful signal to society that domestic violence can never be considered a private or a family matter; it is a human rights violation and should be of concern to society as a whole.

15. According to Amnesty International (2021) the withdrawal from the international treaty coincides with the government cracking down on women's rights and LGBT organizations and activists:

> *Turkey's withdrawal from the Istanbul Convention is an extremely worrying development amid an ongoing erosion of rights in the country. On 26 June, riot police used excessive force on Istanbul Pride marchers who saw the annual celebration of LGBTI rights be banned for the sixth consecutive year. Hundreds of Pride participants were subjected to tear gas and plastic bullets. At least 47 people were detained, including two minors and an AFP journalist who was subjected to torture or other ill treatment when several police officers restrained him on the ground. One officer knelt on his neck, severely restricting his ability to breathe.[1]*

16. Over the past few years, police violence has increased during peaceful demonstrations and protests, including the annual International Women's Day celebrations on 8 March 2023. Police have been using tear gas, and have been firing rubber bullets. They have also attacked female protesters.[2]

---

[1] https://www.amnesty.org/en/latest/news/2021/07/turkeys-withdrawal-from-the-istanbul-convention-rallies-the-fight-for-womens-rights-across-the-world-2/
[2] https://www.cnn.com/2023/03/09/europe/turkey-protests-istanbul-international-womens-day-intl/index.html

**PUBLIC REDACTED VERSION**

17. Other peaceful protests in Turkey have also been violently dispersed with people being attacked and arrested. One of the recent examples is that of a peaceful protests to commemorate the killing of 33 young activists in the city of Suruc in 2015  At the time, young activists from Turkey had gathered to express solidarity with Kurds fighting ISIS in the city of Kobane. An Islamic State (IS) suicide bomber appears to be responsible for the killings. Human Rights Watch documented the wrongful detention and mistreatment of the peaceful protesters trying to commemorate the event.[3]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___22 September 2023___

---

[3] https://www.hrw.org/news/2023/07/27/turkey-istanbul-police-mistreatment-peaceful-protesters

Exhibit 94



# Exhibit 95



PUBLIC REDACTED VERSION

# Exhibit 96

# Expert Declaration for the Case Kurd v Turkey

Submitted by <span style="background:black">           </span>

September 28, 2023



1.

2.

3.

4.

5.

6. I have been asked to write this report by the attorneys for the Plaintiffs in the case *Kurd v Turkey*. I have been asked to use my knowledge, expertise, and past research to provide background and context that would be helpful to the court.

7.  The foundation of the Republic of Turkey was based on the eradication of the ethnic and linguistic diversity of the Ottoman Empire. The persecution of Kurds and Armenians in Turkey was institutionalized in the 1923 Treaty of Lausanne, which denied them virtually any form of autonomy, although the 1920 Treaty of Sèvres had promised them some degree of self-governance and protection. The Ottoman Empire had been multilinguistic, multicultural, and multiethnic. The Turkish nationalists who established the Turkish Republic, however, endeavored to create a new entity in which a single language, culture, and ethnicity— that of the Turks— would prevail over all others. This led to a series of no less than 20 officially recognized anti-government uprisings, including the Sheikh Said, Ararat, and Dersim rebellions. In the analysis of Hamit Bozarslan and other scholars, these revolts represented the single biggest threat to the new Turkish Republic. One indication of how threatening they were, is what was spent to repress them: between 1925 and 1926, an estimated 35 percent of the annual state budget was allocated to the suppression of the Sheikh Said rebellion.[1] In order to crush the Ararat rebellion, which was led by Kurds and survivors of the Armenian genocide, the government in Ankara resorted to acquiring an air force. In the many decades that followed, the new Turkish Air Force was repeatedly deployed to violently crush internal Kurdish-led rebellions.[2]

8.  In the new Turkish Republic, Kurds were denied rights granted to other minorities. Because Kurds are predominantly Sunni Muslim, Ataturk believed that they could be forcibly Turkified. Kurds were referred to as "mountain Turks." However, Kurds are not Turks. While the Kurdish language belongs to the Indo-European language family, Turkish belongs to the Ural-Altaic language family.

9.  The Kurdish language was officially banned in Turkey for most of the 20th century. It was not until 1991 that significant reforms began to ease the restrictions on the use of the Kurdish language in public life.

10. In addition to suppressing the Kurdish language, peaceful Kurdish civil society activity was also severely restricted. At least six Kurdish or pro-Kurdish political parties have been banned in Turkey since 1982, when a new constitution went into effect after the 1980 military coup.

11. The Turkish government's suppression of Kurdish and Armenian political movements pre-dates the foundation of the Kurdistan Workers' Party (PKK) by decades. The history of

---

[1] Hamit Bozarslan, "Les revoltes Kurdes en Turquie Kemaliste (quelques aspects)," Guerres Mondiales et Conflits Contemporains 38, no. 151 (1988): 121.

