**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Kurd, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | )     Civil Action No.:  1:18-cv-1117-CKK |
| v. | ) |
| | ) |
| The Republic of Turkey, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>MODEL OPINION</u>

**[PROPOSED] MEMORANDUM OPINION**

COLLEEN KOLLAR-KOTELLY, United States District Judge

This case deals with events that took place at a May 16, 2017, protest over Turkish President Recep Erdogan's visit to the District of Columbia. Plaintiffs were protesting President Erdogan's policies towards Turkey's Kurdish minority and its crackdown on the People's Democracy Party, a rival, pro-Kurdish political party, when members of President Erdogan's security detail attacked the Plaintiffs, causing several of the Plaintiffs to sustain serious, lasting injuries. As relevant here, Plaintiffs sued the Republic of Turkey, alleging Turkey was liable for various common-law torts and for committing bias-related crimes in violation of D.C. law.

In a prior Memorandum Opinion, the Court denied Turkey's motion to dismiss for lack of subject matter jurisdiction, in which Turkey asserted it was immune from Plaintiffs' claims under the Foreign Sovereign Immunities Act. The D.C. Circuit affirmed on interlocutory appeal, and the Supreme Court denied Turkey's petition for a writ of certiorari. Thereafter, Turkey announced that it would no longer participate in this litigation, and the Clerk of the Court entered default against Turkey. Plaintiffs now move under Federal Rule of Civil Procedure 55(b)(2) and 28 U.S.C. § 1608(e) for a finding that Turkey is liable on the merits of Plaintiffs' claims.

Based on the extensive evidence Plaintiffs submit – including video that shows the attack from multiple angles, declarations from each of the adult Plaintiffs, expert declarations, and public records and business records from U.S. law enforcement officers on the scene – the Court finds that Turkey is liable for each of the claims Plaintiffs pursue in the present motion and are thus entitled to a default judgment against Turkey.

## I.  BACKGROUND

Plaintiffs filed this action on May 10, 2018.  ECF No. 1. Turkey filed a motion to dismiss on sovereign immunity grounds (ECF No. 90), which the Court denied on February 6, 2020. In a "fact-specific decision," the Court concluded, among other things, that Turkey's agents did not use force to protect President Erdogan, but as part of an objectively unjustifiable attack. *Kurd v. Republic of Turkey*, 438 F. Supp. 3d 69, 87-89 (D.D.C. 2020).

Turkey filed an interlocutory appeal. In connection with that appeal, the D.C. Circuit asked the United States to file a brief *amicus curiae* addressing the views of the government on immunity-related issues. *See Usoyan v. Republic of Turkey*, Docket No. 20-7019 (D.C. Cir.), Document No. 1881740. On March 9, 2021, the government filed its brief.  In the government's view, while foreign security agents have authority to use force as necessary for protective purposes, any use of force for other purposes subjects a foreign sovereign to suit under the Foreign Sovereign Immunities Act's ("FSIA") noncommercial tort exception, 28 U.S.C. § 1605(a)(5). Docket No. 20-7019 (D.C. Cir.), Document No. 1888987 at 1. The government also agreed with the Court's evaluation of the evidence and the Court's conclusion "that Turkey is not immune from these suits." *Id.* at 2.

On July 27, 2021, the D.C. Circuit unanimously affirmed the Court's denial of Turkey's motion to dismiss, finding that, "[i]n a 'fact-specific decision,' the district court concluded that Turkey's actions were not covered by the [discretionary function] exception. We agree."  *Usoyan v. Republic of Turkey*, 6 F.4th 31, 45-46 (D.C. Cir. 2021) (citation omitted) (quoting this Court's decision). On September 27, 2021, Turkey filed a petition for *en banc* review. Docket No. 20-7019 (D.C. Cir.), Document No. 1915800. The D.C. Circuit denied Turkey's petition on October

15, 2021. *Id.*, Document No. 1918390. Turkey filed a petition for a writ of certiorari, which the Supreme Court denied. *See Republic of Turkey v. Usoyan*, 143 S. Ct. 395 (2022) (mem.).

The D.C. Circuit issued its mandate on October 25, 2021. *Id.*, Document No. 1919553; ECF No. 138. Pursuant to Federal Rule of Civil Procedure 12(a)(4)(A), Turkey was required to file an answer within 14 days of the issuance of the Mandate, *i.e.,* by November 8, 2021.  Turkey did not file an answer.  Rather, more than two months later, it applied for a stay.  ECF No. 139. The Court denied this motion on September 21, 2022, ordering the parties to meet and confer under Rule 26(f) by October 21, 2022.  ECF Nos. 157-158.[1]

On October 21, 2022, counsel for Turkey sought to withdraw, based on Turkey's reported refusal to participate in discovery. ECF No. 164. Several days later, Turkey submitted a letter to the Court, stating that in fact it would not participate in discovery because it "remain[ed] immune." ECF No. 165. On November 9, 2022, Plaintiffs filed an Affidavit in Support of Default, stating that Turkey had failed to timely respond to Plaintiffs' Amended Complaint, had refused to participate in discovery, and had otherwise failed to follow the Court's Orders. ECF No. 170. On November 22, 2022, the Clerk of the Court entered a default. ECF No. 173.

In an April 12, 2023, Minute Order, the Court directed Plaintiffs to file the instant application by no later than September 29, 2023. Plaintiffs seek a finding that Turkey is liable on a range of claims. All Plaintiffs bring claims for assault, based on their stated fear of physical harm caused by Turkey's agents. Twelve Plaintiffs who allege that agents physically attacked them bring claims for battery. In addition, all Plaintiffs assert claims under the D.C. bias-related crimes statute, contending that the agents' attacks were motivated by hatred of those who support

---

[1] On October 31, 2022, the Supreme Court denied – without comment – a petition for a writ of certiorari Turkey had filed.  USCA Case No. 20-7017; Document No. 1971445.

Kurdish causes or oppose President Erdogan as well as sex-based animus in connection with the six Plaintiffs who are women. Eleven Plaintiffs bring claims for intentional infliction of emotional distress. Finally, Plaintiff Ceren Borazan brings a claim for false imprisonment because an agent subjected her to a chokehold.

## II.  LEGAL STANDARD

"A court has the power to enter default judgment when a defendant fails to defend its case appropriately or otherwise engages in dilatory tactics." *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal & Glass, LLC*, 635 F. Supp. 2d 21, 23 (D.D.C. 2009). "Default establishes the defaulting party's liability for the well-pleaded allegations of the complaint." *Id.* Where, as here, the complaint seeks damages for an uncertain sum, default is requested via an application to the court under Federal Rule of Civil Procedure 55(b)(2).

A plaintiff litigating under the FSIA must "establish[] his claim or right to relief by evidence satisfactory to the court" before a default judgment can be entered against a foreign sovereign defendant. 28 U.S.C. § 1608(e). The FSIA's "evidence satisfactory to the court" requirement is a "lenient standard" that can be satisfied with a lesser "quantum and quality of evidence . . . than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal citations and quotations omitted), *rev'd sub. nom. on other grounds*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). The standard is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Id.* (quoting *Alameda v. Sec'y of Health, Ed. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980)).

"In evaluating whether a plaintiff has sufficiently established its claim [under the FSIA], courts may accept the plaintiff's 'uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence.'" *Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124, 126 (D.D.C. 2013) (omission in original) (quoting *Oveissi v.*

*Islamic Republic of Iran*, 879 F. Supp. 2d 44, 49 (D.D.C. 2012)); *see also, e.g.*, *Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117, 125 (D.D.C. 2018) (default judgment entered per § 1608(e) based on "detailed affidavits," establishing an assault by Congolese agents against protesting individuals in Washington, D.C. during a visit by the Congolese President), *vacated in part on other grounds*, 2019 WL 2191806 (D.D.C. 2019) and 2020 WL 3498586 (D.D.C. 2020); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) ("In evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence.'" (quoting *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000))).

The Court also has discretion in the evidence it chooses to consider. As the D.C. Circuit has said, "[s]ection 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion." *Owens*, 864 F.3d at 785-86. Indeed, in an FSIA default proceeding, the Court may "allow[] plaintiffs to prove their claims using evidence that might not be admissible in a trial." *Id.* at 785; *see also Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (court has "the obligation[] to 'adjust [evidentiary requirements] to . . . differing situations.'" (second alteration and omission in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981))). "This broad discretion extends to the admission of expert testimony." *Owens*, 864 F.3d at 785.

The "district court's satisfaction with the evidence presented" is reviewed for abuse of discretion, while its legal conclusions are reviewed de novo. *Id.*

### III.  FINDINGS OF FACT

In ruling against Turkey's immunity defense in *Kurd v. Republic of Turkey ("Kurd II")*, 438 F. Supp. 3d 69 (D.D.C. 2020), *aff'd sub nom. Usoyan v. Republic of Turkey*, 6 F.4th 31

(D.C. Cir. 2021), the Court previously made factual findings pertinent to the present motion. As described previously, the Court's analysis in *Kurd II* was "aided by the abundance of video evidence filed as exhibits by both parties. The Court incorporates those findings below where appropriate and supplements them with new findings based on the evidence Plaintiffs submit in support of the present motion.

## A.    The Events of May 16, 2017

### 1.    Plaintiffs Took Part in a Peaceful Protest at Lafayette Square

On May 16, 2017, President Erdogan of Turkey was in Washington, D.C. and scheduled to meet with President Trump at the White House. Plaintiffs' Statement of Material Facts ("SMF") ¶ 1.[2] Plaintiffs, having heard about this publicly announced meeting, joined a planned protest against President Erdogan in Lafayette Square. *Id.* ¶¶ 3-4; *see also Kurd*, 438 F. Supp. 3d at 76. Plaintiffs wished to express their opposition to policies and practices of President Erdogan toward the Kurdish people; express support for Kurdish political parties, especially the People's Democratic Party ("HDP"),and call for the release of HDP political prisoners; and express their view that President Erdogan was committing human rights abuses. SMF ¶ 5.

As the peaceful protest in Lafayette Square was ending, Plaintiffs heard that President Erdogan would be travelling from the White House to the Ambassador's Residence in Sheridan Circle. In small groups or individually, Plaintiffs decided to go to Sheridan Circle to continue their protest. SMF ¶¶ 6-7; *see also Kurd*, 438 F. Supp. 3d at 76.

---

[2] Wherever the Court cites to Plaintiffs' Statement of Material Facts, the Court has concluded that each piece of evidence cited therein is admissible for the purpose of meeting Plaintiffs' burden under § 1608(e). The Court likewise concludes that each exhibit it cites to directly is admissible for the purpose of meeting Plaintiffs' burden under § 1608(e). *See Owens*, 864 F.3d at 785-86 ("Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge. . . .").

### 2.    Plaintiffs Continued Their Peaceful Protest at Sheridan Circle

Plaintiffs did not reach Sheridan Circle together, but, upon arrival, each saw a group of people in the street and on the sidewalk adjacent to the Ambassador's Residence. SMF ¶ 7. Among that group were a group of consisting mostly of men that Plaintiffs contend to be Turkish security agents in President Erdogan's security detail. *Id.* ¶ 14. Some members of this group were wearing matching or similar khaki uniforms and others in dark suits. *Id.* ¶ 15. At least some members of this group wore earpieces, were armed with handgun, and wore Turkish breast pins and lanyards with identification cards. *Id.* The Court finds that these similarly dressed individuals were indeed Turkish security agents.

