## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KASIM KURD, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>REPUBLIC OF TURKEY, *et al.*,<br><br>Defendants. | Case No. 18-cv-1117-CKK-ZMF/MJS |

## REPORT AND RECOMMENDATION

On May 16, 2017, a group of Turkish security officials attacked a small crowd of protesters outside the Turkish Ambassador's residence in Washington, D.C. Those events spawned two separate lawsuits seeking to hold the Republic of Turkey accountable for the conduct of its agents under the Foreign Sovereign Immunities Act ("FSIA"). After losing its bid for dismissal on sovereign immunity grounds in both cases, Turkey decided it would no longer participate in the lawsuits and defaulted. Now, the fourteen plaintiffs in this action—Kasim Kurd, Stephen Arthur, Heewa Arya and his minor daughter, C.A., Abbas Azizi, Ceren Borazan, Jane Doe I, Jane Doe II (Hulya Kartal),[1] Jane Doe III, Elif Genc, Jalal Kheirabadi, Mehmet Özgen, Mehmet Tankan, and Murat Yasa—ask the Court to enter default judgment against Turkey as to liability on their claims.[2] The motion is referred to the undersigned for a report and recommendation. Concluding that

---

[1] "Jane Doe II" recently advised that she no longer wishes to proceed pseudonymously but instead by her real name, Hulya Kartal. (ECF No. 334.) The Court now refers to Ms. Kartal and her claims accordingly.

[2] The other case is *Usoyan v. Republic of Turkey*, No. 18-cv-1141-CKK-MJS, through which another group of plaintiffs pursue similar claims against Turkey. The *Usoyan* plaintiffs likewise seek default judgment against Turkey, and the Court is issuing its report and recommendation on that motion today, too. Because both cases arise from the same core set of facts, rely on similar (and sometimes overlapping) evidence, and pursue many of the same legal claims, the Court's rulings mirror each other in some respects. But the Court assessed each case individually in its own right.

Plaintiffs have established liability for the claims they pursue, the undersigned **RECOMMENDS** that Plaintiffs' motion for default judgment against Turkey (ECF No. 241) be **GRANTED**.

## BACKGROUND

The events giving rise to this action have been described at length elsewhere. *Usoyan v. Republic of Turkey* ("*Usoyan II*"), 6 F.4th 31 (D.C. Cir. 2021); *Usoyan v. Republic of Turkey* ("*Usoyan I*"), 438 F. Supp. 3d 1 (D.D.C. 2020); *Kurd v. Republic of Turkey* ("*Kurd II*"), 438 F. Supp. 3d 69 (D.D.C. 2020); *Kurd v. Republic of Turkey* ("*Kurd I*"), 374 F. Supp. 3d 37 (D.D.C. 2019). So, for background purposes, the Court repeats here only what is germane to this motion, with additional details layered into its analysis below as relevant to specific issues.

## I.      Factual Background[3]

On May 16, 2017, Turkish President Recep Tayyip Erdogan met with then-President Donald Trump at the White House. Across the street in Lafayette Square, a large group gathered to protest President Erdogan. The protesters held signs, voiced chants, and wore apparel that expressed their disagreement with President Erdogan and his treatment of the Kurdish people.

After the White House meeting, some of the protesters continued to President Erdogan's likely next location: the Turkish Ambassador's residence located at Sheridan Circle in Northwest D.C. Ultimately, around twenty people—*i.e.*, the anti-Erdogan group, which included all the Plaintiffs—gathered in protest on the Sheridan Circle sidewalk across from the Ambassador's residence. On the other side of the street, on the sidewalk directly in front of the Ambassador's

---

[3] The Court derives these facts from the declarations attached to Plaintiffs' motion for default judgment, as well as video footage of the relevant events. The Court cites to the videos with the file names used by the parties (*e.g.*, "SC01") followed by the specific timestamps associated with the relevant footage (*e.g.*, "0:01–0:30"). Notably, Turkey itself introduced most of this video footage under seal with its original motion to dismiss (as "Exhibit 6," at ECF No. 90-6), and Plaintiffs point back to many of those same video excerpts here. Finally, the Court at certain points references some of the evidence submitted by the parties in *Usoyan*, which the Court denotes accordingly (*i.e.*, "*Usoyan*, ECF No. ##").

residence and facing the protesters, was a larger crowd of people gathered to support President Erdogan. This counterprotest—*i.e.*, the pro-Erdogan group—comprised both civilians and official Turkish security forces, including members of the Turkish presidential security detail and the Turkish national police. Each side voiced strong disagreement with the other. Between them stood law enforcement—including members of the D.C. Metropolitan Police Department, the U.S. Secret Service, and the U.S. Diplomatic Security Service—creating a barrier and attempting to keep the peace. (ECF No. 241-2, Statement of Facts ("SoF") ¶ 28.)

*The First Altercation*. Before long, the two groups became increasingly agitated. Participants from both sides stepped off the sidewalk and into the street, and around 4:05 PM, a brief physical altercation broke out. (*See* Video, SC02 at 0:14–1:30.) Participants from both sides threw punches, kicks, and objects. (*See id.*) The scuffle was short-lived before law enforcement separated the groups and instructed them to remain on their respective sidewalks. (*See* Video, SC02 at 0:54–1:37; SC03 at 0:00–0:37; *see also* SoF ¶ 25.)

Law enforcement then reconstituted their physical barrier, and additional officers on motorcycles arrived and formed a second barrier of police vehicles. (*See, e.g.*, Video, SC03 at 0:10–0:13, 0:31–35; SC12 at 20:26–20:41; *see also* SoF ¶ 29.) The anti-Erdogan group continued holding their signs, chanting, and generally expressing their disapproval of President Erdogan and of Turkey's treatment toward the Kurdish people. For the most part, they remained on the Sheridan Circle sidewalk. (Video, SC03 at 0:10–0:13, 0:28–0:35.) By contrast, the pro-Erdogan group— which, again, included Turkish security officials—started encroaching into the street once more, shouting at the protesters and urging law enforcement to remove them before President Erdogan arrived. (Video, SC09 at 0:50–2:15, 2:40–3:10.)

*The Second Altercation.* President Erdogan's vehicle pulled into the entrance of the Ambassador's Residence around 4:10 PM. (*See* SoF ¶ 47.) Erdogan remained in the vehicle for a few minutes and was seen speaking with the head of the Turkish security forces. Soon after, the pro-Erdogan group—with Turkish security officials among them—broke through the law enforcement barrier and rushed the protesters. (Video, SC02 at 2:36–2:50 & SC09 at 7:15–7:25; *see also* SoF ¶ 36.) Plaintiffs suggest, based on circumstantial evidence, that President Erdogan may have directed the attack. (*See* SoF ¶¶ 47–51; *Usoyan*, ECF No. 127 at 14.)[4] In any case, the protesters were on the Sheridan Circle sidewalk and behind a police barricade when the pro-Erdogan group suddenly charged them. (*Id.*) Some protesters immediately fell, while others attempted to run; none of them rushed forward. (*See* Video, SC02 at 2:45–5:03, SC08 at 0:25–2:26, SC09 at 7:29–7:40 & SC10 at 0:30–0:57.) The pro-Erdogan group—including members of the Turkish security forces—struck and kicked fallen protesters as they laid on the ground, and they chased and attacked other protesters as they ran and tried to flee. (*See id.*; *see also, e.g.*, ECF No. 241-4 at 70–73 ("Azizi Decl.") ¶ 12; ECF No. 241-4 at 75–78 ("Borazan Decl.") ¶¶ 13–16; ECF No. 241-4 at 85–89 ("Kartal Decl.") ¶ 14; ECF No. 241-4 at 127–130 ("Yasa Decl.") ¶ 14.)[5]

Law enforcement on the scene tried to protect the protesters. They ordered the attackers to cease (*see* Video, SC02 at 2:33–5:02 & SC08 at 0:20–2:30), and they put themselves between the attackers and the protesters (*see id.*, SC02 at 2:50–3:00; Kartal Decl. ¶ 15). But despite their efforts, they were unable to immediately halt the attack.

---

[4] Briefing citations are to the page numbers assigned by the Court's electronic case-filing system.

[5] Plaintiffs submitted all their exhibits, including their declarations, in two omnibus attachments. (*See* ECF No. 241-4 (containing Exs. 1–46); ECF No. 241-5 (containing Exs. 47–97).) All of Plaintiffs' declarations are contained in the former attachment. For specificity's sake, the Court's citations to Plaintiffs' declarations in the first instance will include pincites for the entire page range of the declaration along with the cited paragraph number(s), *i.e.*, "ECF No. 241-4 at 70–73 ("Azizi Decl.") ¶ 7." The Court's subsequent citations to those declarations will simply reference them by name and paragraph, *i.e.*, "Azizi Decl. ¶ 7."