[2] Robert Olson, "The Rebellions of Sheikh Said (1925), Mt. Ararat (1930), and Dersim (1937–38): Their Impact on the Development of the Turkish Air Force and on Kurdish and Turkish Nationalism," Die Welt des Islams 40, no. 1 (March 2000): 67– 94.

solidarity between Kurds and Armenians in Turkey – which was on display during the Sheridan Circle protests in 2017 – dates back to at least 1927 when Kurds and Armenian genocide survivors tried to establish an independent state known as the Republic of Mount Ararat in eastern Turkey.

12. The prevalence of hate speech against Armenians and Kurds stems from a refusal to acknowledge the extreme violence perpetrated upon both groups in the 20th century: the Armenian genocide in 1915 and the deployment of the Turkish Air Force to crush multiple Kurdish-led rebellions after 1923.

13. The People's Democratic Party (HDP) [in Turkish: *Halkların Demokratik Partisi*] is a legal political party in Turkey. Since it was founded in 2012, it grew to become the third largest political party in the country. The HDP is one of the strongest advocates for minority and Kurdish rights and gender quality in Turkey, and has a co-chair system where male and female members share power.

14. Selahattin Demirtaş repeatedly said that the HDP would not support Erdogan's plans to transform Turkey from a parliamentary to a presidential system, which has allowed Erdogan to amass sweeping powers.

15. While the HDP advocates for gender equality, Erdogan has repeatedly undermined the rights of women, girls, and the LGBTQ community. In July 2021, Turkey withdrew from the Istanbul Convention, a landmark treaty on combating violence against women and domestic.

16. There are numerous examples of high-ranking Turkish government officials attempting to discredit peaceful Kurdish demands for linguistic or cultural rights by accusing the proponents of terrorism.  This tactic has been well documented and criticized by international bodies, governments, and Human Rights groups.  For example the U.S. State Department notes that, as of 2022, 332,884 people have been arrested and 101,000 people have been detained on terror-related grounds following the 2016 coup attempt. In many of these cases charges were levied "often applying questionable evidentiary standards and without the full due process provided under the law" and "the courts in some cases applied the law unevenly, with legal critics and rights activists asserting court and prosecutor decisions were sometimes subject to executive interference."[3] The European Parliament expressed concern over the Erdogan regime's abusive use of "broadly defined Turkish anti-terrorism legislation," finding it was being used "to punish citizens and media for exercising their right of freedom of expression."[4] Likewise, the United Nations High Commissioner for Human Rights has raised concerns about ""arbitrary detention of people arrested on broad allegations of links to terrorist organizations."[5]  Human Rights Watch reported that Turkey prosecuted over 600 people on terrorism charges for social-media

[3] "Erdoğan 'normalleşme planı'nın detaylarını", Duvar, May 4, 2020. açıkladıhttps://www.gazeteduvar.com.tr/gundem/2020/05/04/bazi-isletmeler-11-mayista-hizmete-acilabilecek
[4] Resolution P8_TA-PROV(2018)0040, of the European Parliament of February 8 2018 on the Current human rights situation in Turkey at ¶ 5.
[5] Erdoğan's hatred of Yezidis takes a toll in Turkey", Nordic Monitor, July 31, 2019, https://nordicmonitor.com/2019/07/erdogans-hatred-of-yazidis-takes-a-toll-in-turkey/

posts advocating for peace, including an end to Turkey's military campaigns in Kurdish regions.[6] The European Commission has noted that in 2017, "many events and demonstrations relating to the Kurdish issue were prohibited on security grounds" and even "[s]ome Kurdish festivals were prohibited on security grounds.[7]

17. In the 1980s, Turkey introduced a 10 percent hurdle – which requires political parties to reach 10 percent of the popular vote to enter into the parliament.[8] The step was taken in order to keep Kurdish or pro-Kurdish parties out of the parliament.[9] The systematic exclusion of Kurdish demands for equal political, civil, and cultural rights from Turkey's political sphere has continued for decades. This exclusion has only intensified under the AKP.

18. Since 2014, the AKP began replacing democratically-elected HDP officials with AKP-appointed "trustees." The AKP trustee appointments have effectively ended local democracy for supporters of pro-Kurdish parties in southeastern Turkey. A new report provides the first quantitative assessment of the disenfranchisement of voters in Turkey since 2014.[10]

**Percentage of HDP Voters in Municipalities Won by the HDP in 2019 who lost Elected Representation to Trustee Appointments**



---

[6] Human Rights Watch, *Turkey Crackdown on Social Media Posts* (Mar. 20, 2018), https://www.hrw.org/news/2018/03/27/turkey-crackdown-social-media-posts. In another report from 2018, Human Rights Watch accusing Turkey convicting three journalists on "bogus charges" and sentencing them to life in prison. Human Rights Watch, *Turkey: Convicted for Critical Ideas* (Feb. 16, 2018), https://www.hrw.org/news/2018/02/16/turkey-convicted-critical-ideas_