With the agents, there were others in civilian clothing (the "pro-Erdogan group"). SMF ¶ 17. While Plaintiffs were arriving in Sheridan Circle and situating themselves across the street from the Ambassador's Residence, the agents and the smaller number of civilians repeatedly hurled ethnic and other curses at them. *Id.* ¶¶ 19-22. Both the agents and the civilians were participating in the shouting. The videos and declarations submitted by the Plaintiffs show that the Turkish security detail yelled threats and anti-Kurdish slurs at the protestors in Turkish including: "die, fucking Kurds," "fuck you, Kurds," "Kurdish sons of bitches," "traitors," and "dogs," the latter term being a phrase used to insult Kurdish people. SMF ¶ 19; Ex. 14, Doe II Decl. ¶ 6; Ex. 10, Arya Decl.¶ 8. Others yelled in Turkish at Jane Doe III, "We will kill you" Ex. 15, Doe III Decl. ¶ 7. Mehmet Tankan heard people yelling in Turkish, "son of a whore," "terrorists" and "traitors." Ex. 20, Tankan Decl. ¶ 6. Kasim Kurd and Jane Doe I saw agents open their suit jackets to show they were carrying guns. Another agent told Kurd in Turkish, "We are already fucking your mothers." Ex. 18, Kurd Decl. ¶ 7. An agent yelled at Jalal Kheirabadi, "motherfucker, we did your mom and sister in Turkey." Ex. 17, Kheirabadi Decl. ¶ 7. An agent can be heard on video shouting in Turkish, "I'm going to take that flag to put in your mom's

pussy. I'm going to fuck your mom's pussy." Ex. 36, [Video SC08] at 5:00-5:05; *see also* Ex. 47, (Translated Transcript of Ex. 36) at 3.

Shortly after most Plaintiffs had arrived in Sheridan Circle, the verbal confrontation turned into a brief physical altercation involving just a handful of individuals. SMF ¶ 25; *see also Kurd II*, 438 F. Supp. 3d at 77. Within less than a minute, police officers were able to separate the groups. SMF ¶ 25; *see also Kurd II*, 438 F. Supp. 3d at 77.

As the Court found in *Kurd II*, the protestors, including Plaintiffs, thereafter remained on the sidewalk next to Sheridan Circle:

> Both sides were instructed to stay on their respective sidewalks. . . . While two of the protesters took one brief step down from the curb, they both quickly stepped back up. Otherwise, the protesters remained in a crude line on the Sheridan Circle sidewalk across from the Ambassador's Residence. . . . Prior to the second altercation, the approximately 20 protesters, including Plaintiffs, were standing and remaining on the Sheridan Circle sidewalk which had been designated for protesting by United States law enforcement. . . . [I]n the time preceding the second altercation, the protesters remained standing on the designated sidewalk.

*Kurd II*, 438 F. Supp. 3d at 77, 88 (citations omitted); *see also* Ex. 18, Kurd Decl., Ex. A; Ex. 55, [Video SC05] at 0:04-1:00; Ex. 49, [Video SC06].

The Court further found by reference to video that "United States law enforcement officers, including MPD officers, lined up between the two groups, primarily facing the pro-Erdogan group." *Kurd II*, 438 F. Supp. 3d at 77; *see also* SMF ¶ 28. Additional police soon arrived, including officers on motorcycles. Those officers lined up their motorcycles as a barrier behind the row of officers already facing the pro-Erdogan group. SMF ¶ 29.

On the sidewalk next to Sheridan Circle, Plaintiffs voiced their positions on various Kurdish-related issues and President Erdogan. Jane Doe II waved a shawl that was yellow, red and green, colors that are culturally associated with the Kurdish people. Ex. 14, Jane Doe II

Decl. ¶ 10. Stephen Arthur and Heewa Arya separately held flags with the same colors. Ex. 9, Arthur Decl. ¶ 11; Ex. 10, Arya Decl. ¶ 12; *see also* Ex. 18, Kurd Decl., Ex. A.

Elif Genc held a sign calling for the release of Selahattin Demirtas, an HDP leader who has been imprisoned in Turkey since 2016. Ex. 16, Genc Decl. ¶ 6. Mehmet Tankan also had a sign calling for Demirtas's release. Ex. 20, Tankan Decl. ¶ 9. Jalal Kheirabadi held a sign that said "Destroyed Kurdish Cities. Erdogan is a War Criminal." Ex. 17, Kheirabadi Decl. at ¶ 8; *see also* Ex. 18, Kurd Decl., Ex. A. Another protestor held a sign that read, "peace in Kurdistan." Ex. 18, Kurd Decl*., Ex. A.

Murat Yasa used a megaphone to chant, "Turkey supports ISIS," "Kurds fight ISIS, Erdogan attacks Kurds," "terrorist, Erdogan," and "Erdogan, stop killing Kurdish Children." Ex. 21, Yasa Decl. ¶ 10; *see also* Ex. 18, Kurd Decl., Ex. A (audible chants of "terrorist, Erdogan" and "Turkey supports ISIS"); *id.* Ex. B (audible chants of "terrorist, Erdogan," "this is America, this is not Turkey," "long live Kurdistan," "Erdogan, stop supporting ISIS," "terrorist, Turkey" and "Turkey supports ISIS").

This Court already determined that there was no legitimate indication that Plaintiffs, or other protestors, posed a physical threat, including to President Erdogan:

> Defendant Turkey argues that President Erdogan was within range of a possible handgun, improvised explosive device, or chemical weapon attack. Even if the Court assumes this to be true, at the time of the second attack, the protesters were merely standing on the Sheridan Circle sidewalk. Defendant Turkey points to no indication that an attack by the protesters was imminent. Moreover, it is uncontroverted that the Turkish security forces did not detain, question, search, or otherwise investigate the protesters before, during, or immediately following the altercation as would be expected if they thought the protesters were armed with serious weapons.

*Kurd II*, 438 F. Supp. 3d at 88; *see also Usoyan*, 6 F.4th at 37, 47 (D.C. Circuit stated "[h]aving reviewed video of the altercation ourselves, we find no clear error with this statement of facts"

and "[t]he nature of the challenged conduct was not plausibly related to protecting President Erdogan").

### 3.    U.S. Law Enforcement Struggled to Keep the Turkish Agents at Bay

Meanwhile, the Turkish officials and employees, along with a handful of civilian supporters, continued to taunt and curse at the protestors.  SMF ¶¶ 18-22; *see also Kurd II*, 438 F. Supp. 3d at 76 (citing SC01, 0:35-0:45). The Turkish security detail shouted violent threats and challenged the protestors to fight. SMF ¶¶ 21-24. The agents urged Plaintiffs to come closer and fight. SMF ¶ 24.  The outnumbered Plaintiffs remained on the sidewalk, holding their protest signs and Kurdish flags, and shouting political slogans.  SMF ¶¶ 26-27.

Police officers repeatedly had to order the Turkish agents (and allied civilians) out of the street and back onto the sidewalk in front of the Ambassador's Residence. Officers also had to physically restrain agents from advancing on the protesters. *See* SMF ¶ 30. For example, officers linked arms to restrain agents. *Id.* Officers repeatedly yelled at agents to "stay back." *Id.*; *see also* Ex. 45, [Video SC09] at 0:25-0:28 (an officer to an agent: "Sir, don't cross this line. Just stay here."); *id.* at 2:51-2:53 (an officer to an agent: "Don't cross the white line!"); Ex. 56, [Video SC12] at 4:16-4:22 (one officer to another "Watch those guys: See these three guys here? Don't let them cross the street."). One officer said to an agent, "You are the head of security.  You need to keep your guys back."  Ex. 45, [Video SC09] at 6:55-7:00.

Agent Ismail Ergunduz extended his arm and moved his hand in a downward gesture to indicate "come here." Ex. 49 [Video SC06] at 0:02-0:06; Ex 18, Kurd Decl. ¶ 13. Agent Mustafa Sumercan made the same gesture at protesters numerous times. Ex. 49 [Video SC06] at 0:06-0:12. He yelled at the protesters: "You come here!  Come here, I said!  Come here!  Come!"  Ex. 45, [Video SC09] at 2:42-2:53; Ex. 46, (Translated Transcript of Ex. 45) at 3. Agent Sumercan

yelled: "Make those fuckers shut up! Shut them up!" Ex. 45, [Video SC09] at 6:55-6:58; Ex. 46, (Translated Transcript of Ex. 45) at 3.

### 4.    The Attack on the Protestors

Between 4:10 p.m. and 4:13 p.m., President Erdogan arrived at the Ambassador's Residence. *Kurd II*, 438 F. Supp. 3d at 77. The Court in *Kurd II* found the following facts as to what happened next:

> At approximately 4:13 p.m., about eight minutes after the first altercation, while President Erdogan remained sitting in his car at the entrance to the Ambassador's Residence, the pro-Erdogan group, including Turkish security forces, launched an attack on the protesters. As the video evidence shows, at the time the pro-Erdogan group attacked the protesters, all of the protesters were standing on the Sheridan Circle sidewalk. In order to launch the attack, the pro-Erdogan group, including Turkish security forces, rushed forward and broke through the United States law enforcement line which had been separating the two groups. The video evidence shows that none of the protesters rushed forward to meet the attackers.

*Kurd II*, 438 F. Supp. 3d at 77 (citations omitted). After the agents pushed past police:

> Some of the protesters immediately fell to the ground. Once on the ground, Erdogan civilian supporters and Turkish security forces continued to strike and kick the protesters who were lying prone on the ground. Other protesters attempted to run away from the attackers and away from the Turkish Ambassador's Residence. Erdogan civilian supporters and Turkish security forces chased the protesters and violently physically attacked many of them.

*Id.* at 77-78 (citations omitted).

It was not necessary in connection with Turkey's arguments about sovereign immunity to assess the individual circumstances of each Plaintiff during the attack, but the Court does so now. The Court's findings regarding are based primarily on Plaintiffs' testimony – submitted in the form of declarations – but in many instances are corroborated by video and other evidence.

<u>Stephen Arthur</u>

Plaintiff Stephen Arthur testifies as follows:

Arthur saw a large group of Turkish agents and others push past the police and sprint at him and the protestors. He believed the agents and others wanted to attack the protestors. He was immediately frightened for his physical safety and that of the other protestors. Ex. 9, Arthur Decl. ¶ 12. Arthur saw no choice but to run away. *Id.* ¶ 13. Despite his fleeing, several Turkish agents grabbed Arthur. They punched him in the head and body and kicked him in the leg, as a police officer tried to protect him. An agent kicked Arthur while he was running out of Sheridan Circle. He saw that at least some of the agents carried guns. This experience caused Arthur pain and fear. *Id.* ¶ 14. As a result of the attack, Arthur suffered physical injuries and emotional distress. *Id.* ¶ 17.

Arthur also saw Turkish agents threaten and attack other protestors, including his friends Murat Yasa and Lucy Usoyan.  Agents knocked them down and kicked them while they were on the ground. He also saw agents hit Elif Genc and kick her after she fell. Ex. 9, Arthur Decl. ¶ 15.