At some point during the fray, President Erdogan exited his parked vehicle, paused a moment seemingly to observe, and then entered the Ambassador's Residence. (Video, SC10 at 0:00–1:52.) At no point did the Turkish security forces "detain, question, search, or otherwise investigate any of the protesters before, during, or immediately after the attack." *Kurd II*, 438 F. Supp. 3d at 78. (*See also* SoF ¶ 44.) Instead, the Turkish security forces, along with others in the pro-Erdogan group, proceeded to collect and rip up the protesters' signs. (*See* Video, SC08 at 1:42–2:00.) Many of the protesters ended up in the hospital because of the attack.

## II.    Procedural Background

Plaintiffs in this case filed suit against the Republic of Turkey on May 10, 2018. (ECF No. 1.) In keeping with the procedure prescribed by 28 U.S.C. § 1608(a), Plaintiffs eventually, and successfully, served Turkey through diplomatic channels. (*See* ECF Nos. 37, 40, 42, 43 (affidavits requesting effectuation of service); ECF No. 49 (return of service).)

Plaintiffs also sued several private individual defendants—not members of the official Turkish security forces—who they allege participated in the attacks. While Plaintiffs worked through the steps to properly serve Turkey, the individual defendants moved to dismiss several of the claims against them (ECF Nos. 21, 32), and U.S. District Judge Colleen Kollar-Kotelly partially granted those motions. (ECF No. 51); *see generally*, *Kurd I*, 374 F. Supp. 3d at 41. Soon after, counsel for Turkey made an appearance (ECF Nos. 57–59, 62), after which Plaintiffs filed an Amended Complaint. (ECF No. 63 ("Am. Compl.").) Turkey then moved to dismiss under Rule 12(b)(1), arguing that the Court lacked subject-matter jurisdiction under the FSIA. (*See* ECF No. 90.) Judge Kollar-Kotelly disagreed, concluding the Court had subject-matter jurisdiction because "Plaintiffs' allegations [fell] within the tortious acts exception to immunity under the FSIA," 28 U.S.C. § 1605(a)(5). *Kurd II*, 438 F. Supp. 3d at 93.

On appeal, a panel of the U.S. Court of Appeals for the D.C. Circuit unanimously affirmed, agreeing that the FSIA's tortious acts exception conferred subject-matter jurisdiction over Turkey. *Usoyan II*, 6 F.4th at 49 (consolidating the sovereign-immunity appeals in both *Usoyan* and *Kurd*). After the Circuit denied rehearing *en banc*, Turkey filed an unsuccessful petition for certiorari with the U.S. Supreme Court, and the case returned to District Court.

That same month, counsel for Turkey moved to withdraw and notified the Court that Turkey would no longer participate in this litigation. (*See* ECF Nos. 164, 167, 168.) Based on those developments—most significantly, Turkey's affirmative decision to not respond to or defend against the lawsuit—Plaintiffs filed an affidavit requesting entry of default on November 9, 2022. (ECF No. 170.) The Clerk entered default against Turkey on November 22, 2022. (ECF No. 173.)

Now, Plaintiffs move for default judgment as to Turkey's liability on their claims (but do not yet seek a ruling on damages). (ECF No. 241 ("Pls.' Mot."); ECF No. 241-1 ("Pls.' Mem.").) After Judge Kollar-Kotelly addressed certain procedural objections from the individual defendants (ECF Nos. 327, 328), the motion for default judgment was referred to the undersigned for a report and recommendation (ECF No. 329; Min. Order, Feb. 14, 2025).

## LEGAL STANDARDS

Federal Rule of Civil Procedure 55 establishes a two-step process to secure a default judgment. At the first step, when a party has "failed to plead or otherwise defend," the plaintiff can request that the Clerk of Court "enter the party's default." Fed. R. Civ. P. 55(a). At the second step, and only after the Clerk has entered default, a plaintiff must generally apply to the court for a default judgment. Fed. R. Civ. P. 55(b)(2).[6] Plaintiffs followed these two steps here.

---

[6] The Rule empowers the Clerk to independently enter judgment if the "claim is for a sum certain or a sum that can be made certain by computation," Fed. R. Civ. P. 55(b)(1), but that provision is inapplicable here.

But still, entry of a default judgment "is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (citation omitted). Rather, Plaintiffs must affirmatively demonstrate that the Court properly exercises subject-matter jurisdiction and personal jurisdiction over the dispute and the defendant. 28 U.S.C. § 1330(a)–(b). And plaintiffs must prove up the merits of their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). As the D.C. Circuit has explained, this is a relatively "lenient standard" that can be satisfied with a lesser "quantum and quality of evidence … than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citations and quotation marks omitted), *rev'd on other grounds sub. nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020). The standard is met "when the plaintiff shows her claim has some factual basis, … even if she might not have prevailed in a contested proceeding." *Id.* (citation and quotation marks omitted). Plaintiffs may satisfy this showing through "uncontroverted factual allegations" supported by "documentary and affidavit evidence." *Firebird Glob. Master Fund II Ltd. v. Republic of Nauru*, 915 F. Supp. 2d 124, 126 (D.D.C. 2013) (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 49 (D.D.C. 2012)); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) ("In evaluating the plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence.") (citation and quotation marks omitted). And the Court retains discretion as to the evidence considered. *See Owens*, 864 F.3d at 785–86 ("Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion.").

## ANALYSIS

As previewed, based on Turkey's default, Plaintiffs now seek default judgment on their claims as to Turkey's liability. The Court begins with jurisdiction—both subject-matter and personal—before turning to merits of the various claims that Plaintiffs press.

## I.    Jurisdiction

When presented with a motion for default judgment under the FSIA, the Court must first confirm "that it has subject matter jurisdiction over the claims [and] personal jurisdiction over the defendant." *Sterling Merch. Fin. Ltd. v. Republic of Cabo Verde*, 261 F. Supp. 3d 48, 50 (D.D.C. 2017); *see* 28 U.S.C. § 1330(a)–(b). The burden of establishing the Court's jurisdiction lies with the party seeking default judgment. *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 190 (D.D.C. 2017). Plaintiffs successfully establish jurisdiction over Turkey here.

### A.    Subject-Matter Jurisdiction

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the statute, the Court has subject-matter jurisdiction over a (1) "nonjury civil action" (2) "against a foreign state" (3) "as to any claim for relief in personam," (4) provided that "the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a).

The first three conditions of Section 1330(a) are easily satisfied here. Plaintiffs' claims against Turkey would proceed on a nonjury basis.[7] The Republic of Turkey is a foreign state. And

---

[7] Plaintiffs' motion elides the "nonjury" issue. While their operative complaint "demand[s] a trial by jury on all claims triable by a jury" (Am. Compl. at 50), the Court presumes this was intended to preserve the possibility of a jury trial against the individual, non-sovereign defendants. After all, and as several other judges in this District have stated, "jury trials are not available in suits brought under the FSIA." *Hansen v. Islamic Republic of Iran*, 2024 WL 3026517, at *3 (D.D.C. June 17, 2024); *see Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 65 (D.D.C. 2010). At least with respect to Turkey, then, this is a nonjury case.

Plaintiffs bring civil claims against Turkey as a foreign sovereign for *in personam* relief. So, the only remaining question is whether Turkey is entitled to immunity under the FSIA.

Foreign sovereigns are generally immune from lawsuits against them in the United States unless an FSIA exception applies. *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015). Here, Plaintiffs invoke jurisdiction under 28 U.S.C. § 1605(a)(5), the FSIA's "tortious acts" exception. Section 1605(a)(5), in relevant part, reads:

> A foreign state shall not be immune from the jurisdiction of courts of the United States in any case … in which [1] money damages are sought against a foreign state [2] for personal injury or death, or damage to or loss of property, [3] occurring in the United States and [4] caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state [5] while acting within the scope of his office or employment[.]

28 U.S.C. § 1605(a)(5) (alterations added). The tortious acts exception itself includes exceptions, including the "discretionary function" carveout. Under that carveout, the exception "shall not apply to any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused[.]" *Id.* § 1605(a)(5)(A).

Here, Plaintiffs treat as settled that the "tortious acts" exception confers jurisdiction. As they put it, "pursuant to the law of the case and the mandate rule, Plaintiffs have already established subject-matter jurisdiction 'by evidence satisfactory to the court.'" (Pls.' Mem. at 26 (quoting 28 U.S.C. § 1608(e)).) They point out that in rejecting Turkey's immunity arguments at the Rule 12(b)(1) stage, Judge Kollar-Kotelly already "ruled that Turkey does not enjoy immunity" (*id.*)— a ruling the D.C. Circuit affirmed. *See Kurd II*, 438 F. Supp. 3d at 89; *Usoyan II*, 6 F.4th at 47. On the facts and circumstances presented here, the Court agrees.