[7] European Commission, Commission Staff Working Document, Turkey 2018 Report at 37, 41 (2018)

[8] *Ibid.*

[9] Hasanain Kazim, "The man who could save Turkish democracy," Der Spiegel, June 1, 2015 https://www.spiegel.de/international/world/how-selahattin-demirtas-became-a-rival-to-erdogan-in-turkey- a-1036595.html

[10] Meghan Bodette, "Democracy Destroyed: Turkey's Crackdown on Local Pro-Kurdish Politics", Kurdish Peace Institute, October 28, 2022, https://www.kurdishpeace.org/research/democracy/democracy- destroyed-turkey-crackdown-local-pro-kurdish-politics/

19. I have watched the videos of the Turkish security agents attacking the peaceful protesters and read accounts of the attack. I understand that the agents shouted derogatory slurs including: "*Die, fucking Kurds,*" "*Fuck you, Kurd,*" "*Kurdish sons of bitches,*" and "*We are going to show you the power of the Turks.*" I understand the agents also called the women "*whores.*" Clearly, their behavior was motivated by racism and sexism. They appear to believe that Kurds and women are not only inferior to them, but can be violently assaulted and threatened with death in broad daylight. It is my expert opinion that this attack constitutes a hate crime. Furthermore, the hate crime appears to have three dimensions:

   a   1) hatred based on the ethnicity, or perceived ethnicity, of the plaintiffs,
   b   2) hatred of their political affiliation (the HDP), and
   c   3) hatred of women.

20. There are countless reports by the U.S. Department of State as well as credible human rights organizations, which attest to the systemic nature of persecution faced by Kurds, Armenians, women, and the HDP. For example, Amnesty International's report on Turkey for 2016/2017 found that "people expressing dissent, especially in relation to the Kurdish issue, were subjected to threats of violence and criminal prosecution."[11] The OHCHR has "documented numerous cases of excessive use of force; killings; enforced disappearances; torture; destruction of housing and cultural heritage; incitement to hatred; prevention of access to emergency medical care, food, water and livelihoods; violence against women; and severe curtailment of the right to freedom of opinion and expression as well as political participation" in South-East Turkey, which is majority Kurdish.[12]

21. According to the 2022 US State Department Report, Erdogan's government suspended 81% of HDP mayors elected in the 2019 municipal elections. Since 2016, the government removed 88% of elected HDP officials.[10]

22. Reports by the U.S. State Department have repeatedly highlighted extreme media bias against the HDP. The 2017 State Department Report notes that 38 of 56 editors from a newspaper that reported on Kurdish issues and mainly was read by Kurdish people faced prosecution for alleged "terror propaganda."[13] The 2022 country report states: "Media coverage of the 2018 parliamentary and presidential candidates similarly overwhelmingly favored the president and ruling party. For example, according to a member of the Radio and Television Supreme Council, between May 14 and May 30 of 2018, Turkish Radio and Television broadcast 67 hours of coverage on President Erdogan, seven hours on CHP candidate Muharrem Ince, 12 minutes on IYI candidate Meral Aksener, eight minutes on Felicity Party candidate Temel Karamollaoglu, and no coverage of HDP candidate Selahattin Demirtas."[14] See image below.[15]

---

[11] Amnesty International, Report 2016-17: The State of the World's Human Rights (Feb. 22, 2017) 2016-17 report at 368.

[12] Rep. of the Office of the UN High Comm'r on the Human Rights Situation in Southeast Turkey (Feb. 2017), at ¶ 2

[13] U.S. Department of State, *Country Reports on Human Rights Practices: Turkey* (2017) at 29.

[14] 2022 Country Reports on Human Rights Practices: Turkey (Türkiye) U.S. Department of State
https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/turkey/

[15] "HDP Candidate Demirtas campaigns against Erdogan from Turkish jail", DW News, June 14, 2018.
https://www.youtube.com/watch?v=aHGd4FMoT50



23. The Council of Europe's Congress of Local and Regional Authorities report underlined that the appointment of so-called "trustees" by Erdogan's AKP to replace democratically-elected HDP mayors was "against the international law."

24. The plaintiffs were peacefully demanding the release of Selahattin Demirtaş from prison. The European Court of Human Rights (ECHR) has ruled twice, in 2018 and again in 2020, that Demirtaş is wrongfully imprisoned and should be immediately released.

25. According to the most recent "Freedom in the World" report published by Freedom House, Turkey is ranked as "Not Free" and received a score of just 32 out of 100. The report further states, "pro-Kurdish parties face regular harassment by the government via hate speech, politically motivated prosecutions, and disinformation in progovernment media."[16]

September 28, 2023

---

[16] "Freedom in the World Report," Freedom House, 2023 https://freedomhouse.org/country/turkey/freedom-world/2023

**PUBLIC REDACTED VERSION**

# Appendix A





"Interview with Lelwy Abdullah: Co-Chair of Deir Ezzor Military Council in Syria", The Wilson Center,





Exhibit 97 SEALED