The Court credits Arthur's testimony, which is undisputed and corroborated by the video evidence. *See* Ex. 36, [Video SC08] at 0:28-0:33; Ex. 45, [Video SC09] at 7:16-7:30; Ex. 48, [Video SC02] at 2:36-2:58; Ex. 56, [Video SC12] at 7:10-7:20; Ex. 65, [Video SC10] at 0:34-0:39; Ex. 20, Tankan Decl., Ex. A. From Arthur's testimony and the video evidence, the Court finds that Turkish agents punched and kicked Arthur, that the agents placed Arthur in apprehension of imminent physical attack, and that Arthur suffered physical injuries and emotional distress as a result.

<u>Heewa Arya</u>

Plaintiff Heewa Arya testifies as follows:

After the initial altercation, Arya left his daughter C.A. with Jane Doe III, near some trees a short distance from the sidewalk where protestors were gathering. Ex. 10, Arya Decl. ¶ 11. From where he was standing within Sheridan Circle, Arya saw Turkish agents rushing past the

police and running directly at the protestors. He heard the attackers screaming. He was terrified, including for his daughter and also feared he would be attacked. *Id.* at ¶ 13. He moved toward a statue on the opposite side of Sheridan Circle, away from the attack. However, an agent caught him and hit him in the face. *Id.* at ¶ 14.

Arya was able to continue moving away from the main area of the attack, going to the side of Sheridan Circle.  But, there, a civilian knocked him to the ground. Then, even as a police officer came to Arya's side, an agent kicked and grabbed him. As Arya was on the ground, agents (and civilians) kicked him repeatedly. Arya thought he was going to die. Eventually, the officer repelled Arya's attackers, and Arya was able to get to his feet. *Id.*

Arya also saw agents and civilians punch and kick Jane Doe II as she was on the ground next to him. The perpetrators yelled at her in Turkish, "bitch," "die, fucking bitch," and "fucking Kurd." *Id.* Even after police pushed the attackers back and were standing nearby, agents continued to approach Doe II and Arya. Arya believed these individuals wanted to attack again. The police were repelled the attackers once more. *Id.*  Arya saw Doe II, shaking on the ground, appearing to have a seizure. He feared she would die. *Id.* at ¶ 16. Arya also saw agents attack other protestors, including his friends Jalal Kheirabadi, Murat Yasa, and Abbas Azizi. *Id.* at ¶ 17.

Arya suffered physical injuries from the attack and has experienced emotional distress as a result of the attack, which has manifested in irritability, disinterest in social activities, difficulty sleeping, difficulty concentrating. *Id.* at ¶¶ 19-20.

The Court credits Arya's testimony, which is undisputed and corroborated by the video evidence. Ex. 10, Arya Decl. Ex. A at 0:14-1:06; *id.* Ex. B at 1:05-1:12; *id.*, Ex. C; Ex. 36 [Video SC08] at 0:23-0:32; Ex. 45 [Video SC09] at 7:16-7:30; Ex. 48 [Video SC02] at 2:36-2:58; Ex. 56 [Video SC12] at 7:10-7:20. From Arya's testimony and the video evidence, the Court finds that

Turkish agents grabbed, punched, and repeatedly kicked Arya, that the agents placed Arya in apprehension of imminent physical harm, and that he suffered physical injuries and emotional distress as a result.

> C.A.

Plaintiff C.A., a minor, has not submitted any testimony in support of the present motion. But two of the other Plaintiffs, her father Heewa Arya and Jane Doe III, testify about C.A.'s experiences during the attack.

Arya testifies that he brought C.A. with him to the protest at Sheridan Circle. Ex. 10, Arya Decl. ¶ 5. After the initial altercation, he left C.A. with Jane Doe III near some trees away from where the rest of the protesters were standing. *Id.* ¶ 11. Jane Doe III testifies she was with C.A. when the attack began, and that agents ran in her and C.A.'s direction. Ex. 15, Jane Doe III Decl. ¶¶ 9-10.

Arya testifies that after he was reunited with C.A., he observed her crying and shaking. C.A. told Arya that she saw the attack and was worried she would be attacked. Arya had never seen C.A. so afraid. She told Arya it was the worst day of her life. As Arya and C.A. left Sheridan Circle, they passed many Erdogan supporters with Turkish flags, which frightened C.A. She expressed to Arya that she was afraid the Erdogan supporters would try to hurt them. Ex. 10, Arya Decl. ¶ 18.[3]

Arya testified that C.A. has suffered emotional distress as a result of the attack. She would repeatedly check to ensure that the doors and windows of their home were locked so the attackers could not get in to hurt them. Ex. 10, Arya Decl. ¶ 21.

---

[3] C.A.'s statements to Arya are admissible under Federal Rules of Evidence 803(1), 803(2), and 803(3).

The Court credits Arya's and Jane Doe III's testimony. Although C.A. was not on video during the attack, Arya's and Jane Doe III's testimony is undisputed and under oath, and the Court has no reason to doubt it.

From Arya's and Doe III's testimony, the Court finds that C.A. witnessed agents attacking the protestors, that the agents placed C.A. in apprehension of imminent physical attack, and that C.A. suffered emotional distress as a result.

Abbas Azizi

Plaintiff Abbas Azizi testifies as follows:

Azizi saw the attackers running past the police and directly at him and the other protestors, screaming. He believed they were going to attack the protestors, including him. He was terrified. Ex. 11, Azizi Decl. ¶ 11.

Azizi saw an agent hit Jalal Kheirabadi who was standing close to him. When Kheirabadi fell to the ground, Azizi tried to help, but an agent in a black suit jumped high in the air and kicked him in the chest, knocking him down. As Azizi lay on the ground, agents kicked him in his body, neck, head, and face. Azizi tried to get up, but other agents kicked him as well. He was scared he was going to die.  With the help of police, Azizi was able to stand, but, then, a large agent punched him. *Id.*. Azizi was disoriented, felt severe chest pain, and could not breathe easily. He felt as though he was having a heart attack. *Id.* at ¶ 14. During the attack, Azizi also saw Turkish agents kicking his friends and fellow protestors Murat Yasa and Lucy Usoyan. *Id*. at ¶ 12. Azizi suffered physical injuries and emotional distress from the attack, which has manifested in depression, anxiety, and difficulty sleeping and concentrating. *Id.* ¶¶ 15-16.

The Court credits Azizi's testimony, which is undisputed and corroborated by the video evidence. *See* Ex. 36 [Video SC08] at 0:23-0:32; Ex. 45 [Video SC09] at 7:16-7:33; Ex. 48 [Video SC02] at 2:36-3:10; Ex. 56 [Video SC12] at 7:10-7:20; Ex. 65 [Video SC10] at 0:43-

0:45; *see also* Ex. 70 (Screenshot of Ex. 48 at 2:45). The video further shows that Azizi's face and shirt were bloodied by the end of the attack. Ex. 45 [Video SC09] at 7:47-7:50; Ex. 48 [Video SC02] at 3:58-4:14. From Azizi's testimony and the video evidence, the Court finds that Turkish agents punched and repeatedly kicked Azizi, that the agents placed Azizi in apprehension of imminent physical attack, and that Azizi suffered physical injuries and emotional distress as a result.

Ceren Borazan

Plaintiff Ceren Borazan testifies as follows:

When Borazan saw the agents charging at her and others, she feared she would be attacked. She ran deeper into Sheridan Circle, away from the Ambassador's Residence. Ex. 12, Borazan Decl. at ¶¶ 13-14. As she ran, Borazan heard a voice behind her yelling in Turkish, "Bitch, come here," and "Where are you running?" Ex. 12, Borazan Decl. ¶ 14.[4]

Borazan ran to the street bordering the far side of Sheridan Circle. Ex. 12, Borazan Decl. ¶ 15; Kurd Decl., Ex. D. Borazan asked drivers in the cars on Massachusetts avenue to let her into their cars in order to escape. Ex. 12, Borazan Decl. ¶ 15. A driver agreed to allow Borazan into a car. She was about to get in when a Turkish security agent grabbed her from behind. The agent was much bigger and taller than she. He wrapped one arm tightly around her neck and put her in a chokehold. With his other hand, he grabbed her wrist and twisted her arm behind her back. While doing this, he threatened Borazan in Turkish, "You're dead, bitch," and "You're going to get more." The agent pulled Borazan's hair, hit her on the back of the head, threw her to

---

[4] The Court finds the voice belonged to a Turkish agent. This is the most reasonable inference, as the video evidence shows an agent chasing Borazan, *see* Ex. 89 [Pls.' Video F], and she testifies that later an agent attacked her moments later.

the ground, and kicked her as she lay there, causing Borazan to experience pain and fear. *Id.* at ¶ 16; Ex. 48 [Video SC02] at 3:41.

Borazan was able to get up and into a different car. But the agent threatened Borazan, "Bitch, get out of the car, you haven't had enough yet." Borazan was afraid that the agent would open the door and pull her out. At Borazan's urging, the driver locked the car doors. Ex. 12, Borazan Decl. at ¶ 17.

Borazan suffered physical injuries and emotional distress as a result of the attack, which has manifested in difficulty concentrating, nightmares, fear, depression, and hopelessness. *Id.* ¶ 21.

The Court credits Borazan's testimony, which is undisputed and corroborated by the video evidence. *See* Ex. 10, Arya Decl., Ex. B; Ex. 18, Kurd Decl., Ex. D; Ex. 36 [Video SC08] at 2:36-2:46; Ex. 48 [Video SC02] at 3:41. From Borazan's testimony and the video evidence, the Court finds that a Turkish agent grabbed Borazan, placed her in a chokehold, hit her, and threw her the ground, that the agent restricted Borazan's freedom of movement, that the agent placed Borazan in apprehension of imminent physical attack, and that Borazan suffered physical injuries and emotional distress as a result.

<u>Jane Doe I</u>

Plaintiff Jane Doe I testifies as follows:

Jane Doe I was at Sheridan Circle participating in the protest. She saw agents running at her and the other protesters, making her fear for her safety. Ex. 13, Jane Doe I Decl. ¶ 12.  She heard shouting by the pro-Erdogan group, including in Turkish, "We will kill you, bitch" directed at her. *Id.* ¶ 11. Then, Doe I ducked behind a tree branch for protection, but an agent grabbed her. She was then punched in the neck and ear and kicked in the leg. *Id.* ¶ 13.

Doe I got away from the agents and went to her friend and fellow protestor, Doe II, who was lying on her back, holding her stomach. Doe I saw that Jane Doe II was slipping in and out of consciousness and convulsing. Turkish agents kept approaching Doe I and Doe II, and one opened his jacket to show Doe I his gun. Based on this, Doe I believed the agents wanted to attack her and Doe II again and she feared for the safety of herself and Doe II. The agents left the area only after being pushed away by police. *Id.* at ¶ 14.

Due to the attack, Doe I suffered physical injuries and emotional distress as a result of the attack. *Id.* at ¶ 16.

The Court credits Doe I's testimony, which is undisputed and corroborated by the video evidence. *See* Ex.10, Arya Decl., Exs. A and C; Ex. 48 [Video SC02] at 2:39-2:47. From Doe I's testimony and the video evidence, the Court finds that a Turkish agent grabbed, punched, and kicked Doe I, that Turkish agents placed Doe I in apprehension of imminent physical attack, and that Doe I suffered physical injuries and emotional distress as a result.