"The law-of-the-case doctrine refers to a family of rules embodying the general concept that a court involved in later phases of a lawsuit should not re-open questions decided by that court or a higher one in earlier phases." *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 697 (D.C.

Cir. 2022) (cleaned up). As the D.C. Circuit recently summed it up, the doctrine "ensures that the same issue presented a second time in the same case in the same court should lead to the same result." *Id.* (cleaned up). But the Circuit likewise pointed out that the "doctrine" is not inflexible; it is "a principle that guides courts in the exercise of their discretion, not a binding rule." *Id.*

In *Wye Oak*, the court applied these principles and held that the law-of-the-case doctrine did not preclude it from revisiting whether an FSIA exception abrogated a foreign sovereign's immunity on the facts of that case. *See id.* at 697–700. As a general matter, the Circuit expressed concern with endorsing the doctrine's use in a way that would "constrain" a court's ability to revisit questions that implicate subject-matter jurisdiction (as sovereign immunity does). *See id.* at 698–99. More specifically, though, the Circuit emphasized the very different procedural postures at which the sovereign-immunity question was presented there: a threshold determination on a Rule 12(b)(1) motion to dismiss on the front end, versus a post-trial assessment of the issue with "the benefit of a full adversarial hearing … and a developed factual record." *Id.* at 698; *see also id.* at 699–700 ("[T]he scant and unproven factual allegations in Wye Oak's complaint were no match for the trial record; the latter included extensive *evidence that both sides had presented* about Iraq's commercial activity[.]") (emphasis added). For this latter reason—the post-pleadings development of a full record through a contested adversarial trial on the merits—the Circuit concluded it was not "being presented with the 'same issue'" on sovereign immunity that had been previously decided, such that the law-of-the-case doctrine was not implicated. *Id.* at 700.

On the surface, *Wye Oak* could be read to suggest the Court should eschew the law-of-the-case doctrine here. After all, its application would likewise implicate jurisdictional questions of sovereign immunity, and this proceeding is now in a different posture than before—*i.e.*, default judgment versus a motion to dismiss. But on a closer look, this case is distinguishable because the

record today is essentially the same record that was before the Court at the time of its prior ruling under Rule 12(b)(1)—at least as to Turkey. There certainly has been no "full adversarial hearing" with evidence from both sides. After all, Turkey chose to stop participating in this case altogether and defaulted. So, unlike in *Wye Oak*, the Court does not have before it any additional evidence (or even arguments) from Turkey that might prompt it to reach a different result. Indeed, the Court previously considered much of the same evidence Plaintiffs now present, including the extensive video footage of the day's events. Plus, the legal burden Plaintiffs must shoulder at each stage is functionally comparable: to overcome the presumption of sovereign immunity at the Rule 12(b)(1) stage "by producing evidence that an [FSIA] exception applies," *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013), and to provide "evidence satisfactory to the court" on that same issue for purposes of default judgment, 28 U.S.C. § 1608(e).

The Court therefore deems it appropriate to apply the law-of-the-case doctrine to Judge Kollar-Kotelly's prior holdings—both affirmed by the Circuit—that the tortious acts exception to the FSIA *generally* abrogates Turkey's immunity for the overall events underlying Plaintiffs' claims, and that the discretionary-function carveout does not apply. Those prior holdings took a broad-brush approach due to the parties' choice to brief immunity holistically rather than on a claim-by-claim basis. *Kurd II*, 438 F. Supp. 3d at 75 ("The Court's approach to resolving the issue of sovereign immunity in these cases has been informed by the parties' briefing," which focused on "blanket sovereign immunity for any and all of the acts which transpired on May 16, 2017."). Put another way, the Court wrestled with the sovereign-immunity issues as applied to Plaintiffs' claims from a 30,000-foot view, expressly leaving open the possibility that certain claims might someday meet a different fate down the line. *See id.* ("Sovereign immunity as to any specific claims … would require additional development of the record and additional argument from the parties.").

The upshot is the Court *could* still conclude that certain of Plaintiffs' claims fall beyond the reach of the FSIA's tortious acts exception, on their specific facts, but it ultimately finds no basis to do so on the record presented.

*　　*　　*

In sum, the Court is satisfied, at least as a general matter, that Plaintiffs have established subject-matter jurisdiction over Turkey under the FSIA's tortious acts exception.

### B.    Personal Jurisdiction

The Court next considers whether it properly exercises personal jurisdiction over Turkey. Under the FSIA, personal jurisdiction exists so long as plaintiffs have made effective service of process pursuant to 28 U.S.C. § 1608(a). *See* 28 U.S.C. § 1330(b). Section 1608(a) outlines "four methods of service," and those methods must be followed "in descending order of preference." *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Here, Plaintiffs pursued service of Turkey through all four methods, ultimately completing service via diplomatic note under Section 1608(a)(4). (*See* ECF Nos. 37, 40, 42, 43 (affidavits requesting effectuation of service under Sections 1608(a)(3) and (a)(4)); ECF No. 49 (return of service, served via diplomatic note).) And soon after, Turkey entered an appearance and filed its Rule 12(b)(1) motion to dismiss. (ECF No. 90.) Plaintiffs' completion of proper service means the Court has personal jurisdiction over Turkey under Section 1330(b) as to any claims that fall within an FSIA exception. *See CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 145 S. Ct. 1572, 1580 (2025) ("[T]he most natural reading of § 1330(b) is that personal jurisdiction over a foreign sovereign is 'automatic' whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished.'") (citation omitted).

12

## II.    Plaintiffs' Claims Under Section 1605(a)(5)

The Court turns next to liability. Section 1605(a)(5) strips Turkey of immunity for injuries that occurred in the United States "caused by the tortious act" of Turkey's agents. Plaintiffs—in varying combinations—contend that Turkey is liable under Section 1605(a)(5) on five claims: (1) civil assault, (2) civil battery, (3) false imprisonment, (4) intentional infliction of emotional distress, and (5) bias-related offenses under D.C. Code § 22-3704. (Pls.' Mem. at 27, 31, 34, 35, 39.) The Court discusses each claim in turn, after first pausing to address two overarching points.

One, Judge Kollar-Kotelly already held that "[t]he events at issue, including the use of force, occurred while the Turkish security forces were engaged in their employment of providing security for President Erdogan." *Kurd II*, 438 F. Supp. 3d at 80. In other words, the actions of the Turkish security forces during the incidents in question are imputable to Turkey. The Court sees no basis to depart from that prior determination. Among other things, the video evidence proffered by Plaintiffs reflects that many of the assailants were uniformed members of the Turkish security force, many of whom wore radio earpieces and at least some of whom were armed with weapons. (*See* Video, Ex. A to Tankan Decl. at 0:00–0:02 (showing Arthur being kicked by dark-suited agent); *id.*, SC02 at 3:20–3:21 (showing Arya being accosted by dark-suited agents); *id.* at 2:45–2:50 (showing Azizi being kicked by dark-suited agent); *id.*, NYT Video 5 (showing Borazan being held in a chokehold and thrown to the ground by dark-suited agent); *id.*, SC02 at 2:39–2:45 (showing Doe I being hit by dark-suited agent); *id.*, Ex. A to Arya Decl. at 0:02–0:09 (showing Kartal being pulled to the ground and kicked in the head by dark-suited agents); *id.*, SC08 at 0:27–0:28 (showing Genc being kicked by individual wearing an olive-green jacket and khaki pants); *id.*, SC02 at 2:36–2:39 (showing Kheirabadi being kicked by individual wearing an olive-green jacket and khaki pants during first altercation and hit by dark-suited agent in second altercation);

13

*id.*, SC12 at 7:30–7:36 (showing agents wearing dark-suits and an olive-green jacket and khaki pants grappling and hitting Tankan); *id.*, SC02 at 3:00–3:20 (showing Yasa being knocked down and kicked by individual wearing an olive-green jacket and khaki pants).) And Plaintiffs' declarations offer similar details along these lines, too. (*See, e.g.*, ECF No. 241-4 at 58–61 ("Arthur Decl.") ¶ 7 (identifying "Turkish security agents" by their "matching or similar khaki uniforms and … dark suits); *see also* SoF ¶ 15 (collecting citations).) For at least these reasons, then, the Court finds Plaintiffs have shown with "satisfactory" evidence, *see* 28 U.S.C. § 1608(e), that the perpetrators of the attacks against them were members of the official Turkish security detail, which means those acts are imputable to Turkey under the FSIA.[8]

Two, the Court will apply District of Columbia law to Plaintiffs' tort claims. Because the torts occurred in the District of Columbia and because the District of Columbia's policy would be most advanced by having its law applied to the facts of this case, the Court applies D.C. law. *See Jones v. Clinch*, 73 A.3d 80, 82 (D.C. 2013) (outlining D.C. choice-of-law considerations).