<u>Jane Doe II</u>

Plaintiff Jane Doe II testifies as follows:

As Doe II stood on the sidewalk, she saw agents and others were running at her. She believed she was in danger and feared for her safety. Ex. 14, Jane Doe II Decl. ¶¶ 12-13.

From behind, someone grabbed Doe II's hair and pulled it, yanking her head up. The person dragged her backwards by the hair. Doe II closed her eyes in pain. She felt a blow to the temple that stunned her. She fell to the ground, losing consciousness momentarily.

As Doe II was on the ground, people kicked her in the head. *Id.* ¶ 14. Doe II believed her assailants were attempting to kill her. She tried to put her hands around her head for protection as she lay on the ground, but felt herself being beaten more. She felt herself slipping in and out of consciousness. *Id.*

At one point, Doe II opened her eyes and saw agents standing above her. She felt panic to be in that position. A police officer trying to protect her by pushing people away and yelling that they should leave her alone.  Ex. 14, Doe II Decl. ¶ 15.

After the attack on Doe II ended, she tried to get up, but felt dizzy immediately. A paramedic told Doe II she had a seizure. She was put into an ambulance and taken to Georgetown University Hospital. There, she had another seizure. Ex. 14, Doe II Decl. ¶ 18. Doe II suffered physical injuries. She suffered multiple herniated discs, bone bruises, and other injuries to her head, back, neck, arm, and shoulder. She was diagnosed with a frozen shoulder and could not move her left arm more than 30 degrees in any direction. She required years of intense physical therapy, and has still not fully healed, more than six years later. *Id.* ¶ 19. She is still in significant pain. Doe II could barely leave her bed for months after the attack. She could not work for a year, could not take her son to school, had difficulty bathing, and even needed her son to help her get dressed. *Id.* ¶ 19. She also suffered emotional distress from the attack, which has manifested in headaches, difficulty sleeping, irritability, loss of interest in social activities, anxiety, stress, and difficulty concentrating. *Id.* ¶ 20.

Other Plaintiffs add pertinent testimony to the attack on Jane Doe II. Plaintiffs Arya and Özgen both saw agents kicking Doe II as she lay vulnerable on the ground. Plaintiff Borazan, Jane Doe I, and Jane Doe III both testified that they saw Jane Doe II on the ground, unconscious or semiconscious. Ex. 12., Borazan Decl. ¶ 19; Ex. 13, Doe I Decl. ¶ 14; Ex. 15, Jane Doe III Decl. ¶ 11. Plaintiffs Doe I and Genc saw her convulsing on the ground. Ex. 13, Doe I Decl. ¶ 14; Ex. 16, Genc Decl. ¶ 13.

The Court credits the testimony of Jane Doe II, Arya, Özgen, Borazan, Jane Doe II, and Genc, which is undisputed and corroborated by video evidence showing agents knock Doe II to

the ground, grab her by the hair and pull her, and repeatedly kick her in the head and else, before, eventually, she suffered an apparent seizure. *See* Ex. 10, Arya Decl., Ex. A at 0:14-1:06; *id.* Ex. B at 1:05-1:12; *id.* Ex. C; Ex. 48 [Video SC02] at 4:20-4:50; Ex. 58 [Pls.' Video B] at 0:02-0:06. The Court finds from Doe II's, Arya's, Özgen's, Borazan's, Doe I's, and Genc's testimony, and from the video evidence, that Turkish agents knocked Doe II to the ground, grabbed her by the hair and pull her, and repeatedly kicked her in the head and elsewhere. Although Doe II did not know specifically who was attacking her, the video evidence and Arya's and Özgen's satisfy the Court that it was Turkish agents. The Court further finds that Turkish agents placed Doe II in apprehension of imminent physical attack, and that Doe II suffered physical injuries and emotional distress as a result of the attack.

Jane Doe III

Plaintiff Jane Doe II testifies as follows:

Before the second attack, Doe III was near the sidewalk next to Sheridan Circle, where she met Heewa Arya and Arya's daughter C.A. To Doe III, it appeared that C.A. was very scared. Doe III showed C.A. a cartoon on her phone and tried to distract C.A. from the yelling and general tension. A friend of Doe III, came with her young son and joined C.A. and Doe III. Ex. 15, Doe III Decl. ¶ 8.

Doe III saw the pro-Erdogan group running towards her, which frightened her. Ex. 15, Doe III Decl. ¶ 10. Doe III ran. *Id.* ¶ 11. As she was trying to run, she felt a kick in her back from someone she believed was an agent, given that most people who had been running in her direction were agents. Doe III fell down and was kicked several times in the back and head, she believes by agents. *Id.* ¶ 10.

Doe III returned to Sheridan Circle to check on fellow protestors. She saw Doe II, who was on the ground and did not look fully conscious. Doe I was holding Doe II's hand. Doe III was upset to see her fellow protestor so badly injured by the agents. Eventually, Doe III helped Doe II into an ambulance. Ex. 15, Doe III Decl. ¶ 11.

Doe III suffered physical injuries and emotional distress as a result of the attack, which has manifested in difficulty sleeping, nightmares, depression, disinterest in seeing friends and other normal life activities. Ex. 15, Doe III Decl. ¶¶ 13.

The Court credits Doe III's testimony. Although the attack on Doe III was not captured on video, her testimony is undisputed and under oath, and the Court has no reason to doubt it. The Court finds from Doe III's testimony that Doe III a Turkish agent kicked Doe III at least once. Doe III testified that she was uncertain whether the person or persons who kicked her was a Turkish agent, but the the most reasonable inference to draw from the testimony is that at least one of her kicks was delivered by an agent. She testified that at the time she was kicked, "most of the people running in [her] direction were agents." Ex. 15, Doe III Decl., ¶ 10. An abundance of other evidence demonstrates that agents were attacking the protestors they caught up with. While there is evidence that civilians were also attacking the protestors, given that there were more agents than civilians in the group chasing Doe III, it is more likely than not that Doe III's assailant was an agent, not a civilian. Moreover, that Doe III was kicked multiple times raises the odds that at least one of the kicks came from an agent. The Court is satisfied that Doe III's testimony provides sufficient circumstantial evidence to meet Plaintiffs' relatively low burden. *See supra* Part II.

The Court further finds that Turkish agents placed Doe III in apprehension of imminent physical attack, and that Doe III suffered physical injuries and emotional distress as a result of the attack.

<u>Elif Genc</u>

Plaintiff Elif Genc testifies as follows:

Genc saw the pro-Erdogan group rush past the police and at the protestors, causing her to fear for her life. Ex. 16, Genc Decl. ¶ 11. She turned to run away, but Agent Hamza Yurteri kicked her, knocking her down. Agents Yurteri and Mehmet Sarman and some civilians then kicked and hit Genc as she lay on the ground, not offering any resistance. *Id.* ¶ 10.

During the attack, someone yelled at Genc in Turkish, "I will kill you, bitch." The Turkish word used connotes not only "bitch," but also "whore" and would only be used by a man toward a woman if the man wanted to express extreme hatred. Ex. 16, Genc Decl. ¶ 11.

Genc believed that she was in great danger and that she had to find a way to escape. Ex. 16, Genc Decl. ¶ 11. She heard a police officer telling her to run and pulled herself up by holding onto the officer's leg. She fled down Massachusetts Avenue. *Id.* ¶ 12.

When the attack on the other protestors seemed to be over, Genc returned to Sheridan Circle. She saw fellow protestor Abbas Azizi covered in blood. Another protestor's head was bleeding, so she wrapped it in a scarf that immediately was soaked in blood. She saw her friend and fellow protestor Lucy Usoyan on the ground. She also saw her friend Jane Doe II on the ground, shaking. Genc was traumatized from witnessing this. Ex. 16, Genc Decl. ¶ 13.

Genc suffered physical injuries and emotional distress as a result of the attack, which has manifested in difficulty sleeping, nightmares, depression, disinterest in seeing friends and other normal life activities. *Id.* at ¶¶ 14-15.

Plaintiff Stephen Arthur also testified that he saw agents hit Genc and then kick her after she fell. Ex. 9, Arthur Decl. ¶ 15.

The Court credits Genc's and Arthur's testimony, which is undisputed and corroborated by the video evidence. *See* Ex. 20, Tankan Decl., Ex. A at 0:01-0:06; Ex. 36 [Video SC08] at 0:27-0:30; Ex. 48 [SC02] at 2:36-3:00; *see also* Ex. 60 (still from Video SC09); Ex. 75 (stills from Video SC02). The Court finds from Genc's and Arthur's testimony and the video evidence that Turkish agents repeatedly hit and kicked Genc, that Turkish agents placed her in apprehension of imminent physical attack, and Genc suffered physical injuries and emotional distress as a result.

<u>Jalal Kheirabadi</u>

Plaintiff Jalal Kheirabadi testifies as follows:

As the second attack started, an agent sprinted directly at Kheirabadi, causing him to fear for his safety. Ex. 17, Kheirabadi Decl. ¶ 10.  That agent hit Kheirabadi, before grabbing him and punching him until he fell, as a police officer tried to stop the agent. *Id.* at ¶ 11. Kheirabadi was able to get up, but was hit again. *Id.*

Kheirabadi escaped the main area of the attack and moved further into Sheridan Circle, but agent Servet Erkan, who had left the vicinity of President Erdogan to participate in the beatings, kicked at and punched Kheirabadi in the head, even though a police officer was next to Kheirabadi. Eventually, officers were able to pull Kheirabadi away from the attack. Ex. 17, Kheirabadi Decl. ¶ 11. Kheirabadi suffered physical injuries and emotional distress as a result of the attack, which has manifested in reduced appetite, nightmares, difficulty sleeping, fearfulness, severe anxiety, and headaches. *Id* ¶¶ 12-13.

The Court credits Kheirabadi's testimony, which is undisputed and corroborated by the video evidence. *See* Ex. 36 [Video SC08] at 0:26-0:41; Ex. 48 [Video SC02] at 2:36-3:00, 5:45-

5:56; Ex. 65 [Video SC10] at 0:34-0:45. The Court finds from Kheirabadi's testimony and the video evidence that Turkish agents repeatedly hit and punched Kheirabadi, that Turkish agents placed Kheirabadi in apprehension of imminent physical attack, and that Kheirabadi suffered physical injuries and emotional distress as a result.

<u>Kasim Kurd</u>

Plaintiff Kasim Kurd testifies as follows:

While protesting on the sidewalk next to Sheridan Circle, Kurd saw a large group of Turkish agents and others charge across the street, directly at the protestors, including him. They looked enraged and were yelling. Kurd believed the agents and others planned to attack the protestors and was scared for his physical safety. Ex. 18, Kurd. Decl. ¶ 16. He called 9-1-1. *Id.* ¶ 9. Kurd ran toward the opposite side of Sheridan Circle. Agents chased Kurd, but he escaped. Ex. 18, Kurd. Decl. ¶ 17. As Kurd fled, he saw an agent grab his friend Ceren Borazan. *Id.* ¶ 21.

Kurd has experienced emotional distress from the attack, which has manifested in headaches, difficulty sleeping, difficulty concentrating, and difficulty working. Ex. 18, Kurd Decl. ¶ 23.