With these two points in mind, the Court turns next to its claim-by-claim analysis.

## A.    Assault and Battery

All Plaintiffs press claims for assault against Turkey. (*See* Am. Compl. ¶¶ 228–34 (Count I).) And except for C.A. and Kurd, all Plaintiffs also press claims for battery. (*See id.* ¶¶ 235–40

---

[8] In fact, in its prior filings—before it chose to stop participating in the litigation—Turkey conceded this point several times over. In Turkey's motion to dismiss, its invocation of immunity was directly premised on the fact that the challenged acts were committed by "Turkish security officers" exercising their "discretion" to protect President Erdogan a part of their official duties. (*See* ECF No. 90 at 53 ("[T]he Turkish security officers had to undertake the necessary risk assessment calculations to carry out their mission to protect their head of state."); *id.* at 54 ("[T]he conduct challenged by Plaintiffs is the product of risk management decisions made by Turkish security officers about how best to protect not only their official diplomatic residence, but also their President and his senior ministers traveling with him.").) This was likewise true on appeal. (*See* Brief for Defendant-Appellant at 25, *Usoyan II*, 6 F.4th 31 (D.C. Cir. 2021) (No. 20-7017) (asserting that "the Turkish Security Detail took measured actions to protect their president").) Turkey's repeated acknowledgements of this point amply reinforce the Court's conclusion.

(Count II); Pls.' Mem. at 31 n.4 (noting non-pursuit of battery claims by C.A. and Kurd).) Plaintiffs argue that the video and testimonial evidence corroborates their claims. The Court agrees.

Assault, in the civil context, is "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the victim." *Evans-Reid v. Dist. of Columbia*, 930 A.2d 930, 937 (D.C. 2007); *accord Hall v. Dist. of Columbia*, 867 F.3d 138, 158 (D.C. Cir. 2017). To establish a claim for assault, a plaintiff must show they (1) "suffered apprehension of harmful or offensive contact" and (2) "that a reasonable person in [their] position would have experienced such apprehension." *Kurd I*, 374 F. Supp. 3d at 46 (citing *Collier v. Dist. of Columbia*, 46 F. Supp. 3d 6, 14 (D.D.C. 2014)) (alterations added); *Madden v. D.C. Transit Sys., Inc.*, 307 A.2d 756, 757 (D.C. 1973); *see also* RESTATEMENT (SECOND) OF TORTS § 21.

Battery, in the civil context, is "an intentional act that causes harmful or offensive bodily contact." *Evans-Reid*, 930 A.2d at 937; *accord Magliore v. Brooks*, 844 F. Supp. 2d 38, 44 (D.D.C. 2012). To establish a claim for battery, a plaintiff must show that the defendant (1) acted "intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact," and that (2) a harmful or offensive "contact with the person of the other directly or indirectly results." RESTATEMENT (SECOND) OF TORTS §§ 13, 18; *Saberi v. Gov't of the Islamic Republic of Iran*, 541 F. Supp. 3d 67, 82 (D.D.C. 2021).

Based on its careful consideration of the evidence Plaintiffs present, the Court concludes that Plaintiffs all carry their burden on their assault and battery claims here.

For starters, and as a general matter, the overwhelming video footage—gathered from multiple sources and multiple vantage points—reflects that the Turkish security agents repeatedly antagonized Plaintiffs, aggressively threatened Plaintiffs, and then ultimately broke through a sizeable police barrier to violently assail Plaintiffs (and other protesters in Sheridan Circle). (*See*

Video, SC06 at 0:00–0:38; SC02 at 2:45–5:03; SC08 at 0:25–2:26; SC09 at 7:29–7:40 & SC10 at 0:30–0:57.) More, Plaintiffs' briefing pinpoints specific timestamps throughout the video footage that show these troubling events as they played out against each of them individually on a person-by-person basis. And more still, all Plaintiffs submitted sworn and detailed declarations that describe their experiences. This evidence, certainly when taken together, straightforwardly establishes Plaintiffs' claims for assault and battery.

In the paragraphs that follow, the Court walks through the relevant facts—and corresponding evidence—that bear on these claims for each Plaintiff (alphabetically).

*Plaintiff Stephen Arthur*. After witnessing the first altercation, Arthur was "frighten[ed]" and began to feel "worried that [he] would be hit." (ECF No. 241-4 at 58–61 ("Arthur Decl.") ¶ 9.) From there, Arthur describes the second altercation as beginning "without warning," with the Turkish security forces "push[ing] past the police and sprint[ing] … directly at [him] and the other protestors," all while "screaming at [the protestors]." (*Id.* ¶ 12.) Arthur feared he was going to be attacked, so he tried to run away with his hands over his head. (*Id.* ¶ 13.) But Turkish security officials grabbed him, tried to keep him from fleeing, and kicked and punched him. (*Id.* ¶ 14.) Arthur testifies that he saw at least some of the Turkish agents "carrying guns" during the attack. (*Id.*) The video footage corroborates this account: Arthur can clearly be seen being punched, kicked, and hit by Turkish security officials as he tried to flee. (Video, SC02 at 2:37–2:58.)

*Plaintiffs Heewa Arya and his minor daughter C.A.* Arya and his then-seven-year-old daughter, C.A., were among the crowd of protesters who clashed with the pro-Erdogan group during the first altercation. At that point, C.A. sat atop her father's shoulders as the fray unfolded around them. (Video, SC02 at 1:24–1:27.) But after that, C.A. became too frightened, and so Arya left C.A. near some trees away from the Sheridan Circle sidewalk, while he rejoined the protesters.

16

(ECF No. 241-4 at 63–67 ("Arya Decl.") ¶ 9, 11.) When the second altercation began, Arya recounts that "all of a sudden" he saw a group of Turkish security forces "push[] past the police" and run "directly at [him] and the other protestors" while "screaming at [them]." (*Id.* ¶ 13.) Arya feared greatly for his daughter's and his own safety, so he tried to flee, but he was knocked to the ground. (*Id.* ¶¶ 13, 14.) All he could do was "protect [his] head" while a Turkish security agent kicked him. (*Id.* ¶ 14; *see* Video, Ex. B to Arya Decl. at 0:34–0:36.) He, too, attests that he saw many of the Turkish security officials "carr[ying] guns." (*Id.*)

*Plaintiff Abbas Azizi*. Azizi attests that the pro-Erdogan group shouted in Turkish (a language he didn't understand) and made threatening gestures (gestures he *did* understand) at him and the protesters on his side of the sidewalk. (Azizi Decl. ¶ 7.) According to Azizi, one of the Turkish security agents hit him in the chest and leg during the first altercation. (*Id.* ¶ 8.) That rattled Azizi, but he chose to continue protesting. (*Id.*) Then the second altercation unfolded. Azizi saw Turkish security officials run "past the police" and "directly at [him] and other protestors" while "screaming at [them]." (*Id.* ¶ 11.) The scene "terrif[ied]" him, and he feared the Turkish security forces were going to attack him and the other protesters. (*Id.*) Indeed, they did. (*See id.* ¶ 12 (describing the attacks a "very painful and terrifying").) Azizi was then kicked in the chest by a Turkish security agent and knocked to the ground, after which other agents continued kicking him while he was down. (Azizi Decl. ¶ 12; *see also* Video, SC02 at 2:45–2:55.)

*Plaintiff Ceren Borazan*. Borazan similarly describes the second altercation as a group of Turkish security officials "shov[ing] the police out of the way" and running and yelling at her and the other protesters. (Borazan Decl. ¶ 13.) The scene "terrified" her, and she attempted to flee. (*Id.* at ¶¶ 13, 14.) A Turkish agent chased her. (Video, SC02 at 3:19–3:22 (showing, in the upper-right-hand corner of the frame, Borazan being chased by a dark-suited agent).) She recalls "a voice

behind [her] yelling in Turkish, 'Bitch, come here,' and asking, 'Where are you running?'" (Borazan Decl. ¶ 14.) She ran to the other side of Sheridan Circle, and she tried to seek refuge in the passing cars of strangers, desperate to escape. (*Id.* ¶ 15.) As she was about to enter a vehicle, a Turkish security agent—a man "much bigger and taller" than her—"grabbed [her] from behind" and pulled her away from the car. (*Id.* ¶ 16.) The agent "wrapped one arm tightly around [her] neck," "grabbed [her] wrist and twisted [her] arm behind [her] back," and said, in Turkish, "'You're dead, bitch,' and 'You're going to get more.'" (*Id.*) The agent then hit her in the back of the head, threw her to the ground, and kicked her as she lay there. (*Id.*; *see* Video, NYT Video 5; *id.* SC02 at 3:41.)) According to Borazan, the Turkish agent continued threatening her even after she managed to climb into a different car, which was able to drive away. (Borazan Decl. ¶¶ 17, 18.)