The Court credits Kurd's testimony, which is undisputed and corroborated by the video evidence. *See* Ex. 18, Kurd Decl., Ex. C; Ex. 48 [Video SC02] at 2:36-2:54; Ex. 36 [Video SC08] at .23-.32; Ex. 45 [Video SC09] at 7:16-7:30; Ex. 56 [Video SC12] at 7:10-7:20. The Court finds from Kurd's testimony and the video evidence that Turkish agents placed Kurd in apprehension of imminent physical attack and that Kurd has suffered emotional distress as a result.

<u>Mehmet Özgen</u>

Plaintiff Mehmet Özgen testifies as follows:

Özgen saw agents running in his direction, yelling. He believed they were going to attack. Ex. 19, Özgen Decl. ¶ 8.

An agent kicked Özgen's leg, causing him to stumble. Ex. 19, Özgen Decl. ¶ 9. Özgen ran toward the edge of Sheridan Circle, to the opposite side from the Ambassador's Residence. At least one agent chased him. He feared for his safety, but was able to escape without further physical harm. *Id.* ¶ 10.

A few moments later, Özgen went toward the side of Sheridan Circle, because he saw his friend Jane Doe II on the ground, being kicked. He wanted to help her, but a police officer directed him away. Ex. 19, Özgen Decl. ¶ 11.

Due to being kicked, Özgen suffered a painful gash to his leg. Ex. 19, Özgen Decl. ¶ 12.

The Court credits Özgen's testimony, which is undisputed and corroborated at least in part by video evidence showing Özgen running from an agent. Although no video appears to have captured agent kicking Özgen, Özgen's testimony on this point is undisputed and under oath, and the Court has no reason to doubt it. The Court finds from Özgen's testimony that a Turkish agent placed him in apprehension of imminent physical attack, that a Turkish agent kicked him, and that Ozgen that he suffered a physical injury and emotional distress as a result.


Mehmet Tankan

Plaintiff Mehmet Tankan testifies as follows:

When the attack began, Tankan was checking social media on his phone. Ex. 20, Tankan Decl. ¶ 11. When Tankan looked up, he saw the pro-Erdogan group racing in his direction. Tankan was scared and expected to be hurt badly. *Id.* ¶ 12.

Armed agents surrounded Tankan. They kicked his body and punched him, including in the head, face, neck, and back. The agents cursed at Tankan in Turkish, "son of a bitch,"

"traitor," and "terrorist." One said, "Your mother is a whore." Agents also threatened Tankan, saying, "We will kill you" and "You will be done." Tankan feared he would die. Ex. 20, Tankan Decl. ¶ 13.

Police officers tried to protect Tankan, including by placing themselves between him and the agents and trying to push the agents away. Despite this, the agents kept hitting Tankan and tried to pull him away from the police. Ultimately, the officers were able to stop the attack.  Ex. 20, Tankan Decl. ¶ 14.

After the police had secured Sheridan Circle, officers took Tankan to an area where his friends Murat Yasa and Lucy Usoyan were sitting. Both were bleeding and appeared to be seriously hurt. Ex. 20, Tankan Decl. ¶ 15.

Tankan suffered physical injuries and emotional distress as a result of the attack, which has manifested in sleeplessness, nightmares, disinterest in social activities, memory loss, and fearfulness. *Id.* ¶¶ 16-17.

The Court credits Tankan's testimony, which is undisputed and corroborated by the video evidence. *See* Ex. 20, Tankan Decl., Ex. A; Ex. 48 [Video SC02] at 3:26-3:50; Ex. 56 [SC12] at 7:25-7:50. The Court finds from Tankan's testimony and the video evidence that Turkish agents repeatedly kicked and punched Tankan, that Turkish agents placed Tankan in apprehension of imminent harm, and that Tankan suffered physical injuries and emotional distress as a result.

<u>Murat Yasa</u>

Plaintiff Yasa testifies as follows:

Yasa saw Turkish agents and civilians sprint past the police, directly at him and the other protestors. He became frightened for his safety. Ex. 21, Yasa Decl. ¶ 12.

An agent hit Yasa from behind, causing him to fall on the grass in Sheridan Circle, behind the sidewalk. As Yasa attempted to stand, another agent and a civilian hit him repeatedly,

causing him to fall again, this time on the sidewalk. Ex. 21, Yasa Decl. ¶ 14. As Yasa lay on the sidewalk, agents Tugay Erkan, Ismail Ergunduz, and Ahmet Dereci kicked him.  Agent Gokhan Yildirim then kicked Yasa's face. *Id.* ¶ 14.

The assailants yelled at Yasa in Turkish, "We are going to show you the power of the Turks" and "We will find and punish you [Kurds], no matter where you are."  Others yelled, "I will fuck your wife," "I will fuck your sister," and "I will fuck your mother." Ex. 21, Yasa Decl. ¶ 15.

The attack ended because police officers pushed the assailants away. Officers helped Yasa sit up.  His face and shirt were covered in blood.  Ex. 21, Yasa Decl. ¶¶ 14, 16;

 Yasa suffered physical injuries and emotional distress as a result of the attack, which has manifested in mental confusion, difficulty sleeping, and memory loss. *Id.* at ¶¶ 17-18.

Plaintiff Arthur also testified that he saw agents knock down Yasa and kick him while he was on the ground. Ex. 9, Arthur Decl., ¶ 15.

The Court credits Yasa's and Arthur's testimony, which is undisputed and corroborated by the video and photographic evidence. *See* Ex. 48 [Video SC02] at 2:39-3:20, 4:17-4:21; Ex. 36 [Video SC08] at 0:26-0:32; Ex. 45 [Video SC09] at 7:28-7:35. The Court finds from Yasa's and Arthur's testimony and the video evidence that Turkish agents repeatedly hit and kicked Yasa, that Turkish agents placed Yasa in apprehension of imminent physical attack, and that Yasa suffered physical injuries and emotional distress as a result.

Plaintiffs will submit their damages evidence in later proceedings. But for now, the Court notes that several Plaintiffs were taken to the hospital and some sustained severe injuries that have required long-term treatment and have had lasting effects. *E.g.*, Ex. 14, Doe II Decl. ¶¶ 17-18; Ex. 21, Yasa Decl. ¶¶ 17-19.

As the Court previously found, "[t]he [second] attack lasted a couple of minutes. Eventually, United States law enforcement officers, including MPD officers, were able to stop the attack. After the attack, Turkish security forces and other Erdogan supporters ripped up the protesters' signs." *Id.*; *see also* Ex. 36 [Video SC08] at 1:22-1:58, 1:41-1:45, 1:50-2:00; *see also* Ex. 48 [Video SC02] at 5:00. At no point before, during, or immediately after the attack did the Turkish security agents question, search, or otherwise investigate any of the protestors. *See* SMF ¶ 44.

**B.    The Social, Political, and Historical Context of the Attack**

Because they are relevant to Plaintiffs' claims, in particular their claims for bias-related crimes, the Court also makes the following findings of fact regarding the historical and political context in which the attack occurred. In making these findings, the Court is aided by the expert reports Plaintiffs submit. The Court finds each of Plaintiffs' expert witnesses to be qualified to opine on the Erdogan government's policies towards the HDP and Turkey's Kurds more generally and finds that each of their opinions are reliably based on the methodologies employed in their respective fields.

The Kurds are the largest ethnic and linguistic minority in Turkey. Since the establishment of the Turkish Republic, minorities have been perceived as a threat to the integrity of the Turkish state. SMF ¶ 178. As a result, "Turkish state oppression of Kurds is longstanding." Ex. 90, Makovsky Decl. at 1. The history has been marked by a series of rebellions followed by massacres, as well as by efforts to marginalize Kurdish culture and political power. SMF ¶ 178. Plaintiffs' experts reported, for example, that Turkey had banned teaching in the Kurdish language, certain Kurdish letters are banned, and people have been detained for wearing shawls in Kurdish colors. Plaintiffs' experts also reported that Kurds have been subjected to racist attacks for speaking in Kurdish, wearing traditional Kurdish clothes, or

listing to Kurdish music, and that bans on peaceful assemblies in Kurdish regions have been enacted.

Plaintiffs' experts explain that the HDP is a pro-Kurdish political party that emphasizes human rights and egalitarianism, including on gender, in its platform. In addition, the experts provided useful information about the background of the HDP, including that it has had high levels of women's representation – 36% of HDP parliamentarians elected were women, even though women make up just 17% of the Turkish parliament overall. Sixty-five percent of female elected mayors were from the HDP.

Plaintiffs' experts testify that the HDP contrasts sharply with President Erdogan's ruling party when it comes to women's issues.  For example, President Erdogan's government has withdrawn from international conventions on violence against women and Turkey has seen an increase in gender-based violence, including, in particular, against Kurdish women.

In 2015, the HDP decided to enter candidates in Turkey's parliamentary election. SMF ¶ 181. The HDP won enough votes to prevent President Erdogan's party from winning a single party majority (after three consecutive victories), thereby threatening Erdogan's consolidation of executive power. SMF ¶ 181. Thereafter, the Erdogan government took steps to dismantle the HDP, including by publicly accusing the HDP of supporting terrorism. SMF ¶ 181. Since 2016, over 10,000 HDP parliamentarians, elected officials and party members have been imprisoned and subjected to political persecution. SMF ¶ 181. More than 80% of HDP officials elected as mayor or parliamentarian have been removed from office. SMF ¶ 181. The best known jailed HDP member is Salahattin Demirtas, a former co-leader of the party. Demirtas was charged with terrorism, separatism, and insulting the president. SMF ¶ 182. The European Court of Human Rights found that Turkey had improperly detained Demirtas for the purpose of limiting political

debate and ordered his release. Turkey has refused to comply with the ECHR ruling and refused to release Demirtas and other political prisoners. *See Selahattin Demirtas v. Turkey (No.2)*, App. No. 14305/17, (Nov. 20, 2018); *Selahattin Demirtas v. Turkey (No.2)*, App. No. 14305/17, (Dec. 20, 2020); *see also* SMF ¶¶ 183-84.

### IV.  CONCLUSIONS OF LAW

The Court's Conclusions of Law proceed in two parts. First, the Court concludes that it has personal-jurisdiction over Turkey and subject-matter over Plaintiffs' claims and that default judgment is otherwise appropriate under Rule 55(b)(2). Second, the Court concludes that each of the claims Plaintiffs pursue herein is supported by evidence satisfactory to the Court.

### A.    Default Judgment is Appropriate Under Rule 55(b)(2)

First, the Court has personal jurisdiction over Turkey. The Plaintiffs served Turkey on February 11, 2019, via diplomatic channels pursuant to the procedures set forth in 28 U.S.C. § 1608(a)(4). *See* ECF No. 49 (return of service). Counsel for Turkey entered an appearance on Turkey's behalf on April 5, 2019. The Amended Complaint was served upon Turkey's counsel via CM/ECF in compliance with Rule 5(b)(2)(E). On June 4, 2019, Turkey filed a motion to dismiss pursuant to Rule 12(b)(1), in which it did not contest the validity of service, thus waiving any challenge to service. *See* Fed. R. Civ. P. 12(h)(1)(B)(i). Accordingly, Turkey has been properly served, which establishes this Court's personal jurisdiction over Turkey. *See* 28 U.S.C. § 1330(b); *see also GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 809 (D.C. Cir. 2012) ("[F]oreign sovereigns . . . are not 'persons' under the Fifth Amendment's Due Process Clause— and thus have no right to assert a personal jurisdiction defense.").