*Plaintiff Jane Doe I.* Doe I recounts that someone from the pro-Erdogan group shouted at her in Turkish: "We will kill you, bitch." (ECF No. 241-4 at 80–83 ("Doe I Decl.") ¶ 11.) She likewise describes how suddenly the second altercation began, with the pro-Erdogan group and the Turkish security agents "running at [her] and the other protestors" and making her "afraid for [her] safety." (*Id.* ¶ 12.) Doe I tried to escape the attack by hiding behind a nearby tree. (*Id.* ¶ 13.) But to no avail. The Turkish security agents grabbed her with such force that it "[tore] off [her] necklace in the process," and then they began to punch and kick her. (*Id.* ¶ 13; *see* Video, SC02 at 2:39–2:47.) Doe I managed to escape but rushed over to Plaintiff Hulya Kartal, who was laying on her back and seemingly suffering from a seizure. (*Id.* ¶ 14 ("[Ms. Kartal] was convulsing, with her head hitting the ground involuntarily.").) While she tended to Kartal, Doe I remained "afraid" because the Turkish forces were "circling [them] like vultures"; Doe I attests that "[o]ne pulled his jacket open to show [her] his gun." (*Id.*) The video corroborates much of this account: one agent

18

in an olive-green jacket and khaki pants circled Doe I and Kartal, and another dark-suited agent charged at them only to be intercepted by law enforcement. (*See* Video, SC02 at 4:34–4:48.)

*Plaintiff Hulya Kartal (a/k/a Jane Doe II)*. During the first altercation, Kartal recounts a physical clash between her and a "civilian." (Kartal Decl. ¶ 8.) The clash frightened her but she continued to protest all the same. (*Id.* ¶¶ 8, 9–10.) Kartal describes the second altercation beginning with her "[seeing] what [she] perceived as a swirl of darkness, which [she] now realize[s] was a group of agents and others running at [her]." (*Id.* ¶ 13.) And she froze amid the chaos. (*Id.*) "Within what seemed like a nanosecond, [she] saw a large man in a black suit next to [her]," but she explains that someone else attacked her from behind, pulling her hair and dragging her backwards. (*Id.* ¶ 14.) Kartal lost consciousness after someone ran at her and punched her in the head; after briefly regaining consciousness, she recalls being kicked in the head. (*Id.*) She "believed that [her] attackers were trying to kill [her]." (*Id.*) Video footage clearly captured this aspect of the attack, depicting at least four different Turkish security agents assailing Kartal while a fifth filmed. (*See* Video, Ex. A to Arya Decl. at 0:01–0:12.) In a moment of consciousness, Kartal "opened [her] eyes and saw agents standing above [her] and also around [her]," and she felt like they were "looking to hit [her] more." (Kartal Decl. ¶ 15.) She recounts a feeling of "panic" as she laid there "incapacitated" with "attackers circl[ing] [her]." (*Id.*; *see* Video, SC02 at 4:34–4:48 (showing an individual in an olive-green jacket and khaki pants circling her and standing over her).)

*Plaintiff Jane Doe III*. Doe III heard "people in the group of [Turkish] agents" yelling, in Turkish, "we will kill you[,]" as well as other "derogatory curses and words about Kurds." (ECF No. 241-4 at 91–93 ("Doe III Decl.") ¶ 8.) On seeing the sudden charge of "Turkish agents running towards [her and the protesters]," she tried to run away. (*Id.* ¶ 11.) But Doe III "felt a kick in [her] back" that caused her to fall to the ground. (*Id.* ¶ 12.) She believes it was a "Turkish security agent"

19

that kicked her to the ground because "most of the people running in [her] direction were agents." (*Id.*) And while on the ground, she "was kicked several times in [her] back and head," which she again believes was done by Turkish security officials. (*Id.*)[9]

*Plaintiff Elif Genc.* Genc recounts that Turkish security agents "were screaming at the protestors" and "[s]ome of them made gestures, indicating that the protestors should come across the street to fight." (ECF No. 241-4 at 95–98 ("Genc Decl.") ¶ 8.) She describes the attacks as beginning "without warning." (*Id.* ¶ 8.) She watched as the Turkish security forces "pushed past police officers and ran at [them] with furious expressions on their faces." (*Id.* ¶ 9.) She believed "[her] life was in danger." (*Id.*) She tried to run but was knocked down and "felt blows all over [her] body." (*Id.* ¶ 10; *see* Video, SC08 at 0:26–0:28 (showing an individual in an olive-green jacket and khaki pants kicking Genc down); *id.*, SC02 at 2:48–2:50 (showing another similarly clad individual run up and kick Genc while on the ground).) During the attack, Genc recalls hearing an individual yell in Turkish, "I will kill you, bitch." (*Id.* ¶ 11 (describing the specific derogatory term, as used in Turkish, as meant "to express extreme hatred").) She felt like "[she] was in great danger"; when she managed to get up, she fled the scene. (*Id.* ¶¶ 11–12.)

*Plaintiff Jalal Kheirabadi.* As soon as he arrived at Sheridan Circle, Kheirabadi recalls that "words were exchanged between the groups." (ECF No. 241-4 at 100–03 ("Kheirabadi Decl.") ¶ 7.) During the first altercation, several civilians in the pro-Erdogan group tried to punch him, and when Kheirabadi tried to "defend [him]self and move away," Turkish security officials then "punched and kicked him." (*Id.*; Video, SC02 at 0:26–0:44.) After the groups were initially separated, Kheirabadi recounts that the Turkish officials were "getting increasingly aggressive,

---

[9] Plaintiffs do not point the Court to footage of this particular event, nor could the Court independently find the scene through its own review of the video. But it is consistent with the other accounts and uncontroverted by other evidence, so, the Court credits Doe III's account of events.

including pushing against police officers and yelling at the protestors." (*Id.* ¶ 9.) And when the second attack began, a Turkish security force member "sprinted directly at [him]." (*Id.* ¶ 10.) Seeing the pro-Erdogan group charge at him and the other protesters made Kheirabadi feel "very scared for the safety of [them] all." (*Id.*) The Turkish agent sprinting at Kheirabadi "grabbed [him]" and "began punching [him]" on contact. (*Id.* ¶ 11.) Kheirabadi was knocked to the ground; when he tried to stand and flee towards safety, a Turkish security agent once again "grabbed [him] and punched [him], even though a police officer was at [his] side." (*Id.*) The video footage reflects and corroborates this aspect of the attack. (*See* Video, SC02 at 2:42–2:55.)

*Plaintiff Kasim Kurd*. Kurd explains that, shortly after arriving at Sheridan Circle, "several agents opened their suit jackets to show they were carrying guns." (ECF No. 241-4 at 105–09 ("Kurd Decl.") ¶ 7.) He recalls that one Turkish security official said to him (in Turkish) that he should go to Turkey "so they could beat [him]," and another said (again, in Turkish), something derogatory and suggestive about Kurd's mother. (*Id.*) During the first altercation, Kurd recounts that "Turkish agents, including one who had a gun, pushed [him] and punched [him] several times in the head." (*Id.* ¶ 8.)[10] After law enforcement broke up that altercation, Kurd was fearful that another attack would occur, so he "called 911 twice to ask for additional police." (*Id.* ¶ 9.) Kurd describes how several members of the Turkish security forces persisted with their taunting and threatening gestures at the protesters. (*Id.* ¶¶ 13–15.) According to Kurd, the second altercation began when "a large group of Turkish agents charged across the street directly at [him] and the other protestors." (*Id.* ¶ 16.) Kurd believed he was going to be attacked and described the scene as "terrifying." (*Id.*) He fled immediately. Despite "Turkish agents chas[ing] [him]," he managed to escape. (*Id.* ¶ 17; Video, Ex. C to Kurd Decl. at 0:00–0:09 (video taken by Kurd running away).)

---

[10] Despite these facts, Plaintiffs opted to not pursue a battery claim on behalf of Kurd.

*Plaintiff Mehmet Özgen*. Özgen similarly describes the second attack beginning when he saw "a group of Turkish agents running together in [his] direction as if to attack [him] and the other protestors." (ECF No. 241-4 at 118–119 ("Özgen Decl.") ¶ 8.)[11] He recalls Turkish security forces "yelling" and explains how he felt "terrorized." (*Id.*) Özgen avers that a Turkish security agent "kicked [his] leg." (*Id.* ¶ 9; *see* Video, SC02 at 2:43–2:45 (showing a dark-suited agent jump-kicking where Özgen was last seen standing (the line of sight is obfuscated).) Fearing for his safety, Özgen fled the scene—with Turkish officials continuing to chase him—and he "was able to escape without further physical harm." (*Id.* ¶ 10.)