Second, the Court has subject matter jurisdiction over Plaintiffs' claims. 28 U.S.C. § 1330(a) gives the federal district courts subject-matter jurisdiction over any civil damages suit against a foreign sovereign for which the sovereign is not immune. Plaintiffs bring civil damages

claims. *See* Am. Compl., ECF No. 63, at ¶ 271. This Court ruled in *Kurd II* that Turkey does not

enjoy immunity, 438 F. Supp 3d at 89, and the D.C. Circuit affirmed in *Usoyan*, 6 F.4th at 47.

The Court's ruling in *Kurd II* was based on the evidence – and in particular the "the ample video

evidence submitted by the parties." 438 F. Supp. 3d at 75. Because the parties' arguments

regarding immunity largely turned on factual disputes, the Court went "beyond the pleadings and

resolve[d] any disputed issues of fact" necessary to ruling on the motion. *Id.* (quoting *Phoenix*

*Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). The D.C. Circuit likewise

affirmed based on the evidence. The court stated that it also "reviewed video of the altercation"

and found "no clear error" with this Court's finding of the critical facts. *Usoyan*, 6 F.4th at 37.

Accordingly, pursuant to the law of the case and the mandate rule, Plaintiffs have already

established subject-matter jurisdiction "by evidence satisfactory to the court," § 1608(e). and

there is no occasion to revisit that matter here.

Plaintiffs' claims against Turkey are otherwise ripe for default judgment as to liability.

Default is appropriate "when the adversary process has been halted because of an essentially

unresponsive party." *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d

689, 691 (D.C. Cir. 1970). Here, as discussed above, Turkey appears to be in willful default.

Turkey itself, via its Ambassador to the United States, told the Court that Turkey "has chosen not

to participate in the discovery process as recently ordered." Notice, ECF No. 165. Turkey also

has not filed an answer, though one was due, at the latest, on November 14, 2021. *See* Mandate

of USCA, ECF No. 138; *see also* Fed. R. Civ. P. 12(a)(4)(A). Entry of default judgment on

liability is warranted under these circumstances. *See, e.g.*, *Int'l Painters & Allied Trades Indus.*

*Pension Fund v. Zak Architectural Metal & Glass, LLC*, 635 F. Supp. 2d 21, 25 (D.D.C. 2009)

(entering default where defendant's answer was a year overdue and defendant "ha[d] not

responded to either the plaintiffs' request to the Clerk for entry of default or the instant motion for default judgment").

Finally, Turkey received notice the entry of default entered against it and will receive notice of the present motion. The entry of default was entered against Turkey while it was still represented by counsel. *See* Dkt. 122; Minute Order of Oct. 25, 2022. And as the Court has previously indicated it would, the Court provided Turkey a copy of Plaintiffs' motion and will provide Turkey a copy of this memorandum opinion and the accompanying order. *See* Order, ECF No. 180 at 2.

Accordingly, default judgment is appropriate under Rule 55(b)(2).

**B.    Evidence Satisfactory to the Court Supports Plaintiffs' Rights to Relief**

Having concluded that default judgment is appropriate under Rule 55(b)(2), the Court now assesses whether Plaintiffs have established their "right[s] to relief by evidence satisfactory to the court." § 1608(e). The Court concludes they have.

**1.    Assault (Count I)**

In their first count, each Plaintiff brings a claim for common-law assault against Turkey. The Court previously defined assault as:

> [A]n intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim. *Hall v. District of Columbia*, 867 F.3d 138, 158, 432 U.S. App. D.C. 150 (D.C. Cir. 2017) (quoting *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)). In order to state a claim for assault, a plaintiff must show that he suffered apprehension of harmful or offensive contact and that a reasonable person in his position would have experienced such apprehension. *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014).

*Kurd v. Republic of Turkey ("Kurd I")*, 374 F. Supp. 3d 37, 46 (D.D.C. 2019) (ruling on motion to dismiss by certain individual defendants) (internal quotations omitted). Turkey's liability for assaulting each Plaintiff follows easily from the Court's findings of fact.

First, each adult Plaintiff submitted testimony that they suffered an apprehension of

harmful contact, and the Court credited that testimony. Minor Plaintiff C.A. did not submit her own testimony, but the Court found based on the testimony of two other Plaintiffs who observed her, including her father, that she appeared frightened during and immediately after the attack. From this testimony and from the reasonable inference of how a 7-year-old child would respond during an attack like this, the Court found that C.A. feared the agents would attack her.

Second, Plaintiffs' apprehension of a harmful contact is objectively reasonable under the circumstances. Immediately preceding the attack, the agents cursed, made threatening gestures, displayed firearms, and threatened physical violence, before they ultimately pushed their way through the police line, charging towards the Plaintiffs while shouting additional threats, all following a prior physical altercation. These circumstances alone make Plaintiffs' apprehension of harmful contact reasonable. *See, e.g.*, *Dingle v. District of Columbia*, 571 F. Supp. 2d 87, 98-99 (D.D.C. 2008); *Mendonca v. City of Providence*, 170 F. Supp. 3d 290, 299 (D.R.I. 2016) (defendant "lunged at" and "chased" plaintiff); *Jenkins v. D.C.*, 223 A.3d 884, 897 (D.C. 2020) ("[S]imply holding a weapon before another person in a threatening manner can constitute intent-to-frighten assault."); *Raess v. Doescher*, 883 N.E.2d 790, 794 (Ind. 2008) (defendant liable for assault who, "angry at the plaintiff . . . , aggressively and rapidly advanced on the plaintiff with clenched fists, piercing eyes, beet-red face, popping veins, and screaming and swearing at him"); *Johnson v. Bollinger*, 356 S.E.2d 378, 381 (N.C. App. 1987) (defendant liable for assault who "approached plaintiff in an angry and threatening manner while wearing a pistol[,] . . . shook his hand in plaintiff's face[,] and said in a loud voice, 'I will get you.'"). But even beyond those facts, the agents *did* beat most of the protestors. Although a plaintiff need not prove an actual harmful contact to prove assault, at least in this instance it adds to the reasonableness of the Plaintiffs' apprehensions that they too would be beaten or would suffer a

further beating.

Finally, the Court reasonably infers from the evidence that the agents intended to cause each Plaintiff to suffer an apprehension of harmful contact. It is black letter law that a person is presumed to intend the natural consequences of his acts. *E.g.*, *United States v. Grider*, 2022 WL 17829149, at *3 (D.D.C. 2022). The natural consequence of the agents' charge through the police line while shouting threats and curses was to cause the protestors to fear imminent physical harm.

Accordingly, evidence satisfactory to the Court demonstrates that Turkey's agents assaulted each Plaintiff.

### 2.    Battery (Count II)

In their second count, each Plaintiff except for C.A. and Kasim Kurd brings a claim for common-law battery against Turkey.[5]

As this Court previously held, "[u]nder District of Columbia law, a battery is an intentional act that causes harmful or offensive bodily contact." *Kurd I*, 374 F. Supp. 3d at 48 (citing *Magliore v. Brooks*, 844 F. Supp. 2d 38, 44 (D.D.C. 2012)) (internal quotations omitted). Bodily contact is "harmful" if it "results in 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 123 (D.D.C. 2012) (quoting Restatement (Second) of Torts § 13)). Even somewhat minimal intentional contact, when offensive, constitutes battery. *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 17 (D.D.C. 2014) (plaintiff's allegations of being struck, including in jaw, stated claim for battery); *Daniels v. District of Columbia*, 894 F. Supp. 2d 61, 67 (D.D.C. 2012)

---

[5] C.A. does not allege any agent made physical contact with her. Kurd alleged he was battered during the initial altercation but does not pursue that claim as to Turkey in the present motion.

(getting "pushed, shoved, and jerked" constituted battery); *Rogers v. Loews L'Enfant Plaza Hotel*, 526 F. Supp. 523, 529 (D.D.C. 1981) (touching that included pulling hair was proper basis of battery claim).

The Court again has no trouble concluding from its findings of fact that all twelve of the Plaintiffs pursuing a battery claim in the present motion have proved their right to relief for their battery claims by evidence satisfactory to the Court. Each of these twelve plaintiffs testified that a Turkish agent punched or kicked them at least once – some of them many times and quite brutally. The Court credited that testimony, which is mostly corroborated by the video evidence. To briefly recap, the Court finds that Turkey's agents:

- repeatedly punched Stephen Arthur, including in the head, and kicked him;

- hit Heewa Arya in the face, knocked him down, and repeatedly kicked him while was on the ground;

- kicked Abbas Azizi in the chest, knocking him down, then kicked him repeatedly, including in the face, before punching him again as he tried to get up;

- grabbed Ceren Borazan in the neck, put her in a chokehold, twisted her arm behind her back, pulled her hair, hit her in the head, threw her to the ground, and kicked her;

- knocked Elif Genc to the ground and then additional agents kicked and hit her;

- grabbed Jane Doe I and punched her in the neck and ear and kicked her in the leg;

- punched Jane Doe II in the back of the head, grabbed and puller her by the hair and kicked her head, and then another agent kicked her while she was on the ground;

- kicked Jane Doe III at least once in the back and the head;

- hit Jalal Kheirabadi, then grabbed him and punched him until he fell, and then other agents repeatedly punched and kicked him after he got up;

- kicked Mehmet Özgen in the leg;

- repeatedly kicked and punched Mehmet Tankan in the head, face, neck, and back;

- repeatedly hit and kicked Murat Yasa, twice knocking him to the ground.

*See supra* Part III.A.4.

Each of these contacts is plainly harmful, and the Plaintiffs each submit testimony that it caused them pain and physical injuries – some severe and lasting. The Court credits this testimony. *See supra* Part.III.4.

Finally, the Court infers from the testimony and video evidence that each of these harmful contacts was intentional. *See Grider*, 2022 WL 17829149, at *3.

Accordingly, evidence satisfactory to the Court establishes that Turkey's agents battered each of these Plaintiffs.

## C.    False Imprisonment (Count III)

In her third count, Ceren Borazan brings a claim for common-law false imprisonment against Turkey arising from a Turkish agent's chokehold.

False imprisonment is "the unlawful detention of a person without a warrant or for any length of time whereby he is deprived of his personal liberty or freedom of locomotion." *Tocker v. Great Atlantic & Pacific Tea Co.*, 190 A.2d 822, 824 (D.C. 1963). False imprisonment may be proven by evidence of "a restraint against plaintiff's will, as where she yields to force, to the threat of force or to the assertion of authority." *Faniel v. Chesapeake and Potomac Telephone Co. of Maryland,* 404 A.2d 147, 151-52 (D.C. 1979). One is liable for false imprisonment when, "by acts or words, one directs, requests, invites or encourages the unlawful detention of another." *Smith v. District of Columbia*, 399 A.2d 213, 218 (D.C. 1979). "Confinement, no matter how brief, suffices to establish a prima facie case of false arrest [or imprisonment]." *Marshall v. District of Columbia*, 391 A.2d 1374, 1381 (D.C. 1978).