*Plaintiff Mehmet Tankan*. Tankan describes how the pro-Erdogan group shouted at him and the other protesters, calling them (in Turkish) "son of a whore," "terrorists[,]" and "traitors." (ECF No. 241-4 at 121–124 ("Tankan Decl.") ¶ 6.) During the first altercation, he watched the two groups collide, and a Turkish security agent approached him "aggressively" and kicked him. (*Id.* ¶ 7.) At that point, Tankan withdrew from the crowd and returned to the other side of Sheridan Circle, where he was standing when the second attack began. (*Id.* ¶ 11.) It was a "terrifying sight," Tankan explains, to look up and see Turkish security force agents "racing in [his] direction with furious expressions on their faces" and "yelling." (*Id.* ¶ 12.) He was quickly surrounded and repeatedly kicked and punched all over his body, while the Turkish security forces threatened him: "We will kill you," "[y]ou will be done," and more. (*Id.* ¶ 13; *see* Video, SC02 at 3:26–3:50; *id.*, SC12 at 7:30–7:40 (body cam footage showing four individuals wearing dark suits and olive-green jackets and khaki pants accosting Tankan amid law enforcement presence).) Even as police intervened, Tankan "feared the agents would continue to come after [him]." (*Id.* ¶ 14.)

---

[11] Plaintiff Özgen submitted his declaration written in what appears to be Turkish, with a certified and notarized translation. (*See* ECF No. 241-4 at 115–17.) The Court refers to and quotes from the translation.

*Plaintiff Murat Yasa*. Yasa expressed that "soon after [he] arrived," he "feared for his safety." (Yasa Decl. ¶ 8.) And when the second attack began, with Turkish security agents "sprint[ing]" and "yelling" as they broke through a police barrier, he was completely "terrified." (*Id.* ¶ 12.) Yasa describes being knocked from behind, laying "in a fetal position," protecting his face with his hands, and "shaking with fear and scared that [he] would die" as a Turkish agent kicked him. (*Id.* ¶ 14; *see* Video, SC02 at 2:57–3:15 (showing Yasa falling and being kicked in the body and head by agents in dark suits and olive-green jackets and khaki pants.)

These consistent accounts—substantiated by the real-time video footage—form the basis for Plaintiffs' assault and battery claims. And they easily demonstrate liability through a showing of "evidence satisfactory to the court." 28 U.S.C. § 1608(e). As to the assault claims, the verbal and physical threats that Plaintiffs describe—serious and concrete threats that are corroborated by the video evidence—were intentional. There is no basis for the Court to believe otherwise. And a reasonable person in Plaintiffs' position would have experienced apprehension of imminent harm as a result. These Plaintiffs surely did. (*See* Arthur Decl. ¶ 13; Arya Decl. ¶¶ 13, 18; Azizi Decl. ¶ 11; Borazan Decl. ¶ 13; Doe I Decl. ¶ 13; Kartal Decl. ¶ 14; Doe III Decl. ¶ 10; Genc Decl. ¶ 11; Kheirabadi Decl. ¶ 10; Kurd Decl. ¶ 16; Özgen Decl. ¶ 8; Tankan Decl. ¶ 13; Yasa Decl. ¶ 12.) Similarly, as to the battery claims, for most of these Plaintiffs (save Kurd and C.A.), their fears of harm came true when they were brutally attacked by the Turkish security forces that afternoon, resulting in bodily contact that was decidedly harmful and offensive. (*See* Arthur Decl. ¶ 14; Arya Decl. ¶ 14; Azizi Decl. ¶ 12; Borazan Decl. ¶ 16; Doe I Decl. ¶ 13; Kartal Decl. ¶ 14; Doe III Decl. ¶ 12; Genc Decl. ¶ 10; Kheirabadi Decl. ¶ 11; Özgen Decl. ¶ 9; Tankan Decl. ¶ 13; Yasa Decl. ¶ 14.) Those attacks were unquestionably intentional. All in all, Plaintiffs' evidence establishes successful claims of assault and battery against Turkey.

23

### B.    False Imprisonment

Next, Plaintiff Borazan brings a claim of false imprisonment. (*See* Am. Compl. ¶¶ 241–44 (Count III).) Under D.C. law, "[a] successful claim of false imprisonment requires a plaintiff to establish (1) the detention or restraint of one against [her] will and (2) the unlawfulness of the detention or restraint." *Doe v. Safeway, Inc.*, 88 A.3d 131, 132 (D.C. 2014); *see also Tocker v. Great Atl. & Pac. Tea Co.*, 190 A.2d 822, 824 (D.C. 1963) (defining "false imprisonment" as "the unlawful detention of a person without a warrant or for any length of time whereby he is deprived of his personal liberty or freedom of locomotion"); *Smith v. Dist. of Columbia*, 306 F. Supp. 3d 223, 260 (D.D.C. 2018) ("False imprisonment is the restraint by one person of the physical liberty of another without consent or legal justification.") (citation and quotation marks omitted). Based on these principles, Borazan establishes a false imprisonment claim here.

As described above, while Borazan was attempting to escape by climbing into a passerby's car, a Turkish security official pulled her from that car and placed her in a chokehold; the assailant then hit Borazan in the back of the head and threw her to the ground. (Borazan Decl. ¶ 16; Video, NYT Video 5.) The Turkish agent's actions plainly operated to "deprive[]" Borazan "of [her] personal liberty [and] freedom." *Tocker*, 190 A.2d at 824. And while the facts suggest that the ensuing "restraint" may have been relatively brief, that does not preclude a claim. Under D.C. law, "[c]onfinement, no matter how brief, suffices to establish a prima facie case[.]" *Marshall v. Dist. of Columbia*, 391 A.2d 1374, 1381 (D.C. 1978); *see also Jones v. Dist. of Columbia*, 2019 WL 5690341, at *6 (D.D.C. June 13, 2019) (explaining that "the length of detention, while potentially relevant to damages and affirmative defenses, has no bearing on [a] prima facie case.").

The Court should find that Borazan established a claim for false imprisonment.[12]

---

[12] Plaintiffs do not cite to any cases that are factually analogous to the circumstances here, and neither did the Court locate any such cases in the civil tort context. The Court found several cases, however, recognizing

## C.    Intentional Infliction of Emotional Distress

Plaintiffs Arya, Azizi, Borazan, C.A., Kartal, Jane Doe III, Genc, Kheirabadi, Kurd, Tankan, and Yasa all claim that Turkey is liable for intentional infliction of emotional distress, or "IIED." (*See* Am. Compl. ¶¶ 245–50 (Count IV).)[13] To prevail on an IIED claim, a plaintiff must prove "(1) extreme and outrageous conduct by the defendant that (2) intentionally or recklessly (3) caused [them] severe emotional distress." *Robertson v. Dist. of Columbia*, 269 A.3d 1022, 1033 (D.C. 2022); RESTATEMENT (SECOND) OF TORTS § 46; *see* 28 U.S.C. § 1608(e).

Start with the "extreme and outrageous" element. It requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991) (quotation marks omitted). "[I]n determining whether conduct is extreme or outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred." *King v. Kidd*, 640 A.2d 656, 668 (D.C. 1993) (citation omitted).

Here, as Judge Kollar-Kotelly previously emphasized, this attack was carried out by "Turkish government agents" in "America's capital" to "stifle the First Amendment rights of people protesting the treatment of a minority group in Turkey." *Kurd I*, 374 F. Supp. 3d at 53. *Kurd I*, 374 F. Supp. 3d at 53. While the use of force in the protest context does not always rise to the level of outrageousness necessary to sustain an IIED claim, *see, e.g.*, *Black Lives Matter D.C. v.*

---

that the same actions taken against Borazan here would support a claim for *criminal* false imprisonment under various state laws. *See, e.g.*, *Conner v. State*, 19 So. 3d 1117, 1124–25 (Fla. 2d Dist. Ct. App. 2009) (finding criminal false imprisonment when "the victim's freedom of movement was restricted … because she was pushed to the ground from behind and choked for a few seconds"); *Commonwealth v. McBride*, 260 A.3d 148, 2021 WL 3015320, at *4 (Pa. Super. Ct. 2021) ("[W]e conclude Complainant's testimony that, as she attempted to leave the building, Appellant 'grabbed her from behind[,] pulled her down to the ground and placed her in a chokehold,' was sufficient to support his conviction of false imprisonment."). If these facts suffice for purposes of *criminal* liability, they ought to suffice for *civil* liability, too.

[13] Plaintiffs Arthur, Doe I, and Özgen expressly do not pursue IIED claims.