The plaintiff's only burden is to show a nonconsensual detainment. *See Marshall*, 391

36

A.2d at 1380 (The "lack of legal authority or justification is not part of plaintiff's affirmative case; rather, these are defenses to be raised and proved by the defendant."). Thereafter, the "presumption of unlawful restraint…shifts to defendant the burden of justifying the restraint as lawful." *Clarke v. District of Columbia*, 311 A.2d 508, 511 (D.C. 1973). If a defendant fails to rebut a prima facie case of false imprisonment by presenting a lawful basis therefore, the plaintiff is entitled to judgment. *Id.*

As discussed above, the Court finds that a Turkish agent wrapped one arm tightly around Borazan's neck and put her in a chokehold, and then with his other hand grabbed her wrist and twisted her arm behind her back. The Court finds that this was a nonconsensual confinement and is sufficient for Borazan to establish a prima facie case of false imprisonment. Because Turkey has not asserted a lawful basis for confining Borazan, it cannot rebut her prima facie case.

Accordingly, evidence satisfactory to the Court demonstrates that Turkey's agent falsely imprisoned Borazan.

**D.    Intentional Infliction of Emotional Distress (Count IV)**

In their fourth count, Plaintiffs Arya, Azizi, Borazan, C.A., Doe II, Doe III, Genc, Kheirabadi, Kurd, Tankan, and Yasa bring claims for common-law intentional infliction of emotional distress against Turkey. The Court previously set forth the elements of intentional infliction of emotional distress:

> In order to state a claim for intentional infliction of emotional distress, a plaintiff must allege (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff [to suffer] severe emotional distress. *Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163 (D.C. 2013). Extreme and outrageous conduct is defined as conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.* Conduct will be sufficient to sustain a claim for intentional infliction of emotional distress if the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" *Id.*

*Kurd I*, 374 F. Supp. 3d at 53 (cleaned up).

The Court has likewise held as a matter of law that the conduct Plaintiffs alleged amounts

to extreme and outrageous behavior:

> these actions occurred during an attack which included "Turkish government agents, in America's capital, to stifle the First Amendment rights of people protesting the treatment of a minority group in Turkey." Highlighting the extreme and outrageous nature of Defendants' alleged actions, following the attack, 40 members of the United States Congress sent a letter to then-Attorney General Jeff Sessions and then-Secretary of State Rex Tillerson expressing their "outrage over the remorseless acts of violence inflicted upon individuals exercising their Constitutionally-protected First Amendment right to free speech In addition, 20 members of the United States Senate sent a similar letter to then-Secretary of State Tillerson.
>
> . . . . .
>
> Plaintiffs allege that they were engaging in a peaceful protest over Turkey's treatment of its Kurdish minority and President Erdogan's other repressive policies. Plaintiffs claim that, during this protest, Defendants yelled threats and ethnic slurs at them. Plaintiffs further allege that Defendants twice pushed past law enforcement in order to repeatedly physically attack the protesters.

*Kurd I*, 374 F. Supp. 3d at 53-54 (citations omitted).

Plaintiffs' evidence corroborates these allegations. As the Court has found, Plaintiffs

were in Washington, D.C., peacefully protesting Turkey's treatment of its Kurdish minority

population and President Erdogan's other repressive policies. *Supra* Part III.A. Turkey's agents

yelled threats and ethnic slurs at them and then pushed past law enforcement to physically attack

them. *Id.* Plaintiffs submit the letters from the State Department and members of Congress

publicly condemning the attack. *See* Exs. 86, 87, 88, 92.

Pursuant to the Court's holding in *Kurd I*, this evidence accordingly suffices to show

extreme or outrageous behavior. Other courts have likewise found that the unprovoked beating of

an unarmed individual rises to the level of "outrageous" conduct, especially when the perpetrator

is an armed state officer. *See McKnight v. D.C.*, 412 F. Supp. 2d 127, 137 (D.D.C. 2006) ("[A]

reasonable jury could find that kicking an unarmed young man, who was laying on the ground after having been shot without justification" by a police officer, was outrageous conduct); *see also, e.g.*, *Brown v. Bettinger*, 2019 WL 8892623, *4 (S.D. Fla. 2019) (applying and citing multiple cases for this proposition); *Alexander v. Newman*, 345 F. Supp. 2d 876, 888 (W.D. Tenn. 2004) ("Unprovoked beatings by officials who are hired to protect and serve the community could certainly be deemed [outrageous]."). Indeed, Turkey's brutal and coordinated attack on unarmed protestors satisfies this prong "easily" because it was "intended to cause the highest degree of emotional distress… in [the] targeted audience." *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009) (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)).

The agents' intent or recklessness with respect to Plaintiffs' emotional wellbeing can be inferred "from the very outrageousness of [their] conduct." *Kotsch v. D.C.*, 924 A.2d 1040, 1046 (D.C. 2007) (citing *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980)). Turkish agents called protestors "whore," Ex. 16, Genc Decl. ¶ 11, threatened to "fuck" their female family members, Ex. 21, Yasa Decl. ¶ 15, and hurled racial slurs calculated to cause emotional harm. *See supra* Part III.A.2; *see also, e.g.*, SMF ¶¶ 19-20 (agents yelled, "I am going to take that flag to put in your mom's pussy" and "die fucking Kurds," among numerous other anti-Kurdish and misogynistic threats and taunts); SMF ¶ 19 (agents yelled "We will find and punish you [Kurds], no matter where you are."); *cf. Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1042 (D.C. 2015) (publicizing civil complaint containing sexually explicit language in part to trigger professional licensure investigations "may reasonably be regarded as so extreme and outrageous" (quoting *Drejza v. Vaccaro*, 650 A.2d 1308, 1316 (D.C. 1994))). Small children like Plaintiff C.A. were present at the attack. Ex. 10, Arya Decl. ¶ 9, 18; Ex. 15, Jane Doe III Decl. ¶ 9.

Moreover, D.C. police officers stationed at Sheridan Circle tried to prevent and then stop the attack, putting Turkey's agents on-notice to the fact that their actions were unacceptable. *See* SMF ¶¶ 30. Put simply, "any reasonable person would have known that emotional distress . . . would result" from Turkey's brutal and coordinated attack on peaceful protestors. *Waldon*, 415 A.2d at 1077 (cleaned up).

The Court further finds that the agents' actions inflicted severe emotional distress "of so acute a nature that harmful physical consequences might be not unlikely to result." *Kostch v. D.C.*, 924 A.2d 1040, 1046 (D.C. 2007) (internal quotation marks and citation omitted). As discussed above, each Plaintiff pursuing an emotional distress claim has testified that they experienced some sort of physical consequences, and the Court has credited their testimony.

To summarize, the Court finds that:

- Plaintiff Arya has experienced irritability, disinterest in social activities, difficulty sleeping, difficulty concentrating.

- Plaintiff C.A., who was seven at the time of the attack, expressed notable fearfulness after the attack.

- Plaintiff Azizi has experienced depression, anxiety, and difficulty sleeping and concentrating.

- Plaintiff Borazan has experienced difficulty concentrating, nightmares, fear, depression, and hopelessness.

- Plaintiff Doe II has experienced headaches, difficulty sleeping, irritability, loss of interest in social activities, anxiety, stress, and difficulty concentrating.

- Plaintiff Doe III has experienced difficulty sleeping, nightmares, depression, disinterest in seeing friends and other normal life activities.

- Plaintiff Genc has experienced nightmares, fearfulness, and difficulty concentrating.

- Plaintiff Kheirabadi has experienced reduced appetite, nightmares, difficulty sleeping, fearfulness, severe anxiety, and headaches.

- Plaintiff Kurd has experienced headaches, difficulty sleeping, difficulty concentrating, and difficulty working.

- Plaintiff Tankan has experienced sleeplessness, nightmares, disinterest in social activities, memory loss, and fearfulness.

- Plaintiff Yasa has experienced post-traumatic stress disorder, manifesting in symptoms like mental confusion, difficulty sleeping, and memory loss.

*See supra* Part III.A.4; *see also* Ex. 29, Gordon Decl.

Accordingly, evidence satisfactory to the Court demonstrates that Turkey's agents intentionally inflicted emotional distress upon Plaintiffs Arya, Azizi, Borazan, C.A., Jane Doe II, Jane Doe III, Genc, Kheirabadi, Kurd, Tankan, and Yasa.

**E.    Bias-Related Crimes (Count V)**

D.C. Code § 22-3704, permits a civil action by "any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, family responsibilities, homelessness, disability, matriculation, or political affiliation of a victim of the subject designated act." D.C. Code § 22-3704; *see also Kurd I*, 374 F. Supp. 3d at 42-46 (citing D.C. Code § 22-3704).

Both assault and battery qualify as predicate offenses under the statute. *Kurd I*, 374 F. Supp. 3d at 42-46; *Aboye v. United States*, 121 A.3d 1245, 1249-50 (D.C. 2015) ("the term 'designated act' in D.C.Code § 22–3701(2) means any criminal act recognized under D.C. law, including the offense of threats to do bodily harm"); see also D.C. Code § 22-3701(2) (liability extends to "attempting, aiding, abetting, advising, inciting, conniving, ...."). Liability is not dependent on the existence of a criminal prosecution for the designated act. *Kurd I*, 374 F. Supp. 3d at 56-57 (citing D.C. Code § 22-3704(a)).

Courts have found that demonstration of "an accused's prejudice" is satisfied by evidence

that the accused shouted, for example, ethnic or homophobic slurs before or during an alleged assault. *E.g., Lucas v. United States*, 240 A.3d 328, 348 (D.C. 2020) (sufficient evidence included "volume and duration of homophobic taunts, the temporal proximity between the comments and the assault, and the gravity of the physical encounter" (citing *Kurd I*, 374 F. Supp. 3d at 59)); *Aboye v. United States*, 121 A.3d 1245, 1248 (D.C. 2015) (evidence that appellant used the word "fa\*\*\*t" and made statements such as "Look at those fa\*\*\*ts," in a conversation with a third party prior to threatening his neighbors was sufficient to uphold conviction); *Shepherd v. United States*, 905 A.2d 260, 263 (D.C. 2006) (trial court's finding "was amply supported by evidence" that perpetrator "accompanied his assaults on the two women with a verbal stream of homophobic insults"). For example, in *Shepherd*, the perpetrator "used his left forearm and shoulder to hit one of the woman in the chest, as he said, "you fucking dikes, get off the sidewalk." *Shepherd v. United States*, 905 A.2d 260, 261–62 (D.C. 2006). Bias need not be the only motivation for the attack – "additional motives like anger or revenge" can also be present. *Lucas v. United States*, 240 A.3d 328, 349 (D.C. 2020).

The Court has already concluded that satisfactory evidence demonstrates that each Plaintiff was the victim of an assault and that 12 of the 14 Plaintiffs were victims of a battery. *Supra* Parts IV.A. and IV.B. The Court further finds that satisfactory evidence demonstrates that the assault and batteries were motivated by prejudice based on ethnicity/national origin, political affiliation, and gender.