*United States*, 775 F. Supp 3d 241, 264–65 (D.D.C. 2025) (rejecting IIED claim based on use of force by law enforcement officers) (collecting cases), the facts here are meaningfully distinguishable from the types of cases rejecting such claims. Here, the protesters were already contained and controlled by U.S. law enforcement, who separated them from the Turkish Ambassador's residence (and President Erdoğan). But still, the Turkish security forces broke through the police cordon, chased down protesters, and physically attacked them even as they fled or lay prone on the ground. The well-known test that all first-year law students learn for determining whether conduct is "extreme and outrageous" is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" RESTATEMENT (SECOND) OF TORTS § 46 cmt. d; *accord Homan v. Goyal*, 711 A.2d 812, 818 (D.C. 1998). Especially in context, the conduct here easily passes that test. *Cf. Ortberg v. Goldman Sachs Grp.*, 64 A.3d 158, 163–64 (D.C. 2013) (finding mere "oblique threats" chanted by protesters to be insufficiently "outrageous").

On the second element, "[i]t is possible to infer the existence of … intent or recklessness … from the very outrageousness of a defendant's conduct." *Kotsch v. Dist. of Columbia*, 924 A.2d 1040, 1046 (D.C. 2007). Courts can also infer intent "from accompanying threats of physical violence." *Waldon v. Covington*, 415 A.2d 1070, 1077 (D.C. 1980). Plaintiffs say these inferences are appropriately drawn here, especially given the overt threats of violence and the fact that the Turkish security forces blatantly ignored U.S. law enforcement in carrying out the attacks. (Pls.' Mem. at 37–38.) The Court agrees. On these facts, "any reasonable person would have known that emotional distress and physical harm would result." *Waldon*, 415 A.2d at 1077 (cleaned up).

Finally, the third element requires "severe" emotional distress, which is a relatively "high standard" to meet. *Ortberg*, 64 A.3d at 164. Generalized symptoms and conclusory assertions of

"mental anguish," "stress," or "severe emotional distress" cannot carry the day. *Futrell v. Dep't of Lab. Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003); *see also Ortberg*, 64 A.3d at 165; *Kurd I*, 374 F. Supp. 3d at 55 (dismissing without prejudice Plaintiff Kheirabadi's IIED claim based on mere conclusory assertion of "severe emotional distress").[14]

Here, Plaintiffs have all adduced evidence demonstrating a qualifying level of "severe" emotional distress they attribute to the attacks. Plaintiff Arya attests to sleeping issues, mood swings, and a disinterest in social activities after the events on the May 16, 2017. (Arya Decl. ¶ 20.) And his minor daughter, C.A., developed a fear that "attackers would come to [their] house," which led C.A. to habitually check if the doors and windows were locked. (*Id.* at ¶ 21.) Plaintiff Azizi describes sleeping issues, difficulty concentrating, depression, anxiety, and an inability to work; he attests that he was so fearful after the attacks that he even tried to sell his home and relocate. (Azizi Decl. ¶ 18.) Plaintiff Borazan suffers from difficulty concentrating, nightmares, fear, anger, disinterest in social activities, depression, and hopelessness, and she feels "re-traumatiz[ed]" anytime she sees the widely circulated image of her being held in a chokehold. (Borazan Decl. ¶ 21.) Kartal recounts much of the same. She attests to changes of mood, disinterest in social activities, general anxiety and stress, and traumatic aversion to depictions from that day. (Kartal Decl. ¶ 19.)[15] Plaintiff Doe III faces difficulty sleeping, nightmares, depression, and a disinterest in engaging in social activities. (Doe III Decl. ¶ 16.) Plaintiff Genc describes nightmares, fear, difficulty concentrating, and a manifest impact on her school assignments since the events on May 16, 2017. (Genc Decl. ¶ 15.) Kheirabadi attests to having a reduced appetite,

---

[14] Plaintiffs were granted leave to file an amended complaint to supplement their allegations on Kheirabadi's IIED claim, and they did so. (*See* Am. Compl. ¶ 172.)

[15] In Kartal's Declaration, some pages and paragraphs appear to repeat. (*See* ECF No. 241-4 at 88–89.) The Court cites to paragraph 19 on ECF p. 89. (*See* Pls.' Mem. at 38 (doing same).)

sleeping issues, and fear of strangers. (Kheirabadi Decl. ¶ 13.) Plaintiff Kurd suffers from headaches and trouble sleeping, concentrating, and managing his work that manifested after the events of May 16, 2017. (Kurd Decl. ¶ 23.) Tankan suffers from sleeplessness, nightmares, irritability, disinterest in social activities and friends, depression, memory loss, and fearfulness; and he says these symptoms "had a significant negative impact on [his] ability to run" his business after the attack. (Tankan Decl. ¶ 17.) Finally, Plaintiff Yasa likewise attests to mental confusion, difficulty sleeping, memory loss, and diagnosed post-traumatic stress disorder—all of which have had such a negative effect on his business that he "was forced to close." (Yasa Decl. ¶ 18.)

These injuries and symptoms rise to the level of severity required to sustain an IIED claim. *See, e.g.*, *Hammons v. Islamic Republic of Iran*, 2023 WL 5933340, at *20 (D.D.C. July 24, 2023) ("Severe emotional distress may include panic attacks, loss of sleep, anxiety, depression, inability to work, and the creation of new phobias."), *report and recommendation adopted*, 2023 WL 6211248 (D.D.C. Sept. 25, 2023).

All told, Plaintiffs Arya, Azizi, Borazan, C.A., Kartal, Jane Doe III, Genc, Kheirabadi, Kurd, Tankan, and Yasa have established liability on their IIED claims against Turkey.

### D.    Bias Related Crime – D.C. Code § 22-3704

Finally, all Plaintiffs pursue a claim against Turkey under the D.C. Bias Related Crime Act ("DCBRCA"), D.C. Code § 22-3704. (*See* Am. Compl. ¶¶ 251–57 (Count V).)

The DCBRCA was enacted by the D.C. Council in 1990 to "provide[] enhanced criminal penalties for persons who commit bias-related crimes," *Lucas v. United States*, 240 A.3d 328, 335 (D.C. 2020), but the statute also authorizes a private civil claim for "any person who incurs injury to his or her person or property as a result of an intentional act that demonstrates an accused's prejudice based on the actual or perceived ... national origin … of a victim of the subject designated

act," D.C. Code § 22-3704(a); *see Navarrete v. Whole Foods Mkt. IP, Inc.*, 2025 WL 343122, at *1 (D.D.C. Jan. 30, 2025). The statute defines "designated act" to mean a "criminal act, including ... assault," D.C. Code § 22-3701(2), but the phrase broadly encompasses "any criminal act recognized under D.C. law," *Aboye v. United States*, 121 A.3d 1245, 1250 (D.C. 2015). And civil liability under the DCBRCA is not contingent on a criminal prosecution, let alone a conviction. D.C. Code § 22-3704(a) (allowing for liability "[i]rrespective of any criminal prosecution or the result of a criminal prosecution"); *see also Kurd I*, 374 F. Supp. 3d at 56.

Here, Plaintiffs say the Court should find that Turkey violated the DCBRCA because the Turkish security forces committed criminal assault (along with other potential crimes) against Plaintiffs and were motivated in doing so, at least in part, by Plaintiffs' actual or perceived Kurdish national origin. (Pls.' Mem. at 40–43.) Based on the evidence presented, the Court agrees.

## 1.    Designated Act

To begin, for the same reasons that support their civil assault and battery claims, Plaintiffs establish they suffered injury from a "designated act" carried out by Turkey's agents. "Assault" is expressly included in statute's illustrative list of designated acts. D.C. Code § 22-3701(2). Although criminal assault is not defined in the D.C. Code, the offense is essentially coextensive with common-law assault. *Mungo v. United States*, 772 A.2d 240, 245 (D.C. 2001) ("We have … construed the offense to be common law assault."). The D.C. Court of Appeals recognizes "two distinct" categories of criminal assault: attempted-battery assaults and intent-to-frighten assaults. *See Robinson v. United States*, 506 A.2d 572, 574 (D.C. 1986). The former, as the D.C. Court of Appeals recently clarified, may be committed through even "an offensive touching, performed with minimal force," *Perez Hernandez v. United States*, 286 A.3d 990, 993 (D.C. 2022) (en banc), provided that the conduct was committed purposely or knowingly, *id.* at 1002–03. The latter

category of assault requires, in simplified terms, threatening conduct purposefully designed to "engender fear" or "create apprehension," where such conduct "would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility." *Powell v. United States*, 238 A.3d 954, 957–58 (D.C. 2020) (citation and quotation marks omitted). As described above, the actions of the Turkish security officials in Sheridan Circle that afternoon fall comfortably within these categories of criminal assault. The record is replete with satisfactory evidence to establish that the Turkish agents' threatening verbal and physical behavior towards Plaintiffs was intentional and designed to "engender fear"—and then some—in Plaintiffs.[16]

### 2. Kurdish National Origin

On the question of bias, moreover, Plaintiffs adduce ample evidence to show that the attacks were motivated, at least in meaningful part, by prejudice based on national origin.