At the motion to dismiss stage, the Court found that the allegations in the Complaint demonstrated "'prejudice based on' the protester's Kurdish identity and anti-Erdogan political affiliation." *Kurd v. Republic of Turkey ("Kurd I")*, 374 F. Supp. 3d 37, 59 (D.D.C. 2019). The evidence Plaintiffs have presented in support of the present motion corroborates the Plaintiffs'

allegations. The Court has found that the Plaintiffs were holding Kurdish flags and scarves in Kurdish colors; signs announcing their affiliation with the HDP, a pro-Kurdish political party that is an electoral rival of President Erdogan, including signs calling for the release of HDP leaders jailed in Turkey; signs criticizing the oppression of Kurds by President Erdogan; and signs indicating political opposition to President Erdogan. *See* Part III.A.2. For example, Plaintiffs Genc and Tankan had signs calling for the release of Selahattin Demirtas, a leader of the HDP party who has been imprisoned in Turkey since 2016. *Id.* Plaintiff Kheirabadi held a sign that said "Destroyed Kurdish Cities.  Erdogan is a War Criminal."  *Id.*  Plaintiff Jane Doe II held a shawl that was yellow, red and green – colors that are culturally associated with Kurds. Plaintiffs Arthur and Arya also held flags with those colors. *Id.* Plaintiff Yasa and others chanted slogans like "Erdogan, stop killing Kurdish Children." *Id.*

The Court also takes into account Plaintiffs' expert reports demonstrating that discrimination against Kurds, the largest minority in Turkey, is "longstanding." *Supra* Part III.B. Plaintiffs' experts explained that Kurds are subjected to racist attacks and even detention for speaking Kurdish, wearing Kurdish colors or listening to Kurdish music; that the Kurdish language and other expressions of Kurdish identity were banned for years, and that bans continue on assemblies in Kurdish regions. *Id.* Advocacy for Kurdish rights has resulted in prosecutions and criminal charges. *Id.*

Plaintiffs' experts also explained that the HDP is a pro-Kurdish political party that siphoned votes away from President Erdogan's ruling party and threatened his one-party control. *Supra* Part III.B. As result, the Erdogan government has sought to dismantle the HDP. *Id.* It has accused its members of terrorism and removed elected HDP mayors and parliamentarian from office, imprisoning over 10,000 HDP officials, including the leader of the HDP, Selahattin

Demirtas, whose release Plaintiffs were calling for at Sheridan Circle. *Id*.

This historical background and context informs the agents' actions at Sheridan Circle. Before and during the attack, the Turkish security agents shouted ethnic slurs and threats targeted at Plaintiffs' Kurdish identity, including "die, fucking Kurds," "fuck you, Kurds," "Kurdish sons of bitches" "we are going to show you the power of the Turks," and "we will find and punish you [Kurds] no matter where you are." *Supra* Parts III.A.2, III.A.4. The Turkish agents called the Plaintiffs "traitors" and "dogs." *Supra* Part III.A.2. The Turkish agents repeatedly and loudly threatened the Plaintiffs, directly disparaging their Kurdish identity and Kurdish political affiliation both immediately prior and during their attack.[6] The content, volume and duration of these taunts, the temporal proximity between the comments and the attack (the threats and slurs continued during the assault) and the gravity of the attack (plaintiffs were repeatedly kicked, punched and battered, resulting in severe injuries), persuades the Court that the agents were motivated, at least in part, by anti-Kurdish animus. *See, e.g., Lucas*, 240 A.3d at 348; *Aboye*, 121 A.3d at 1248; *Shepherd*, 905 A.2d at 263.

In addition, as further evidence of their motivation, after the attack the Turkish security agents ripped up the protestor's signs – in particular signs that advocated for the release of HDP political prisoners and for Kurdish causes – and threw them on the ground. *Kurd II*, 438 F. Supp. 3d at 78; *supra* Part III.A.4. The Court infers from this evidence that the agents were also

---

[6] Although Plaintiffs are not always able to identify exactly who said what, the Court finds from the testimony that at least some of these anti-Kurdish slurs and threats were shouted by Turkish agents (as opposed to civilians). *See, e.g.*, Ex. 10, Arya Decl. ¶ 8 ("I heard people from the group of agents and allied civilians yelling loudly, in English and Turkish, including, "fuck you, Kurds," "Armenian bastards," and "die, fucking Kurds." There were both agents and civilians were yelling."); Ex. 11 ¶ 7 ("Both agents and civilians were shouting loudly and repeatedly"); Ex. 15, Jane Doe III Decl. ¶ 8 ("The agents shouted derogatory curses and words about Kurds.").

motivated, at least in part, by Plaintiffs' actual or perceived anti-Erdogan political beliefs, and political affiliation with the HDP.

In addition, as Plaintiffs' experts further explain, Kurdish women have been particularly targeted for persecution and arrest. *See* Part III.B.  In part, this is due to the prominent role of women in the HDP, which contrasts sharply with President Erdogan's political party which withdrawn from international treaties meant to tackle violence against women and presided over an increase in police violence against women. *Id.* Accordingly, gender-based violence is inherently intertwined with political violence against actual or perceived HDP members. In addition to the anti-Kurdish slurs discussed above, the agents before and during the attack interspersed their threats with sexist terms and phrases otherwise indicative of gender-based violence. *Supra* Parts III.A.3-4. For example, Turkish agents threatened to sexually assault (and kill) the female Plaintiffs and called them whores and bitches. *Id.* The agents yelled "motherfucker, we did your mom and sister in Turkey," "I'm going to take that [Kurdish] flag to put in your mom's pussy," "your mother is a whore," "I will fuck your wife," "I will fuck your sister," and "I will fuck your mother" while attacking the Plaintiffs. *Id.* The Turkish security agent who placed Ceren Borazan in a chokehold told her "You're dead, bitch," "You're going to get more" and "you haven't had enough yet."  SMF ¶¶ 84-85.  This evidence demonstrates that the Turkish agents were motivated, at least in part, by animus based on gender, as well as by animus based on political affiliation.[7]

---

[7] Plaintiffs did not plead sex specifically as a basis for their bias-related crimes claims. The Court concludes Plaintiffs were not required to do so. They pleaded bias-related crimes and sufficient facts to show that the attack was motivated in part by the agents' anti-women bias. *See* Dkt. 63, Am. Compl., at ¶¶ 65, 76, 92, 127, 129-30, 135, 142, 154, 160, 163, 168, 181. This is enough. *See Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014). Alternatively, the Court finds that amendment is appropriate under both Federal Rule of Civil Procedure 15(a)(2) and 15(b)(1), and

Accordingly, evidence satisfactory to the Court demonstrates that Turkey's agents committed bias-related crimes against each Plaintiff.

## F.    Turkey's Vicarious Liability

Finally, the Court concludes that Turkey is vicariously liable for the torts its agents committed during the attack. This Court ruled in *Kurd II* that "[t]he events at issue, including the use of force, occurred while the Turkish security forces were engaged in their employment of providing security for President Erdogan." *Kurd II*, 438 F. Supp. 3d at 80. This ruling is supported by satisfactory evidence.

Courts in D.C. "apply the scope-of-employment test very expansively" – so much so that it "often is akin to asking whether the defendant merely was on duty or on the job when committing the alleged tort." *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008) (Kavanaugh, J.). "Even a servant's unauthorized intended tortious acts are within the scope of employment if they are 'done in connection with the servant's employment' and 'not unexpected in view of the duties of the servant.'" *Doe v. Exxon Mobil Corp.*, 573 F. Supp.2d 16, 27 (D.D.C. 2008). The test is met if a tortious act is committed even only in part to serve the tortfeasor's employer. *See, e.g.*, *Blair v. District of Columbia*, 190 A.3d 212, 226 (D.C. 2018) ("To come within that scope, an employee's actions need not be wholly in furtherance of the employer's business."). Thus, "if the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge." *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014)

---

that the amended complaint would not require service on Turkey. *See, e.g.*, *See Maalouf v. Islamic Republic of Iran*, 514 F. Supp. 3d 280, 286 (D.D.C. 2021); *see also NAACP Legal Def. & Educ. Fund, Inc. v. Wilkinson*, 2021 WL 723993, at *12 & n.8 (D.D.C. 2021) (granting amendment under Rule 15(b)(1) during summary judgment briefing).

(quoting *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 (D.C. 2000)); *see also, e.g.*, *Lyon* 533 F.2d at 655.

The use of force is "not unexpected" when the tortfeasor's job duties create the "possibility of confrontation." *Hicks v. Office of the Sergeant at Arms for the U.S. Senate*, 873 F. Supp. 2d 258, 269 (D.D.C. 2012). As the Court has already held, when "security forces" are employed, "the use of some degree of force is not unexpected." *Kurd II*, 438 F. Supp. 3d at 80; *see also, e.g.*, *Steele v. Meyer*, 964 F. Supp. 2d 9, 20 (D.D.C. 2013) (presence of "armed Military Police Officers" during meeting "points to the conclusion that the possible need for the use of force was anticipated").

In light of the breadth of this test, courts in D.C. have often concluded that heinous acts were committed in the scope of employment. *See Harbury*, 22 F.3d at 422 (torture and extrajudicial killing); *Lyon v. Carey*, 533 F.2d 649, 654 (D.C. Cir. 1976) (rape during a furniture delivery); *Doe*, 573 F. Supp. 2d at 27-28 (sexual assault, torture, and extrajudicial killings); *Brown*, 782 A.2d at 758 (sexual abuse of a minor); *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (shooting a laundromat customer). Turkey is similarly liable here for the heinous acts of its agents, committed while on duty during President Erdogan's visit to the United States.

Here, Plaintiffs submit expert testimony showing that the Turkish government has a policy of silencing violently silencing those who speak in favor of Kurdish rights – especially the HDP and its supporters. Plaintiffs' experts also show that President Erdogan's security guards have repeatedly engaged in similar attacks on protestors during foreign visits. SMF ¶ 163. In *Miango*, the court found allegations that members of Congolese President Joseph Kabila Kabange's presidential security detail had previously committed violence against Congolese dissidents was sufficient to show that they were acting within the scope of their employment

when they assaulted a group of peaceful protestors. *Miango*, 288 F. Supp. 3d at 125. Furthermore, the conduct need only be "incidental" to the employee's duties. *See Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.D.C. 2006). "Conduct is incidental if it is foreseeable." *Hicks v. Office of the Sergeant at Arms for the U.S. Senate*, 873 F. Supp. 2d 258, 265 (D.D.C. 2012). And the foreseeability inquiry "is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf." *Id.* (quoting *Wilson v. Libby*, 498 F. Supp. 2d 74, 97-98 (D.D.C. 2007)).

The Court finds that here, as in *Miango*, the conduct of Turkey's agents was foreseeable. The Court further finds that Turkey's agents launched the attack, at least in part, to serve the ends of the Turkish government. Plaintiffs' experts demonstrate that it is the policy of the Erdogan regime to silence dissent, especially dissent on matters of Kurdish rights and dissent expressed by HDP supporters. *Supra* Part III.B.

## V. **CONCLUSION**

For the reasons explained above, the Court concludes that Defendant Turkey is liable for the claims asserted against it by Plaintiffs. Accordingly, the Court GRANTS Plaintiffs' motion. Turkey liable to Plaintiffs for their claims. By separate order the Court will schedule a conference to discuss damages proceedings.

An appropriate Order accompanies this Memorandum Opinion.


_____                    _____
Date                                    UNITED STATES DISTRICT COURT JUDGE