Among other factors, the use of slurs against a victim before or during an assault can be sufficient evidence of prejudice. *See, e.g.*, *Lucas*, 240 A.3d at 348 (sufficient evidence of bias included "the volume and duration of homophobic taunts, the temporal proximity between the comments and the assault, and the gravity of the physical encounter"); *Aboye*, 121 A.3d at 1251–52 (similar, basing conviction on evidence that assailant repeatedly used the word "f***ot" toward the victims); *Shepherd v. United States*, 905 A.2d 260, 263 (D.C. 2006) (finding this element "amply supported by evidence" that the perpetrator "accompanied his assaults on the two women with a verbal stream of homophobic insults"). And importantly, bias need not be the only motivation behind the challenged acts; "additional motives like anger or revenge" can properly coexist. *Lucas*, 240 A.3d at 342 (interpreting the DCBRCA to mean that "a defendant's bias against

---

[16] As noted already, whether criminal prosecutions or convictions followed is immaterial for purposes of imposing civil liability under the statute. Nonetheless, Plaintiffs highlight that the U.S. Attorney's Office secured several indictments against individual members of the Turkish security forces based on their actions toward the protesters (including Plaintiffs) in Sheridan Circle that fateful afternoon.

a victim due to the victim's protected characteristic must be a but-for cause of the defendant's underlying criminal act," but "need not be the sole cause, or even the primary cause").

Here, Plaintiffs put forward ample evidence demonstrating that they and other protesters at Sheridan Circle were advocating for the Kurdish minority in Turkey, including by carrying Kurdish flags, apparel in traditional Kurdish colors, and more. (*See, e.g.*, Arthur Decl. ¶ 11 ("I wrapped myself in a red, yellow and green flag. These colors are associated historically with the Kurdish communities in Turkey[.]"); Arya Decl. ¶ 12 ("I wore a flag that was red, yellow and green, colors that are associated historically with the Kurdish people."); Kartal Decl. ¶ 10 ("I stood on the sidewalk, holding a yellow, red and green shawl … because its colors are culturally associated with the Kurdish people."); Kheirabadi Decl. ¶ 8 (describing his protest sign, which depicted ruins and read, "Destroyed Kurdish Cities. Erdogan is a War Criminal"); Özgen Decl. ¶ 7 (holding banner that read "Kurds fight ISIS, Turkey fights Kurds"); Yasa Decl. ¶ 10 (shouting into a megaphone pro-Kurdish sentiments, such as "Erdogan, stop killing Kurdish Children").) More, Plaintiffs' evidence demonstrates that the pro-Erdogan group (including Turkish security forces) were shouting Kurdish-infused smears and threats at Plaintiffs and the other protesters. (*See, e.g.*, Arya Decl. ¶ 8 (hearing Turkish security force members yell at him and the other protesters "fuck you, Kurds," "die, fucking Kurds," among other things); Kartal Decl. ¶ 6 (describing the "ethnic slurs" yelled by Turkish security forces, including "Kurdish sons of bitches," "dogs," and "traitors"); Doe III Decl. ¶ 8 ("The agents shouted derogatory curses and words about Kurds."); *see also* Yasa Decl. ¶ 15 (recalling one of his attackers yell, "we will find and punish you [Kurds], no matter where you are," while kicking him) (alteration in original).)

Taken together, certainly, Plaintiffs' prominent display of Kurdish support coupled with the Kurdish-related slurs shows, by "evidence satisfactory to the court," 28 U.S.C. § 1608(e), that the

surrounding assaults were motivated by prejudice based on the Turkish agents perceived to be Plaintiffs' Kurdish national origin. Indeed, this is a particularly easy conclusion for the Court to reach without any evidence or argument being presented by Turkey to the contrary.

For these reasons, the Court finds that Plaintiffs successfully established their DCBRCA claims based on their actual or perceived Kurdish national origin.[17]

### 3.    Plaintiffs' Alternative DCBRCA Theories

Given the Court's finding that Plaintiffs established liability on their DCBRCA claims based on national origin, the Court need not address Plaintiffs' alternative theories premised on other alleged biases that may have motivated the Turkish security forces in carrying out the attacks. *See, e.g.*, *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 81 n.6 (D.D.C. 2017) (declining to address alternative theories of relief given "the bar on double recovery") (citing *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976)). This is true as to Plaintiffs' "political affiliation" bias theory, as well as their theory of "sex-based" animus—the latter of which Plaintiffs separately acknowledge is not pled in their operative complaint. (Pls.' Mem. at 43–47.) After all, there are no Plaintiffs who are positioned to pursue a DCBRCA claim based on political-affiliation bias or sex-based bias who have not already shown liability based on national-origin-based bias.

On this same basis, there is no reason for the Court to consider whether to allow Plaintiffs to amend their complaint at this juncture to add a sex-based DCBRCA claim. Plus, even if the

---

[17] The Court pauses to explain why Plaintiffs' DCBRCA claim fits within the FSIA's "tortious acts" exception. Recall that the statute applies to any case "in which money damages are sought against a foreign state for personal injury or death … occurring in the United States and caused by the tortious act or omission … of any official or employee of that foreign state while acting within the scope of his office or employment[.]" 28 U.S.C. § 1605(a)(5). Plaintiffs' claims here are grounded on tortious acts—claims of assault and battery—that happen to play double duty as "designated acts" for purposes of the DCBRCA, which in turn authorizes statutory damages for those acts if Plaintiffs can prove the requisite prejudice-focused intent. This is not to say that every statutory damages claim would fall within the ambit of the FSIA's "tortious acts" exception, but, at least on the specific facts here, Plaintiffs' claims fit the bill.

Court believed it appropriate to consider such an amendment, the Court is skeptical that Plaintiffs could properly pursue that amended claim against Turkey without re-serving the newly amended complaint.[18] Plaintiffs are generally correct (*see* Pls.' Mem. at 46) that courts typically require service of a new complaint on a defaulted foreign sovereign only where the changes are "substantial." *Shoham v. Islamic Republic of Iran*, 922 F. Supp. 2d 44, 47 (D.D.C. 2013). But the exemplar cases they cite are meaningfully distinct from the circumstances here because Plaintiffs are not merely asking to make technical revisions or supplement with additional factual allegations in support of existing legal claims. *See id.* (distinguishing the same cases Plaintiffs cite on this basis). Plaintiffs seek to plead an additional bias-related crime claim against Turkey based on a proffered bias that was never pled. This strikes the Court as at least arguably "substantial." And the analysis is further complicated by the fact that Plaintiffs are suing not only Turkey—which has defaulted—but also several private, individual defendants—all of whom are actively defending against Plaintiffs' claims. The individual defendants would presumably invoke their own arguments against allowing Plaintiffs' proposed amendment at this stage of the case, and so the Court declines to unnecessarily wade into that issue in resolving this motion.

For at least these reasons, the Court does not reach the alternative DCBRCA claims.

## CONCLUSION AND RECOMMENDATION

For the reasons explained, the undersigned **RECOMMENDS** that the Court **GRANT** Plaintiffs' motion for default judgment (ECF No. 241). Specifically, the Court should conclude that it properly exercises jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1605(a)(5) and grant judgment on liability as to Plaintiffs' claims for: (1) civil assault by all Plaintiffs; (2) civil battery

---

[18] Notably, Plaintiffs say they will withdraw their "sex- and gender-based bias theory" if the Court finds they need to amend and re-serve the complaint on Turkey in order to pursue it. (Pls.' Mem. at 47 n.6.)

by all Plaintiffs *except* C.A. and Kurd; (3) false imprisonment by Borazan; (4) IIED by all Plaintiffs *except* Arthur, Jane Doe I, and Özgen; and (5) violation of the DCBRCA—on the basis of actual or perceived Kurdish national origin—by all Plaintiffs.

As a final point, the Court stresses that its ruling today focuses strictly on Plaintiffs' claims against Turkey and not the private, individual defendants who are actively defending against Plaintiffs' claims. As Judge Kollar-Kotelly previously explained in connection with referring Plaintiffs' motion for default judgment against Turkey to the undersigned, "Turkey's liability is not conclusive of the Individual Defendants' liability." (ECF No. 327, Mem. Op. & Order at 5.) The Court today does not announce anything inconsistent with that proposition.

Dated: September 15, 2025

_____
MATTHEW J. SHARBAUGH
United States Magistrate Judge

\*     \*     \*

The Court hereby advises that, pursuant to 28 U.S.C. § 636(b)(1)(C) and LCvR 72.3(b), any party who objects to a report and recommendation must file a written objection within fourteen (14) days of the party's receipt of the report and recommendation. The written objections must specifically identify the portion of the report or recommendation to which objection is made and the basis for such objections. Failure to file timely objections to the findings and recommendations set forth in this report may waive that party's right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).